### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **HALCÓN RESOURCES** | § | |
| **CORPORATION**, *et al.*, | § | **Case No. 19-_____ (\_\_\_)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | |
| | § | |

### DISCLOSURE STATEMENT FOR JOINT PREPACKAGED CHAPTER 11 PLAN OF HALCÓN RESOURCES CORPORATION AND ITS AFFILIATED DEBTORS

| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP** | **WEIL, GOTSHAL & MANGES LLP** |
| Alfredo R. Pérez (15776275) | Gary T. Holtzer |
| 700 Louisiana Street, Suite 1700 | Lauren Tauro |
| Houston, Texas 77002 | 767 Fifth Avenue |
| Telephone: (713) 546-5000 | New York, New York 10153 |
| Facsimile:  (713) 224-9511 | Telephone: (212) 310-8000 |
| | Facsimile: (212) 310-8007 |

*Proposed Counsel for Debtors*
*and Debtors in Possession*

Dated:   August 2, 2019
Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Halcón Resources Corporation (0684), Halcón Resources Operating, Inc. (4856), Halcón Holdings, Inc. (5102), Halcón Energy Properties, Inc. (5292), Halcón Permian, LLC (6153), Halcón Field Services, LLC (0280), and Halcón Operating Co., Inc. (3588).  The Debtors' mailing address is 1000 Louisiana St., Suite 1500, Houston, TX 77002.

**THIS SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE PREPACKAGED PLAN *BEFORE* THE FILING OF VOLUNTARY PETITIONS UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>").  BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  AFTER THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND CONFIRMING THE PREPACKAGED PLAN.**

**DISCLOSURE STATEMENT, DATED AUGUST 2, 2019**

**Solicitation of Votes
on the Plan of Reorganization of**

**HALCÓN RESOURCES CORP., *ET AL*.**

**from the holders of outstanding**

**SENIOR NOTES CLAIMS
EXISTING EQUITY INTERESTS**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PREPACKAGED PLAN IS 5:00 P.M. (PREVAILING CENTRAL TIME) ON SEPTEMBER 5, 2019 UNLESS EXTENDED BY THE DEBTORS IN WRITING.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF (I) CLAIMS MAY VOTE ON THE PREPACKAGED PLAN IS JULY 30, 2019 (THE "<u>NOTEHOLDER VOTING RECORD DATE</u>") AND (II) INTERESTS MAY VOTE ON THE PREPACKAGED PLAN IS AUGUST 6, 2019 (THE "<u>EQUITY INTEREST VOTING RECORD DATE</u>" AND, TOGETHER WITH THE NOTEHOLDER VOTING RECORD DATE, THE "<u>RECORD DATES</u>").**

---

**RECOMMENDATION BY THE DEBTORS**

The board of directors of Halcón Resources Corporation and the board of directors or members, as applicable, of each of its affiliated Debtors (as of the date hereof) have unanimously approved the transactions contemplated by the Solicitation and the Prepackaged Plan (each as defined below) and recommend that all creditors and equity holders whose votes are being solicited submit ballots to accept the Prepackaged Plan.

Subject to the terms and conditions of the Restructuring Support Agreement (as defined herein), holders of approximately 67% of the Senior Notes (as defined below) have agreed to vote in favor of, or otherwise support, the Prepackaged Plan.

---

**PARTIES SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PREPACKAGED PLAN.**

**THE ISSUANCE AND DISTRIBUTION OF THE NEW COMMON SHARES (OTHER THAN THE BACKSTOP SHARES (AS DEFINED BELOW)), THE WARRANTS (AND THE NEW COMMON SHARES ISSUABLE UPON EXERCISE THEREOF), AND THE SUBSCRIPTION RIGHTS TO HOLDERS OF ALLOWED SENIOR NOTES CLAIMS AND ALLOWED EXISTING EQUITY INTERESTS, AS APPLICABLE, UNDER ARTICLE IV OF THE PREPACKAGED PLAN SHALL BE EXEMPT, PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE, WITHOUT FURTHER ACT OR ACTIONS BY ANY ENTITY, FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT"), AND ANY OTHER APPLICABLE SECURITIES LAWS TO THE FULLEST EXTENT PERMITTED BY SECTION 1145 OF THE BANKRUPTCY CODE.  SUCH SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE.  IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.**

**THE ISSUANCE AND SALE, AS APPLICABLE, OF THE NEW COMMON SHARES PURSUANT TO THE BACKSTOP COMMITMENT AGREEMENT, INCLUDING THOSE ISSUED IN RESPECT OF THE BACKSTOP COMMITMENT PREMIUM (SUCH SECURITIES, COLLECTIVELY, THE "BACKSTOP SHARES"), ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER. SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND**

MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

PRIOR TO THE PETITION DATE, THE SOLICITATION OF VOTES ON THE PREPACKAGED PLAN (THE "SOLICITATION") WITH RESPECT TO THE SENIOR NOTES CLAIMS IS BEING MADE PURSUANT TO SECTION 4(A)(2) AND REGULATION D OF THE SECURITIES ACT AND ONLY FROM HOLDERS OF SENIOR NOTES WHO ARE ELIGIBLE HOLDERS (I.E., ACCREDITED INVESTORS AS DEFINED IN RULE 501 OF THE SECURITIES ACT); PROVIDED, HOWEVER, THAT ALL HOLDERS OF ALLOWED SENIOR NOTES CLAIMS WILL BE ENTITLED TO RECEIVE DISTRIBUTIONS UNDER THE PREPACKAGED PLAN, AS PROVIDED IN THE PREPACKAGED PLAN.[2]

THE SECURITIES ISSUED PURSUANT TO THE PREPACKAGED PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PREPACKAGED PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. ALL STATEMENTS, OTHER THAN STATEMENTS OF HISTORICAL FACTS, CONCERNING, AMONG OTHER THINGS, PLANNED CAPITAL EXPENDITURES, POTENTIAL INCREASES IN OIL AND NATURAL GAS PRODUCTION, POTENTIAL COSTS TO BE INCURRED, FUTURE CASH FLOWS AND BORROWINGS, BUSINESS STRATEGY AND OTHER PLANS AND OBJECTIVES FOR FUTURE OPERATIONS, ARE FORWARD-LOOKING STATEMENTS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE

---

[2] Following the Petition Date, and subject to the interim approval by the Bankruptcy Court of this Disclosure Statement, the Solicitation is being made to all other holders of Senior Notes and all holders of Existing Equity Interests pursuant to section 1145 of the Bankruptcy Code.

STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL IN THE COMPANY'S FILINGS WITH THE SEC AND UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED," AS WELL AS THE ABILITY OF MANAGEMENT TO EXECUTE ITS PLANS TO MEET ITS GOALS AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS.  THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS WILL NOT BE IMPAIRED BY THE PREPACKAGED PLAN AND, AS A RESULT, THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PREPACKAGED PLAN. DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL TRADE CREDITORS, EMPLOYEES, AND INSURANCE PROVIDERS OF ALL UNDISPUTED AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS PROVIDED HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PREPACKAGED PLAN OR THIS DISCLOSURE STATEMENT.

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PREPACKAGED PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PREPACKAGED PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

---

**THE PREPACKAGED PLAN PROVIDES THAT (I) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PREPACKAGED PLAN, (II) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN IS SOLICITED BUT WHO DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PREPACKAGED PLAN, (III) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHO VOTE, OR ARE DEEMED, TO REJECT THE PREPACKAGED PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN, (IV) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHO WERE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN BUT DID NOT OPT OUT, (V) ALL OTHER HOLDERS OF CLAIMS OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY LAW, AND (VI) THE RELEASED PARTIES (AS DEFINED IN THE PREPACKAGED PLAN), ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................4

    A.   Background and Overview of Prepackaged Plan ........................................4

    B.   Summary of Plan Classification and Treatment of Claims ........................6

    C.   Inquiries ...................................................................................................11

II.   THE DEBTORS' BUSINESS ..............................................................................12

    A.   The Debtors' Operations ..........................................................................12

    B.   Regulation of Debtors' Business ..............................................................13

III.  CORPORATE AND CAPITAL STRUCTURE ....................................................13

    A.   Corporate Structure ..................................................................................13

    B.   Directors and Officers ..............................................................................14

    C.   Debtors' Capital Structure ........................................................................14

IV.   KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11
    CASES ................................................................................................................16

    A.   2016 Restructuring ...................................................................................16

    B.   Acquisitions and Divestitures in 2017 and 2018 .....................................17

    C.   Unforeseen Operational Issues at Monument Draw ................................18

    D.   Reduction in Borrowing Base ...................................................................19

    E.   Decline in Liquidity .................................................................................19

    F.   Debtors' Prepetition Restructuring Efforts ..............................................19

V.    ANTICIPATED EVENTS DURING CHAPTER 11 CASES .............................21

    A.   Commencement of Chapter 11 Cases and First Day Motions ................22

    B.   Confirmation Hearing, Solicitation Procedures, and Rights Offering
        Procedures ................................................................................................24

    C.   Backstop Commitment Agreement ...........................................................24

    D.   Exit Financing Motion ..............................................................................24

    E.   Other Procedural Motions and Retention of Professionals ......................25

    F.   Timetable for Chapter 11 Cases ...............................................................25

VI.   SUMMARY OF PLAN ........................................................................................25

    A.   General ......................................................................................................25

    B.   Administrative Expense Claims, Fee Claims, Priority Tax Claims, and DIP
        Claims ......................................................................................................26

C. Classification of Claims and Interests.................................................28

D. Treatment of Claims and Interests .....................................................30

E. Means for Implementation .................................................................33

F. Distributions ......................................................................................41

G. Procedures for Resolving Claims .......................................................46

H. Executory Contracts and Unexpired Leases.......................................48

I. Conditions Precedent to the Occurrence of the Effective Date ..........51

J. Effect of Confirmation .......................................................................52

K. Retention of Jurisdiction ...................................................................57

L. Miscellaneous Provisions ..................................................................59

VII. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
SECURITIES LAWS ......................................................................................63

A. Section 1145 of the Bankruptcy Code Exemption and Subsequent
Transfers............................................................................................64

B. Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers ........65

VIII. CERTAIN TAX CONSEQUENCES OF PLAN ..............................................66

A. Consequences to the Debtors.............................................................67

B. Consequences to U.S. Holders of Certain Claims .............................70

IX. CERTAIN RISK FACTORS TO BE CONSIDERED ......................................79

A. Certain Bankruptcy Law Considerations ...........................................79

B. Risks Related to Investment in the Exit RBL Facility .......................81

C. Additional Factors Affecting the Value of Reorganized Debtors .......83

D. Factors Relating to Securities to Be Issued Under Plan.....................85

E. Factors Relating to Equity Rights Offerings ......................................87

F. Additional Factors..............................................................................88

X. VOTING PROCEDURES AND REQUIREMENTS ........................................89

A. Voting Deadline.................................................................................89

B. Voting Procedures..............................................................................90

C. Parties Entitled to Vote .....................................................................90

D. Waivers of Defects, Irregularities, etc...............................................92

E. Further Information, Additional Copies..............................................92

XI. CONFIRMATION OF PLAN...........................................................................92

A. Confirmation Hearing ........................................................................92

B.      Objections to Confirmation ...................................................................93

C.      Requirements for Confirmation of Plan............................................94

XII.    VALUATION ANALYSIS ....................................................................98

XIII.   ALTERNATIVES TO CONFIRMATION  AND CONSUMMATION OF PLAN.......102

A.      Alternative Plan of Reorganization.................................................102

B.      Sale Under Section 363 of the Bankruptcy Code .............................103

C.      Liquidation under Chapter 7 of Bankruptcy Code............................103

XIV.    CONCLUSION AND RECOMMENDATION...........................................104

**EXHIBITS**

| **EXHIBIT A** | Plan |
| **EXHIBIT B** | Restructuring Support Agreement |
| **EXHIBIT C** | Noteholder Rights Offering Procedures |
| **EXHIBIT D** | Existing Equity Interests Rights Offering Procedures |
| **EXHIBIT E** | Exit Commitment Letter |
| **EXHIBIT F** | Liquidation Analysis |
| **EXHIBIT G** | Financial Projections |

# I.
# INTRODUCTION

## A.    Background and Overview of Prepackaged Plan

Halcón Resources Corporation ("**Halcón Parent**") and its debtor affiliates (collectively, the "**Debtors**," "**Halcón**," or the "**Company**") submit this disclosure statement (as may be amended, the "**Disclosure Statement**") in connection with the Solicitation on the *Joint Prepackaged Chapter 11 Plan of Halcón Resources Corporation and Its Affiliated Debtors*, dated August 2, 2019 (the "**Prepackaged Plan**"),[1] attached hereto as **Exhibit A**.  The Debtors under the Prepackaged Plan include Halcón Parent and its affiliates that are guarantors under the Senior Notes Indenture and RBL Agreement (each as defined herein).  The Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on or about August 6, 2019, which is during the Solicitation period.  During the Chapter 11 Cases, the Debtors intend to operate their businesses in the ordinary course and will seek authorization from the Bankruptcy Court to make payment in full on a timely basis to trade creditors, employees, and insurance providers of undisputed amounts due prior to and during the Chapter 11 Cases.

The Debtors are commencing this Solicitation to implement a comprehensive financial restructuring to deleverage the Company's balance sheet to ensure the long-term viability of the Company's enterprise.  As a result of extensive negotiations, on August 2, 2019, the Debtors executed a restructuring support agreement (the "**Restructuring Support Agreement**"), attached hereto as **Exhibit B**, with certain beneficial holders (the "**Senior Noteholders**") that hold approximately 67% of the 6.75% senior notes due 2025 (the "**Senior Notes**") issued under that certain indenture, dated as of February 16, 2017 (as amended, modified, or otherwise supplemented from time to time, the "**Senior Notes Indenture**"), by and among Halcón Parent, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as indenture trustee, together with their respective successors and permitted assigns and any subsequent Senior Noteholder that becomes party to the Restructuring Support Agreement in accordance with the terms thereof (collectively, the "**Consenting Creditors**").

Under the terms of the Restructuring Support Agreement, the Consenting Creditors have agreed, subject to the terms and conditions of the Restructuring Support Agreement, to support a consensual restructuring of the Debtors' existing debt obligations in chapter 11 through the Prepackaged Plan (the "**Restructuring**").  The Restructuring will leave the Debtors' businesses intact and will substantially deleverage the Debtors' capital structure.  As described more fully herein, the Debtors' balance sheet liabilities will be reduced from approximately $869.5 million in funded debt to approximately $115 million in funded debt, which represents an approximate 87% reduction of debt on the Effective Date relative to the Petition Date.  This deleveraging will enhance the Debtors' long-term growth prospects and competitive position and will provide the Debtors with excess capital to invest in and grow their business.  The Restructuring will, therefore,

---

[1] Capitalized terms used in this Disclosure Statement, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Prepackaged Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Prepackaged Plan, the Prepackaged Plan will govern.

allow the Debtors to emerge from the Chapter 11 Cases as a stronger company, better positioned to withstand the challenges and volatility of the energy industry and succeed as a leading producer of oil, natural gas, and natural gas liquids in the Delaware Basin in West Texas.  The Consenting Creditors have played a critically important role in formulating the Restructuring and actively participated in the development and negotiation of the Prepackaged Plan.

Under the Prepackaged Plan, in exchange for the reduction and modification of the Debtors' funded debt, each holder of an Allowed Senior Notes Claim will receive its Pro Rata share of 91% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the MIP Equity, the Warrant Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium.

Under the Prepackaged Plan, in exchange for the cancellation of Existing Equity Interests, each holder of an Existing Equity Interest will receive either:

1. if a Registered Holder holds fewer than or equal to 2,000 shares of Existing Equity Interests, cash in amount equal to the inherent value of such holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium, (ii) the Warrants, and (iii) the Existing Equity Interests Subscription Rights; or

2. such holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium, (ii) the Warrants, and (iii) the Existing Equity Interests Subscription Rights.

Additionally, each holder of a Senior Notes Claim will be offered the right to purchase its Pro Rata share of New Common Shares for an aggregate purchase price of $150,150,000 (the "**Senior Noteholder Rights Offering**") in accordance with the rights offering procedures substantially in the form attached hereto as **Exhibit C** (the "**Noteholder Rights Offering Procedures**") and each holder of Existing Equity Interests will be offered the right to purchase its Pro Rata share of New Common Shares for an aggregate purchase of up to $14,850,000 (the "**Existing Equity Interests Rights Offering**," and together with the Senior Noteholder Rights Offering, the "**Equity Rights Offerings**") in accordance with the rights offering procedures substantially in the form attached hereto as **Exhibit D** (the "**Existing Equity Interests Rights Offering Procedures**").  In each case, the New Common Shares will be offered at a price per share equal to a 26% discount to plan value based on the lower of (A) the Enterprise Value (as defined herein) or (B) an assumed total enterprise value of $425 million (the "**Rights Offering Per Share Price**").  Certain of the Consenting Creditors have agreed to backstop the Senior Noteholder Rights Offering in exchange for a premium (the "**Backstop Commitment Premium**") in the form of New Common Shares equal to 6% of the aggregate amount of the Senior Noteholder Rights Offering at the Rights Offering Per Share Price, subject to dilution by the MIP Equity and Warrant Equity; *provided, however,* that under certain circumstances resulting in termination of the Backstop Commitment

Agreement, the Backstop Parties may be eligible to be paid the Backstop Commitment Premium in Cash, as more fully described therein.

RBL Claims will either be paid in full, in cash, or refinanced on the Effective Date of the Prepackaged Plan and holders of General Unsecured Claims will receive payment of their Claims in full in the ordinary course of business.

In addition to supporting the Prepackaged Plan, certain Consenting Creditors (the "**DIP Lenders**") have agreed to provide the Debtors with postpetition financing pursuant to a junior secured term loan financing facility in an aggregate principal amount of $35 million (the "**DIP Facility**").  The DIP Facility will be used to support the Debtors' working capital needs during the Chapter 11 Cases.  Claims arising under the DIP Facility will be paid in full, in cash, on the Effective Date of the Prepackaged Plan.

On the Effective Date, the Debtors will obtain a new senior secured revolving credit facility in an aggregate principal amount of up to $750 million (the "**Exit RBL Facility**") pursuant to the terms set forth in that certain senior secured revolving credit facility commitment letter, dated August 2, 2019, a copy of which is attached hereto as **Exhibit E**.  The borrowing base for the Exit RBL Facility will be initially set at $275 million and will be re-determined semiannually on May 1 and November 1 of the applicable year.

The borrowing base for the Exit RBL Facility will be initially set at $275 million and will be re-determined semiannually on May 1 and November 1 of the applicable year.  The proceeds from the Equity Rights Offerings and the Exit RBL Facility will be used by the Company to (i) provide additional liquidity for working capital and general corporate purposes, (ii) pay all reasonable and documented Restructuring Expenses, and (iii) fund Plan distributions.

The effect of the Restructuring on the Debtors' capital structure is summarized as follows:

| Pre-Restructuring Capital Structure | | Post-Restructuring Capital Structure (Estimated) | |
|---|---|---|---|
| Prepetition Revolving Facility | $225,000,000 | Exit RBL | $115,000,000[2] |
| Senior Notes (including interest) | $644,500,000 | | |
| **Total Funded Debt** | **$869,500,000** | **Total Funded Debt** | **$115,000,000** |

### B.      Summary of Plan Classification and Treatment of Claims

Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Prepackaged Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Prepackaged Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Prepackaged Plan leaves unaltered the legal, equitable, and contractual

---

[2] Although $115 million is expected to be outstanding under the Exit RBL Agreement, on the Effective Date, the Reorganized Debtors will have access to an aggregate principal amount of $275 million under the Exit RBL Agreement, subject to certain standard conditions.

rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Prepackaged Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims and Interests in the following Classes are being solicited under, and are entitled to vote on, the Prepackaged Plan:

- Class 4 – Senior Notes Claims; and

- Class 7 – Existing Equity Interests.

The following table summarizes: (1) the treatment of Claims and Interests under the Prepackaged Plan; (2) which Classes are impaired by the Prepackaged Plan; (3) which Classes are entitled to vote on the Prepackaged Plan; and (4) the estimated recoveries for holders of Claims and Interests.[3] The table is qualified in its entirety by reference to the full text of the Prepackaged Plan.  For a more detailed summary of the terms and provisions of the Prepackaged Plan, see section VI – Summary of the Prepackaged Plan below.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the valuation analysis in section XII – Estimated Enterprise Valuation of the Reorganized Debtors below.

---

[3] Any Claim or Interest in a Class that is considered vacant under Section 3.5 of the Prepackaged Plan will be deemed eliminated from the Prepackaged Plan for purposes of voting to accept or reject the Prepackaged Plan, and disregarded for purposes of determining whether the Prepackaged Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[4] |
|---|---|---|---|
| Class 1: Other Priority Claims | The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Prepackaged Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code. | Unimpaired<br><br>(**Not entitled to vote** – deemed to accept) | 100% |
| Class 2: Other Secured Claims | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Prepackaged Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | Unimpaired<br><br>(**Not entitled to vote** – deemed to accept) | 100% |
| Class 3: RBL Claims | The legal, equitable, and contractual rights of the holders of Allowed RBL Claims are unaltered by the Prepackaged Plan.  On the Effective Date, each holder of an Allowed RBL Claim shall receive payment in full, in Cash of all Allowed RBL Claims, including by a refinancing, and all outstanding letters of credit shall either be replaced, cash collateralized or otherwise secured to the satisfaction of the Issuing Bank (as defined in the RBL Agreement) in accordance with the terms of the RBL Agreement. | Unimpaired<br><br>(**Not entitled to vote** – deemed to accept) | 100% |

---

[4] The estimated percentage recoveries set out in this table assume an implied equity value of $335 million.  The estimated percentage recoveries do not take into account dilution from any New Common Shares issued pursuant to the Management Incentive Plan, which reserves up to 7.5 - 10% of the New Common Shares for participants under a post-restructuring equity-based management incentive plan to be adopted on the Effective Date.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[4] |
|---|---|---|---|
| Class 4: Senior Note Claims | On the Effective Date, each holder of an Allowed Senior Notes Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of (i) 91% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium, and (ii) the Senior Noteholder Subscription Rights. | Impaired (**Entitled to vote**) | Estimated Percentage Recovery: 22.1%[5] |
| Class 5: General Unsecured Claims | The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Prepackaged Plan. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced. | Unimpaired (**Not entitled to vote** – deemed to accept) | 100% |
| Class 6: Intercompany Claims | On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their discretion and in consultation with the Consenting Creditors. | Unimpaired (**Not entitled to vote** – deemed to accept) | 100% |

---

[5] The estimated percentage recovery for Class 4 assumes that the Existing Equity Interests Subscription Rights are fully subscribed.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[4] |
|---|---|---|---|
| Class 7: Existing Equity Interests | On the Effective Date, Existing Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect. Each holder of Existing Equity Interests shall receive on account of such holder's Existing Equity Interests: (1) if a Registered Holder holds fewer than or equal to 2,000 shares of Existing Equity Interests, Cash in an amount equal to the inherent value of such Registered Holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium, (ii) the Warrants and (iii) the Existing Equity Interests Subscription Rights; or (2) for any other holder of Existing Equity Interests, such holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium; provided, however, that the amount of total New Common Shares available to be issued pursuant to this provision shall be reduced by the amount of New Common Shares that would have been distributed to holders of Existing Equity Interests in the absence of the immediately preceding clause (1), (ii) the Warrants, and (iii) the Existing Equity Interests Subscription Rights. | Impaired<br><br>(**Entitled to vote**) | N/A |
| Class 8: Other Equity Interests | On the Effective Date, Other Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect. | Impaired<br><br>(**Not entitled to vote** – deemed to reject) | N/A |
| Class 9: Intercompany Interests | Intercompany Interests are Unimpaired. On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.13 of the Prepackaged Plan. | Unimpaired<br><br>(**Not entitled to vote** – deemed to accept) | 100% |

The table below sets forth the percentage ownership figures of New Common Shares upon occurrence of different events:

| | Pre-Rights Offerings, MIP, Warrants, and Backstop Commitment Premium | Post-Rights Offerings and Pre-exercise of MIP and Warrants | Post-Rights Offerings and Warrants Exercise and Pre-MIP | Post-Rights Offering, MIP and Warrants Exercise |
|---|---|---|---|---|
| Holders of Senior Notes | 91% | 21.98% | 15.38% | 13.85% |
| Equity Rights Offerings[6] | 0% | 71.93% | 50.35% | 45.31% |
| Backstop Commitment Premium | 0% | 3.92% | 2.75% | 2.47% |
| Existing Equity | 9% | 2.17% | 1.52% | 1.37% |
| Warrant Equity | 0% | 0.00% | 30.00% | 27.00% |
| Management Incentive Plan ("**MIP**")[7] | 0% | 0% | 0% | 10.00% |
| | 100.00% | 100.00% | 100.00% | 100.00% |

### C.    Inquiries

If you have any questions regarding the packet of materials you have received, please reach out to Kurtzman Carson Consultants LLC, the Debtors' voting agent (the "**Voting Agent**") at (866) 967-1781 (US & Canada toll-free) or (310) 751-2681 (international) or by sending an electronic mail message to:

**HalconQuestions@kccllc.com**

Copies of this Disclosure Statement, which includes the Prepackaged Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, http://www.kccllc.net/halcon.    PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

**WHERE TO FIND ADDITIONAL INFORMATION**: The Company currently files quarterly and annual reports with, and furnishes other information to, the SEC.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.   Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement.  Reports filed with the SEC on or after the date of this Disclosure Statement are also incorporated by reference herein.

---

[6] Ownership percentages assume $165 million in Rights Offerings Proceeds.

[7] Assumes the full MIP of 10% of equity is granted by the New Board.

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on March 12, 2019; and

- Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2019, filed with the SEC on May 9, 2019.

## II.
## THE DEBTORS' BUSINESS

### A.    The Debtors' Operations

The Company is an independent energy company focused on the acquisition, production, exploration, and development of onshore liquids-rich oil and natural gas assets.  Up until a few years ago, the Company's oil and natural gas assets consisted of producing properties and undeveloped acreage positions in unconventional liquids-rich basins and fields primarily located in the Bakken and Three Forks formations in North Dakota and the Eagle Ford formation in East Texas.  The Debtors also owned oil and gas properties in Ohio and Pennsylvania, as well as varying working interests located in the Austin Chalk Trend in East Texas.

On July 27, 2016, the Company commenced voluntary cases pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  In its previous cases, the bankruptcy court confirmed the Company's prepackaged chapter 11 plan, which effectuated a largely consensual restructuring of the Company's balance sheet and provided for the reduction of approximately $1.8 billion of secured debt (the "**2016 Restructuring**").  Since the 2016 Restructuring, however, the Company transitioned into a pure-play, single-basin operator in the Delaware Basin in West Texas.  Specifically, in 2017 and 2018, the Company divested its assets located in the Williston Basin in North Dakota (the "**Williston Divestiture**") and in the El Halcón area of East Texas (the "**El Halcón Divestiture**") and acquired several properties located in the Delaware Basin in (i) Pecos and Reeves Counties, Texas (the "**Hackberry Draw**"), (ii) Ward and Winkler Counties, Texas (the "**Monument Draw**"), and (iii) Ward County, Texas (the "**West Quito Draw**").  As a result, the Debtors' properties and drilling activities are exclusively focused in the Delaware Basin, where they have an extensive drilling inventory.

The Debtors' production is currently averaging approximately 18,284 barrels of oil equivalents per day (boe/d), consisting of roughly 59% oil, 20% natural gas liquids, and 21% gas, with such production allocated among the Debtors' assets as follows:

- Monument Draw:  7,195 boe/d  (70% oil)

- West Quito Draw:  4,959 boe/d  (35% oil)

- Hackberry Draw:  5,793 boe/d   (66% oil)

As of December 31, 2018, using SEC pricing, the Debtors estimated total proved oil and natural gas reserves were approximately 85.2 MMBoe, consisting of 50.7 MMBbls of oil, 17.1 MMBbls of natural gas liquids, and 104.7 Bcf of natural gas.  Approximately 47% of the Debtors' estimated

proved reserves were classified as proved developed as of December 31, 2018.  The Debtors maintain operational control of approximately 99% of their estimated proved reserves.

For the fiscal year ended December 31, 2018, the Debtors' total operating revenues were approximately $226.6 million, representing a 40% decrease in operating revenues year over year, which decline was driven primarily by (i) the Williston and El Halcón Divestitures in 2017 (which was partially mitigated by the production associated with the Debtors' assets located in the Delaware Basin and drilling activities since acquiring the assets) and (ii) the decline and sustained low prices of crude oil and natural gas in 2018.

### B.    Regulation of Debtors' Business

The Company's operations are conducted in the United States and are subject to the local, state, federal and, in some instances, tribal laws, regulations, and treaties in the jurisdictions in which they operate.  The laws, regulations, and treaties that impact the Company's operations include those relating to the operation of drilling units, environmental protection, and health and safety, and restrictions on oil and natural gas exploration and development.

## III.
## CORPORATE AND CAPITAL STRUCTURE

### A.    Corporate Structure

The Company consists of entities organized in Delaware and Texas.  Halcón Parent is the parent company that owns, either directly or indirectly, each of its subsidiaries.  Below is a chart illustrating the Debtors' organizational structure as of the Petition Date.



13

### B.        Directors and Officers

The Company is controlled by the board of directors of Halcón Parent (the "**Board**"), although each separate Debtor is either a member-managed limited liability company or a corporation with a two-person board of directors.    Halcón Parent's Board consists of eight members:

| Name | Position |
|---|---|
| James W. Christmas | Chairman of the Board |
| William J. Campbell | Director |
| Michael L. Clark | Director |
| Janine J. McArdle | Director |
| Darryl L. Schall | Director |
| Ronald D. Scott | Director |
| Nathan W. Walton | Director |
| Carin M. Barth | Director |

The Debtors' senior management team consists of the following individuals:

| Name | Position |
|---|---|
| Richard H. Little | Chief Executive Officer |
| Jon Wright | Executive Vice President and Chief Operating Officer |
| Quentin Hicks | Executive Vice President, Chief Financial Officer and Treasurer |
| David S. Elkouri | Executive Vice President and Chief Legal Officer |
| Leah Kasparek | Senior Vice President and Human Resources Administration |

The Debtors currently lease corporate office space in Houston, Texas and Denver, Colorado.

### C.        Debtors' Capital Structure

#### i.        Equity Ownership

Halcón Parent is a public company and files annual reports with, and furnishes other information to, the SEC.  Until recently, the common stock of Halcón Parent was traded on the New York Stock Exchange (the "**NYSE**") under the symbol "HK."  However, on July 22, 2019, the Company was notified that due to "abnormally low" trading price levels, the NYSE commenced delisting proceedings to delist Halcón Parent's common stock and warrants exercisable for common stock. Trading in the Company's securities was suspended on July 22, 2019 and, beginning on July 23, 2019, the common stock and warrants of the Company began trading on the OTC Pink marketplace under the symbols "HKRS" and "HKRSW," respectively.  The NYSE will apply to the SEC to delist the common stock upon completion of all applicable procedures.

As of May 6, 2019, 1 billion shares of the Debtors' $0.0001 par value common stock had been authorized with 164,256,015 shares of common stock issued and outstanding.

### ii.     Prepetition Indebtedness

The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.  As of the date hereof, the Debtors have outstanding funded debt obligations in the aggregate amount of approximately $869.5 million, which amount consists of (i) approximately $225 million in secured borrowings under the Debtors' RBL Agreement and (ii) approximately $644.5 million in principal and accrued interest under the Senior Notes (each as defined below).

*Prepetition Senior Revolving Facility*.  The Debtors are parties to that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 7, 2017 (as amended, modified, or otherwise supplemented from time to time, the "**RBL Agreement**"), by and among Halcón Parent, as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "**Prepetition RBL Agent**"), and the lenders holding loans issued thereunder party thereto from time to time (the "**RBL Lenders**").  All of the remaining Debtors are guarantors under the RBL Agreement.  Pursuant to the RBL Agreement, the RBL Lenders agreed to provide the Debtors with a $1 billion senior secured reserve-based revolving credit facility with a current borrowing base of $225 million.  The maturity date of the RBL Agreement is September 7, 2022.  The RBL Claims are secured by a first-priority lien on substantially all of the Company's property and the proceeds thereof in favor of the Prepetition RBL Agent and the RBL Lenders.

The borrowing base under the RBL Agreement is redetermined semi-annually, with the RBL Lenders and Halcón Parent each having the right to one interim unscheduled redetermination between any two consecutive semi-annual redeterminations.  The borrowing base takes into account the estimated value of the Debtors' oil and natural gas reserves, proved reserves, total indebtedness, and other relevant factors consistent with customary oil and natural gas lending criteria.

As set forth in further detail below, the Debtors utilize derivative contracts to economically hedge their exposure to price fluctuations and reduce the variability in the Debtors' cash flows associated with anticipated sales of future oil and natural gas production.  As of July 30, 2019, the aggregate mark-to-market value of all derivative assets and liabilities related to their Prepetition Hedging Agreements (as herein defined), calculated using standard industry valuation processes, was a net asset of approximately $6.5 million (subject to daily fluctuations).  The Debtors did not post collateral specific to any of their prepetition Hedge Agreements as they are secured under the RBL Agreement.

*Prepetition Senior Notes*.  On February 16, 2017, Halcón Parent issued $850 million aggregate principal amount of the Senior Notes pursuant to the Senior Notes Indenture.

The Senior Notes were issued at par and bear interest at a rate of 6.75% per annum, payable semi-annually on February 15 and August 15 of each year.  The Senior Notes will mature on February 15, 2025.  Proceeds from the placement of the Senior Notes were approximately $834.1 million after deducting initial purchasers' discounts and commissions and offering expenses.  Halcón Parent used a portion of the net proceeds from the placement to fund the repurchase and redemption of certain outstanding notes and for general corporate purposes.  The Senior Notes are

15

jointly and severally, fully and unconditionally guaranteed on a senior unsecured basis by each of the Debtors.

As a result of the consummation of the Williston Divestiture (which required the Company to repurchase a portion of the Senior Notes under the Senior Notes Indenture), on September 7, 2017, Halcón Parent commenced an offer to purchase, for cash, up to $425 million of the $850 million outstanding aggregate principal amount of its Senior Notes at 103% of principal plus accrued and unpaid interest. The offer to purchase expired on October 6, 2017, with notes representing in excess of $425 million in principal amount validly tendered. As a result, on October 10, 2017, Halcón Parent repurchased approximately $425 million principal amount of the Senior Notes on a Pro Rata basis at 103% of par plus accrued and unpaid interest of approximately $4.1 million (the "**Notes Repurchase**").

On February 15, 2018, Halcón Parent issued an additional $200 million aggregate principal amount of its Senior Notes at a price to the initial purchasers of 103% of par (the "**Additional Senior Notes**"). The net proceeds from the sale of the Additional Senior Notes were approximately $202.4 million after deducting initial purchasers' premiums, commissions, and estimated offering expenses. The proceeds were used to fund the cash consideration for the acquisition of the West Quito Draw Assets (defined below) and for general corporate purposes, including to fund the Debtors' 2018 drilling program. The Additional Senior Notes were issued under the Senior Notes Indenture and are treated as a single class with, and have the same terms as, the Senior Notes.

As of the date hereof, the aggregate principal amount outstanding under the Senior Notes is approximately $625,005,000 plus any applicable interest, fees, and other amounts.

### iii.     *Legal Proceedings*

One of the Debtors is currently named as a defendant in pending litigation involving a contract dispute. In this proceeding, a state court in Pennsylvania issued a judgment of approximately $9.1 million against the Debtors following a jury trial. The Debtors appealed that decision and posted $3 million in collateral to secure an appellate bond. The appeal is currently pending.

**IV.**
**KEY EVENTS LEADING TO**
**COMMENCEMENT OF THE CHAPTER 11 CASES**

### A.     2016 Restructuring

Primarily as a result of the sustained decline in oil prices, on July 27, 2016, Halcón Resources Corporation and twenty-one of its subsidiaries (collectively, "**Halcón I**"), predecessors to the Debtors, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On September 9, 2016, Halcón I emerged from its prepackaged bankruptcy chapter 11 cases substantially de-levered, with approximately $1 billion in debt.

16

**B.      Acquisitions and Divestitures in 2017 and 2018**

Following the 2016 Restructuring, the Debtors made a strategic decision to transform the Company into a pure-play, single basin company focused on the Delaware Basin in West Texas.  The Debtors executed this strategy over the course of approximately 18 months by (i) divesting all of their producing properties located in areas outside of the Delaware Basin, most significantly in the Williston Basin in North Dakota and the Eagle Ford formation in East Texas, and (ii) acquiring primarily undeveloped acreage in three areas located in the Delaware Basin: Hackberry Draw, Monument Draw, and West Quito Draw.

### i.      *Option Agreement to Acquire Monument Draw Assets (December 2016)*

On December 9, 2016, the Debtors entered into an option agreement to purchase up to 15,040 net acres in the Monument Draw area of the Delaware Basin, located in Ward and Winkler Counties, Texas (the "**Monument Draw Assets**").  The Monument Draw Assets are divided into two tracts: the southern tract (the "**Southern Tract**") and the northern tract (the "**Northern Tract**").  As discussed below, the Debtors subsequently exercised their options to purchase the Southern Tract in June 2017 and the Northern Tract in January 2018.

### ii.      *Hackberry Draw Acquisition (February 2017)*

On February 28, 2017, the Debtors acquired 20,901 net acres in the Southern Delaware Basin in Pecos and Reeves Counties, Texas (the "**Hackberry Draw Assets**") for a gross purchase price of approximately $705 million, which was funded by the issuance of approximately $400 million of new 8% automatically convertible preferred stock and borrowings under the RBL Agreement.

### iii.      *El Halcón Divestiture (March 2017)*

On March 19, 2017, the Debtors consummated the El Halcón Divestiture, pursuant to which the Debtors sold all of the Debtors' oil and natural gas properties and related assets located in the Eagle Ford formation of East Texas for a gross sales price of approximately $500 million.  The Debtors used the net proceeds from the sale to repay amounts outstanding under their RBL Agreement and for general corporate purposes.

### iv.      *Monument Draw Acquisition (June 2017)*

On June 15, 2017, the Debtors exercised their option to purchase the Southern Tract of the Monument Draw Assets for approximately $87.4 million, which was funded by a portion of the proceeds from the El Halcón Divestiture and cash generated from operations.

### v.      *Williston Divestiture (September 2017)*

On September 7, 2017, the Debtors consummated the Williston Divestiture, whereby the Debtors sold all of the Company's operated oil and natural gas leases, oil and natural gas wells, and related assets located in the Williston Basin in North Dakota, as well as 100% of the membership interests in two of Halcón Parent's former subsidiaries for a gross sales price of approximately $1.4 billion. The Debtors used a portion of the proceeds from the Williston Divestiture to (i) repay amounts outstanding under the RBL Agreement, (ii) repurchase a portion of the Senior Notes pursuant to

17

the Notes Repurchase, and (iii) redeem all $112.8 million of the Debtors' outstanding 12% senior secured second lien notes (as required under the applicable indenture). On November 9, 2017, the Debtors sold their non-operated properties and related assets located in the Williston Basin in North Dakota and Montana for approximately $105.2 million.

### vi.     *Acquisition of Northern Tract in Monument Draw (January 2018)*

On January 9, 2018, the Debtors exercised their option to purchase the Northern Tract of the Monument Draw Assets for approximately $108.2 million, which was funded by borrowings under the RBL Agreement.

### vii.     *Acquisition of West Quito Draw Assets (April 2018)*

On April 4, 2018, the Debtors purchased acreage and related assets in the Delaware Basin located in Ward County, Texas (the "**West Quito Draw Assets**") for a gross purchase price of $200 million. The Company funded the cash consideration for the acquisition of the West Quito Draw Assets with the net proceeds from the issuance of the Additional Senior Notes and the public placement of common stock for gross proceeds of approximately $63 million.

### C.     Unforeseen Operational Issues at Monument Draw

Certain operational challenges at Monument Draw impacted the Debtors' financial performance in 2018 and 2019, including elevated levels of hydrogen sulfide ("**H2S**") in the natural gas produced from the Monument Draw wells. In 2017 and the first half 2018, the Company drilled and put online six wells in Monument Draw, all of which performed very well with strong production rates. Although these wells produced some H2S as part of the gas stream, the amounts of H2S produced were manageable and this sour gas was sold to ETC Gas Company, Ltd. ("**ETC**") through a sour gas sales agreement Halcón had previously negotiated. In the third quarter of 2018, the Debtors put eight new wells online in Monument Draw, all of which had higher levels of H2S than the six previous wells. In addition, the ETC sour gas sales pipeline went out of service for repair in July of 2018. Accordingly, the Company had to treat all wells in Monument Draw at the well-head with expensive chemical treating to remove the H2S from its gas to sweeten the gas so that it could be sold on a sweet gas sales line. The higher than expected levels of H2S coupled with the loss of the ETC sour gas pipeline forced the Debtors to cease all drilling and completion activities at Monument Draw for the fourth quarter of 2018 and most of the first quarter of 2019, resulting in significant lost revenue.

The high H2S levels also required the Debtors to incur significant unexpected costs, including approximately $45 million in well-head level chemical treating costs from the third quarter of 2018 through the second quarter of 2019.

The Debtors took a pro-active approach to identifying and implementing a long-term solution to handle the H2S levels it is seeing in Monument Draw. Most notably, the Debtors incurred in excess of $40 million in capital costs over the last year to build out a high spec gas gathering system capable of handling the high levels of H2S in the gas streams from its wells and also built a new Company owned H2S gas treating plant (the "**Valkyrie System**"). The Valkyrie System was put in service in early April of 2019. The Valkyrie System is a much more effective method of treating the sour gas and sweetening it for sale on sweet gas sales lines compared to the previous

18

chemical treating methods the Debtors were using at the wellhead. After the Valkyrie System went into operation in early April 2019, the Debtors' gas treating costs at Monument Draw Assets have declined significantly.

The combination of lost revenue and significant unanticipated operating and capital expenses at Monument Draw resulted in increasing the Debtors' leverage profile for the first quarter of 2019 above the 5.0x covenant limit of under the RBL Agreement.

### D.   Reduction in Borrowing Base

As a result of covenant violations under its RBL Agreement, the Company received a temporary waiver of the covenant violation in May 2019 from a majority of the participating lenders in its RBL Agreement. This amendment reduced the Company's borrowing base from $275 million to $225 million. The waiver was subsequently extended to August 8, 2019.

### E.   Decline in Liquidity

As shown in the chart below, a decline in commodity prices, combined with the unanticipated operational issues and the resulting covenant violation under the RBL Agreement, lead to a dramatic reduction in the Company's liquidity.

| HK Historical Liquidity | | | | | | | | | | | | ($ in MM) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2016 | 3/31/2017 | 6/30/2017 | 9/30/2017 | 12/31/2017 | 3/31/2018 | 6/30/2018 | 9/30/2018 | 12/31/2018 | 3/31/2019 | 6/30/2019 | 7/31/2019 |
| Senior Revolver Borrowing Base | $600 | $600 | $650 | $140 | $100 | $100 | $200 | $200 | $275 | $275 | $225 | $225 |
| Less: Revolver Drawn | (186) | - | (153) | - | - | - | - | (55) | - | (105) | (188) | (223) |
| Borrowing Base Availability | 414 | 600 | 497 | 140 | 100 | 100 | 200 | 145 | 275 | 170 | 37 | 2 |
| Plus: Cash on Hand | - | 62 | - | 989 | 424 | 382 | 96 | - | 47 | - | 2 | 14 |
| Less: Letters of Credit O/S | (7) | (6) | (6) | (6) | (2) | (2) | (2) | (2) | (1) | (2) | (2) | (2) |
| Total Liquidity | $407 | $656 | $491 | $1,123 | $522 | $480 | $294 | $143 | $321 | $168 | $37 | $14 |

### F.   Debtors' Prepetition Restructuring Efforts

The Debtors took several steps to address their capital structure and liquidity needs without a comprehensive in-court restructuring before commencing solicitation, including (i) selling of the Debtors' water infrastructure assets and (ii) conducting a multi-track strategic and financial alternative process with the assistance of the Advisors, which included exploring a sale of some or all of the Company's assets, a new secured debt financing, and restructuring options.

### i.   Sale of the Water Assets

On December 20, 2018, the Debtors sold their water infrastructure assets located in the Delaware Basin (the "**Water Assets**") to WaterBridge Resources LLC ("**WaterBridge**") for approximately $200 million in cash. Additional incentive payments to the Debtors of up to $25 million per year for the next five years are available subject to the Debtors' ability to meet certain annual incentive thresholds relating to the number of wells connected to the Water Assets per year. Upon closing, the Debtors dedicated all of the produced water from their oil and natural gas wells within the Monument Draw, Hackberry Draw, and West Quito Draw operating areas to WaterBridge.

19

### ii.      Multi-Track Process to Sell Certain Assets, the Company, and/or Raise New Secured Debt Financing

On March 12, 2019, the Company publicly announced that it was exploring potential financial and strategic alternatives, and that these alternatives included the sale of certain assets or the entire Company ("**M&A Process**") and financing transactions.  The Company engaged Perella and its affiliate to manage the process.

Beginning in April 2019, Perella and TPH (as defined below), the Debtors' investment bankers, contacted over 50 potential purchasers to participate in the Debtors' strategic and financial review process.  Of those parties, the Debtors executed non-disclosure agreements ("**NDAs**") with over 15 potential purchasers and the Company's management team provided presentations to 10 potential purchasers.  Non-binding indications of interest were due on May 23, 2019.  The Debtors received five non-binding indications of interest during the M&A Process, including two non-binding M&A offers that did not include indications of value or exchange ratio, one verbal indication of interest in an M&A transaction without specific terms, and two non-binding offers for certain of the Company's assets.  After analyzing the bids and the financial condition of the bidders, the Debtors did not believe that moving forward with a sale was in the best interests of the Company.

The Debtors' efforts to obtain financing were also unsuccessful.  In connection with this process, Perella and TPH solicited interest from both existing stakeholders across the capital structure and third-party investors.   The Debtors executed NDAs with six parties, and the Company's management team provided presentations to four potential financing providers.  Non-binding indications of interest were due on May 23, 2019.  The Debtors received a total of three financing proposals.  The financing proposals received either did not provide the necessary liquidity needed or contained terms and restrictions that were not feasible for the Company.  After analyzing the proposals and the conditions therein, the Debtors did not believe that moving forward with any of the proposals would be in the best interest of the Company.

### iii.      Prepetition Negotiations with Creditors

Despite the efforts outlined above, it became clear that the Debtors' revenue and cash flow generating capacity would not be sufficient in the near term to (i) comply with the Debtors' financial covenants under the RBL Agreement and (ii) maintain the liquidity necessary to operate their businesses and preserve their long-term viability and enterprise value.  Accordingly, the Debtors began to explore potential transactions that would allow the Debtors to deleverage their capital structure and better position the Debtors for long-term success.

Since March of 2019, the Company and its Advisors have been actively engaged in discussions and negotiations regarding restructuring alternatives with an ad hoc group of holders of Senior Notes (the "**Ad Hoc Group**") represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal counsel, and Ducera Partners LLC, as financial advisor.

During that same time, the Debtors also engaged in negotiations with the RBL Lenders to amend certain financial covenants in the RBL Agreement.  On May 9, 2019, the Debtors and the RBL Lenders entered into that certain Eighth Amendment to the Revolving Credit Agreement

20

(the "**RBL Amendment**"), pursuant to which the RBL Lenders agreed to waive any default resulting from the Company's failure to comply with the leverage ratio financial covenant set forth in the RBL Agreement, subject to the terms and conditions set forth therein.  The waiver under the RBL Amendment terminates on August 8, 2019 and under the RBL Agreement on such date.

### *iv.*      *The Restructuring Support Agreement and Prepackaged Plan*

On August 2, 2019, after months of negotiations, the Debtors, with the aid of their Advisors and the approval of the Board, executed the Restructuring Support Agreement with the Consenting Creditors.

Through the Restructuring Support Agreement, the Company secured substantial support for the Prepackaged Plan from key stakeholders.  The Restructuring Support Agreement commits the Consenting Creditors to support the Prepackaged Plan and the broader restructuring transaction by, among other things:

- voting to accept the Prepackaged Plan;

- agreeing to provide the releases set forth in the Prepackaged Plan;

- supporting and taking all commercially reasonable steps to consummate the Prepackaged Plan; and

- refraining from taking any action that would delay or impede consummation of the Prepackaged Plan.

Together, the Restructuring Support Agreement and the Prepackaged Plan provide a pathway toward a comprehensive restructuring of Halcón's prepetition obligations, preserve the going-concern value of Halcón's business, maximize creditor recoveries, and provide for an equitable distribution to Halcón's stakeholders, all while minimizing disruption to day-to-day operations.

## V.
## ANTICIPATED EVENTS
## DURING CHAPTER 11 CASES

In accordance with the Restructuring Support Agreement, the Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on or about August 6, 2019.  The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits and become subject to the limitations of the Bankruptcy Code.

The Debtors intend to continue operating their businesses in the ordinary course during the pendency of the Chapter 11 Cases as they have been doing before the Petition Date.  To facilitate the efficient and expeditious implementation of the Prepackaged Plan through the Chapter 11 Cases, and to minimize disruptions to the Debtors' operations on the Petition Date, the Debtors intend to seek to have the Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly and to file various motions seeking important and urgent relief from the Bankruptcy Court.  Such relief, if granted, will assist in the administration of the Chapter 11 Cases;

however, there can be no assurance that the requested relief will be granted by the Bankruptcy Court.

### A.       Commencement of Chapter 11 Cases and First Day Motions

On the Petition Date, the Debtors intend to file multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course. Such relief is designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations. The following is a brief overview of the substantive relief the Debtors intend to seek on the Petition Date to maintain their operations in the ordinary course.

#### i.       *Debtor in Possession Financing*

To address their working capital needs and fund their reorganization efforts, on or immediately after the Petition Date, the Debtors intend to seek Bankruptcy Court approval of an agreement with the DIP Lenders to receive a $35 million debtor-in-possession junior secured term loan credit facility. The proposed order seeking approval of the DIP Facility also reflects an agreement between and among the Debtors and the RBL Lenders regarding the consensual use of Cash Collateral (as defined in the Bankruptcy Code) and the terms of adequate protection to be provided to such parties.

#### ii.       *Cash Management System*

The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the various Debtors. On the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue using their existing cash management system, bank accounts, and related business forms, as well as to continue their intercompany arrangements, to avoid disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases.

#### iii.       *Trade Creditors*

In the ordinary course of business, the Debtors rely upon a variety of vendors and service providers. Pursuant to the Prepackaged Plan, the Debtors intend to pay all of their obligations to such vendors and service providers in full. However, certain vendors or service providers may seek to terminate or alter the terms of their agreements with the Debtors if the Debtors fail to honor their obligations as they become due. To avoid the detrimental effects of potential actions taken by the Debtors' vendors and service providers, and to minimize any disruption to the Debtors' operations, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to satisfy their obligations to vendors and service providers in the ordinary course.

#### iv.       *Taxes*

Pursuant to the Prepackaged Plan, the Debtors intend to pay all taxes and fees in full. To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to pay

22

all taxes, fees, and similar charges and assessments, whether arising pre- or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course of the Debtors' businesses.

### v.      *Insurance*

In connection with the operation of the Debtors' businesses, the Debtors maintain various insurance policies designed to protect their property, assets, key personnel, and business operations.   The types of insurance policies maintained by the Debtors include workers' compensation programs, as well as liability and property insurance programs.

The maintenance of certain insurance coverage is essential to the Debtors' operations and is required by laws, various regulations, financing agreements, and contracts.  The Debtors believe that the satisfaction of their insurance obligations, whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with third parties and the uninterrupted operation of the Debtors' business.  Accordingly, on the Petition Date, the Debtors intend to file a motion seeking authority from the Bankruptcy Court to continue to honor their insurance obligations in the ordinary course.

### vi.      *Employee Wages and Benefits*

The Debtors' business is labor intensive and relies upon various employees and independent contractors.  Generally, members of the Debtors' workforce rely upon their compensation to meet their daily living expenses.  To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue to honor their obligations to their workforce in the ordinary course of business, including (i) the payment and maintenance of various employee compensation obligations, such as wages, salaries, taxes, certain withholdings, and other programs, (ii) the payment and maintenance of employee benefit programs, such as employee leave, healthcare, life insurance, and retirement benefits, and (iii)  the payment of pre- and postpetition contractor obligations to both agency and independent contractors.

### vii.      *Hedging Program*

In the ordinary course of business, the Debtors have historically entered into financial derivative contracts primarily to hedge the Debtors' exposure to commodity price risks to their cash flows. To that end, on the Petition Date, the Debtors intend to file a motion requesting that the Bankruptcy Court permit the Debtors to, among other things, continue performing under prepetition financial derivative contracts and enter into and perform under new postpetition financial derivative contracts.

### viii.      *Royalties and Joint Interest Billings*

The Debtors are parties to numerous joint operating agreements and other contracts governing operations on their oil and gas or leases.  In addition, the Debtors are obligated, pursuant to their oil and gas leases, to remit revenue to the lessors who own the mineral rights leased by the Debtors, which is attributable to their share of production from the producing wells located on their

respective leases, free of expenses of production. Further, certain assignments of the oil and gas leases created an interest in a share of the production from the producing wells located on the respective leases, free of expenses of production, that burden the Debtors' working interest in the leases. In order to preserve the status quo, avoid the incurrence of unnecessary statutory liens, and to eliminate the risk of pervasive litigation over the existence of statutory liens, lien priorities, and the amounts of claims of the various interest owners, the Debtors will request authority to (i) deliver, in the ordinary course of business, the funds owed to the holders of royalty interests and working interests as required by the leases and related agreements and (ii) continue to satisfy the obligations incurred in connection with the operation of their oil and gas leases, including their lease operating expenses, joint interest billing and other joint operating agreement obligations, in the ordinary course of business and without regard to whether such obligations related to pre- or postpetition periods.

### ix.　　　*Utilities*

In the ordinary course of business, the Debtors incur certain expenses related to the essential utility services such as telecommunications, information technology, waste disposal, water, gas, electric, and other utility services. On the Petition Date, the Debtors intend to seek approval of procedures to provide such utility providers with adequate assurance that the Debtors will continue to honor their obligations in the ordinary course.

### B.　　**Confirmation Hearing, Solicitation Procedures, and Rights Offering Procedures**

The Debtors intend to file a motion requesting, among other things, that the Bankruptcy Court (i) conditionally approve this Disclosure Statement, (ii) schedule a hearing (the "**Combined Hearing**") to consider the adequacy of this Disclosure Statement and confirmation of the Prepackaged Plan, (iii) approval of the solicitation procedures with respect to the Prepackaged Plan, and (iv) approval of the Rights Offering Procedures. The Debtors anticipate that notice of the Combined Hearing will be mailed to all known holders of Claims and Interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court. Notice of the Combined Hearing will also be published.

### C.　　**Backstop Commitment Agreement**

In connection with negotiation of the Prepackaged Plan, the Debtors have entered into the Backstop Commitment Agreement. In accordance with the Restructuring Support Agreement, on or immediately after the Petition Date, the Debtors intend to file a motion with the Bankruptcy Court seeking authorization to assume the Backstop Commitment Agreement.

### D.　　**Exit Financing Motion**

On or immediately after the Petition Date, the Debtors intend to file a motion with the Bankruptcy Court seeking, among other things, (a) authorization to assume certain exit financing agreements and (b) approval of payment of all obligations thereunder.

24

### E.     Other Procedural Motions and Retention of Professionals

The Debtors intend to file various motions that are common to chapter 11 cases of similar size and complexity as these Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

### F.     Timetable for Chapter 11 Cases

In accordance with the Restructuring Support Agreement, the Debtors have agreed to proceed with the implementation of the Prepackaged Plan through the Chapter 11 Cases.  Among the milestones contained in the Restructuring Support Agreement is the requirement that the Bankruptcy Court enter the order confirming the Prepackaged Plan by within 70 days of the Petition Date.  The Restructuring Support Agreement also requires that the Effective Date occur by within 85 days after the Bankruptcy Court enters an order confirming the Prepackaged Plan.  Although the Debtors will request that the Bankruptcy Court approve a timetable consistent with the Restructuring Support Agreement, there can be no assurance that the Effective Date will occur on such timetable.  Achieving the various milestones under the Restructuring Support Agreement is crucial to successfully reorganizing the Debtors.

## VI.
## SUMMARY OF PLAN

### A.     General

This section of this Disclosure Statement summarizes the Prepackaged Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Prepackaged Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (1) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (2) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.  Classes 4, 7, and 8 are impaired under the Prepackaged Plan, and holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Prepackaged Plan unless such Classes of Claims or Interests are deemed to reject the Plan.  Ballots are being furnished herewith to all holders of Claims in Classes 4 and 7 that are entitled to vote to facilitate their voting to accept or reject the Prepackaged Plan.  Class 8 is deemed to reject the Prepackaged Plan and, therefore, Interests in such Class will not vote on the Prepackaged Plan.

25

### B.     Administrative Expense Claims, Fee Claims, Priority Tax Claims, and DIP Claims.

### i.     *Treatment of Administrative Expense Claims*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim (other than Restructuring Expenses or a Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### ii.     *Treatment of Fee Claims*

(a)     All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which a Final Order relating to any such Allowed Fee Claim is entered or (ii) on such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Reorganized Debtors, as applicable.  The Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed

26

Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with section 2.1 of the Prepackaged Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way, other than customary liens in favor of the depository bank at which the Fee Escrow Account is maintained.

(c)     Any objections to Fee Claims shall be served and filed (i) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (ii) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### iii.     *Treatment of Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### iv.     *Treatment of DIP Claims*

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim (a) shall be paid in full in Cash by the Debtors equal to the Allowed amount of such DIP Claim and all commitments under the DIP Agreement shall terminate, or (b) shall be otherwise satisfied by the Debtors in a manner acceptable to the DIP Agent, any affected DIP Lender under the DIP Agreement, and any other holder of a DIP Claim, as applicable. Upon the indefeasible payment or satisfaction in full in Cash, or other satisfactory treatment, of the DIP Claims in accordance with the terms of the Prepackaged Plan, on the Effective Date, all Liens granted to secure such obligations shall be terminated and of no further force and effect.

### v.     *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such

Restructuring Expenses.  On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

### vi.        Statutory Fees

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

### C.        Classification of Claims and Interests

### i.        Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Prepackaged Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Prepackaged Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### ii.        Formation of Debtor Groups for Convenience Only

The Prepackaged Plan groups the Debtors together solely for the purpose of describing treatment under the Prepackaged Plan, confirmation of the Prepackaged Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Prepackaged Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Prepackaged Plan, all Debtors shall continue to exist as separate legal entities.

### iii.        Summary of Classification of Claims and Interests

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under the Prepackaged Plan, (ii) entitled to vote to accept or reject the Prepackaged Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Prepackaged Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

28

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | RBL Claims | Unimpaired | No (Deemed to accept) |
| Class 4 | Senior Notes Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 7 | Existing Equity Interests | Impaired | Yes |
| Class 8 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 9 | Intercompany Interests | Unimpaired | No (Deemed to accept) |

### iv.        Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Prepackaged Plan, nothing under the Prepackaged Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### v.        Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Prepackaged Plan for purposes of voting to accept or reject the Prepackaged Plan, and disregarded for purposes of determining whether the Prepackaged Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### vi.        Voting Classes; Presumed Acceptance by Non-Voting Classes

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Prepackaged Plan, the Prepackaged Plan shall be presumed accepted by the holders of such Claims in such Class.

### vii.        Voting; Presumptions; Solicitation

(a)    **Acceptance by Certain Impaired Classes.**  Only holders of Claims in Class 4 and Interests in Class 7 are entitled to vote to accept or reject the Prepackaged Plan.  An Impaired Class of Claims shall have accepted the Prepackaged Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Prepackaged Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Prepackaged Plan.  An Impaired Class of Interests shall have accepted the Prepackaged Plan if the holders of at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class have voted to accept

29

the Prepackaged Plan. Holders of Claims in Class 4 and Interests in Class 7 shall receive ballots containing detailed voting instructions.

(b)     **Deemed Acceptance by Unimpaired Classes**.   Holders of Claims and Interests in Classes 1, 2, 3, 5, 6, and 9 are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Prepackaged Plan.

(c)     **Deemed Rejection by Impaired Class**.  Holders of Interests in Class 8 are deemed to have rejected the Prepackaged Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Prepackaged Plan.

### viii.     *Cramdown*

If any Class is deemed to reject the Prepackaged Plan or is entitled to vote on the Prepackaged Plan and does not vote to accept the Prepackaged Plan, the Debtors may (i) seek confirmation of the Prepackaged Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Prepackaged Plan in accordance with the terms hereof and the Bankruptcy Code, including by (A) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or (B) withdrawing the Prepackaged Plan as to an individual Debtor at any time before the Confirmation Date.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### ix.     *No Waiver*

Nothing contained in the Prepackaged Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

D.     **Treatment of Claims and Interests**

### i.     *Class 1:  Other Priority Claims*

(a)     **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Prepackaged Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(b)     **Impairment and Voting**:  Allowed Other Priority Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

30

### ii.        Class 2:  Other Secured Claims

(a)        **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Prepackaged Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b)        **Impairment and Voting**:  Allowed Other Secured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### iii.        Class 3:  RBL Claims

(a)        **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed RBL Claims are unaltered by the Prepackaged Plan.  On the Effective Date, each holder of an Allowed RBL Claim shall receive payment in full, in Cash of all Allowed RBL Claims, including by a refinancing, and all outstanding letters of credit shall either be replaced, cash collateralized or otherwise secured to the satisfaction of the Issuing Bank (as defined in the RBL Agreement) in accordance with the terms of the RBL Agreement.

(b)        **Impairment and Voting**:  Allowed RBL Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed RBL Claims are conclusively presumed to accept the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan, and the votes of such holders shall not be solicited with respect to such Allowed RBL Claims.

(c)        **Allowance**:  The RBL Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount up to $225 million, plus all amounts owing by the Debtors under the Secured Swap Agreements (as defined in the RBL Agreement) that have terminated as of or prior to the Effective Date, plus all accrued and unpaid interest and fees (including interest and fees at the default rate that has accrued but not been paid during the Chapter 11 Cases), and all other amounts that are outstanding under the RBL Agreement as of the Effective Date.

### iv.        Class 4:  Senior Notes Claims

(a)        **Treatment**:  On the Effective Date, each holder of an Allowed Senior Notes Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of (i) 91% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and

31

the New Common Shares issued pursuant to the Backstop Commitment Premium, and (ii) the Senior Noteholder Subscription Rights.

(b)  **Impairment and Voting**:  Senior Notes Claims are Impaired.  Holders of Senior Note Claims are entitled to vote on the Prepackaged Plan.

(c)  **Allowance**:  The Senior Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $625,005,000.

### v.   *Class 5: General Unsecured Claims*

(a)  **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Prepackaged Plan.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(b)  **Impairment and Voting**:  Allowed General Unsecured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan, and the votes of such holders shall not be solicited with respect to such Allowed General Unsecured Claims.

### vi.   *Class 6: Intercompany Claims*

(a)  **Treatment**:  On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their discretion and in consultation with the Consenting Creditors.

(b)  **Impairment and Voting**:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### vii.   *Class 7: Existing Equity Interests*

(a)  **Treatment**:  On the Effective Date, Existing Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect.  Each holder of Existing Equity Interests shall receive on account of such holder's Existing Equity Interests:

> (1) if a Registered Holder holds fewer than or equal to 2,000 shares of Existing Equity Interests, Cash in an amount equal to the inherent value of such Registered Holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares

32

issued pursuant to the Backstop Commitment Premium, (ii) the Warrants and (iii) the Existing Equity Interests Subscription Rights; or

(2) for any other holder of Existing Equity Interests, such holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to the Prepackaged Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium; provided, however, that the amount of total New Common Shares available to be issued pursuant to this provision shall be reduced by the amount of New Common Shares that would have been distributed to holders of Existing Equity Interests in the absence of the immediately preceding clause (1), (ii) the Warrants, and (iii) the Existing Equity Interests Subscription Rights.

(b)      **Impairment and Voting**:  Existing Equity Interests are Impaired.  Holders of Existing Equity Interests are entitled to vote on the Prepackaged Plan.

### viii.      *Class 8: Other Equity Interests*

(a)      **Treatment**:   On the Effective Date, Other Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect.

(b)      **Impairment and Voting**:   Other Equity Interests are Impaired.   In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Equity Interests are conclusively presumed to reject the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan, and the votes of such holders shall not be solicited with respect to Other Equity Interests.

### ix.      *Class 9: Intercompany Interests*

(a)      **Treatment**:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.13 of the Prepackaged Plan.

(b)      **Impairment and Voting**:  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

### E.      <u>Means for Implementation</u>

### i.      *Sources of Consideration for Plan Distributions*

(a)      **Cash on Hand**.  The Reorganized Debtors shall use Cash on hand to fund distributions to certain holders of Claims against the Debtors.

(b)      **New Common Shares and Warrants**.   On or as soon as reasonably practicable after the Effective Date, Reorganized Halcón Parent shall issue and distribute the New

33

Common Shares and the Warrants to holders of Allowed Senior Notes Claims and Existing Equity Interests entitled to receive New Common Shares and Warrants pursuant to the Prepackaged Plan, or notwithstanding anything to the contrary in the Prepackaged Plan, such holder's designated affiliates to the extent permitted by DTC.

(c)     **Exit RBL Facility**.  On the Effective Date, the Reorganized Debtors shall enter into the Exit RBL Facility, the proceeds of which may be used to (i) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, (ii) pay all reasonable and documented Restructuring Expenses, and (iii) fund Plan Distributions.

(d)     **Plan Funding**.  Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Equity Rights Offerings and Exit RBL Facility.

### ii.        *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Prepackaged Plan, the provisions of the Prepackaged Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

### iii.       *Continued Corporate Existence; Effectuating Documents; Further Transactions*

(a)     Except as otherwise provided in the Prepackaged Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents.

(b)     On and after the Effective Date, all actions contemplated by the Prepackaged Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor and subject to the terms of each such contract or other agreement, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the Amended Organizational Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor, (ii) a Reorganized Debtor to be dissolved, (iii) the legal name of a Reorganized Debtor to be changed, or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are

deemed to require no further action or approval (other than any requisite filings required under applicable state, federal, or foreign law).

(c)     On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Prepackaged Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Prepackaged Plan and the Definitive Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Prepackaged Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, (iv) the Restructuring Transactions, (v) if the Debtors expect to qualify for and elect to utilize the special bankruptcy exception under section 382(l)(5) of the Tax Code, the Debtors may seek Bankruptcy Court approval of certain procedures and potential restrictions on the accumulation of Claims with respect to Persons who are or will be substantial claimholders and the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Shares, and (vi) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

### iv.     Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to a distribution under the Prepackaged Plan and except as otherwise set forth in the Prepackaged Plan, or in any Plan Document, including with respect to refinancing the RBL Agreement, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, Securities and other documents evidencing any Claim or Interest (other than Intercompany Interests that are not modified by the Prepackaged Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Disbursing Agent.  The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Prepackaged Plan.

### v.     Cancellation of Certain Existing Security Interests

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### vi.      *Officers and Boards of Directors*

(a)      On the Effective Date, the New Board shall consist of (i) the Reorganized Debtors' chief executive officer and (ii) the members selected by the Requisite Creditors to be disclosed in the Plan Supplement to the extent known and determined.  The identity and affiliations of any person proposed to serve on the New Board shall be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)      Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective Amended Organizational Documents.

(c)      Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations or duties to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable Amended Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### vii.      *Management Incentive Plan*

After the Effective Date, the New Board shall adopt the Management Incentive Plan.  The participants and amounts allocated under the Management Incentive Plan and other terms and conditions thereof shall be determined in the sole discretion of the New Board; provided, however, that the Management Incentive Plan shall include restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares representing 7.5% to 10% of the New Common Shares authorized to be issued pursuant to the Prepackaged Plan and the Equity Rights Offerings on a fully diluted basis.

### viii.      *Authorization and Issuance of New Common Shares and Warrants*

(a)      On the Effective Date, (i) Reorganized Halcón Parent is authorized to issue or cause to be issued and shall issue (A) the New Common Shares (including the New Common Shares issuable in connection with the Backstop Commitment Premium and the Equity Rights Offerings) and (B) the Warrants, and (ii) the issuance of Subscription Rights by Reorganized Halcón Parent in connection with the Equity Rights Offerings is authorized, ratified, and confirmed in all respects; each in accordance with the terms of the Prepackaged Plan without the need for any further corporate or shareholder action.  All of the New Common Shares and the Warrants issuable under the Prepackaged Plan, when so issued, shall be duly authorized, validly issued, and, in the case of the New Common Shares, fully paid, and non-assessable.  The Warrant Equity (upon

36

payment of the exercise price in accordance with the terms of such Warrants) issued pursuant to the Prepackaged Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

(b)  No later than seven (7) calendar days prior to the Voting Deadline, the Debtors, with the consent of the Requisite Creditors, shall make a determination as to whether Reorganized Halcón Parent will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp) following December 31, 2019.  If the Debtors determine pursuant to this provision that Reorganized Halcón Parent will continue to be a reporting company under the Exchange Act following December 31, 2019, the Debtors shall use their commercially reasonable efforts to have the New Common Shares listed on the New York Stock Exchange, or another nationally recognized exchange, as soon as practicable, subject to meeting applicable listing requirements following the Effective Date.  If the Debtors determine pursuant to this provision that Reorganized Halcón Parent will not continue to be a reporting company under the Exchange Act following December 31, 2019, the Debtors shall file the Governance Term Sheet.

(c)  The Warrants shall be issuable pursuant to the terms of the respective Warrant Agreements, the form and substance of which shall be consistent with the Restructuring Term Sheet and filed with the Plan Supplement.  Each Warrant shall, subject to the terms of the respective Warrant Agreements, be exercisable for one (1) New Common Share.

### ix.  *Securities Exemptions*

(a)  The issuance, and distribution of the New Common Shares, the Warrants (and the Warrant Equity), and the Subscription Rights to holders of Allowed Senior Notes Claims and Allowed Existing Equity Interests, as applicable, under Article IV of the Prepackaged Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code.  The New Common Shares and the Warrants (and the Warrant Equity issuable upon exercise thereof) issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)  The issuance and sale, as applicable, of the New Common Shares to be issued pursuant to the Backstop Commitment Agreement, including those to be issued in respect of the Backstop Commitment Premium, are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder.  Such Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 of the Securities Act.

(c)     On the Effective Date, the ownership of the New Common Shares shall be reflected through the facilities of the DTC.  None of the Debtors, the Reorganized Debtors, or any other Person shall be required to provide any further evidence other than the Prepackaged Plan or the Confirmation Order with respect to the treatment of the New Common Shares or the Warrants under applicable securities laws.  DTC and any transfer agent shall be required to accept and conclusively rely upon the Prepackaged Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Shares or the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

(d)     The Debtors may elect to deliver the Warrants through the facilities of DTC; *provided*, *however*, that delivery of the Warrants through the facilities of DTC shall not be mandatory.

(e)     Notwithstanding anything to the contrary in the Prepackaged Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Prepackaged Plan, including whether the New Common Shares, the Warrants, and the Warrant Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### *x.     Equity Rights Offerings*

The Equity Rights Offerings shall be conducted by the Debtors and consummated on the terms and subject to the conditions set forth in the Rights Offering Procedures and the Senior Noteholder Backstop Agreement. To facilitate the Senior Noteholder Rights Offering and the other Restructuring Transactions, and in exchange for the Backstop Commitment Premium, the Backstop Parties have agreed to consummate the Backstop Purchase, subject to the terms and conditions set forth in the Senior Noteholder Backstop Agreement.  The Backstop Parties' obligation to consummate the Backstop Purchase pursuant to the Senior Noteholder Backstop Agreement shall be contingent upon all conditions set forth in the Senior Noteholder Backstop Agreement being satisfied or otherwise waived in accordance with the Senior Noteholder Backstop Agreement.  Confirmation shall constitute Bankruptcy Court approval of the Equity Rights Offerings (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith).

(a)     **Existing Equity Interests Rights Offering**.  After the Petition Date, subject to interim approval of this Disclosure Statement by the Bankruptcy Court, subject to the Existing Equity Cash Out, the Debtors shall distribute the Existing Equity Interests Subscription Rights to holders of Existing Equity Interests as set forth in the Prepackaged Plan and the applicable Rights Offering Procedures. Each Rights Offering Participant in the Existing Equity Interests Rights Offering shall be offered the Existing Equity Interests Subscription Rights to purchase its Pro Rata share of the New Common Shares to be issued pursuant to the Existing Equity Interests Rights Offering.  On the Effective Date, the Debtors shall consummate the Existing Equity Interests Rights Offering.  The Existing Equity Interests Subscription Rights may not be sold, transferred, or assigned.

(b) **Senior Noteholder Rights Offering**.

i. After the Petition Date, subject to interim approval of this Disclosure Statement by the Bankruptcy Court, the Debtors shall distribute the Senior Noteholder Subscription Rights to holders of Senior Notes Claim as set forth in the Prepackaged Plan and the applicable Rights Offering Procedures. Each Rights Offering Participant in the Senior Noteholder Rights Offering shall be offered the Senior Noteholder Subscription Rights to purchase its Pro Rata share of the New Common Shares to be issued pursuant to the Senior Noteholder Rights Offering. On the Effective Date, the Debtors shall consummate the Senior Noteholder Rights Offering. The Senior Noteholder Subscription Rights may not be sold, transferred, or assigned. The Senior Noteholder Rights Offering shall be fully backstopped by the Backstop Parties in accordance with and subject to the terms and conditions of the Senior Noteholder Backstop Agreement.

ii. In accordance with the Senior Noteholder Backstop Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, the amount of New Common Shares equal to its respective Backstop Commitment (as defined in the Senior Noteholder Backstop Agreement). The Backstop Commitment for the Senior Noteholder Rights Offering, shall be treated as a put option and the Backstop Commitment Premium shall be treated as remuneration for agreeing to enter into such put option. Upon the Effective Date, the Backstop Commitment Premium shall be immediately and automatically payable and issued.

(c) **Proceeds**. The proceeds of the Equity Rights Offerings shall be used to (i) fund Plan distributions, (ii) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, and (iii) pay all reasonable and documented Restructuring Expenses.

### xi.     *Exit RBL Agreement*

(a) On the Effective Date, the Reorganized Debtors are authorized to and shall enter into the Exit RBL Agreement and all other documents, notes, agreements, guaranties, and other collateral documents contemplated thereby. The Exit RBL Agreement shall constitute legal, valid, binding, and authorized joint and several obligations of the Reorganized Debtors enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Prepackaged Plan, or the Confirmation Order. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit RBL Agreement (x) shall be valid, binding, perfected, enforceable first priority Liens and security interests in the property subject to a security interest granted by the applicable Reorganized Debtors pursuant to the Exit RBL Agreement, with the priorities established in respect thereof under applicable non-bankruptcy law

and (y) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Prepackaged Plan, or the Confirmation Order.

(b)       The Exit RBL Agent is hereby authorized to file, with the appropriate authorities, financing statements, amendments thereto or assignments thereof and other documents, including mortgages or amendments or assignments thereof in order to evidence the first priority Liens, pledges, mortgages, and security interests granted in connection with the Exit RBL Agreement.  The guaranties, mortgages, pledges, Liens, and other security interests granted in connection with the Exit RBL Agreement are granted in good faith as an inducement to the Exit RBL Lenders to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance and the priorities of such Liens, mortgages, pledges, and security interests shall be as set forth in the Exit RBL Agreement and the collateral documents executed and delivered in connection therewith.

### xii.       *Registration Rights Agreement*

On the Effective Date, Reorganized Halcón Parent and the Registration Rights Parties shall enter into the Registration Rights Agreement.  The Registration Rights Agreement shall provide the Registration Rights Parties with commercially reasonable demand and piggyback registration rights and other customary terms and conditions.

### xiii.       *Intercompany Interests*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.  For the avoidance of doubt, to the extent reinstated pursuant to the Prepackaged Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date.

### xiv.       *Senior Notes Trustee Expenses and Certain Senior Notes Trustee Rights*

Notwithstanding anything herein to the contrary, distributions under the Prepackaged Plan on account of the Senior Notes Claims shall be subject to the rights of the Senior Notes Trustee under the Senior Notes Indenture, including the right of the Senior Notes Trustee to assert and exercise their charging lien.  To allow the holders of Senior Notes Claims to receive the full treatment set forth in the Prepackaged Plan without reduction by the charging lien or the expenses of the Senior Notes Trustee, the Debtors or Reorganized Debtors shall, on account of the Senior Notes Claims, pay to the Senior Notes Trustee all reasonable and documented fees and out-of-pocket costs and expenses incurred on or prior to the Effective Date by the Senior Notes Trustee that are required to be paid under the Senior Notes Indenture.

### xv.	Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Prepackaged Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Prepackaged Plan.

### xvi.	Separate Plans

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Prepackaged Plan for purposes of economy and efficiency, the Prepackaged Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Prepackaged Plan with respect to one or more Debtors, it may still confirm the Prepackaged Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

## F.	Distributions

### i.	Distributions Generally

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Prepackaged Plan.

### ii.	Postpetition Interest on Claims

Except as otherwise provided in the Prepackaged Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claim (except for Senior Notes Claims) in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced; *provided*, *however*, that nothing herein shall expand any Person's right to receive, or the Debtors' or Reorganized Debtors' obligation to pay, postpetition interest.

### iii.	Date of Distributions

Unless otherwise provided in the Prepackaged Plan, any distributions and deliveries to be made under the Prepackaged Plan shall be made on the Effective Date or as soon as practicable thereafter; provided, however, that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate.

### iv.	Distribution Record Date

(a)	As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure

Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)        Notwithstanding anything in the Prepackaged Plan to the contrary, in connection with any Plan Distribution to be effected through the facilities of DTC (whether by means of book entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Prepackaged Plan with holders of New Common Shares to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Common Shares to be distributed under the Prepackaged Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book entry exchange procedures to the extent that the holders of New Common Shares held their Existing Equity Interests or Senior Notes through the facilities of DTC; *provided*, *however*, that such New Common Shares are permitted to be held through DTC's book entry system; *provided*, *further*, *however*, that to the extent the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, Reorganized Halcón Parent shall take all such reasonable actions as may be required to cause the distributions of the New Common Shares under the Prepackaged Plan.  Holders of Existing Equity Interests that are entitled to receive New Common Shares, but had held such Existing Equity Interests outside of the facilities of DTC, may receive their New Common Shares by means of book-entry with the Reorganized Debtor's transfer agent.  Notwithstanding anything in the Prepackaged Plan to the contrary, no Person (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Prepackaged Plan, including, whether the New Common Shares are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### v.        *Distributions after Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### vi.        *Disbursing Agent*

All distributions under the Prepackaged Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.18 of the Prepackaged Plan.

### vii.        Delivery of Distributions

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all distributions to any holder of an Allowed Claim as and when required by the Prepackaged Plan at (i) the address of such holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

Except as otherwise provided in the Prepackaged Plan, all distributions to holders of RBL Claims shall be governed by the RBL Agreement and shall be deemed completed when made to the RBL Agent, which shall be deemed to be the holder of all RBL Claims for purposes of distributions to be made hereunder.  The RBL Agent shall hold or direct such distributions for the benefit of the holders of Allowed RBL Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this provision, the RBL Agent shall arrange to deliver such distributions to or on behalf of such holders of Allowed RBL Claims.

Except as otherwise provided in the Prepackaged Plan, all distributions to holders of Senior Notes Claims shall be governed by the Senior Notes Indenture and shall be deemed completed when made to the Senior Notes Trustee, which shall be deemed to be the holder of all Senior Notes Claims for purposes of distributions to be made hereunder.  The Senior Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Senior Notes Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this provision, the Senior Notes Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed Senior Notes Claims.  Notwithstanding anything to the contrary in the Prepackaged Plan, the distribution of New Common Shares shall be made through the facilities of DTC in accordance with the customary practices of DTC for a mandatory distribution, as and to the extent practicable, and the Distribution Record Date shall not apply.  In connection with such distribution, the Senior Notes Trustee shall deliver instructions to DTC instructing DTC to effect distributions on a Pro Rata basis as provided under the Prepackaged Plan with respect to the Senior Notes Claims.

Notwithstanding anything to the contrary in the Prepackaged Plan, the distribution of Warrants (provided the Warrants are DTC-eligible and the Debtors elect, subject to approval by the Requisite Creditors, to deliver such Warrants through the facilities of DTC) shall be made through the facilities of DTC in accordance with the customary practices of DTC for a mandatory distribution, as and to the extent practicable, and the Distribution Record Date shall not apply.  To the extent the Warrants are not delivered through the facilities of DTC, the Debtors shall facilitate registration of the Warrants into the names of the relevant beneficial owners as soon as practicable following the Effective Date.

#### viii.      *Unclaimed Property*

One year from the later of: (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

#### ix.      *Satisfaction of Claims*

Unless otherwise provided in the Prepackaged Plan, any distributions and deliveries to be made on account of Allowed Claims under the Prepackaged Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

#### x.      *Manner of Payment under Plan*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Prepackaged Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

#### xi.      *Fractional Shares*

No fractional shares of New Common Shares shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number. The total number of New Common Shares to be distributed on account of Allowed Claims shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Fractional amounts of New Common Shares that are not distributed in accordance with section 6.11 of the Prepackaged Plan shall be returned to, and ownership thereof shall vest in, Reorganized Halcón Parent.

#### xii.      *Minimum Distribution*

Neither the Reorganized Debtors nor the Disbursing Agent, as applicable, shall have an obligation to make a distribution pursuant to the Prepackaged Plan that is less than one (1) share of New Common Shares or less than $100.00 in Cash; provided, however, that Registered Holders of Existing Equity Interests receiving a Plan Distribution under section 4.7(a)(1) of the Prepackaged Plan shall receive such distributions notwithstanding section 6.12 of the Prepackaged Plan.

### xiii.        *No Distribution in Excess of Amount of Allowed Claim*

Notwithstanding anything to the contrary in the Prepackaged Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of the Prepackaged Plan).

### xiv.        *Allocation of Distributions Between Principal and Interest*

Except as otherwise provided in the Prepackaged Plan and subject to section 6.2 of the Prepackaged Plan or as otherwise required by law (as determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### xv.        *Setoffs and Recoupments*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Prepackaged Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided*, *however*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### xvi.        *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all applicable distributions or payments provided for under the Prepackaged Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Prepackaged Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### xvii.        *Expenses of Disbursing Agent*

Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' fees and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### xviii.          Withholding and Reporting Requirements

In connection with the Prepackaged Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (i)  sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (ii) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under the Prepackaged Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant to the Prepackaged Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Prepackaged Plan.

Any party entitled to receive any property as an issuance or distribution under the Prepackaged Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Reorganized Debtors a Form W-8, Form W-9 and/or any other forms or documents, as applicable, requested by any Reorganized Debtor to reduce or eliminate any required federal, state, or local withholding.  If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution under the Prepackaged Plan shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a distribution under the Prepackaged Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

### G.          Procedures for Resolving Claims

### i.          Disputed Claims Process

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Prepackaged Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced.  The holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties.  Except for (i) proofs of Claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any

46

of the Debtors pursuant to section 8.3 of the Prepackaged Plan and (ii) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn.  To the extent not otherwise provided in the Prepackaged Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under section 7.1 of the Prepackaged Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### ii.        Objections to Claims

Except insofar as a Claim is Allowed under the Prepackaged Plan, only the Debtors or the Reorganized Debtors shall be entitled to object to Claims.  Any objections to Claims shall be served and filed (i) on or before the ninetieth (90th) day following the later of (a) the Effective Date and (b) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors.

### iii.        Estimation of Claims

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### iv.        Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Prepackaged Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Prepackaged Plan without further notice or Bankruptcy Court approval.

### v.        No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Prepackaged Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

47

### vi.  *Distributions after Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Prepackaged Plan.  As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Prepackaged Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## H.  Executory Contracts and Unexpired Leases

### i.  *General Treatment*

(a)  As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts; *provided*, *however*, that the Requisite Creditors consent to such rejection, or (v) is specifically designated as a contract or lease to be rejected as reasonably requested by the Requisite Creditors in the Plan Supplement; *provided*, *however*, that such rejection shall be deemed unreasonable if it would give rise to a potential Cure Amount that cannot be satisfied on the Effective Date otherwise cause the Prepackaged Plan to not be feasible pursuant to section 1129 of the Bankruptcy Code.

(b)  Subject to (i) satisfaction of the conditions set forth in section 8.1(a) of the Prepackaged Plan, (ii) resolution of any disputes in accordance with section 8.2 of the Prepackaged Plan with respect to the contracts or leases subject to such dispute, and (iii) the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Prepackaged Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Prepackaged Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Prepackaged Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### ii.  *Determination of Assumption and Cure Disputes; Deemed Consent*

(a)  Following the Petition Date, the Debtors shall have served a notice to parties of executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume such contracts or leases in connection with the Prepackaged Plan and indicating that Cure Amounts (if any) shall be asserted against the Debtors or the Reorganized Debtors, as applicable, in the ordinary course.  Any monetary amounts by which any executory contract or unexpired lease to be assumed under the Prepackaged Plan is in default shall be satisfied, under section 365(b)(1)

48

of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof.

(b)     If there is a dispute regarding (i) any Cure Amount, (ii) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective.  Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Amounts, the applicable Debtor may assume the executory contract or unexpired lease prior to the resolution of any such dispute; *provided*, *however*, that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Amount by the contract counterparty; *provided*, *further*, *however*, that following entry of a Final Order resolving any such dispute, the Debtor shall have the right to reject any executory contract or unexpired lease within thirty (30) days of such resolution.

(c)     Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption of such executory contract or unexpired lease in accordance with the procedures set forth therein, shall be deemed to have assented to such assumption and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption thereafter.

(d)     Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption of the underlying contracts and unexpired leases.  Assumption of any executory contract or unexpired lease pursuant to the Prepackaged Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

### iii.     *Rejection Damages Claims*

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.

### iv.     *Survival of the Debtors' Indemnification Obligations*

Any obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions,

49

suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Prepackaged Plan. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Prepackaged Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### v.      *Compensation and Benefit Plans*

All employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Prepackaged Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

### vi.      *Insurance Policies*

(a)      All insurance policies to which any Debtor is a party as of the Effective Date, including any directors' and officers' insurance policies, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors.

(b)      In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

### vii.      *Reservation of Rights*

(a)      Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Prepackaged Plan or in the Plan Supplement, nor anything contained in the Prepackaged Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)      Except as explicitly provided in the Prepackaged Plan, nothing in the Prepackaged Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)      Nothing in the Prepackaged Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Prepackaged Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## I.      Conditions Precedent to the Occurrence of the Effective Date

### i.      *Conditions Precedent to Effective Date*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)      the Plan Supplement has been filed;

(b)      the Bankruptcy Court has entered the Confirmation Order and such Confirmation Order has not been stayed, modified, or vacated;

(c)      the conditions to the effectiveness of the Exit RBL Facility, and all documentation related thereto, have been satisfied or waived in accordance with the terms thereof and the Exit RBL Agreement is in full force and effect;

(d)      all governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring shall have been obtained and all applicable waiting periods have expired;

(e)      all Restructuring Expenses shall have been paid in Cash;

(f)      the Restructuring Support Agreement shall be in full force and effect and binding on all parties thereto;

(g)      the Senior Noteholder Backstop Agreement shall be in full force and effect and binding on all parties thereto, and the Backstop Order (as defined in the Restructuring Support Agreement) shall be entered;

(h)      each of the Definitive Documents shall have satisfied the consent requirements of the Requisite Creditors in accordance with the Restructuring Support Agreement;

(i)      the amended certificate of incorporation of Reorganized Halcón Parent shall have been filed with the appropriate Governmental Unit, as applicable; and

(j)      the Debtors, together with the Subscription Agent (as defined in the Rights Offering Procedures), shall have received proceeds of at least $150,150,000 for the issuance of the New Common Shares in connection with the Senior Noteholder Rights Offering.

51

### *ii.      Waiver of Conditions Precedent*

(a)      Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Requisite Creditors without leave of or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Prepackaged Plan in any court.  If the Prepackaged Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Prepackaged Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### *iii.      Effect of Failure of a Condition*

If the conditions listed in sections 9.1 of the Prepackaged Plan are not satisfied or waived in accordance with section 9.2 of the Prepackaged Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Prepackaged Plan shall be null and void in all respects and nothing contained in the Prepackaged Plan or this Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, or any other Person.

## J.      Effect of Confirmation

### *i.      Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Prepackaged Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Prepackaged Plan and whether such holder has accepted the Prepackaged Plan.

### ii.       Vesting of Assets

Except as otherwise provided in the Prepackaged Plan, or any Plan Document, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Prepackaged Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  Subject to the terms of the Prepackaged Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Prepackaged Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### iii.      Discharge of Claims against and Interests in Debtors

Upon the Effective Date and in consideration of the distributions to be made under the Prepackaged Plan, except as otherwise expressly provided in the Prepackaged Plan or in the Confirmation Order, each holder (as well as any trustee or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Prepackaged Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or Reorganized Debtor.

### iv.      Pre-Confirmation Injunctions and Stays

Unless otherwise provided in the Prepackaged Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### v.       Injunction against Interference with Plan

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

53

### *vi.*      *Plan Injunction*

(a)      Except as otherwise provided in the Prepackaged Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims against or Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are permanently enjoined after the entry of the Confirmation Order from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor, (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Prepackaged Plan, and the Plan Documents, to the full extent permitted by applicable law, and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Prepackaged Plan and the Plan Documents.

(b)      By accepting distributions pursuant to the Prepackaged Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Prepackaged Plan, including the injunctions set forth in section 10.6 of the Prepackaged Plan.

### *vii.*      *Releases*

(a)      **Releases by Debtors.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Prepackaged Plan and the obligations contemplated by the Plan Documents or as otherwise provided in any order of the Bankruptcy Court, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action (including any**

derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Prepackaged Plan, the Restructuring Support Agreement, the Plan Documents or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Prepackaged Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that nothing herein shall be construed to release any Person from willful misconduct or intentional fraud as determined by a Final Order.

(b)     **Releases by Holders of Claims or Interests.** As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Prepackaged Plan and the Plan Documents and the obligations contemplated by the Restructuring Transactions, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service and contribution of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Restructuring Transactions,

55

**the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Plan Documents, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to the Prepackaged Plan, or any other act or omission; provided, however, that nothing herein shall be construed to release any Person from willful misconduct or intentional fraud as determined by a Final Order.**

### *viii.*      *Exculpation*

**To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, the Exit RBL Facility, the Equity Rights Offerings, the Management Incentive Plan, this Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, and the Prepackaged Plan (including the Plan Documents), or the solicitation of votes for, or confirmation of, the Prepackaged Plan; the funding of the Prepackaged Plan; the occurrence of the Effective Date; the administration of the Prepackaged Plan or the property to be distributed under the Prepackaged Plan; the issuance of Securities under or in connection with the Prepackaged Plan; the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Prepackaged Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Prepackaged Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Prepackaged Plan or such distributions made pursuant to the Prepackaged Plan, including the issuance of Securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### *ix.*      *Injunction Related to Releases and Exculpation*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Prepackaged Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Prepackaged Plan or the Confirmation Order.

56

### x.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Prepackaged Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### xi.      *Retention of Causes of Action and Reservation of Rights*

Except as otherwise provided in the Prepackaged Plan, including sections 10.6, 10.7, 10.8 and 10.9, nothing contained in the Prepackaged Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action against parties with a relationship with the Debtors.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### xii.      *Ipso Facto and Similar Provisions Ineffective*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, (iii) the confirmation or consummation of the Prepackaged Plan, including any change of control that shall occur as a result of such consummation, or (iv) the Restructuring Transactions.

## K.      Retention of Jurisdiction

### i.      *Retention of Jurisdiction*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)      to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

57

(b)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Prepackaged Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Prepackaged Plan;

(e)     to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Prepackaged Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Prepackaged Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Prepackaged Plan, this Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Prepackaged Plan, the Confirmation Order, any transactions or payments in furtherance of either (including the Equity Rights Offerings), or any agreement, instrument, or other document governing or related to any of the foregoing, other than the Exit Facility;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Prepackaged Plan;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, this Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(q)     to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of the Prepackaged Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(r)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(s)     to recover all Assets of the Debtors and property of the Estates, wherever located; and

(t)     to enter a final decree closing each of the Chapter 11 Cases.

## L.     **Miscellaneous Provisions**

### i.     *Exemption from Certain Transfer Taxes*

Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any Securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Prepackaged Plan, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of Collateral under the Exit RBL Agreement, and (vi) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Prepackaged Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### ii.        *Request for Expedited Determination of Taxes*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### iii.        *Dates of Actions to Implement Plan*

In the event that any payment or act under the Prepackaged Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### iv.        *Amendments*

(a)        **Plan Modifications**.  The Prepackaged Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court in accordance with the Restructuring Support Agreement.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Prepackaged Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Prepackaged Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Prepackaged Plan, and any holder of a Claim or Interest that has accepted the Prepackaged Plan shall be deemed to have accepted the Prepackaged Plan as amended, modified, or supplemented; *provided*, *however*, that any such modification is acceptable to the Requisite Creditors.

(b)        **Certain Technical Amendments**.  Subject to the Restructuring Support Agreement, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Prepackaged Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under the Prepackaged Plan.

### v.        *Revocation or Withdrawal of Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Prepackaged Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Prepackaged Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor (i) the Prepackaged Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Prepackaged Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Prepackaged Plan, and any document or agreement executed pursuant to the Prepackaged Plan shall be deemed null and void, and (iii) nothing contained in the Prepackaged Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any

60

other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

### vi.      *Severability*

If, prior to the entry of the Confirmation Order, any term or provision of the Prepackaged Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the terms of the Restructuring Support Agreement, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Prepackaged Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Prepackaged Plan, as it may have been altered or interpreted in accordance with section 12.6 of the Prepackaged Plan, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Prepackaged Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (iii) nonseverable and mutually dependent.

### vii.      *Governing Law*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under the Prepackaged Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### viii.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Prepackaged Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### ix.      *Successors and Assigns*

The rights, benefits, and obligations of any Person named or referred to in the Prepackaged Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### x.      *Entire Agreement*

On the Effective Date, the Prepackaged Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements,

understandings, and representations on such subjects, all of which have become merged and integrated into the Prepackaged Plan.

### xi.        *Computing Time*

In computing any period of time prescribed or allowed by the Prepackaged Plan, unless otherwise set forth in the Prepackaged Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### xii.       *Exhibits to Plan*

All exhibits, schedules, supplements, and appendices to the Prepackaged Plan (including the Plan Supplement) are incorporated into and are a part of the Prepackaged Plan as if set forth in full in the Prepackaged Plan.

### xiii.      *Notices*

All notices, requests, and demands hereunder shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

        (a)     if to the Debtors or Reorganized Debtors:

        Halcón Resources Corporation
        1000 Louisiana St., Suite 1500
        Houston, Texas 7702
        Attn: David Elkouri, Executive Vice President and Chief Legal Officer

– and –

        WEIL, GOTSHAL & MANGES LLP
        700 Louisiana Street, Suite 1700
        Houston, Texas 77002
        Attn: Alfredo R. Pérez
        Telephone: (713) 546-5000
        Facsimile:  (713) 224-9511

– and –

        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York 10153
        Attn:  Gary T. Holtzer, Esq., and Lauren Tauro, Esq.
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007

*Attorneys for Debtors*

(b)      if to the Consenting Creditors:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:  Andrew Rosenberg, Esq., Robert Britton, Esq., Samuel Lovett, Esq.
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5361

*Attorneys for Consenting Creditors*

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

### *xiv.*      *Reservation of Rights*

Except as otherwise provided herein, the Prepackaged Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Prepackaged Plan, any statement or provision of the Prepackaged Plan, or the taking of any action by the Debtors with respect to the Prepackaged Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

## VII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The Solicitation is being made before the Petition Date only to holders of Senior Notes who are "accredited investors" within the meaning of Rule 501(a) of Regulation D of the Securities Act pursuant to Section 4(a)(2) and Regulation D of the Securities Act.  Following the Petition Date, and subject to the interim approval by the Bankruptcy Court of this Disclosure Statement, the Solicitation is being made to all other holders of Senior Notes and Existing Equity Interests pursuant to section 1145 of the Bankruptcy Code.

The New Common Shares, the Warrants (and the Warrant Equity), and the Subscription Rights issued under the Prepackaged Plan will be issued without registration under the Securities Act or any similar federal, state, or local law.  The issuance, and distribution of the New Common Shares (other than the Backstop Shares), the Warrants (and the Warrant Equity), and the Subscription Rights to holders of Allowed Senior Notes Claims and Allowed Existing Equity Interests, as applicable, under Article IV of the Prepackaged Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Entity, from registration under the

63

Securities Act, and any other applicable state or local securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.

The issuance and sale, as applicable, of the New Common Shares pursuant to the Backstop Commitment Agreement, including those issued in respect of the Backstop Commitment Premium, are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 of the Securities Act.

### A.     <u>Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers</u>

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale pursuant to a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. The issuance and distribution of the New Common Shares (other than the Backstop Shares) and the Warrants (and the Warranty Equity) to holders of Allowed Senior Note Claims and Allowed Existing Equity Interests, as applicable, under Article IV of the Prepackaged Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Person, from registration under (i) the Securities Act and (ii) any applicable state or local law requiring registration for the issuance or distribution of securities. The New Common Shares and the Warrants (and the Warrant Equity) issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"**Control**," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more

of a class of voting securities of a reorganized debtor may be presumed to be a "**controlling person**" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act, which permits the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

No later than seven calendar days prior to the Voting Deadline, the Debtors, with the consent of the Requisite Creditors, shall make a determination as to whether Reorganized Halcón Parent will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp) following December 31, 2019.  If the Debtors determine that Reorganized Halcón Parent will continue to be a reporting company under the Exchange Act following December 31, 2019, the Debtors shall use their commercially reasonable efforts to have the New Common Shares listed on the New York Stock Exchange, or another nationally recognized exchange, as soon as practicable, subject to meeting applicable listing requirements following the Effective Date.  If the Debtors determine pursuant that Reorganized Halcón Parent will not continue to be a reporting company under the Exchange Act following December 31, 2019, the Debtors shall file the Governance Term Sheet. No assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

### B.        Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers

The issuance and sale, as applicable, of the Backstop Shares are being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act and Regulation D thereunder.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as the resale provisions of Rule 144 of the Securities Act, in each case subject to the Reorganized Debtors' Amended Organizational Documents.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

Each book entry position or certificate representing, or issued in exchange for or upon the transfer, sale, or assignment of, any Backstop Share, as well as certificates evidencing the New Common Shares held by holders of 10% or more of the New Common Shares, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, shall, upon issuance, be

deemed to contain or be stamped or otherwise imprinted, as applicable, with a restrictive legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON DATE OF ISSUANCE, HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Reorganized Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Backstop Shares. Reorganized Debtor will also reserve the right to stop the transfer of any Backstop Shares if such transfer is not in compliance with Rule 144, pursuant to a resale registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

In any case, recipients of securities issued under the Prepackaged Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration requirements under state law in any given instance and as to any applicable requirements or conditions to such availability.

## VIII.
## CERTAIN TAX CONSEQUENCES OF PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Prepackaged Plan to the Debtors and to holders of Senior Note Claims and Existing Equity Interests. The following summary does not address the U.S. federal income tax consequences to holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Prepackaged Plan or who are deemed to reject the Prepackaged Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to

special classes of taxpayers (*e.g.,* non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Senior Note Claims or Existing Equity Interests through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, and persons whose Senior Note Claims or Existing Equity Interests are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes, nor does it apply to any person that acquires New Common Shares in the secondary market.

Unless otherwise indicated, this discussion assumes that all Class 4 Senior Note Claims, Class 7 Existing Equity Interests, New Common Shares, Senior Noteholder Subscription Rights, Existing Equity Interests Subscription Rights, and the Warrants are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their respective forms.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.  All holders of Senior Note Claims and Existing Equity Interests are urged to consult their tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Prepackaged Plan.***

### A.     Consequences to the Debtors

For U.S. federal income tax purposes, each of the Debtors is a member of an affiliated group of corporations of which Parent is the common parent and which files a single consolidated U.S. federal income tax return (the "**Tax Group**").  The Debtors estimate that the Tax Group had incurred approximately $2,600 million of consolidated net operating losses ("**NOLs**") as of December 31 2018, and projects $79 million of operating loss for 2019.  The Debtors project no material tax for 2019.  Subject to on-going review, the Debtors believe that as of December 31, 2018 a substantial portion of the NOLs may be subject to significant limitation under Section 382 of the Tax Code, and that the aggregate tax basis in their assets (other than stock of members of the Tax Group) is greater than fair market value.  In addition, the Debtors expect that a portion of their interest expense for the 2018 and 2019 taxable years will be subject to disallowance and carry forward under Section 163(j) of the Tax Code.  The amount of any such NOLs and other tax attributes remains subject to further analysis of the Debtors and to audit and adjustment by the IRS.

As discussed below, in connection with and upon implementation of the Prepackaged Plan, the Debtors anticipate that certain tax attributes will be reduced, and that the subsequent utilization of certain tax attributes (such as any disallowed interest expense carryforward incurred through the Effective Date) may be further limited.

67

### 1. Cancellation of Debt

In general, the Tax Code provides that a corporate debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan. The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, a corporate debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Under applicable Treasury Regulations, the reduction in certain tax attributes occurs under consolidated return principles, as in the case of the Debtors who are members of the Tax Group. Any reduction in tax attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

In connection with the implementation of the Prepackaged Plan, the Debtors are expected to incur a significant amount of COD for U.S. federal income tax purposes, with an attendant reduction in NOLs and/or tax attributes (but in the case of tax basis, only to the extent such tax basis exceeds the amount of the respective Debtor's liabilities, as determined for these purposes, immediately after the Effective Date).

### 2. Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including any disallowed interest expense) allocable to periods prior to the Effective Date ("**Pre-Change Losses**") are expected to be subject to certain limitations resulting from a change in ownership. Any such limitation applies in addition to, and not in lieu of, any attribute reduction that results from COD incurred in connection with the Prepackaged Plan.

Under Section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors expect that the issuance of New Common Shares pursuant to the Prepackaged Plan will constitute an ownership change of the Tax Group for this purpose and that the Reorganized Debtors' use of its Pre-Change Losses will be subject to limitation unless an exception to the general rules of Sections 382 and 383 of the Tax Code applies; depending on whether there was an ownership change either as of December 31, 2018 or at another time prior to the Effective Date, any such limitation may be material.

#### (a) General Annual Limitation

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) *immediately before* the ownership change (with certain adjustments) multiplied by (B) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 2.09% for ownership changes occurring in August 2019). For a corporation (or consolidated group) in bankruptcy that undergoes

an ownership change pursuant to a confirmed bankruptcy plan, subject to a special exception described below, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

Under certain circumstances the annual limitation may apply to unrealized built-in losses. If a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then built-in losses (including, but not limited to, amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses, the deductibility of which will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10 million or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

Under certain circumstances the annual limitation otherwise computed may be increased. If a corporation (or consolidated group) has an net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, under an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance. The Debtors anticipate that the Tax Group will be in a net unrealized built-in loss position on the Effective Date.

If the corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to recognized built-in gains); currently, the Debtors are confirming whether the Tax Group underwent a Section 382 ownership change either as of December 31, 2018 or at a later date prior to the Petition Date. If such an ownership change has already occurred or will occur prior to the Effective Date, then the ownership change that will occur in connection with the Restructuring as of the Effective Date is not expected to result in any material additional limitation on the use of the Debtors' NOLs and other tax attributes, except as relates to NOLs and other tax attributes generated after such earlier ownership change. If, however, the Debtors determine that no such earlier ownership change has occurred, then the application of Section 382 of the Tax Code as of the Effective Date would result in significant impairment in the value of the Tax Group's NOLs and other tax attributes unless an exception to the general rule in Section 382 of the Tax Code applies.

        (b)    <u>Special Bankruptcy Exception</u>

An exception to the foregoing annual limitation rules generally applies when shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of

69

the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan. Under this exception, a debtor's Pre-Change Losses are not subject to the annual limitation. However, if this exception applies, the debtor's Pre-Change Losses generally will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. Also, if the reorganized debtor thereafter undergoes another "ownership change" within two years, the annual limitation with respect to such later ownership change could be zero, effectively precluding any future use of their Pre-Change Losses. A debtor that qualifies for this exception may, if it so desires, elect not to have the exception apply and instead remain subject to the annual limitation described above, the Debtors have not determined whether or not this exception will apply in connection with the Prepackaged Plan. Accordingly, it is possible that the Debtors will not qualify for this exception or that the Debtors will elect not to apply this exception. In order to preserve the potential to qualify for this exception, the Debtors included in the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing certain procedures and potential restrictions on the post-petition period accumulation of Claims by persons who are or will be substantial claimholders if, upon further factual development and analysis, the Debtors conclude that they can qualify for and wish to elect to utilize the special bankruptcy exception.

### B.       Consequences to U.S. Holders of Certain Claims

This summary discusses the U.S. federal income tax consequences to holders of Class 4 Senior Note Claims, Class 7 Existing Equity Interests, the New Common Shares, Senior Noteholder Subscription Rights, Existing Equity Interests Subscription Rights, or the Warrants that are for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Class 4 Senior Note Claims, Class 7 Existing Equity Interests, the New Common Shares, Senior Noteholder Subscription Rights, Existing Equity Interests Subscription Rights, or the Warrants, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such instruments, you are urged to consult your own tax advisor.

### 3. Holders of Class 4 Senior Note Claims

Pursuant to the Prepackaged Plan, holders of Senior Note Claims will receive New Common Shares and the right to participate in the Senior Noteholder Rights Offering in complete and final satisfaction of their Senior Note Claims.

The U.S. federal income tax consequences of the Prepackaged Plan to a holder of the Senior Note Claims depends, in part, on whether the Senior Note Claims and, possibly, the Senior Noteholder Subscription Rights constitute "securities" of Parent for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term.  In general, debt obligations issued with a weighted-average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted-average maturity at issuance of ten (10) years or more constitute securities.  In addition, a right to acquire stock and, presumably, a right to acquire a "security" generally can also be treated as a "security."  The Senior Noteholder Subscription Rights may constitute a "security" of Parent as relates to the Senior Notes.  Holders of the Senior Note Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of the Senior Note Claims (which include debt obligations that have maturities of either 7 or 8 years) and the Senior Noteholder Subscription Rights for U.S. federal income tax purposes.  *See* B.1.c —"Senior Noteholder Subscription Rights," below.

### (a) Recapitalization Treatment

In the event that a holder's Senior Note Claim constitutes a "security" of Parent for U.S. federal income tax purposes, the holder's receipt of the New Common Shares and Senior Noteholder Subscription Rights pursuant to the Prepackaged Plan should be treated as a "recapitalization" for U.S. federal income tax purposes.  If so treated, each holder of a Senior Note Claim generally will not recognize any gain or loss upon the exchange of its Senior Note Claim for New Common Shares.  In the event that a holder's Senior Noteholder Subscription Rights also constitute a security of Parent for U.S. federal income tax purposes, then receipt of the Senior Noteholder Subscription Rights also would not result in the recognition of any gain or loss.  If the Senior Noteholder Subscription Right is not treated as a security of Parent for U.S. federal income tax purposes, each holder of a Senior Note Claim generally will not recognize any loss but will recognize gain (*See* B.1.c — "Taxable Exchange Treatment," below for calculation of gain), if any, up to the amount of the fair market value of the Senior Noteholder Subscription Rights received.  *See* B.1.d — "Character of Gain or Loss," below.  A holder will also have interest income to the extent of any consideration allocable to accrued but unpaid interest (and possibly accrued OID) not previously included in income (*see* B.1.e —"Distributions in Discharge of Accrued Interest or OID," below).

In a recapitalization exchange, a holder's tax basis in the New Common Shares and Senior Noteholder Subscription Rights should equal such holder's adjusted tax basis in its Senior Note Claim, increased by any gain or interest income recognized in the exchange.  In general, the holder's holding period for the New Common Shares and the Senior Noteholder Subscription Rights would include the holder's holding period for its Senior Note Claim, except to the extent that such rights were issued in respect of a Senior Note Claim for accrued but unpaid interest or, with respect to the Senior Noteholder Subscription Rights, to the extent the Senior Noteholder Subscription Rights are not treated as a security, in which case, the holding period for the Senior Noteholder Subscription Rights should begin the day following the Effective Date.

(b)     Taxable Exchange Treatment

In the event that a holder's Senior Note Claim does not constitute a "security" of Parent for U.S. federal income tax purposes, a holder of a Senior Note Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the aggregate fair market value of New Common Shares and any Senior Noteholder Subscription Rights received in satisfaction of its Senior Note Claims (other than any consideration received in respect of a Senior Note Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the holder's adjusted tax basis in its Senior Note Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* B.1.d — "Character of Gain or Loss," below.  A holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income.  *See* B.1.e — "Distributions in Discharge of Accrued Interest or OID," below.

In this instance, a holder of Senior Note Claims will have a tax basis in New Common Shares and Senior Noteholder Subscription Rights received in satisfaction of its Senior Note Claims equal to the fair market value of such interests and rights.  A holder's holding period in which the New Common Shares are received pursuant to a taxable exchange should begin the day following the Effective Date.

(c)     Senior Noteholder Subscription Rights

The characterization of the Senior Noteholder Subscription Rights and their subsequent exercise for U.S. federal income tax purposes as the exercise of options to acquire New Common Shares is uncertain given that the Senior Noteholder Subscription Rights must be exercised prior to the Effective Date, the receipt and exercise of the Senior Noteholder Subscription Rights pursuant to the Prepackaged Plan could be viewed as an integrated transaction pursuant to which part of the underlying New Common Shares are treated as acquired directly in satisfaction of a holder's Senior Note Claims and part are treated as acquired for Cash.  The characterization of the Senior Noteholder Subscription Rights as the exercise of an option to acquire New Common Shares (and not as an integrated element within a larger purchase of New Common Shares) may impact, among other things, the amount of loss (if any) that a holder of Senior Note Claims may recognize if the satisfaction of its Senior Note Claim as part of the Prepacked Plan is treated as a taxable exchange and, assuming the exercise of such rights, a holder's tax basis in the New Common Shares received.  Unless otherwise indicated, the discussion herein assumes that the Senior Noteholder Subscription Rights are respected as options to acquire New Common Shares (including the discussion above regarding the calculation of gain or loss).

72

Regardless of the characterization of the Senior Noteholder Subscription Rights, a holder of Senior Noteholder Subscription Rights generally would not recognize any gain or loss upon the exercise of such Senior Noteholder Subscription Rights. A holder's aggregate tax basis in the New Common Shares received upon exercise of a Senior Noteholder Subscription Right should be equal to the sum of (i) the amount paid upon exercise of the Senior Noteholder Subscription Rights and (ii) the holder's tax basis in the Senior Noteholder Subscription Rights.

A holder's holding period in the New Common Shares received upon exercise of a Senior Noteholder Subscription Right generally should commence the day following the exercise of the Senior Noteholder Subscription Right. In addition, if the Senior Noteholder Subscription Rights are treated as received as part of a "recapitalization," any gain recognized upon a subsequent disposition of the New Common Shares may be treated as ordinary income to the extent of any carryover of accrued market discount in respect of the Senior Note Claim Exchanged therefor not previously included in income (*see* B.1.d — "Character of Gain or Loss," below).

It is uncertain whether a holder that receives but does not exercise a Senior Noteholder Subscription Right should be treated as receiving anything of additional value in respect of its Senior Note Claim. If the Senior Noteholder Subscription Rights are respected for U.S. federal income tax purposes as options to acquire New Common Shares, and a holder is treated as having received a Senior Noteholder Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the Senior Noteholder Subscription Right, upon such lapse of the Senior Noteholder Subscription Right the holder generally would recognize a loss to the extent of the holder's tax basis in the Senior Noteholder Subscription Right. In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (which in the case of a "recapitalization" exchange, even if the right lapses unexercised, should include the holding period of the Senior Note Claim exchanged therefor).

(d)      Character of Gain or Loss

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Senior Note Claim or Existing Equity Interest constitutes a capital asset in the hands of the holder and how long it has been held, whether the Senior Note Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A holder that purchased its Senior Note Claims from a prior holder at a "market discount" (relative to the principal amount of the Senior Note Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. A holder that purchased its Senior Note Claim from a prior holder will be considered to have purchased such Senior Note Claim with "market discount" if the holder's adjusted tax basis in its Senior Note Claim is less than the revised issue price of such Senior Note Claim by at least a *de minimis* amount. Under these rules, gain recognized on the exchange of Senior Note Claims (other than in respect of a Senior Note Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of Senior Note Claims did not elect to include market discount

73

in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Senior Note Claims, such deferred amounts would become deductible at the time of the exchange.

In the case of an exchange of any Senior Note Claims that qualifies as a recapitalization exchange, the Tax Code indicates that any accrued market discount in respect of such Senior Note Claims should only be currently includable in income to the extent of any gain recognized in the recapitalization exchange.  Any accrued market discount that is not included in income should be applied to any "securities" received in the exchange (such as the New Common Stock or Senior Noteholder Subscription Rights), such that any gain recognized by a holder upon a subsequent disposition of such securities would be treated as ordinary income to the extent of any accrued market discount not previously included in income.  To date, specific Treasury regulations implementing this rule have not been issued.

### (e)    Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Prepackaged Plan by a holder of a Senior Note Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder may be entitled to recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly, it is also unclear whether, by analogy, a holder of a Senior Note Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Prepackaged Plan provides that consideration received in respect of a Senior Note Claim is generally allocable first to the principal amount of the Senior Note Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Senior Note Claim for accrued but unpaid interest.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Prepackaged Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

### 4.    Holders of Class 7 Existing Equity Interests

Pursuant to the Prepackaged Plan, holders of Existing Equity Interests will either receive (i) a Cash distribution or (ii) New Common Shares, Warrants, and the right to participate in the Existing Equity Rights Offering, in each case, in complete and final satisfaction of their Existing Equity Interests.

### (a)    Receipt of a Cash distribution

The U.S. federal income tax consequences of the Prepackaged Plan to a holder of Existing Equity Interests receiving a Cash distribution should generally treat the receipt of such Cash as

consideration received in a taxable redemption of such holder's Existing Equity Interests. In general, as a result of the redemption of a holder's Existing Equity Interest, such holder will recognize, for U.S. federal income tax purposes, gain or loss in an amount equal to the difference, if any, between (i) the amount of cash received in redemption of such holder's Existing Equity Interests and (ii) such holder's adjusted tax basis in the Existing Equity Interests redeemed therefor.

Any such gain or loss generally should be long-term capital gain or loss if the holder has a holding period of more than one year in the Existing Equity Interests being redeemed. A reduced tax rate on long-term capital gain may apply in respect of Existing Equity Interests held by non-corporate holders. The deductibility of capital losses is subject to significant limitations.

(b)     Receipt of New Common Shares, Warrants, and the right to participate in the Existing Equity Rights Offering

The U.S. federal income tax consequences of the Prepackaged Plan to a holder of Existing Equity Interests depends, in part, on whether the Existing Equity Subscription Rights and Warrants constitute "securities" of Parent for U.S. federal income tax purposes.

As noted above, the term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions, and a right to acquire stock and, presumably, a right to acquire a "security" generally can also be treated as a "security." The Existing Equity Subscription Rights and the Warrants may constitute "securities" of Parent. Holders of the Existing Equity Interests and/or Warrants are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of the Existing Equity Subscription Rights as "securities" of Parent for U.S. federal income tax purposes. Unless otherwise indicated, the discussion herein assumes that the Existing Equity Holder Subscription Rights and the Warrants are treated as "securities" (including the discussion below regarding the calculation of gain or loss) *See* B.2.b —"Existing Equity Subscription Rights" below.

(i)     Recapitalization Treatment

A holder of an Existing Equity Interest's exchange of its Existing Equity Interest pursuant to the Prepackaged Plan should be treated as a "recapitalization" for U.S. federal income tax purposes. As such, the holder would not recognize any loss as a result of the exchange and would not recognize any gain as a result of the receipt of the New Common Shares. In the event that the Existing Equity Subscription Rights and Warrants each constitute "securities" of Parent for U.S. federal income tax purposes, each holder of Existing Equity Interests generally will not recognize any gain upon the receipt of Existing Equity Subscription Rights and Warrants in exchange for such holder's Existing Equity Interests. If the Existing Equity Subscription Right or the Warrants are not treated as a security of Parent for U.S. federal income tax purposes, each holder of an Existing Equity Interest generally will not recognize any loss but will recognize gain (computed as described in the next paragraph), if any, up to the amount of the fair market value of the consideration received that is not treated as a security or stock of Parent for U.S. federal income tax purposes. Any such gain or loss generally should be long-term capital gain or loss if the holder has a holding period in its New Common Shares of more than one year at that time. A reduced

75

tax rate on long-term capital gain may apply in respect of Existing Equity Interests held by non-corporate holders.  The deductibility of capital losses is subject to significant limitations.

A holder computes its gain as equal to the difference, if any, between (i) the sum of the aggregate fair market value of New Common Shares, Existing Equity Subscription Rights and Warrants the holder received in exchange for its Existing Equity Interest, and (ii) the holder's adjusted tax basis in such Existing Equity Interest exchanged therefor.

In a recapitalization exchange, a holder's tax basis in the New Common Shares, Existing Equity Subscription Rights and Warrants should equal such holder's adjusted tax basis in its Existing Equity Interest increased by any gain recognized in the exchange allocated among the securities based on their relative fair market value.  In general, the holder's holding period for the New Common Shares, Existing Equity Subscription Rights and Warrants would include the holder's holding period for its Existing Equity Interests, except to the extent that the Existing Equity Subscription Rights and/or Warrants are not treated as a security, in which case, the holding period for such Existing Equity Subscription Rights and/or Warrants should begin the day following the Effective Date.

<div align="center">(ii)      Existing Equity Subscription Rights</div>

As is the case with respect to the Senior Noteholder Subscription Rights (described above), the characterization of the Existing Equity Subscription Rights and their subsequent exercise, as applicable, for U.S. federal income tax purposes as the exercise of options to acquire New Common Shares is uncertain given that the Existing Equity Subscription Rights must be exercised prior to the Effective Date, the receipt and exercise of the Existing Equity Subscription Rights pursuant to the Prepackaged Plan could be viewed as an integrated transaction pursuant to which part of the underlying New Common Shares are treated as acquired directly in satisfaction of a holder's Existing Equity Interests and part are treated as acquired for Cash.  The characterization of the Existing Equity Subscription Rights as the exercise of an option to acquire New Common Shares may impact, among other things, assuming the exercise of such rights, a holder's tax basis in the New Common Shares received.  The discussion herein assumes that the Existing Equity Subscription Rights are respected as options (including the discussion above regarding the calculation of gain or loss).

Regardless of the characterization of the Existing Equity Subscription Rights and Warrants, a holder of Existing Equity Subscription Rights and Warrants generally would not recognize any gain or loss upon the exercise of such Existing Equity Subscription Rights and Warrants.  A holder's aggregate tax basis in the New Common Shares received upon exercise of an Existing Equity Subscription Right and/or Warrant should be equal to the sum of (i) the amount paid upon exercise of the Existing Equity Subscription Rights and/or Warrant, as applicable, and (ii) the holder's tax basis in the Existing Equity Subscription Rights and Warrants.

A holder's holding period in the New Common Shares received upon exercise of an Existing Equity Subscription Right and/or Warrant, as applicable, generally should commence the day following the exercise of the right.

<div align="center">76</div>

It is uncertain whether a holder that receives but does not exercise an Existing Equity Subscription Right should be treated as receiving anything of additional value in respect of its Existing Equity Interest. If the Existing Equity Subscription Rights are respected for U.S. federal income tax purposes as options to acquire New Common Shares, and the holder is treated as having received an Existing Equity Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the Existing Equity Subscription Right, upon the lapse of the Existing Equity Subscription Right, the holder generally would recognize a loss to the extent of the holder's tax basis in the Existing Equity Subscription Right or Warrant. In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (which in the case of a "recapitalization" exchange, even if the right lapses unexercised, should include the holding period of the Existing Equity Interest exchanged therefor).

(iii)     Disposition of New Common Shares

Unless a nonrecognition provision applies, and subject to the discussion below, a holder generally will recognize capital gain or loss upon the sale or exchange of the New Common Shares in an amount equal to the difference between (i) the sum of the cash and the fair market value of any property received from such disposition and (ii) the holder's adjusted tax basis in the New Common Shares. Any such gain or loss generally should be long-term capital gain or loss if the holder has a holding period in its New Common Shares of more than one year at that time. A reduced tax rate on long-term capital gain may apply in respect of New Common Shares held by non-corporate holders. The deductibility of capital losses is subject to significant limitations.

## 5.     Distributions

Cash distributions with respect to the New Common Shares generally will be treated as taxable dividends to the extent allocable to the Reorganized Debtor's current and/or accumulated earnings and profits as determined under U.S. federal income tax principles ("earnings and profits"), and will be includible as ordinary income by the holder when received. To the extent the amount of any distribution exceeds available earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the stock as to which the distribution was made, but not below zero. Any remaining excess will be treated as gain from the sale or exchange of such stock.

Dividends are generally taxed as ordinary income; however, dividends received by non-corporate holders may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. Non-corporate holders are urged to consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.

In general, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes will qualify for the 50% dividends received deduction that is available to corporate shareholders that own less than 20% of the voting power or value of the outstanding stock of the distributing corporation (other than certain preferred stock not applicable here). A corporate shareholder holding 20% or more of the distributing corporation (by vote and value)

77

may be eligible for a 65% dividends received deduction. No assurance can be given that the Debtors will have sufficient earnings and profits (as determined for U.S. federal income tax purposes) to cause distributions to be treated as dividends and thus eligible for a dividends received deduction.

The dividends received deduction is only available if certain holding period and taxable income requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed. Finally, the tax consequences of the receipt of a dividend by a corporate shareholder may be different if the dividend is treated as an "extraordinary dividend" under applicable rules.

### 6. Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Prepackaged Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a refund or credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. Holders of Senior Note Claims should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Claims should consult their tax advisors regarding these regulations and whether the contemplated transactions under the Prepackaged Plan would be subject to these regulations and require disclosure on their tax returns.

***The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder's circumstances and income tax situation. All Holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Prepackaged Plan.***

## IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Prepackaged Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Prepackaged Plan or its implementation. Documents filed with the SEC may contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

### A.      Certain Bankruptcy Law Considerations

#### i.       General

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Prepackaged Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Prepackaged Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Prepackaged Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees. The cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### ii.      Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Prepackaged Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Prepackaged Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Prepackaged Plan. Even if all Voting Classes vote in favor of the Prepackaged Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Prepackaged Plan, the Bankruptcy Court could decline to confirm the Prepackaged Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Prepackaged Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise.

#### iii.     Non-Consensual Confirmation

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the Prepackaged Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Prepackaged Plan, the bankruptcy court determines

79

that the Prepackaged Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Class votes to reject the Prepackaged Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Prepackaged Plan satisfies these requirements.

### iv.        *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Prepackaged Plan have not occurred or have not been waived as set forth in Article IX of the Prepackaged Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Prepackaged Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### v.        *Risk of Termination of the Restructuring Support Agreement*

The Restructuring Support Agreement contains certain provisions that give the Requisite Creditors (as defined in the Restructuring Support Agreement) the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

### vi.        *Conversion into Chapter 7 Cases*

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  Please refer to Section XIII.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit F**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### vii.        *Risks Related to Possible Objections to the Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Prepackaged Plan or specific provisions of the Prepackaged Plan.  Although the Debtors believe that the Prepackaged Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Prepackaged Plan or that the Bankruptcy Court will not sustain such an objection.

### viii.        *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Sections 10.7, 10.8, and 10.9 of the Prepackaged Plan provide for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors,

the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Prepackaged Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Prepackaged Plan.

### B.      Risks Related to Investment in the Exit RBL Facility

#### i.      *Insufficient Cash Flow to Meet Debt Obligations*

On the Effective Date, on a consolidated basis, it is expected that the Reorganized Debtors will have total secured indebtedness of approximately $115 million, which is expected to consist of the Exit RBL Facility. If the Reorganized Debtors subsequently fully draw on the Exit RBL Facility, the total secured funded indebtedness outstanding could increase to up to approximately $750 million. This high level of expected indebtedness and the funds required to service such debt could, among other things, make it more difficult for the Reorganized Debtors to satisfy their obligations under such indebtedness, increasing the risk that they may default on such debt obligations.

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments. Any insufficiency could negatively impact the Reorganized Debtors' business. A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt. Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as:

- Refinancing or restructuring debt;

- Selling assets;

- Reducing or delaying capital investments; or

- Seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations. An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtors' ability to make payments on the Exit RBL Facility and their business, financial condition, results of operations, and prospects.

### ii.        *Defects in Collateral Securing the Exit RBL Facility*

The indebtedness under the Exit RBL Facility will be secured, subject to certain exceptions and permitted liens, on a first-priority basis by security interests in substantially all assets of the Reorganized Debtors (henceforth, the "**Collateral**").  The Collateral securing the Exit RBL Facility may be subject to exceptions, defects, encumbrances, liens, and other imperfections.  Further, the Debtors have not conducted appraisals of any of their assets constituting Collateral to determine if the value of the Collateral upon foreclosure or liquidation equals or exceeds the amount of the Exit RBL Facility or such other obligation secured by the Collateral.  Accordingly, it cannot be assured that the remaining proceeds from a sale of the Collateral would be sufficient to repay holders of the securities under the Exit RBL Facility all amounts owed under them.  The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors.  The amount received upon a sale of Collateral would be dependent on numerous factors, including the actual fair market value of the Collateral at such time, and the timing and manner of the sale.  By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value.  In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Reorganized Debtors' obligations under the Exit RBL Facility, in full or at all.  There can also be no assurance that the Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.  Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the Exit RBL Facility.

### iii.        *Failure to Perfect Security Interests in Collateral*

The failure to properly perfect liens on the Collateral could adversely affect the Exit RBL Agent's ability to enforce its rights with respect to the Collateral for the benefit of the holders of the Exit RBL Facility.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the Exit RBL Agent will monitor, or that the Reorganized Debtors will inform the trustee or the Exit RBL Agent of, the future acquisition of property and rights that constitute Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral.  The Exit RBL Agent has no obligation to monitor the acquisition of additional property or rights that constitute Collateral or the perfection of any security interests therein.  Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes against third parties.

### iv.        *Casualty Risk of Collateral*

The Reorganized Debtors will be obligated by the Exit RBL Facility to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar nature in the same or similar localities.  There are, however, certain losses that may either be uninsurable or not economically insurable, in whole or in part.  As a result, it is possible that the insurance proceeds will not compensate the Reorganized Debtors fully for their losses.  If there is a total or partial loss of any of the pledged Collateral, the insurance proceeds received may

be insufficient to satisfy the secured obligations of the Reorganized Debtors, including the Exit RBL Facility.

### v.      *Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors*

Any future pledge of Collateral in favor of the Exit RBL Agent, including pursuant to security documents delivered after the date of the Exit RBL Facility, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the securities under the Exit RBL Facility to receive a greater recovery than if the pledge had not been given, and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

### C.      Additional Factors Affecting the Value of Reorganized Debtors

### i.      *Claims Could Be More than Projected*

There can be no assurance that the estimated Allowed amount of Claims in Class 5 (General Unsecured Claims) will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.   Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.   Therefore, the actual amount of Allowed Claims in Class 5 may vary materially from the Debtors' projections and feasibility analysis.

### ii.      *Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences.   Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Prepackaged Plan, consumer demand for the Reorganized Debtors' products, inflation, and other unanticipated market and economic conditions.   There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.   Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.   Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.   In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters,

terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

### iii.         *Risks Associated with the Debtors' Business and Industry*

The risks associated with the Debtors' businesses and industry are more fully described in the Debtors' SEC filings, including Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on March 12, 2019.  The risks associated with the Debtors' businesses and industry described in the Debtors' SEC filings include, but are not limited to, the following:

- volatility in commodity prices for oil, natural gas and natural gas liquids;

- the Debtors' ability to replace the Debtors' oil and natural gas reserves and production;

- the possibility that acquisitions may involve unexpected costs or delays and that acquisitions may not achieve intended benefits and may divert management's time and energy;

- the presence or recoverability of estimated oil and natural gas reserves attributable to the Debtors' properties and the actual future production rates and associated costs of producing those oil and natural gas reserves;

- the Debtors' ability to successfully develop the Debtors' large inventory of undeveloped acreage;

- access to and availability of water and other treatment materials to carry out fracture stimulations in the Debtors' resource play;

- access to adequate gathering systems, processing and treating facilities, and transportation take-away capacity to move the Debtors' production to marketing outlets to sell the Debtors' production at market prices;

- the cost and availability of goods and services, such as drilling rigs, fracture stimulation services and tubulars;

- contractual limitations that affect the Debtors' management's discretion in managing the Debtors' business, including covenants that, among other things, limit the Debtors' ability to incur debt, make investments and pay cash dividends;

- the potential for production decline rates for the Debtors' wells to be greater than the Debtors expect;

- the Debtors' ability to successfully integrate acquired oil and natural gas businesses and operations;

- competition, including competition for acreage in the Debtors' resource play;

- environmental risks;

- drilling and operating risks;

- exploration and development risks;

- the possibility that the industry may be subject to future regulatory or legislative actions (including additional taxes and changes in environmental regulations);

- general economic conditions, whether internationally, nationally or in the regional and local market areas in which the Debtors do business, may be less favorable than expected, including the possibility that economic conditions in the United States will worsen and that capital markets are disrupted, which could adversely affect demand for oil and natural gas and make it difficult to access capital;

- social unrest, political instability or armed conflict in major oil and natural gas producing regions outside the United States, such as the Middle East, and armed conflict or acts of terrorism or sabotage;

- other economic, competitive, governmental, regulatory, legislative, including federal and state regulations and laws, geopolitical and technological factors that may negatively impact the Debtors' business, operations or oil and natural gas prices;

- the Debtors' insurance coverage may not adequately cover all losses that the Debtors may sustain; and

- title to the properties in which the Debtors have an interest may be impaired by title defects.

### D.    Factors Relating to Securities to Be Issued Under Plan

#### i.    *Market for Securities*

As stated above, the Company was notified by the NYSE that due to "abnormally low" trading price levels, the NYSE has determined to commence delisting proceedings to delist Halcón

Parent's common stock and warrants exercisable for common stock.  Trading in the Company's securities was suspended on July 22, 2019 and, beginning on July 23, 2019, the common stock and warrants of the Company began trading on the OTC Pink marketplace under the symbols "HK" and "HK.SW", respectively.  The NYSE will apply to the SEC to delist the common stock upon completion of all applicable procedures.

No later than seven calendar days prior to the Voting Deadline, the Debtors, with the consent of the Requisite Creditors, shall make a determination as to whether Reorganized Halcón Parent will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp).  If the Debtors determine that Reorganized Halcón Parent will continue to be a reporting company under the Exchange Act, the Debtors shall use their commercially reasonable efforts to have the New Common Shares listed on the NYSE, or another nationally recognized exchange, as soon as practicable, subject to meeting applicable listing requirements following the Effective Date. However, there can be no assurance as to when or whether any such listing will occur or as to the liquidity of any market for the New Common Shares.

### ii.      Potential Dilution

The ownership percentage represented by the New Common Shares distributed on the Effective Date under the Prepackaged Plan to the holders of Existing Equity and Senior Notes will be subject to dilution from the New Common Shares issued pursuant to each of the Rights Offerings, the Management Incentive Plan, the Warrants and the Backstop Commitment Premium, and any other shares that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Shares issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

### iii.      Significant Holders

The holders of Senior Note Claims are expected to acquire a significant ownership interest in the New Common Shares pursuant to the Prepackaged Plan, the Rights Offerings and the Backstop Commitment Agreement.  If such holders were to act as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Shares and the Warrants.

### iv.      Equity Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Shares and the Warrants (and the New Common Shares issuable upon exercise thereof) would rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Common Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### v. *Implied Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares*

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Shares or the Warrants (and the New Common Shares issuable upon exercise thereof) in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities of creditors receiving New Common Shares or the Warrants (and the New Common Shares issuable upon exercise thereof) under the Prepackaged Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Common Shares or the Warrants (and the New Common Shares issuable upon exercise thereof) is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Shares or the Warrants (and the New Common Shares issuable upon exercise thereof) to rise and fall. Accordingly, the implied value, stated herein and in the Prepackaged Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Shares in the public or private markets.

### vi. *No Dividends*

Reorganized Halcón Parent might not pay any dividends on the New Common Shares and may instead retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in the New Common Shares (including the New Common Shares issuable upon exercise of the Warrants) may depend entirely upon any future appreciation in the value of the New Common Shares. There is no guarantee that the New Common Shares will appreciate in value or even maintain their initial value.

### E. Factors Relating to Equity Rights Offerings

### i. *Debtors Could Modify the Rights Offering Procedures*

The Debtors may modify the procedures governing the Equity Rights Offerings, with the approval of the Required Backstop Parties (as defined in the Backstop Commitment Agreement), to, among other things, adopt additional detailed procedures if necessary to administer the distribution and exercise of Subscription Rights or to comply with applicable law. Such modifications may adversely affect the rights of those participating in the Rights Offerings.

### ii. *Bankruptcy Court May Not Approve Rights Offering Procedures*

The Bankruptcy Court's approval of the Rights Offering Procedures is crucial to consummating the restructuring contemplated by the Prepackaged Plan. Failure to obtain the Bankruptcy Court's approval of the Rights Offering Procedures could prevent the Debtors from consummating the Prepackaged Plan and the transactions contemplated thereby.

### *iii.      The Backstop Commitment Agreement Could be Terminated*

The Backstop Commitment Agreement contains certain provisions that give the parties the ability to terminate the Backstop Commitment Agreement if various conditions are not satisfied. Termination of the Backstop Commitment Agreement could prevent the Debtors from consummating the Prepackaged Plan.  Under certain circumstances resulting in termination of the Backstop Commitment Agreement, as more fully described therein, the Backstop Parties may be eligible to be paid the Backstop Commitment Premium in Cash.

### F.      <u>Additional Factors</u>

### *i.      Debtors Could Withdraw Plan*

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Prepackaged Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### *ii.      Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### *iii.      No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Prepackaged Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Prepackaged Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Prepackaged Plan.

### *iv.      No Legal or Tax Advice Is Provided by this Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Prepackaged Plan or object to confirmation of the Prepackaged Plan.

### *v.*     *No Admission Made*

Nothing contained herein or in the Prepackaged Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Prepackaged Plan on the Debtors or holders of Claims or Interests.

## X.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Prepackaged Plan, each holder of a Claim or Interest in a Voting Class as of the Record Dates, as applicable (an "**Eligible Holder**"), should carefully review the Prepackaged Plan attached hereto as **Exhibit A**.  All descriptions of the Prepackaged Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Prepackaged Plan.

### A.     **Voting Deadline**

All Eligible Holders have been sent a Ballot together with this Disclosure Statement.  Such Holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

The Debtors have engaged Kurtzman Carson Consultants LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Prepackaged Plan.

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARDS CONFIRMATION OF THE PREPACKAGED PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE 5:00 P.M. (PREVAILING CENTRAL TIME) ON SEPTEMBER 5, 2019 (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS.**

IF YOU ARE RETURNING YOUR BALLOT TO YOUR NOMINEE, PLEASE RETURN IT BY THE DEADLINE PROVIDED BY YOUR NOMINEE TO ALLOW SUFFICIENT TIME FOR YOUR VOTE TO BE INCLUDED ON A MASTER BALLOT AND FORWARDED TO THE VOTING AGENT BY THE VOTING DEADLINE.

IF YOU (I) HAVE ANY QUESTIONS REGARDING THE BALLOT, (II) DID NOT RECEIVE A COPY OF THE PREPACKAGED PLAN, OR (III) NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE REACH OUT TO THE VOTING AGENT AT (866) 967-1781 (US & CANADA TOLL-FREE) OR (310) 751-2681 (INTERNATIONAL) OR BY SENDING AN ELECTRONIC MAIL MESSAGE TO:

**HalconQuestions@kccllc.com**

89

### B.  Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot (collectively, a "**Solicitation Package**") to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent, or electronically via e-mail to HalconQuestions@KCCLLC.com with "Halcon" in the subject line.

**HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.**

### C.  Parties Entitled to Vote

Under the Bankruptcy Code, only holders of Claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (2) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the plan.

The claims in the following classes are impaired under the Prepackaged Plan and entitled to vote to accept or reject the Prepackaged Plan:

- Class 4 – Senior Note Claims

- Class 7 – Existing Equity Interests

An Eligible Holder should vote on the Prepackaged Plan by completing a Ballot in accordance with the instructions therein and as set forth above.

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Dates.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Prepackaged Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.  Any Ballot marked to both accept and reject the Prepackaged Plan will not be counted.  If you return more than one Ballot voting different claims, the Ballots are not voted in the same manner, and if you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Prepackaged Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim or Interest; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Dates and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Prepackaged Plan and such abstentions will not be counted as votes for or against the Prepackaged Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Prepackaged Plan.

### i.      *Fiduciaries and Other Representatives*

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act.  Authorized signatories should submit the separate Ballot of each Eligible Holder for whom they are voting.

### ii.      *Agreements Upon Furnishing Ballots*

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor or equity holder (as applicable) with respect to such Ballot to accept: (a) all of the terms of, and conditions to, this Solicitation; and (b) the terms of the Prepackaged Plan including the injunction, releases, and exculpations set forth in Sections 10.4, 10.5, 10.6, 10.7, 10.8, and 10.9 therein.  All parties in interest retain their right to object to confirmation of the Prepackaged Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

### *iii.* *Change of Vote*

Subject to the provisions of the Restructuring Support Agreement, any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Prepackaged Plan.

### D.       Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E.       Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your claims or about the packet of material you received, or if you wish to obtain an additional copy of the Prepackaged Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## XI.
## CONFIRMATION OF PLAN

### A.       Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  On, or as promptly as practicable after, the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.      Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Prepackaged Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

a)  **Debtors** at
Halcón Resources Corp.
1000 Louisiana Street, Suite 1500
Houston, Texas 77002
Attn: David Elkouri, Executive Vice President and Chief Legal Officer

b)  **Counsel to Debtors** at
Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:   Alfredo R. Pérez (Alfredo.Perez@weil.com)
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Gary T. Holtzer, Esq., and Lauren Tauro, Esq.
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

c)  **Office of the U.S. Trustee** at
Office of the United States Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516
Houston, Texas 77002
Attn:   Diane Livingstone
Telephone: (713) 718-4650
Facsimile: (713) 718-4670

d)  **Counsel to the Consenting Creditors** at
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:  Andrew Rosenberg, Esq., Robert Britton, Esq., Samuel Lovett, Esq.

Telephone:  (212) 450-4000
Facsimile:  (212) 701-5361

> **IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.      Requirements for Confirmation of Plan

#### i.      Requirements of Section 1129(a) of the Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including whether:

(i)      the Prepackaged Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)      the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)      the Prepackaged Plan has been proposed in good faith and not by any means forbidden by law;

(iv)      any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Prepackaged Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Prepackaged Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Prepackaged Plan is reasonable, or if such payment is to be fixed after confirmation of the Prepackaged Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)      the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Prepackaged Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in the Prepackaged Plan with the Debtors, or a successor to the Debtors under the Prepackaged Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)      with respect to each Class of Claims or Interests, each holder of an impaired Claim has either accepted the Prepackaged Plan or will receive or retain under the Prepackaged Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Prepackaged Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Prepackaged Plan under chapter 7 of the Bankruptcy Code;

94

(vii)   except to the extent the Prepackaged Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Prepackaged Plan or is not impaired under the Prepackaged Plan;

(viii)   except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Prepackaged Plan provides that Administrative Expense Claims and Other Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Prepackaged Plan, equal to the allowed amount of such Claims;

(ix)   at least one Class of impaired Claims has accepted the Prepackaged Plan, determined without including any acceptance of the Prepackaged Plan by any insider holding a Claim in such Class;

(x)   confirmation of the Prepackaged Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Prepackaged Plan; and

(xi)   all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Prepackaged Plan provides for the payment of all such fees on the Effective Date of the Prepackaged Plan.

As provided above, among the requirements for confirmation are that the Prepackaged Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Prepackaged Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Prepackaged Plan; and (C) feasible.

### ii.    *Acceptance of Plan*

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Prepackaged Plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Prepackaged Plan.

If any impaired Class of Claims or Interests does not accept the Prepackaged Plan (or is deemed to reject the Prepackaged Plan), the Bankruptcy Court may still confirm the Prepackaged Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Prepackaged Plan (or is deemed to reject the Prepackaged Plan), the Prepackaged Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Prepackaged Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the

95

Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied for the Prepackaged Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Prepackaged Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the Prepackaged Plan, property of a value, as of the effective date of the Prepackaged Plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Prepackaged Plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the Prepackaged Plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the Prepackaged Plan.

The Debtors believe the Prepackaged Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PREPACKAGED PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### iii.        *Best Interests Test*

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such

holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Prepackaged Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit F.**

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit F** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### iv.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Prepackaged Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Prepackaged Plan. As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the reserve information, development of schedules, and financial information, the "**Financial Projections**") for fiscal years 2019 through 2023 (the "**Projection Period**"). The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit G**. Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Prepackaged Plan and that confirmation of the Prepackaged Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, article VIII hereof sets forth certain risk factors that could impact the feasibility of the Prepackaged Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in

interest after the Confirmation Date or otherwise make such information public. In connection with the planning and development of the Prepackaged Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Prepackaged Plan. The Financial Projections assume that the Prepackaged Plan will be implemented in accordance with its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production domestically and internationally, demand for drilling services, competition and supply of competing rigs, changes in the political environment of the countries in which the Debtors operate, regulatory changes, and a variety of other factors.

Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Prepackaged Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

## XII.
## VALUATION ANALYSIS

Solely for the purposes of the Prepackaged Plan and this Disclosure Statement, Perella Weinberg Partners LP and Tudor, Pickering, Holt & Co. ("**TPH**"), as investment bankers to the Debtors, have estimated a range of total enterprise value (the "**Enterprise Value**") and implied equity value (the "**Equity Value**") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Prepackaged Plan.

For purposes of the Prepackaged Plan, the estimated range of the Enterprise Value of the Reorganized Debtors was determined to be approximately $425 million to $475 million, with a midpoint estimate of approximately $450 million, as of an assumed Effective Date of October 1, 2019. The estimated range of the Enterprise Value represents a valuation of the Reorganized Debtors based on the application of standard valuation techniques, including (a) risked net asset value ("**Risked  NAV**") analysis, (b) discounted cash flow ("**DCF**") analysis, (c) public comparable company ("**Comparable Company**") analysis, and (d) precedent transactions ("**Precedent Transaction**") analysis. For purposes of this valuation, TPH has assumed that no material changes that would affect estimated value occur between the date of this Disclosure Statement and the assumed Effective Date. TPH's estimated range of the Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Prepackaged Plan or of the terms and provisions of the Prepackaged Plan. This valuation analysis is based on information as of July 31, 2019 and is based on reserve information, development schedules and financial information provided by the Debtors' management, as well as the Financial Projections discussed in this Disclosure Statement. This valuation analysis is based on a number of assumptions, including but not limited to a successful

98

reorganization of the Debtors' business in a timely manner, the achievement of the Financial Projections, access to adequate exit financing, continuity of a qualified management team, and capital market conditions consistent with those that exist as of July 31, 2019.

The following is a brief summary of certain financial analyses performed by TPH to arrive at its estimated range of the Enterprise Value. TPH has assigned a weighting to each valuation methodology to arrive at its estimated range of the Enterprise Value to reflect TPH's view of appropriateness of each methodology for the Debtors' circumstances.

### A.     Risked NAV Analysis

The value of the Debtors' proved oil and gas reserves and unproved reserves and unproved acreage were estimated using both pre-tax and post-tax Risked NAV analyses. The Risked NAV analysis estimates the value of the business by calculating the sum of the present value of future cash flows generated by the Reorganized Debtors' reserves.  For the pre-tax risked NAV, various risk-adjusted discount rates are applied to future cash flows from the Reorganized Debtors' reserve report, determined by reserve category. For the post-tax risked NAV, various risk adjustment factors are applied to the present value (using the company's weighted average cost of capital) of future cash flows from the Reorganized Debtors' reserve report, determined by reserve category.  The risk adjustment factors and risk-adjusted discount rates utilized are based on oil and gas exploration and production ("**E&P**") industry standard guidance from The Society of Petroleum Evaluation Engineers, 38th Annual Survey of Parameters Used in Property Evaluation dated July 2019.  The Enterprise Value of the Reorganized Debtors is then calculated by adjusting the aggregate risk-adjusted cash flows for (i) the present value of future corporate costs and other expenditures, including general and administrative costs and, (ii) in the case of the post-tax risked NAV, the present value of future taxes.

### B.     DCF Analysis

The DCF analysis estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business.  The DCF discounts the expected cash flows by a theoretical or observed discount rate.  This approach has two components: (i) calculating the present value of the projected unlevered after-tax cash flows for a determined period of time and (ii) adding the present value of the terminal value of the cash flows.  The terminal value represents the portion of the Enterprise Value that lies beyond the time horizon of the available projections. TPH utilized the Financial Projections to perform these calculations.  In performing the DCF analysis, TPH made assumptions for the (i) weighted average cost of capital to estimate the discount rate which is used to calculate the present value of future cash flows and (ii) the terminal EBITDA multiple, which is used to determine the portion of the Enterprise Value represented by the time period beyond the Financial Projections.

### C.     Comparable Company Analysis

The Comparable Company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar geographic location, scale, reserve composition, operating and financial characteristics and other characteristics deemed relevant. Under this methodology, the enterprise value for each selected public company is

determined by examining the trading prices for the equity securities of such company in the public markets and adding the outstanding net debt for such company. Such enterprise values are commonly expressed as multiples of various measures of operating and asset metrics such as EBITDA, production, and proved reserves. The Enterprise Value of the Reorganized Debtors is calculated by applying these multiples to the Reorganized Debtors' projected financial metrics.

### D.     Precedent Transactions Analysis

The Precedent Transactions analysis estimates the value of a company by examining public and private mergers and acquisitions transactions on an enterprise and asset-level basis. Under this approach, transaction values are commonly expressed as multiples of various measures of operating and asset metrics such as EBITDA, production, net acres and proved reserves. The selection of transactions for this purpose was based on the geographic location, scale and other characteristics deemed relevant to the Reorganized Debtors, and included both enterprise and asset-level transactions. The Enterprise Value of the Reorganized Debtors is calculated by applying these transaction value multiples to the Reorganized Debtors' actual and projected financial metrics.  To adjust for going concern value, the implied value calculated from multiples derived from asset-level transactions is reduced by the present value of future general and administrative costs.

The summary set forth above does not purport to be a complete description of the analysis performed by TPH.  The preparation of an Enterprise Value estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects for such a business. As a result, the estimate of Enterprise Value and Equity Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set herein.

THE ASSUMED RANGE OF THE ENTERPRISE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF OCTOBER 1, 2019 REFLECTS WORK PERFORMED BY TPH ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO TPH AS OF JULY 31, 2019. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT TPH'S CONCLUSIONS, TPH DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the Enterprise Value of the Reorganized Debtors of between $425 million and $475 million and estimated net debt of $115 million as of the Effective Date, the imputed range of Equity Value for the Reorganized Debtors is between approximately $310 million and $360 million, with a midpoint estimate of $335 million.

TPH DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS IN CONNECTION WITH TPH'S ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF ESTIMATES OF THE DEBTORS

WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE ENTERPRISE VALUE PREPARED BY TPH REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PREPACKAGED PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PREPACKAGED PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, TPH, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL AND COMMODITY MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

TPH assumed that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated Enterprise Value and Equity Value ranges assume the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on Enterprise Value and Equity Value.  In estimating the Enterprise Value, TPH: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal

101

financial and operating data of the Debtors, including the Financial Projections; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that TPH deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. TPH assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information. The estimated ranges of Enterprise Value and Equity Value do not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Prepackaged Plan. TPH has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance or at any time.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY TPH REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH TPH'S VALUATION ANALYSIS. TPH IS ACTING AS INVESTMENT BANKER TO THE COMPANY, AND WILL NOT BE RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL OR OTHER SPECIALIST ADVICE.

## XIII.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Prepackaged Plan.  After studying these alternatives, the Debtors have concluded that the Prepackaged Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Prepackaged Plan.  If the Prepackaged Plan is not confirmed and consummated, the alternatives to the Prepackaged Plan are: (A) the preparation and presentation of an alternative reorganization; (B) the a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

### A.      Alternative Plan of Reorganization

If the Prepackaged Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets.  The Debtors, however, believe that the Prepackaged Plan, as described herein, enables their creditors to realize the most value under the circumstances.

102

## B.      Sale Under Section 363 of the Bankruptcy Code

If the Prepackaged Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. Holders of Claims in Classes 2, 3, and the DIP Lenders would be entitled to credit bid on any property to which their security interest is attached to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 2, 3, and the DIP Lenders would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Prepackaged Plan.

## C.      Liquidation under Chapter 7 of Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit F.**

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Prepackaged Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the  Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

## XIV.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 4 and 7 to vote in favor thereof.

Dated: August 2, 2019

    Houston, Texas

Respectfully submitted,

_____

Name:    Richard Little
Title:    Chief Executive Officer

on behalf of

Halcón Resources Corporation
Halcón Holdings, Inc.
Halcón Operating Co., Inc.
Halcón Resources Operating, Inc.
Halcón Field Services, LLC
Halcón Energy Properties, Inc.
Halcón Permian, LLC

[*Signature Page to Disclosure Statement*]

**Exhibit A**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HALCÓN RESOURCES** | § | |
| **CORPORATION,** *et al.*, | § | **Case No. 19-_____ (___)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | |
| | § | |

**JOINT PREPACKAGED CHAPTER 11 PLAN OF
HALCÓN CORPORATION AND ITS AFFILIATED DEBTORS**

| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP** | **WEIL, GOTSHAL & MANGES LLP** |
| Alfredo R. Pérez (15776275) | Gary T. Holtzer |
| 700 Louisiana Street, Suite 1700 | Lauren Tauro |
| Houston, Texas  77002 | 767 Fifth Avenue |
| Telephone: (713) 546-5000 | New York, New York 10153 |
| Facsimile:  (713) 224-9511 | Telephone: (212) 310-8000 |
| | Facsimile: (212) 310-8007 |

*Proposed Counsel for the Debtors
and Debtors in Possession*

Dated:   August 2, 2019
        Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Halcón Resources Corporation (0684), Halcón Resources Operating, Inc. (4856), Halcón Holdings, Inc. (5102), Halcón Energy Properties, Inc. (5292), Halcón Permian, LLC (6153), Halcón Field Services, LLC (0280), and Halcón Operating Co., Inc. (3588).  The Debtors' mailing address is 1000 Louisiana St., Suite 1500, Houston, TX 77002.

**Table of Contents**

ARTICLE I.      **Definitions and Interpretation.** ........................................................................1

  1.1        Definitions ..................................................................................................... 1

  1.2        Interpretation; Application of Definitions; Rules of Construction. ............... 12

  1.3        Reference to Monetary Figures. .................................................................... 13

  1.4        Consent Rights of Consenting Creditors. ...................................................... 13

  1.5        Controlling Document. .................................................................................. 13

ARTICLE II.     **Administrative Expense Claims, Fee Claims, priority tax claims, and DIP Claims.** ......................................................................................13

  2.1        Treatment of Administrative Expense Claims. ............................................... 13

  2.2        Treatment of Fee Claims. .............................................................................. 14

  2.3        Treatment of Priority Tax Claims. ................................................................ 15

  2.4        Treatment of DIP Claims. ............................................................................. 15

  2.5        Restructuring Expenses. ................................................................................ 15

  2.6        Statutory Fees. ............................................................................................... 15

ARTICLE III.    **Classification of Claims and Interests.** .......................................................16

  3.1        Classification in General. .............................................................................. 16

  3.2        Formation of Debtor Groups for Convenience Only. ..................................... 16

  3.3        Summary of Classification of Claims and Interests. ...................................... 16

  3.4        Special Provision Governing Unimpaired Claims. ........................................ 17

  3.5        Elimination of Vacant Classes. ..................................................................... 17

  3.6        Voting Classes; Presumed Acceptance by Non-Voting Classes. .................... 17

  3.7        Voting; Presumptions; Solicitation. ............................................................... 17

  3.8        Cramdown. ................................................................................................... 17

  3.9        No Waiver. ................................................................................................... 18

ARTICLE IV.    **Treatment of Claims and Interests.** ...........................................................18

  4.1        Class 1: Other Priority Claims. .................................................................... 18

  4.2        Class 2: Other Secured Claims. .................................................................... 18

  4.3        Class 3: RBL Claims. ................................................................................... 19

  4.4        Class 4: Senior Notes Claims. ...................................................................... 19

  4.5        Class 5: General Unsecured Claims. ............................................................. 19

| | | |
|---|---|---|
| 4.6 | Class 6:  Intercompany Claims. | 20 |
| 4.7 | Class 7:  Existing Equity Interests. | 20 |
| 4.8 | Class 8:  Other Equity Interests. | 21 |
| 4.9 | Class 9:  Intercompany Interests. | 21 |

**ARTICLE V.    Means for Implementation. ........................................................21**

| | | |
|---|---|---|
| 5.1 | Sources of Consideration for Plan Distributions. | 21 |
| 5.2 | Compromise and Settlement of Claims, Interests, and Controversies. | 22 |
| 5.3 | Continued Corporate Existence; Effectuating Documents; Further Transactions. | 22 |
| 5.4 | Cancellation of Existing Securities and Agreements. | 23 |
| 5.5 | Cancellation of Certain Existing Security Interests. | 23 |
| 5.6 | Officers and Boards of Directors. | 23 |
| 5.7 | Management Incentive Plan. | 24 |
| 5.8 | Authorization and Issuance of New Common Shares and Warrants. | 24 |
| 5.9 | Securities Exemptions. | 25 |
| 5.10 | Equity Rights Offerings. | 26 |
| 5.11 | Exit RBL Agreement. | 27 |
| 5.12 | Registration Rights Agreement. | 27 |
| 5.13 | Intercompany Interests. | 28 |
| 5.14 | Senior Notes Trustee Expenses and Certain Senior Notes Trustee Rights. | 28 |
| 5.15 | Restructuring Transactions. | 28 |
| 5.16 | Separate Plans. | 28 |

**ARTICLE VI.    Distributions. ..............................................................................29**

| | | |
|---|---|---|
| 6.1 | Distributions Generally. | 29 |
| 6.2 | Postpetition Interest on Claims. | 29 |
| 6.3 | Date of Distributions. | 29 |
| 6.4 | Distribution Record Date. | 29 |
| 6.5 | Distributions after Effective Date. | 30 |
| 6.6 | Disbursing Agent. | 30 |
| 6.7 | Delivery of Distributions. | 30 |
| 6.8 | Unclaimed Property. | 31 |
| 6.9 | Satisfaction of Claims. | 31 |

| 6.10 | Manner of Payment under Plan. | 31 |
|------|-------------------------------|----|
| 6.11 | Fractional Shares. | 32 |
| 6.12 | Minimum Distribution. | 32 |
| 6.13 | No Distribution in Excess of Amount of Allowed Claim. | 32 |
| 6.14 | Allocation of Distributions Between Principal and Interest. | 32 |
| 6.15 | Setoffs and Recoupments. | 32 |
| 6.16 | Rights and Powers of Disbursing Agent. | 33 |
| 6.17 | Expenses of Disbursing Agent. | 33 |
| 6.18 | Withholding and Reporting Requirements. | 33 |

| **ARTICLE VII.** | **Procedures for Resolving Claims.** | **34** |
|------|-------------------------------|----|
| 7.1 | Disputed Claims Process. | 34 |
| 7.2 | Objections to Claims. | 34 |
| 7.3 | Estimation of Claims. | 34 |
| 7.4 | Claim Resolution Procedures Cumulative. | 35 |
| 7.5 | No Distributions Pending Allowance. | 35 |
| 7.6 | Distributions after Allowance. | 35 |

| **ARTICLE VIII.** | **Executory Contracts and Unexpired Leases.** | **35** |
|------|-------------------------------|----|
| 8.1 | General Treatment. | 35 |
| 8.2 | Determination of Assumption and Cure Disputes; Deemed Consent. | 36 |
| 8.3 | Rejection Damages Claims. | 37 |
| 8.4 | Survival of the Debtors' Indemnification Obligations. | 37 |
| 8.5 | Compensation and Benefit Plans. | 37 |
| 8.6 | Insurance Policies. | 37 |
| 8.7 | Reservation of Rights. | 38 |

| **ARTICLE IX.** | **Conditions Precedent to the Occurrence of the  Effective Date.** | **38** |
|------|-------------------------------|----|
| 9.1 | Conditions Precedent to Effective Date. | 38 |
| 9.2 | Waiver of Conditions Precedent. | 39 |
| 9.3 | Effect of Failure of a Condition. | 40 |

| **ARTICLE X.** | **Effect of Confirmation.** | **40** |
|------|-------------------------------|----|
| 10.1 | Binding Effect. | 40 |
| 10.2 | Vesting of Assets. | 40 |

iii

| | | |
|---|---|---|
| 10.3 | Discharge of Claims against and Interests in Debtors. | 40 |
| 10.4 | Pre-Confirmation Injunctions and Stays. | 41 |
| 10.5 | Injunction against Interference with Plan. | 41 |
| 10.6 | Plan Injunction. | 41 |
| 10.7 | Releases. | 42 |
| 10.8 | Exculpation. | 43 |
| 10.9 | Injunction Related to Releases and Exculpation. | 44 |
| 10.10 | Subordinated Claims. | 44 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. | 44 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 44 |
| **ARTICLE XI.** | **Retention of Jurisdiction.** | **45** |
| 11.1 | Retention of Jurisdiction. | 45 |
| **ARTICLE XII.** | **Miscellaneous Provisions.** | **47** |
| 12.1 | Exemption from Certain Transfer Taxes. | 47 |
| 12.2 | Request for Expedited Determination of Taxes. | 47 |
| 12.3 | Dates of Actions to Implement Plan. | 47 |
| 12.4 | Amendments. | 47 |
| 12.5 | Revocation or Withdrawal of Plan. | 48 |
| 12.6 | Severability. | 48 |
| 12.7 | Governing Law. | 48 |
| 12.8 | Immediate Binding Effect. | 49 |
| 12.9 | Successors and Assigns. | 49 |
| 12.10 | Entire Agreement. | 49 |
| 12.11 | Computing Time. | 49 |
| 12.12 | Exhibits to Plan. | 49 |
| 12.13 | Notices. | 49 |
| 12.14 | Reservation of Rights. | 51 |

Each of Halcón Resources Corporation, Halcón Resources Operating, Inc., Halcón Holdings, Inc., Halcón Energy Properties, Inc., Halcón Permian, LLC, Halcón Field Services, LLC, and Halcón Operating Co., Inc. (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in <u>section 1.1</u> below.

## ARTICLE I.         DEFINITIONS AND INTERPRETATION.

### 1.1     *Definitions.*

The following terms shall have the respective meanings specified below:

***Administrative Expense Claim*** means any Claim (other than DIP Claims) for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses, (ii) Fee Claims, and (iii) Restructuring Expenses.

***Ad Hoc Noteholder Group*** means those certain holders of Senior Notes represented by the Consenting Creditor Advisors.

***Allowed*** means, with respect to any Claim against or Interest in a Debtor, (i) any Claim to which the Debtors and the holder of the Claim agree to the amount of the Claim or a court of competent jurisdiction has determined the amount of the Claim by Final Order, (ii) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a Final Order of the Bankruptcy Court, (iii) any Claim that is listed in the Schedules, if any are filed, as liquidated, non-contingent, and undisputed, or (iv) any Claim or Interest expressly allowed hereunder; *provided, however,* that, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to this Plan.

***Amended Organizational Documents*** means, with respect to each Reorganized Debtor, the form of certificate of incorporation, certificate of formation, bylaws, limited liability company agreement, shareholder agreement (if any), or other similar organizational documents, as applicable, for such Reorganized Debtor.

***Asset*** means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible property.

***Backstop Commitment Premium*** has the meaning ascribed to such term in the Senior Noteholder Backstop Agreement.

**Backstop Parties** means the Senior Noteholders that are signatories to the Senior Noteholder Backstop Agreement.

**Backstop Purchase** has the meaning ascribed to such term in the Senior Noteholder Backstop Agreement.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**Cash** means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim.

**Chapter 11 Case** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

2

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

*Class* means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

*Collateral* means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

*Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

*Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court (i) approving (a) the Disclosure Statement pursuant to sections 1125 and 1126(b), (b) the solicitation of votes and voting procedures, (c) the form of ballots, and (d) the Rights Offering Procedures, and (ii) confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

*Consenting Creditors* has the meaning set forth in the RSA.

*Consenting Creditor Advisors* means, together, the Consenting Creditor Counsel and Ducera Partners, LLC, as financial advisor to the Ad Hoc Noteholder Group.

*Consenting Creditor Counsel* means (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel and (ii) Porter Hedges LLP, as local counsel, to the Ad Hoc Noteholder Group.

*Cure Amount* means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*Debtor(s)* has the meaning set forth in the introductory paragraph of this Plan.

*Definitive Documents* has the meaning ascribed to such term in the RSA.

*DIP Agent* means Wilmington Trust, National Association, solely in its capacity as administrative agent under the DIP Facility, or its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Agreement.

*DIP Agreement* means that certain Junior Secured Debtor-In-Possession Credit Agreement, to be dated after the Petition Date, by and among, Halcón Parent, as borrower, the other Debtors, as guarantors, the DIP Lenders, and the DIP Agent, as the same may be amended,

3

restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

***DIP Claim*** means all Claims held by the DIP Lenders on account of, arising under, or relating to the DIP Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, interest, reasonable and documented fees, expenses, costs, and other charges of the DIP Lenders.

***DIP Facility*** means that certain debtor-in-possession financing facility provided by the DIP Lenders in an aggregate principal amount of $35,000,000 made available pursuant to the terms of the DIP Agreement.

***DIP Lenders*** means lenders from time to time party to the DIP Agreement.

***DIP Orders*** means, collectively, (i) the Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(2), 364(c)(3), and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and (ii) a Final Order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Agreement and access the DIP Facility, which DIP Orders shall be in form and substance acceptable to the DIP Lenders.

***Disbursing Agent*** means any Entity in its capacity as a disbursing agent under section 6.6 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such capacity to make distributions pursuant to this Plan.

***Disclosure Statement*** means the disclosure statement for this Plan, including all exhibits, schedules, supplements, modifications, amendments, and annexes thereto, each as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law.

***Disputed*** means, with respect to a Claim, (i) any Claim, which Claim is disputed under ARTICLE VII of this Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

***Distribution Record Date*** means, except as otherwise provided in this Plan or the Plan Documents, the Effective Date.

*DTC* means Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

*Effective Date* means the date which is the first Business Day on which (i) all conditions to the effectiveness of this Plan set forth in section 9.1 of this Plan have been satisfied or waived in accordance with the terms of this Plan and (ii) no stay of the Confirmation Order is in effect.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Equity Rights Offerings* means, collectively, the Senior Noteholder Rights Offering and the Existing Equity Interests Rights Offering.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Exchange Act* means the Securities Exchange Act of 1934, as amended.

*Exculpated Parties* means, collectively, and in each case in their capacities as such during the Chapter 11 Cases, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

*Existing Equity Cash Out* has the meaning set forth in the Restructuring Term Sheet.

*Existing Equity Interests* means shares of the class of common stock of Halcón Parent that existed immediately prior to the Effective Date, including any restricted stock of Halcón Parent that vests prior to the Effective Date.

*Existing Equity Interests Rights Offering* means that certain rights offering pursuant to which, subject to the Existing Equity Cash Out, each holder of Allowed Existing Equity Interests is entitled to receive Existing Equity Interests Subscription Rights to acquire New Common Shares in accordance with the applicable Rights Offering Procedures.

*Existing Equity Interests Subscription Rights* means the Subscription Rights allocated to holders of Allowed Existing Equity Interests in accordance with the Rights Offering Procedures.

*Exit RBL Agent* means the administrative agent under the Exit RBL Agreement.

5

***Exit RBL Agreement*** means that certain senior secured revolving credit agreement, to be dated as of the Effective Date, by and among Halcón Parent, as borrower, the Exit RBL Agent, and the Exit RBL Lenders, the form of which shall be contained in the Plan Supplement, and which shall otherwise be in form and substance substantially consistent with the Exit RBL Commitment Letter.

***Exit RBL Commitment Letter*** means that certain commitment letter among the Halcón Parent, BMO Harris Bank N.A. and BMO Capital Markets Corp., attached to the Disclosure Statement as Exhibit G that sets forth the principal terms of the Exit RBL Agreement and as approved by order of the Bankruptcy Court.

***Exit RBL Lenders*** means the lenders party to the Exit RBL Agreement as of the Effective Date.

***Exit RBL Facility*** means a revolving loan facility in an aggregate principal amount of $750,000,000, with an initial borrowing base at $275,000,000, governed by the Exit RBL Agreement, the proceeds of which shall be used, subject to the terms thereof, to (i) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, (ii) pay all reasonable and documented Restructuring Expenses, and (iii) fund Plan Distributions, in each case consistent with the Restructuring Term Sheet. For the avoidance of doubt, the Exit RBL Facility is the same as, and is referred to in the RSA as, the "Exit Facility."

***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by Professional Persons.

***Fee Escrow Account*** means an interest-bearing account in an amount equal to the total estimated amount of Fee Claims funded by the Debtors on the Effective Date.

***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

***Governance Term Sheet*** means a term sheet, in accordance with section 5.8 of this Plan, setting forth the post-Effective Date corporate governance of Reorganized Halcón Parent.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*General Unsecured Claim* means any Claim, other than a RBL Claim, Senior Notes Claim, Other Secured Claim, Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, DIP Claim, or Intercompany Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

*Halcón Parent* means Halcón Resources Corporation.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means any Interests in any of the Debtors held by another Debtor.

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the applicable Debtor, that existed immediately before the Effective Date.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Management Incentive Plan* means a post-emergence management incentive plan to be implemented by the New Board after the Effective Date as further described in section 5.7 of this Plan.

*MIP Equity* means New Common Shares issued in connection with the Management Incentive Plan.

*New Board* means the initial board of directors of Reorganized Halcón Parent.

*New Common Shares* means the shares of common stock of Reorganized Halcón Parent to be issued (i) on the Effective Date pursuant to this Plan, including pursuant to the Equity Rights Offerings and Backstop Commitment Premium, (ii) upon implementation of the Management Incentive Plan, (iii) upon exercise of the Warrants, or (iv) as otherwise permitted pursuant to the Amended Organizational Documents of Reorganized Halcón Parent.

*Other Equity Interests* means all Interests in Halcón Parent other than Existing Equity Interests.

7

*Other Priority Claim* means any Claim other than an Administrative Expense Claim, a DIP Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

*Other Secured Claim* means any Secured Claim other than a Priority Tax Claim, a DIP Claim, or a RBL Claim.

*Person* means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*Petition Date* means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

*Plan* means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to this Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the RSA.

*Plan Distribution* means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under this Plan.

*Plan Document* means any Definitive Document or document in the Plan Supplement.

*Plan Supplement* means a supplement or supplements to this Plan containing certain documents relevant to the implementation of this Plan, to be filed with the Bankruptcy Court no later than seven (7) calendar days before the Voting Deadline, which shall include (i) the Amended Organizational Documents of Reorganized Halcón Parent, (ii) the slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the Exit RBL Agreement, (v) the Warrant Agreement(s), (vi) a schedule of retained Causes of Action, (vii) the Registration Rights Agreement, (viii) and the Governance Term Sheet, if applicable; *provided*, *however*, that, through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the RSA.

*Priority Tax Claim* means any Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

*Professional Person* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Registration Rights Agreement* means the registration agreement to be entered into on the Effective Date by Reorganized Halcón Parent and the Registration Rights Parties, the terms of which shall be consistent in all material respects with the Restructuring Term Sheet.

*Registration Rights Parties* means the Consenting Creditors and any recipient of New Common Shares that receives (together with its affiliates and related funds) 10% or more of the voting Securities of Reorganized Halcón Parent issued pursuant to this Plan.

*Released Parties* means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Creditors, (iv) the Ad Hoc Noteholder Group and each of its members, (v) the Senior Notes Trustee, (vi) the Exit RBL Agent, Exit RBL Lenders, and any arranger under the Exit RBL Facility, (vii) the DIP Agent and DIP Lenders, (viii) the RBL Agent and the RBL Lenders, (ix) with respect to each of the foregoing Persons in clauses (i) through (viii), each of their affiliates, and (x) with respect to each of the foregoing Persons in clauses (i) through (ix) such Persons' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

*Releasing Parties* means, collectively, (i) the holders of all Claims or Interests who vote to accept this Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject this Plan is solicited but who do not vote either to accept or to reject this Plan, (iii) the holders of all Claims or Interests who vote, or are deemed, to reject this Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, (v) all other holders of Claims and Interests to the maximum extent permitted by law, and (vi) the Released Parties.

*Reorganized Halcón Parent* means Halcón Parent, as reorganized on the Effective Date in accordance with this Plan.

*Reorganized Debtor(s)* means, with respect to each Debtor, such Debtor as reorganized as of the Effective Date in accordance with this Plan.

*Requisite Creditors* has the meaning set forth in the RSA.

*Restructuring* has the meaning set forth in the RSA.

*Restructuring Expenses* means the reasonable and documented fees and expenses incurred by the Consenting Creditors Advisors and the DIP Agent in connection with the Restructuring, as provided by the RSA, payable in accordance with the terms of the applicable fee letters executed with such parties, and any applicable law or orders of the Bankruptcy Court.

*Restructuring Term Sheet* means that certain term sheet attached as Exhibit A to the RSA.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including (i) the consummation of the transactions provided for under or contemplated by the RSA and the Restructuring Term Sheet, (ii) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of this Plan, the RSA, and the Restructuring Term Sheet, and that satisfy the requirements of applicable law, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan, the RSA, and the Restructuring Term Sheet, and (iv) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the RSA and the Restructuring Term Sheet.

*RBL Agent* means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the RBL Agreement.

*RBL Agreement* means that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 7, 2017 (as amended, modified, or otherwise supplemented from time to time), by and among Halcón Parent, as borrower, the RBL Agent, and the RBL Lenders party thereto from time to time.

*RBL Claims* means all Claims against the Debtors arising under or in connection with the RBL Agreement and all documents relating thereto, including all Letters of Credit, Loan Documents, and Secured Swap Agreements (each as defined in the RBL Agreement).

*RBL Lenders* means the lenders from time to time party to the RBL Agreement and all other Secured Parties (as defined in the RBL Agreement).

*Registered Holder* means a holder of an Existing Equity Interest whose ownership interest is registered directly on the books and records of Halcón Parent's transfer agent.

*Rights Offering Equity* means New Common Shares issued pursuant to the Equity Rights Offerings.

*Rights Offering Participant* means each holder of an Existing Equity Interest (subject to the Existing Equity Cash Out) or Senior Notes Claim as of the Rights Offering Record Date.

*Rights Offering Procedures* means the procedures for the implementation of the Equity Rights Offerings, as applicable, in substantially the form attached to the Disclosure Statement as Exhibit E and Exhibit F.

*Rights Offering Record Date* means August 30, 2019.

*RSA* means that certain Restructuring Support Agreement, dated as of August 2, 2019, by and among the Debtors and the Consenting Creditors, attached to the Disclosure

10

Statement as <u>Exhibit A</u>, as the same may be amended, restated, or otherwise modified in accordance with its terms.

**Schedule of Rejected Contracts** means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to this Plan, if any, as the same may be amended, modified, or supplemented from time to time.

**Schedules** means, the schedules of Assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

**Secured Claim** means a Claim to the extent (i) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (a) as set forth in this Plan, (b) as agreed to by the holder of such Claim and the Debtors, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

**Senior Notes Claim** means any Claim arising from, or related to, the Senior Notes.

**Senior Notes Indenture** means that certain indenture, dated as of February 16, 2017 (as amended, modified, or otherwise supplemented from time to time), under which the Senior Notes were issued, by and among Halcón Parent, as issuer, each of the guarantors named therein, and the Senior Notes Trustee.

**Senior Noteholder** means a holder of Senior Notes.

**Senior Noteholder Backstop Agreement** means the Backstop Commitment Agreement, dated August 2, 2019, by and among Halcón Parent and the Backstop Commitment Parties and attached to the RSA as <u>Exhibit B</u>.

**Senior Noteholder Rights Offering** means that certain rights offering pursuant to which each holder of Allowed Senior Notes Claim is entitled to receive Senior Noteholder Subscription Rights to acquire New Common Shares in accordance with the applicable Rights Offering Procedures.

**Senior Noteholder Subscription Rights** means the Subscription Rights allocated to holders of Allowed Senior Notes Claims in accordance with the applicable Rights Offering Procedures.

**Senior Notes** means the 6.75% Senior Notes due 2025 issued pursuant to the Senior Notes Indenture in the aggregate principal amount of $625,005,000.

**Senior Notes Trustee** means U.S. Bank National Association in its capacity as trustee under the Senior Notes Indenture and its successors, assigns, or any replacement trustee appointed pursuant to the terms of the Senior Notes Indenture.

*Securities Act* means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Statutory Fees* means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Subscription Rights* means the subscription rights to acquire New Common Shares in accordance with the Rights Offering Procedures.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*U.S. Trustee* means the United States Trustee for Region 7.

*Voting Deadline* means September 5, 2019 at 5:00 p.m. prevailing Central Time, or such other date and time as may set by the Bankruptcy Court.

*Warrant Agreement(s)* means one or more warrant agreement(s) to be entered into by and among Reorganized Parent and the warrant agent named therein that shall govern the terms of the Warrants, the form(s) of which shall be included in the Plan Supplement.

*Warrants* has the meaning set forth in the Restructuring Term Sheet.

*Warrant Equity* means New Common Shares issuable upon the exercise of the Warrants, subject to dilution by the MIP Equity.

**1.2** ***Interpretation; Application of Definitions; Rules of Construction.***

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the RSA. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall

12

be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3  *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4  *Consent Rights of Consenting Creditors.*

Notwithstanding anything herein to the contrary, any and all consent rights of the Consenting Creditors set forth in the RSA with respect to the form and substance of this Plan, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

### 1.5  *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

**ARTICLE II.**     **ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, PRIORITY TAX CLAIMS, AND DIP CLAIMS.**

### 2.1  *Treatment of Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim (other than Restructuring Expenses or a Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, *however*, that Allowed

Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2.2     *Treatment of Fee Claims.*

(a)     All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which a Final Order relating to any such Allowed Fee Claim is entered or (ii) on such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Reorganized Debtors, as applicable.  The Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with section 2.1 of this Plan.  No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way, other than customary liens in favor of the depository bank at which the Fee Escrow Account is maintained.

(c)     Any objections to Fee Claims shall be served and filed (i) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (ii) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

<center>14</center>

**2.3     *Treatment of Priority Tax Claims.***

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**2.4     *Treatment of DIP Claims.***

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim (a) shall be paid in full in Cash by the Debtors equal to the Allowed amount of such DIP Claim and all commitments under the DIP Agreement shall terminate, or (b) shall be otherwise satisfied by the Debtors in a manner acceptable to the DIP Agent, any affected DIP Lender under the DIP Agreement, and any other holder of a DIP Claim, as applicable.  Upon the indefeasible payment or satisfaction in full in Cash, or other satisfactory treatment, of the DIP Claims in accordance with the terms of this Plan, on the Effective Date, all Liens granted to secure such obligations shall be terminated and of no further force and effect.

**2.5     *Restructuring Expenses.***

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

**2.6     *Statutory Fees.***

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S.

15

Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

**ARTICLE III.          CLASSIFICATION OF CLAIMS AND INTERESTS.**

**3.1     *Classification in General.***

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2     *Formation of Debtor Groups for Convenience Only.***

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

**3.3     *Summary of Classification of Claims and Interests.***

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | RBL Claims | Unimpaired | No (Deemed to accept) |
| Class 4 | Senior Notes Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 7 | Existing Equity Interests | Impaired | Yes |
| Class 8 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 9 | Intercompany Interests | Unimpaired | No (Deemed to accept) |

16

**3.4**   *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**3.5**   *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**3.6**   *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims in such Class.

**3.7**   *Voting; Presumptions; Solicitation.*

(a)   **Acceptance by Certain Impaired Classes**.   Only holders of Claims in Class 4 and Interests in Class 7 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  An Impaired Class of Interests shall have accepted this Plan if the holders of at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class have voted to accept this Plan.  Holders of Claims in Class 4 and Interests in Class 7 shall receive ballots containing detailed voting instructions.

(b)   **Deemed Acceptance by Unimpaired Classes**.   Holders of Claims and Interests in Classes 1, 2, 3, 5, 6, and 9 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c)   **Deemed Rejection by Impaired Class**.   Holders of Interests in Class 8 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject this Plan.

**3.8**   *Cramdown.*

If any Class is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code, including by (A) modifying the treatment applicable to a

17

Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or (B) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.9    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

### ARTICLE IV.        TREATMENT OF CLAIMS AND INTERESTS.

### 4.1    *Class 1:  Other Priority Claims.*

(a)    **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(b)    **Impairment and Voting**:    Allowed Other Priority Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.2    *Class 2:  Other Secured Claims.*

(a)    **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b)    **Impairment and Voting**:    Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed

Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.3    *Class 3: RBL Claims*

(a)    **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed RBL Claims are unaltered by this Plan.  On the Effective Date, each holder of an Allowed RBL Claim shall receive payment in full, in Cash of all Allowed RBL Claims, including by a refinancing, and all outstanding letters of credit shall either be replaced, cash collateralized or otherwise secured to the satisfaction of the Issuing Bank (as defined in the RBL Agreement) in accordance with the terms of the RBL Agreement.

(b)    **Impairment and Voting**:  Allowed RBL Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed RBL Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed RBL Claims.

(c)    **Allowance**:  The RBL Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount up to $225 million, plus all amounts owing by the Debtors under the Secured Swap Agreements (as defined in the RBL Agreement) that have terminated as of or prior to the Effective Date, plus all accrued and unpaid interest and fees (including interest and fees at the default rate that has accrued but not been paid during the Chapter 11 Cases), and all other amounts that are outstanding under the RBL Agreement as of the Effective Date.

### 4.4    *Class 4: Senior Notes Claims.*

(a)    **Treatment**:  On the Effective Date, each holder of an Allowed Senior Notes Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of (i) 91% of the total New Common Shares issued pursuant to this Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium, and (ii) the Senior Noteholder Subscription Rights.

(b)    **Impairment and Voting**:  Senior Notes Claims are Impaired.  Holders of Senior Notes Claims are entitled to vote on this Plan.

(c)    **Allowance**:  The Senior Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $625,005,000.

### 4.5    *Class 5: General Unsecured Claims.*

(a)    **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall continue to pay or dispute

19

each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(b)   **Impairment and Voting**:   Allowed General Unsecured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed General Unsecured Claims.

### 4.6   *Class 6:  Intercompany Claims.*

(a)   **Treatment**:  On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their discretion and in consultation with the Consenting Creditors.

(b)   **Impairment and Voting**:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.7   *Class 7:  Existing Equity Interests.*

(a)   **Treatment**:   On the Effective Date, Existing Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect.  Each holder of Existing Equity Interests shall receive on account of such holder's Existing Equity Interests:

> (1) if a Registered Holder holds fewer than or equal to 2,000 shares of Existing Equity Interests, Cash in an amount equal to the inherent value of such Registered Holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to this Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium, (ii) the Warrants and (iii) the Existing Equity Interests Subscription Rights; or

> (2) for any other holder of Existing Equity Interests, such holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to this Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium; *provided*, *however*, that the amount of total New Common Shares available to be issued pursuant to this provision shall be reduced by the amount of New Common Shares that would have been distributed to holders of Existing Equity Interests in the absence of the immediately preceding clause (1), (ii) the Warrants, and (iii) the Existing Equity Interests Subscription Rights.

20

(b) **Impairment and Voting**: Existing Equity Interests are Impaired. Holders of Existing Equity Interests are entitled to vote on this Plan.

### 4.8 *Class 8:  Other Equity Interests.*

(a) **Treatment**:  On the Effective Date, Other Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect.

(b) **Impairment and Voting**: Other Equity Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Other Equity Interests.

### 4.9 *Class 9:  Intercompany Interests.*

(a) **Treatment**:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.13 of this Plan.

(b) **Impairment and Voting**: Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.


## ARTICLE V.   MEANS FOR IMPLEMENTATION.

### 5.1 *Sources of Consideration for Plan Distributions.*

(a) *Cash on Hand*.  The Reorganized Debtors shall use Cash on hand to fund distributions to certain holders of Claims against the Debtors.

(b) *New Common Shares and Warrants*.  On or as soon as reasonably practicable after the Effective Date, Reorganized Halcón Parent shall issue and distribute the New Common Shares and the Warrants to holders of Allowed Senior Notes Claims and Existing Equity Interests entitled to receive New Common Shares and Warrants pursuant to the Plan, or notwithstanding anything to the contrary in this Plan, such holder's designated affiliates to the extent permitted by DTC.

(c) *Exit RBL Facility*.  On the Effective Date, the Reorganized Debtors shall enter into the Exit RBL Facility, the proceeds of which may be used to (i) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, (ii) pay all reasonable and documented Restructuring Expenses, and (iii) fund Plan Distributions.

21

(d) ***Plan Funding***.  Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Equity Rights Offerings and Exit RBL Facility.

### 5.2 *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

### 5.3 *Continued Corporate Existence; Effectuating Documents; Further Transactions.*

(a) Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents.

(b) On and after the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor and subject to the terms of each such contract or other agreement, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the Amended Organizational Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor, (ii) a Reorganized Debtor to be dissolved, (iii) the legal name of a Reorganized Debtor to be changed, or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under applicable state, federal, or foreign law).

(c) On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and the Definitive Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree, (ii) the execution and delivery of appropriate instruments of transfer,

22

assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, (iv) the Restructuring Transactions, (v) if the Debtors expect to qualify for and elect to utilize the special bankruptcy exception under section 382(l)(5) of the Tax Code, the Debtors may seek Bankruptcy Court approval of certain procedures and potential restrictions on the accumulation of Claims with respect to Persons who are or will be substantial claimholders and the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Shares, and (vi) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

### 5.4 *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, or in any Plan Document, including with respect to refinancing the RBL Agreement, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, Securities and other documents evidencing any Claim or Interest (other than Intercompany Interests that are not modified by this Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Disbursing Agent. The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.

### 5.5 *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.6 *Officers and Boards of Directors.*

(a)     On the Effective Date, the New Board shall consist of (i) the Reorganized Debtors' chief executive officer and (ii) the members selected by the Requisite Creditors to be disclosed in the Plan Supplement to the extent known and determined. The identity and affiliations of any person proposed to serve on the New Board shall be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve

as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective Amended Organizational Documents.

(c)        Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations or duties to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable Amended Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.7    *Management Incentive Plan.*

After the Effective Date, the New Board shall adopt the Management Incentive Plan.  The participants and amounts allocated under the Management Incentive Plan and other terms and conditions thereof shall be determined in the sole discretion of the New Board; *provided*, *however*, that the Management Incentive Plan shall include restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares representing 7.5% to 10% of the New Common Shares authorized to be issued pursuant to this Plan and the Equity Rights Offerings on a fully diluted basis.

### 5.8    *Authorization and Issuance of New Common Shares and Warrants.*

(a)        On the Effective Date, (i) Reorganized Halcón Parent is authorized to issue or cause to be issued and shall issue (A) the New Common Shares (including the New Common Shares issuable in connection with the Backstop Commitment Premium and the Equity Rights Offerings) and (B) the Warrants, and (ii) the issuance of Subscription Rights by Reorganized Halcón Parent in connection with the Equity Rights Offerings is authorized, ratified, and confirmed in all respects; each in accordance with the terms of this Plan without the need for any further corporate or shareholder action.  All of the New Common Shares and the Warrants issuable under this Plan, when so issued, shall be duly authorized, validly issued, and, in the case of the New Common Shares, fully paid, and non-assessable.  The Warrant Equity (upon payment of the exercise price in accordance with the terms of such Warrants) issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

(b)        No later than seven (7) calendar days prior to the Voting Deadline, the Debtors, with the consent of the Requisite Creditors, shall make a determination as to whether Reorganized Halcón Parent will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp) following December 31, 2019.  If the Debtors determine pursuant to this provision that Reorganized Halcón Parent will continue to be a reporting company under the Exchange Act following December 31, 2019, the Debtors shall use their commercially reasonable efforts to have the New Common Shares listed on the New York Stock Exchange, or another nationally recognized exchange, as soon as practicable, subject to meeting applicable

24

listing requirements following the Effective Date.  If the Debtors determine pursuant to this provision that Reorganized Halcón Parent will not continue to be a reporting company under the Exchange Act following December 31, 2019, the Debtors shall file the Governance Term Sheet.

(c)       The Warrants shall be issuable pursuant to the terms of the respective Warrant Agreements, the form and substance of which shall be consistent with the Restructuring Term Sheet and filed with the Plan Supplement.  Each Warrant shall, subject to the terms of the respective Warrant Agreements, be exercisable for one (1) New Common Share.

### 5.9      *Securities Exemptions.*

(a)       The issuance and distribution of the New Common Shares, the Warrants (and the Warrant Equity), and the Subscription Rights to holders of Allowed Senior Notes Claims and Allowed Existing Equity Interests, as applicable, under Article IV of this Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code.  The New Common Shares and the Warrants (and the Warrant Equity issuable upon exercise thereof) issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)       The issuance and sale, as applicable, of the New Common Shares to be issued pursuant to the Backstop Commitment Agreement, including those to be issued in respect of the Backstop Commitment Premium, are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder.  Such Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 of the Securities Act.

(c)       On the Effective Date, the ownership of the New Common Shares shall be reflected through the facilities of the DTC.  None of the Debtors, the Reorganized Debtors, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Shares or the Warrants under applicable securities laws.  DTC and any transfer agent shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Shares or the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

(d)       The Debtors may elect to deliver the Warrants through the facilities of DTC; *provided*, *however*, that delivery of the Warrants through the facilities of DTC shall not be mandatory.

(e)     Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including whether the New Common Shares, the Warrants, and the Warrant Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 5.10   *Equity Rights Offerings.*

The Equity Rights Offerings shall be conducted by the Debtors and consummated on the terms and subject to the conditions set forth in the Rights Offering Procedures and the Senior Noteholder Backstop Agreement. To facilitate the Senior Noteholder Rights Offering and the other Restructuring Transactions, and in exchange for the Backstop Commitment Premium, the Backstop Parties have agreed to consummate the Backstop Purchase, subject to the terms and conditions set forth in the Senior Noteholder Backstop Agreement.  The Backstop Parties' obligation to consummate the Backstop Purchase pursuant to the Senior Noteholder Backstop Agreement shall be contingent upon all conditions set forth in the Senior Noteholder Backstop Agreement being satisfied or otherwise waived in accordance with the Senior Noteholder Backstop Agreement.  Confirmation shall constitute Bankruptcy Court approval of the Equity Rights Offerings (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith).

(a)     **Existing Equity Interests Rights Offering**.  After the Petition Date, subject to interim approval of the Disclosure Statement by the Bankruptcy Court, subject to the Existing Equity Cash Out, the Debtors shall distribute the Existing Equity Interests Subscription Rights to holders of Existing Equity Interests as set forth in the Plan and the applicable Rights Offering Procedures.  Each Rights Offering Participant in the Existing Equity Interests Rights Offering shall be offered the Existing Equity Interests Subscription Rights to purchase its Pro Rata share of the New Common Shares to be issued pursuant to the Existing Equity Interests Rights Offering.  On the Effective Date, the Debtors shall consummate the Existing Equity Interests Rights Offering.  The Existing Equity Interests Subscription Rights may not be sold, transferred, or assigned.

(b)     **Senior Noteholder Rights Offering**.

(i)     After the Petition Date, subject to interim approval of the Disclosure Statement by the Bankruptcy Court, the Debtors shall distribute the Senior Noteholder Subscription Rights to holders of Senior Notes Claim as set forth in the Plan and the applicable Rights Offering Procedures. Each Rights Offering Participant in the Senior Noteholder Rights Offering shall be offered the Senior Noteholder Subscription Rights to purchase its Pro Rata share of the New Common Shares to be issued pursuant to the Senior Noteholder Rights Offering.  On the Effective Date, the Debtors shall consummate the Senior Noteholder Rights Offering.  The Senior Noteholder Subscription Rights may not be sold, transferred, or assigned.  The Senior Noteholder Rights Offering shall be fully backstopped by the Backstop Parties in accordance with and subject to the terms and conditions of the Senior Noteholder Backstop Agreement.

(ii)    In accordance with the Senior Noteholder Backstop Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, the amount of New Common Shares equal to its respective Backstop Commitment (as defined in the Senior Noteholder Backstop Agreement).  The Backstop Commitment for the Senior Noteholder Rights Offering, shall be treated as a put option and the Backstop Commitment Premium shall be treated as remuneration for agreeing to enter into such put option.  Upon the Effective Date, the Backstop Commitment Premium shall be immediately and automatically payable and issued.

(c)    **Proceeds**.  The proceeds of the Equity Rights Offerings shall be used to (i) fund Plan distributions, (ii) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, and (iii) pay all reasonable and documented Restructuring Expenses.

### 5.11    *Exit RBL Agreement.*

(a)    On the Effective Date, the Reorganized Debtors are authorized to and shall enter into the Exit RBL Agreement and all other documents, notes, agreements, guaranties, and other collateral documents contemplated thereby.  The Exit RBL Agreement shall constitute legal, valid, binding, and authorized joint and several obligations of the Reorganized Debtors enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, this Plan, or the Confirmation Order.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit RBL Agreement (x) shall be valid, binding, perfected, enforceable first priority Liens and security interests in the property subject to a security interest granted by the applicable Reorganized Debtors pursuant to the Exit RBL Agreement, with the priorities established in respect thereof under applicable non-bankruptcy law and (y) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, this Plan, or the Confirmation Order.

(b)    The Exit RBL Agent is hereby authorized to file, with the appropriate authorities, financing statements, amendments thereto or assignments thereof and other documents, including mortgages or amendments or assignments thereof in order to evidence the first priority Liens, pledges, mortgages, and security interests granted in connection with the Exit RBL Agreement.  The guaranties, mortgages, pledges, Liens, and other security interests granted in connection with the Exit RBL Agreement are granted in good faith as an inducement to the Exit RBL Lenders to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance and the priorities of such Liens, mortgages, pledges, and security interests shall be as set forth in the Exit RBL Agreement and the collateral documents executed and delivered in connection therewith.

### 5.12    *Registration Rights Agreement.*

On the Effective Date, Reorganized Halcón Parent and the Registration Rights Parties shall enter into the Registration Rights Agreement.  The Registration Rights Agreement

shall provide the Registration Rights Parties with commercially reasonable demand and piggyback registration rights and other customary terms and conditions.

### 5.13 *Intercompany Interests.*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.  For the avoidance of doubt, to the extent reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date.

### 5.14 *Senior Notes Trustee Expenses and Certain Senior Notes Trustee Rights.*

Notwithstanding anything herein to the contrary, distributions under the Plan on account of the Senior Notes Claims shall be subject to the rights of the Senior Notes Trustee under the Senior Notes Indenture, including the right of the Senior Notes Trustee to assert and exercise their charging lien.  To allow the holders of Senior Notes Claims to receive the full treatment set forth in this Plan without reduction by the charging lien or the expenses of the Senior Notes Trustee, the Debtors or Reorganized Debtors shall, on account of the Senior Notes Claims, pay to the Senior Notes Trustee all reasonable and documented fees and out-of-pocket costs and expenses incurred on or prior to the Effective Date by the Senior Notes Trustee that are required to be paid under the Senior Notes Indenture.

### 5.15 *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

### 5.16 *Separate Plans.*

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

## ARTICLE VI.   DISTRIBUTIONS.

### 6.1   *Distributions Generally.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of this Plan.

### 6.2   *Postpetition Interest on Claims.*

Except as otherwise provided in this Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claim (except for Senior Notes Claims) in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced; *provided*, *however*, that nothing herein shall expand any Person's right to receive, or the Debtors' or Reorganized Debtors' obligation to pay, postpetition interest.

### 6.3   *Date of Distributions.*

Unless otherwise provided in this Plan, any distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon as practicable thereafter; *provided, however,* that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate.

### 6.4   *Distribution Record Date.*

(a)   As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)   Notwithstanding anything in this Plan to the contrary, in connection with any Plan Distribution to be effected through the facilities of DTC (whether by means of book entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under this Plan with holders of New Common Shares to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Common Shares to be distributed under this Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book entry exchange procedures to the extent that the holders of New Common Shares held their Existing Equity Interests or Senior Notes through the facilities of DTC; *provided*, *however*, that such New Common Shares are permitted to be held through DTC's book entry system; *provided, further*, *however*, that to the extent the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, Reorganized Halcón Parent shall take all such

reasonable actions as may be required to cause the distributions of the New Common Shares under this Plan. Holders of Existing Equity Interests that are entitled to receive New Common Shares, but had held such Existing Equity Interests outside of the facilities of DTC, may receive their New Common Shares by means of book-entry with the Reorganized Debtor's transfer agent. Notwithstanding anything in this Plan to the contrary, no Person (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, whether the New Common Shares are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 6.5 *Distributions after Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6 *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.18 of this Plan.

### 6.7 *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all distributions to any holder of an Allowed Claim as and when required by this Plan at (i) the address of such holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

Except as otherwise provided in this Plan, all distributions to holders of RBL Claims shall be governed by the RBL Agreement and shall be deemed completed when made to the RBL Agent, which shall be deemed to be the holder of all RBL Claims for purposes of distributions to be made hereunder. The RBL Agent shall hold or direct such distributions for the benefit of the holders of Allowed RBL Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this provision, the RBL Agent shall arrange to deliver such distributions to or on behalf of such holders of Allowed RBL Claims.

30

Except as otherwise provided in this Plan, all distributions to holders of Senior Notes Claims shall be governed by the Senior Notes Indenture and shall be deemed completed when made to the Senior Notes Trustee, which shall be deemed to be the holder of all Senior Notes Claims for purposes of distributions to be made hereunder.  The Senior Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Senior Notes Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this provision, the Senior Notes Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed Senior Notes Claims.  Notwithstanding anything to the contrary in this Plan, the distribution of New Common Shares shall be made through the facilities of DTC in accordance with the customary practices of DTC for a mandatory distribution, as and to the extent practicable, and the Distribution Record Date shall not apply.  In connection with such distribution, the Senior Notes Trustee shall deliver instructions to DTC instructing DTC to effect distributions on a Pro Rata basis as provided under this Plan with respect to the Senior Notes Claims.

Notwithstanding anything to the contrary in this Plan, the distribution of Warrants (provided the Warrants are DTC-eligible and the Debtors elect, subject to approval by the Requisite Creditors, to deliver such Warrants through the facilities of DTC) shall be made through the facilities of DTC in accordance with the customary practices of DTC for a mandatory distribution, as and to the extent practicable, and the Distribution Record Date shall not apply.  To the extent the Warrants are not delivered through the facilities of DTC, the Debtors shall facilitate registration of the Warrants into the names of the relevant beneficial owners as soon as practicable following the Effective Date.

### 6.8     *Unclaimed Property.*

One year from the later of: (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 6.9     *Satisfaction of Claims.*

Unless otherwise provided in this Plan, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.10     *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

**6.11** *Fractional Shares.*

No fractional shares of New Common Shares shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number. The total number of New Common Shares to be distributed on account of Allowed Claims shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Fractional amounts of New Common Shares that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized Halcón Parent.

**6.12** *Minimum Distribution*.

Neither the Reorganized Debtors nor the Disbursing Agent, as applicable, shall have an obligation to make a distribution pursuant to this Plan that is less than one (1) share of New Common Shares or less than $100.00 in Cash; *provided*, *however*, that Registered Holders of Existing Equity Interests receiving a Plan Distribution under section 4.7(a)(1) of this Plan shall receive such distributions notwithstanding this section 6.12.

**6.13** *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of this Plan).

**6.14** *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan and subject to section 6.2 of this Plan or as otherwise required by law (as determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

**6.15** *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided*, *however*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of

32

Action that a Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### 6.16    *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all applicable distributions or payments provided for under this Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.17    *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' fees and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.18    *Withholding and Reporting Requirements.*

In connection with this Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (i)  sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (ii) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under this Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Reorganized Debtors a Form W-8, Form W-9 and/or any other forms or documents, as applicable, requested by any Reorganized Debtor to reduce or eliminate any required federal, state, or local withholding.  If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in

33

respect of such distribution under this Plan shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

**ARTICLE VII.        PROCEDURES FOR RESOLVING CLAIMS.**

### 7.1     *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in this Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced.  The holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties.  Except for (i) proofs of Claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to section 8.3 of this Plan and (ii) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn.  To the extent not otherwise provided in this Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under section 7.1 of this Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### 7.2     *Objections to Claims.*

Except insofar as a Claim is Allowed under this Plan, only the Debtors or the Reorganized Debtors shall be entitled to object to Claims.  Any objections to Claims shall be served and filed (i) on or before the ninetieth (90th) day following the later of (a) the Effective Date and (b) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors.

### 7.3     *Estimation of Claims.*

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously

objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 7.4    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval.

### 7.5    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.6    *Distributions after Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *General Treatment.*

(a)    As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts; *provided*, *however*, that the Requisite Creditors consent to such rejection, or (v) is specifically designated as a contract or lease to be rejected <u>as reasonably</u>

requested by the Requisite Creditors in the Plan Supplement; *provided*, *however*, that such rejection shall be deemed unreasonable if it would give rise to a potential Cure Amount that cannot be satisfied on the Effective Date or otherwise cause the Plan to not be feasible pursuant to section 1129 of the Bankruptcy Code.

(b)     Subject to (i) satisfaction of the conditions set forth in <u>section 8.1(a)</u> of this Plan, (ii) resolution of any disputes in accordance with <u>section 8.2</u> of this Plan with respect to the contracts or leases subject to such dispute, and (iii) the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 8.2     *Determination of Assumption and Cure Disputes; Deemed Consent.*

(a)     Following the Petition Date, the Debtors shall have served a notice to parties of executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume such contracts or leases in connection with this Plan and indicating that Cure Amounts (if any) shall be asserted against the Debtors or the Reorganized Debtors, as applicable, in the ordinary course.  Any monetary amounts by which any executory contract or unexpired lease to be assumed under this Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof.

(b)     If there is a dispute regarding (i) any Cure Amount, (ii) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective.  Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Amounts, the applicable Debtor may assume the executory contract or unexpired lease prior to the resolution of any such dispute; *provided*, *however*, that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Amount by the contract counterparty; *provided*, *further*, *however*, that following entry of a Final Order resolving any such dispute, the Debtor shall have the right to reject any executory contract or unexpired lease within thirty (30) days of such resolution.

(c)     Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption of such executory contract or unexpired lease in accordance with the procedures set forth therein, shall be deemed to have assented to such assumption and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption thereafter.

(d)     Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption of the underlying contracts and unexpired leases.  Assumption of any executory

contract or unexpired lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

### 8.3     *Rejection Damages Claims.*

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.

### 8.4     *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by this Plan.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors.  Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.5     *Compensation and Benefit Plans.*

All employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

### 8.6     *Insurance Policies.*

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any directors' and officers' insurance policies, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

(b)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

### 8.7     *Reservation of Rights.*

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)     Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX.     CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

### 9.1     *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)     the Plan Supplement has been filed;

(b)     the Bankruptcy Court has entered the Confirmation Order and such Confirmation Order has not been stayed, modified, or vacated;

(c) the conditions to the effectiveness of the Exit RBL Facility, and all documentation related thereto, have been satisfied or waived in accordance with the terms thereof and the Exit RBL Agreement is in full force and effect;

(d) all governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring shall have been obtained and all applicable waiting periods have expired;

(e) all Restructuring Expenses shall have been paid in Cash;

(f) the RSA shall be in full force and effect and binding on all parties thereto;

(g) the Senior Noteholder Backstop Agreement shall be in full force and effect and binding on all parties thereto, and the Backstop Order (as defined in the RSA) shall be entered;

(h) each of the Definitive Documents shall have satisfied the consent requirements of the Requisite Creditors in accordance with the RSA;

(i) the amended certificate of incorporation of Reorganized Halcón Parent shall have been filed with the appropriate Governmental Unit, as applicable; and

(j) the Debtors, together with the Subscription Agent (as defined in the Rights Offering Procedures), shall have received proceeds of at least $150,150,000 for the issuance of the New Common Shares in connection with the Senior Noteholder Rights Offering.

### 9.2 *Waiver of Conditions Precedent.*

(a) Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Requisite Creditors without leave of or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge this Plan in any court.  If this Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b) Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c) The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

**9.3**    *Effect of Failure of a Condition.*

If the conditions listed in <u>section 9.1</u> of this Plan are not satisfied or waived in accordance with <u>section 9.2</u> of this Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, or any other Person.

## ARTICLE X.        EFFECT OF CONFIRMATION.

**10.1**    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.

**10.2**    *Vesting of Assets.*

Except as otherwise provided in this Plan, or any Plan Document, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

**10.3**    *Discharge of Claims against and Interests in Debtors.*

Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise expressly provided in this Plan or in the Confirmation Order, each holder (as well as any trustee or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the

40

Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or Reorganized Debtor.

### 10.4 *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5 *Injunction against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6 *Plan Injunction.*

(a) Except as otherwise provided in this Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims against or Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are permanently enjoined after the entry of the Confirmation Order from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor, (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan, and the Plan Documents, to the full extent permitted by applicable law, and (v) commencing or

41

continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan and the Plan Documents.

(b)    By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in section 10.6 of this Plan.

**10.7    _Releases._**

**(a)    Releases by Debtors.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan and the obligations contemplated by the Plan Documents or as otherwise provided in any order of the Bankruptcy Court, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of this Plan, the RSA, the Plan Documents or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to this Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; _provided_, _however_, that nothing herein shall be construed to release any Person from willful misconduct or intentional fraud as determined by a Final Order.**

**(b)    Releases by Holders of Claims or Interests.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents and the obligations contemplated by the Restructuring Transactions, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service and contribution of the Released Parties to facilitate the**

42

reorganization of the Debtors and the implementation of the Restructuring Transactions, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Plan Documents, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to this Plan, or any other act or omission; *provided*, *however*, that nothing herein shall be construed to release any Person from willful misconduct or intentional fraud as determined by a Final Order.

### 10.8   *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, the Exit RBL Facility, the Equity Rights Offerings, the Management Incentive Plan, the Disclosure Statement, the RSA, the Restructuring Transactions, and this Plan (including the Plan Documents), or the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of Securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and

**distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### 10.9    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

### 10.10    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11    *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in this Plan, including sections 10.6, 10.7, 10.8, and 10.9, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action against parties with a relationship with the Debtors. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.12    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates

an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation, or (iv) the Restructuring Transactions.

## ARTICLE XI.        RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under this Plan;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either (including the Equity Rights Offerings), or any agreement, instrument, or other document governing or related to any of the foregoing, other than the Exit Facility;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(q)     to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of this Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(r)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(s)     to recover all Assets of the Debtors and property of the Estates, wherever located; and

(t)     to enter a final decree closing each of the Chapter 11 Cases.

## ARTICLE XII.        MISCELLANEOUS PROVISIONS.

### 12.1    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any Securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of Collateral under the Exit RBL Agreement, and (vi) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.2    *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.3    *Dates of Actions to Implement Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.4    *Amendments.*

(a)    **Plan Modifications**.    This Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court in accordance with the RSA.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be

47

deemed to have accepted this Plan as amended, modified, or supplemented; *provided*, *however*, that any such modification is acceptable to the Requisite Creditors.

(b)   **Certain Technical Amendments**.   Subject to the RSA, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under this Plan.

### 12.5   *Revocation or Withdrawal of Plan.*

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

### 12.6   *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the terms of the RSA, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this section, is (i) valid and enforceable pursuant to its terms, (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (iii) nonseverable and mutually dependent.

### 12.7   *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the

principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.8    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.9    *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.10   *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 12.11   *Computing Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12   *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

### 12.13   *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

49

(a)     if to the Debtors or Reorganized Debtors:

Halcón Resources Corporation
1000 Louisiana St., Suite 1500
Houston, Texas 7702
Attn: David Elkouri, Executive Vice President and Chief Legal Officer

– and –

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn: Alfredo R. Pérez
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Gary T. Holtzer, Esq., and Lauren Tauro, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*

(b)     if to the Consenting Creditors:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:  Andrew Rosenberg, Esq., Robert Britton, Esq., Samuel Lovett, Esq.
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5361

*Attorneys for Consenting Creditors*

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

**12.14** *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated: August 2, 2019
   Houston, Texas

        Respectfully submitted,


        _____

        Name: Richard Little
        Title: Chief Executive Officer


        on behalf of


        Halcón Resources Corporation
        Halcón Resources Operating, Inc.
        Halcón Holdings, Inc.
        Halcón Energy Properties, Inc.
        Halcón Permian, LLC
        Halcón Field Services, LLC
        Halcón Operating Co., Inc.

**Exhibit B**

**Restructuring Support Agreement**

EXECUTION VERSION

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with all exhibits, schedules, and attachments hereto, as each may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), dated as of August 2, 2019, is entered into by and among:

(a) Halcón Resources Corporation ("*Parent*"), Halcón Resources Operating, Inc., Halcón Holdings, Inc., Halcón Energy Properties, Inc., Halcón Permian, LLC, Halcón Field Services, LLC, and Halcón Operating Co., Inc., each such entity a subsidiary of Parent (collectively with Parent, the "*Company*" or the "*Debtors*"); and

(b) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "*Senior Noteholders*"), of the 6.75% Senior Notes due 2025 (the "*Senior Notes*") issued under that certain indenture, dated as of February 16, 2017 (as amended, modified, or otherwise supplemented from time to time, the "*Senior Notes Indenture*"), by and among Parent, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as indenture trustee, together with their respective successors and permitted assigns and any subsequent Senior Noteholder that becomes party hereto in accordance with the terms hereof (collectively, the "*Consenting Creditors*").

The Company, each Consenting Creditor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein collectively as the "*Parties*" and each individually as a "*Party*."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).

## RECITALS

**WHEREAS**, the Parties have engaged in arm's-length, good faith discussions regarding a restructuring of certain of the Company's indebtedness and other obligations, including the Company's indebtedness and obligations under the Revolving Credit Agreement and Senior Notes Indenture;

**WHEREAS**, the Parties have agreed to a restructuring of the Company's capital structure (the "*Restructuring*"), which is anticipated to be implemented through the Plan (as defined below), a solicitation of votes thereon (the "*Solicitation*"), the Equity Rights Offerings (as defined below), and the commencement by the Company of voluntary cases (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*");

**WHEREAS**, as of the date hereof, the Consenting Creditors, in the aggregate, hold approximately 67.3% of the aggregate outstanding principal amount of the Senior Notes;

**WHEREAS**, as of the date hereof, the Consenting Creditors, in the aggregate, hold or control, directly or indirectly, approximately 26.2% of the issued and outstanding common equity of Parent (the "*Existing Equity Interests*");

**WHEREAS**, in connection with the Restructuring, (i) the Senior Noteholders will be offered the right to purchase New Common Shares (as defined below) for an aggregate purchase price of $150,150,000 (the "***Senior Noteholder Rights Offering***"), and (ii) certain of the Consenting Creditors (in such capacity, the "***Backstop Parties***") will backstop the Senior Noteholder Rights Offering, in each case, in accordance with the terms and conditions described in the Restructuring Term Sheet and the backstop commitment agreement dated as of the date hereof, attached hereto as **Exhibit B** (the "***Senior Noteholder Backstop Agreement***");

**WHEREAS**, in connection with the Restructuring, subject to the Existing Equity Cash Out, the holders of common stock of Parent will be offered the right to purchase New Common Shares for an aggregate purchase price of $14,850,000 (the "***Existing Equity Interests Rights Offering***") in accordance with the terms and conditions described in the Restructuring Term Sheet;

**WHEREAS**, the Restructuring will include the grant of a new post-restructuring management incentive plan (the "***Management Incentive Plan***") in accordance with the terms and conditions described in the Restructuring Term Sheet;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment specifically as set forth in the Restructuring Term Sheet and this Agreement.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. **Certain Definitions.** The following terms used in this Agreement shall have the following definitions:

(a) "***Ad Hoc Noteholder Group***" means those certain holders of Senior Notes represented by the Consenting Creditor Advisors.

(b) "***Alternative Restructuring***" means any new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, winding up, assignment for the benefit of creditors, transaction, debt investment, equity investment, joint venture, partnership, sale, plan proposal, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more of the Debtors or the debt, equity, or other interests in any one or more of the Debtors that is an alternative to the Restructuring and the Plan, including the Equity Rights Offerings, the Exit Facility and the other transactions contemplated by the Plan.

(c) "***Backstop Assumption Motion***" means the motion and proposed form of order to be filed by the Debtors with the Bankruptcy Court seeking the assumption of the Senior Noteholder Backstop Agreement pursuant to section 365 of the Bankruptcy Code, authorizing the payment of certain expenses and other amounts thereunder (including the Backstop Commitment Premium and the Expense Reimbursement (each as defined in the Senior

Noteholder Backstop Agreement) and the indemnification provisions set forth therein, and granting any other related relief.

(d)    "***Backstop Order***" means an order of the Bankruptcy Court approving the Backstop Assumption Motion, which shall include, among other things, provisions expressly approving (i) the payment of the Backstop Commitment Premium and Expense Reimbursement, and (ii) the indemnification provisions set forth in the Senior Noteholder Backstop Agreement.

(e)    "***Consenting Creditor Advisors***" means, together, the Consenting Creditor Counsel and Ducera Partners, LLC, as financial advisor to the Ad Hoc Group of Noteholders.

(f)    "***Consenting Creditor Counsel***" means, collectively, (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel and (ii) Porter Hedges LLP, as local counsel, to the Ad Hoc Noteholder Group.

(g)    "***Definitive Documents***" shall have the meaning ascribed to such term in Section 3 of this Agreement.

(h)    "***Equity Rights Offerings***" means, collectively, the Senior Noteholder Rights Offering and the Existing Equity Interests Rights Offering.

(i)    "***Plan***" means the prepackaged chapter 11 plan of reorganization of the Company implementing the Restructuring, attached hereto as **Exhibit C**, including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time.

(j)    "***Qualified Marketmaker***" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims against or Interests in the Company (or enter with customers into long and short positions in Claims against or Interests in the Company), in its capacity as a dealer or marketmaker in Claims against or Interests in the Company and (ii) is, in fact, regularly in the business of making a market in claims against or interests in issuers or borrowers (including debt securities or other debt).

(k)    "***Requisite Creditors***" means, as of the date of determination, Consenting Creditors holding at least two-thirds of the outstanding Senior Notes held by the Consenting Creditors as of such date.

(l)    "***Restructuring Term Sheet***" means the term sheet (including any schedules and exhibits attached thereto), attached hereto as **Exhibit A**, which contains the material terms and provisions of the Restructuring agreed upon by the Parties that are to be incorporated into the Plan and the Definitive Documents.

(m)    "***Support Period***" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 6 and (ii) the Effective Date.

(n)    "***Voting Deadline***" means the deadline to submits votes to accept or reject the Plan.

3

2.    **Support Effective Date**.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "*Support Effective Date*") that:

(a)    this Agreement has been executed by (i) each Debtor and (ii) Consenting Creditors holding, in aggregate, at least 66⅔% in principal amount of the Senior Notes; and

(b)    the reasonable and documented fees and expenses incurred by the Consenting Creditor Advisors pursuant to the terms of their fee letters as of the Support Effective Date have been paid in full in Cash.

3.    **Exhibits; Definitive Documents; Bankruptcy Process.**

(a)    Each of the exhibits attached hereto, including the Restructuring Term Sheet, and any schedules or exhibits to such exhibits (collectively, the "*Exhibits and Schedules*") are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between the terms of this Agreement (excluding the Exhibits and Schedules) and the Exhibits and Schedules, the Exhibits and Schedules shall govern.  In the event of any inconsistency between the terms of this Agreement (including the Exhibits and Schedules) and the Definitive Documents, as applicable, the terms of the Definitive Documents shall govern.

(b)    The definitive documents and agreements governing the Restructuring (collectively, the "*Definitive Documents*") shall include:

i.    the Plan;

ii.    the Confirmation Order and any motion or other pleadings related to the Plan or to confirmation of the Plan;

iii.    the Solicitation Materials and the motion seeking approval of the Solicitation Materials;

iv.    (A) the interim order authorizing use of cash collateral and approving the DIP Financing (if any) (the "*Interim DIP Order*") and (B) the final order authorizing use of cash collateral and approving the DIP Financing (if any) (the "*Final DIP Order*" and, together with the Interim DIP Order, the "*DIP Orders*");

v.    the DIP Documents;

vi.    the Equity Rights Offering Documents;

vii.    the Backstop Assumption Motion and Backstop Order;

viii.    the Exit Facility, if any, and any material document related to the Exit Facility;

4

ix.      the Amended Organizational Documents;

x.      the Management Incentive Plan;

xi.      the Warrant Agreement; and

xii.      if applicable, the Governance Term Sheet (as defined in the Plan).

(c)      Except as set forth or provided for herein, the Definitive Documents (and any modifications, restatements, supplements, or amendments to any of the Definitive Documents) shall, after the Support Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all respects with the terms of this Agreement and otherwise be in form and substance reasonably  satisfactory to the Debtors and the Requisite Creditors.

(d)      <u>Commencement of the Chapter 11 Cases</u>.  Provided that the Support Effective Date has occurred, the Company hereby agrees that, as soon as reasonably practicable, but in no event later than August 7, 2019 (the "***Outside Petition Date***") (the date on which such filing occurs, the "***Petition Date***"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases.

4.      **<u>Agreements of the Consenting Creditors.</u>**

(a)      <u>Voting; Support</u>.  Each Consenting Creditor (severally and not jointly) agrees that, for the duration of the Support Period applicable to such Consenting Creditor, such Consenting Creditor shall:

i.      timely vote or cause to be voted its Claims or Interests, if applicable, to accept the Plan by delivering or causing to be delivered its duly authorized, executed, and completed ballot or ballots, and consent to and, if applicable, not opt out of, the releases set forth in the Plan against each Released Party on a timely basis, and, in any event, within four (4) Business Days following commencement of the Solicitation;

ii.      not change or withdraw (or cause or direct to be changed or withdrawn) any such vote or release described in clause (i) above; *provided*, *however*, that notwithstanding anything in this Agreement to the contrary, a Consenting Creditor's vote and release may, upon prior written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following (and solely in the event of) the termination of this Agreement pursuant to <u>Section 6</u> with respect to such Consenting Creditor;

iii.      timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

<div align="center">5</div>

        iv.     negotiate in good faith with the Company the form of the Definitive Documents and (as applicable) execute the Definitive Documents;

        v.     not directly or indirectly, through any Person (including any indenture trustee), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring;

        vi.     not object to, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede, the Solicitation, the Equity Rights Offerings, the Exit Facility, the approval of and entry of the DIP Orders, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

        vii.     not direct the Senior Notes Trustee to take any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Restructuring Term Sheet, and, if the Senior Notes Trustee takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Restructuring Term Sheet, such Consenting Creditor shall use its commercially reasonable efforts to cause and direct (if reasonably requested by the Company) the Senior Notes Trustee to cease, withdraw, and refrain from taking any such action;

        viii.     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment; *provided*, *however*, that no such additional or alternative provisions shall modify any Consenting Creditor's economic treatment set forth in the Restructuring Term Sheet without such Consenting Creditor's written consent.

      (b)    Transfers.  Each Consenting Creditor agrees that, for the duration of the Support Period, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a "**Transfer**"), directly or indirectly, in whole or in part, any of its Claims or Interests or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any Claims against or Interests into a voting trust, or entry into a voting agreement with respect to any such Claims or Interests), unless the transferee thereof either (i) is a Consenting Creditor or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims, Interests, or other claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit D** (the "**Joinder Agreement**"), and delivering an executed copy thereof within two (2) Business Days following such execution, to Weil, Gotshal & Manges LLP ("**Weil**"), as counsel to the Company, and the Consenting Creditor Counsel, in which event (A) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights

6

(and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Creditor agrees that any Transfer of any Claims or Interests that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer. Notwithstanding anything to the contrary herein, a Consenting Creditor may Transfer its Claims or Interests to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; *provided*, *however*, that (x) such Qualified Marketmaker must Transfer such right, title, or interest by the earlier of five (5) Business Days following its receipt thereof and, if received prior to the Voting Deadline, five (5) Business Days prior to the Voting Deadline, (y) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims or Interests is to a transferee that is or becomes a Consenting Creditor at the time of such transfer, and (z) such Consenting Creditor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 4. Without limitation of the foregoing, if the Qualified Marketmaker fails to comply with this Section 4(b), such Qualified Marketmaker shall comply with the obligations of a Consenting Creditor under Section 4(a) of this Agreement.

(c)     Additional Claims and Interests. To the extent any Consenting Creditor (i) acquires additional Claims or Interests, (ii) holds or acquires any other claims or interests against the Company entitled to vote on the Plan, or (iii) Transfers any Claims or Interests, then, in each case, such Consenting Creditor shall promptly notify Weil and the Consenting Creditor Counsel (in no event less than three (3) Business Days following such transaction). Each such Consenting Creditor agrees that such additional Claims, Interests, or other claims and interests shall be subject to this Agreement and that, for the duration of the Support Period applicable to such Consenting Creditor, it shall vote (or cause to be voted) any such additional Claims, Interests, or other claims or interests entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 4(a) hereof.

(d)     Additional Parties. Any Senior Noteholder may, at any time after the Support Effective Date, become a party to this Agreement as a Consenting Creditor (an "***Additional Consenting Creditor***"), by delivering an executed copy of a Joinder Agreement to Weil and the Consenting Creditor Counsel, pursuant to which such Additional Consenting Creditor shall be bound by the terms of this Agreement as a Consenting Creditor hereunder and shall be deemed a Consenting Creditor for all purposes hereunder.

(e)     The foregoing provisions of this Section 4 will not (i) limit any Consenting Creditor's rights to enforce any rights under this Agreement or (ii) be construed to prohibit or limit any Consenting Creditor from appearing as a party-in-interest in any matter to be adjudicated in a court of competent jurisdiction or the Chapter 11 Cases (as applicable), so long as, from the Support Effective Date and continuing for the Support Period, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, are not in violation of this Agreement, and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring.

7

5.      **Agreements of the Company.**

(a)     <u>Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall:

i.      use commercially reasonable efforts to (A) support the Restructuring, as contemplated under this Agreement and the Restructuring Term Sheet, (B) implement and consummate the Restructuring in a timely manner, and take any and all actions in furtherance of the Restructuring, as contemplated under this Agreement and the Restructuring Term Sheet, (C) negotiate in good faith with the Consenting Creditors the form of the Definitive Documents and (as applicable) execute the Definitive Documents, and (D) obtain, file, submit, or register any and all required governmental, regulatory, and third-party approvals that are necessary for the Restructuring;

ii.     subject to <u>Section 29</u> hereof, not directly or indirectly (A) seek, solicit, support, propose, assist, encourage, vote for, consent to, enter, or participate in any discussion regarding the negotiation or formulation of an Alternative Restructuring, (B) publicly announce its intention not to pursue the Restructuring, or (C) object to, impede, delay, or take any other action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, or materially impede or delay, the confirmation or consummation of the Restructuring;

iii.    operate its business in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (A) resulting from or relating to this Agreement or the filing or prosecution of the Chapter 11 Cases or (B) imposed by the Bankruptcy Court);

iv.     as reasonably requested, confer with the Consenting Creditors and their respective representatives that have entered into and are subject to a confidentiality agreement with the Company to report on operational matters and the general status of ongoing operations; *provided*, *however*, that (A) such requests shall be directed solely to David S. Elkouri in accordance with <u>Section 23</u> hereof and (B) any information provided in response to such requests shall be deemed "Confidential Information" in accordance with the applicable confidentiality agreements between the Company and the receiving Consenting Creditors;

v.      maintain good standing and legal existence under the laws of the state or other jurisdiction in which such entity is incorporated, organized, or formed;

vi.     not sell, or file any motion or application seeking to sell, any assets in excess of $5 million other than in the ordinary course of business, except (A) as otherwise provided in this Agreement or (B) with the prior written consent of the Requisite Creditors;

8

vii.    promptly provide written notice to the Consenting Creditors and the Consenting Creditor Advisors of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause any condition precedent contained in this Agreement not to occur or become impossible to satisfy, (B) the receipt of any written notice from any governmental authority or third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, or (C) receipt of any written notice of any proceeding commenced or, to the actual knowledge of the Company, threatened against the Company relating to or involving or otherwise affecting in any material respect the transactions contemplated by this Agreement or the Restructuring, or (D) a failure of the Company to comply in any material respect with or satisfy a covenant, condition, or agreement to be complied with or satisfied by it hereunder;

viii.    promptly notify the Consenting Creditors and the Consenting Creditor Advisors in writing following the receipt of notice of any material governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

ix.    not adopt any new executive compensation or retention plans, approve any executive bonuses, or retention payments, or terminate any employees that would give rise to contractual severance obligations, without the prior written consent of the Requisite Creditors;

x.    subject to Section 29 hereof, not take any action that is inconsistent with, or is intended to interfere with, consummation of the Restructuring;

xi.    provide draft copies of all material motions or applications related to the Restructuring (including all "first day" and "second day" motions and orders, the Plan, the Disclosure Statement, ballots, and other Solicitation Materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed Confirmation Order) the Company intends to file with the Bankruptcy Court to the Consenting Creditors Counsel, if reasonably practicable, at least two (2) Business Days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders, or materials at least two (2) Business Days in advance is not reasonably practicable prior to filing, such motion, order, or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with the Consenting Creditor Advisors regarding the form and substance of any such proposed filing with the Bankruptcy Court;

xii.    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment;

9

xiii.      subject to professional responsibilities, timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization; and

xiv.      pay in cash (A) immediately prior to the Petition Date, all reasonable and documented fees and expenses accrued prior to the Petition Date for which invoices or receipts are furnished by the Consenting Creditor Advisors at least one Business Day prior thereto, (B) after the Petition Date, subject to any applicable orders of the Bankruptcy Court but without the need to file fee or retention applications, all reasonable and documented fees and expenses incurred by the Consenting Creditor Advisors from time to time prior to (to the extent not previously paid), on, and after the Petition Date, and (C) on the Effective Date, all reasonable and documented fees and expenses of the Consenting Creditor Advisors incurred and outstanding in connection with the Restructuring (including any estimated fees and expenses estimated to be incurred through the Effective Date).

6.      **Termination of Agreement.**

(a)      This Agreement shall terminate three (3) Business Days following the delivery of written notice (in accordance with Section 23 hereof) from: (i) the Requisite Creditors to Parent at any time after the occurrence and during the continuance of any Creditor Termination Event (as defined below) or (ii) Parent to the Consenting Creditors at any time after the occurrence and during the continuance of any Company Termination Event (as defined below).  Notwithstanding any provision to the contrary in this Section 6, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of a Creditor Termination Event or Company Termination Event specified herein.  This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Effective Date.  This Agreement shall terminate automatically as to any Consenting Creditor that sells or transfers all Claims against and Interests in the Company that it holds in accordance with Section 4(b).

(b)      A "Creditor Termination Event" shall mean any of the following:

i.      the breach by the Company of any of the undertakings, representations, warranties, or covenants of the Company set forth herein in any material respect that remains uncured (if susceptible to cure) for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 23 (as applicable);

10

ii.     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or prohibiting the Debtors from implementing the Plan or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) days after such issuance;

iii.    the Company enters into a definitive agreement with respect to an Alternative Restructuring or publicly announces its intention to pursue an Alternative Restructuring;

iv.     if, as of 11:59 p.m. prevailing Eastern Time on August 5, 2019, the Company has not commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code;

v.      if, as of 11:59 p.m. prevailing Eastern Time on the Outside Petition Date, the Chapter 11 Cases have not been filed;

vi.     on the Petition Date, the Company has not filed (A) the Plan, (B) the Disclosure Statement, (C) motions seeking (x) interim and final approval of the DIP Orders and DIP Credit Agreement, if applicable and (y) a combined hearing for approval of the Disclosure Statement and confirmation of the Plan, and (D) the Backstop Assumption Motion;

vii.    if, as of 11:59 p.m. prevailing Eastern Time on the date that is three (3) Business Days after the Petition Date, the Bankruptcy Court has not entered the Interim DIP Order;

viii.   if, as of 11:59 p.m. prevailing Eastern Time on the date that is thirty (30) days after the Petition Date, the Bankruptcy Court has not entered the Final DIP Order;

ix.     if, as of 11:59 p.m. prevailing Eastern Time on the date that is thirty (30) days after the commencement of Solicitation, the Voting Deadline has not occurred;

x.      if, as of 11:59 p.m. prevailing Eastern Time on the date that is seventy (70) days after the Petition Date, the Bankruptcy Court has not entered the Confirmation Order and the Backstop Order;

xi.     if, as of 11:59 p.m. prevailing Eastern Time on the date that is eighty-five (85) days after the Petition Date, the Effective Date has not occurred (the "***Outside Date***");

xii.    the Bankruptcy Court (A) enters an order denying confirmation of the Plan or (B) after entry of the Confirmation Order, enters an order vacating the Plan or Confirmation Order, or modifying or otherwise amending the Plan or

11

Confirmation Order in a manner materially inconsistent with this Agreement, the Restructuring, the Plan, or any other Definitive Documents then in effect;

xiii.    the Bankruptcy Court enters an order terminating the Company's exclusive right to file or solicit acceptances of a chapter 11 plan;

xiv.    the Company withdraws the Plan or publicly announces its intention to withdraw the Plan;

xv.    the Bankruptcy Court enters an order (A) directing the appointment of a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

xvi.    the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is inconsistent in any material respect with this Agreement or the applicable DIP Order, or otherwise not consented to by the Requisite Creditors;

xvii.    if any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended in any material respect without the consent of the Requisite Creditors;

xviii.    if applicable, the occurrence of the Maturity Date (as defined in the DIP Credit Agreement) without the Plan having been substantially consummated;

xix.    the termination of the Senior Noteholder Backstop Agreement, other than as a result of consummation of the Equity Rights Offerings;

xx.    if the Company shall not have obtained a firm commitment for DIP Financing and the consensual use of cash collateral in form and substance satisfactory to the Requisite Creditors prior to the Petition Date;

xxi.    if the Company shall not have obtained a firm commitment for the Exit Facility in form and substance reasonably satisfactory to the Requisite Creditors prior to the Effective Date;

xxii.    if any court of competent jurisdiction has entered a final, non-appealable judgement or order declaring this Agreement to be unenforceable;

xxiii.    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company or that would materially and adversely affect the Company's ability to operate the Company's businesses in the ordinary course; or

xxiv.    either (A) the Company files a motion, application, or adversary proceeding (or the Company supports any such motion, application, or adversary

12

proceeding filed or commenced by any third party) challenging the validity, enforceability, or priority of, or seeking avoidance or subordination of, any portion of the Claims arising under the Senior Notes and Senior Notes Indenture asserting any other cause of action against the Consenting Creditors or with respect or relating to the Claims arising under the Senior Notes and Senior Notes Indenture; or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order that is inconsistent with this Agreement or the Plan in any material respect.

(c)     A "Company Termination Event" shall mean any of the following:

i.     the breach by one or more of the Consenting Creditors of any of the undertakings, representations, warranties, or covenants of the Consenting Creditors set forth herein in any material respect that remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 23 hereof (as applicable), but only if the non-breaching Consenting Creditors hold less than 66⅔% of the aggregate principal amount of Senior Notes;

ii.     if, pursuant to Section 29 hereof, the board of directors, managers, members, or partners, as applicable, of any Company entity party hereto reasonably determines in good faith based upon the advice of legal counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided*, *however*, that such Company entity provides notice of any such determination to the Consenting Creditors within one (1) day of board approval of any Alternative Restructuring;

iii.     if, as of 11:59 p.m. prevailing Eastern Time on August 5, 2019, the Support Effective Date has not occurred;

iv.     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or prohibiting the Debtors from implementing the Plan or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) days after such issuance;

v.     if the Company shall not have obtained a firm commitment for DIP Financing and the consensual use of cash collateral in form and substance satisfactory to the Company prior to the Petition Date;

vi.     if the Company shall not have obtained a firm commitment for the Exit Facility in form and substance satisfactory to the Company prior to the Effective Date;

vii.     the Bankruptcy Court enters an order (A) directing the appointment of a trustee in the Chapter 11 Cases, (B) converting any of the

Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

viii.      the Bankruptcy Court (A) enters an order denying confirmation of the Plan or (B) after entry of the Confirmation Order, enters an order vacating the Plan or Confirmation Order, or modifying or otherwise amending the Plan or Confirmation Order in a manner materially inconsistent with this Agreement, the Restructuring, the Plan, or any other Definitive Documents then in effect;

ix.      the Bankruptcy Court enters an order terminating the Company's exclusive right to file or solicit acceptances of a chapter 11 plan;

x.      the termination of the Senior Noteholder Backstop Agreement, other than as a result of consummation of the Equity Rights Offerings; or

xi.      the occurrence of the Outside Date if the Effective Date has not occurred.

Notwithstanding the foregoing, any of the dates or deadlines set forth in Sections 6(b) and 6(c) may be extended by agreement of the Company and the Requisite Creditors (which may be provided by the Consenting Creditors Advisors on behalf of the Requisite Creditors).

(d)      Mutual Termination.  This Agreement may be terminated at any time by the mutual written agreement of the Company and the Requisite Creditors.

(e)      Effect of Termination.

i.      The date on which termination of this Agreement is effective as to a Party in accordance with this Section 6 shall be referred to as the "**Termination Date**" and, the provisions of this Agreement shall terminate on the Termination Date, except as otherwise provided in Section 15 hereof.

ii.      Subject to the provisions contained in Section 6(a) and Section 15 hereof, upon the Termination Date, this Agreement shall forthwith become null and void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; *provided*, *however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(f)      Limited Waiver of Automatic Stay.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of

14

notice of termination of this Agreement by any Party solely in accordance with the terms of this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice, and if this Agreement is terminated in accordance with Section 6, each Consenting Creditor's vote or release described in Section 4(a)i of this Agreement may be revoked (and, upon such revocation, deemed void *ab initio*) notwithstanding the Automatic Stay or passage of the Voting Deadline); *provided*, *however*, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

7. **Definitive Documents; Good Faith Cooperation; Further Assurances.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents, which shall be subject to the applicable consent rights of the Requisite Creditors in Section 3. Furthermore, subject to the terms hereof, each of the Parties shall (i) take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and (ii) refrain from taking any action that would frustrate the purpose and intent of this Agreement.

8. **Representations and Warranties.**

(a)     Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the Support Effective Date (or as of the date a Consenting Creditor becomes a Party to this Agreement by executing and delivering a Joinder Agreement):

      i.     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

      ii.     the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

15

iii.      the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws; and

iv.      this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)      Representations and Warranties of the Consenting Creditors. Each Consenting Creditor severally (and not jointly) represents and warrants to the other Parties that, as of the Support Effective Date (or such later date on which a Consenting Creditor becomes a Party to this Agreement by executing and delivering a Joinder Agreement), such Consenting Creditor (i) is the owner of the aggregate principal amount of Senior Notes and the number of shares of Existing Equity Interests set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof), free and clear of any restrictions on transfer, liens or options, warrants, purchase rights, contracts, commitments, claims, demands, and other encumbrances and does not own any other Senior Notes or Existing Equity Interests or (ii) has, with respect to the beneficial owners of such Senior Notes and Existing Equity Interests, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Senior Notes and Existing Equity Interests or to exchange, assign, and transfer such Senior Notes and Existing Equity Interests and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)      Representations and Warranties of the Company.   The Company represents and warrants, on a joint and several basis, to the other Parties as of the Support Effective Date:

i.      there is no pending or undisclosed agreement, understanding, negotiation, or discussion (in each case, whether oral or written) with respect to any Alternative Restructuring;

ii.      except as would not reasonably be expected to have a Material Adverse Effect (as defined in the Senior Noteholder Backstop Agreement), when furnished, none of the material and information regarding the Company that was provided to the Consenting Creditors in the virtual data room maintained by or on behalf of the Company or provided by or on behalf of the Company to the Consenting Creditor Advisors on an advisors' eyes only basis, in each case, in connection with the Restructuring, when read or considered together, contains any untrue statement of a material fact or omits to state a material fact necessary in order to prevent the statements made therein from being materially misleading; *provided, however*, that the foregoing shall not apply to any projections or other

16

forward looking material or information provided by or on behalf of the Company and, with respect to any such projections or other forward looking material or information, the Company represents, warrants, and covenants, on a joint and several basis, that such material and information was prepared in good faith by the Company based on assumptions that the Company determined were reasonable at the time of the preparation thereof; *provided*, *further*, *however*, that the foregoing representation shall not survive confirmation of the Plan; and

      iii.    the aggregate principal amount of outstanding indebtedness (excluding any fees, costs, expenses and indemnities that may be owed by the applicable obligors) on account of the Senior Notes is at least $625 million.

9.    **Disclosure; Publicity.**  The Company shall submit drafts to Consenting Creditor Counsel of any press releases, and any and all filings with the Securities and Exchange Commission that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days prior to making any such disclosure.  Except as required by applicable law, and notwithstanding any provision of any other agreement between the Company and such Consenting Creditor to the contrary, no Party or its advisors shall disclose to any Person (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Company and the Consenting Creditor Advisors, the principal amount or percentage of any Senior Notes or other Claims against, or Interests in, the Debtors held by any Consenting Creditor without such Consenting Creditor's prior written consent; *provided*, *however*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take commercially reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Senior Notes collectively held by the Consenting Creditors.  Notwithstanding the provisions in this Section 9, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.

10.    **Amendments and Waivers.**

(a)    Other than as set forth in Section 10(b), this Agreement, including the Exhibits and Schedules, may not be waived, modified, amended, or supplemented except with the written consent of the Company and the Requisite Creditors.

(b)    Notwithstanding Section 10(a):

      i.    any waiver, modification, amendment, or supplement to this Section 10 shall require the written consent of all of the Parties;

      ii.    any modification, amendment, or change to the definition of "Requisite Creditors" shall require the written consent of each Consenting Creditor and the Company;

17

iii. any waiver, modification, amendment, or supplement to the Securities Issuance Requirements shall require the written consent of all Parties; and

iv. any change, modification, or amendment to this Agreement, the Restructuring Term Sheet, or the Plan that treats or affects any Consenting Creditor's Claims arising under the Senior Notes and Senior Notes Indenture in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors are treated shall require the written consent of such materially adversely and disproportionately affected Consenting Creditor.

(c) In the event that a materially adversely and disproportionately affected Consenting Creditor ("***Non-Consenting Creditor***") does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification, or amendment receives the consent of Consenting Creditors (i) owning at least 66⅔% of the outstanding Senior Notes and (ii) representing at least a majority in number of claimants asserting Claims arising under the Senior Notes, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect with respect to all other Consenting Creditors from time to time without the consent of any Consenting Creditors who have so consented.

(d) Notwithstanding anything in this Agreement to the contrary, no amendment or waiver of the Outside Date shall be effective as to any Supporting Party without such Supporting Party's prior written consent. In the event that the Parties properly amend or waive the Outside Date, this Agreement shall terminate on the Outside Date that existed under this Agreement immediately prior to such amendment or waiver with respect to each Party that did not expressly consent in writing to such amendment or waiver.

11. **Effectiveness.** This Agreement shall become effective and binding upon each Party on the Support Effective Date; *provided*, *however*, that signature pages executed by Consenting Creditors shall be delivered to (i) other Consenting Creditors in a redacted form that removes such Consenting Creditors' holdings of the Senior Notes and (ii) the Company, Weil, and Consenting Creditor Counsel in an unredacted form (to be held by Weil and Consenting Creditor Counsel on a professionals' eyes only-basis).

12. **Fee and Expenses.** In accordance with and subject to <u>Section 2(b)</u> and <u>Section 5(a)xiv</u> hereof and the terms of the applicable fee letters, the Company shall pay or reimburse when due all reasonable and documented fees and expenses of the Ad Hoc Noteholder Group and the Consenting Creditor Advisors (regardless of whether such fees and expenses were incurred before or after the Petition Date) incurred through and including the Termination Date.

13. <u>**GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**</u>

(a) This Agreement and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with, and the rights of the Parties shall be

governed by, the law of the State of New York, without giving effect to any conflict of laws principles that would require the application of the law of any other jurisdiction.

(b)      Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("*NY Courts*") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring. Each of the Parties agrees not to commence any proceeding relating to this Agreement or the Restructuring except in the NY Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any NY Courts. Each of the Parties further agrees that notice as provided in Section 23 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(b) shall be brought in the Bankruptcy Court.

(c)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

14.      **Specific Performance/Remedies.**  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not seek, and

19

will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

15.     **Survival.**  Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the acknowledgements, agreements and obligations of the Parties in this Section 15 and Sections 6, 12 (for purposes of enforcement of obligations accrued through the Termination Date), 13, 14, 16, 17, 18, 19, 20, 22, 24, 25, 26, 27 and 28 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *however*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.     **Headings.**  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.     **Successors and Assigns; Severability; Several Obligations.**  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that nothing contained in this Section 17 shall be deemed to permit Transfers of the Claims arising under the Senior Notes and Senior Notes Indenture or the Existing Equity Interests other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  Except as expressly provided for herein, the agreements, representations, warranties, and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.     **No Third-Party Beneficiaries.**  The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and no other Person shall be a third-party beneficiary hereof.

19.     **Prior Negotiations; Entire Agreement.**  This Agreement, including the Exhibits and Schedules, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other prior agreements (oral or written), negotiations, and documents between and among the Parties (and their respective advisors) with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect.

20.     **Relationship Among Parties.**  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Consenting Creditors under this Agreement shall be

20

several, not joint and several, (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other Person, and (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.

21.     **Relationship Among Consenting Creditors**. Notwithstanding anything herein to the contrary, each Consenting Creditor hereby agrees and acknowledges that (i) this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company and the Consenting Creditors do not constitute a "group" within the meaning of Rule 13d-5 under the Exchange Act, (ii) none of the Consenting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the Company or any of the Company's other lenders, Senior Noteholders, or stakeholders, including as a result of this Agreement or the transactions contemplated herein, and (iii) no action taken by any Consenting Creditor pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Consenting Creditors that the Consenting Creditors are in any way acting in concert or as a "group."

22.     **Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement and executed counterpart signature pages hereto may be delivered by electronic mail (in ".pdf" or ".tif" format), facsimile, or other electronic imaging means, which shall be deemed to be an original for the purposes of this Agreement.

23.     **Notices.**  All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses:

(1)     If to the Company, to:

1000 Louisiana Street, Suite 1500
Houston, Texas 77002
Attention:  David S. Elkouri, Executive Vice President and Chief Legal Officer
                (delkouri@halconresources.com)

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Gary Holtzer, Esq.
                (Gary.Holtzer@weil.com)
                Alfredo R. Pérez, Esq.
                (Alfredo.Perez@weil.com)
                Lauren Tauro, Esq.
                (Lauren.Tauro@weil.com)

21

(2)     If to a Consenting Creditor, or a transferee thereof, to the addresses set forth below the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:   Andrew Rosenberg, Esq.
                    (arosenberg@paulweiss.com)
                    Robert Britton, Esq.
                    (rbritton@paulweiss.com)
                    Samuel Lovett, Esq.
                    (slovett@paulweiss.com)

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

### 24.     **No Solicitation; Representation by Counsel; Adequate Information.**

(a)     This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases or solicitation of an offer to buy securities, including with respect to the Equity Rights Offerings.  The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and, as applicable, related ballots and Solicitation Materials. In addition, this Agreement does not constitute an offer to issue or sell securities to any Person or the solicitation of an offer to acquire or buy securities in any jurisdiction where such offer or solicitation would be unlawful.

(b)     Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)     Each Consenting Creditor acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act and a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (ii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been registered under the Securities Act and that such securities are, to the extent not offered, solicited, or acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iii) has

22

such knowledge and experience in financial and business matters to evaluate properly the terms and conditions of this Agreement and the Restructuring and is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

25.    **Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

26.    **No Waiver of Participation and Preservation of Rights.**  Except as provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims and any liens or security interests it may have in any assets of the Company.  Without limiting the foregoing sentence in any way, if this Agreement is terminated in accordance with its terms for any reason (other than consummation of the Restructuring), the Parties each fully and expressly reserve any and all of their respective rights, remedies, claims, defenses, and interests, in the case of any claim for breach of this Agreement arising prior to termination.

27.    **Settlement Discussions.**  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing herein (including Exhibits and Schedules) shall be construed as or be deemed to be evidence of an admission or concession of any kind on the part of any Party of any claim, fault, liability, or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign, or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

28.    **Miscellaneous.**  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation of this Agreement is to be interpreted in a neutral manner.  Any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," (iv) the word "or" shall not be exclusive and shall be read to mean "and/or," and (v) any reference in this Agreement to "dollars" or "$" shall mean U.S. dollars.  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

23

29.     **Fiduciary Duty.**  Nothing in this Agreement shall require the Company or any directors, officers, or members of any Company party hereto, each in their capacity as such, to take any action, or to refrain from taking any action, to the extent that doing so would be inconsistent with its fiduciary obligations under applicable law (as reasonably determined by it in good faith after consultation with outside legal counsel), *provided*, *however*, that within one (1) day of board approval of the entry into a definitive agreement with respect to any Alternative Restructuring, the Company shall provide written notice to the Consenting Creditor Advisors on behalf of the Ad Hoc Noteholder Group (which may be provided by email) of the taking of such action.

[*Signature Pages Follow*]

24

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**HALCÓN RESOURCES CORPORATION**

By: _____
    Name:  Richard Little
    Title:   Chief Executive Officer

**HALCÓN RESOURCES OPERATING, INC.**

By: _____
    Name:  Richard Little
    Title:   Chief Executive Officer

**HALCÓN HOLDINGS, INC.**

By: _____
    Name:  Richard Little
    Title:   Chief Executive Officer

**HALCÓN ENERGY PROPERTIES, INC.**

By: _____
    Name:  Richard Little
    Title:   Chief Executive Officer

[*Signature Page to Restructuring Support Agreement*]

**HALCÓN PERMIAN, LLC**

By:_____
    Name:  Richard Little
    Title:    Chief Executive Officer

**HALCÓN FIELD SERVICES, LLC**

By:_____
    Name:  Richard Little
    Title:    Chief Executive Officer

**HALCÓN OPERATING CO., INC.**

By:_____
    Name:  Richard Little
    Title:    Chief Executive Officer

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**BLUE FALCON LIMITED**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: Patrick Criscillo

Title: Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022
_____

_____
Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**CITY OF PHOENIX EMPLOYEES' RETIREMENT PLAN**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:   Patrick Criscillo

Title:   Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022
_____

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**NORTHROP GRUMMAN PENSION MASTER TRUST**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: Patrick Criscillo _____

Title: Authorized Signatory _____

Notice Address:

399 Park Avenue
New York, NY 10022 _____

Fax: _____
Attention: Scott Hoffman _____
Email: sh@brigadecapital.com _____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**GOLDMAN SACHS TRUST II - GOLDMAN SACHS MULTI-MANAGER
NON-CORE FIXED INCOME FUND**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: Patrick Criscillo

Title: Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022 _____

_____

Fax: _____
Attention: Scott Hoffman _____
Email: sh@brigadecapital.com _____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**ILLINOIS STATE BOARD OF INVESTMENT**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:    Patrick Criscillo

Title:    Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

_____
Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**FCA CANADA INC. ELECTED MASTER TRUST**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:    Patrick Criscillo

Title:    Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**FCA US LLC MASTER RETIREMENT TRUST**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:    Patrick Criscillo

Title:    Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**JPMORGAN FUNDS - MULTI-MANAGER ALTERNATIVES FUND**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: Patrick Criscillo

Title: Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: <u>Patrick Criscillo</u>

Title: <u>Authorized Signatory</u>

Notice Address:

<u>399 Park Avenue</u>
<u>New York, NY 10022</u>
_____

Fax: _____
Attention: <u>Scott Hoffman</u>
Email: <u>sh@brigadecapital.com</u>

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**MEDIOLANUM BEST BRANDS**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:  Patrick Criscillo

Title:  Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022
_____

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**NEW YORK CITY FIRE DEPARTMENT PENSION FUND, SUBCHAPTER TWO**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:   Patrick Criscillo

Title:   Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**NEW YORK CITY POLICE PENSION FUND, SUBCHAPTER 2**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:   Patrick Criscillo

Title:   Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:   Patrick Criscillo

Title:   Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**U.S. HIGH YIELD BOND FUND**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: Patrick Criscillo

Title: Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

_____

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**SEI GLOBAL MASTER FUND PLC THE SEI HIGH YIELD FIXED INCOME FUND**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: Patrick Criscillo

Title: Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

_____

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**SEI INSTITUTIONAL INVESTMENTS TRUST-HIGH YIELD BOND FUND**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: ___Patrick Criscillo___

Title: ___Authorized Signatory___

Notice Address:

399 Park Avenue
New York, NY 10022 _____

_____
Fax: _____
Attention: Scott Hoffman _____
Email: sh@brigadecapital.com _____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**SEI INSTITUTIONAL MANAGED TRUST-HIGH YIELD BOND FUND**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:    Patrick Criscillo

Title:    Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022 _____

_____
Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**GIC PRIVATE LIMITED**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name: _____Patrick Criscillo_____

Title: _____Authorized Signatory_____

Notice Address:

399 Park Avenue
New York, NY 10022_____

_____
Fax: _____
Attention: Scott Hoffman_____
Email: sh@brigadecapital.com_____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**ST. JAMES'S PLACE DIVERSIFIED BOND UNIT TRUST**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:     Patrick Criscillo

Title:      Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022 _____

_____
Fax: _____
Attention: Scott Hoffman _____
Email: sh@brigadecapital.com _____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**SAS TRUSTEE CORPORATION**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:    Patrick Criscillo

Title:    Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022
_____

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**TCORPIM HIGH YIELD FUND**
**By Brigade Capital Management, LP as Investment Manager**

By: _____

Name:      Patrick Criscillo

Title:      Authorized Signatory

Notice Address:

399 Park Avenue
New York, NY 10022

Fax: _____
Attention: Scott Hoffman
Email: sh@brigadecapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**LION POINT MASTER, LP**
By: Lion Point Capital GP, LLC, its general partner

By: _____

Name:   James Murphy

Title:    Authorized Signatory

███████████████████████████

███████████████████████████

Notice Address:

250 W 55th Street
New York, NY 10019

Fax: _____
Attention: Irshad Karim
Email: legal@lionpoint.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**LUMINUS ENERGY PARTNERS MASTER FUND, LTD**

By: _____

Name: _____Shawn R. Singh_____

Title:      Authorized Signatory

<!-- redacted -->

Notice Address:

1700 Broadway
New York, NY 10019 _____

_____
Fax: _____
Attention: Shawn R. Singh _____
Email: ssingh@luminusmgmt.com ____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**OAKTREE OPPORTUNITIES FUND X HOLDINGS (DELAWARE), L.P.**

By:  Oaktree Fund GP, LLC
Its:  General Partner

By:  Oaktree Fund GP I, L.P.
Its:  Managing Member

By:  _____

Name:  Allen Li

Title:  Authorized Signatory

By:  _____

Name:  Emily Stephens

Title:  Authorized Signatory

████████████████████████████

███████████████████████████████

Notice Address:

333 S. Grand Avenue
Los Angeles, CA 90071

_____

Fax: _____
Attention: Corporate Actions Team
Email: ali@oaktreecapital.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**OAKTREE OPPS XB HOLDCO LTD.**

By:  Oaktree Capital Management, L.P.
Its:  Director

By: _____

Name:    Allen Li

Title:    Vice President

By: _____

Name:    Emily Stephens

Title:    Managing Director

██████████████████████████

████████████████████████████████

Notice Address:

333 S. Grand Avenue
Los Angeles, CA 90071

_____

Fax: _____
Attention: Corporate Actions Team
Email: ali@oaktreecapital.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**OAKTREE OPPORTUNITIES FUND XB HOLDINGS (DELAWARE), L.P.**

By:  Oaktree Fund GP, LLC
Its:  General Partner

By:  Oaktree Fund GP I, L.P.
Its:  Managing Member

By: _____

Name: _____Allen Li_____

Title: _____Authorized Signatory_____

By: _____

Name: _____Emily Stephens_____

Title: _____Authorized Signatory_____

████████████████████████

████████████████████████████

Notice Address:

333 S. Grand Avenue
Los Angeles, CA 90071_____

_____
Fax: _____
Attention: Corporate Actions Team_____
Email: ali@oaktreecapital.com_____

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**OAKTREE VALUE OPPORTUNITIES FUND HOLDINGS, L.P.**

By:  Oaktree Value Opportunities Fund GP, L.P.
Its:  General Partner

By:  Oaktree Value Opportunities Fund GP Ltd.
Its:  General Partner

By:  Oaktree Capital Management, L.P.
Its:  Director

By:  _____

Name:     Allen Li

Title:     Vice President

By:  _____

Name:     Emily Stephens

Title:     Managing Director

████████████████████████████████

██████████████████████████████████████

Notice Address:

333 S. Grand Avenue
Los Angeles, CA 90071

_____

Fax: _____
Attention: Corporate Actions Team
Email: ali@oaktreecapital.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**GEN IV INVESTMENT OPPORTUNITIES, LLC**

By: _____

Name: ____Paul Segal____

Title: ____President____

Notice Address:

1700 Broadway, 38th Floor
New York, NY 10019 _____

_____

Fax: _____
Attention: David Chang_____
Email: dchang@lspower.com_____

[*Signature Page to Restructuring Support Agreement*]

# EXHIBIT A

## RESTRUCTURING TERM SHEET

# HALCÓN RESOURCES CORPORATION

## RESTRUCTURING TERM SHEET

### August 2, 2019

This restructuring term sheet (this "***Term Sheet***") presents the principal terms of a proposed financial restructuring (the "***Restructuring***") of the existing indebtedness of Halcón Resources Corporation ("***Parent***") and its subsidiaries identified below (collectively, the "***Company***" or the "***Debtors***"), which Restructuring will be consummated by commencing cases under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") to pursue a prepackaged chapter 11 plan containing the terms set forth herein.  This is the Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of August 2, 2019, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "***RSA***").  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in **Annex 1**.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN.  THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.  EXCEPT AS SET FORTH IN THE RSA, NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

| OVERVIEW | |
|---|---|
| **Company:** | Parent, Halcón Resources Operating, Inc., Halcón Holdings, Inc., Halcón Energy Properties, Inc., Halcón Permian, LLC, Halcón Field Services, LLC, and Halcón Operating Co., Inc. |
| **Proposed Filing Date and Venue:** | No later than August 7, 2019 (the "***Petition Date***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"). |
| **Claims and Interests to be Restructured:** | Revolving Credit Agreement Claims: consisting of up to $225 million in principal amount, including reimbursement obligations in respect of letters of credit, plus all other secured obligations, including secured swap obligations, plus unpaid interest (including interest at the default rate that has accrued but not been paid during the Chapter 11 Cases), fees, and other expenses arising and payable under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 7, 2017 (as amended, modified, or otherwise supplemented from time to time, the "***Revolving Credit Agreement***"), by and among Parent, as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "***Revolving Credit Agreement Agent***"), and the lenders thereunder (together with the other Secured Parties (as defined therein), the "***Revolving Credit Agreement Lenders***") (the Claims thereunder, the "***Revolving Credit Agreement Claims***") party thereto from time to time.<br><br>Senior Notes Claims: consisting of approximately $625,005,000 in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 6.75% Senior Notes due 2025 (the "***Senior Notes***," and the holders thereof, the "***Senior Noteholders***") or that certain indenture, dated as of February 16, 2017 (as amended, modified, or otherwise supplemented from time to time, the "***Senior Notes Indenture***," and the Claims thereunder, the "***Senior Notes Claims***"), under which the Senior Notes were issued by and among Parent, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as indenture trustee.<br><br>General Unsecured Claims: consisting of any prepetition Claim against the Company that is not a Revolving Credit Agreement Claim, a Senior Notes Claim, an Intercompany Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "***General Unsecured Claims***").<br><br>Existing Equity Interests: consisting of shares of the class of common stock of Parent that existed immediately prior to the Effective Date, including any restricted stock of Parent that vests prior to the Effective Date.<br><br>Other Equity Interests: consisting of all Interests in Parent other than Existing Equity Interests. |

| **TRANSACTION OVERVIEW** | |
|---|---|
| **Overview of the Restructuring:** | The Restructuring will be implemented through the commencement of prepackaged Chapter 11 Cases by the Company to pursue confirmation of the Plan, which will be solicited to holders of Senior Notes Claims prior to the Petition Date. |
| | As a component of the Restructuring and consistent with the Equity Rights Offering Documents, (i) each Senior Noteholder will be offered the right to purchase its Pro Rata share of New Common Shares for an aggregate purchase price of $150,150,000 (the "***Senior Noteholder Rights Offering***") and (ii) subject to the Existing Equity Cash Out (as defined below), each holder of Existing Equity Interests will be offered the right to purchase its Pro Rata share of New Common Shares for an aggregate purchase price of up to $14,850,000 (the "***Existing Equity Interests Rights Offering***," and together with the Senior Noteholder Rights Offering, the "***Equity Rights Offerings***"), in each case, at a price per share equal to a 26% discount to Plan Value based on the lower of (A) the Total Enterprise Value or (B) an assumed total enterprise value of $425 million. The proceeds of the Equity Rights Offerings will be used by the Company to (i) provide additional liquidity for working capital and general corporate purposes, (ii) pay all reasonable and documented Restructuring Expenses, and (iii) fund Plan distributions. |
| | As of the Effective Date, the Revolving Credit Agreement Claims, Senior Notes Claims, Existing Equity Interests, and Other Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect. |
| **DIP Financing; Use of Cash Collateral:** | The Restructuring will be financed by (i) consensual use of cash collateral and (ii) a new money post-petition junior secured term loan facility in an aggregate amount of up to $35 million (the "***DIP Financing***"), provided by the DIP Lenders and on terms and conditions consistent with the material terms set forth in the term sheet attached hereto as **Exhibit A** (the "***DIP Term Sheet***"). |
| | The prepetition liens on the Debtors' assets pledged as collateral under the Revolving Credit Facility Agreement (the "***Prepetition Collateral***") and the adequate protection replacement liens (the "***AP Revolver Liens***") granted in favor of the Revolving Credit Agreement Lenders on the Prepetition Collateral under the DIP Order shall be senior to the liens granted to the DIP Lenders under the DIP Documents on the Prepetition Collateral, and the AP Revolver Liens shall be senior to the DIP Lenders' liens granted under the DIP Documents with respect to unencumbered property. |
| | The DIP Documents shall be in form and substance acceptable to the Company and the DIP Lenders. |

3

| TREATMENT OF CLAIMS AND INTEREST | |
|---|---|
| **Administrative Expense Claims, DIP Claims, and Priority Tax Claims:** | Except to the extent that a holder of an Allowed Administrative Expense Claim, an Allowed DIP Claim, or an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim, an Allowed DIP Claim, and an Allowed Priority Tax Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. Unimpaired – Presumed to Accept. |
| **Other Secured Claims:** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors (in consultation with the Consenting Creditors), (i) each such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such holder's Allowed Other Secured Claim will be reinstated, or (iii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. Unimpaired – Presumed to Accept. |
| **Other Priority Claims:** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors (in consultation with the Consenting Creditors), (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. Unimpaired – Presumed to Accept. |
| **Revolving Credit Agreement Claims:** <br><br> *Up to $225 million in principal amount plus all other outstanding secured obligations* | On the Effective Date, each holder of an Allowed Revolving Credit Agreement Claim will receive payment in full, in Cash, including by a refinancing, and all outstanding letters of credit will be replaced, cash collateralized, or otherwise secured to the satisfaction of the Issuing Bank (as defined in the Revolving Credit Agreement) in accordance with the terms of the Revolving Credit Agreement. |

| | |
|---|---|
| *thereunder* | |
| **Senior Notes Claims:**<br><br>*$625,005,000 Allowed Claim* | On the Effective Date, each holder of an Allowed Senior Notes Claim will receive, in full and final satisfaction of such Allowed Senior Notes Claim, its Pro Rata share of (i) 91% of the total New Common Shares issued pursuant to the Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium, and (ii) the right to participate in the Senior Noteholder Rights Offering.<br><br>Impaired – Entitled to Vote. |
| **General Unsecured Claims:** | Each holder of a General Unsecured Claim will be paid in the ordinary course of business without regard to the automatic stay or other restrictions on the payment of prepetition Claims under the Bankruptcy Code, but subject to all defenses and disputes the Debtors or the Reorganized Debtors may assert as to the validity or amount of such Claims, or will receive such other treatment as may be required to deem such General Unsecured Claim unimpaired under the Bankruptcy Code.<br><br>Unimpaired – Presumed to Accept. |
| **Existing Equity Interests:** | On the Effective Date, Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect. Each holder of Existing Equity Interests will receive either:<br><br>(1) if a Registered Holder holds fewer than or equal to 2,000 shares of Existing Equity Interests, Cash in an amount equal to the inherent value of such Registered Holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to the Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium, (ii) the Warrants, and (iii) the right to participate in the Existing Equity Interests Rights Offering (the "***Existing Equity Cash Out***"); or<br><br>(2) for any other holder of Existing Equity Interests, such holder's Pro Rata share of (i) 9% of the total New Common Shares issued pursuant to the Plan on the Effective Date, subject to dilution by the Rights Offering Equity, the Warrant Equity, the MIP Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium; *provided, however*, that the amount of total New Common Shares available to be issued pursuant to this provision shall be reduced by the amount of New Common Shares that would have been distributed to holders of Existing Equity Interests in the absence of the Existing Equity Cash Out, (ii) the Warrants, and (iii) the right to participate in the Existing Equity Interests Rights |

5

| | Offering. |
|---|---|
| | Impaired – Entitled to Vote. |
| **Other Equity Interests** | On the Effective Date, Other Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect. |
| | Impaired – Presumed to Reject. |
| **Intercompany Claims:** | All Intercompany Claims will be adjusted, reinstated, or discharged in the Company's discretion (in consultation with the Consenting Creditors). |
| | Unimpaired – Presumed to Accept. |
| **OTHER MATERIAL PROVISIONS** | |
| **Senior Noteholder Rights Offering:** | In connection with the Senior Noteholder Rights Offering, each Senior Noteholder will be offered the right to purchase its Pro Rata share of New Common Shares for an aggregate purchase price of $150,150,000 (subject to dilution by the MIP Equity, the Warrant Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium). The Senior Noteholder Rights Offering will be backstopped by the Backstop Parties in exchange for the Backstop Commitment Premium. |
| | Discount: New Common Shares in the Senior Noteholder Rights Offering will be issued at an aggregate purchase price of $150,150,000 at a price per share equal to a 26% discount to Plan Value based on the lower of (A) the Total Enterprise Value or (B) an assumed total enterprise value of $425 million. |
| **Existing Equity Interests Rights Offering:** | In connection with the Existing Equity Interests Rights Offering, each holder of Existing Equity Interests will be offered the right to purchase its Pro Rata share of New Common Shares for an aggregate purchase price of up to $14,850,000 (subject to dilution by the MIP Equity, the Warrant Equity, and the New Common Shares issued pursuant to the Backstop Commitment Premium); *provided, however*, that the amount of total New Common Shares available to be purchased pursuant to the Existing Equity Interests Rights Offering will be reduced by the amount of New Common Shares that would have been distributed to holders of Existing Equity Interests in the absence of the Existing Equity Cash Out. |
| | Discount: New Common Shares in the Existing Equity Interests Rights Offering will be issued as an aggregate purchase price of up to $14,850,000 at a price per share equal to a 26% discount to Plan Value based on the lower of (A) the Total Enterprise Value or (B) an assumed total enterprise value of $425 million. |

6

| GENERAL PROVISIONS | |
|---|---|
| **Executory Contracts and Unexpired Leases:** | As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts (as defined in the Plan); *provided*, *however*, that the Requisite Creditors consent to such rejection, or (v) is specifically designated as a contract or lease to be rejected as reasonably requested by the Requisite Creditors in the Plan Supplement; *provided*, *however*, that such rejection shall be deemed unreasonable if it would give rise to a potential Cure Amount that cannot be satisfied on the Effective Date or otherwise cause the Plan to not be feasible pursuant to section 1129 of the Bankruptcy Code. |
| **Board of Directors:** | The Board of Directors will consist of (i) the Reorganized Debtors' chief executive officer and (ii) the members selected by the Requisite Creditors to be disclosed in the plan supplement (the "***New Board***"). |
| **Charter, By-Laws and Organizational Documents:** | The Amended Organizational Documents will become effective as of the Effective Date. |
| **Management Incentive Plan:** | The Plan will provide for the establishment of a post-emergence management incentive plan to be adopted by the New Board (the "***Management Incentive Plan***"), which will include restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares representing 7.5% - 10% of the New Common Shares on a fully diluted basis (the "***MIP Equity***"). The MIP Equity will be reserved for grants made from time to time to directors, officers, or other management and employees of the Company, in a form, amounts, and at times to be determined by the New Board. |
| **Cancellation of Notes, Instruments, Certificates and other Documents:** | On the Effective Date of the Plan, all notes, instruments, certificates evidencing debt of the Company and Interests in Parent will be cancelled and obligations of the Company thereunder will be discharged. |
| **Vesting of Assets:** | On the Effective Date, pursuant to section 1141(b)-(c) of the Bankruptcy Code, all operating assets of the Company will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |

| | |
|---|---|
| **Survival of Indemnification Obligations and D&O Insurance:** | Any obligations of the Company pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Company or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Company will not be discharged or impaired by confirmation of the Plan.  All such obligations will be deemed and treated as executory contracts to be assumed by the Company under the Plan and will continue as obligations of the Reorganized Debtors.  Any Claim based on the Company's obligations herein will be an Allowed Claim. |
| | In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. |
| **Conditions to Effectiveness:** | Effectiveness of the Plan will be subject to the satisfaction of customary conditions, including the following (as applicable): |
| | i.  the Definitive Documents (as defined in the RSA) will contain terms and conditions consistent in all material respects with this Term Sheet and the RSA; |
| | ii.  the Bankruptcy Court will have entered the Confirmation Order, and such Confirmation Order will not have been stayed or modified; |
| | iii.  the Exit Facility, including all documentation related thereto, will have been consummated; |
| | iv.  all governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring will have been obtained and all applicable waiting periods will have expired; and |
| | v.  all Restructuring Expenses will have been paid in full. |
| | The conditions to effectiveness may be waived, in whole or in part, in writing by the Debtors and the Requisite Creditors. |
| **Releases by Debtors:** | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents and the documents in the plan supplement or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will |

8

<table>
<tr><td></td><td>be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the RSA, the Definitive Documents and the documents in the plan supplement or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that nothing herein will be construed to release any Person from willful misconduct or intentional fraud as determined by a Final Order.</td></tr>
<tr><td><strong>Releases by Third-Parties:</strong></td><td>As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the documents in the plan supplement and the obligations contemplated by the Restructuring, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right,</td></tr>
</table>

| | duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Definitive Documents and the documents in the plan supplement, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission; provided, however, that nothing herein will be construed to release any Person from willful misconduct or intentional fraud as determined by a Final Order. |
|---|---|
| **Exculpation:** | To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, the Exit Facility, the Equity Rights Offerings, the Management Incentive Plan, the Disclosure Statement, the RSA, the Restructuring, and the Plan (including the Definitive Documents and the documents in the plan supplement), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of |

| | |
|---|---|
| | securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Discharge and Injunction:** | The Plan will contain standard discharge and injunction provisions. |
| **Exemption from SEC Registration:** | The issuance and distribution under the Plan of the (i) New Common Shares (other than New Common Shares issued pursuant to the Senior Noteholder Backstop Agreement, including the Backstop Commitment Premium), (ii) the Warrants, and (iii) the Warrant Equity will be issued in reliance on the exemption from registration under the Securities Act or applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code and the New Common Shares issued pursuant to the Senior Noteholder Backstop Agreement, including on account of the Backstop Commitment Premium, will be issued in reliance on the exemption from registration under the Securities Act pursuant to Section 4(a)(2) and/or Regulation D of the Securities Act (each, a "*Securities Exception*"). |
| **Securities Issuance Requirements/ Registration Rights Agreement:** | The issuance of the New Common Shares will be subject to the following requirements (the "*Securities Issuance Requirements*"):<br><br>• the issuance of the New Common Shares under the Plan on the Effective Date will be made through the facilities of DTC in accordance with the customary practices of DTC for a mandatory distribution and the Reorganized Debtors will reflect ownership of the New Common Shares through the facilities of DTC; *provided*, *however*, that to the extent the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, Reorganized Parent shall take all such reasonable actions as may be required to cause the distributions of the New Common Shares under this Plan, *provided*, *further*, *however*, that Holders of Existing Equity Interests that are entitled to receive New Common Shares, but had held such Existing Equity Interests outside of the facilities of DTC, may receive their New Common Shares by means of book-entry with the Reorganized Parent's transfer agent;<br><br>• no later than seven (7) calendar days prior to the Voting Deadline, the Debtors, with the consent of the Requisite Creditors, shall make a determination as to whether Reorganized Parent will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp) following December 31, 2019. If the Debtors determine that Reorganized Parent will continue to be a reporting company under the Exchange Act following December 31, 2019, the Debtors shall use their commercially reasonable efforts to have the New Common Shares listed on the New York Stock Exchange, or another |

| | |
|---|---|
| | nationally recognized exchange, as soon as practicable, subject to meeting applicable listing requirements following the Effective Date.  If the Debtors determine pursuant to this provision that Reorganized Parent will not continue to be a reporting company under the Exchange Act following December 31, 2019, the Debtors shall file a governance term sheet, in form and substance reasonably acceptable to the Company and Requisite Creditors, with the Plan Supplement;<br><br>• the composition of the New Board will comply in all respects with the rules applicable to the nationally recognized exchange on which the New Common Shares are listed (and the Consenting Creditors will agree to such modifications to the New Board as are necessary to comply with such requirements); and<br><br>• after the Effective Date, the sale or transfer of the New Common Shares will not be subject to any right of first refusal or right of first offer restrictions in favor of other holders of the New Common Shares.<br><br>Furthermore, on the Effective Date, the Reorganized Debtors, the Consenting Creditors and any holder of 10% or more of the New Common Shares will be party to a registration rights agreement (the "***Registration Rights Agreement***"). |
| **Tax Structure:** | To the extent practicable, the Restructuring contemplated by this Term Sheet will be structured (in consultation with the Consenting Creditors) so as to obtain the most beneficial structure for the Company, its equity holders post-transaction, holders of Existing Equity Interests, and holders of Senior Notes Claims as determined by the Company. |
| **Consent Rights of Consenting Creditors:** | Notwithstanding anything to the contrary herein or in the Plan, any and all consent rights of the Consenting Creditors set forth in the RSA with respect to the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, will be incorporated into the Plan by reference and fully enforceable as if stated in full in the Plan. |
| **Restructuring Expenses:** | The Company will pay, immediately prior to the Petition Date, all Restructuring Expenses, including fees and expenses estimated to be incurred prior to the filing of the Chapter 11 Cases, for which invoices or receipts are furnished by the Consenting Creditor Advisors at least one (1) Business Day prior thereto.<br><br>On the Effective Date, without the need to file a fee or retention application in the Chapter 11 Cases, the Company will pay all Restructuring Expenses, including fees and expenses estimated to be incurred through the Effective Date to the extent invoiced at least one (1) Business Day before the |

| | Effective Date by the Consenting Creditor Advisors. |
|---|---|
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |

## ANNEX 1

## Defined Terms

| **Defined Terms** | |
|---|---|
| "***Ad Hoc Noteholder Group***" | The ad hoc group of Senior Noteholders represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel, and Ducera Partners LLC, as financial advisor. |
| "***Administrative Expense Claim***" | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses. |
| "***Allowed***" | With reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (iii) any Claim or Interest expressly allowed under the Plan; *provided*, *however*, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| "***Amended Organizational Documents***" | The forms of certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), or other similar organizational documents, as applicable, of the Reorganized Parent. |
| "***Backstop Commitment Premium***" | The amount to be paid as consideration to the Backstop Parties on the Effective Date, pursuant to the terms and conditions set forth in the Plan and the Senior Noteholder Backstop Agreement, in the form of New Common Shares, issued at a price per share equal to a 26% discount to Plan Value based on the lower of (A) the Total Enterprise Value or (B) an assumed total enterprise value of $425 million, equal to 6% of the aggregate amount of the Senior Noteholder Rights Offering, subject to dilution by the MIP Equity and the Warrant Equity. |
| "***Backstop Parties***" | Senior Noteholders that are signatories to the Senior Noteholder Backstop Agreement. |

| **Defined Terms** | |
|---|---|
| "**Business Day**" | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close. |
| "**Cash**" | Legal tender of the United States of America. |
| "**Cause of Action**" | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim. |
| "**Chapter 11 Cases**" | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court. |
| "**Claim**" | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| "**Confirmation Date**" | The date on which the Bankruptcy Court enters the Confirmation Order. |

| Defined Terms | |
|---|---|
| "*Confirmation Order*" | The order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases and approving the Disclosure Statement and Solicitation Materials. |
| "*Consenting Creditors*" | Senior Noteholders that are signatories to the RSA, and any subsequent Senior Noteholder that becomes party thereto in accordance with the terms of the RSA. |
| "*DIP Claim*" | All Claims held by the DIP Lenders on account of, arising under, or relating to the DIP Financing or the DIP Orders, which includes Claims for all principal amounts outstanding, interest, reasonable and documented fees, expenses, costs, and other charges of the DIP Lenders. |
| "*DIP Credit Agreement*" | The credit agreement governing the terms of the DIP Financing, which shall be in form and substance consistent in all material respects with the DIP Term Sheet and acceptable to the DIP Lenders. |
| "*DIP Documents*" | The DIP Credit Agreement, any guaranty or intercreditor agreements related thereto, any collateral and security documentation related thereto, and any ancillary documentation related thereto. |
| "*DIP Lenders*" | Certain of the Consenting Creditors in their capacity as lenders under the DIP Financing. |
| "*DIP Order*" | The interim and final order(s) of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Financing and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders. |
| "*Disclosure Statement*" | The disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code. |
| "*DTC*" | The Depository Trust Company. |
| "*Effective Date*" | The date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective. |
| "*Entity*" | An "entity," as defined in section 101(15) of the Bankruptcy Code. |
| "*Equity Rights Offering Documents*" | Collectively, the Senior Noteholder Backstop Agreement and the Rights Offering Procedures. |

| **Defined Terms** | |
|---|---|
| "*Estate(s)*" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| "*Exculpated Parties*" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "*Existing Equity Interests*" | Shares of the class of common stock of Parent that existed immediately prior to the Effective Date, including any restricted stock of Parent that vests prior to the Effective Date. |
| "*Exit Facility*" | The financing to be provided to the Reorganized Debtors on the Effective Date in accordance with the Plan and that certain commitment letter among the Debtors, BMO Harris Bank N.A. and BMO Capital Markets Corp. dated as of even date herewith. |
| "*Fee Claim*" | A Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Cases. |
| "*Final Order*" | An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or |

4

| **Defined Terms** | |
|---|---|
| | 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| "*Intercompany Claim*" | Any Claim against a Debtor held by another Debtor. |
| "*Interest*" | Any equity interest (as defined in section 101(16) of the Bankruptcy Code) in the Company, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in the Company, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Company, that existed immediately before the Effective Date. |
| "*New Common Shares*" | Shares of common stock of Reorganized Parent. |
| "*Other Equity Interests*" | All Interests in Parent other than Existing Equity Interests. |
| "*Other Priority Claim*" | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "*Other Secured Claim*" | A Secured Claim other than a Priority Tax Claim, a DIP Claim, or a Revolving Credit Agreement Claim. |
| "*Person*" | Any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity. |
| "*Plan*" | The prepackaged chapter 11 plan of reorganization of the Company implementing the Restructuring, including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time in accordance with its terms and the RSA. |
| "*Plan Value*" | The value of a New Common Share as of the Effective Date. |
| "*Priority Tax Claim*" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |

| **Defined Terms** |
|---|

| | |
|---|---|
| "*Pro Rata*" | The proportion that an Allowed Claim or Interest in a particular class bears to the aggregate amount of Allowed Claims or Interests in that class. |
| "*Registered Holder*" | A holder of Existing Equity Interests whose ownership interest is registered directly on the books and records of the Company's transfer agent. |
| "*Released Parties*" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Creditors, (iv) the Ad Hoc Noteholder Group, (v) the Senior Notes Trustee, (vi) the arrangers, agents and lenders under the Exit Facility, (vii) the agent and DIP Lenders under the DIP Financing, (viii) the Revolving Credit Agreement Agent and the Revolving Credit Agreement Lenders, (ix) with respect to each of the foregoing Persons, in clauses (i) through (viii), each of their affiliates, and (x) with respect to each of the foregoing Persons in clauses (i) through (ix), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "*Releasing Parties*" | Collectively, (i) the holders of all Claims or Interests who vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (v) all other holders of Claims and Interests to the maximum extent permitted by law. |
| "*Reorganized Debtors*" | Each of the Debtors as reorganized on the Effective Date in accordance with the Plan. |
| "*Reorganized Parent*" | Parent as reorganized on the Effective Date in accordance with the Plan. |
| "*Requisite Creditors*" | As of the date of determination, Consenting Creditors holding at least two-thirds of the outstanding Senior Notes held by the Consenting Creditors as of such date. |

6

| **Defined Terms** | |
|---|---|
| "***Restructuring Expenses***" | The reasonable and documented fees and expenses incurred by the Consenting Creditors Advisors pursuant to the terms of their fee letters. |
| "***Rights Offering Equity***" | New Common Shares issued pursuant to the Equity Rights Offerings. |
| "***Rights Offering Procedures***" | The rights offering procedures filed with the Bankruptcy Court, which set forth the procedures for the Senior Noteholders and holders of Existing Equity Interests to participate in the Equity Rights Offerings. |
| "***Senior Notes Trustee***" | U.S. Bank National Association, as trustee under the Senior Notes Indenture and its successors, assigns, or any replacement trustee appointed pursuant to the terms of the Senior Notes Indenture. |
| "***Secured Claim***" | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "***Securities Act***" | Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and any rules and regulations promulgated thereby. |
| "***Senior Noteholder Backstop Agreement***" | The Backstop Commitment Agreement entered into simultaneously with the RSA, and attached thereto as <u>Exhibit B</u>. |
| "***Solicitation Materials***" | Collectively, the Disclosure Statement and the related solicitation materials. |
| "***Total Enterprise Value***" | The total enterprise value of the Reorganized Debtors. |
| "***Unimpaired***" | With respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| "***Warrant Agreement***" | One or more warrant agreement(s) to be entered into by and among Reorganized Parent and the warrant agent named therein that will govern the terms of the Warrants. |
| "***Warrants***" | The Series A Warrants, the Series B Warrants, and the Series C Warrants issued pursuant to the Plan as of the Effective Date. <br><br> (i)    "<u>Series A Warrants</u>" means warrants issued to holders of |

| **Defined Terms** |
| --- |
| Existing Equity Interests pursuant to the Plan that will be exercisable in Cash for a 3-year period after the Effective Date for a number of shares equal to 10% of the New Common Shares issued and outstanding as of the Effective Date, less the number of New Common Shares that would have been issued but for the Existing Equity Cash Out (subject to dilution by the MIP Equity), in an amount equal to an implied 75% recovery to Senior Noteholders on account of the Senior Notes Claims (inclusive of non-default interest under the Senior Notes through the date of such exercise calculated as though the Senior Notes remained outstanding through the date of such exercise and all accrued and unpaid interest had been added to the outstanding principal amount of the Notes daily; *provided*, *however*, that to the extent DTC requirements are applicable, if DTC is not able to provide for daily accretion, the Consenting Creditors agree to negotiate in good faith with the Debtors on alternative accretion schedules to address any such impediment in accordance with section 4(a)(viii) of the RSA.<br><br>(ii)  "Series B Warrants" means warrants issued to holders of Existing Equity Interests pursuant to the Plan that will be exercisable in Cash for a 3-year period after the Effective Date for a number of shares equal to 10% (20% cumulative) of the New Common Shares issued and outstanding as of the Effective Date, less the number of New Common Shares that would have been issued but for the Existing Equity Cash Out (subject to dilution by the MIP Equity), in an amount equal to an implied 95% recovery to Senior Noteholders on account of the Senior Notes Claims (inclusive of non-default interest under the Senior Notes through the date of such exercise calculated as though the Senior Notes remained outstanding through the date of such exercise and all accrued and unpaid interest had been added to the outstanding principal amount of the Notes daily; *provided*, *however*, that to the extent DTC requirements are applicable, if DTC is not able to provide for daily accretion, the Consenting Creditors agree to negotiate in good faith with the Debtors on alternative accretion schedules to address any such impediment in accordance with section 4(a)(viii) of the RSA.<br><br>(iii)  "Series C Warrants" means warrants issued to holders of Existing Equity Interests pursuant to the Plan that will be exercisable in Cash for a 3-year period after the Effective Date for a number of shares equal to 10% (30% cumulative) of the New Common Shares issued and outstanding as of the Effective Date, less the number of New Common Shares that would have |

8

| **Defined Terms** | |
|---|---|
| | been issued but for the Existing Equity Cash Out (subject to dilution by the MIP Equity), in an amount equal to an implied 125% recovery to Senior Noteholders on account of the Senior Notes Claims (inclusive of non-default interest under the Senior Notes through the date of such exercise calculated as though the Senior Notes remained outstanding through the date of such exercise and all accrued and unpaid interest had been added to the outstanding principal amount of the Notes daily; *provided, however*, that to the extent DTC requirements are applicable, if DTC is not able to provide for daily accretion, the Consenting Creditors agree to negotiate in good faith with the Debtors on alternative accretion schedules to address any such impediment in accordance with section 4(a)(viii) of the RSA. |
| "***Warrant Equity***" | The New Common Shares issuable upon the exercise of the Warrants, subject to dilution by the MIP Equity. |

## Exhibit A

## DIP Term Sheet

| Key Terms | Noteholder DIP Financing |
|---|---|
| Borrower | Halcón Resources Corporation |
| Guarantor(s) | All existing or future domestic subsidiaries of the Borrower |
| Administrative Agent | Wilmington Trust, National Association |
| DIP Facility | $35 million multi-draw DIP term loan facility, available in one borrowing on the entry of the Interim Order in an amount to be agreed and one borrowing on entry of the Final Order |
| Tenor | 6 months |
| Pricing | • Interest: L+550<br>• Undrawn Spread: 1.00% |
| Fees | • Upfront Fee: 2.00% on allocated commitment amount, earned and paid in full on the closing date<br>• Administrative Agent Fees: $20,000 per annum and a $5,000 acceptance fee |
| Security | Subject to a professional fee carve-out, junior lien on all assets encumbered by the prepetition RBL facility, and a lien on any unencumbered assets (but subject to the adequate protection lien in favor of the RBL facility in such assets) |
| Ranking | Subject to the RBL liens, any recovery from the foreclosure of collateral shall be applied, first to post-petition secured hedges and second, to the obligations outstanding under the DIP facility |
| Milestones | • 30 days after petition date for final DIP order<br>• 75 days after petition date for confirmation of a plan of reorganization<br>• 95 days after the petition date for effective date of a plan of reorganization |

| Key Terms | Noteholder DIP Financing |
|---|---|
| **Financial Maintenance Covenants** | • Rolling 13-week budget recast every four weeks subject to majority lender approval<br>• 4 week variance reporting with initial variance test performed 4 weeks after petition date and then performed every 4 weeks thereafter<br>• 120% permitted variance on aggregate operating disbursements<br>• Positive variance carryforward for immediately succeeding 4-week period |
| **Reporting Requirements** | • Consolidated financial statements: monthly, quarterly, annual (audited)<br>• 4 week variance reporting with first variance report due 4 weeks after petition date<br>• Bi-weekly cash flow and operations update call |
| **Use of Proceeds** | Incremental liquidity purposes during the Borrower's bankruptcy proceeding, subject to budget agreed to by majority lenders and permitted variances |
| **Closing Conditions** | Usual and customary conditions to closing for facilities and transactions of this type, including:<br>• Approval by the majority lenders of the initial budget<br>• Execution of credit documentation<br>• Delivery of PATRIOT Act information<br>• Grant of security interest and lien on DIP collateral<br>• Entry into interim DIP order<br>• Payment of fees and expenses |

## EXHIBIT B

## SENIOR NOTEHOLDER BACKSTOP AGREEMENT

**Execution Version**

# HALCÓN RESOURCES CORPORATION

# BACKSTOP COMMITMENT AGREEMENT

**August 2, 2019**

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| 1. | CERTAIN DEFINITIONS | 2 |
| 2. | THE BACKSTOP COMMITMENT | 10 |
| | 2.1 Backstop Commitment | 10 |
| | 2.2 Escrow; Closing | 11 |
| | 2.3 Expense Reimbursement | 11 |
| | 2.4 Funding Default | 12 |
| 3. | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 13 |
| | 3.1 Organization | 13 |
| | 3.2 Due Authorization, Execution and Delivery; Enforceability | 13 |
| | 3.3 Authorized and Issued Equity Interests | 13 |
| | 3.4 Consents | 14 |
| | 3.5 No Conflicts | 14 |
| | 3.6 Company Information | 14 |
| | 3.7 Absence of Certain Changes | 14 |
| | 3.8 No Violation; Compliance with Laws | 14 |
| | 3.9 Legal Proceedings | 15 |
| | 3.10 No Unlawful Payments | 15 |
| | 3.11 Compliance with Money Laundering Laws | 15 |
| | 3.12 No Broker's Fees | 15 |
| | 3.13 Investment Company Act | 15 |
| | 3.14 Takeover Statutes | 16 |
| | 3.15 Arm's-Length | 16 |
| | 3.16 Title to Real Property | 16 |
| | 3.17 No Undisclosed Relationships | 16 |
| | 3.18 Licenses and Permits | 17 |
| | 3.19 Environmental | 17 |
| | 3.20 Tax Matters | 18 |
| | 3.21 Employee Benefit Plans | 18 |
| | 3.22 Internal Control Over Financial Reporting | 19 |
| | 3.23 Disclosure Controls and Procedures | 19 |
| | 3.24 Material Contracts | 19 |
| | 3.25 Insurance | 20 |
| | 3.26 Intellectual Property | 20 |
| | 3.27 No Other Representations and Warranties | 21 |
| 4. | REPRESENTATIONS AND WARRANTIES OF EACH BACKSTOP PARTY | 21 |
| | 4.1 Organization | 22 |
| | 4.2 Due Authorization | 22 |
| | 4.3 Due Execution; Enforceability | 22 |
| | 4.4 No Registration Under the Securities Act; Selling Restrictions | 22 |

| 4.5 | Acquisition for Investment | 22 |
| 4.6 | No Conflicts | 22 |
| 4.7 | Consents and Approvals | 22 |
| 4.8 | Investor Representation | 23 |
| 4.9 | Investment Experience | 23 |
| 4.10 | Sufficiency of Funds | 23 |
| 4.11 | Ownership | 23 |
| 4.12 | Legal Proceedings | 23 |
| 4.13 | No Broker's Fee | 23 |
| 4.14 | Independent Investigation | 23 |

5. COVENANTS ... 24

| 5.1 | Conduct of Business | 24 |
| 5.2 | Non-Disclosure of Holdings Information | 25 |
| 5.3 | Use of Proceeds | 25 |
| 5.4 | Blue Sky | 25 |
| 5.5 | Senior Noteholder Rights Offering | 25 |
| 5.6 | The New Common Shares | 25 |
| 5.7 | Backstop Notice | 25 |
| 5.8 | Facilitation | 26 |
| 5.9 | Access to Information; Confidentiality | 26 |
| 5.10 | Regulatory Approvals | 27 |

6. CONDITIONS TO THE BACKSTOP PARTIES' CLOSING OBLIGATIONS ... 29

| 6.1 | Conditions to the Backstop Parties' Closing Obligations | 29 |
| 6.2 | Conditions to the Company's Closing Obligations | 30 |

7. INDEMNIFICATION AND CONTRIBUTION ... 31

| 7.1 | Indemnification Obligations | 31 |
| 7.2 | Indemnification Procedure | 32 |
| 7.3 | Settlement of Indemnified Claims | 33 |
| 7.4 | Contribution | 33 |
| 7.5 | Treatment of Indemnification Payments | 34 |

8. MISCELLANEOUS ... 34

| 8.1 | Notice | 34 |
| 8.2 | Assignment | 35 |
| 8.3 | Survival | 36 |
| 8.4 | Entire Agreement | 36 |
| 8.5 | Waivers and Amendments | 36 |
| 8.6 | Governing Law; Jurisdiction; Venue; Process | 37 |
| 8.7 | Counterparts | 37 |
| 8.8 | Headings | 37 |
| 8.9 | Severability | 37 |
| 8.10 | Termination | 37 |
| 8.11 | Breach | 38 |
| 8.12 | Effect of Termination | 38 |

8.13    Waiver of Jury Trial.........................................................................................39
8.14    Damages........................................................................................................39
8.15    Specific Performance ....................................................................................39
8.16    No Reliance....................................................................................................39
8.17    Publicity .........................................................................................................39
8.18    Settlement Discussions .................................................................................40
8.19    No Recourse...................................................................................................40
8.20    Other Interpretive Matters.............................................................................40

HALCÓN RESOURCES CORPORATION
BACKSTOP COMMITMENT AGREEMENT
August 2, 2019

**BACKSTOP COMMITMENT AGREEMENT**, dated as of August 2, 2019 (this "*Agreement*"), among Halcón Resources Corporation (the "*Company*"), a Delaware corporation (collectively, with Halcón Resources Operating, Inc., Halcón Holdings, Inc., Halcón Energy Properties, Inc., Halcón Permian, LLC, Halcón Field Services, LLC, and Halcón Operating Co., Inc., the "*Company Parties*" or the "*Debtors*") and the parties set forth on **Schedule 1** hereto (each a "*Backstop Party*" and collectively, the "*Backstop Parties*"). The Company and each Backstop Party is referred to herein, individually, as a "*Party*" and, collectively, as the "*Parties*."

## RECITALS

**WHEREAS**, the Company is the issuer of those certain 6.75% Senior Notes due 2025 (the "*Senior Notes*") issued under that certain indenture, dated as of February 16, 2017 (as amended, modified, or otherwise supplemented from time to time, the "*Senior Notes Indenture*"), by and among the Company, each of the guarantors named therein, and U.S. Bank National Association, as indenture trustee.

**WHEREAS**, the Parties have engaged in arm's-length, good faith discussions regarding a restructuring of certain of the Company's indebtedness and other obligations, including the Company's indebtedness and obligations under the Revolving Credit Agreement and Senior Notes Indenture.

**WHEREAS**, the Parties, and certain other Senior Noteholders, together with their respective successors and permitted assigns and any subsequent Senior Noteholder that becomes party to the RSA in accordance with the terms thereof (collectively, the "*Consenting Creditors*"), entered into that certain Restructuring Support Agreement, dated as of the date hereof (the "*RSA*"), pursuant to which the Parties agreed to, among other things, support a restructuring of the Company's capital structure (the "*Restructuring*").

**WHEREAS**, consistent with the RSA, the Restructuring is anticipated to be implemented through a prepackaged plan of reorganization (as may be supplemented, amended, or modified from time to time, the "*Plan*"), a solicitation of votes thereon (the "*Solicitation*"), the Rights Offerings and the commencement by the Company of voluntary cases (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*").

**WHEREAS**, in connection with the Restructuring and pursuant to the Plan, among other things, (a) the Company will conduct an equity rights offering (the "*Senior Noteholder Rights Offering*"), by distributing to each Senior Noteholder rights to purchase such Senior Noteholder's *pro rata* share of the New Common Shares (defined below) available to be purchased in connection with the Senior Noteholder Rights Offering, and in an amount consistent with the Restructuring Term Sheet, for an aggregate purchase price of $150,150,000.00, and (b) subject to the terms and conditions contained in this Agreement, each

1

Backstop Party has agreed to purchase (on a several and not joint basis) an aggregate amount of New Common Shares equal to its Backstop Obligation (as defined below).

<div align="center">

**AGREEMENT**

</div>

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual promises, representations, warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.    CERTAIN DEFINITIONS**

The following terms have the meanings set forth below:

"***Ad Hoc Noteholder Group***"  has the meaning set forth in the RSA.

"***Affiliate***" of any Person means any Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"***Aggregate Commitment Amount***" means USD $150,150,000.00.

"***Agreement***" has the meaning assigned to it in the Preamble hereto.

"***Antitrust Authorities***" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other governmental entity, whether domestic or foreign, having jurisdiction pursuant to the Antitrust Laws.

"***Antitrust Laws***" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law, whether domestic or foreign, governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"***Approval Order***" means an order entered by the Bankruptcy Court in the Chapter 11 Cases authorizing the Company (on behalf of the Debtors) to assume this Agreement, including all exhibits and other attachments hereto.

"***Backstop Commitment***" means, with respect to each Backstop Party, the maximum amount of consideration in exchange for New Common Shares that such Backstop Party may be required to pay under this Agreement.  Such amounts are set forth opposite each Backstop Party's name in **Schedule 1** hereto.  The aggregate Backstop Commitments under this Agreement shall equal $150,150,000.00.

<div align="center">

2

</div>

"**Backstop Commitment Premium**" means (a) in the event of the purchase of New Common Shares by any Backstop Party in accordance with this Agreement, 6.00% of such Backstop Party's Backstop Commitment, payable in the form of New Common Shares issued at the Per Share Price, and (b) in the event this Agreement is terminated by the Required Backstop Parties under Section 8.10.4, 6.00% of such Backstop Party's Backstop Commitment, payable in full in cash.

"**Backstop Notice**" has the meaning assigned to it in Section 2.1.1 hereto.

"**Backstop Obligation**" means, with respect to each Backstop Party, the amount of New Common Shares required to be purchased by it on the Effective Date, in an amount equal to the product of:  (a) the Remaining Shares; and (b) such Backstop Party's Backstop Percentage.

"**Backstop Party**" and "**Backstop Parties**" have the meanings assigned to them in the Preamble hereto.

"**Backstop Party Professionals**" means (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Ad Hoc Noteholder Group, (b) one local counsel to the Ad Hoc Noteholder Group, (c) one financial advisor to the Ad Hoc Group of Noteholders, and (d) other professional advisors for specialized areas of expertise as circumstances warrant, which are retained by Consenting Creditors, with the consent of the Company (which consent shall not be unreasonably delayed, conditioned or withheld).

"**Backstop Percentage**" means, with respect to a Backstop Party, the figure expressed as a percentage, calculated by dividing: (a) such Backstop Party's Backstop Commitment; by (b) the Aggregate Commitment Amount.  Such percentages are set forth opposite each Backstop Party's name in **Schedule 1** attached hereto.

"**Backstop Purchase**" has the meaning assigned to it in Section 2.1.2(b) hereto.

"**Bankruptcy Code**" means Chapter 11 of Title 11 of the United States Code.

"**Bankruptcy Court**" has the meaning assigned to it in the Recitals hereto.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"**Chapter 11 Cases**" has the meaning assigned to it in the Recitals hereto.

"**Closing**" has the meaning assigned to it in Section 2.2.2(a) hereto.

"**Company**" has the meaning assigned to it in the Preamble hereto.

"**Company Disclosure Schedule**" means the disclosure schedule delivered by the Company to the Backstop Parties on the date of this Agreement.

"*Company Information*" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) posted or filed by the Company with the SEC pursuant to the reporting requirements set forth in the Exchange Act.

"*Company Parties*" has the meaning assigned to it in the Preamble hereto.

"*Company Plan*" and "*Company Plans*" have the meanings assigned to them in Section 3.21.1 hereto.

"*Confirmation Order*" has the meaning set forth in the RSA.

"*Consenting Creditors*" has the meaning assigned to in the Recitals hereto.

"*Debtors*" has the meaning assigned to it in the Preamble hereto.

"*Defaulting Backstop Party*" means each Backstop Party that causes a Funding Default.

"*Definitive Documents*" has the meaning set forth in the RSA.

"*Disclosure Statement*" has the meaning assigned to in the RSA.

"*Effective Date*" has the meaning set forth in the Restructuring Term Sheet.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Environmental Laws*" means all applicable Laws (including common law), rules, regulations, codes, ordinances, orders in council, orders, decrees, treaties, directives, judgments or legally binding agreements promulgated or entered into by or with any governmental entity, relating to the protection of the environment, preservation or reclamation of natural resources, the generation, management, use, transportation, treatment, storage, disposal, release or threatened release of, or exposure to, any Hazardous Material or to occupational health and safety matters (to the extent relating to the management of or exposure to Hazardous Materials).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that, together with the Company is, or at any relevant time during the past six years was, treated as a single employer under section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"*Event*" means any event, change, effect, circumstance, occurrence, development, condition, result, state of facts or change of facts.

"*Excepted Liens*" has the meaning set forth in the Revolving Credit Agreement.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exit Facility*" means financing to be provided to the Debtors, as reorganized on the Effective Date in accordance with the Plan, in form and substance reasonably acceptable to the Required Backstop Parties.

4

"*Expense Reimbursement*" has the meaning assigned to it in Section 2.3.1 hereto.

"*Filing Party*" has the meaning assigned to it in Section 5.10.2 hereto.

"*Funding Amount*" has the meaning assigned to it in Section 2.1.3 hereto.

"*Funding Default*" means the failure by any Backstop Party to pay the Purchase Price with respect to its Backstop Obligation by the Effective Date in accordance with Section 2.2.

"*GAAP*" means U.S. generally accepted accounting principles.

"*Hazardous Materials*" means all pollutants, contaminants, hazardous wastes, chemicals, hazardous materials, and hazardous substances, including any sulphuric or other acid, explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, lead in any form (including soluble and particulate), arsenic, polychlorinated biphenyls, urea-formaldehyde or radon gas that are subject to regulation or which can give rise to liability under any Environmental Law because of their hazardous or deleterious properties or characteristics.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

"*Indemnified Claim*" has the meaning assigned to it in Section 7.1 hereto.

"*Indemnified Losses*" has the meaning assigned to it in Section 7.1 hereto.

"*Indemnified Person*" has the meaning assigned to it in Section 7.1 hereto.

"*Indemnifying Party*" and "*Indemnifying Parties*" have the meanings assigned to them in Section 7.1 hereto.

"*Intellectual Property*" means any and all of the following in any jurisdiction throughout the world, and all corresponding rights: (a) material inventions, patents and industrial designs (including utility model rights, design rights and industrial property rights), patent and industrial design applications, and patent disclosures, together with all reissues, continuations, continuations-in-part, revisions, divisionals, extensions, and reexaminations; (b) material trademarks, service marks, designs, trade dress, logos, slogans, trade names, business names, corporate names, Internet domain names, and all other indicia of origin, all applications and registrations in connection therewith, and all goodwill associated with any of the foregoing (this clause (b), "*Marks*"); (c) material works of authorship, copyrights, software, data, database rights and moral rights, and all applications and registrations in connection therewith; (d) trade secrets and other confidential information, including know how, methods, processes, techniques, formulae, and product specifications; (e) material rights of privacy and publicity, including rights to the use of names of real persons; and (f) material other intellectual property rights.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986.

"*Investment Company Act*" means the Investment Company Act of 1940, as amended.

5

"*Joinder Agreement*" has the meaning assigned to it in <u>Section 8.2</u> hereto.

"*Joint Filing Party*" has the meaning assigned to it in <u>Section 5.10.3</u>.

"*Knowledge of the Company*" means the actual knowledge of Richard Little, Quentin Hicks and David Elkouri.

"*Law*" means any law (including common law), statute, ordinance, treaty, rule, regulation, policy or requirement of any governmental authority and authoritative interpretations thereon, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

"*Leased Real Property*" has the meaning assigned to it in <u>Section 3.16.1</u>.

"*Legal Proceedings*" has the meaning assigned to it in <u>Section 3.9</u> hereto.

"*Lien*" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in Sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"*Material Adverse Effect*" means any Event occurring after the date hereof that, individually or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on the business, results of operations or condition (financial or otherwise) of the Company Parties, or the properties, assets, finances or liabilities of the Company Parties, taken as a whole; <u>provided</u> that "Material Adverse Effect" shall not include any Event occurring after the date hereof and arising out of or resulting from: (a) conditions or effects that generally affect persons or entities engaged in the industries, business, markets, financial conditions or the geographic area in which the Company Parties operate taking into consideration any Event that is related to the operations of the Company in the specific geographical and geological areas in which it operates, (b) general economic conditions in regions and markets in which the Company Parties operate, (c) regional, national or international political or social conditions, including acts of war, terrorism or natural disasters, escalation or material worsening of hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or its territories, possessions, diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (d) financial, banking, securities, credit, or commodities markets, prevailing interest rates or general capital markets conditions, (e) changes in United States generally accepted accounting principles, (f) changes in Laws, orders, or other binding directives issued by any governmental entity, (g) the taking of any action or any inaction required by this Agreement, the RSA, the Restructuring Term Sheet, the Plan, or any action or inaction in connection with the Chapter 11 Cases, including the commencement, announcement and pendency of the Chapter 11 Cases, or (h) any action or inaction consented to or requested by the Consenting Creditors; <u>provided</u>, that exceptions set forth in clauses (a), (b), (c) and (d) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Company Parties, taken as a whole, as compared to other companies comparable in size and

scale to the Company Parties operating in the industries and same geographical area in which the Company Parties operate.

"*Marks*" has the meaning assigned to it in the definition of Intellectual Property.

"*Material Contracts*" means (a) all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which the Company is a party, (b) any contracts to which the Company is a party that are likely to reasonably involve consideration of more than $10,000,000, in the aggregate, over a twelve-month period, and (c) all contracts: (i) the Company is granted a right or license with respect to any material Intellectual Property of any other Person thereunder, which right or license is material to the Company's business; (ii) the Company grants to any other Person thereunder any right or license with respect to any material Owned IP; or (iii) the Company's ability to use, own, license, transfer, enforce, or disclose any material Owned IP is adversely affected, including settlement agreements, but in the case of (i) and (iii), excluding Off-the-Shelf Licenses.

"*MIP*" means a post-emergence management incentive plan to be implemented by the board of the Company after the Effective Date as further described in the Plan.

"*Money Laundering Laws*" has the meaning assigned to it in Section 3.11 hereto.

"*New Common Shares*" means shares of common stock of the Company as reorganized on the Effective Date in accordance with the Plan.

"*Notice of Assignment*" has the meaning assigned to it in Section 8.2 hereto.

"*Off-the-Shelf License*" means any license for unmodified, commercially available "off-the-shelf" software that is used in the Company's internal "back-office" operations for which the Company pays an aggregate fee, royalty, or other consideration for any such software or group of related Software licenses of no more than $50,000.

"*Offering Deadline*" means the date on which the subscription period for the Senior Noteholder Rights Offering shall expire (as such date may be extended pursuant to the Plan and the Senior Noteholder Rights Offering Procedures).

"*Owned IP*" means all Intellectual Property owned or purported to be owned by any Group Company, including the Registered IP.

"*Party*" and "*Parties*" have the meanings assigned to them in the Preamble hereto.

"*Perella*" has the meaning assigned to it in Section 5.9.1 hereto.

"*Per Share Price*" means an amount equal to the price at which one share of the New Common Shares is sold to holders of Senior Notes in the Senior Noteholder Rights Offering pursuant to the Senior Noteholder Rights Offering Documents.

7

"**Person**" includes any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

"**Petition Date**" has the meaning assigned to it in the Plan.

"**Plan**" has the meaning assigned to it in the Recitals hereto.

"**Purchase Price**" means, with respect to any Backstop Party, the applicable purchase price in respect of its Backstop Purchase calculated as the product (expressed in U.S. dollars) of (a) such Backstop Party's Backstop Obligation, multiplied by (b) the Per Share Price.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee simple or leased by the Company or any of its Subsidiaries, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Registered IP**" has the meaning assigned to it in Section 3.26.1 hereto.

"**Related Party Agreement**" has the meaning assigned to it in Section 3.17 hereto.

"**Remaining Shares**" means the aggregate number of New Common Shares that have not been subscribed for and purchased, if any, in the Senior Noteholder Rights Offering as of the Offering Deadline.

"**Replacement Period**" has the meaning assigned to it in Section 2.4.1 hereto.

"**Replacement Purchase**" has the meaning assigned to it in Section 2.4.1 hereto.

"**Replacing Backstop Parties**" has the meaning assigned to it in Section 2.4.1 hereto.

"**Required Backstop Parties**" has the meaning assigned to it in Section 8.5 hereto.

"**Reserve Report**" has the meaning assigned to it in Section 3.16.1 hereto.

"**Restructuring**" has the meaning assigned to it in the Recitals hereto.

"**Restructuring Term Sheet**" has the meaning assigned to it in the RSA.

"**Revolving Credit Agreement**" has the meaning assigned to it in the Restructuring Term Sheet.

"**Rights Offerings**" has the meaning set forth in the RSA for "Equity Rights Offerings."

"**RSA**" has the meaning assigned to it in the Recitals hereto.

"**SEC**" means the U.S. Securities and Exchange Commission.

8

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Senior Noteholder Rights Offering*" has the meaning assigned to it in the Recitals hereto.

"*Senior Noteholder Rights Offering Documents*" means this Agreement and the Senior Noteholder Rights Offering Procedures.

"*Senior Noteholder Rights Offering Procedures*" means the procedures governing the Senior Notes Rights Offering, in form and substance reasonably acceptable to the Required Backstop Parties.

"*Senior Notes*" has the meaning assigned to it in the Recitals hereto.

"*Senior Notes Indenture*" has the meaning assigned to it in the Recitals hereto.

"*Solicitation*" has the meaning assigned to it in the Recitals hereto.

"*Subscription Agent*" means Kurtzman Carson Consultants LLC, together with its affiliates and subcontractors.

"*Subscription Account*" has the meaning assigned to it in Section 2.1.3 hereto.

"*Subscription Amount*" has the meaning assigned to it in Section 2.1.2(a) hereto.

"*Subscription Funding Date*" has the meaning assigned to it in Section 2.2.1 hereto.

"*Subscription Rights*" means those certain rights to purchase New Common Shares pursuant to the Senior Noteholder Rights Offering at the "Per Share Price" per share, which the reorganized Company will issue to participating Senior Noteholders pursuant to the Plan.

"*Subsidiary*" means, with respect to any Person, any corporation, limited liability company, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other Subsidiary or Affiliate), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body thereof or (c) has the power to direct, or otherwise control, the business and policies thereof by contract, equity ownership or otherwise.

"*Takeover Statute*" means any restrictions contained in any "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation.

"*Tudor*" has the meaning assigned to it in Section 5.9.1 hereto.

"*Warrants*" has the meaning assigned to it in the RSA.

"*Weil*" has the meaning assigned to it in Section 5.9.1 hereto.

9

**2.      THE BACKSTOP COMMITMENT**

**2.1     Backstop Commitment.**<u>New Common Shares</u>.  The Senior Noteholder Rights Offering will be made, and the New Common Shares will be issued and sold in reliance upon, the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, and all New Common Shares (other than the New Common Shares issued on account of the Backstop Commitment Premium to the Backstop Parties) will be issued in reliance upon such exemption.  The issuance of the New Common Shares to the Backstop Parties on account of the Backstop Obligations and the Backstop Commitment Premium will be made in reliance on the exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act, and, in each case, the Disclosure Statement, Confirmation Order and Plan shall include a statement to such effect.

2.1.2   <u>The Rights Offering and the Backstop Commitment</u>.  (a) On and subject to the terms and conditions hereof and the Senior Noteholder Rights Offering Procedures, including entry of the Confirmation Order, each Backstop Party agrees, severally and not jointly, to (i) fully exercise all Subscription Rights that are properly issued to it and its Affiliates pursuant to the Senior Noteholder Rights Offering, (ii) duly purchase all New Common Shares issuable to it and its Affiliates pursuant to such exercise (the "***Subscription Amount***") at the applicable Per Share Price and (iii) complete, duly execute and submit a subscription exercise form and any other documentation required pursuant to the Senior Noteholder Rights Offering Procedures and the Plan.

(b)      On and subject to the terms and conditions hereof, including entry of the Confirmation Order, each Backstop Party agrees, severally and not jointly, to (i) purchase an aggregate number of New Common Shares equal to its Backstop Obligation (the "***Backstop Purchase***") for an amount equal to the Purchase Price and (ii) complete, duly execute and submit a subscription exercise form and any other documentation required pursuant to the Senior Noteholder Rights Offering Procedures and the Plan.

2.1.3   <u>Backstop Notice</u>.  On or before the fifth (5th) Business Day after the Offering Deadline, the Subscription Agent on behalf of the Company shall notify each Backstop Party in writing (the "***Backstop Notice***") as to: (a) the Remaining Shares; (b) its consequent Backstop Obligation; (c) the aggregate amount payable on the Effective Date with respect to such Backstop Party's Subscription Amount and Backstop Obligation (collectively, the "***Funding Amount***"); and (d) the account information (including wiring instructions) for the account to which such Backstop Party shall deliver and pay the Funding Amount, which account may be an escrow account and the Funding Amount (the "***Subscription Account***").

10

**2.2**     **Escrow; Closing.**

2.2.1     **Escrow**.  No later than two (2) Business Days prior to the Effective Date (such date, the "***Subscription Funding Date***"), each Backstop Party shall deliver and pay its Funding Amount by wire transfer of immediately available funds in U.S. dollars into the Subscription Account in satisfaction of such Backstop Party's Backstop Commitment.

2.2.2     **Closing**.  (a) Subject to Article VI, the closing of the transactions contemplated hereby (the "***Closing***") shall take places at the offices of Weil, Gotshal & Manges LLP, 767 5th Avenue, New York, NY 10253, at 5:00 p.m., New York City time, on the Effective Date contemporaneously with the substantial consummation of the Plan.

    (b)     At the Closing, the funds held in the Subscription Account shall be released to the Company.

    (c)     At the Closing, issuance of the Remaining Shares will be made by the Reorganized Company to each Backstop Party against payment of the applicable portion of such Backstop Party's Funding Amount, in satisfaction of such Backstop Party's Backstop Commitment.

2.2.3     **Premium**.  Subject to Section 2.4, the Company hereby agrees to pay each Backstop Party its Backstop Commitment Premium, which premium shall be deemed earned upon the effective date of this Agreement and payable upon the earlier of (a) the Effective Date and (b) termination of this Agreement by the Requisite Backstop Parties, pursuant to Section 8.10.3.

2.2.4     **Certain Tax Matters.** All parties hereto agree to treat the transactions contemplated by this Agreement as follows for U.S. federal income tax purposes: (a) the Backstop Obligation shall be treated as a put option; (b) the Backstop Commitment Premium herein shall be treated as remuneration to the Backstop Parties for agreeing to enter into such put option; and (c) no party shall take any position or action inconsistent with such treatment and/or characterization, except, in each case, to the extent otherwise required by applicable Law.

2.2.5     **Withholding**.  Except as otherwise required by applicable Law, the Company shall not withhold any taxes with respect to the Backstop Commitment Premium.

**2.3**     **Expense Reimbursement.**

2.3.1     The Company agrees to pay or reimburse when due, to the extent not otherwise paid pursuant to the RSA or in connection with the Chapter 11 Cases or another order of the Bankruptcy Court, all accrued and unpaid fees, costs and expenses of the Backstop Parties' Professionals, incurred in connection with this Agreement, the RSA, and these Chapter 11 Cases, whether prior to, on, or after the date hereof through the Effective Date for which invoices or receipts are forwarded to the

11

Company by the Backstop Parties at least one (1) Business Day prior to the Effective Date (the "***Expense Reimbursement***").

**2.4     Funding Default.**

2.4.1     Upon the occurrence of a Funding Default, the Backstop Parties (other than any Defaulting Backstop Party) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Backstop Parties of such Funding Default, which notice shall be given promptly following the occurrence of such Funding Default and to all Backstop Parties substantially concurrently (such five (5) Business Day period, the "***Replacement Period***"), to elect, by written notice to the Company, to purchase all or any portion of the New Common Shares attributable to such Defaulting Backstop Party's Backstop Obligation (such purchase, a "***Replacement Purchase***") on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon by all of the non-defaulting Backstop Parties that elect to purchase all or any portion of the New Common Shares attributable to such Defaulting Backstop Party, or, if no such agreement is reached by the date upon which the Replacement Period expires, based upon each such electing Backstop Party's Backstop Percentage of the aggregate number of New Common Shares that have not been purchased as a result of such Funding Default (such Backstop Parties, the "***Replacing Backstop Parties***").  The purchase price paid by any Replacing Backstop Party in connection with a Replacement Purchase shall be equal to the applicable Purchase Price.  Within one (1) Business Day from delivery of written notice of a Funding Default, electing Backstop Parties will fund the Subscription Account with the additional Purchase Price with respect to the Replacement Purchase.

2.4.2     If a Backstop Party is a Defaulting Backstop Party, it shall not be entitled to any of the Backstop Commitment Premium hereunder.

2.4.3     Other than as set forth in Section 2.4.1, nothing in this Agreement shall require any Backstop Party to purchase more than its Backstop Obligation.

2.4.4     Notwithstanding anything to the contrary set forth in Section 8.12 but subject to Section 8.14, no provision of this Agreement shall relieve any Defaulting Backstop Party from liability hereunder, or limit the availability of the remedies set forth in Section 8.15 or otherwise available to the non-defaulting parties hereto, in connection with any such Backstop Party's Funding Default.

12

3.     **REPRESENTATIONS AND WARRANTIES OF THE COMPANY**Except (a) as set forth in the corresponding section of the Company Disclosure Schedule or (b) as disclosed in the Company Information and publicly available on the SEC's website prior to the date hereof, the Company, on behalf of itself and each of the Company Parties, as applicable, hereby represents and warrants to each of the Backstop Parties, in their capacities as Backstop Parties, as of the date hereof, as follows:

3.1     **Organization.** Each Company Party:

    3.1.1   is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization, except where any such failure to be duly organized, validly existing and in good standing, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect;

    3.1.2   has all corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business, except where any such failure to own and/or operate, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

3.2     **Due Authorization, Execution and Delivery; Enforceability**. The Company has the requisite corporate power and authority to enter into, execute and deliver this Agreement and, subject to the entry of the Approval Order and the Confirmation Order, to perform its obligations hereunder, and has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement. Assuming due and valid execution and delivery by the other Parties, this Agreement constitutes the legally valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

3.3     **Authorized and Issued Equity Interests.**

    3.3.1   On the Effective Date, (i) the outstanding equity interests in the Company will consist solely of the New Common Shares issued under the Rights Offerings and the Plan, any New Common Shares issued upon exercise of the Warrants or under the MIP, (ii) no New Common Shares will be held by the Company in its treasury, and, (iii) except as may otherwise be provided under the MIP or the Warrants issued under the Plan, no New Common Shares will be reserved for issuance upon exercise of options and other rights to purchase or acquire New Common Shares.

    3.3.2   As of the Effective Date, the New Common Shares, when issued, will be duly and validly issued and outstanding and will be fully paid and non-assessable. As of the Effective Date, the Company shall have the ability to issue sufficient New Common Shares to consummate the transaction contemplated under this Agreement, the RSA and the Plan.

3.3.3    Except as set forth in this <u>Section 3.3,</u> as of the Effective Date, no shares or other equity interests or voting interests in the Company will have been issued, reserved for issuance or be outstanding.

3.4    **Consents**.  Subject to the entry of the Confirmation Order and the filing of the Amended Organizational Documents with the Delaware Secretary of State prior to or on the Effective Date, none of the execution, delivery or performance of this Agreement by the Company, including the issuance of the New Common Shares by the Company, will require any consent of, authorization by, exemption from, filing with, or notice to any governmental entity having jurisdiction over the Company Parties, other than the failure of which to make or obtain, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

3.5    **No Conflicts**.  Except for entry of the Confirmation Order, and subject to the occurrence of the Effective Date, the execution, delivery and performance of this Agreement by the Company, including the issuance of the New Common Shares and the consummation of the transactions contemplated hereunder, will not (a) conflict with or result in any breach of any provision of any Company Party's certificate of incorporation, by-laws or equivalent governing documents as in effect on the Effective Date, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination or, except to the extent specified in the Plan, acceleration or cancellation under any Material Contract, lease, mortgage, license, indenture, instrument or any other material agreement or contract to which any Company Party is a party or by which any Company Party's properties or assets are bound as in effect on the Effective Date after giving effect to the Plan, or (c) result in a violation of any Law, rule, regulation, order, judgment or decree (including, without limitation, federal and state securities Laws and regulations) applicable to any Company Party or by which any Company Party's properties or assets will be bound or affected, except in the case of clauses (b) and (c), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

3.6    **Company Information**.  Since December 31, 2018, the Company has timely filed all required Company Information with the SEC. The Disclosure Statement as filed with the Bankruptcy Court will contain "adequate information," as such term in defined in section 1125 of the Bankruptcy Code, and will otherwise comply in all material respects with section 1125 of the Bankruptcy Code.

3.7    **Absence of Certain Changes**.  Since December 31, 2018, no event has occurred or exists that constitutes, individually or in the aggregate, a Material Adverse Effect.

3.8    **No Violation; Compliance with Laws**.  (a) The Company is not in violation of its charter or by-laws in any material respect, and (b) no other Company Party is in violation of its respective charter or by-laws, certificate of formation or limited liability company operating agreement or similar organizational document in any material respect.  None of the Company Parties is or has been at any time since February 16, 2017 deemed to be in violation of any Law or order, except for any such violations that have not had and would

14

not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.9 **Legal Proceedings**.  Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, as of the date hereof, there are no legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("*Legal Proceedings*") pending or, to the Knowledge of the Company, threatened to which any of the Company Parties is a party or to which any property of the Company Parties is the subject, in each case that (a) in any manner draws into question the validity or enforceability of this Agreement, the Definitive Documents or the Restructuring or (b) would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.10 **No Unlawful Payments**.  Since February 16, 2017, none of the Company Parties nor, to the Knowledge of the Company, any of their respective directors, officers or employees acting on behalf of the Company with the express authority to do such act has in any material respect: (a) used any funds of any of the Company Parties for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any applicable provision of the U.S. Foreign Corrupt Practices Act of 1977 or any other applicable statute, regulation, order or measure prohibiting bribery and corruption in any relevant jurisdiction; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

3.11 **Compliance with Money Laundering Laws**.  The operations of the Company Parties are and, since February 16, 2017 have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company Parties operate (and the rules and regulations promulgated thereunder) and any related or similar Laws (collectively, the "*Money Laundering Laws*") and, as of the date hereof, no material Legal Proceeding by or before any governmental entity or any arbitrator involving any of the Company Parties with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

3.12 **No Broker's Fees**.  None of the Company Parties is  a party to any contract with any Person (other than this Agreement) that would give rise to a valid claim against the Backstop Parties for a brokerage commission, finder's fee or like payment in connection with the Senior Noteholder Rights Offering.

3.13 **Investment Company Act**.  The Company Parties are not and, after giving effect to the Senior Noteholder Rights Offering and the application of the proceeds thereof as described in the Definitive Documents, will not be subject to registration and regulation as an "investment company" as such term is defined in the Investment Company Act.

15

**3.14**   **Takeover Statutes**.  No Takeover Statute is applicable to this Agreement, the Backstop Commitment and the other transactions contemplated by this Agreement.

**3.15**   **Arm's-Length**.  The Company acknowledges and agrees that (a) each of the Backstop Parties is acting solely in the capacity of an arm's-length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Senior Noteholder Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other Company Party or any of their Affiliates and (b) no Backstop Party is advising the Company or any other Company Party or any of their Affiliates as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

**3.16**   **Title to Real Property.**

3.16.1   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) the Company Parties have good and defensible title to the oil and gas properties evaluated in the most recently delivered Reserve Report and good title to all its other personal properties, in each case, free and clear of all Liens except Liens permitted under the Revolving Credit Agreement, and (b) after giving full effect to the Excepted Liens, the Company (or applicable Subsidiary) owns the net interests in production attributable to the hydrocarbon interests as reflected in the most recently delivered Reserve Report, and the ownership of such properties shall not in any material respect obligate the Company or such Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such property in an amount in excess of the working interest of each property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Company's or such Subsidiary's net revenue interest in such property.  "*Reserve Report*" means that certain report issued by Netherland, Sewell & Associates, Inc., as of December 31, 2018  with respect to the oil and gas reserves of the Company attributable to the properties of the Company and certain of its Subsidiaries.

3.16.2   Each Company Party is in compliance with all obligations under all material real property leases other than oil and gas leases to which it is a party ("*Leased Real Property*"), except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such material real property leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each of the Company Parties enjoys peaceful and undisturbed possession under all such material leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**3.17**   **No Undisclosed Relationships**.   Other than contracts or other direct or indirect relationships between or among the Company Parties, there are no contracts or other

16

direct or indirect relationships (a "*Related Party Agreement*") existing as of the date hereof between or among the Company or any of its Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of any Company Party on the other hand, that is required by the Exchange Act to be described in the Company Information and that is not so described, except for the transactions contemplated by this Agreement. Any Related Party Agreement existing as of the date hereof is described in the Company Information or the Definitive Documents.

3.18    **Licenses and Permits**. Each Company Party possesses or has access to all licenses, certificates, permits and other authorizations issued by, and has made all declarations and filings with, the appropriate governmental entities that are necessary for the ownership or lease of its respective properties and the conduct of its business, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No Company Party (a) has received notice of any revocation or modification of any such license, certificate, permit or authorization or (b) has reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.19    **Environmental**. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, since February 16, 2017: (a) no written notice, claim, demand, request for information, order, complaint or penalty has been received by any Company Party and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Knowledge of the Company, threatened in each case which allege a violation of liability under any Environmental Laws, in each case relating to any Company Party and that have not been settled or resolved, (b) each Company Party has all environmental permits, licenses and other approvals, and has maintained all financial assurances, necessary for its operations to comply with all applicable Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits, licenses and other approvals and with all other applicable Environmental Laws, (c) to the Knowledge of the Company, since February 16, 2017, no Hazardous Material has been released at, on or under any property currently owned, operated or leased by any Company Party in a manner or circumstance or condition that would reasonably be expected to give rise to any cost, liability or obligation of any Company Party under any Environmental Laws, (d) to the Knowledge of the Company, since February 16, 2017, no Hazardous Material has been generated, owned, treated, stored, handled or controlled by any Company Party or transported by any Company Party to or released by any Company Party at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of any Company Party under any Environmental Laws, (e) except for leases of the Leased Real Property, there are no written agreements in which any Company Party has expressly assumed or undertaken responsibility for any known or reasonably likely liability or obligation of any other Person arising under or relating to Environmental Laws, which in any such case has not been filed or posted by the Company as Company Information or made available to the Backstop Parties prior to the date hereof, and (f) to the Knowledge of the Company, no Company Party has entered into any consent decree,

17

settlement or other agreement with any governmental entity or is subject to any order issued by any governmental entity relating to any Environmental Laws or Hazardous Materials.

**3.20     Tax Matters.**

3.20.1   Except as would not reasonably be expected to be material to the Company Parties taken as a whole, (a) each of the Company Parties has filed or caused to be filed all U.S. federal, state, provincial, local and non-U.S. tax returns required to have been filed by it and (b) taken as a whole, each such tax return is true and correct;

3.20.2   Each of the Company Parties has timely paid or caused to be timely paid all material taxes required to be paid by it (whether or not shown on any tax returns) or made adequate provision (to the extent required in accordance with GAAP) for the payment thereof; and

3.20.3   As of the date hereof, with respect to the Company Parties, other than in connection with the Chapter 11 Cases and other than taxes or assessments that are being contested in good faith or are not expected to result in material negative adjustments to the Company Parties taken as a whole, (a) there are no claims being asserted in writing with respect to any taxes, (b) no presently effective waivers or extensions of statutes of limitations with respect to taxes have been given or requested and (c) no tax returns are being examined by, and no written notification of intention to examine a tax return has been received from, the Internal Revenue Service or any other governmental entity charged with the administration and collection of taxes.

**3.21     Employee Benefit Plans.**

3.21.1   Except for the filing and pendency of the Chapter 11 Cases or otherwise as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) all employee benefit plans of the Company Parties (the "***Company Plans***", each of them a "***Company Plan***") comply in form and in operation in all material respects with their terms and with all applicable Laws; and (b) no Company Party, nor any ERISA Affiliate of a Company Party, in the four (4) years preceding the date hereof has contributed to, or incurred any liability or obligation with respect to, any employee benefit plan subject to Title IV of ERISA.

3.21.2   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no pending, or to the Knowledge of the Company, threatened claims, sanctions, actions or lawsuits, asserted or instituted against any Company Plan or any Person as fiduciary or sponsor of any Company Plan, in each case other than claims for benefits in the normal course.

3.21.3   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) all other compensation and benefit

18

arrangements of the Company Parties comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements, and (b) no Company Party could reasonably be expected to have any obligation to provide any individual with a "gross up" or similar payment in respect of any taxes that may become payable under section 409A or 4999 of the Internal Revenue Code.

3.21.4   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are (a) no labor disputes against the Company Parties, or, to the Knowledge of the Company, threatened against any Company Party, and (b) no claims of unfair labor practices, charges or grievances pending against any Company Party, or to the Knowledge of the Company, threatened against any of them by any Person.

3.21.5   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Company Party has complied and is currently in compliance with all Laws and legal requirements in respect of personnel, employment and employment practices, (b) all service providers of the Company Parties are correctly classified as employees, independent contractors, or otherwise for all purposes (including any applicable tax and employment policies or Law), and (c) the Company Parties have not and are not engaged in any unfair labor practice.

3.22   **Internal Control Over Financial Reporting**.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company has established and maintains a system of internal control over financial reporting that has been designed to provide reasonable assurances regarding the reliability of financial reporting (within the meaning of Rules 13(a)-15(f) and 15(d) – 15(f) under the Exchange Act) and the preparation of financial statements for external purposes in accordance with GAAP.   To the Knowledge of the Company, there are no material weaknesses in the Company's internal control over financial reporting as of the date hereof.

3.23   **Disclosure Controls and Procedures**.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company maintains disclosure controls and procedures designed to ensure that information required to be disclosed by the Company under the Exchange Act in its Company Information is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including information that is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

3.24   **Material Contracts**.   Other than as a result of the Chapter 11 Cases, all Material Contracts are valid, binding and enforceable by and against the Company Parties that are party thereto and, to the Knowledge of the Company, each other party thereto (except where the failure to be valid, binding or enforceable does not constitute a Material Adverse Effect), and since December 31, 2018, no written notice to terminate, in whole

19

or part, any Material Contract has been delivered to any Company Party (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect). No Company Party nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.**Insurance**. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) the Company Parties have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses; (b) all premiums due and payable in respect of material insurance policies maintained by the Company Parties have been paid; (c) the Company reasonably believes that the insurance maintained by or on behalf of the Company Parties is adequate in all material respects; and (d) as of the date hereof, to the Knowledge of the Company, no Company Party has received notice from any insurer or agent of such insurer with respect to any material insurance policies of any Company Party of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

**3.26     Intellectual Property.**

3.26.1  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) each Company Party exclusively owns and possesses the entire right, title and interest in and to all applications or registrations for Intellectual Property owned by or registered to any Company Party (the "***Registered IP***"), free and clear of all encumbrances and licenses; (b) the material Registered IP is subsisting and, to the Knowledge of the Company, valid and enforceable; and (c) the Company Parties have taken reasonable steps under the circumstances to preserve, maintain and protect all material Owned IP.

3.26.2  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, no Person possesses any Intellectual Property that materially restricts the use or registration anywhere in the world by the Company Parties of any material Mark used in the Company Parties' respective businesses (other than Marks licensed from a third Person to the Company Parties pursuant to a Material Contract, but including any Marks constituting Registered IP). No Person possesses any Intellectual Property sufficient to successfully cancel or otherwise invalidate any such Mark on grounds of prior use, registration, fraud, lack of distinctiveness, or other defects or circumstances.

3.26.3  Since February 16, 2017, there are no and there have not been any material Legal Proceedings pending or threatened in writing against or affecting any Company Party asserting or relating to (a) any material invalidity, misuse, misappropriation or unenforceability of or challenging the ownership or scope of any of the Owned IP, or (b) any material infringement, dilution, or misappropriation by, or conflict with, any Person with respect to any Intellectual Property (including any

20

material demand or request that a Company Party license any rights from any Person).  To the Knowledge of the Company, none of the Company Parties or the conduct of any of their respective businesses (including any manufacture, marketing, distribution, importation, offer for sale, sale, or use of any of their respective products) has materially infringed, misappropriated, diluted, or conflicted with, or does materially infringe, misappropriate, dilute, or conflict with, any Intellectual Property of any other Person.  To the Knowledge of the Company, no material Owned IP has been infringed, misappropriated, diluted, or conflicted by any other Person.

3.26.4  The Company Parties uses commercially reasonable efforts to protect the confidentiality, integrity and security of the systems and all information stored or contained therein or transmitted thereby from any unauthorized use, access, interruption or modification by third parties.  The Company Parties have taken reasonable precautions to ensure that all material systems (a) are fully functional and operate and run in a reasonable and efficient business manner and (b) conform in all material respects to the specifications and purposes thereof.  The Company Parties have an adequate disaster recovery and business continuity plan in place with respect to the material systems and have adequately tested such plan for effectiveness.  Since February 16, 2017 there have not been any malfunctions, breakdowns, unplanned downtime, service interruptions, or continued substandard performance with respect to material systems that have disrupted the business of any Company Party that have not been remedied or replaced in all material respects.  To the Knowledge of the Company, there have been no actual or alleged security breaches or unauthorized use, access or intrusions, of any system or any personal information, payment card information, data, or any other such information (including data of any customer of any Company Party) used, collected, maintained, or stored by or on behalf of any Company Party (or any loss, destruction, compromise, or unauthorized disclosure thereof).  The systems are adequate for the operation of the businesses of the Company Parties as currently conducted in all material respects.

**3.27**   **No Other Representations and Warranties**.   Except for the representations and warranties contained in this Article III (including the related portions of the Company Disclosure Schedule), none of the Company Parties has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Company Parties, including any representation or warranty as to the accuracy or completeness of any information regarding the Company Parties furnished or made available to the Backstop Parties and their Affiliates or as to the future revenue, profitability or success of the Company Parties, or any representation or warranty arising from statute or otherwise in Law.

**4.**   **REPRESENTATIONS AND WARRANTIES OF EACH BACKSTOP PARTY**

Each Backstop Party hereby severally and not jointly represents and warrants, on its own behalf and in its capacity as investment manager for its managed funds and accounts party hereto, to the Company as of the date of this Agreement:

21

**4.1**   **Organization**.  The Backstop Party is duly organized, validly existing and in good standing (or equivalent thereof) under the Laws of the jurisdiction of its organization.

**4.2**   **Due Authorization**.  The Backstop Party has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

**4.3**   **Due Execution; Enforceability**.  This Agreement has been duly and validly executed and delivered by the Backstop Party and constitutes its legally valid and binding obligation, enforceable against it in accordance with its terms.

**4.4**   **No Registration Under the Securities Act; Selling Restrictions**.  Each Backstop Party acknowledges that the New Common Shares to be purchased by it, or to be issued to it in respect of the Backstop Commitment Premium, in each case, pursuant to the terms of this Agreement have not been registered under the Securities Act by reason of specific exemptions and the Company is relying on the truth and accuracy of, and such Backstop Party's compliance with, the representations, warranties, agreements, acknowledgements and understandings of such Backstop Party set forth herein, and that the Company shall not be required to effect any registration under the Securities Act, or any state securities Law, of the New Common Shares.  Each Backstop Party understands and agrees that it will not offer, resell, pledge or otherwise transfer the New Common Shares unless the New Common Shares are offered, resold, pledged or otherwise transferred in accordance with any applicable securities Laws of the United States or any state thereof.

**4.5**   **Acquisition for Investment**.  The New Common Shares are being acquired under this Agreement by the Backstop Party in good faith solely for its own account, for investment and not with a view toward, or for resale in connection with, distribution within the meaning of the Securities Act.

**4.6**   **No Conflicts**.  The execution, delivery, and, subject to the terms and conditions of this Agreement, performance by such Backstop Party of this Agreement and the consummation of the transactions contemplated hereunder, do not and will not (a) violate any provision of the organizational documents of such Backstop Party or (b) conflict with or violate any Law or order applicable to such Backstop Party or any of its respective assets or properties, except for any such conflict, violation, breach or default that would, individually or in the aggregate, reasonably be expected to result in a material adverse effect on the ability of the Backstop Parties to timely consummate the transactions contemplated by this Agreement.

**4.7**   **Consents and Approvals**.  No consent, approval, order, authorization, filing, notice, registration or qualification of or with any court or governmental authority or body having jurisdiction over such Backstop Party is required in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

22

**4.8**  **Investor Representation**.  It is (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act and (ii) an institutional accredited investor as defined in Rule 501(a)(1), (2), (3), (7), or (8) under the Securities Act.

**4.9**  **Investment Experience**.  It has substantial experience in evaluating and investing in securities and acknowledges that it is capable of evaluating the merits and risks of, and can bear the economic risk of entering into, the transactions contemplated by this Agreement, and that each Backstop Party's financial condition and investments are such that it is in a financial position to bear the economic risk of and withstand a complete loss of such investment.

**4.10**  **Sufficiency of Funds**.  As of the Effective Date, each Backstop Party shall have available funds sufficient to pay the total Funding Amount, including the Backstop Obligation of such Backstop Party as of the date thereof.

**4.11**  **Ownership**.  (a) As of the date hereof, each Backstop Party and its Affiliates are, collectively, the beneficial owner of, or the investment advisor or manager for the beneficial owner of, the aggregate principal amount of Senior Notes set forth opposite such Backstop Party's name under the column "Face Amount of Senior Notes Held" on **Schedule 1** attached hereto.

(b)  As of the date hereof, such Backstop Party or its applicable Affiliates has the full power to vote, dispose of and compromise at least the aggregate principal amount of the Senior Notes set forth opposite such Backstop Party's name under the column "Face Amount of Senior Notes Held" on **Schedule 1** attached hereto.

(c)  Such Backstop Party has not entered into any contract to transfer, in whole or in part, any portion of its right, title or interest in such Senior Notes where such transfer would prohibit such Backstop Party from complying with the terms of this Agreement or the RSA.

**4.12**  **Legal Proceedings**.  There are no Legal Proceedings pending or, to the knowledge of such Backstop Party, threatened to which the Backstop Party or any of its Subsidiaries is a party or to which any property of the Backstop Party or any of its Subsidiaries is the subject, in each case that will (or would be reasonably likely to) prohibit, delay or adversely impact such Backstop Party's timely performance of its obligations under this Agreement.

**4.13**  **No Broker's Fee**.  None of the Backstop Parties or their Affiliates is a party to any contract with any Person (other than this Agreement) that would give rise to a valid claim against the Company for a brokerage commission, finder's fee or like payment in connection with the Senior Noteholder Rights Offering or the sale of the Remaining Shares.

**4.14**  **Independent Investigation**.  (a) Each of the Backstop Parties has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company Parties, and acknowledges that it has been provided adequate access to the personnel, properties,

23

assets, premises, books and records, and other documents and data of the Company Parties for such purpose.

(b) Each of the Backstop Parties acknowledges and agrees that (i) none of the Company Parties, nor any other Person on behalf of the Company Parties has made any representation or warranty, expressed or implied, as to the Company Parties, or the accuracy or completeness of any information regarding the Company Parties furnished or made available to the Backstop Parties and its representatives, or any other matter related to the transactions contemplated herein, except as expressly set forth in this Agreement, (ii) such Backstop Party has not relied on any representation or warranty from the Company Parties or any other Person on behalf of the Company Parties in determining to enter into this Agreement, except as expressly set forth in this Agreement and (iii) none of the Company Parties or any other Person acting on behalf of the Company Parties shall have any liability to such Backstop Party or any other Person with respect to any projections, forecasts, estimates, plans or budgets of future revenue, expenses or expenditures, future results of operations, future cash flows or the future financial condition of the Company Parties or the future business, operations or affairs of the Company Parties, except as set forth in this Agreement.

**5.      COVENANTS**

**5.1      Conduct of Business.**  Except as expressly set forth in this Agreement, the Definitive Documents or with the prior written consent of the Required Backstop Parties (not to be unreasonably withheld or delayed and taking into account the pendency of the Chapter 11 Cases), during the period from the date of this Agreement to the earlier of the Effective Date and the date on which this Agreement is terminated in accordance with its terms, (a) the Company shall, and shall cause each of the other Company Parties to, carry on its business in the ordinary course and use its commercially reasonable efforts to: (i) preserve intact its current business and business organizations in all material respects, (ii) preserve its material relationships with customers, sales representatives, suppliers, licensors, licensees, distributors and others having material business dealings with any of the Company Parties in connection with their business, (iii) file or post Company Information within the time periods required under the Exchange Act, or reasonably promptly thereafter, in each case in accordance with ordinary course practices, (iv) maintain its physical assets, properties and facilities in all material respects in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (v) operate its businesses in compliance with all applicable laws, rules and regulations in all material respects, and (vi) maintain all insurance policies, or suitable replacements therefor, in full force and effect through the close of business on the Effective Date in all material respects, and (b) the Company shall not: (i) sell, license to any Person, transfer, assign, abandon, subject to a security interest, or allow to lapse or expire any material Intellectual Property (other than expiration of any issued or registered Intellectual Property at the end of its respective maximum statutory term), or (ii) enter into any transaction that is material to the Company Parties' business other than (A) transactions in the ordinary course of business that are consistent with prior business practices of the Company Parties, and (B) transactions expressly contemplated by the RSA and the Plan.

<div align="center">24</div>

For the avoidance of doubt and without limiting the generality of the foregoing, the following shall be deemed to occur outside of the ordinary course of business of the Company Parties and shall require the prior written consent of the Required Backstop Parties unless the same would otherwise be permissible under the RSA, the Plan or this Agreement (including the preceding clause (A) or (B)):

1. material amendments of the Company's certificate of incorporation and bylaws;
2. any new executive compensation or retention plans; or
3. any executive bonuses or retention payments.

5.2    **Non-Disclosure of Holdings Information**.  The Company shall not disclose publicly **Schedule 1** to this Agreement or the holdings information of any Backstop Party as of the date hereof or any time hereafter; provided, that in connection with the Chapter 11 Cases, on or after the Petition Date, the Company Parties may file this Agreement with the Bankruptcy Court and the SEC, but shall redact **Schedule 1** and any holdings information of any Backstop Party set forth in **Schedule 1**; provided, further, that the Company shall be permitted to disclose in connection with the Chapter 11 Cases, on or after the Petition Date, the aggregate principal amount of, and aggregate percentage of, the Senior Notes held by the Backstop Parties and Consenting Creditors, in each case, as a group.

5.3    **Use of Proceeds**.  The Company will apply the proceeds from the Senior Noteholder Rights Offering for purposes identified in the Definitive Documents.

5.4    **Blue Sky**.  The Company shall, on or before the Effective Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for or to qualify the New Common Shares to be issued pursuant to this Agreement, at the Effective Date, under applicable securities and "Blue Sky" laws of the states of the United States (**or** to obtain an exemption from such qualification).  The Company shall timely make all filings and reports relating to the offer and sale of the Remaining Shares issued hereunder required under applicable securities and "Blue Sky" laws of the states of the United States following the Effective Date.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 5.4.**Senior Noteholder Rights Offering**.  The Company shall use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and effectuate the Senior Noteholder Rights Offering in accordance with the Plan, the RSA, the Restructuring Term Sheet, the Definitive Documents and this Agreement.**The New Common Shares**.  Subject to the entry of the Confirmation Order and the occurrence of the Effective Date, the New Common Shares, when issued, will be duly and validly issued and outstanding and will be fully paid and non-assessable.  As of the Effective Date, the Company shall have the ability to issue sufficient New Common Shares to consummate the transaction contemplated under this Agreement, the RSA and the Plan.

5.7    **Backstop Notice**.    The Company shall determine the aggregate amount of Remaining Shares and Purchase Price, if any, set forth in the Backstop Notice in good

25

faith, and shall direct the Subscription Agent to provide such written backup relating to the calculation thereof as the Backstop Parties may reasonably request.

5.8     **Facilitation**.  The Company shall use commercially reasonable efforts to, and cause each of the other Company Parties to, and each Backstop Party shall use commercially reasonable efforts to, support and take all actions necessary or reasonably requested by the Required Backstop Parties to facilitate the Solicitation, the Rights Offerings and confirmation and consummation of the Plan within the timeframes contemplated by the RSA.

5.9     **Access to Information; Confidentiality**.

5.9.1   Subject to applicable Law and Section 5.9.2, upon reasonable, prior written, notice prior to the Effective Date and for a reasonable business purpose, the Debtors shall afford the Backstop Parties and the Backstop Party Professionals upon request reasonable access, during normal business hours and without unreasonable disruption or interference with the business or operations of the Company Parties or any of their subsidiaries, to the Debtors' properties, books, assets, Contracts and records and, prior to the Effective Date, the Debtors shall furnish promptly to such parties all reasonable information concerning the Debtors' business, properties and personnel as may reasonably be requested by any such party; provided that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company, would cause any of the Company Parties or any of their subsidiaries to violate any of their respective obligations with respect to confidentiality to a third-party, (ii) to disclose any legally privileged information of any of the Company Parties or any of their subsidiaries, (iii) to violate any applicable Law or (iv) to permit any invasive environmental sampling. All requests for information and access made in accordance with this Section 5.9 shall be directed to Weil, Gotshal & Manges LLP ("*Weil*"), Perella Weinberg Partners L.P. ("*Perella*"), Tudor, Pickering, Holt & Co. Advisors LP ("*Tudor*"), or any other entity or person identified by any of them in writing; provided, however, that the Backstop Parties may initiate communications with the Company's officers, directors or management with the advance written consent of Weil, Perella or Tudor.

5.9.2   From and after the date hereof until the date that is one (1) year after the expiration of the Effective Date, each Backstop Party shall, and shall cause the Backstop Party Professionals to, (i) treat as confidential and not provide or disclose to any Person any documents or information that is, was or becomes known by such Backstop Party or Backstop Party Professional on a non-confidential basis prior to its disclosure to such Backstop Party or Backstop Party Professional, or is or was received or otherwise obtained by such Backstop Party or the Backstop Party Professionals pursuant to Section 5.9.1 or in connection with a request for approval pursuant to Section 5.1 (except that provision or disclosure may be made to any Backstop Party Professional of such Backstop Party who needs to know such information for purposes of this Agreement and

26

who agrees to observe the terms of this Section 5.9.2 (and such Backstop Party will remain liable for any breach of such terms by any such Backstop Party Professional)), and (ii) not use such documents or information for any purpose other than in connection with this Agreement or the transactions contemplated hereby or thereby. Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (A) is now or subsequently becomes generally available to the public through no violation of this Section 5.9.2, (B) becomes available to a Backstop Party or the Backstop Party Professionals on a non-confidential basis from a source other than any of the Company Parties, provided that such information was not furnished to such Backstop Party or Backstop Party Professional by a source known by it to be prohibited from disclosing such information by a contractual, legal or fiduciary obligation to the Company (including its advisors) or any other party with respect to such information, (C) becomes available to a Backstop Party or the Backstop Party Professionals through document production or discovery in connection with the Chapter 11 Cases or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Cases or other such process, or (D) such Backstop Party or any Backstop Party Professionals thereof is required to disclose pursuant to applicable Law, rule, regulation, governmental or regulatory authority or stock exchange requirements, or by legal, judicial, administrative or regulatory process or pursuant to applicable Law or applicable securities exchange rules; provided, that, such Backstop Party or such Backstop Party Professional shall provide the Company with prompt written notice of such legal compulsion and cooperate with the Company to obtain a protective order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Company's sole cost and expense; provided, further, that, in the event that such protective order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its commercially reasonable efforts (at the Company's sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or documents. The provisions of this Section 5.9.2 shall not apply to any Consenting Creditor that is or becomes a party to a confidentiality or non-disclosure agreement with the Company Parties, for so long as such agreement remains in full force and effect (including any amendments thereto).

**5.10    Regulatory Approvals.**

5.10.1 Each Party agrees to use reasonable best efforts to make all filings and to obtain all consents, approvals and authorizations required to be obtained from any governmental authority, in each case in order to consummate the transactions contemplated hereby, and to make effective the Plan and the Senior Noteholder Rights Offering Documents, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any Antitrust Authority, any drafts

27

thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable after the commencement of the Senior Noteholder Rights Offering (and with respect to any filings required pursuant to the HSR Act, if any, no later than five (5) Business Days following the date of the commencement of the Senior Noteholder Rights Offering) and (ii) promptly furnishing any documents or information reasonably requested by any Antitrust Authority.

5.10.2   The Company and each Backstop Party subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Agreement, the Plan or the Senior Noteholder Rights Offering Documents that has notified the Company in writing of such obligation (each such Backstop Party, a "***Filing Party***") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content. The Company and each Filing Party shall, to the extent permitted by applicable Law: (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any material communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all material correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Backstop Parties and the Company.

5.10.3   Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "***Joint Filing Party***") any transaction contemplated by this Agreement, the Plan or the Senior Noteholder Rights Offering Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

5.10.4   The Company and each Filing Party shall use their reasonable best efforts to obtain all authorizations, approvals, consents, or clearances under any applicable Antitrust Laws or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest possible date after the date of filing. The communications contemplated by this Section 5.10.4 may be made by

the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.

**6.     CONDITIONS TO THE BACKSTOP PARTIES' CLOSING OBLIGATIONS**

**6.1     Conditions to the Backstop Parties' Closing Obligations**.   The obligation of the Backstop Parties to consummate the Backstop Purchase shall be subject to the satisfaction of each of the following conditions on the Effective Date:

6.1.1   Certain Documents. Each of the Exit Facility and the Senior Noteholder Rights Offering Documents is in form and substance reasonably acceptable to the Required Backstop Parties.

6.1.2   Agreements. The RSA and this Agreement shall not have been terminated.

6.1.3   Antitrust Laws.  The expiration or termination of any waiting periods under the HSR Act or other Antitrust Laws, if applicable, with respect to the transactions contemplated by this Agreement.

6.1.4   Approval Order.  The Bankruptcy Court shall have entered the Approval Order in form and substance reasonably acceptable to the Required Backstop Parties, and such order shall not be reversed, stayed, dismissed, vacated, reconsidered, modified or amended in any material respect (other than in accordance with the terms of this Agreement or the RSA).

6.1.5   Confirmation Order. The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Required Backstop Parties and such order shall not be reversed, stayed, dismissed, vacated, reconsidered, modified or amended in any material respect (other than in accordance with the terms of this Agreement or the RSA).

6.1.6   Plan. The Company and all of the other Company Parties shall have complied in all material respects with the terms of the Plan, once filed, that are to be performed by the Company, and the other Company Parties on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than the consummation of the Senior Noteholder Rights Offering and the Backstop Purchase) set forth in the Plan shall have been satisfied or waived in accordance with the terms of the Plan.

6.1.7   Expense Reimbursement.   The Company shall have paid the Expense Reimbursement in full in cash, or such amount shall be paid concurrently with the Effective Date, in each case, to the extent invoiced in accordance with the terms hereof.

6.1.8   Senior Noteholder Rights Offering.  The Senior Noteholder Rights Offering shall have been conducted in accordance with this Agreement and the Senior Noteholder Rights Offering Documents.

29

6.1.9   <u>Backstop Notice</u>.  The Backstop Parties shall have received the Backstop Notice in accordance with the terms of this Agreement.

6.1.10   <u>Material Adverse Effect</u>.  Since the date of this Agreement, there shall not have occurred a Material Adverse Effect.

6.1.11   <u>Representations and Warranties</u>.

(a)   The representations and warranties of the Company contained in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.3</u> shall be true and correct in all material respects on and as of the Effective Date after giving effect to the Plan with the same effect as if made on and as of the Effective Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(b)   The representations and warranties of the Company contained in this Agreement other than those referred to in clauses (a) above shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Effective Date after giving effect to the Plan with the same effect as if made on and as of the Effective Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.1.12   <u>Covenants</u>.  The Company, on behalf of itself and the other Company Parties, shall have performed and complied, in all material respects, with all of its respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Effective Date.

6.1.13   <u>Officer's Certificate</u>.  The Backstop Parties shall have received on and as of the Effective Date a certificate of the chief executive officer or chief financial officer of the Company confirming that the conditions set forth in <u>Sections 6.1.10</u> and <u>6.1.11</u> and have been satisfied.

6.1.14   <u>No Legal Impediment</u>.  No Law or order shall have been enacted, adopted or issued by any governmental entity that prohibits the consummation of the Restructuring or the transactions contemplated by this Agreement.

**6.2**   **Conditions to the Company's Closing Obligations**.  The obligation of the Company to consummate the Closing shall be subject to the satisfaction of each of the following conditions on the Effective Date:

6.2.1   <u>Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Required Backstop

Parties and such order shall not be reversed, stayed, dismissed, vacated, reconsidered, modified or amended in any material respect (other than in accordance with the terms of this Agreement or the RSA).

6.2.2   <u>Plan</u>.   The conditions to the occurrence of the Effective Date (other than the consummation of the Senior Noteholder Rights Offering and the Backstop Purchase) set forth in the Plan shall have been satisfied or waived in accordance with the terms of the Plan.

6.2.3   <u>Representations and Warranties</u>.   Each of the representations and warranties of each of the Backstop Parties, set forth in <u>Section 4</u> hereof, shall be true and correct in all material respects as of the Effective Date, except with respect to representations and warranties that expressly speak of an earlier date, which shall be true and correct in all material respects as of such date.

6.2.4   <u>Covenants</u>.   Each of the Backstop Parties, on its own behalf and in its capacity as investment manager for its managed funds and accounts party hereto, shall have performed and complied, in all material respects, with all of its respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Effective Date.

6.2.5   <u>No Legal Impediment</u>.   No Law or order shall have been enacted, adopted or issued by any governmental entity that prohibits the consummation of the Restructuring or the transactions contemplated by this Agreement.

6.2.6   <u>Antitrust Approval</u>.   All terminations or expirations of waiting periods imposed by any governmental entity required under any Antitrust Laws, shall have occurred and other notifications, consents, authorizations and approvals required to be made or obtained from any governmental entity under any Antitrust Law shall have been made or obtained for the transactions contemplated by this Agreement.

6.2.7   <u>Proceeds of Rights Offering</u>.   The Company shall have received each of the Backstop Party's respective Funding Amounts in accordance with the terms of this Agreement.

**7.   INDEMNIFICATION AND CONTRIBUTION**

**7.1   Indemnification Obligations**.   The Company and the other Company Parties (the "*Indemnifying Parties*" and each, an "*Indemnifying Party*") shall, jointly and severally, indemnify and hold harmless each Backstop Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives, attorneys, and controlling Persons (each, an "*Indemnified Person*") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than taxes of the Backstop Parties except to the extent otherwise provided for in this Agreement) (collectively, "*Indemnified Losses*") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in

connection with this Agreement, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Company Parties, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable and documented out-of-pocket legal or other third-party expenses of counsel (which, so long as there are no actual conflicts of interests among such Indemnified Persons, shall be limited to one law firm serving as counsel for the Indemnified Persons) incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Indemnified Losses (a) as to a Defaulting Backstop Party, its Affiliates or any Indemnified Person related thereto, caused by a default by such Defaulting Backstop Party (or Indemnified Persons related thereto) or any breach by any Backstop Party (or Indemnified Persons related thereto) under this Agreement, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person. Notwithstanding anything to the contrary in this Agreement, the Indemnifying Parties will not be liable for, and no Indemnified Person shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

7.2    **Indemnification Procedure**.  Promptly after receipt by an Indemnified Person of notice of the commencement of any indemnified claim, challenge, litigation, investigation or proceeding (an "*Indemnified Claim*"), such Indemnified Person will, if a claim is to be made hereunder against an Indemnifying Party in respect thereof, notify such Indemnifying Party in writing of the commencement thereof; provided, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person other than on account of this Section 6.2 or otherwise under this Agreement. In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its

32

election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable and documented costs of investigation) unless (a) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (b) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (d) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person. Notwithstanding anything herein to the contrary, the Company and its Subsidiaries shall have sole control over any tax controversy or tax audit and shall be permitted to settle any liability for taxes of the Company and its Subsidiaries.

7.3     **Settlement of Indemnified Claims.**   In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Section 6.2, the Indemnifying Party shall not be liable for any settlement, compromise, or consent to the entry of any judgment of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).   If any settlement compromise, or consent to the entry of any judgment of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Indemnified Losses by reason of such settlement compromise, consent to the entry of any judgment or judgment to the extent such Indemnified Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Section 6.2. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement compromise, consent to the entry of any judgment with respect to any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (a) such settlement, compromise or consent includes an unconditional release of such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (b) such settlement, compromise or consent does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

7.4     **Contribution**.   If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Indemnified Losses that are subject to indemnification pursuant to Section 7.1, then the Indemnifying Party shall

33

contribute to the amount paid or payable by such Indemnified Person as a result of such loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the unsubscribed New Common Shares in the Senior Noteholder Rights Offering contemplated by this Agreement and the Plan bears to (b) the Backstop Commitment Premium paid or proposed to be paid to the Backstop Parties. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

7.5     **Treatment of Indemnification Payments**.  All amounts paid by an Indemnifying Party to an Indemnified Person under this Article 7 shall, to the extent permitted by applicable Law, be treated as adjustments to the Purchase Price for all tax purposes. The provisions of this Article 7 are an integral part of the transactions contemplated by this Agreement and without these provisions the Backstop Parties would not have entered into this Agreement. The Approval Order shall provide that the obligations of the Company under this Article 7 shall constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code and are payable without further order of the Bankruptcy Court, and that the Company may comply with the requirements of this Article 7 without further order of the Bankruptcy Court.

8.      **MISCELLANEOUS**

8.1     **Notice**.  Any notice or other communication required or which may be given pursuant to this Agreement will be in writing and either delivered personally to the addressee or sent via electronic mail, courier, by certified mail, or registered mail (return receipt requested), and will be deemed given when so delivered personally or sent via electronic mail, or, if mailed, five (5) calendar days after the date of mailing, as follows:

if to a Backstop Party, to the address or email address set forth in **Schedule 1** hereto:

> **with a copy to:**
>
> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019

34

Attn.:

Andrew Rosenberg, Esq.
(arosenberg@paulweiss.com)
Robert Britton, Esq.
(rbritton@paulweiss.com)
John Weber, Esq.
(jweber@paulweiss.com)

**if to the Company, to:**

Denver, Colorado 80202

Attn.:   David S. Elkouri
Executive Vice President and Chief Legal Officer
(delkouri@halconresources.com)

**with copies to:**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Attn.:   Gary Holtzer, Esq.
(Gary.Holtzer@weil.com)
Alfredo R. Pérez, Esq.
(Alfredo.Perez@weil.com)
Gavin Westerman, Esq.
(Gavin.Westerman@weil.com)
Lauren Tauro, Esq.
(Lauren.Tauro@weil.com)

8.2     **Assignment**.  Except as described in this Section 8.2, this Agreement will be binding upon and inure to the benefit of each and all of the Parties, and neither this Agreement nor any of the rights, interests or obligations hereunder will be assigned by any of the Parties without the prior written consent of the Company.  Notwithstanding the foregoing, any Backstop Party may assign its rights and obligations hereunder prior to the date upon which the Backstop Notice is delivered to the Backstop Parties, to (a) any other Consenting Creditor in a manner consistent with the terms of the RSA that agrees as part of such assignment to assume such Backstop Party's Backstop Obligation, or (b) any Backstop Party or to any of its or their wholly-owned affiliates (and/or any affiliate that is wholly-owned by any of such Backstop Party's wholly-owned affiliates); provided, that, in each case, any such assignment shall not release such Backstop Party from any of its obligations under this Agreement in the event that such assignee does not fulfill its obligations hereunder; provided, further, that (i) such assignee and the assigning Backstop Party shall have duly executed and delivered to the Company and Weil, Gotshal

35

& Manges LLP a written notice of such assignment in substantially the form attached as <u>Exhibit A</u> hereto (a "*Notice of Assignment*"), and the Company shall have delivered countersigned copies of such notice to such assignee and the assigning Backstop Party and to Paul, Weiss, Rifkind, Wharton & Garrison LLP; and (ii) with respect to any assignee that is not a party to this Agreement, such assignee shall be required, by delivery of an executed agreement in substantially the form attached as <u>Exhibit B</u> hereto (a "*Joinder Agreement*"), to be bound by the obligations of such assignee's assigning Backstop Party hereunder.  Upon the effectiveness of any assignment pursuant to this <u>Section 8.2</u>, the Company shall update **Schedule 1** hereto to reflect such assignment.

8.3    **Survival.**  Subject to <u>Section 8.12</u>, (a) all representations and warranties made in this Agreement and the schedules attached hereto shall not survive the execution and delivery of this Agreement and consummation of the Senior Noteholder Rights Offering and (b) covenants and agreements that by their terms are to be satisfied after the Effective Date, including, without limitation, the Expense Reimbursement set forth in <u>Section 2.3.1</u> and the covenants set forth in <u>Section 5.3</u>, shall survive the Effective Date until satisfied in accordance with their terms.

8.4    **Entire Agreement**.    This Agreement, including the terms of the agreements contemplated hereby and referred to herein (including the RSA and Equity Rights Offering Documents (as defined in the RSA)) contain the entire agreement by and between the Company and the Backstop Parties with respect to the transactions contemplated by this Agreement and supersedes all prior agreements and representations, written or oral, with respect thereto.  To the extent there is an inconsistency between the provisions in this Agreement and the agreements contemplated hereby and referred to herein, the provisions in this Agreement shall control. To the extent there is an inconsistency between the provisions in this Agreement and the Plan, the Plan shall control; <u>provided</u>, that notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Backstop Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Backstop Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with <u>Section 8.5</u>.

8.5    **Waivers and Amendments**.  This Agreement may be amended, modified or superseded, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Company and the Backstop Parties who are holders of 66.67% of the aggregate issued and outstanding principal amount of Senior Notes held by all Backstop Parties (the "*Required Backstop Parties*").  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof.  No waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor any single or partial exercise of any right, power or privilege pursuant to this Agreement, shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not

36

exclusive of any rights or remedies which any Party otherwise may have at law or in equity.  Notwithstanding anything to the contrary in this Agreement, no amendment that reduces or otherwise modifies the Backstop Commitment Premium, Purchase Price, or increases a Backstop Party's Backstop Obligation or any other funding or financial obligation of any Backstop Party shall be effective against any Backstop Party without such Backstop Party's prior written consent.

8.6     **Governing Law; Jurisdiction; Venue; Process**.  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York, without giving effect to any conflict of laws principles that would require the application of the Law of any other jurisdiction. Each Party hereby irrevocably submits, for itself and its property, to the exclusive jurisdiction of the courts of the State of New York located in the Borough of Manhattan, for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 8.6 shall be brought in the Bankruptcy Court.

8.7     **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.  All such counterparts will be deemed an original, will be construed together and will constitute one and the same instrument.

8.8     **Headings**.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

8.9     **Severability**.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein will not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties hereto will be enforceable to the fullest extent permitted by Law.

8.10    **Termination**.  This Agreement shall terminate:

8.10.1  automatically if the RSA is terminated pursuant to the terms thereof;

8.10.2  if the Parties mutually agree in writing to terminate this Agreement;

8.10.3  at the Company's election, by written notice to the Backstop Parties, in the event of a material breach of this Agreement by any Backstop Party or any Replacing Backstop Party that has prevented the satisfaction of any condition, or the Company's or any Backstop Party's performance of any of its obligations hereunder or under the RSA, if such violation or breach has not been waived by the Company or cured in all material respects by the applicable Backstop Party or Replacing Backstop Parties within ten (10) Business Days after written notice

37

thereof from the Company (provided, however, that the Company may not seek to terminate this Agreement based upon a material breach arising out of its own actions or omissions in breach hereof); or

8.10.4   at the Required Backstop Parties' election, by written notice to the Company, in the event that a material breach of this Agreement by the Company has prevented the satisfaction of any condition to the effectiveness of the Plan, or the Company's or any Backstop Party's performance of any of its obligations hereunder or under the RSA, if such violation or breach has not been waived by the Required Backstop Parties or been cured in all material respects by the Company within ten (10) Business Days after written notice thereof from the Backstop Parties (provided, however, that the Backstop Parties may not seek to terminate this Agreement based upon a material breach arising out of the actions or omissions of any Backstop Party in breach hereof);

**8.11**   **Breach**.  Regardless of the termination of this Agreement pursuant to Section 8.10, each Party shall remain liable for any breaches of this Agreement prior to its termination.

**8.12**   **Effect of Termination.**

8.12.1   Upon termination of this Agreement pursuant to Section 8.10, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the parties hereto; provided, that (a) the obligation of the Company to pay the Expense Reimbursement pursuant to Section 2.3 and to pay the Backstop Commitment Premium if payable pursuant to Sections 2.2.3 and/or 8.12.2 shall survive the termination of this Agreement and shall remain in full force and effect until such obligation has been satisfied (except as otherwise set forth herein), (b) the provisions set forth in this Section 8.12, Section 8.13, Section 8.14, Section 8.15, Section 8.17, Section 8.18, Section 8.19 and Section 8.20 shall survive the termination of this Agreement in accordance with their terms and (c) subject to Section 8.14, nothing in this Section 8.12 shall relieve any Party from liability for its intentional fraud or any willful or intentional breach of this Agreement occurring prior to the date of termination of this Agreement.  For purposes of this Agreement, "willful or intentional breach" means a breach of this Agreement that is a consequence of an intentional act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.  For the avoidance of doubt, the failure to timely pay the Purchase Price by any of the Backstop Parties in accordance with the terms of this Agreement (and subject to the applicable cure period set forth in Section 8.10.3) shall constitute a willful breach of this Agreement.

8.12.2   If this Agreement is terminated by the Required Backstop Parties under Section 8.10.4, the Company shall, promptly after the date of such termination, pay the Backstop Commitment Premium; provided that such fee is payable pursuant to Section 2.2.3, entirely in cash to each Backstop Party or its designee(s). The Backstop Commitment Premium shall (to the extent payable in cash hereunder)

38

pursuant to an Approval Order, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall be payable by the Debtors as provided in this Agreement without further order of the Bankruptcy Court.

8.13    **Waiver of Jury Trial**.   EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICALBE LAW ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.

8.14    **Damages**.  Notwithstanding anything to the contrary in this Agreement, no Party will be liable for, and no Party shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

8.15    **Specific Performance**.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

8.16    **No Reliance**.  No Backstop Party or any of its Affiliates shall have any duties or obligations to the other Backstop Parties in respect of this Agreement, the transactions contemplated hereby, the Definitive Documents or the Restructuring, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Backstop Party or any of its Affiliates shall be subject to any fiduciary or other implied duties to the other Backstop Parties, (b) no Backstop Party or any of its Affiliates shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Backstop Party, (c) no Backstop Party or any of its Affiliates shall have any duty to the other Backstop Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Backstop Parties any information relating to the Company or any of its Affiliates that may have been communicated to or obtained by such Backstop Party or any of its Affiliates in any capacity, (d) no Backstop Party may rely, and each Backstop Party confirms that it has not relied, on any due diligence investigation that any other Backstop Party or any Person acting on behalf of such other Backstop Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, and (e) each Backstop Party acknowledges that no other Backstop Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Backstop Obligation.

8.17    **Publicity**.  Except as required by Law, at all times prior to the Effective Date or the earlier termination of this Agreement in accordance with its terms, the Company and the

39

Backstop Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement. No Party may identify or use the name of any Backstop Party in connection with any press release or other public announcement related to this Agreement without the prior written consent of such Backstop Party.

8.18 **Settlement Discussions**. This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to section 408 of the U.S. Federal Rules of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding (other than a legal proceeding to approve or enforce the terms of this Agreement).

8.19 **No Recourse**. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Affiliates of any Party other than the parties to this Agreement and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Affiliates of any Party, as such, for any obligation or liability of any Party or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, that nothing in this Section 8.19 shall relieve or otherwise limit the liability of any Party or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments. For the avoidance of doubt, none of the parties hereto will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the parties hereto or their respective successors and permitted assigns, as applicable.

8.20 **Other Interpretive Matters**. Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply: (a) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (b) any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars; (c) all exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any capitalized terms used in any such exhibit or schedule but not otherwise defined therein shall be defined as set forth in this Agreement; (d) words imparting the singular number only shall include the plural and vice versa; (e) words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear

40

41

unless the context otherwise requires; (f) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (g) the division of this Agreement into Sections and other subdivisions are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (h) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

[*Signature pages follow*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

HALCÓN RESOURCES CORPORATION


By: _____
    Name:  Richard Little
    Title:    Chief Executive Officer

[*Signature Page to Backstop Commitment Agreement*]

**BLUE FALCON LIMITED**
**By Brigade Capital Management, LP as**
**Investment Manager**

By:_____
  Name: Patrick Criscillo
  Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN
By Brigade Capital Management, LP as
Investment Manager**

By: _____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**NORTHROP GRUMMAN PENSION
MASTER TRUST
By Brigade Capital Management, LP as
Investment Manager**

By:_____

Name: Patrick Criscillo

Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**GOLDMAN SACHS TRUST II -
GOLDMAN SACHS MULTI-
MANAGER NON-CORE FIXED
INCOME FUND
By Brigade Capital Management, LP as
Investment Manager**

By:_____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**ILLINOIS STATE BOARD OF
INVESTMENT
By Brigade Capital Management, LP as
Investment Manager**

By: _____

      Name: Patrick Criscillo
      Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**FCA CANADA INC. ELECTED MASTER TRUST**
**By Brigade Capital Management, LP as Investment Manager**

By:_____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**FCA US LLC MASTER RETIREMENT TRUST**
**By Brigade Capital Management, LP as Investment Manager**

By:_____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**JPMORGAN FUNDS - MULTI-MANAGER ALTERNATIVES FUND
By Brigade Capital Management, LP as
Investment Manager**

By: _____

  Name: Patrick Criscillo
  Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
**By Brigade Capital Management, LP as Investment Manager**

By:_____

      Name: Patrick Criscillo
      Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**MEDIOLANUM BEST BRANDS**
**By Brigade Capital Management, LP as**
**Investment Manager**

By:_____

    Name: Patrick Criscillo
    Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**NEW YORK CITY FIRE
DEPARTMENT PENSION FUND,
SUBCHAPTER TWO
By Brigade Capital Management, LP as
Investment Manager**

By:_____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**NEW YORK CITY POLICE PENSION
FUND, SUBCHAPTER 2
By Brigade Capital Management, LP as
Investment Manager**

By: _____

    Name: Patrick Criscillo
    Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**TEACHERS' RETIREMENT SYSTEM
OF THE CITY OF NEW YORK
By Brigade Capital Management, LP as
Investment Manager**

By:_____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**U.S. HIGH YIELD BOND FUND**
**By Brigade Capital Management, LP as**
**Investment Manager**

By: _____

    Name: Patrick Criscillo
    Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**SEI GLOBAL MASTER FUND PLC
THE SEI HIGH YIELD FIXED
INCOME FUND
By Brigade Capital Management, LP as
Investment Manager**

By: _____

Name: Patrick Criscillo
Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**SEI INSTITUTIONAL INVESTMENTS TRUST-HIGH YIELD BOND FUND**
**By Brigade Capital Management, LP as**
**Investment Manager**

By:_____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**SEI INSTITUTIONAL MANAGED
TRUST-HIGH YIELD BOND FUND
By Brigade Capital Management, LP as
Investment Manager**

By: _____

    Name: Patrick Criscillo
    Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**GIC PRIVATE LIMITED**
**By Brigade Capital Management, LP as**
**Investment Manager**

By:_____

     Name: Patrick Criscillo
     Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**ST. JAMES'S PLACE DIVERSIFIED
BOND UNIT TRUST
By Brigade Capital Management, LP as
Investment Manager**

By:_____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

SAS TRUSTEE CORPORATION
By Brigade Capital Management, LP as
Investment Manager

By: _____

Name: Patrick Criscillo
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**TCORPIM HIGH YIELD FUND**
**By Brigade Capital Management, LP as**
**Investment Manager**

By:_____

    Name: Patrick Criscillo
    Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**LION POINT MASTER, LP**
By: Lion Point Capital GP, LLC, its general
partner


By: _____
        Name: James Murphy
        Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**LUMINUS ENERGY PARTNERS
MASTER FUND, LTD**

By: _____
Name: Shawn R. Singh
Title: Authorized Signatory

*[Signature page to Backstop Commitment Agreement]*

**OAKTREE OPPORTUNITIES FUND X HOLDINGS (DELAWARE), L.P.**

By:  Oaktree Fund GP, LLC
Its:  General Partner

By:  Oaktree Fund GP I, L.P.
Its:  Managing Member

By: _____

Name: Allen Li
Title: Authorized Signatory

By: _____

Name: Emily Stephens
Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**OAKTREE OPPS XB HOLDCO LTD.**

By:  Oaktree Capital Management, L.P.
Its:  Director

By: _____
      Name: Allen Li
      Title: Vice President

By: _____
      Name: Emily Stephens
      Title: Managing Director

[*Signature page to Backstop Commitment Agreement*]

**OAKTREE OPPORTUNITIES FUND XB HOLDINGS (DELAWARE), L.P.**

By:  Oaktree Fund GP, LLC
Its:  General Partner

By:  Oaktree Fund GP I, L.P.
Its:  Managing Member

By:_____
    Name: Allen Li
    Title: Authorized Signatory

By:_____
    Name: Emily Stephens
    Title: Authorized Signatory

[*Signature page to Backstop Commitment Agreement*]

**OAKTREE VALUE OPPORTUNITIES FUND HOLDINGS, L.P.**

By:  Oaktree Value Opportunities Fund GP, L.P.
Its:  General Partner

By:  Oaktree Value Opportunities Fund GP Ltd.
Its:  General Partner

By:  Oaktree Capital Management, L.P.
Its:  Director

By: _____
    Name: Allen Li
    Title: Vice President

By: _____
    Name: Emily Stephens
    Title: Managing Director

[*Signature page to Backstop Commitment Agreement*]

**GEN IV INVESTMENT
OPPORTUNITIES, LLC**

By: _____
Name: Paul Segal
Title: President

[*Signature page to Backstop Commitment Agreement*]

## SCHEDULE 1

### Backstop Parties

| Backstop Party | Backstop Commitment | Backstop Percentage | Face Amount of Senior Notes Held | Address/Email |
|---|---|---|---|---|
| [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] |
| Total: | [    ] | [    ] | [    ] | |

## EXHIBIT A

## Form of Notice of Assignment

Halcón Resources Corporation
1801 California Street, Suite 3500
Denver, Colorado 80202
Attn.:  David S. Elkouri
         Executive Vice President and Chief Legal Officer
         (delkouri@halconresources.com)

with copies to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn.:  Gary Holtzer, Esq.
         (Gary.Holtzer@weil.com)
         Alfredo R. Perez, Esq.
         (Alfredo.Perez@weil.com)
         Lauren Tauro, Esq.
         (Lauren.Tauro@weil.com)

[_____]
[Address]
Attn.: [____]
Email address: [_____]

        Re:     Transfer Notice Under Backstop Agreement

        Reference is hereby made to that certain Backstop Commitment Agreement, dated as of July __, 2019, (the "**Backstop Commitment Agreement**"), by and among the Company and the Backstop Parties. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Backstop Commitment Agreement.

        The purpose of this notice ("**Notice**") is to advise you, pursuant to Section 8.2 of the Backstop Commitment Agreement, of the proposed transfer by [●] (the "**Transferor**") to [●] (the "**Transferee**") of the Backstop Commitment representing [●]% of the aggregate Backstop Commitments as of the date hereof, which represents $[●] of the Transferor's Backstop Commitment (or [●]% of the aggregate Backstop Commitments). [If applicable: The Transferee represents to the Company and the Transferor that it is a Backstop Party under the Backstop Commitment Agreement.]

        By signing this Notice below, Transferee represents to the Company and the Transferor that it will execute and deliver a joinder to the Backstop Agreement.

This Notice shall serve as a transfer notice in accordance with the terms of the Backstop Commitment Agreement. Please acknowledge receipt of this Notice delivered in accordance with Section 8.2 by returning a countersigned copy of this Notice to counsel to the Backstop Parties via the contact information set forth above.

**EXHIBIT B**

**Form of Joinder Agreement**

**JOINDER AGREEMENT**

This Joinder Agreement (the "***Joinder Agreement***") to the Backstop Commitment Agreement dated as of _____, 2019 (as amended, supplemented or otherwise modified from time to time, the "***Backstop Commitment Agreement***"), among the Company and the Backstop Parties is executed and delivered by the undersigned (the "***Joining Party***") as of _____, 2019 (the "***Joinder Date***").  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Backstop Commitment Agreement.

Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Backstop Commitment Agreement, a copy of which is attached to this Joinder Agreement as **Annex 1** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Backstop Party" for all purposes under the Backstop Commitment Agreement.

Representations and Warranties.  The Joining Party hereby severally and not jointly makes the representations and warranties of the Backstop Parties as set forth in Section 4 of the Backstop Commitment Agreement to the Company as of the date hereof.

Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the Laws of the State of New York, but without giving effect to applicable principals of conflicts of law to the extent that the application of the Law of another jurisdiction would be required thereby.

[*Signature pages to follow*]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By:_____
      Name:
      Title:

[*Signature Page to Joinder Agreement to Backstop Commitment Agreement*]

## EXHIBIT C

**PLAN**

**OMITTED**

**Exhibit C**

**Noteholder Rights Offering Procedures**

**HALCÓN RESOURCES CORPORATION**

**SENIOR NOTEHOLDER
RIGHTS OFFERING PROCEDURES**

The New Common Shares (collectively, the "<u>Senior Noteholder Rights Offering Securities</u>") issued pursuant to this Senior Noteholder Rights Offering (as defined below) are distributed and issued without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), in reliance generally upon the exemption from registration provided by Section 1145 of the Bankruptcy Code.

None of the Senior Noteholder Subscription Rights (defined below) or Senior Noteholder Rights Offering Securities issuable upon exercise of such rights distributed pursuant to these procedures (the "<u>Senior Noteholder Rights Offering Procedures</u>") have been or, at the time of original issuance, will be registered under the Securities Act, or the securities laws of any state.

The Senior Noteholder Subscription Rights will not be detachable from the Senior Notes (as defined below) or the Allowed Senior Notes Claims and no Senior Noteholder Subscription Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Senior Noteholder Subscription Rights, the Senior Noteholder Rights Offering Securities, the Allowed Senior Noteholder Rights Offering Claims and any related claims) (each of the above, a "<u>Transfer</u>"), except in accordance with the Senior Noteholder Backstop Agreement (as defined in the Plan), to the extent the Eligible Senior Noteholder Offeree is a party thereto. If the Senior Notes or any portion of the Allowed Senior Notes Claims are or have been Transferred after the Record Date by an Eligible Senior Noteholder Offeree, the corresponding Senior Noteholder Subscription Rights will be cancelled automatically, and neither such Eligible Senior Noteholder Offeree nor the transferee of such Allowed Senior Notes Claims will receive any Senior Noteholder Rights Offering Securities in connection with such transferred Senior Notes or Allowed Senior Noteholder Claims.

Participation in the Senior Noteholder Rights Offering is limited to Eligible Senior Noteholder Offerees (defined below). The Senior Noteholder Rights Offering Securities are available only to Eligible Senior Noteholder Offerees, and any invitation, offer or agreement to subscribe or purchase will be entered into only with Eligible Senior Noteholder Offerees. No offer or invitation to subscribe or purchase is being made to any person who is not an Eligible Senior Noteholder Offeree and no such person should act or rely on any offer or invitation to subscribe or purchase Senior Noteholder Rights Offering Securities.

To exercise the Senior Noteholder Subscription Rights, an Eligible Senior Noteholder Offeree must complete and return to the Subscription Nominee (as defined below) a Senior Noteholder Rights Exercise Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and must coordinate with their Subscription Nominees to pay the

**Senior Noteholder Rights Exercise Price (as defined below), so that such payment of the Senior Noteholder Exercise Price is actually received by the Subscription Agent on or before the Senior Noteholder Rights Expiration Time (as defined below), except that, with respect with respect to Eligible Senior Noteholder Offerees who are Backstop Parties, such Backstop Parties must coordinate with the Subscription Nominees to pay the Senior Noteholder Rights Exercise Price so that such payment no later than two (2) Business Days prior to the effective date of the Plan (the "Effective Date"), in accordance with these Senior Noteholder Rights Offering Procedures and the Senior Noteholder Backstop Agreement.**

**Any Eligible Senior Noteholder Offeree that subscribes for Senior Noteholder Rights Offering Securities and is an "underwriter" under Section 1145(b) of the Bankruptcy Code will be subject to restrictions under the Securities Act on its ability to resell those securities and will receive "restricted securities" (as defined under Rule 144 promulgated under the Securities Act). Resale restrictions are discussed in more detail in Section 5.9 of the Disclosure Statement, entitled "Securities Exemption."**

**The distribution or communication of these Senior Noteholder Rights Offering Procedures and the issue of the Senior Noteholder Rights Offering Securities in certain jurisdictions may be restricted by law. No action has been taken or will be taken to permit the distribution or communication of these Senior Noteholder Rights Offering Procedures in any jurisdiction where any action for that purpose may be required. Accordingly, these Senior Noteholder Rights Offering Procedures may not be distributed or communicated, and the Senior Noteholder Rights Offering Securities may not be subscribed, purchased or issued, in any jurisdiction, except in circumstances where such distribution, communication, subscription, purchase or issuance would comply with all applicable laws and regulations without the need for the issuer to take any action or obtain any consent, approval or authorization therefor, except for any notice filings required under U.S. federal and applicable state securities laws.**

**Each Senior Noteholder Rights Offering Security issued upon exercise of a Senior Noteholder Subscription Right to an Eligible Senior Noteholder Offeree located outside the United States, and any certificate issued in exchange for or upon the transfer, sale or assignment of any such Senior Noteholder Rights Offering Securities, shall be imprinted, stamped or otherwise associated with legends to facilitate compliance with applicable securities and business entity laws, procedures of depositary institutions and organizational documents (e.g. legends with respect to local law, etc.).**

**The Senior Noteholder Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, or an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

Eligible Senior Noteholder Offerees should note the following times relating to the Senior Noteholder Rights Offering:

| Date | Calendar Date | Event |
| --- | --- | --- |
| Senior Noteholder Rights Offering Record Date | August 30, 2019 | The date fixed by the Company for the determination of the holders of Senior Notes eligible to participate in the Senior Noteholder Rights Offering. |
| Senior Noteholder Rights Commencement Date | August 31, 2019 | Commencement of the Senior Noteholder Rights Offering. |
| Senior Noteholder Rights Expiration Time | 5:00 p.m. New York City time on September 23, 2019 | The deadline for Eligible Senior Noteholder Offerees to subscribe for Senior Noteholder Rights Offering Securities. An Eligible Senior Noteholder Offeree's applicable Senior Noteholder Rights Exercise Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), must be received by the Eligible Senior Noteholder Offeree's Subscription Nominee in sufficient time to allow such Subscription Nominee to deliver the these documents to the Subscription Agent by the Senior Noteholder Rights Expiration Time. <br><br> Eligible Senior Noteholder Offerees who are not Backstop Parties must coordinate with their Subscription Nominees to pay the Senior Noteholder Rights Exercise Price, so that such payment of the Senior Noteholder Exercise Price is actually received by the Subscription Agent on or before the Senior Noteholder Rights Expiration Time. <br><br> Eligible Senior Noteholder Offerees who are Backstop Parties must deliver the Senior Noteholder Exercise Price no later than two (2) Business Days prior to the effective date of the Plan (the "Effective Date"), in accordance with these Senior Noteholder Rights Offering Procedures and the Senior Noteholder Backstop Agreement. |

3

## I.        Introduction

Halcón Resources Corporation (the "*Debtor*" or "*Parent*") and certain of its subsidiaries (together with the Debtor, the "*Debtors*")[1] are pursuing a proposed financial restructuring of their existing debt and other obligations to be effectuated pursuant to a plan of reorganization (the "*Plan*") in connection with a chapter 11 bankruptcy case, in accordance with the terms and conditions set forth in the Restructuring Support Agreement, dated as of August 2, 2019 (the "*Restructuring Support Agreement*"), by and among the Debtors and certain holders of Senior Note Claims.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth for such terms in the Plan or the Senior Noteholder Backstop Agreement (as defined in the Plan).

On [●], 2019, the United States Bankruptcy Court for the Southern District of Texas Houston Division (the "*Bankruptcy Court*") entered an order (the "*Rights Offering Approval*") that approved, among other things, the form and manner of the Debtor's rights offering (the "*Senior Noteholder Rights Offering*").  In connection with the Plan, and in accordance with these procedures (the "*Senior Noteholder Rights Offering Procedures*"), the Debtor will launch the Senior Noteholder Rights Offering to Eligible Senior Noteholder Offerees (as defined below), pursuant to which Eligible Senior Noteholder Offerees will be entitled to receive their pro rata portion of non-transferable (except in accordance with the Senior Noteholder Backstop Agreement, to the extent party thereto) subscription rights to acquire $150,150,000 of Senior Noteholder Rights Offering Securities on the terms and conditions set forth in the Plan. An "*Eligible Senior Noteholder Offeree*" is a holder of an Allowed Senior Note Claim as of the Senior Noteholder Rights Offering Record Date (as defined below).

Only Eligible Senior Noteholder Offerees may participate in the Senior Noteholder Rights Offering.  These Senior Noteholder Rights Offering Procedures will govern the ability of Eligible Senior Noteholder Offerees to participate in the Senior Noteholder Rights Offering.

All questions relating to these Senior Noteholder Rights Offering Procedures, other documents associated with the Senior Noteholder Rights Offering, or the requirements to participate in the Senior Noteholder Rights Offering should be directed to KCC LLC, the subscription agent (the "*Subscription Agent*") retained by the Debtors at:

<div align="center">

KCC LLC
1290 Avenue of the Americas, 9th Floor
New York, NY  10104
Attention: Halcón Resources
Tel:  (866) 967-1781

</div>

<div align="center">

**Questions (but not documents) may be directed to HalconQuestions@kccllc.com
(please reference "Halcón Resources" in the subject line)**

</div>

*THE DISCLOSURE STATEMENT, WHICH IS SUBJECT TO FINAL APPROVAL BY THE BANKRUPTCY COURT, DISTRIBUTED IN CONNECTION WITH THE DEBTORS'*

---

[1] The entities included in the definition of "Debtors" are as follows: Halcón Resources Corporation, Halcón Resources Operating, Inc., Halcón Holdings, Inc., Halcón Energy Properties, Inc., Halcón Permian, LLC, Halcón Field Services, LLC, and Halcón Operating Co., Inc.

*SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN SETS FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH ELIGIBLE SENIOR NOTEHOLDER OFFEREE PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE SENIOR NOTEHOLDER RIGHTS OFFERING, INCLUDING THE SECTIONS ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," "VALUATION ANALYSIS," AND "CERTAIN TAX CONSEQUENCES OF THE PLAN." THE DISCLOSURE STATEMENT IS AVAILABLE ON THE DEBTORS' RESTRUCTURING WEBSITE AT HTTP://WWW.KCCLLC.NET/HALCON AND COPIES ARE ALSO AVAILABLE UPON REQUEST FROM THE SUBSCRIPTION AGENT.*

## II.    Rights Offering

To fully exercise its right to participate in the Senior Noteholder Rights Offering (the "*Senior Noteholder Subscription Rights*"), an Eligible Senior Noteholder Offeree must (i) complete the rights offering subscription exercise form (the "*Senior Noteholder Rights Exercise Form*"), which has been distributed with these Senior Noteholder Rights Offering Procedures to Eligible Senior Noteholder Offerees and (ii) pay the purchase price, which is an amount equal to its pro rata share of $150,150,000 for Eligible Senior Noteholder Offerees (the "*Senior Noteholder Rights Exercise Price*"), such pro rata share to be calculated as the proportion that an Eligible Senior Noteholder Offeree's Allowed Senior Notes Claim bears to the aggregate of all Allowed Senior Note Claims as of August 30, 2019 (the "*Senior Noteholder Rights Offering Record Date*"), rounded down to the nearest dollar.

Each Eligible Senior Noteholder Offeree may exercise (in whole dollar increments) all, some, or none of such pro rata share, and the Senior Noteholder Rights Exercise Price for such Eligible Senior Noteholder Offeree will be adjusted accordingly (in whole dollar increments). The portion of Senior Noteholder Rights Offering Securities issued to an Eligible Senior Noteholder Offeree who elects to acquire such Senior Noteholder Rights Offering Securities shall be rounded down to the nearest dollar. No compensation shall be paid, whether in cash or otherwise, in respect of such rounded-down amounts.

The Senior Noteholder Subscription Rights will not be detachable from the Senior Notes (as defined below) or the Allowed Senior Notes Claim and no Senior Noteholder Subscription Rights may be Transferred, except in accordance with the Senior Noteholder Backstop Agreement, to the extent the Eligible Senior Noteholder Offeree is a party thereto. If the Senior Notes or any portion of the Allowed Senior Notes Claims are or have been Transferred after the Record Date by an Eligible Senior Noteholder Offeree, the corresponding Senior Noteholder Senior Noteholder Subscription Rights will be cancelled automatically, and neither such Eligible Senior Noteholder Offeree nor the transferee of such allowed Senior Notes Claims will receive any Senior Noteholder Rights Offering Securities in connection with such transferred Senior Notes or Allowed Senior Noteholder Claims.

Once an Eligible Senior Noteholder Offeree has properly exercised its Senior Noteholder Subscription Rights, subject to the terms and conditions contained in these Senior Noteholder Rights Offering Procedures and the Backstop Commitment Agreement in the case of any Backstop Party, such exercise will be irrevocable.

5

### III.     The Backstop

The Senior Noteholder Rights Offering will be backstopped by the Backstop Parties.  Each of the Backstop Parties, severally and not jointly, has agreed, pursuant to the Senior Noteholder Backstop Agreement, to purchase all New Common Stock that are offered to and not purchased by other Eligible Senior Noteholder Offerees pursuant to the Senior Noteholder Rights Offering (the "*Unsubscribed Senior Noteholder Shares*") on a pro rata basis in accordance with the percentages set forth in Schedule I to, and all of the other terms and conditions of, the Senior Noteholder Backstop Agreement.  As consideration for their undertakings in the Senior Noteholder Backstop Agreement, the Backstop Parties will receive the Backstop Commitment Premium set forth in the Senior Noteholder Backstop Agreement.  The Backstop Parties will be provided with a special form (the *"Backstop Addendum"*) to attach to their Senior Noteholder Rights Exercise Form.

There will be no over-subscription privilege in the Senior Noteholder Rights Offering.  The unsubscribed Senior Noteholder Rights Offering Securities will not be offered to other Eligible Senior Noteholder Offerees but will be purchased by the Backstop Parties in accordance with the Senior Noteholder Backstop Agreement.

### IV.     Commencement/Expiration of the Rights Offering

The Senior Noteholder Rights Offering shall commence on the day upon which the Senior Noteholder Rights Exercise Form is first mailed or made available to Eligible Senior Noteholder Offerees (the "*Rights Commencement Date*").  The Senior Noteholder Rights Offering shall expire at 5:00 p.m. New York City time on September 23, 2019, unless, if permitted by the Rights Offering Approval, extended by the Debtor in accordance with the Plan (such time and date, as may be amended, the "*Senior Noteholder Rights Expiration Time*").  The Debtor shall promptly notify the Eligible Senior Noteholder Offerees of any extension and of the new Senior Noteholder Rights Expiration Time by press release or otherwise.

The Debtor will furnish, or cause to be furnished, Senior Noteholder Rights Exercise Forms to the Eligible Senior Noteholder Offerees and/or, to the extent applicable, their brokers, dealers, commercial banks, trust companies, or other agents or nominees (the "*Subscription Nominees*").  Each Subscription Nominee is entitled to receive sufficient copies of these Senior Noteholder Rights Offering Procedures and the Senior Noteholder Rights Exercise Form for distribution to the beneficial owners of the Senior Notes for whom such Subscription Nominee holds such Senior Notes.

### V.     Exercise of Senior Noteholder Subscription Rights

Each Eligible Senior Noteholder Offeree that elects to participate in the Senior Noteholder Rights Offering must affirmatively make a binding, irrevocable election to exercise its Senior Noteholder Subscription Rights (the "*Binding Senior Noteholder Rights Election*") before the Senior Noteholder Rights Expiration Time.

6

**The Binding Senior Noteholder Rights Election, upon receipt by the Subscription Agent, cannot be withdrawn.**

Each Eligible Senior Noteholder Offeree will be entitled to participate in the Senior Noteholder Rights Offering solely to the extent provided in these Senior Noteholder Rights Offering Procedures, except in the case of Eligible Senior Noteholder Offerees who are Backstop Parties, who are entitled to participate in the Senior Noteholder Rights Offering to the extent also provided in Senior Noteholder Backstop Agreement.

A.      Exercise by Eligible Senior Noteholder Offerees

In order to exercise the Senior Noteholder Subscription Rights, each Eligible Senior Noteholder Offeree must (i) return a duly completed Senior Noteholder Rights Exercise Form to the Subscription Agent so that the duly completed Senior Noteholder Rights Exercise Form is *actually received* by the Subscription Agent on or before the Senior Noteholder Rights Expiration Time ,and (ii) pay to the Subscription Agent, by wire transfer of immediately available funds, the Senior Noteholder Rights Exercise Price, so that payment of the Senior Noteholder Rights Exercise Price is *actually received* by the Subscription Agent on or before the Senior Noteholder Rights Expiration Time, provided, that the Backstop Parties (in their capacities as Eligible Senior Noteholder Offerees) shall not be required to pay their respective Senior Noteholder Rights Exercise Prices until no later than two (2) Business Days prior to the effective date of the Plan (the "*Effective Date*"), in accordance with these Senior Noteholder Rights Offering Procedures and the Senior Noteholder Backstop Agreement.

In order to exercise its Senior Noteholder Subscription Rights, any Eligible Senior Noteholder Offeree who holds Senior Notes through a Subscription Nominee must return a duly completed Senior Noteholder Rights Exercise Form to its Subscription Nominee or otherwise instruct its Subscription Nominee as to its instructions for the Senior Noteholder Subscription Rights (in each case in sufficient time to allow such Subscription Nominee to deliver the Senior Noteholder Rights Exercise Form to the Subscription Agent prior to the Senior Noteholder Rights Expiration Time) in accordance with procedures established by its Subscription Nominee, which, in turn, must comply with clauses (i) and (ii) of the immediately preceding paragraph.

For purposes of this Senior Noteholder Rights Offering, U.S. Bank National Association, in its capacity as Indenture Trustee for the Senior Notes, shall not constitute a Subscription Nominee and shall have no responsibility with respect to sending any Senior Noteholder Rights Offering information or collecting any Senior Noteholder Rights Exercise Forms.

B.      Deemed Representations and Acknowledgements

Any Eligible Senior Noteholder Offeree that participates in the Senior Noteholder Rights Offering is deemed to have made the following representations and acknowledgements:

(i)      Such Eligible Senior Noteholder Offeree recognizes and understands that the Senior Noteholder Subscription Rights are not transferable, except in accordance with the Senior Noteholder Backstop Agreement, to the extent such Eligible

7

Senior Noteholder Offeree is a party thereto (see Section II above for details), and that the benefits of the Senior Noteholder Subscription Rights are not separable from the claim or securities with respect to which the Senior Noteholder Subscription Rights have been granted. Such creditor represents and warrants that it is an Eligible Senior Noteholder Offeree.

(ii)   Such Eligible Senior Noteholder Offeree represents and warrants that it will not accept a distribution of Senior Noteholder Rights Offering Securities if at such time, it does not hold all of the Allowed Senior Note Claim associated with its Senior Noteholder Subscription Rights and, by accepting a distribution of Senior Noteholder Rights Offering Securities, such Eligible Senior Noteholder Offeree will be deemed to be the owner thereof.

C.   <u>Failure to Exercise Senior Noteholder Subscription Rights</u>

**Unexercised Senior Noteholder Subscription Rights will be relinquished at the Senior Noteholder Rights Expiration Time.**

If, on or prior to the Senior Noteholder Rights Expiration Time, the Subscription Agent for any reason does not receive from an Eligible Senior Noteholder Offeree or its Subscription Nominee a duly completed Senior Noteholder Rights Exercise Form, such Eligible Senior Noteholder Offeree shall be deemed to have irrevocably relinquished and waived its right to participate in the Senior Noteholder Rights Offering with respect to Senior Notes underlying such undelivered Senior Noteholder Rights Exercise Form.

Any attempt to exercise Senior Noteholder Subscription Rights after the Senior Noteholder Rights Expiration Time shall be null and void and the Debtor shall not be obligated to honor any such purported exercise received by the Subscription Agent after the Senior Noteholder Rights Expiration Time regardless of when the documents relating thereto were sent.

**The method of delivery of the Senior Noteholder Rights Exercise Form and any other required documents is at each Eligible Senior Noteholder Offeree's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent. Delivery by reputable overnight courier is encouraged and strongly recommended. In all cases, you should allow sufficient time to ensure timely delivery prior to the Senior Noteholder Rights Expiration Time.**

**The risk of non-delivery of the Senior Noteholder Rights Exercise Form and any other required documents sent to the Subscription Agent in connection with the exercise of the Senior Noteholder Subscription Rights lies solely with the holders of the Allowed Senior Note Claims, and none of the Debtors, the reorganized Debtors, or any of their respective officers, directors, employees, agents or advisers, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

D.   <u>Payment for Senior Noteholder Subscription Rights</u>

If, on or prior to the Senior Noteholder Rights Expiration Time, the Subscription Agent for any reason does not receive on behalf of an Eligible Senior Noteholder Offeree immediately available funds by wire transfer in an amount equal to the total Senior Noteholder Rights

8

Exercise Price for such Eligible Senior Noteholder Offeree's Senior Noteholder Subscription Rights, such Eligible Senior Noteholder Offeree shall be deemed to have relinquished and waived its Senior Noteholder Subscription Rights, subject to the next paragraph; *provided*, that the Backstop Parties (in their capacities as Eligible Senior Noteholder Offerees) shall not be required to pay their respective Senior Noteholder Rights Exercise Prices until no later than two (2) Business Days prior to the Effective Date.

### E.   Disputes, Waivers, and Extensions

Any and all disputes concerning the timeliness, viability, form, and eligibility of any exercise of Senior Noteholder Subscription Rights shall be addressed in good faith by the Debtor, the determinations of which shall be final and binding. The Debtor may (i) waive any defect or irregularity, or permit a defect or irregularity to be corrected, within such times as it may determine in good faith to be appropriate or (ii) reject the purported exercise of any Senior Noteholder Subscription Rights for which the Senior Noteholder Rights Exercise Form and/or payment includes defects or irregularities. Senior Noteholder Rights Exercise Forms shall be deemed not to have been properly completed until all irregularities have been waived or cured. The Debtor reserves the right to give notice to any Senior Noteholder Eligible Offeree regarding any defect or irregularity in connection with any purported exercise of Senior Noteholder Subscription Rights by such Eligible Senior Noteholder Offeree and the Debtor may permit such defect or irregularity to be cured; it being understood, that none of the Debtor, the Subscription Agent, or the Backstop Parties (or any of their respective officers, directors, employees, agents or advisors) shall incur any liability for failure to give such notification.

The Debtor, with the approval of the Bankruptcy Court (if applicable) and the consent of the Backstop Parties, the Consenting Creditors and the DIP Agent, may (i) extend the duration of the Senior Noteholder Rights Offering or adopt additional detailed procedures to more efficiently administer the distribution and exercise of the Senior Noteholder Subscription Rights; and (ii) make such other changes to the Senior Noteholder Rights Offering, including changes that affect which parties constitute Eligible Senior Noteholder Offerees.

### F.   Funds

The payments made to acquire Senior Noteholder Rights Offering Securities pursuant to the Senior Noteholder Rights Offering (the "***Senior Noteholder Rights Offering Funds***") shall be deposited when made and held by the Subscription Agent pending the Effective Date in a segregated account or accounts (i) which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien, encumbrance, or cash collateral arrangements and (ii) which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Senior Noteholder Rights Offering until the Effective Date. The Subscription Agent shall not use the Senior Noteholder Rights Offering Funds for any purpose other than to release the funds as directed by the Debtor on the Effective Date or as otherwise set forth in these Senior Noteholder Rights Offering Procedures or in the Plan, and, until released in accordance with the foregoing, the Senior Noteholder Rights Offering Funds will not be deemed part of the Debtors' bankruptcy estate. The Subscription Agent shall not permit the Senior Noteholder Rights Offering Funds to be encumbered by any lien, encumbrance, or cash collateral obligation. No interest will be paid to participating Eligible

9

Senior Noteholder Offerees on account of any amounts paid in connection with their exercise of Senior Noteholder Subscription Rights under any circumstances.

G.    Participating Eligible Senior Noteholder Offeree Release

See Section 10.7 of the Plan for important information regarding releases.

**VI.    Settlement of the Senior Noteholder Rights Offering and Distribution of the Senior Noteholder Rights Offering Securities**

The settlement of the Senior Noteholder Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtor with these Senior Noteholder Rights Offering Procedures, and the simultaneous occurrence of the Effective Date. The Debtor intends that the Senior Noteholder Rights Offering Securities will be issued to Eligible Senior Noteholder Offerees and/or to any party that an Eligible Senior Noteholder Offeree so designates in the Senior Noteholder Rights Offering Exercise Form, in book-entry form, and that DTC, or its nominee, will be the holder of record of such Senior Noteholder Rights Offering Securities. To the extent DTC is unwilling or unable to make the Senior Noteholder Rights Offering Securities eligible on the DTC system, the Senior Noteholder Rights Offering Securities will be issued directly to the Eligible Senior Noteholder Offeree or its designee. For the avoidance of doubt, any such Eligible Senior Noteholder Offeree, and not a designee, shall remain responsible for the exercise and payment of its Senior Noteholder Subscription Rights.

**VII.    Miscellaneous**

A.    Issuance

The Senior Noteholder Rights Offering Securities to be issued pursuant to the Senior Noteholder Rights Offering are expected to be delivered to Eligible Senior Noteholder Offerees that have properly exercised their Senior Noteholder Subscription Rights on or as soon as practicable following the Effective Date.  See Section VII.

B.    Securities Law and Related Matters

The Senior Noteholder Rights Offering Securities issued to the Eligible Senior Noteholder Offerees participating in the Senior Noteholder Rights Offering, other than Senior Noteholder Rights Offering Securities issued to the Backstop Parties on account of their respective Backstop Obligations and the Backstop Commitment Premium, will be exempt from registration under the Securities Act of 1933, as amended (the "*Securities Act*"), and any other applicable federal and state securities laws pursuant to Section 1145 of the Bankruptcy Code, and may be resold, without registration under the Securities Act or other applicable federal and state securities laws, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code. The Senior Noteholder Rights Offering Securities issued to the Backstop Parties on account of their respective Backstop Obligations or the Backstop Commitment Premium in accordance with the Senior Noteholder Backstop Agreement will be exempt for registration under the Securities Act, and any other applicable federal and state securities laws, pursuant to Section 4(a)(2) and Regulation D of the Securities Act.  Such Securities will be considered "restricted securities" and may **not** be resold without registration

10

under the Securities Act or the availability of an exemption from registration under the Securities Act.

There is not and there may not be a public market for the Senior Noteholder Rights Offering Securities. Accordingly, there can be no assurance that an active trading market for the Senior Noteholder Rights Offering Securities will ever develop or, if such a market does develop, that it will be maintained. No later than seven (7) calendar days prior to the Voting Deadline (as defined in the Plan), the Debtors, with the consent of the Requisite Creditors (as defined in the Plan), shall make a determination as to whether the reorganized Debtor shall continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp). If the Debtors determine that the reorganized Debtor will continue to be a reporting company under the Exchange Act, the Debtors shall use their commercially reasonable efforts to have the Senior Noteholder Rights Offering Securities listed on the New York Stock Exchange, or another nationally recognized exchange, as soon as practicable, subject to meeting applicable listing requirements following the Effective Date. However, there can be no assurance that a listing will be achieved or that an active trading market for the shares of common stock of the Debtor will ever develop or, if such a market does develop that it will be maintained.

**VIII.   Rights Offering Conditioned Upon Effectiveness of the Plan; Reservation of Senior Noteholder Subscription Rights; Return of Rights Offering Amount**

All exercises of Senior Noteholder Subscription Rights are subject to and conditioned upon the effectiveness of the Plan.  The Debtor will accept a Binding Senior Noteholder Rights Election only upon the confirmation and effectiveness of the Plan.  Notwithstanding anything contained herein, in the Disclosure Statement or in the Plan to the contrary, the Debtor reserves the right, with the approval of the Required Backstop Parties, not to be unreasonably withheld, to modify these Senior Noteholder Rights Offering Procedures or adopt additional detailed procedures if necessary in the Debtor's business judgment to more efficiently administer the distribution and exercise of the Senior Noteholder Subscription Rights or comply with applicable law.

In the event that (i) the Senior Noteholder Rights Offering is terminated, (ii) the Debtor revokes or withdraws the Plan, or (iii) the Effective Date of the Plan does not occur on or before the "*Outside Date*" (as defined in the Restructuring Support Agreement, and may be extended in accordance with the terms thereof), the Subscription Agent shall, within five (5) Business Days of such event, return all amounts received from Eligible Senior Noteholder Offerees, without any interest, and, in the case of clauses (ii) and (iii) above, the Senior Noteholder Rights Offering shall automatically be terminated.

**Exhibit D**

**Existing Equity Interests Rights Offering Procedures**

**HALCÓN RESOURCES CORPORATION**

**EXISTING EQUITY INTERESTS
RIGHTS OFFERING PROCEDURES**

**The New Common Shares (collectively, the "Existing Equity Interests Rights Offering Securities") issued pursuant to this Existing Equity Interests Rights Offering (as defined below) are distributed and issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), in reliance generally upon the exemption from registration provided by Section 1145 of the Bankruptcy Code.**

**None of the Existing Equity Interests Subscription Rights (defined below) or Existing Equity Interests Rights Offering Securities issuable upon exercise of such rights distributed pursuant to these procedures (the "Existing Equity Interests Rights Offering Procedures") have been or, at the time of original issuance, will be registered under the Securities Act, or the securities laws of any state.**

**The Existing Equity Interests Subscription Rights will not be detachable from the Existing Equity Interests (as defined below) or the Allowed Existing Equity Interests Claims and no Existing Equity Interests Subscription Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Existing Equity Interests Subscription Rights, the Existing Equity Interests Rights Offering Securities, the Allowed Existing Equity Interests Claims and any related claims) (each of the above, a "Transfer"). If the Existing Equity Interests or any portion of the Allowed Existing Equity Interests Claims are or have been Transferred after the Record Date by an Eligible Existing Equity Interests Offeree, the corresponding Existing Equity Interests Subscription Rights will be cancelled automatically, and neither such Eligible Existing Equity Interests Offeree nor the transferee of such Allowed Existing Equity Interests Claims will receive any Existing Equity Interests Rights Offering Securities in connection with such transferred Existing Equity Interests or Allowed Existing Equity Interests Claims.**

**Participation in the Existing Equity Interests Rights Offering is limited to Eligible Existing Equity Interests Offerees (defined below). The Existing Equity Interests Rights Offering Securities are available only to Eligible Existing Equity Interests Offerees, and any invitation, offer or agreement to subscribe or purchase will be entered into only with Eligible Existing Equity Interests Offerees. No offer or invitation to subscribe or purchase is being made to any person who is not an Eligible Existing Equity Interests Offeree and no such person should act or rely on any offer or invitation to subscribe or purchase Existing Equity Interests Rights Offering Securities.**

**If you hold your Existing Equity Interests with your Subscription Nominee, to exercise the Existing Equity Interests Subscription Rights, you must complete and return to the Subscription Nominee (as defined below) an Existing Equity Interests Rights Exercise Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable)**

**and coordinate the payment of the Existing Equity Interests Rights Exercise Price (as defined below), so that such payment of the Existing Equity Interests Exercise Price is actually received by the Subscription Agent on or before the Existing Equity Interests Rights Expiration Time.**

**If you hold your Existing Equity Interests directly on the books and records of the Debtor's transfer agent, to exercise the Existing Equity Interests Subscription Rights, you must complete and return to the Subscription Agent (as defined below) an Existing Equity Interests Rights Exercise Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and pay the Existing Equity Interests Rights Exercise Price to the Subscription Agent, prior to the Existing Equity Interests Rights Expiration Time (as defined below).**

**If you hold your Existing Equity Interests with both your Subscription Nominee and directly on the books and records of the Debtor's transfer agent, you will receive multiple Existing Equity Interests Rights Exercise Forms, each of which must be completed and returned to the Subscription Nominee or directly to the Subscription Agent, as applicable (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable).**

**Any Eligible Existing Equity Interests Offeree that subscribes for Existing Equity Interests Rights Offering Securities and is an "underwriter" under Section 1145(b) of the Bankruptcy Code will be subject to restrictions under the Securities Act on its ability to resell those securities and will receive "restricted securities" (as defined under Rule 144 promulgated under the Securities Act). Resale restrictions are discussed in more detail in Section 5.9 of the Disclosure Statement, entitled "Securities Exemption."**

**The distribution or communication of these Existing Equity Interests Rights Offering Procedures and the issue of the Existing Equity Interests Rights Offering Securities in certain jurisdictions may be restricted by law. No action has been taken or will be taken to permit the distribution or communication of these Existing Equity Interests Rights Offering Procedures in any jurisdiction where any action for that purpose may be required. Accordingly, these Existing Equity Interests Rights Offering Procedures may not be distributed or communicated, and the Existing Equity Interests Rights Offering Securities may not be subscribed, purchased or issued, in any jurisdiction, except in circumstances where such distribution, communication, subscription, purchase or issuance would comply with all applicable laws and regulations without the need for the issuer to take any action or obtain any consent, approval or authorization therefor, except for any notice filings required under U.S. federal and applicable state securities laws.**

**Each Existing Equity Interests Rights Offering Security issued upon exercise of a Subscription Right to an Eligible Existing Equity Interests Offeree located outside the United States, and any certificate issued in exchange for or upon the transfer, sale or assignment of any such Existing Equity Interests Rights Offering Securities, shall be imprinted, stamped or otherwise associated with legends to facilitate compliance with applicable securities and business entity laws, procedures of depositary institutions and organizational documents (e.g. legends with respect to local law, etc.).**

2

**The Existing Equity Interests Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, or an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

Eligible Existing Equity Interests Offerees should note the following times relating to the Existing Equity Interests Rights Offering:

| Date | Calendar Date | Event |
| --- | --- | --- |
| Existing Equity Interests Rights Offering Record Date | August 30, 2019 | The date fixed by the Company for the determination of the holders of Existing Equity Interests eligible to participate in the Existing Equity Interests Rights Offering. |
| Existing Equity Interests Rights Commencement Date | August 31, 2019 | Commencement of the Existing Equity Interests Rights Offering. |
| Existing Equity Interests Rights Expiration Time | 5:00 p.m. New York City time on September 23, 2019 | The deadline for Eligible Existing Equity Interests Offerees to subscribe for Existing Equity Interests Rights Offering Securities. |
| | | An Eligible Existing Equity Interests Offeree who holds their Existing Equity Interests through their Subscription Nominee must submit their Existing Equity Interests Rights Exercise Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), to such Subscription Nominee in sufficient time to allow such Subscription Nominee to deliver the these documents to the Subscription Agent by the Existing Equity Interests Rights Expiration Time. |
| | | An Eligible Existing Equity Interests Offeree who holds their Existing Equity Interests on the books and records of the Debtor's transfer agent must submit their Existing Equity Interests Rights Exercise Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), to the Subscription Agent in sufficient time so such documents are received by the Subscription Agent on or before the Existing Equity Interests Rights Expiration Time. |
| | | Holders of Existing Equity Interests who own 2,000 shares or fewer of Existing Equity Interests **and** hold such Existing Equity Interests on the books and records of |

4

| Date | Calendar Date | Event |
|---|---|---|
| | | the Debtor's transfer agent **are not** Eligible Existing Equity Interests Offerees and **may not participate in the Existing Equity Interests Rights Offering** and will instead receive a cash distribution, as set forth in the Plan.<br><br>Eligible Existing Equity Interests Offerees who hold their Existing Equity Interests through their Subscription Nominee must coordinate with their Subscription Nominees to pay the Existing Equity Interests Rights Exercise Price, so that such payment of the Existing Equity Interests Exercise Price is actually received by the Subscription Agent on or before the Existing Equity Interests Rights Expiration Time.<br><br>Eligible Existing Equity Interests Offerees who hold their Existing Equity Interests through the books and records of the Debtor's transfer agent must pay the Existing Equity Interests Rights Exercise Price to the Subscription Agent so that payment of the Existing Equity Interests Rights Exercise Price is actually received by the Subscription Agent on or before the Existing Equity Interests Rights Expiration Time. |

## I.     Introduction

Halcón Resources Corporation (the "*Debtor*" or "*Parent*") and certain of its subsidiaries (together with the Debtor, the "*Debtors*")[1] are pursuing a proposed financial restructuring of their existing debt and other obligations to be effectuated pursuant to a plan of reorganization (the "*Plan*") in connection with a chapter 11 bankruptcy case, in accordance with the terms and conditions set forth in the Restructuring Support Agreement, dated as of August 2, 2019 (the "*Restructuring Support Agreement*"), by and among the Debtors and certain holders of Senior Note Claims.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth for such terms in the Plan.

On [●], 2019, the United States Bankruptcy Court for the Southern District of Texas Houston Division (the "*Bankruptcy Court*") entered an order (the "*Rights Offering Approval*") that approved, among other things, the form and manner of the Debtor's rights offering (the "*Existing Equity Interests Rights Offering*").  In connection with the Plan, and in accordance with these procedures (the "*Existing Equity Interests Rights Offering Procedures*"), the Debtor will launch the Existing Equity Interests Rights Offering to Eligible Existing Equity Interests Offerees (as defined below), pursuant to which Eligible Existing Equity Interests Offerees will be entitled to receive their pro rata portion of non-transferable subscription rights to acquire $14,850,000 of Existing Equity Interests Rights Offering Securit*e*s on the terms and conditions set forth in the Plan. An "*Eligible Existing Equity Interests Offeree*" is a holder of Existing Equity Interests as of the Existing Equity Interests Rights Offering Record Date (as defined below), who holds such Existing Equity Interests either through (a) their Subscription Nominee (as defined below) or (b) on the books and records of the Debtor's transfer agent and own more than 2,000 shares of Existing Equity Interests. Holders of Existing Equity Interests who own 2,000 shares or fewer of Existing Equity Interests *and* hold such Existing Equity Interests on the books and records of the Debtor's transfer agent are not Eligible Existing Equity Interests Offerees and may not participate in the Existing Equity Interests Rights Offering and will instead receive a cash distribution, as set forth in the Plan.

Only Eligible Existing Equity Interests Offerees may participate in the Existing Equity Interests Rights Offering.  These Existing Equity Interests Rights Offering Procedures will govern the ability of Eligible Existing Equity Interests Offerees to participate in the Existing Equity Interests Rights Offering.

All questions relating to these Existing Equity Interests Rights Offering Procedures, other documents associated with the Existing Equity Interests Rights Offering, or the requirements to participate in the Existing Equity Interests Rights Offering should be directed to KCC LLC, the subscription agent (the "*Subscription Agent*") retained by the Debtors at:

<div align="center">

KCC LLC
1290 Avenue of the Americas, 9th Floor
New York, NY  10104
Attention: Halcón Resources
Tel:  (866) 967-1781

</div>

---

[1] The entities included in the definition of "Debtors" are as follows: Halcón Resources Corporation, Halcón Resources Operating, Inc., Halcón Holdings, Inc., Halcón Energy Properties, Inc., Halcón Permian, LLC, Halcón Field Services, LLC, and Halcón Operating Co., Inc.

**Questions (but not documents) may be directed to HalconQuestions@kccllc.com (please reference "Halcón Resources" in the subject line)**

*THE DISCLOSURE STATEMENT, WHICH IS SUBJECT TO FINAL APPROVAL BY THE BANKRUPTCY COURT, DISTRIBUTED IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN SETS FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH ELIGIBLE EXISTING EQUITY INTERESTS OFFEREE PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE EXISTING EQUITY INTERESTS RIGHTS OFFERING, INCLUDING THE SECTIONS ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," "VALUATION ANALYSIS," AND "CERTAIN TAX CONSEQUENCES OF THE PLAN." THE DISCLOSURE STATEMENT IS AVAILABLE ON THE DEBTORS' RESTRUCTURING WEBSITE AT HTTP://WWW.KCCLCC.NET/HALCON AND COPIES ARE ALSO AVAILABLE UPON REQUEST FROM THE SUBSCRIPTION AGENT.*

## II.     Rights Offering

To fully exercise its right to participate in the Existing Equity Interests Rights Offering (the "***Existing Equity Interests Subscription Rights***"), an Eligible Existing Equity Interests Offeree must (i) complete the rights offering subscription exercise form (the "***Existing Equity Interests Rights Exercise Form***"), which has been distributed with these Existing Equity Interests Rights Offering Procedures to Eligible Existing Equity Interests Offerees and (ii) pay the purchase price, which is an amount equal to its pro rata share of $14,850,000 for Eligible Existing Equity Interests Offerees (the "***Existing Equity Interests Rights Exercise Price***"), such pro rata share to be calculated as the proportion that an Eligible Existing Equity Interests Offeree's Allowed Claim bears to the aggregate of all Allowed Existing Equity Interests Claims as of August 30, 2019 (the "***Existing Equity Interests Rights Offering Record Date***"), rounded down to the nearest dollar.

Each Eligible Existing Equity Interests Offeree may exercise (in whole dollar increments) all, some, or none of such pro rata share, and the Existing Equity Interests Rights Exercise Price for such Eligible Existing Equity Interests Offeree will be adjusted accordingly (in whole dollar increments).  The portion of Existing Equity Interests Rights Offering Securities issued to an Eligible Existing Equity Interests Offeree who elects to acquire such Existing Equity Interests Rights Offering Securities shall be rounded down to the nearest dollar.  No compensation shall be paid, whether in cash or otherwise, in respect of such rounded-down amounts.

The Existing Equity Interests Subscription Rights will not be detachable from the Existing Equity Interests (as defined below) or the Allowed Existing Equity Interests Claims and no Existing Equity Interests Subscription Rights may be Transferred. If the Existing Equity Interests or any portion of the Allowed Existing Equity Interests Claims are or have been Transferred after the Record Date by an Eligible Existing Equity Interests Offeree, the corresponding Existing Equity Interests Subscription Rights will be cancelled automatically, and neither such Eligible Existing Equity Interests Offeree nor the transferee of such Allowed Existing Equity Interests Claims will receive any Existing Equity Interests Rights Offering Securities in connection with such transferred Existing Equity Interests or Allowed Existing Equity Interests Claims.

7

Once an Eligible Existing Equity Interests Offeree has properly exercised its Existing Equity Interests Subscription Rights, subject to the terms and conditions contained in these Existing Equity Interests Rights Offering Procedures, such exercise will be irrevocable.

## III.     Commencement/Expiration of the Rights Offering

The Existing Equity Interests Rights Offering shall commence on the day upon which the Existing Equity Interests Rights Exercise Form is first mailed or made available to Eligible Existing Equity Interests Offerees (the "*Rights Commencement Date*"). The Existing Equity Interests Rights Offering shall expire at 5:00 p.m. New York City time September 23, 2019, unless, if permitted by the Rights Offering Approval, extended by the Debtor in accordance with the Plan (such time and date, as may be amended, the "*Existing Equity Interests Rights Expiration Time*").  The Debtor shall promptly notify the Eligible Existing Equity Interests Offerees of any extension and of the new Existing Equity Interests Rights Expiration Time by press release or otherwise.

The Debtor will furnish, or cause to be furnished, Existing Equity Interests Rights Exercise Forms to the Eligible Existing Equity Interests Offerees and/or, to the extent applicable, their brokers, dealers, commercial banks, trust companies, or other agents or nominees (the "*Subscription Nominees*").  Each Subscription Nominee is entitled to receive sufficient copies of these Existing Equity Interests Rights Offering Procedures and the Existing Equity Interests Rights Exercise Form for distribution to the beneficial owners of the Existing Equity Interests for whom such Subscription Nominee holds such Existing Equity Interests.

If you hold your Existing Equity Interests with your Subscription Nominee, you must complete the Existing Equity Interests Rights Exercise Form and return it to your Subscription Nominee. If you hold your Existing Equity Interests directly on the books and records of the Debtor's transfer agent, you must complete the Existing Equity Interests Rights Exercise Form and return it to the Subscription Agent.  If you hold your Existing Equity Interests with both your Subscription Nominee and directly on the books and records of the Debtor's transfer agent, you will receive multiple Existing Equity Interests Rights Exercise Forms, each of which must be completed and returned to the Subscription Nominee or directly to the Subscription Agent, as applicable.

## IV.     Exercise of Existing Equity Interests Subscription Rights

Each Eligible Existing Equity Interests Offeree that elects to participate in the Existing Equity Interests Rights Offering must affirmatively make a binding, irrevocable election to exercise its Existing Equity Interests Subscription Rights (the "*Binding Existing Equity Interests Rights Election*") before the Existing Equity Interests Rights Expiration Time.

---

**The Binding Existing Equity Interests Rights Election, upon receipt by the Subscription Agent, cannot be withdrawn.**

---

Each Eligible Existing Equity Interests Offeree will be entitled to participate in the Existing Equity Interests Rights Offering solely to the extent provided in these Existing Equity Interests Rights Offering Procedures.

8

A.      <u>Exercise by Eligible Existing Equity Interests Offerees</u>

In order to exercise the Existing Equity Interests Subscription Rights with respect to Existing Equity Interests held directly on the books and records of the Debtor's transfer agent, each Eligible Existing Equity Interests Offeree must (i) return duly completed Existing Equity Interests Rights Exercise Form(s) to the Subscription Agent so that the duly completed Existing Equity Interests Rights Exercise Form is *actually received* by the Subscription Agent on or before the Existing Equity Interests Rights Expiration Time and (ii) pay to the Subscription Agent, by wire transfer of immediately available funds, the Existing Equity Interests Rights Exercise Price, so that payment of the Existing Equity Interests Rights Exercise Price is *actually received* by the Subscription Agent on or before the Existing Equity Interests Rights Expiration Time.

In order to exercise Existing Equity Interests Subscription Rights with regards to Existing Equity Interests through a Subscription Nominee, Eligible Existing Equity Interests Offerees must return a duly completed Existing Equity Interests Rights Exercise Form to its Subscription Nominee or otherwise instruct its Subscription Nominee as to its instructions for the Existing Equity Interests Subscription Rights (in each case in sufficient time to allow such Subscription Nominee to deliver the Existing Equity Interests Rights Exercise Form to the Subscription Agent prior to the Existing Equity Interests Rights Expiration Time) in accordance with procedures established by its Subscription Nominee, which, in turn, must comply with clauses (i) and (ii) of the immediately preceding paragraph.

For purposes of this Existing Equity Interests Rights Offering, Broadridge Corporate Issuer Solutions, in its capacity as transfer agent for the Existing Equity Interests, shall not constitute a Subscription Nominee and shall have no responsibility with respect to sending any Existing Equity Interests Rights Offering information or collecting any Existing Equity Interests Rights Exercise Forms.

B.      <u>Deemed Representations and Acknowledgements</u>

Any Eligible Existing Equity Interests Offeree that participates in the Existing Equity Interests Rights Offering is deemed to have made the following representations and acknowledgements:

(i)      Such Eligible Existing Equity Interests Offeree recognizes and understands that the Existing Equity Interests Subscription Rights are not transferable (see Section II above for details), and that the benefits of the Existing Equity Interests Subscription Rights are not separable from the claim or securities with respect to which the Existing Equity Interests Subscription Rights have been granted. Such holder represents and warrants that it is an Eligible Existing Equity Interests Offeree.

(ii)      Such Eligible Existing Equity Interests Offeree represents and warrants that it will not accept a distribution of Existing Equity Interests Rights Offering Securities if at such time, it does not hold all of the Existing Equity Interests associated with its Existing Equity Interests Subscription Rights and, by accepting a distribution of Existing Equity Interests Rights Offering Securities, such Eligible Existing Equity Interests Offeree will be deemed to be the owner thereof.

9

      C.        <u>Failure to Exercise Existing Equity Interests Subscription Rights</u>

**Unexercised Existing Equity Interests Subscription Rights will be relinquished at the Existing Equity Interests Rights Expiration Time.**

If, on or prior to the Existing Equity Interests Rights Expiration Time, the Subscription Agent for any reason does not receive from an Eligible Existing Equity Interests Offeree or its Subscription Nominee a duly completed Existing Equity Interests Rights Exercise Form, such Eligible Existing Equity Interests Offeree shall be deemed to have irrevocably relinquished and waived its right to participate in the Existing Equity Interests Rights Offering with respect to Existing Equity Interests underlying such undelivered Existing Equity Interests Rights Exercise Form.

Any attempt to exercise Existing Equity Interests Subscription Rights after the Existing Equity Interests Rights Expiration Time shall be null and void and the Debtor shall not be obligated to honor any such purported exercise received by the Subscription Agent after the Existing Equity Interests Rights Expiration Time regardless of when the documents relating thereto were sent.

**The method of delivery of the Existing Equity Interests Rights Exercise Form and any other required documents is at each Eligible Existing Equity Interests Offeree's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent.  Delivery by reputable overnight courier is encouraged and strongly recommended.  In all cases, you should allow sufficient time to ensure timely delivery prior to the Existing Equity Interests Rights Expiration Time.**

**The risk of non-delivery of the Existing Equity Interests Rights Exercise Form and any other required documents sent to the Subscription Agent in connection with the exercise of the Existing Equity Interests Subscription Rights lies solely with the holders of the Existing Equity Interests, and none of the Debtors, the reorganized Debtors, or any of their respective officers, directors, employees, agents or advisers, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

      D.        <u>Payment for Existing Equity Interests Subscription Rights</u>

If, on or prior to the Existing Equity Interests Rights Expiration Time, the Subscription Agent for any reason does not receive on behalf of an Eligible Existing Equity Interests Offeree immediately available funds by wire transfer in an amount equal to the total Existing Equity Interests Rights Exercise Price for such Eligible Existing Equity Interests Offeree's Existing Equity Interests Subscription Rights, such Eligible Existing Equity Interests Offeree shall be deemed to have relinquished and waived its Existing Equity Interests Subscription Rights, subject to the next paragraph.

      E.        <u>Disputes, Waivers, and Extensions</u>

Any and all disputes concerning the timeliness, viability, form, and eligibility of any exercise of Existing Equity Interests Subscription Rights shall be addressed in good faith by the Debtor, the determinations of which shall be final and binding.  The Debtor may (i) waive any defect or irregularity, or permit a defect or irregularity to be corrected, within such times as it may determine in good faith to be appropriate or (ii) reject the purported exercise of any Existing Equity Interests Subscription Rights for which the Existing Equity Interests Rights Exercise

10

Form and/or payment includes defects or irregularities. Existing Equity Interests Rights Exercise Forms shall be deemed not to have been properly completed until all irregularities have been waived or cured. The Debtor reserves the right to give notice to any Existing Equity Interests Eligible Offeree regarding any defect or irregularity in connection with any purported exercise of Existing Equity Interests Subscription Rights by such Eligible Existing Equity Interests Offeree and the Debtor may permit such defect or irregularity to be cured; it being understood, that none of the Debtor or the Subscription Agent shall incur any liability for failure to give such notification.

The Debtor, with the approval of the Bankruptcy Court (if applicable) and the consent of the Backstop Parties, the Consenting Creditors and the DIP Agent, may (i) extend the duration of the Existing Equity Interests Rights Offering or adopt additional detailed procedures to more efficiently administer the distribution and exercise of the Existing Equity Interests Subscription Rights; and (ii) make such other changes to the Existing Equity Interests Rights Offering, including changes that affect which parties constitute Eligible Existing Equity Interests Offerees.

F.     Funds

The payments made to acquire Existing Equity Interests Rights Offering Securities pursuant to the Existing Equity Interests Rights Offering (the "***Existing Equity Interests Rights Offering Funds***") shall be deposited when made and held by the Subscription Agent pending the Effective Date in a segregated account or accounts (i) which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien, encumbrance, or cash collateral arrangements and (ii) which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Existing Equity Interests Rights Offering until the Effective Date. The Subscription Agent shall not use the Existing Equity Interests Rights Offering Funds for any purpose other than to release the funds as directed by the Debtor on the Effective Date or as otherwise set forth in these Existing Equity Interests Rights Offering Procedures or in the Plan, and, until released in accordance with the foregoing, the Existing Equity Interests Rights Offering Funds will not be deemed part of the Debtors' bankruptcy estate. The Subscription Agent shall not permit the Existing Equity Interests Rights Offering Funds to be encumbered by any lien, encumbrance, or cash collateral obligation. No interest will be paid to participating Eligible Existing Equity Interests Offerees on account of any amounts paid in connection with their exercise of Existing Equity Interests Subscription Rights under any circumstances.

G.     Participating Eligible Existing Equity Interests Offeree Release

See Section 10.7 of the Plan for important information regarding releases.

**V.     Settlement of the Existing Equity Interests Rights Offering and Distribution of the Existing Equity Interests Rights Offering Securities**

The settlement of the Existing Equity Interests Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtor with these Existing Equity Interests Rights Offering Procedures, and the simultaneous occurrence of the Effective Date. The Debtor intends that the Existing Equity Interests Rights Offering Securities will be issued to Eligible Existing Equity Interests Offerees and/or to any party that an Eligible Existing Equity Interests

11

Offeree so designates in the Existing Equity Interests Rights Offering Exercise Form, in book-entry form, and that DTC, or its nominee, will be the holder of record of such Existing Equity Interests Rights Offering Securities. To the extent DTC is unwilling or unable to make the Existing Equity Interests Rights Offering Securities eligible on the DTC system, the Existing Equity Interests Rights Offering Securities will be issued directly to the Eligible Existing Equity Interests or its designee. For the avoidance of doubt, any such Eligible Existing Equity Interests Offeree, and not a designee, shall remain responsible for the exercise and payment of its Exiting Equity Interests Subscription Rights.

Eligible Existing Equity Interests Offerees that are entitled to receive Existing Equity Interests Rights Offering Securities, but had held such Existing Equity Interests outside of the facilities of DTC, will receive their Existing Equity Interests Rights Offering Securities by means of book-entry with the Reorganized Debtor's transfer agent.

## VI.    Miscellaneous

### A.    Issuance

The Existing Equity Interests Rights Offering Securities to be issued pursuant to the Existing Equity Interests Rights Offering are expected to be delivered to Eligible Existing Equity Interests Offerees that have properly exercised their Existing Equity Interests Subscription Rights on or as soon as practicable following the Effective Date.  See Section VII.

### B.    Securities Law and Related Matters

The Existing Equity Interests Rights Offering Securities issued to the Eligible Existing Equity Interests Offerees participating in the Existing Equity Interests Offering will be exempt from registration under the Securities Act of 1933, as amended (the "*Securities Act*"), and any other applicable federal and state securities laws pursuant to Section 1145 of the Bankruptcy Code, and may be resold, without registration under the Securities Act or other applicable federal and state securities laws, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code.

There is not and there may not be a public market for the Existing Equity Interests Rights Offering Securities. Accordingly, there can be no assurance that an active trading market for the Existing Equity Interests Rights Offering Securities will ever develop or, if such a market does develop, that it will be maintained. No later than seven (7) calendar days prior to the Voting Deadline (as defined in the Plan), the Debtors, with the consent of the Requisite Creditors (as defined in the Plan), shall make a determination as to whether the reorganized Debtor shall continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp). If the Debtors determine that the reorganized Debtor will continue to be a reporting company under the Exchange Act, the Debtors shall use their commercially reasonable efforts to have the Existing Equity Interests Rights Offering Securities listed on the New York Stock Exchange, or another nationally recognized exchange, as soon as practicable, subject to meeting applicable listing requirements following the Effective Date. However, there can be no assurance that a listing will be achieved or that an active trading market for the shares of common stock of the Debtor will ever develop or, if such a market does develop that it will be maintained.

12

**VII.    Rights Offering Conditioned Upon Effectiveness of the Plan; Reservation Existing Equity Interests Subscription Rights; Return of Rights Offering Amount**

All exercises of Existing Equity Interests Subscription Rights are subject to and conditioned upon the effectiveness of the Plan.  The Debtor will accept a Binding Existing Equity Interests Rights Election only upon the confirmation and effectiveness of the Plan.  Notwithstanding anything contained herein, in the Disclosure Statement or in the Plan to the contrary, the Debtor reserves the right to modify these Existing Equity Interests Rights Offering Procedures or adopt additional detailed procedures if necessary in the Debtor's business judgment to more efficiently administer the distribution and exercise of the Existing Equity Interests Subscription Rights or comply with applicable law.

In the event that (i) the Existing Equity Interests Rights Offering is terminated, (ii) the Debtor revokes or withdraws the Plan, or (iii) the Effective Date of the Plan does not occur on or before the "*Outside Date*" (as defined in the Restructuring Support Agreement, and may be extended in accordance with the terms thereof), the Subscription Agent shall, within five (5) Business Days of such event, return all amounts received from Eligible Existing Equity Interests Offerees, without any interest, and, in the case of clauses (ii) and (iii) above, the Existing Equity Interests Rights Offering shall automatically be terminated.

13

## Exhibit E

## Exit Commitment Letter

**EXECUTION COPY**

**BMO HARRIS BANK N.A.**
700 LOUISIANA STREET, SUITE 2100
HOUSTON, TEXAS 77002

**BMO CAPITAL MARKETS CORP.**
3 TIMES SQUARE
NEW YORK, NEW YORK 10036

August 2, 2019

Halcón Resources Corporation
1000 Louisiana St., Suite 1500
Houston, TX 77002
Attention:  Richard Little, PE, Chief Executive Officer

$750.0 Million Senior Secured Revolving Credit Facility
Commitment Letter

Ladies and Gentlemen:

BMO Harris Bank N.A. ("BMO Bank") and BMO Capital Markets ("BMOCM" and, together with BMO Bank, the "Commitment Party", "BMO", "we" or "us") understand that Halcón Resources Corporation, a Delaware corporation ("you" or the "Borrower"), and certain of your subsidiaries (together with the Borrower, the "Debtors") are considering filing voluntary petitions to commence cases (the "Chapter 11 Cases") under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") in order to implement a restructuring of the Debtors pursuant to a prepackaged plan of reorganization contemplated by the plan of reorganization substantially in the form attached hereto as Exhibit A (the "Chapter 11 Plan" and the foregoing collectively, the "Transactions").

In connection therewith, the Borrower has requested that (a) we structure, arrange and syndicate a $750.0 million senior secured reserve-based revolving credit facility (the "Credit Facility") with an initial borrowing base of $275.0 million (the "Initial Borrowing Base"), (b) BMO Bank serve as sole administrative agent and (c) BMO Bank commit to provide a portion of the Credit Facility as set forth herein.

1.  Commitments

BMO Bank is pleased to advise you of its commitment to provide 100% of the Initial Borrowing Base under the Credit Facility (BMO Bank, in such capacity, the "Initial Lender"), subject to the terms and conditions set forth in this letter and Exhibits B and C attached hereto (this letter, together with Exhibits A, B and C attached hereto, the "Commitment Letter"). Capitalized terms used in this letter but not defined herein shall have the meanings given to them in the Exhibits attached hereto.

2. <u>Titles and Roles</u>

It is agreed that (a) BMOCM will act as sole lead arranger and sole bookrunner for the Credit Facility (acting in such capacities, the "<u>Lead Arranger</u>") and (b) BMO Bank will act as sole administrative agent for the Credit Facility.

It is further agreed that BMO will have "left" and "highest" placement in any and all marketing materials or other documentation used in connection with the Credit Facility and shall hold the leading role and responsibilities conventionally associated with such placement, including maintaining the sole physical books for the Credit Facility. You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by this Commitment Letter and the Fee Letters referred to below) will be paid in connection with the Credit Facility unless you and we shall so agree (it being understood and agreed that no other agent, co-agent, arranger, co-arranger, bookrunner, co-bookrunner, manager or co-manager shall be entitled to greater economics in respect of the Credit Facility than BMO). Notwithstanding the foregoing, BMO shall have the right, subject to your consent (not to be unreasonably withheld, delayed or conditioned), to award titles to other financial institutions as joint lead arrangers and joint bookrunners (each, an "<u>Additional Arranger</u>" and, together with the Lead Arranger, the "<u>Arrangers</u>") who are (or whose respective lending affiliates are, as applicable) Lenders (each, an "<u>Additional Initial Lender</u>") that provide (or whose affiliates provide) commitments in respect of the Credit Facility (it being agreed that (a) each of the parties hereto shall, upon request of you or the Lead Arranger, execute an amendment (or amendment and restatement) or joinder to this Commitment Letter to reflect the commitments of any such financial institutions, pursuant to which each such Additional Initial Lender will assume a portion of the commitments with respect to the Initial Borrowing Base under the Credit Facility, and upon such execution the commitments of BMO Bank in respect to the Initial Borrowing Base under the Credit Facility will be permanently reduced on a dollar for dollar basis by the amount of the commitments to the Initial Borrowing Base of such Additional Initial Lender and (b) no such other Additional Arranger or Additional Initial Lender will have rights in respect of the management of the syndication of the Credit Facility (including, without limitation, in respect of "market flex" rights under the Arranger Fee Letter, over which BMO will have sole control)).

3. <u>Syndication; Information</u>

BMOCM, as Lead Arranger, intends to syndicate the Credit Facility (including, in our discretion, all or part of BMO Bank's commitments hereunder) to a group of banks, financial institutions and other commercial bank lenders identified by us in consultation with you, and subject to your consent (not to be unreasonably withheld, delayed or conditioned) (together with the Initial Lender and any Additional Initial Lender, the "Lenders"). Notwithstanding any other provision of this Commitment Letter to the contrary, (a) the Initial Lender and any Additional Initial Lender shall not be relieved or novated from their respective obligations hereunder (including their respective obligations to fund the Credit Facility on the Closing Date) in connection with any syndication, assignment or participation of the Credit Facility, including their respective commitments in respect thereof, until after the initial funding of the Credit Facility on the Closing Date, (b) no assignment or novation shall become effective with respect to all or any portion of the Initial Lender's or Additional Initial Lender's commitments in respect of the Credit Facility until after the initial funding of the Credit Facility on the Closing Date (except in respect of the foregoing clauses (a) and (b), upon execution and delivery of an amendment (or amendment and restatement) or joinder to this Commitment Letter to reflect the appointment of any financial institution as an Additional Agent or Additional Initial Lender as described in Section 2 above) and (c) unless you and we agree in writing, the Initial Lender and each Additional Initial Lender shall retain exclusive control over all rights and obligations with respect to their respective commitments in respect of the Credit

2

Facility, including all rights with respect to consents, modifications, supplements and amendments, until the Closing Date has occurred.

The Lead Arranger intends to commence syndication efforts promptly upon the execution of this Commitment Letter, and you agree actively to assist the Lead Arranger in completing a syndication satisfactory to us and you. Such assistance shall include, but not be limited to, until the earlier to occur of (i) a Successful Syndication (as defined in the Upfront Fee Letter) and (ii) forty-five (45) days after the Closing Date (such earlier date, the "Syndication Date"), (a) your using commercially reasonable efforts to ensure that the syndication efforts benefit from your and your affiliates' existing lending relationships, (b) direct contact between your senior management and advisors and the proposed Lenders at times and locations to be mutually agreed upon, (c) your preparing and providing to the Lead Arranger a customary confidential information memoranda and other customary marketing materials (including, without limitation, lender slides and/or other marketing materials to be used in connection with the syndication) with respect to you and your properties, including financial information and Projections (as defined below), as the Lead Arranger may reasonably request in connection with the arrangement and syndication of the Credit Facility (all such information, memoranda and material, "Information Materials") and (d) your hosting, with the Lead Arranger, of one or more meetings with prospective Lenders at such times and locations to be mutually agreed upon. You hereby authorize the Lead Arranger to download copies of the Borrower's trademark logos from its website and post copies thereof on the SyndTrak site or similar workspace established by the Lead Arranger to syndicate the Credit Facility and use the logos on any confidential information memoranda, presentations and other marketing materials prepared in connection with the syndication of the Credit Facility or in any advertisements (to which you consent, such consent not to be unreasonably withheld, conditioned or delayed) that we may place after the closing of the Credit Facility in financial and other newspapers, journals, the World Wide Web, home page or otherwise, at our own expense describing our services to the Borrower hereunder. You also understand and acknowledge that we may provide to market data collectors, such as league table or other service providers to the lending industry, information regarding the closing date, size, type, purpose of, and parties to, the Credit Facility.

Notwithstanding anything to the contrary contained in this Commitment Letter or any Fee Letter or any other letter agreement or undertaking concerning the financing of the Transactions, without limiting your obligations to assist with syndication efforts as set forth above, none of the commencement or completion of syndication of the Credit Facility, the completion of a confidential information memorandum or other marketing materials, or compliance with any other provision set forth in this Commitment Letter (other than the conditions described in Section 5 of this Commitment Letter) shall constitute a condition to the commitments hereunder or to the funding of the Credit Facility on the Closing Date.

The Lead Arranger will manage all aspects of the syndication in consultation with you, including decisions as to (a) the selection of institutions to be approached (subject to your consent, not to be unreasonably withheld, delayed or conditioned) and when they will be approached, (b) when commitments will be accepted, (c) which institutions will participate (subject to your consent, not to be unreasonably withheld, delayed or conditioned), (d) the allocation of the commitments among the Lenders and (e) the amount and distribution of fees among the Lenders. You hereby acknowledge and agree that the Lead Arranger will have no responsibility other than to arrange the syndication of the commitments as set forth herein and to perform the other obligations to be performed by the Lead Arranger as set forth herein, and the Lead Arranger is acting solely in the capacity of an arm's length contractual counterparty to you with respect to the arrangement of the Credit Facility (including in connection with determining the terms of the Credit Facility) and not as a financial advisor or a fiduciary to, or an agent of, the Borrower or any other person. In consideration of the Commitment Party's commitments and other agreements hereunder, effective upon your acceptance of this Commitment Letter

3

and continuing until the earlier of the Syndication Date and the termination of this Commitment Letter, you will ensure that there will be no competing arrangement, offering, placement, or syndication of any other debt financing similar to, or as a replacement of, all or any portion of the Credit Facility, excluding with respect to amendments, waivers and other similar agreements to the Existing Credit Agreement (as defined in Exhibit B) prior to the commencement of the Chapter 11 Cases or with respect to the DIP Facility (as defined in Exhibit B) (it being agreed that deferred purchase obligations, intercompany debt, capital leases, purchase money financings and equipment financings are not restricted by the foregoing).

You hereby represent and warrant that (a) all written information (including all Information Materials), other than financial projections and other forward-looking information (collectively, the "Projections"), information of a general economic or general industry nature (such non-excluded items, the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto) and (b) the Projections that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished to us (it being recognized by the Commitment Party that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations and warranties in the preceding sentence would be incorrect if such Information or Projections were furnished at such time and such representations were remade, in any material respect, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances. You understand that in arranging and syndicating the Credit Facility, the Commitment Party may use and rely on the Information and Projections without independent verification thereof.

If requested, you also will assist us in preparing an additional version of the Information Materials (the "Public-Side Version") to be used by prospective Lenders' public-side employees and representatives ("Public-Siders") who do not wish to receive material non-public information (within the meaning of United States federal securities laws) with respect to the Borrower, its affiliates and any of their respective securities ("MNPI") and who may be engaged in investment and other market related activities with respect to the Borrower's or its affiliates' securities or loans. Before distribution of any Information Materials, you agree to execute and deliver to us (a) a customary letter in which you authorize distribution of the Information Materials to a prospective Lender's employees willing to receive MNPI ("Private-Siders") and (b) a separate customary letter in which you authorize distribution of the Public-Side Version to Public-Siders and represent that either (i) no MNPI is contained therein or (ii) neither the Borrower, nor any of its controlling or controlled entities has any debt or equity securities issued pursuant to a public offering or Rule 144A private placement and agree that if the Borrower, or any of its controlling or controlled entities is the issuer of any debt or equity securities issued pursuant to a public offering or Rule 144A private placement thereafter, you will publicly disclose any information contained in the Information Materials delivered to Public-Siders that constitutes MNPI at such time and, in the case of both clauses (a) and (b), exculpating us and our affiliates and the Borrower and its affiliates from any liability related to the use of the contents of the Information Materials by the recipients thereof. You also acknowledge that the Lead Arranger Public-Siders consisting of publishing debt analysts may participate in any meetings or telephone conference calls held pursuant to clause (d) of the second preceding paragraph; provided that such analysts shall not publish any information obtained from such meetings or calls (A) until the syndication of the Credit Facility has been completed upon the making of

4

allocations by BMOCM freeing the Credit Facility to trade or (B) in violation of any confidentiality agreement between you and the BMO.

The Borrower agrees that the following documents may be distributed to both Private-Siders and Public-Siders, unless the Borrower advises BMO in writing (including by email) within a reasonable time prior to their intended distribution that such materials should only be distributed to Private-Siders: (a) administrative materials prepared by BMO for prospective Lenders (such as a lender meeting invitation, bank allocation, if any, and funding and closing memoranda), (b) notification of changes in the Credit Facility's terms and (c) drafts and final versions of the Loan Documents and administrative materials prepared by the Commitment Party for prospective Lenders (such as lender meeting invitations, allocations and funding and closing memoranda). If you advise us that any of the foregoing should be distributed only to Private-Siders, then Public-Siders will not receive such materials without further discussions with you.

4.   Fees

As consideration for the commitment and agreements of the Commitment Party hereunder and the Lead Arranger's agreements to perform the services described herein, you agree to pay or cause to be paid the nonrefundable fees described in the Arranger Fee Letter and Upfront Fee Letter, each dated as of the date hereof and delivered herewith (collectively, the "Fee Letters") on the terms and subject to the conditions set forth therein.

All fees payable hereunder and under the Fee Letters shall be paid in immediately available funds in U.S. Dollars and shall not be subject to reduction by way of withholding, setoff or counterclaim or be otherwise affected by any claim or dispute related to any other matter. In addition, all fees payable hereunder shall be paid without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any national, state or local taxing authority, or will be grossed up by you for such amounts.

5.   Conditions

BMO Bank's commitment hereunder and the Lead Arranger's agreements to perform the services described herein are subject only to the conditions set forth in this Section 5, in Exhibit B under the heading "CERTAIN CONDITIONS – Initial Conditions" and in Exhibit C. It being understood that there are no conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, the Fee Letters and the Loan Documents other than those expressly stated in this Section 5.

6.   Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Commitment Party, the Lead Arranger and any other arrangers or agents in respect of the Credit Facility appointed pursuant to the Commitment Letter, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Chapter 11 Cases, the Fee Letters, the Credit Facility, the use of the proceeds thereof or the Transactions (or any related transaction) or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon written demand with customary backup documentation for any reasonable and documented out-of-pocket legal or other

5

documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (limited, in the case of counsel, to the reasonable fees, disbursements and other charges of a single counsel to the indemnified persons, including (if necessary) one local counsel in each relevant jurisdiction and one regulatory counsel to all such indemnified persons, taken as a whole, and, solely in the event of a conflict of interest, one additional counsel (and, if necessary, one regulatory counsel and one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons), provided that the foregoing indemnity will not, as to any indemnified person, apply (i) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of such indemnified person or its control affiliates, directors, officers or employees, advisors or agents (collectively, the "Related Parties"), (ii) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from a material breach in bad faith of the funding obligations of such indemnified person or any control affiliate of such indemnified person under this Commitment Letter or (iii) to the extent arising from any dispute solely among indemnified persons (other than a Proceeding against any indemnified person in its capacity or in fulfilling its role as Lead Arranger, administrative agent, bookrunner, lender or any other similar role in connection with this Commitment Letter, the Fee Letters, the Credit Facility or the use of the proceeds thereof) not arising out of any act or omission on the part of you or your affiliates and (b) regardless of whether the Closing Date occurs, to reimburse the Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses (including, without limitation, due diligence expenses, syndication expenses, consultant's fees and expenses, travel expenses, and fees, charges, expenses and disbursements of counsel) incurred in connection with the Chapter 11 Cases, the Credit Facility and any related documentation (including this Commitment Letter, the Fee Letters and the definitive financing documentation in connection with the Credit Facility) or the administration, amendment, modification or waiver thereof (limited, in the case of counsel, to the reasonable fees, disbursements and other charges of a single counsel to the Commitment Party and its affiliates, including (if necessary) one local counsel in each relevant jurisdiction and one regulatory counsel to all such persons, taken as a whole, and, solely in the event of a conflict of interest, one additional counsel (and, if necessary, one regulatory counsel and one local counsel in each relevant jurisdiction) to each group of similarly situated affected persons).  You further agree to pay all reasonable and documented out-of-pocket costs and expenses of each Commitment Party and its affiliates (including, without limitation, reasonable and documented fees and disbursements of counsel) incurred in connection with the enforcement of any of its rights and remedies hereunder.

It is further agreed that the Commitment Party shall only have liability to you (as opposed to any other person) and that the Commitment Party shall be liable solely in respect of its own commitment to the Credit Facility on a several, and not joint, basis with any other party committing to the Credit Facility. No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such indemnified person. None of the indemnified persons or you or any of your or their respective Related Parties of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letters, the Credit Facility or the transactions contemplated hereby, provided that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 6.

You shall not, without the prior written consent of an indemnified person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless (a) such settlement includes an unconditional release of such indemnified person in form and

6

substance reasonably satisfactory to such indemnified person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any indemnified person or any injunctive relief or other non-monetary remedy.  You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to the indemnified persons.

On and after the commencement of the Chapter 11 Cases, the expense reimbursements and indemnification provisions of this Commitment Letter shall constitute administrative expenses under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code in the Chapter 11 Cases without the need to file any motion (other than any motion as may be necessary to obtain the approvals of this Commitment Letter and the Fee Letters), application or proof of claim and notwithstanding any administrative claims bar date, and shall be immediately payable in accordance with the terms hereof without further notice or order of the Bankruptcy Court.

7.  Sharing of Information, Affiliate Activities

BMO may employ the services of its affiliates in providing certain services hereunder and, in connection with the provision of such services, may exchange with such affiliates information concerning you and the other companies that may be the subject of the transactions contemplated by this Commitment Letter, and, to the extent so employed, such affiliates shall be entitled to the benefits, and be subject to the obligations, of BMO hereunder.  BMO shall be responsible for its affiliates' failure to comply with such obligations under this Commitment Letter.

You acknowledge that the Commitment Party and its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. The Commitment Party will not use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or its other relationships with you in connection with the performance by the Commitment Party of services for other companies, and the Commitment Party will not furnish any such information to other companies. You also acknowledge that the Commitment Party has no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

You further acknowledge that the Commitment Party is a full service securities and banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, the Commitment Party and/or its affiliates may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and other companies with which you may have commercial or other relationships. With respect to any securities and/or financial instruments so held by the Commitment Party, its affiliates or any of its respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

8.  Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person, except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, (b) in any legal, judicial or administrative proceeding or as

7

otherwise required by law or regulation or as requested by a governmental or regulatory authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof), in each case excluding disclosure in the context of the Chapter 11 Cases, which shall be governed by the last sentence of this paragraph, (c) if the Commitment Party consents in writing to such proposed disclosure, (d) in connection with the enforcement of your rights hereunder or under the Fee Letter and (e) this Commitment Letter and the existence and contents hereof (but not the Fee Letters or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed (i) in connection with the arrangement or syndication of the Credit Facility or in connection with any public filing, (ii) to the Ad Hoc Noteholder Group (as defined in the Restructuring Support Agreement, dated as of August 2, 2019 (as amended, supplemented or otherwise modified from time to time, the "RSA")) and (iii) after the execution of the RSA, in connection with the Solicitation (as defined in the RSA) of any holder of Senior Notes (as defined in the RSA). Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file the Fee Letters with the Bankruptcy Court under seal in form and substance reasonably satisfactory to BMO or in a redacted manner in form and substance reasonably satisfactory to BMO and provide an unredacted copy of the Fee Letters to the Bankruptcy Court, the Office of the United States Trustee and advisors to (x) any official committee appointed in the Chapter 11 Cases and (y) the Consenting Creditors who are party to the RSA; provided, that the disclosure to such advisors is on a confidential, "professionals only" basis.

The Commitment Party shall use all nonpublic information received by it in connection with the Credit Facility and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; provided, however, that nothing herein shall prevent the Commitment Party from disclosing any such information (a) to rating agencies in connection with any rating of the Commitment Party or any of its affiliates, (b) to any Lenders or participants or prospective Lenders or participants, (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case the Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over the Commitment Party or its affiliates, (e) to the employees, legal counsel, independent auditors, professionals and other experts or agents of the Commitment Party (collectively, "Representatives") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (f) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and the Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Transactions, (g) to the extent any such information becomes publicly available other than by reason of disclosure by the Commitment Party, its affiliates or Representatives in breach of this Commitment Letter, (h) for purposes of establishing a "due diligence" defense, (i) to any direct or indirect contractual counterparty to any swap or derivative transaction relating to the Borrower or any of its subsidiaries and (j) pursuant to customary disclosure about the terms of the financing contemplated hereby in the ordinary course of business to market data collectors and similar service providers to the loan industry for league table purposes; provided that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of the Commitment Party or customary market standards for dissemination of such type of information. If the Closing Date occurs, the Commitment Party's obligations under this paragraph shall terminate and be superseded by the confidentiality provisions in the Credit Facility. Otherwise, the provisions of this paragraph shall automatically terminate on the earlier of (a) the Closing Date and (b) one year following the date of this Commitment Letter.

9.  Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of the Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. The Commitment Party reserves the right to employ the services of its affiliates in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates certain fees payable to the Commitment Party in such manner as the Commitment Party and its affiliates may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the Fee Letters are the only agreements that have been entered into among us and you with respect to the Credit Facility and set forth the entire understanding of the parties with respect thereto. This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

The Borrower agrees that it will not assert any claim against any Arranger or the Commitment Party based on an alleged breach of fiduciary duty by such Arranger or Commitment Party in connection with this Commitment Letter and the transactions contemplated hereby. Additionally, the Borrower acknowledges and agrees that neither any Arranger nor the Commitment Party is advising the Borrower as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction. The Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and neither the Arranger nor the Commitment Party shall have any responsibility or liability to the Borrower with respect thereto. Any review by any Arranger or the Commitment Party of the Borrower, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of any Arranger or the Commitment Party, as applicable, and shall not be on behalf of the Borrower.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or any other Federal court having jurisdiction over the Chapter 11 Cases, and, to the extent that the Bankruptcy Court or Federal court do not have jurisdiction, any state or Federal court sitting in the Borough of Manhattan in the City of New York, over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably waive, to the fullest extent permitted by applicable law, trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the Fee Letters or the transactions contemplated hereby or thereby (whether based on contract, tort or any other theory) or the performance of services hereunder or thereunder.

The Commitment Party hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"),

9

it is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify the Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Party and each of their respective affiliates.

The indemnification, fee, expense, jurisdiction, syndication; information and confidentiality provisions contained herein and the provisions of the Fee Letters shall remain in full force and effect regardless of whether definitive financing documentation for the Credit Facility shall be executed and delivered and (other than in the case of the syndication and information provisions, which shall only survive if the Closing Date occurs) notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the Credit Agreement upon the occurrence of the Closing Date thereunder.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letters by returning to us executed counterparts of this Commitment Letter and the Fee Letters not later than 5:00 p.m., New York City time, on August 2, 2019. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In the event that the initial borrowing under the Credit Facility does not occur on or before the Expiration Date (as defined below), then the commitments with respect to the Credit Facility shall automatically terminate unless the Commitment Party, in its sole discretion, agrees to an extension.

For purposes of this Commitment Letter, "Expiration Date" means the earliest to occur of: (i) the termination of the RSA, (ii) August 16, 2019, if and to the extent the Bankruptcy Court has not entered an order, in form and substance reasonably satisfactory the Lead Arranger (which order is final, is in full force and effect, is unstayed and has not been amended, supplemented or otherwise modified without the consent of the Lead Arranger) approving this Commitment Letter, the Fee Letters and the transactions contemplated hereby and thereby (including the fees, payments, expenses and indemnities and other obligations set forth in this Commitment Letter and the Fee Letters), (iii) on any date after which an order described in the immediately preceding clause (ii) has been entered but ceases to be in full force and effect, is stayed, is vacated, or is amended or modified without the consent of the Lead Arranger, (iv) the completion of the Chapter 11 Cases without the closing of the Credit Facility, (v) the dismissal or conversion of the Chapter 11 Cases to proceedings under Chapter 7 of the Bankruptcy Code and (vi) November 15, 2019.

[*Signature Pages Follow*]

10

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

BMO HARRIS BANK N.A.

By: _____
Name: James V. Ducote
Title: Managing Director

BMO CAPITAL MARKETS CORP.

By: _____
Name:
Title:

*Commitment Letter Signature Page*

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

BMO HARRIS BANK N.A.

By: _____
      Name:
      Title:

BMO CAPITAL MARKETS CORP.

By: _____
      Name: Will Felder
      Title: Vice President

*Commitment Letter Signature Page*

Accepted and agreed to as of the date first written above:

HALCÓN RESOURCES CORPORATION


By: _____
     Name:
     Title:

EXHIBIT A

CHAPTER 11 PLAN

**OMITTED**

EXHIBIT B

TERM SHEET

**EXHIBIT B**

$750.0 Million Senior Secured Revolving Credit Facility
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions for the Credit Facility.  Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit B is attached and in Exhibit C to such Commitment Letter.

## I.        Parties

| | |
|---|---|
| Borrower: | Halcón Resources Corporation ("Halcón"), a Delaware corporation. |
| Guarantors: | Each of the Borrower's direct and indirect, existing and future material domestic subsidiaries (the "Guarantors" and together with the Borrower the "Credit Parties"); provided that any subsidiary that (a) owns any Borrowing Base Properties (as defined below) or (b) incurs or guarantees any obligations under any Material Indebtedness (to be defined) shall, in each case, be a Guarantor. On the Closing Date (as defined below) the following subsidiaries will be Guarantors: Halcón Resources Operating, Inc., Halcón Holdings, Inc., Halcón Energy Properties, Inc., Halcón Permian, LLC, Halcón Field Services, LLC and Halcón Operating Co., Inc. |
| Sole Lead Arranger and Sole Bookrunner: | BMO Capital Markets ("BMOCM") will act as sole lead arranger and bookrunner (in such capacity, the "Lead Arranger") for the Credit Facility (as defined below), and will perform the duties customarily associated with such role. |
| Administrative Agent: | BMO Harris Bank N.A. (in such capacity, the "Administrative Agent"). |
| LC Issuer: | BMO Harris Bank N.A. (acting through itself or such of its affiliates as it deems appropriate under the circumstances), each named agent under the Credit Facility and any other Lender reasonably acceptable to the Borrower (in such capacity, an "LC Issuer"). |
| Lenders: | A syndicate of banks, financial institutions and other commercial bank lenders, including BMO Bank (acting through itself or such of its affiliates as it deems appropriate under the circumstances), arranged by the Lead Arranger and reasonably acceptable to the Borrower (the "Lenders"). |
| Majority Lenders: | Lenders holding more than 50.0% of the aggregate amount of the Loans and participations in Letters of Credit and unused Commitments under the Credit Facility (each as defined below) (the "Majority Lenders"). |
| Required Lenders: | Lenders holding not less than 66 2/3% of the aggregate amount of the Loans and participations in Letters of Credit and unused Commitments under the Credit Facility (the "Required Lenders"). |

## II.     **Credit Facility**

| | |
|---|---|
| Type and Amount of Credit Facility: | A senior secured revolving credit facility (the "Credit Facility"; the commitments thereunder the "Commitments") in an aggregate principal amount of up to $750,000,000 (the loans thereunder, the "Loans"), subject to the Borrowing Base (as defined below) then in effect. |
| Availability: | Subject to the Borrowing Base then in effect, the Credit Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the fifth anniversary of the Closing Date (the "Maturity Date") in accordance with the terms hereof and subject to satisfaction of applicable conditions precedent. |
| | Availability under the Credit Facility shall be equal to the lesser of (a) the then-effective aggregate Commitments and (b) the then-effective Borrowing Base. |
| Letters of Credit: | A portion of the Credit Facility not in excess of $50,000,000 shall be available for the issuance of letters of credit (the "Letters of Credit") by the LC Issuers.  The commitment to provide Letters of Credit shall be ratable among each LC Issuer. No Letter of Credit shall have an expiration date after the earlier of (a) twelve (12) months after the date of issuance and (b) five business days prior to the Maturity Date; provided that any Letter of Credit may provide for the automatic renewal thereof; provided further that any Letter of Credit may expire after the date referred to in clause (b) above if (i) the LC Issuer consents to such expiration date and (ii) such Letter of Credit is cash collateralized or backstopped on terms reasonably acceptable to the LC Issuer and the Borrower. |
| | Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Loans) on the same business day.  To the extent that the Borrower does not so reimburse the LC Issuer, the Lenders shall be irrevocably and unconditionally obligated to reimburse the LC Issuer on a *pro rata* basis. |
| Use of Proceeds: | The proceeds of the Loans will be used by the Borrower (a) on the Closing Date, to refinance in full the indebtedness under that certain Junior Secured Debtor-In-Possession Credit Agreement, dated on or about August 7, 2019, among the Borrower, certain subsidiaries of the Borrower, as guarantors thereunder, the lenders party thereto and Wilmington Trust, N.A., as administrative agent (the "DIP Facility"), (b) for working capital and other general corporate purposes, (c) to issue Letters of Credit, (d) for transactions fees and expenses and (e) for fees and expenses related to the Borrower's emergence from the Chapter 11 Cases. |
| | The Borrower will not use any proceeds for (a) the purpose of purchasing or carrying directly or indirectly any margin stock or for any other purpose which would cause this transaction to constitute a "purpose credit" within the meaning of Regulation U or (b) in violation of any Anti-Corruption Laws or applicable Sanctions (in each case to be defined in the Loan Documents). |
| Security and Priority: | The Loans and other obligations under (a) the Credit Facility, (b) cash management products between the Borrower or any of its subsidiaries and the Administrative Agent or an affiliate of the Administrative Agent or a Lender or an affiliate of a Lender and (c) each hedging agreement between the Borrower or any of its |

2

subsidiaries and the Administrative Agent or an affiliate of the Administrative Agent or a Lender or an affiliate of a Lender shall be jointly and severally guaranteed by the Guarantors and the Borrower (with respect to secured hedge obligations and secured cash management obligations for which a Guarantor is the primary obligor) and ratably secured by first priority, perfected liens and security interests on (subject to customary exceptions and other exceptions to be agreed), whether now or hereafter acquired, (i) substantially all personal property (including a pledge of 100% of the stock of each of the Borrower's subsidiaries (limited to 65% of all the voting equity of any foreign subsidiaries)), subject to exceptions to be agreed, (ii) oil and gas properties of the Credit Parties comprising not less than 85% of the total value of the PV-9 from the Borrowing Base Properties (as defined below) and (iii) all deposit accounts, securities accounts and commodity accounts of the Credit Parties which accounts shall be subject to control agreements in form and substance reasonably satisfactory to the Administrative Agent on the Closing Date (or such later date as may be reasonably agreed by the Administrative Agent); provided that the Loan Documents shall contain limited exceptions to the requirement to enter into such control agreements with respect to (A) deposit accounts that have a balance of no greater than $1.0 million, individually, and $3.0 million in the aggregate for all such accounts and (B) certain types of other accounts to be agreed (collectively, and together with all proceeds thereof, the "Collateral").

On the Closing Date, the Borrower will also deliver acceptable evidence of title on not less than 85% of the total value of the PV-9 from the Borrowing Base Properties (as defined below) evaluated in the Initial Reserve Report.

All the above-described pledges and security interests shall be created on terms and pursuant to documentation consistent with the Documentation Principles (as defined below).

Borrowing Base:   The "Borrowing Base" shall be the loan value assigned to the proved reserves attributable to the Borrower's and its subsidiaries' oil and gas properties located within the geographic boundaries of the United States as set forth in the reserve report most recently delivered to the Administrative Agent and the Lenders pursuant to the Credit Agreement (the "Borrowing Base Properties").

As of the Closing Date, the Borrowing Base will be set initially at an amount equal to $275.0 million (the "Initial Borrowing Base") until the next scheduled redetermination of the Borrowing Base or the Borrowing Base is otherwise adjusted or redetermined as described herein (it being understood that the first scheduled redetermination of the Borrowing Base shall occur on or about May 1, 2020 (such date, the "Initial Borrowing Base Redetermination Date")).

The Borrowing Base will be redetermined on a semi-annual basis, with the parties having the right to interim unscheduled redeterminations as described below. The Borrowing Base will also be subject to interim adjustments in connection with (a) liquidations or unwinds of hedging agreements, (b) dispositions of Borrowing Base Properties, (c) the Credit Parties' failure to provide the minimum required satisfactory title information, (d) the incurrence of Specified Additional Debt and (e) to the extent applicable, failure to satisfy the Post-Closing Hedging Covenant, in each case as described below.

3

Scheduled Borrowing Base redeterminations will occur on a semi-annual basis each May 1st and November 1st, commencing on or about May 1, 2020, based upon a reserve report prepared as of the immediately preceding December 31st and June 30th, respectively, and delivered to the Administrative Agent on or before April 1st and October 1st, respectively. Each December 31st reserve report will be prepared by an independent petroleum engineering firm reasonably acceptable to the Administrative Agent, and each June 30th reserve report will be prepared by an independent petroleum engineering firm reasonably acceptable to the Administrative Agent or internally by the Borrower consistent with the procedures used in the immediately preceding reserve report prepared by an independent petroleum engineer.  In the case of the June 30th reserve report, if such reserve report is prepared internally by or under the supervision of the Borrower's chief engineer as set forth above, the Borrower shall certify that such reserve report is true and accurate in all material respects (with appropriate exceptions for projections and cost estimates) and, except as otherwise specified therein, has been prepared in all material respects in accordance with the procedures used in the immediately preceding December 31st reserve report.  In addition, the Administrative Agent, at the request of the Required Lenders, and the Borrower, each may request one additional unscheduled Borrowing Base redetermination during each period between scheduled Borrowing Base redeterminations; provided, that no request for an unscheduled Borrowing Base redetermination may be made by the Administrative Agent or the Lenders prior to the Initial Borrowing Base Redetermination Date.

Decisions regarding the amount of the Borrowing Base will be made at the sole credit discretion of the Lenders based upon the value of the Borrowing Base Properties as set forth in the most recent reserve report and in accordance with each Lender's normal and customary standards and practices for determining the value of oil and gas properties based upon its usual and customary criteria for reserve based lending as they exist at such time.  Increases in the amount of the Borrowing Base will require approval of all Lenders, and decreases or maintenance of the amount of the Borrowing Base will require approval of the Required Lenders.

If the Borrower or any subsidiary (a) liquidates or unwinds any hedging agreement upon which the Lenders relied in determining the Borrowing Base or (b) disposes of Borrowing Base Properties, and the Borrowing Base value attributable to such liquidated or unwound hedging agreement and/or the Borrowing Base value of such disposed Borrowing Base Properties, since the last scheduled redetermination exceeds, individually or in the aggregate, when combined with all such other liquidated or unwound hedging agreements and disposed Borrowing Base Properties since the last scheduled redetermination, ten percent (10%) of the then-effective Borrowing Base, then the Borrowing Base shall be reduced by an amount equal to the Borrowing Base value assigned to the such liquidated hedging agreement or disposed Borrowing Base Properties in the then-effective Borrowing Base.

The Borrowing Base shall be adjusted as a result of the Credit Parties' failure to deliver acceptable evidence of title on not less than 85% of the total value of the PV-9 from the Borrowing Base Properties unless cured or otherwise rendered moot by the delivery of additional title information.

4

The Borrowing Base shall be adjusted in connection with the issuance of any permitted unsecured senior or senior subordinated indebtedness after the Closing Date (such additional unsecured senior or senior subordinated loans or notes, "Specified Additional Debt"), by an amount equal to $0.25 for every $1.00 of Specified Additional Debt incurred, other than any Specified Additional Debt incurred to refinance any Specified Additional Debt (only to the extent that the aggregate principal amount of such refinancing indebtedness does not result in an increase in the principal amount thereof); provided, that, in the event a Borrowing Base Deficiency (as defined below) exists at the time of incurrence of Specified Additional Debt (after giving effect to the adjustment required hereby), then the Borrower shall be required to prepay the Loans in an amount equal to the lesser of the net cash proceeds of such Specified Additional Debt or such Borrowing Base Deficiency.

If the Credit Parties fail to satisfy the Post-Closing Hedging Covenant (as defined below) on or before the Post-Closing Hedging Date (as defined below), the Administrative Agent shall have the right to reduce the Borrowing Base then in effect, on the Post-Closing Hedging Date, by an amount determined by the Administrative Agent acting in its sole discretion and consistent with its normal oil and gas lending criteria as it exists at the particular time (but in any event in an amount not more than the Borrowing Base value attributable to the commodity hedging agreements not entered into in connection with the Post-Closing Hedging Covenant).

## III.    **Certain Payment Provisions**

| | |
|---|---|
| Fees and Interest Rates: | As set forth in Annex I. |
| Maturity: | The fifth anniversary of the Closing Date (the "Maturity Date"). |
| Optional Prepayments: | Loans may be prepaid at any time on three (3) business day's prior notice for Eurodollar Loans (as defined in Annex I) and one (1) business day's prior notice for ABR Loans (as defined in Annex I), in writing, without premium or penalty in minimum amounts to be agreed upon, subject to reimbursement of the Lenders' "breakage costs" in the case of a prepayment of Eurodollar Loans prior to the last day of the relevant interest period. Amounts repaid under the Credit Facility may be reborrowed. |
| Mandatory Prepayments: | If, as a result of (a) a scheduled redetermination of the Borrowing Base or (b) any adjustment of the Borrowing Base as a result of the failure to deliver satisfactory title information, the sum of outstanding Loans and the Lender's exposure in respect of Letters of Credit exceeds the lesser of (x) the aggregate Commitments and (y) the Borrowing Base, a  deficiency (a "Borrowing Base Deficiency") shall exist, and the Borrower will be required to eliminate such Borrowing Base Deficiency notifying the Administrative Agent with 10 days that it intends to take one or more of the following actions (provided that if the Borrower fails to elect any of the following actions within 10 days it shall be deemed to have elected option (i) hereof): |

5

(i) within 30 days, prepay the Loans (and cash collateralize any such deficiency attributable to Letter of Credit exposure) in an amount equal to such Borrowing Base Deficiency,

(ii) prepay the Loans (and cash collateralize any such deficiency attributable to Letter of Credit exposure) in not more than six equal monthly installments, in an aggregate amount equal to such Borrowing Base Deficiency (with the first such payment to be made within 30 days),

(iii) within 30 days, provide additional collateral not evaluated in the most recently delivered reserve report and/or evaluated but not mortgaged in the form of proved oil and gas properties having a Borrowing Base value determined by the Required Lenders sufficient to eliminate such Borrowing Base Deficiency or

(iv) a combination of the foregoing options (i), (ii) and (iii) sufficient to eliminate such Borrowing Base Deficiency.

If a Borrowing Base Deficiency exists as a result of a Borrowing Base adjustment for an asset disposition, an unwind or termination of a hedging agreement, the failure of the Borrower to satisfy the Post-Closing Hedging Covenant on or before the Post-Closing Hedging Date or an incurrence of Specified Additional Debt, within one business day of such asset disposition, unwind or termination of a hedging agreement, Post-Closing Hedging Date or incurrence of Specified Additional Debt, as applicable, the Borrower will be required to prepay the Loans in an amount equal to such Borrowing Base Deficiency, and if any Borrowing Base Deficiency remains after prepaying all of the Loans as a result of outstanding Letters of Credit, cash collateralize such excess.

Any mandatory prepayment made by the Borrower shall not require or trigger a reduction of the Commitments under the Credit Facility.

| Optional Commitment Reductions: | Upon prior written notice to be agreed, the Commitments may be reduced by the Borrower in minimum amounts to be agreed upon or terminated in whole, subject to reimbursement of the Lenders' "breakage costs" in the case of a prepayment of Eurodollar Loans prior to the last day of the relevant interest period. If, as a result of any termination or reduction of the Commitments, a Borrowing Base Deficiency exists, the Borrower will be required to prepay the Loans on the date of such reduction or termination in an aggregate principal amount equal to such excess, and if any remains after prepaying all of the Loans as a result of outstanding Letters of Credit, cash collateralize such excess. |
| --- | --- |

## IV.  Certain Conditions

| Initial Conditions: | The availability of the initial borrowing under the Credit Facility on the Closing Date shall be conditioned only upon satisfaction or waiver of (a) the delivery of a customary borrowing notice, (b) the conditions precedent set forth in Section 5 of the Commitment Letter and (c) the conditions set forth in Exhibit C (such requirements, the "Initial Conditions"). |
| --- | --- |
|  | For purposes of this Commitment Letter and the Fee Letters, "Closing Date" shall mean the date of the satisfaction or waiver of the Initial Conditions and the initial funding of the Credit Facility. |

6

| Ongoing Conditions: | After the Closing Date, the making of each Loan and the issuance of each Letter of Credit shall be conditioned upon (a) the accuracy of all representations and warranties in the Loan Documents (including, without limitation, the material adverse effect, solvency and litigation representations) in all material respects (or if such representation is already qualified by materiality, in all respects) and (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit. |
|---|---|

## V.      Certain Documentation Matters

| Loan Documents: | The definitive documentation for the Credit Facility (the "Loan Documents") shall be negotiated in good faith and shall contain only those conditions, mandatory prepayments, prepayment premiums (if any), representations, warranties, covenants and events of default expressly set forth in this Exhibit B (applicable to the Borrower and its subsidiaries or restricted subsidiaries, as applicable, in each case, with materiality thresholds, baskets, exceptions, limitations, qualifications and grace and cure periods to be agreed) and, except as set forth herein, those terms and conditions usual for facilities and transactions of this type and which shall reflect (a) the Administrative Agent's required agency and other form provisions (including with respect to a replacement of the LIBO Rate) so long as such changes are not inconsistent with this Commitment Letter and are customarily included in credit agreements with respect to which the Administrative Agent acts as administrative agent, (b) the Chapter 11 Plan and (c) the terms and conditions set forth in the Commitment Letter and as otherwise mutually agreed by the Borrower and the Administrative Agent  (collectively, the "Documentation Principles").  It is understood and agreed that the Loan Documents shall give due regard to the Borrower's existing Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 7, 2017, by and among the Borrower, the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (as the same may be amended, restated, amended and restated, supplemented or otherwise modified to date, the "Existing Credit Agreement"). |
|---|---|
| Representations and Warranties: | To be applicable to the Borrower and its subsidiaries or restricted subsidiaries, as applicable, limited to the following: |

- Organization, Powers;
- Authority, Enforceability;
- Approvals, including full force and effect of the confirmation order, No Conflicts;
- Financial Condition, No Material Adverse Effect;
- Litigation;
- Environmental Matters;
- Compliance with Laws and Agreements, No Defaults;
- Investment Company Act;
- Taxes;
- ERISA;
- Disclosure, No Material Misstatements;
- Insurance;
- Restrictions on Liens;
- Subsidiaries;

7

- Location of Business and Offices;
- Properties, Titles, Etc.;
- Maintenance of Properties;
- Gas Imbalances, Prepayments;
- Marketing of Production;
- Swap Agreements;
- Use of Loans and Letters of Credit;
- Solvency;
- Anti-Corruption Laws and Sanctions;
- Senior Debt Status; and
- EEA Financial Institutions.

Affirmative Covenants:

To be applicable to the Borrower and its subsidiaries or restricted subsidiaries, as applicable, limited to the following:

- Delivery of Financial Statements (with unaudited financial statements to be delivered within 45 days of the end of each of the first three fiscal quarters of the Borrower's fiscal year, and with audited financial statements to be delivered within 90 days of the end of the Borrower's fiscal year) and other information customary for facilities of this type (including a quarterly compliance certificate, consolidating information regarding unrestricted subsidiaries, reporting of hedging agreements in connection with the delivery of any reserve report, insurance certificates, accounting reports, SEC filings and shareholder reports, notices under other material instruments, lists of purchasers, notice of dispositions and hedge liquidations, notice of casualty events, certain organizational changes, production reports and lease operating statements, a 12 month cash flow forecast and capital budget delivered within 90 days of fiscal year end and notice of certain incurrence of indebtedness);
- Notices of Material Events;
- Existence, Conduct of Business;
- Payment of Obligations;
- Performance of Obligations under Loan Documents;
- Operation and Maintenance of Properties;
- Insurance;
- Books and Records, Inspection Rights;
- Compliance with Laws (including OFAC, Patriot Act, FCPA and beneficial ownership requirements);
- Environmental Matters;
- Further Assurances;
- Reserve Reports;
- Title Information with respect to at least 85% of the PV-9 of the Borrowing Base Properties;
- Additional Collateral (including maintenance of liens on not less than 85% of the total value of the PV-9 of the Borrowing Base Properties), Additional Guarantors;
- ERISA Compliance;

8

- Maintenance of control agreements over deposit, securities and commodities accounts and location of proceeds of Loans (violation of which will cause an immediate Event of Default);
- Unrestricted Subsidiaries;
- Marketing Activities;
- Keepwell;
- Swap Agreements as set forth in the "Minimum Hedging" paragraph in the Section titled "Commodity Hedging"; and
- Post-Closing Obligations (if applicable).

| | |
|---|---|
| Financial Covenants: | Limited to the following: |

(a) Total Net Leverage Ratio: The Borrower will not permit, as of the last day of any fiscal quarter commencing with the first full fiscal quarter ending after the Closing Date, its ratio of total net debt (net of unrestricted cash only to the extent that such cash and cash equivalents are maintained in accounts subject to a control agreement in favor of the Administrative Agent, in an amount not to exceed (i) if any Loans are outstanding under the Credit Facility, $50.0 million or (ii) if no Loans are outstanding under the Credit Facility, an unlimited amount) as of such date to consolidated adjusted EBITDAX (to be defined in a manner to be agreed, provided that fees, expenses and other restructuring transaction costs which are incurred through a date to be agreed, in connection with the Transactions, the Chapter 11 Cases and the other transactions contemplated hereby or thereby and other non-recurring costs and expenses will be permitted to be added back when calculating consolidated adjusted EBITDAX) for the four fiscal quarters ending on such date to be greater than 4.00 to 1.00 (the "Total Net Leverage Ratio").

For purposes of calculating the Total Net Leverage Ratio, (A) for the first full fiscal quarter ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such fiscal quarter by 4, (B) for the period of the first two full fiscal quarters ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such two fiscal quarters by 2, and (C) for the period of the first three full fiscal quarters ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such three fiscal quarters by 4/3.

(b) Current Ratio: The Borrower will not permit, as of the last day of any fiscal quarter commencing with the first full fiscal quarter ending after the Closing Date, its ratio of (i) consolidated current assets (including the unused amount of the Borrowing Base then available to be borrowed, but excluding (A) all non-cash assets under Accounting Standards Codification Topic No. 815, (B) the aggregate amount of any deposits (in each case, whether in cash or otherwise) posted by the Borrower or any of its restricted subsidiaries to secure swap obligations owing by such persons or to cover market exposures) and (C) any deferred tax assets to (ii) consolidated current liabilities (excluding non-cash obligations under FASB Accounting Standards Codification 815, current maturities under the Credit Facility and of long-term indebtedness and any deferred tax liabilities) to be less than 1.0 to 1.0 (the "Current Ratio" and, together with the Leverage Ratio, the "Financial Covenants").

| Negative Covenants: | To be applicable to the Borrower and its subsidiaries or restricted subsidiaries, as applicable, limited to the following: |
|---|---|

- Debt, to include a basket for Specified Additional Debt without limit, subject to (i) no default or event of default has occurred and is continuing after giving effect to any such Specified Additional Debt issuance, (ii) pro forma compliance, after giving effect to any such Specified Additional Debt issuance, with the Financial Covenants, (iii) reduction in the Borrowing Base in the manner described above (in the section titled "Borrowing Base") and (iv) other conditions and restrictions to be agreed;
- Liens;
- Dividends, Distributions and Redemptions; Repayment and Amendment of certain junior debt (including any Specified Additional Debt), to include a basket for restricted payments and repayments of such junior debt, subject to (i) no default or event of default has occurred and is continuing after giving effect to such restricted payment or repayment of such junior debt, (ii) availability on a pro forma basis of at least 20% of the then-effective Borrowing Base and (iii) pro forma compliance, after giving effect to any such restricted payment or repayment of such junior debt, with a Total Net Leverage Ratio of not greater than 2.75:1.00 (the "Restricted Payment Conditions");
- Investments, Loans and Advances, to include a basket subject to the Restricted Payment Conditions;
- Designation and Conversion of Restricted and Unrestricted Subsidiaries; Indebtedness of Unrestricted Subsidiaries;
- Nature of Business; International Operations;
- Proceeds of Loans;
- ERISA Compliance;
- Sales or Discount of Receivables;
- Mergers, Other Fundamental Changes, Etc.;
- Sale of Properties;
- Environmental Matters;
- Transactions with Affiliates;
- Subsidiaries;
- Negative Pledge Agreements; Dividends Restrictions;
- Gas Imbalances, Take-or-Pay or Other Prepayments; and
- Swap Agreements as set forth in the "Maximum Hedging" paragraph in the Section titled "Commodity Hedging"; and
- Amendments to Organizational Documents in a manner that is material and adverse to the interests of the Lenders and Fiscal Year End.

| Commodity Hedging: | Minimum Hedging: The Credit Parties shall use commercially reasonable efforts to enter into as of the Closing Date, and shall thereafter maintain, commodity hedging contracts hedging at prices reasonably acceptable to the Administrative Agent for no less than (a) 75% of the total forecasted production (based on the most recently delivered reserve report) of crude oil and natural gas, calculated separately, from total proved developed producing oil and gas properties of the Credit Parties for a period through at least the first 12 full calendar months following the Closing Date and (b) 50% of the total forecasted production (based on the most recently delivered reserve report) of crude oil and natural gas, calculated separately, from |
|---|---|

10

total proved developed producing oil and gas properties of the Credit Parties for each of the full calendar months 13 through 24 following the Closing Date (the hedge contracts referred to herein, the "Required Hedges").

Maximum Hedging: As of the date of entry into any commodity hedging contract, the Credit Parties shall have entered into commodity hedging contracts for no more than 85% of the total forecasted production (based on the most recently delivered reserve report) of crude oil and natural gas, calculated separately, from total proved developed producing oil and gas properties of the Credit Parties for the 60 full calendar months following such date. No commodity hedging contract shall have a tenor longer than 60 months from the date such hedging arrangement is created.

Secured commodity hedging contracts shall be limited to those entered into with the Administrative Agent or affiliates of the Administrative Agent, Lenders or affiliates of Lenders and "Approved Counterparties" (to be defined in a customary manner).

If, after using their commercially reasonable efforts, the Credit Parties are unable to enter into the Required Hedges as of the Closing Date, within 30 days after the Closing Date (or such later date as may be agreed by the Administrative Agent in its sole discretion) (the "Post-Closing Hedging Date"), the Credit Parties shall enter into the Required Hedges. The requirement set forth in this paragraph is referred to herein as the "Post-Closing Hedging Covenant.

| Events of Default: | To be applicable to the Borrower and its restricted subsidiaries, limited to the following: |
|---|---|

- Failure to pay any required principal of any Loan or reimbursement obligation in respect of Letter of Credit disbursement when due,
- Failure to pay interest, fees or other amounts when due (subject to a grace period of 3 business days);
- Failure to comply with any covenant or condition of the Loan Documents (subject to a grace period consistent with the Documentation Principles);
- Any representation or warranty shall have been incorrect in any material respect when made (without duplication of a materiality qualifier);
- Cross-payment default (subject to a grace period consistent with the Documentation Principles) and cross-acceleration to other material indebtedness;
- Bankruptcy or insolvency (subject to a grace period consistent with the Documentation Principles);
- Unsatisfied material judgment (subject to a 30 day grace period);
- Change in control (the definition of which is to be agreed);
- ERISA events;
- Actual or asserted (in writing) invalidity of any guarantee, security document or intercreditor or subordination provisions or non-perfection of any security interest; and
- The Loan Documents cease to be in full force and effect and valid, binding and enforceable.

11

| | |
|---|---|
| Voting: | Amendments and waivers with respect to the Loan Documents shall require the approval of the Majority Lenders, except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the Maturity Date or the date for any scheduled date of payment or prepayment of principal, (ii) reductions in the rate of interest (other than waivers of default interest) or any fee or extensions of any due date thereof, (iii) increases in the amount of, or extensions of the expiry date of, any Lender's commitment and (iv) changes in the pro rata payment sharing provisions, (b) the consent of all of the Lenders shall be required with respect to increases of the Borrowing Base, (c) the consent of the Required Lenders, shall be required with respect to reductions or reaffirmations of, waivers of an automatic reduction in, or postponement of a scheduled redetermination of the Borrowing Base and (d) the consent of all of the Lenders shall be required with respect to modifications of any of the voting percentages, releases of all or substantially all of the collateral or releases of any Guarantor (except as otherwise expressly permitted in the Loan Documents).   Notwithstanding the foregoing the Administrative Agent may (without the consent of the Lenders) enter into amendments or modifications to the Loan Documents in order to implement a LIBOR replacement rate in accordance with the terms thereof. |
| | The Loan Documents shall contain customary provisions for replacing non-consenting Lenders, in connection with amendments, modifications, waivers and Borrowing Base redeterminations requiring the consent of all Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto. |
| Assignments and Participations: | After the Closing Date, the Lenders shall be permitted to assign all or a portion of their Loans and Commitments with the consent, not to be unreasonably withheld, conditioned or delayed, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) a payment or bankruptcy event of default has occurred and is continuing, provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) business days after having received notice thereof, (b) the Administrative Agent and (c) the LC Issuer.  In the case of partial assignments (other than to another Lender, to an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $5.0 million, unless otherwise agreed by the Borrower and the Administrative Agent. |
| | The Lenders shall also be permitted to sell participations in their Loans. Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions.  Voting rights of a participant shall be limited to those matters set forth in clause (a) of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required.  Pledges of Loans in accordance with applicable law shall be permitted without restriction.  Promissory notes shall be issued under the Credit Facility upon request.   No assignments or participations shall be permitted to be made to the Borrower or any of its affiliates or to natural persons. |
| Yield Protection; Etc.: | The Loan Documents shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy or other requirements of law, and from the imposition of or |

changes in withholding or other taxes (including reflecting that both (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III shall, in the case of each of the foregoing clause (x) and clause (y), be deemed to be a change in law after the Closing Date regardless of the date enacted, adopted or issued) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan on a day other than the last day of an interest period with respect thereto.

| | |
|---|---|
| Defaulting Lenders: | The Loan Documents shall contain provisions relating to "defaulting" Lenders (including provisions relating to reallocation of participations in, or the Borrower providing cash collateral to support Letters of Credit, to the suspension of certain voting rights and rights to receive certain fees, and to termination or assignment of the Commitments or Loans of such Lenders). |
| Expenses and Indemnification: | The Borrower shall, regardless of whether the Closing Date occurs, pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Lead Arranger associated with the syndication of the Credit Facility and the preparation, execution, delivery and administration of the Loan Documents and any amendment, modification or waiver with respect thereto (limited, in the case of counsel, to the reasonable fees, disbursements and other charges of a single counsel to the Administrative Agent and the Lead Arranger, including (if necessary) one local counsel in each relevant jurisdiction and one regulatory counsel to all such persons with respect to a relevant regulatory matter, taken as a whole, and, solely in the event of a conflict of interest, one additional counsel (and, if necessary, one regulatory counsel and one local counsel in each relevant jurisdiction or for each matter) to each group of similarly situated affected persons), (b) all reasonable and documented out-of-pocket costs, expenses, taxes, assessments and other charges incurred by the Administrative Agent or any Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by the Credit Facility or any security instrument and (c) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Issuing Lender or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Issuing Lender or any Lender, in connection with the enforcement or protection of its rights in connection with the Loan Documents. |

The Administrative Agent, the Arrangers and the Lenders (and their affiliates and their respective officers, directors, employees, advisors, agents and other representatives) will have no liability for, and will be indemnified and held harmless against, any loss, claim, damage, liability, cost or expense incurred in respect of the transactions and the financing contemplated hereby or the use or the proposed use of proceeds thereof and any claim, litigation, investigation or proceeding relating to any of the foregoing (except to the extent resulting from the gross negligence, bad faith or willful misconduct of the indemnified person, as determined by a court of competent jurisdiction by final and nonappealable judgment); provided, that counsel shall be limited to a single counsel to the

indemnitees, taken as a whole, including (if necessary) one local counsel in each relevant jurisdiction and, solely in the case of a conflict, one additional counsel (and, if necessary one local counsel in each relevant jurisdiction) for the conflicted parties.

| | |
|---|---|
| EU Bail-In Provisions: | The Loan Documents will contain customary EU Bail-In provisions. |
| QFC Provisions: | The Loan Documents will contain customary "QFC" provisions. |
| Governing Law and Forum: | State of New York. |
| Counsel to the Lead Arranger and the Administrative Agent: | Simpson Thacher & Bartlett LLP. |

**Annex I**

**Interest and Certain Fees**

Pricing Grid**:**          The applicable margin and applicable commitment fee will be determined in accordance with the following table:

| Level | Borrowing Base Usage | Eurodollar Loans | ABR Loans | Commitment Fee |
|-------|---------------------|------------------|-----------|----------------|
| V | $\geq$ 90% | 300.0 bps | 200.0 bps | 50.0 bps |
| IV | > 75% $\leq$ 90% | 275.0 bps | 175.0 bps | 50.0 bps |
| III | > 50% $\leq$ 75% | 250.0 bps | 150.0 bps | 50.0 bps |
| II | > 25% $\leq$ 50% | 225.0 bps | 125.0 bps | 37.5 bps |
| I | $\leq$ 25% | 200.0 bps | 100.0 bps | 37.5 bps |

Borrowing Base Usage at any time is based on total outstanding Loans, Letters of Credit and reimbursement obligations under the Credit Facility as a percentage of the Borrowing Base.

Interest Rate Options:    The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin or the Adjusted LIBO Rate plus the Applicable Margin.

As used herein:

"Alternate Base Rate" means the highest of (i) the rate of interest last quoted by The Wall Street Journal in the U.S. as the prime rate in effect (the "Prime Rate"), (ii) the NYFRB Rate from time to time plus 0.5% and (iii) the Adjusted LIBO Rate for a one month interest period plus 1%. If the ABR as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00%.

"Adjusted LIBO Rate" means the LIBO Rate, as adjusted for statutory reserve requirements for eurocurrency liabilities.

"Applicable Margin" means a percentage determined in accordance with the pricing grid.

"Commitment Fee Rate" means a percentage determined in accordance with the pricing grid.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its

public website from time to time, and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate, provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"Interest Period" means a period of one, two, three or six months (as selected by the Borrower).

"Interpolated Rate" means, at any time, for any interest period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period; and (b) the LIBO Screen Rate for the shortest period (for which that LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any interest period, the LIBO Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such interest period; provided that if the LIBO Screen Rate shall not be available at such time for such interest period (an "Impacted Interest Period") then the LIBO Rate shall be the Interpolated Rate.

"LIBO Screen Rate" means, for any day and time, with respect to any Eurodollar Borrowing for any interest period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for a period equal in length to such interest period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion); provided that if the LIBO Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day; provided, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar Borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

2

| Interest Payment Dates: | In the case of Loans bearing interest based upon the Alternate Base Rate ("ABR Loans"), quarterly in arrears. |
|---|---|
| | In the case of Loans bearing interest based upon the Adjusted LIBO Rate ("Eurodollar Loans"), on the last day of each relevant Interest Period and, in the case of any Interest Period longer than three months, on each successive date three months after the first day of such Interest Period. |
| Commitment Fees: | The Borrower shall pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily amount of the unused amount of the commitment of such Lender. Accrued commitment fees shall be payable quarterly in arrears and on the date that is the earlier of the Maturity Date and the date of termination of the Commitments. |
| Letter of Credit Fees: | The Borrower shall pay a participation fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans on the face amount of each such Letter of Credit.  Such participation fee shall be shared ratably among the Lenders and shall be payable quarterly in arrears. |
| | A fronting fee equal to the greater of (i) $500 or (ii) 0.25% per annum on the face amount of each Letter of Credit, shall be payable quarterly in arrears to the applicable LC Issuer for its own account.  In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the applicable Issuing Bank for its own account. |
| Default Rate: | During the continuation of a payment or bankruptcy event of default, and during the continuation of any other event of default after the Administrative Agent has delivered notice to the Borrower, all outstanding principal, fees and other obligations shall bear interest at 2.00% above the rate applicable to ABR Loans. |
| Rate and Fee Basis: | All commitment fees and all per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed. |

EXHIBIT C

CONDITIONS PRECEDENT

**EXHIBIT C**

$750.0 Million Senior Secured Reserve-Based Revolving Credit Facility
Conditions Precedent

Capitalized terms used but not defined in this Exhibit C shall have the meanings set forth in the Summary of Terms and Conditions to which this Exhibit C is attached.

The Closing Date and the making of the initial extensions of credit under the Credit Facility will be subject to the satisfaction of the following conditions precedent:

1.  The Administrative Agent shall have received (a) the Loan Documents, which shall, in each case, be consistent with the terms of the Indicative Summary of Terms and Conditions to which this Exhibit C is attached and shall otherwise be in form and substance reasonably satisfactory to the Lead Arranger, shall have been executed and delivered by each of parties thereto, including all documents and instruments required to create and perfect the Administrative Agent's security interest in the Collateral and (b) customary officer's closing certificates (including incumbency certificates of officers), organizational documents, customary evidence of authorization and good standing certificates in jurisdictions of formation/organization, in each case, with respect to the Credit Parties, customary legal opinions related to the Loan Documents, including an opinion on no conflicts with applicable laws in addition to other customary opinions, a solvency certificate (with respect to the Borrower and its subsidiaries on a consolidated basis as of the Closing Date after giving effect to the transactions contemplated to occur on the Closing Date) certified by a senior authorized financial officer of the Borrower and such other documents and instruments as are customary for transactions of this type (including evidence of insurance).

2.  The Administrative Agent and the Arranger shall have received all commitment, arrangement, upfront and agency fees and all other fees and amounts due and payable on or prior to the Closing Date, and to the extent invoiced, reimbursement or payment of all reasonable and documented out-of-pocket expenses required to be reimbursed or paid by the Borrower (including, without limitation, the fees and expenses of Simpson Thacher & Bartlett LLP, counsel to the Administrative Agent).

3.  The Administrative Agent shall have received acceptable evidence of title on not less than 85% of the total value of the PV-9 from the Borrowing Base Properties evaluated in the Initial Reserve Report.

4.  All actions necessary to establish that the Administrative Agent will have a perfected first priority security interest in the Collateral (as described in the section titled "Collateral" on Exhibit B) shall have been taken, including (a) delivery of counterparts and exhibits for mortgages or deeds of trust, as applicable, which are necessary and appropriate for filing in the appropriate jurisdictions and (b) the Borrower's execution and delivery of control agreements in connection with its deposit accounts, commodities accounts or securities accounts, as applicable.

5.  The Administrative Agent shall have received a certificate of a responsible officer of the Borrower certifying (a) that the Borrower and its subsidiaries have received all material third party and governmental consents and approvals required by the terms of the Loan Documents and (b) that since December 31, 2018, there has not been any event, occurrence, development or change in the circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, financial condition, operations, performance or properties of the Borrower, the Guarantors or their respective restricted subsidiaries, taken as a whole; provided, that a material adverse effect shall not include any event, occurrence, development or change

in the circumstances or facts arising out of or resulting from: (a) conditions or effects that generally affect persons or entities engaged in the industries, business, markets, financial conditions or the geographic area in which the Credit Parties operate taking into consideration any event that is related to the operations of the Credit Parties in the specific geographical and geological areas in which it operates, (b) general economic conditions in regions and markets in which the Credit Parties operate, (c) regional, national or international political or social conditions, including acts of war, terrorism or natural disasters, escalation or material worsening of hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or its territories, possessions, diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (d) financial, banking, securities, credit, or commodities markets, prevailing interest rates or general capital markets conditions, (e) changes in United States generally accepted accounting principles, (f) changes in Laws, orders, or other binding directives issued by any governmental entity, (g) the taking of any action or any inaction required by the RSA, the Backstop Agreement, the Restructuring Term Sheet, the Chapter 11 Plan, or any action or inaction in connection with the Chapter 11 Cases, including the commencement, announcement and pendency of the Chapter 11 Cases, or (h) any action or inaction consented to or requested by the Consenting Noteholders; provided, that exceptions set forth in clauses (a), (b), (c) and (d) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Credit Parties, taken as a whole, as compared to other companies comparable in size and scale to the Credit Parties operating in the industries and same geographical area in which the Credit Parties operate.

6. The Administrative Agent and the Lead Arranger shall have received (a) satisfactory audited consolidated financial statements of the Borrower for the year ended December 31, 2018 and reasonably satisfactory unaudited consolidated financial statements of the Borrower for each fiscal quarter thereafter ending at least 45 days prior to the Closing Date, (b) a pro forma unaudited consolidated balance sheet of the Borrower and its subsidiaries as of the Closing Date, after giving effect to the making of the initial extensions of credit under the Facility, the application of the proceeds thereof and to the other transactions contemplated to occur on the Closing Date, certified by the Borrower's chief financial officer, which shall reflect no indebtedness other than the Loans made by the Lenders on the Closing Date and other indebtedness permitted by the Facility Documentation (excluding any Specified Additional Debt), (c) a satisfactory reserve report prepared by Netherland Sewell & Associates, Inc. with an as of date of January 1, 2019 covering the oil and gas properties of the Borrower and its subsidiaries included in the Borrowing Base, (d) a satisfactory reserve report prepared internally by the Borrower consistent with the procedures used in the reserve report identified in clause (c) with an as of date of July 1, 2019 covering the oil and gas properties of the Borrower and its subsidiaries included in the Borrowing Base (the "Initial Reserve Report"), accompanied by an officer's certificate covering certain customary matters with respect to such reserve report and (e) lease operating statements and production reports with respect to the oil and gas properties evaluated in the Initial Reserve Report, in form and substance satisfactory to the Lead Arranger, for the fiscal year ended December 31, 2018 and for each fiscal quarter ending thereafter ending at least 45 days prior to the Closing Date.

7. The Administrative Agent and each Lender who has requested the same shall have received, at least three (3) business days prior to the Closing Date, (a) all documentation and other information regarding the Borrower in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and (b) to the extent applicable, in connection with "beneficial ownership" rules and regulations, a customary certification regarding beneficial ownership or control of the Borrower in a form reasonably satisfactory to the Administrative Agent and each requesting Lender, in the case of clauses (a) and (b), to the extent reasonably requested in writing at least ten (10) business days prior to the Closing Date.

2

8.  The Administrative Agent shall be reasonably satisfied that after the making of the Loans on the Closing Date, the application of the proceeds thereof and after giving effect to the other transactions contemplated hereby, the Borrower and the Guarantors shall have unused availability under the Borrowing Base of not less than $125.0 million.

9.  The Administrative Agent shall have received evidence reasonably satisfactory to it that all loans and other obligations under the DIP Facility are being repaid in full, the DIP Facility is being terminated, and the liens securing the DIP Facility are being released, in each case substantially contemporaneously with the proceeds of the initial funding under the Credit Facility. After giving effect to the transactions contemplated hereby, the Borrower and its subsidiaries shall have no indebtedness outstanding other than (a) the Loans and other extensions of credit under the Credit Facility and (b) any other indebtedness permitted under the Loan Documents (excluding any Specified Additional Debt).  The Administrative Agent shall have received evidence satisfactory to it that all liens on the assets of the Borrower and its subsidiaries (other than liens permitted by the Loan Documents) have been (or will be concurrently with the initial funding under the Credit Facility) released or terminated and that duly executed recordable releases and terminations in forms reasonably acceptable to the Administrative Agent with respect thereto have been obtained by the Borrower or its subsidiaries.

10. Not later than August 16, 2019, the Bankruptcy Court shall have entered an order in form and substance reasonably satisfactory to the Lead Arranger (which order is final, is in full force and effect, is unstayed and has not been amended, supplemented or otherwise modified without the consent of the Lead Arranger) approving the Commitment Letter, the Fee Letters and the transactions contemplated thereby (including the fees set forth in the Fee Letters) and specifically providing for the right to receive all amounts due and owing, including indemnification obligations, the fees and other payments as set forth herein, and reimbursement of all reasonable costs and expenses incurred in connection with the transactions contemplated herein and as set forth herein and which shall be entitled to priority as administrative expense claims under Sections 503(b) and 507(a)(1) of title 11 of the Bankruptcy Code, regardless of whether the Closing Date occurs.

11. The Chapter 11 Plan and all other related documentation (a) shall be satisfactory to the Lead Arranger with respect to any portions of such Chapter 11 Plan that directly relate to the Credit Facility, and reasonably satisfactory to the Lead Arranger in all other respects, (b) shall have been confirmed by an order of the Bankruptcy Court which order shall be satisfactory to the Lead Arranger with respect to any portions of such order that directly relate to the Credit Facility, and reasonably satisfactory to the Lead Arranger in all other respects, which order shall be in full force and effect, unstayed and final, and shall not have been modified or amended without the written consent of the Lead Arranger, reversed or vacated, (c) all conditions precedent to the effectiveness of the Chapter 11 Plan as set forth therein shall have been satisfied or waived (the waiver thereof having been approved by the Lead Arranger), and the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Chapter 11 Plan in accordance with its terms shall have occurred contemporaneously with the Closing Date and (d) the transactions contemplated by the Chapter 11 Plan to occur on the effective date of the Chapter 11 Plan shall have been substantially consummated (as defined in Section 1101 of the Bankruptcy Code) on the Closing Date and substantially contemporaneously with the initial funding hereunder in accordance with the terms of the Chapter 11 Plan and in compliance with applicable law and Bankruptcy Court and regulatory approvals.

12. All representations and warranties shall be true and correct in all material respects with the same effect as though made on and as of such date, except in the case of any representation and warranty which (a) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (b) is qualified by a materiality or material adverse effect standard in which case such representation and warranty shall be true and correct in all respects.

3

## Exhibit F

## Liquidation Analysis

## LIQUIDATION ANALYSIS

As part of the chapter 11 process, Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court determine that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive under the plan value that is not less than the amount that the holder would receive if the debtors had liquidated under chapter 7.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Chapter 11 Plan of Reorganization* (the "**Plan**").

Below is a summary of an illustrative liquidation analysis (the "**Liquidation Analysis**") assuming that the Debtors pursue a hypothetical liquidation under chapter 7. Per chapter 7 requirements, the Debtors' assets would be disposed under the direction of a chapter 7 Trustee ("**Trustee**"). The illustrative sale proceeds would provide for lower recoveries relative to the recoveries under the Plan and as a result the Debtors believe that under the Plan, Holders of Claims would receive value greater than the amounts that such Holders would receive if the Debtors were forced to liquidate under chapter 7, and that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

A.      **Limitations and Key Assumptions Underlying the Hypothetical Liquidation**

**THE ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES AND USE OF THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT OR CLAIM TO REPRESENT ANY ASSUMPTIONS OR COMPARISONS FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.**

The Debtors prepared the illustrative Liquidation Analysis with the assistance of FTI Consulting. The Liquidation Analysis contains numerous estimates, including estimated Allowed Claims based upon a review of the Debtors' financial statements to account for estimated liabilities as necessary. The Liquidation Analysis does not contemplate a sale of the Debtors' business on a going concern basis.  The Liquidation Analysis includes estimates for Claims as part of the Chapter 11 Cases which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind down costs and Trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis, and no bar date to file proofs of claim has been set. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and interests under the Plan. **THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

The Debtors note that the assumptions utilized in developing the Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors or a chapter 7 Trustee. Accordingly, there can be no guarantees that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated. In addition, any liquidation would take place in the future, at which time circumstances may exist which cannot presently be predicted.

The Debtors recognize that there are other potential alternatives that could occur in a hypothetical chapter 7 liquidation not presented in the Liquidation Analysis, including alternatives that would give rise to reduced and delayed creditor recoveries.

1

**THE DEBTORS RESERVE THEIR RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.**

1.      **General Assumptions**

The following general assumptions were considered by the Debtors and their advisors as assumptions that would be applicable in any hypothetical chapter 7 liquidation.

a)      **Administrative Procedures and Conversion of Cases**

For purposes of the chapter 7 Liquidation Analysis, the Debtors assume that each of the Chapter 11 Cases are converted to a chapter 7 case and consolidated during the chapter 7 proceeding for procedural purposes only. In the event that the Debtors were to be liquidated in separately administered chapter 7 cases, the administrative costs to the Debtors in each of the cases, including professional fees, Trustee fees, the Debtors' operational costs, etc. would likely be higher than if the cases were consolidated.

b)      **Professionals Involved in the Chapter 7 Proceedings**

As part of the chapter 7 case, the Debtors assume that the Trustee would choose to retain certain professionals, including counsel, advisors and investment bankers, among others, to provide expertise and assistance in the liquidation of the Debtors. The Liquidation Analysis illustratively assumes that the existing counsel, advisors, and consultants would be replaced by the Trustee with new professionals.

c)      **Timing Considerations of Chapter 7 Cases**

The Liquidation Analysis assumes the conversion to Chapter 7 occurs on September 30, 2019 (the "Chapter 7 Conversion Date"). The Trustee would require time to hire new advisors and those advisors would require time to get up to speed before a process could begin to liquidate the assets. While the Debtors' oil and gas properties may be sold in several transactions, this analysis assumes that they are all sold by January 31, 2020, four months after the start of the liquidation. An additional two months are assumed for a wind down of the estate.

It is assumed that the Debtors' DIP Facility, which would be in default, would be unavailable as a source of liquidity and that the Debtors would not have funds to support any process other than an orderly and expedited wind-down of the Debtors' business by the trustee to convert the Debtors' assets to cash and limit the amount of administrative expenses. There can be no assurance, however, that the liquidation would be completed in a limited timeframe, nor is there any assurance that the recoveries assigned to the Debtors' assets would in fact be realized.

In an actual liquidation, the process and length of wind-down could be significantly longer and more expensive than the amounts assumed herein and thereby significantly reduce the actual recoveries compared to this analysis. For example, the potential for priority, contingent, and other Claims; litigation; rejection costs; and the final determination of Allowed Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to the creditors. Also, in the context of a liquidation, there would likely be a myriad of potential offset Claims, particularly with respect to joint interest billings that would take time to reconcile and resolve. Additionally, certain of the joint operating agreements may be non-assignable (absent consent from the other working interest owners) which could result in potential asset transfer issues in the context of a chapter 7 liquidation. Also, a number of factors in a liquidation could affect the Trustee's ability to sell the Debtors' oil and gas assets for their current market value. These risks include if they are forced to halt production for a period of time or lose relationships with vendors, customers, royalty owners, joint interest owners, and midstream firms. There is a high risk that the employee base could deteriorate and the Trustee could be challenged to gather appropriate information on the assets for the sales process. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if Debtors were in fact, to undergo such a

2

liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

### d)        Trustee Fees for Chapter 7 Administration

The Debtors assume that under a chapter 7 liquidation, the Trustee would require fees necessary to facilitate a sale of the Debtors' business. The illustrative Liquidation Analysis assumes that such fees would likely be approximately three percent (3%) of the available liquidation proceeds in excess of $1 million and excluding cash. These fees are assumed to be earned for the Trustee's creation and development of materials for marketing and the facilitation of the solicitation process for the parties, in addition to general administrative expenses, such as Trustee's compensation. Additionally, per section 326(a) of the Bankruptcy Code, for a case under chapter 7, the Court may allow reasonable compensation for the Trustee's services not to exceed three percent (3%) of such moneys disbursed or turned over in the case by the Trustee to parties in interest, excluding the Debtors, but including holders of secured Claims.

### e)        Additional Claims

The cessation of the Debtors' business in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under the proposed Plan. Examples of these kinds of Claims include tax liabilities, employee Claims, Claims related to additional rejection of executory contracts (unless specified herein), incremental costs associated with plugging and abandoning liabilities, and litigation Claims. While some of these Claims could be significant, no adjustment has been made for these potential Claims unless specified in the assumptions to the Liquidation Analysis.

### B.        Consummation of the Plan Will Provide Greater Value than Under a Hypothetical Liquidation through Chapter 7 of the Bankruptcy Code

As presented in the illustrative Liquidation Analysis, the Debtors believe that a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code would result in reductions in the value to be realized by constituents as compared to the distributions that are contemplated under the Plan. As a result, the Debtors believe that Consummation of the Plan will provide a substantially greater return to constituents than would any liquidation under chapter 7 of the Bankruptcy Code.

3

LIQUIDATION ANALYSIS

| Liquidation Analysis | | Actual | Adj. | Forecast | Low | | Mid | | High | |
|---|---|---|---|---|---|---|---|---|---|---|
| ($000s) | Note | 30-Jun | | 30-Sep | $ | % | $ | % | $ | % |
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| Cash & Cash Equivalents | A | $2,238 | ($988) | $1,250 | $1,250 | 100% | $1,250 | 100% | $1,250 | 100% |
| Trade Accounts Receivable | B | 25,208 | 181 | 25,389 | 24,120 | 95% | 24,754 | 98% | 25,389 | 100% |
| Joint Interest Billing Receivable | C | 5,512 | - | 5,512 | 4,410 | 80% | 4,685 | 85% | 4,961 | 90% |
| Other Receivable | D | 3,530 | (1,643) | 1,888 | 1,705 | 90% | 1,751 | 93% | 1,796 | 95% |
| Derivatives Receivable, Net | E | (595) | 5,430 | 4,835 | 484 | 10% | 846 | 18% | 1,209 | 25% |
| Income Tax Receivable | F | 1,250 | - | 1,250 | 625 | 50% | 781 | 63% | 938 | 75% |
| Other Current Assets | G | 13,303 | 150 | 13,453 | 8,352 | 62% | 8,427 | 63% | 8,502 | 63% |
| Oil & Gas Properties, Net | H | 906,784 | (1,749) | 905,035 | 367,443 | N/A | 439,148 | N/A | 510,852 | N/A |
| Other Property & Equipment, Net | I | 10,683 | (650) | 10,033 | 1,739 | 17% | 2,454 | 24% | 3,170 | 32% |
| Other Assets | J | 500 | - | 500 | - | 0% | - | 0% | - | 0% |
| **Total Gross Liquidation Proceeds** | | **$968,415** | **$731** | **$969,146** | **$410,127** | | **$484,097** | | **$558,066** | |
| (-) Purchase Price Adjustment for Post-Conversion Cash Flow | K | | | | ($41,217) | | ($41,217) | | ($41,217) | |
| (-) Net Wind-Down Expenses (Oct - Mar) | L | | | | (9,959) | | (9,959) | | (9,959) | |
| (-) Trustee Fees | M | | | | (12,183) | 3% | (14,402) | 3% | (16,621) | 3% |
| (-) Trustee Legal & Financial Advisors | N | | | | (12,304) | 3% | (11,733) | 3% | (11,161) | 2% |
| **Total Net Liquidation Proceeds** | | | | | **$334,465** | | **$406,786** | | **$479,108** | |

| Claims Recovery Analysis ($000s) | | | Claims | Low | | Mid | | High | |
|---|---|---|---|---|---|---|---|---|---|
| Class | Claims | Note | Estimate | $ | % | $ | % | $ | % |
| | Administrative Expense Claims | O | $40,664 | $40,664 | 100% | $40,664 | 100% | $40,664 | 100% |
| | DIP Claims | P | 25,413 | 25,413 | 100% | 25,413 | 100% | 25,413 | 100% |
| 1 | Other Priority Claims | Q | - | - | N/A | - | N/A | - | N/A |
| 2 | Other Secured Claims | R | 9,164 | 9,164 | 100% | 9,164 | 100% | 9,164 | 100% |
| 3 | RBL Claims | S | 237,945 | 237,945 | 100% | 237,945 | 100% | 237,945 | 100% |
| 4 | Senior Note Claims | T | 644,458 | 14,764 | 2.3% | 64,939 | 10.1% | 115,115 | 17.9% |
| 5 | General Unsecured Claims | U | 284,445 | 6,516 | 2.3% | 28,662 | 10.1% | 50,808 | 17.9% |
| 6 | Intercompany Claims | V | - | - | N/A | - | N/A | - | N/A |
| 7 | Existing Equity Interests | W | - | - | N/A | - | N/A | - | N/A |
| 8 | Other Equity Interests | X | - | - | N/A | - | N/A | - | N/A |
| 9 | Intercompany Interests | Y | - | - | N/A | - | N/A | - | N/A |
| **Total Claims Recovery** | | | **$1,242,088** | **$334,465** | | **$406,786** | | **$479,108** | |

## C.      Notes to Liquidation Analysis

*Gross Liquidation Proceeds*

### A. Cash and Equivalents

- Cash consists of cash in bank accounts and highly liquid investment securities that have original maturities of one year or less.

- The Liquidation Analysis assumes that the Debtors will have access to the cash in its accounts upon conversion of the cases to Chapter 7. However, the secured lenders may have the right to sweep this cash to pay down their Claims upon conversion, which could adversely affect the Trustee's ability to run an orderly liquidation.

### B. Trade Accounts Receivable

- Balances include amounts due for oil, gas and NGL production accrued through the chapter 7 Conversion Date and not yet received from the Debtors' customers.

- These receivables are expected to be highly collectible, but there could be a risk that the Debtors' customers could make Claims against the estate in a liquidation and attempt to set off their Claims with the Debtors' receivables.

- The analysis assumes that the Trustee would be able to retain the necessary personnel at the Debtors to assist in calculating and collecting these receivables. If the Trustee did not have sufficient access to capital or for any other reason was not able to retain these key personnel, that could negatively impact recovery of these receivables.

4

- For the purposes of the Liquidation Analysis, recoveries of trade receivables are estimated to be highly recoverable due to the short-term contractual obligations of the receivable counterparties and the low probability of contractual breaches. An ultimate recovery range of 95% to 100% is estimated for trade receivables.

## C. Joint Interest Billing Receivables

- Joint Interest Billing Receivables include receivables from joint interest owners for their share of lease operating expenses, capital expenditures, production taxes, and gathering and transport fees, among other items.

- These receivables are expected to be less collectible than receipts for production as joint interest owners are likely to attempt to offset their potential Claims against the estate for unpaid royalties and lost revenue by holding back these receivables.

- Furthermore, collecting these receipts is further dependent on retaining company personnel to calculate the appropriate bills, and any loss in personnel can negatively impact the Trustee's ability to collect. An ultimate recovery range of 80% to 90% is estimated for Joint Interest Billing Receivables.

## D. Other Receivables

- Other Receivables include receivables for joint interest billing related to midstream costs and those owed by midstream partners.

- Collection of some of these receivables is susceptible to offset by counterparties for claims against the Estate, though collection of other of these receivables can be offset by the estate in its distribution of revenues to the same counterparties.

- Collecting these receipts is further dependent on retaining company personnel to calculate the appropriate bills and any loss in personnel can negatively impact the Trustee's ability to collect.

- For the purpose of the Liquidation Analysis, an ultimate recovery of 90% to 95% is estimated for Other Receivables.

## E. Derivatives Receivables

- Derivatives Receivables include net receivables from hedge settlement partners.

- These receivables are expected to be collectable but are highly susceptible to movements in commodity prices and edge settlement partners may deduct fees or costs to terminate hedges prematurely.

- To account for commodity price risk and potential termination costs, an ultimate recovery range of 10 to 25% is estimated for Derivatives Receivables.

## F. Income Tax Receivable

- Income Tax Receivables include receivables due to the Debtors from overpayment of income taxes in prior years.

- These receivables are expected to be collected by February 2020, though collection is at risk of offset by the federal government to potentially offset other taxes or Claims that could be owed through the dissolution of the Debtors. An ultimate recovery range of 50% to 75% is estimated for Income Tax Receivables.

## G. Other Current Assets

- Other Current Assets include prepaid expenses, cash collateral posted for certain surety bonds, professional fee retainers, and other vendor deposits.

- Professional retainers are assumed to be utilized against accrued professional fees and cash collateral posted

5

for surety bonds is assumed to offset Other Secured Claims – Class 2.

- Most of the remaining Other Current Assets are not expected to be recoverable under a liquidation scenario.

- For the purposes of the Liquidation Analysis, an ultimate recovery range of 62% to 63% is assumed for Other Current Assets.

## H. Oil & Gas Properties, Net

- Given the daily production and depletion of oil and gas assets, the Liquidation Analysis assumes the Trustee will pursue a prompt and broad marketing of the assets over a four-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures. It also assumes the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets. The Liquidation Analysis assumes that the Trustee will expend minimal capital necessary to maintain production and preserve asset value including funding certain expenditures such as artificial lift.

- The liquidation of the Debtors' oil and gas properties includes proved reserves, unproved reserves, and undeveloped acreage that would produce an aggregate sale value in the range of $367.4 million to $510.9 million based on the application of income approach (the discounted cash flow method) for proved reserves and the market approach (the precedent transaction method) for certain unproved reserves, adjusted to account for current market conditions, limited performance history, and recent operational issues.

- The income approach considered the Debtors' reserve report with an effective date as of September 30, 2019 using the NYMEX strip as of July 26, 2019 for the commodity price forecast.  Depending on the reserve category, certain risk adjustments were made to the discounted cash flow values for proved reserves.

- The market approach considered the Debtors' undeveloped lease acreage as of September 30, 2019, adjusting for leases the Debtors would lose upon cessation of drilling and completion capital expenditures, under contractual continuous drilling obligations, or lease expiration provisions.

## I. Other Property, Plant & Equipment, Net

- Other Property, Plant & Equipment, Net mainly consists of office furniture, fixtures, and computer equipment, for which only a limited recovery is assumed.

- For the purpose of the Liquidation Analysis, an ultimate recovery of 17% to 32% is estimated for Other Property, Plant & Equipment, Net.

## J. Other Assets

- Other Assets includes unamortized insurance premiums.

- The unamortized insurance premiums would not be recoverable under a chapter 7 liquidation process.

*Liquidation Costs*

## K. Post Conversion Cash Flow

- Because the Debtors oil and gas assets were valued as of September 30, 2019, the Liquidation Analysis assumes that any cash flow generated from the sale of oil and gas reserves over the four-month asset marketing and sales process will accrue to the buyer of such assets as a post-closing adjustment to the purchase price either in favor of the Estate or the buyer.

6

**L. Net Wind-Down Expenses**

- The Liquidation Analysis assumes the effective data for the sale of the Debtors' oil and gas assets is September 30, 2019, with the sale closing on January 31, 2020 and an additional two-month post-closing wind-down. During this six-month winddown period, the Liquidation Analysis assumes the Debtors will continue to employ the workforce required during the asset marketing and sale process and ensuing winddown of the Estate.

- The Trustee is assumed to reduce employee and other related expenses upon the conversion of the case and throughout the six-month liquidation timeframe. This Liquidation Analysis includes the cost of an employee retention program equal to a blended rate of 35% of total employee compensation.

**M. Trustee Fees**

- Section 326 of the Bankruptcy Code provides for fees payable to the Trustee of 3.0% for liquidation proceeds in excess of $1 million, excluding cash.

**N. Trustee Legal and Financial Advisors**

- Professional fees include estimates for certain legal and financial advisory professionals required during the wind-down period.

- These professionals are assumed to be paid 2% to 3% of the liquidation proceeds.

*Recovery Analysis*

Any available net proceeds would be allocated to the applicable creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code:

**O. Administrative Claims**

- Administrative Claims include approximately $40.7 million of unpaid post-petition vendor and royalties payable and accrued liabilities and other costs and expenses of administration of the Debtors' estates during the Chapter 11 Cases. The Liquidation Analysis projects an estimate recovery of 100% for holders of Administrative Claims.

- The cessation of the business in a liquidation would likely incur other Claims including contract rejection Claims. No attempt has been made here to value such liabilities, unless specific herein.

**P. DIP Facility Claims**

- The Liquidation Analysis assumes there will be approximately $25.4 million in outstanding DIP Facility Claims consisting of principal, plus accrued and unpaid pre- and post-Conversion Date interest.

- The Debtors estimate that there will be approximately $4.5 million in superpriority carve-out claims for chapter 11 professional fees and fees of the United States Trustee.

- The Liquidation Analysis projects that all allowed and undisputed DIP Facility Claims (including all claims for adequate protection in the order approving the DIP Facility) will be paid in full.

**Q. Class 1 - Other Priority Claims**

- The Debtors estimate that there will be no Class 1 Claims on the Chapter 7 Conversion Date.

**R. Class 2 – Other Secured Claims**

- Other Secured Claims include cash collateral and deposits held by surety bond providers and office lessors.

7

- The Liquidation Analysis assumes that the surety bonds are pulled by their beneficiaries and that the surety bond providers offset the cash collateral to cover part of their claims against the Estate, with any remaining deficiency amounts claimed against the Debtors as general unsecured claims.

- The Liquidation Analysis assumes that all office leases are rejected in the course of the liquidation and that deposits held by office lessors are used to offset their contract rejection damages, with the remaining damages allowed as general unsecured claims against the Estate.

### S. Class 3 – RBL Claims

- The Debtors estimate that there will be approximately $237.9 million in Class 3 Claims consisting of principal, plus accrued and unpaid pre- and post-Conversion Date interest, with post-Petition Date interest accruing at the default rate of interest. The Liquidation Analysis projects that the liquidation proceeds shall cause Class 3 Claims to be paid in full.

### T. Class 4 – Senior Note Claims

- The Debtors estimate that there will be approximately $644.5 million in Class 5 Claims as of the Chapter 7 Conversion Date. The Liquidation Analysis projects an estimated recovery rate of 2.3% to 17.9% for Class 4 Claims.

### U. Class 5 - General Unsecured Claims

- The Debtors estimate that there will be approximately $284.4 million in General Unsecured Claims as of the Chapter 7 Conversion Date.

- General Unsecured Claims are estimated as of the Petition Date and include amounts not expected to be paid through one of the first day motions or as of the Chapter 7 Conversion Date.

- The Liquidation Analysis includes lease rejection claims for the Debtors' two offices, employee contract rejection claims, and potential rejection claims related to some of the Debtors' midstream executory contracts, for illustrative purposes only. Other executory contract rejection claims have not been assumed for the purpose of the Liquidation Analysis.

- Class 7 includes approximately $5.3 million related to litigation Claims, which are currently disputed Claims, not including amounts secured by cash collateral held by surety bond providers. The Debtors are parties in additional lawsuits not considered in this amount as they remain unliquidated.

- The Liquidation Analysis projects that General Unsecured Claims will be paid 2.3% to 17.9% in a chapter 7 proceeding

### V. Class 6 - Intercompany Claims

- The Debtors estimate that there will be no Class 6 recoveries.

### W. Class 7 – Existing Equity Interests

- The Debtors estimate that there will be no Class 7 recoveries.

### X. Class 8 – Other Equity Interests

- The Debtors estimate that there will be no Class 8 recoveries.

### Y. Class 9 – Intercompany Interests

- The Debtors estimate that there will be no Class 9 recoveries.

## Exhibit G

## Financial Projections

## FINANCIAL INFORMATION AND PROJECTIONS

*The prospective financial information included in this Disclosure Statement has been prepared by, and is the responsibility of, the Debtors' management team ("**Management**"). No independent auditors have examined, compiled or performed any procedures with respect to the accompanying prospective financial information.*

*The Debtors do not, as a matter of course, publish their business plans, budgets or strategies or disclose projections or forecasts of their anticipated financial positions, results of operations or cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans, budgets, strategies, projections or forecasts of their anticipated financial positions, results of operations or cash flows to creditors or equity interest holders prior to the Effective Date of the Plan or to include such information in documents required to be filed with the SEC or otherwise make such information publicly available.*

*The assumptions, projections and other financial information contained in this section contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.*

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Management has prepared financial projections (the "**Projections**") for the years 2019 through 2023 (the "**Projection Period**"). The Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the potential future performance of the Reorganized Debtors' operations assuming the consummation of the Plan. The Company's long-term debt obligations are fully and unconditionally guaranteed, jointly and severally, by all of the Debtors' existing 100% owned subsidiaries. The Projections are presented on a consolidated basis, including estimates of operating results for all Debtor entities. The Projections will also assist each holder of a claim or interest in determining whether to vote to accept or reject the Plan. In general, as illustrated by the Projections, the reduction of debt on the Debtors' balance sheet will substantially reduce future interest expense and improve future cash flows. Based on the Projections, the Debtors should have sufficient cash flow to pay and service their post-restructuring debt obligations and to operate their business. The Debtors believe that the Confirmation Date and Effective Date of the Plan are not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS DO NOT REFLECT THE IMPACT OF FRESH START ACCOUNTING, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED BELOW IN SECTION XI, A VARIETY OF

RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN SECTION XI BELOW AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES AND ANY RESULTING CHANGES TO THE PROJECTIONS COULD BE MATERIAL.

## 1) General Assumptions

### a. Overview

The Debtors are an independent energy company focused on the acquisition, production, exploration and development of onshore liquids-rich oil and natural gas assets in the United States.

### b. Presentation

The Debtors' long-term debt obligations are fully and unconditionally guaranteed, jointly and severally, by all of the Debtors' existing 100% owned subsidiaries. The Projections are presented on a consolidated basis, including estimates of operating results for the Debtor entities in total.

### c. Accounting Policies

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to Accounting Standards Certification ("**ASC**") 852-10, as issued by the Financial Accounting Standards Board.

### d. Methodology

Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Projections. In preparation of the Projections, the Debtors considered the current commodity price environment, historical operating/production performance and operating costs. The Projections were developed on a field-by-field, bottoms-up basis and incorporate multiple sources of information, including general business and economic conditions.

### e. Plan Consummation

The operating assumptions assume that the Restructuring Transaction will be consummated pursuant to the Plan and that the Plan will be confirmed and consummated by September 30, 2019, and reflect the estimated cash impact of the Plan's treatment of each class of claims or interests. The Debtors do not believe a change in the assumed date of the consummation of the Plan would materially impact the post-confirmation capital structure, their operating performance, these Projections or the underlying economics associated with the Plan.

## 2) Assumptions With Respect to the Projected Income Statement

### a. Production

Forecasted oil, natural gas and natural gas liquids ("**NGL**") volumes for operated production are based on production estimates by Management and contemplate future commodity prices and anticipated operated

rig activity. Forecasted volumes for non-operated production are based on anticipated development plans of outside operators obtained through active dialogue with those operators.

| FORECASTED VOLUMES MBOE/day | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Volumes | 17.9 | 18.4 | 17.6 | 21.6 | 26.2 |

### b. Revenues

Revenues are derived from the sale of the consolidated **Reorganized Debtors'** share of oil, natural gas and NGL production primarily from its owned working interests in the Delaware Basin of West Texas.

### c. Commodity Pricing

Revenues are sensitive to changes in the prices received for oil and natural gas production. Oil and natural gas production is sold at prevailing market prices, which may be volatile and subject to numerous factors which are outside of the Reorganized Debtors' control. The Projections assume New York Mercantile Exchange ("**NYMEX**") futures strip pricing for crude oil and natural gas as of **July 26, 2019**, as shown in the chart below: Assumptions regarding realized pricing (i.e., "differentials") from NYMEX are based on input from Management and existing marketing, gathering and transportation contracts with purchasers of the Reorganized Debtors' production.

| FORECASTED PRICE DECK | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Oil ($/bbl) | $ 56.93 | $ 55.04 | $ 53.29 | $ 52.65 | $ 52.84 |
| Gas ($/mcf) | $ 2.49 | $ 2.46 | $ 2.54 | $ 2.59 | $ 2.67 |

### d. Rig Count

Contemplating the forecasted commodity pricing, we have assumed the following operated rig counts, as shown in the chart below:

| FORECASTED RIGS | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Number of Rigs | 1.6 | 1.0 | 1.0 | 2.0 | 2.0 |

### e. Operating Costs

Lease operating expenses ("**LOE**"), workover expenses, gathering expenses, and production taxes are based on historical levels and Management estimates of future expectations. LOE includes, among other items, lifting costs, fuel, certain payroll, maintenance and repair and outside services. Forecasted LOE contemplates anticipated improvements due, in part, to operational improvements and efficiencies as well as cost decreases from our vendors in light of the current commodity price environment.

### f. Income Taxes

For the years ended December 31, 2019 and 2020, Federal Income Taxes are projected to remain at an effective rate of zero due to the impact of deductions for depletion, depreciation, intangible drilling costs, and NOLs. For the years ended December 31, 2021 through 2023, the Debtors expect to pay approximately $5 million per year in Federal Income Taxes. Tax projections have not been approved by a

licensed tax professional and do not constitute a thorough and exhaustive tax analysis performed on behalf of the Debtors'.

**g. General and Administrative**

General and Administrative Costs ("**G&A**") are primarily comprised of labor costs and other expenses associated with the Debtors' corporate overhead. Projected G&A is based on historical G&A costs, adjusted for current operational commitments.

**h. Impairment Charges**

To the extent capitalized costs of evaluated oil and natural gas properties, net of accumulated depletion, exceed the discounted future net revenues of proved oil and natural gas reserves, net of deferred taxes, such excess capitalized costs are charged to expense as a non-cash full cost ceiling test impairment. The Company does not forecast ceiling test impairments due to the variability of certain inputs, such as i) commodity prices, which are inherently volatile, and ii) transfers of unevaluated properties, which are analyzed quarterly for potential impairment based upon factors in existence at the time of evaluation for impairment, including, but not limited to: the Company's intentions with respect to drilling on such properties, remaining lease terms, geological and geophysical evaluations, drilling results, the assignment of proved reserves and the economic viability of development if proved reserves are assigned. Changes in commodity prices, production rates, levels of reserves, future development costs, transfers of unevaluated properties, capital spending, and other factors will determine the Company's ceiling test calculations and impairment analyses in future periods.

**i. Depreciation, Depletion & Amortization**

Depreciation, Depletion and Amortization ("**DD&A**") is forecasted using the units of production method ("**UOP**"). The amortization base in the UOP calculation includes the sum of proved property, net of accumulated DD&A, estimated future development costs (future costs to access and develop proved reserves), and asset retirement costs, less related salvage value.

**j. Reorganization Expenses**

Reorganization expenses consist of actual and estimated fees for professional advisors, financing fees and other costs directly attributable to the Chapter 11 Cases. Expenses and other costs associated with the restructuring are forecasted to be approximately **[$35.0 million]**.

**3) Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

The projected Consolidated Balance Sheets were developed using **[June 30, 2019]** unaudited financial results as a starting point and are adjusted on a go-forward basis, incorporating projected results from operations and cash flows over the Projection Period.

**a. Capital Expenditures**

Projections for capital expenditures were prepared with consideration of the Debtors' current drilling program and future estimates in the development of the Delaware Basin in West Texas. These expenditures include capital associated with drilling new producing wells, improving operational efficiency and capitalized maintenance expenditures. Capital expenditures also include expenditures

directed at maintaining lease acreage positions, building infrastructure and geological and geophysical expenditures.

**b. Working Capital**

The Projections contemplate timing of forecasted receivables, payables and interest payments that are consistent with the timing experienced with the Debtors' historical receipts and payments.

**c. Pro Forma Adjustments Related to Emergence**

The Balance Sheet included in the Projections presents a pro forma view assuming the effect of certain adjustments related to the Debtors' emergence from the Chapter 11 Cases. These adjustments primarily relate to the exchange of the Senior Notes for equity. While the 2019 through 2023 Projections roll-forward the effect of such pro forma adjustments, fresh-start accounting pursuant to ASC 852-10 principles have not been applied.

**d. Capital Structure**

The Projections include secured financing in the form of a reserve based revolving Exit Facility as well as the Equity Rights Offering at emergence. Proceeds under the Exit RBL Facility and Equity Rights Offering will allow the Reorganized Debtors to finance day-to-day operations and the forecasted capital plan. The Projections do not contemplate any additional equity or debt financing.

Case 19-34446   Document 19   Filed in TXSB on 08/07/19   Page 410 of 412

| CONSOLIDATED BALANCE SHEET ($ in Thousands) | Pre-Reorg 9/30/2019 | Debt Discharge (a) | Equity Raise (b) | Credit Facility Refinancing (b) | Post-Reorg 9/30/2019 | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | | | |
| Cash and Cash Equivalents | $1,250 | | | | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 |
| Accounts Receivable | 35,885 | | | | 35,885 | 44,368 | 42,406 | 41,221 | 49,082 | 52,568 |
| Receivables from Derivatives Contracts | 5,436 | | | | 5,436 | 2,819 | - | - | - | - |
| Prepaid and Other Current Assets | 10,825 | | | | 10,825 | 10,825 | 10,825 | 10,825 | 10,825 | 10,825 |
| **Total Current Assets** | $53,395 | $0 | $0 | $0 | $53,395 | $59,261 | $54,481 | $53,296 | $61,157 | $64,643 |
| **Net PP&E** | | | | | | | | | | |
| Gross Oil and Gas Properties | $2,581,140 | | | | $2,581,140 | $2,629,583 | $2,745,838 | $2,862,624 | $3,096,615 | $3,349,935 |
| Gross Gas Gathering and Other Operating Assets | 217,165 | | | | 217,165 | 225,390 | 261,590 | 264,590 | 267,590 | 267,590 |
| Less: Accumulated DD&A | (1,677,023) | | | | (1,677,023) | (1,699,024) | (1,780,830) | (1,859,065) | (1,954,892) | (2,070,982) |
| **Net PP&E** | $1,121,281 | $0 | $0 | $0 | $1,121,281 | $1,155,949 | $1,226,598 | $1,268,149 | $1,409,313 | $1,546,543 |
| **Other Noncurrent Assets** | | | | | | | | | | |
| Other Long Term Assets | $5,425 | | | | $5,425 | $5,425 | $5,425 | $5,425 | $5,425 | $5,425 |
| Receivables from Derivatives Contracts | 1,001 | | | | 1,001 | - | - | - | - | - |
| Debt Issuance Costs | 10,752 | (10,752) | | | - | - | - | - | - | - |
| **Total Other Noncurrent Assets** | $17,178 | ($10,752) | $0 | $0 | $6,426 | $5,425 | $5,425 | $5,425 | $5,425 | $5,425 |
| **TOTAL ASSETS** | $1,191,854 | ($10,752) | $0 | $0 | $1,181,103 | $1,220,635 | $1,286,504 | $1,326,870 | $1,475,895 | $1,616,611 |
| **Current Liabilities** | | | | | | | | | | |
| Accounts Payable | $98,755 | | | ($30,115) | $68,640 | $88,408 | $85,030 | $85,273 | $100,883 | $122,086 |
| Liabilities from Derivatives Contracts | 2,912 | | | | 2,912 | 8 | - | - | - | - |
| Debtor-in-Possession Financing | 26,651 | | (26,651) | | - | - | - | - | - | - |
| Other Current Liabilities | 1,626 | | | | 1,626 | 1,626 | 1,626 | 1,626 | 1,626 | 1,626 |
| **Total Current Liabilities** | $129,944 | $0 | ($26,651) | ($30,115) | $73,178 | $90,042 | $86,656 | $86,899 | $102,509 | $123,712 |
| **Long-Term Liabilities** | | | | | | | | | | |
| Pre-Petition Revolving Credit Facility | $223,234 | | ($138,349) | ($84,885) | $0 | $0 | $0 | $0 | $0 | $0 |
| Exit Revolving Credit Facility | - | | | 115,000 | 115,000 | 149,826 | 191,111 | 199,178 | 272,944 | 304,150 |
| Long-Term Debt | 625,005 | (625,005) | | | - | - | - | - | - | - |
| Asset Retirement Obligations | 7,085 | | | | 7,085 | 7,085 | 7,085 | 7,085 | 7,085 | 7,085 |
| Deferred Tax Liability | 50,305 | | | | 50,305 | 50,305 | 50,305 | 50,305 | 50,305 | 50,305 |
| Other Long-Term Liabilities | 2,748 | | | | 2,748 | 2,748 | 2,748 | 2,748 | 2,748 | 2,748 |
| **Total Long-Term Liabilities** | $908,377 | ($625,005) | ($138,349) | $30,115 | $175,138 | $209,964 | $251,249 | $259,316 | $333,082 | $364,288 |
| **Stockholders' Equity** | $153,533 | $614,253 | $165,000 | $0 | $932,787 | $920,630 | $948,599 | $980,655 | $1,040,304 | $1,128,611 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $1,191,854 | ($10,752) | $0 | $0 | $1,181,103 | $1,220,635 | $1,286,504 | $1,326,870 | $1,475,895 | $1,616,611 |

(a) Reflects the extinguishment of Senior Notes in exchange for Equity pursuant to the Plan. The blance of the Senior Notes in excess of the Rights Offering is treated as a gain in retained earnings.

(b) Reflects the equity offering pursuant to the Plan, excluding fees, used to pay off existing Debtor-in-Possession financing, with the remainder used to pay down the Revolving Credit Facility

(c) The Projections do not reflect all of the adjustments necessary to implement resh-start accounting pursuaunt to Accounts Standards Certification ("ASC") 852-10, as issued by the Financial Accounting Standards Board

**CONSOLIDATED INCOME STATEMENT**
($ in Thousands)

| | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|
| **Total Revenue** | $230,046 | $244,808 | $241,848 | $300,065 | $365,946 |
| **Cost of Operations** | | | | | |
| Operating Expenses | ($115,594) | ($102,066) | ($92,045) | ($102,900) | ($118,019) |
| General and Administrative [1] | (84,790) | (27,971) | (27,191) | (27,191) | (27,191) |
| Impairment Charges | (939,622) | - | - | - | - |
| Depreciation, Depletion, and Amortization | (111,264) | (81,806) | (78,235) | (95,827) | (116,090) |
| **Total Expenses** | ($1,251,270) | ($211,843) | ($197,471) | ($225,917) | ($261,300) |
| **Income (Loss) from Operations** | ($1,021,224) | $32,965 | $44,378 | $74,148 | $104,646 |
| **Other Income (Expenses)** | | | | | |
| Interest Income / (Expense) | ($15,884) | ($8,996) | ($9,822) | ($11,999) | ($15,089) |
| Realized Gain / (Loss) on Derivatives | 12,226 | 2,811 | - | - | - |
| Unrealized Gain / (Loss) on Derivatives | (54,000) | (2,811) | - | - | - |
| Gain / Loss on Extinguishment of Debt | 342,905 | - | - | - | - |
| Gain / (Loss) on Sale of Property and Equipment | (3,782) | - | - | - | - |
| Other | (783) | - | - | - | - |
| **Total Other Income / (Expenses)** | $280,682 | ($8,996) | ($9,822) | ($11,999) | ($15,089) |
| **Income (Loss) Before Income Taxes** | ($740,543) | $23,969 | $34,556 | $62,150 | $89,557 |
| Income Tax (Expense) / Benefit | 45,485 | - | (5,000) | (5,000) | (3,750) |
| **Net Income (Loss) to Common Shareholders** | ($695,058) | $23,969 | $29,556 | $57,150 | $85,807 |

(1) Includes restructuring expenses during 2019

**EBITDA RECONCILIATION**
($ in Thousands)

| | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|
| Net Income (Loss) | ($695,058) | $23,969 | $29,556 | $57,150 | $85,807 |
| Depreciation, Depletion, and Amortization | $111,264 | $81,806 | $78,235 | $95,827 | $116,090 |
| Interest Expense / (Income) | 15,884 | 8,996 | 9,822 | 11,999 | 15,089 |
| Unrealized (Gain) / Loss on Derivatives | 54,000 | 2,811 | - | - | - |
| Income Tax Expense | (45,485) | - | 5,000 | 5,000 | 3,750 |
| Share-Based Compensation Expenses | (3,007) | 4,000 | 2,500 | 2,500 | 2,500 |
| Other Non-Recurring | 670,486 | - | - | - | - |
| **Adjusted EBITDA** | $108,085 | $121,582 | $125,113 | $172,475 | $223,236 |

**CONSOLIDATED STATEMENT OF CASH FLOWS**
($ in Thousands)

| | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|
| **Cash Flow from Operating Activities** | | | | | |
| Net Income (Loss) | ($695,058) | $23,969 | $29,556 | $57,150 | $85,807 |
| | | | | | |
| **Adjustments to Reconcile Net Cash Flow from Operations** | | | | | |
| Depreciation, Depletion, and Amortization | $111,264 | $81,806 | $78,235 | $95,827 | $116,090 |
| Amortization of Loan Costs and Discount / Premium | 1,703 | - | - | - | - |
| (Gain) / Loss on Sale of Property and Equipment | 3,782 | - | - | - | - |
| Unrealized (Gain) / Loss on Derivatives | 54,000 | 2,811 | - | - | - |
| Impairment Charges | 939,622 | - | - | - | - |
| Share-Based Compensation Expenses | (3,007) | 4,000 | 2,500 | 2,500 | 2,500 |
| Deferred Tax Expense | (45,485) | - | - | - | - |
| (Gain) / Loss on Extinguishment of Debt | (342,905) | - | - | - | - |
| Changes in Working Capital | (52,983) | (1,416) | 1,427 | 7,749 | 17,717 |
| **Net Cash Provided by Operations** | **($29,066)** | **$111,170** | **$111,719** | **$163,226** | **$222,114** |
| | | | | | |
| **Cash Flow from Investing Activities** | | | | | |
| Capital Expenditures | ($307,747) | ($144,283) | ($111,475) | ($228,278) | ($244,518) |
| Capitalized Interest, G&A, ARO, and Other | (8,354) | (8,172) | (8,311) | (8,713) | (8,802) |
| **Net Cash Used in Investing Activities** | **($316,101)** | **($152,455)** | **($119,786)** | **($236,991)** | **($253,320)** |
| | | | | | |
| **Cash Flow from Financing Activities** | | | | | |
| Net Borrowings (Pay Down) of Long-Term Debt | $299,551 | $41,285 | $8,067 | $73,766 | $31,206 |
| **Net Cash Used in Financing Activities** | **$299,551** | **$41,285** | **$8,067** | **$73,766** | **$31,206** |
| | | | | | |
| Net Increase (Decrease in Cash and Cash Equivalents | ($45,616) | $0 | $0 | $0 | $0 |
| | | | | | |
| Cash and Cash Equivalents at Beginning of Period | $46,866 | $1,250 | $1,250 | $1,250 | $1,250 |
| | | | | | |
| Cash and Cash Equivalents at End of Period | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 |