IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **HALCÓN RESOURCES CORPORATION**, *et al.*, | § § § § | **Case No. 19-34446 (DRJ)** |
| **Debtors.**[1] | § § § | **(Jointly Administered)** **Re: Docket No. 20** |

**NOTICE OF FILING OF PLAN SUPPLEMENT FOR JOINT
PREPACKAGED CHAPTER 11 PLAN OF HALCÓN RESOURCES
CORPORATION AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE** that Halcón Resources Corporation and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby file this plan supplement (as may be amended, modified, or supplemented from time to time, the "**Plan Supplement**") in connection with, and in accordance with, the *Joint Prepackaged Chapter 11 Plan of Halcón Resources Corporation and Its Affiliated Debtors*, dated August 2, 2019 [Docket No. 20] (the "**Plan**").[2]  The documents contained in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  These documents have not yet been approved by the Bankruptcy Court.  If the Plan is confirmed by the Bankruptcy Court, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Halcón Resources Corporation (0684), Halcón Resources Operating, Inc. (4856), Halcón Holdings, Inc. (5102), Halcón Energy Properties, Inc. (5292), Halcón Permian, LLC (6153), Halcón Field Services, LLC (0280), and Halcón Operating Co., Inc. (3588).  The Debtors' mailing address is 1000 Louisiana St., Suite 1500, Houston, TX 77002.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Plan Supplement includes the following documents:

| Exhibit | Plan Supplement Document |
|:---:|:---:|
| A | Exit RBL Agreement |
| B | Warrant Agreement |
| C | Registration Rights Agreement |
| D | Schedule of Retained Causes of Action |
| E | New Board Disclosure |
| F | Amended Certificate of Incorporation of Reorganized Halcón Resources Corporation |
| G | Amended By-Laws of Reorganized Halcón Resources Corporation |
| H | Governance Term Sheet |
| I | Schedule of Rejected Executory Contracts and Unexpired Leases |
| J | Reporting Company Election |

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are not final and remain subject to continuing negotiations among the Debtors and other interested parties.  Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be permitted by the Plan or by order of the Bankruptcy Court.

2

**PLEASE TAKE FURTHER NOTICE** that this Plan Supplement and all other documents filed in these chapter 11 cases are available free of charge by visiting http://www.kccllc.net/halcon. You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: August 30, 2019
      Houston, Texas

                     /s/  Alfredo R. Pérez
                     WEIL, GOTSHAL & MANGES LLP
                     Alfredo R. Pérez (15776275)
                     700 Louisiana Street, Suite 1700
                     Houston, Texas  77002
                     Telephone: (713) 546-5000
                     Facsimile:  (713) 224-9511
                     Email:  Alfredo.Perez@weil.com

                     -and-

                     WEIL, GOTSHAL & MANGES LLP
                     Gary Holtzer (admitted *pro hac vice*)
                     Lauren Tauro (admitted *pro hac vice*)
                     767 Fifth Avenue
                     New York, New York  10153
                     Telephone:  (212) 310-8000
                     Facsimile:  (212) 310-8007
                     Email:  Gary.Holtzer@weil.com
                              Lauren.Tauro@weil.com

                     *Proposed Attorneys for Debtors*
                     *and Debtors in Possession*

**Certificate of Service**

I hereby certify that on August 30, 2019, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez

## <u>Exhibit A</u>

**Exit RBL Agreement**

*DRAFT 8/30/19*

**SENIOR SECURED REVOLVING CREDIT AGREEMENT**

**DATED AS OF**
**[_____], 2019**

**AMONG**

**HALCÓN RESOURCES CORPORATION,**
**AS BORROWER,**

**BMO HARRIS BANK N.A.,**
**AS ADMINISTRATIVE AGENT,**

**AND**

**THE LENDERS PARTY HERETO**

**BMO CAPITAL MARKETS CORP.,**
**AS SOLE LEAD ARRANGER[1] AND SOLE BOOKRUNNER**

---

[1] NTD: JLAs to be named.

# ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    Terms Defined Above ................................................................................. 2
Section 1.02    Certain Defined Terms ............................................................................... 2
Section 1.03    Types of Loans and Borrowings ............................................................... 31
Section 1.04    Terms Generally; Rules of Construction ................................................... 31
Section 1.05    Accounting Terms and Determinations; GAAP ......................................... 32
Section 1.06    Interest Rates; LIBOR Notification .......................................................... 32
Section 1.07    Divisions .................................................................................................. 33

# ARTICLE II
## THE CREDITS

Section 2.01    Commitments ............................................................................................ 33
Section 2.02    Loans and Borrowings .............................................................................. 33
Section 2.03    Requests for Borrowings ........................................................................... 34
Section 2.04    Interest Elections ...................................................................................... 35
Section 2.05    Funding of Borrowings ............................................................................. 36
Section 2.06    Termination and Reduction of Aggregate Maximum Credit Amounts ...... 36
Section 2.07    Borrowing Base ........................................................................................ 39
Section 2.08    Borrowing Base Adjustment Provisions ................................................... 41
Section 2.09    Letters of Credit ....................................................................................... 42

# ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    Repayment of Loans .................................................................................. 46
Section 3.02    Interest ...................................................................................................... 46
Section 3.03    Alternate Rate of Interest .......................................................................... 47
Section 3.04    Prepayments. ............................................................................................ 48
Section 3.05    Fees .......................................................................................................... 50

# ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ................ 51
Section 4.02    Presumption of Payment by the Borrower ................................................. 52
Section 4.03    Disposition of Proceeds ............................................................................ 52
Section 4.04    Payments and Deductions to a Defaulting Lender. .................................... 53

# ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01    Increased Costs ......................................................................................... 55
Section 5.02    Break Funding Payments ........................................................................... 56
Section 5.03    Taxes ......................................................................................................... 57
Section 5.04    Mitigation Obligations; Replacement of Lenders ...................................... 60

# ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01    Closing Date .............................................................................................. 61
Section 6.02    Each Credit Event ..................................................................................... 65

i

ARTICLE VII
REPRESENTATIONS AND WARRANTIES

Section 7.01    Organization; Powers ................................................................................... 66
Section 7.02    Authority; Enforceability .............................................................................. 66
Section 7.03    Approvals; No Conflicts; Confirmation Order ............................................ 66
Section 7.04    Financial Condition; No Material Adverse Effect ....................................... 67
Section 7.05    Litigation. ..................................................................................................... 67
Section 7.06    Environmental Matters .................................................................................. 68
Section 7.07    Compliance with Laws and Agreements; No Defaults ................................. 68
Section 7.08    Investment Company Act............................................................................... 69
Section 7.09    Taxes .............................................................................................................. 69
Section 7.10    ERISA ............................................................................................................ 69
Section 7.11    Disclosure; No Material Misstatements ........................................................ 69
Section 7.12    Insurance ....................................................................................................... 70
Section 7.13    Restriction on Liens ...................................................................................... 70
Section 7.14    Subsidiaries ................................................................................................... 70
Section 7.15    Location of Business and Offices .................................................................. 70
Section 7.16    Properties; Titles, Etc.................................................................................... 71
Section 7.17    Maintenance of Properties ............................................................................ 72
Section 7.18    Gas Imbalances, Prepayments....................................................................... 72
Section 7.19    Marketing of Production ............................................................................... 72
Section 7.20    Swap Agreements .......................................................................................... 72
Section 7.21    Use of Loans and Letters of Credit .............................................................. 73
Section 7.22    Solvency......................................................................................................... 73
Section 7.23    Money Laundering......................................................................................... 73
Section 7.24    Anti-Corruption Laws ................................................................................... 73
Section 7.25    Anti-Corruption Laws; Sanctions; OFAC.................................................... 74
Section 7.26    EEA Financial Institutions ........................................................................... 74
Section 7.27    Senior Debt Status......................................................................................... 74

ARTICLE VIII
AFFIRMATIVE COVENANTS

Section 8.01    Financial Statements; Other Information ...................................................... 74
Section 8.02    Notices of Material Events............................................................................ 78
Section 8.03    Existence; Conduct of Business .................................................................... 78
Section 8.04    Payment of Obligations................................................................................. 78
Section 8.05    Performance of Obligations under Loan Documents .................................... 79
Section 8.06    Operation and Maintenance of Properties..................................................... 79
Section 8.07    Insurance ....................................................................................................... 79
Section 8.08    Books and Records; Inspection Rights ......................................................... 80
Section 8.09    Compliance with Laws.................................................................................. 80
Section 8.10    Environmental Matters.................................................................................. 80
Section 8.11    Further Assurances........................................................................................ 81
Section 8.12    Reserve Reports ............................................................................................ 81
Section 8.13    Title Information ........................................................................................... 82
Section 8.14    Additional Collateral; Additional Guarantors.............................................. 83
Section 8.15    ERISA Compliance ....................................................................................... 84
Section 8.16    Account Control Agreements; Location of Proceeds of Loans..................... 84
Section 8.17    Unrestricted Subsidiaries ............................................................................. 84
Section 8.18    Marketing Activities ..................................................................................... 85
Section 8.19    Keepwell ....................................................................................................... 85

ii

Section 8.20   Post-Closing Required Swap Agreements Covenant ................................................ 85

ARTICLE IX
NEGATIVE COVENANTS

Section 9.01   Financial Covenants ............................................................................................. 86
Section 9.02   Indebtedness......................................................................................................... 86
Section 9.03   Liens..................................................................................................................... 88
Section 9.04   Restricted Payments; Repayment of Specified Indebtedness; Restrictions on
                Amendments of Specified Indebtedness ............................................................. 88
Section 9.05   Investments, Loans and Advances ...................................................................... 89
Section 9.06   Designation and Conversion of Restricted and Unrestricted Subsidiaries;
                Indebtedness of Unrestricted Subsidiaries.......................................................... 90
Section 9.07   Nature of Business; International Operations ..................................................... 91
Section 9.08   Amendments to Organizational Documents; Fiscal Year End.............................. 91
Section 9.09   Proceeds of Loans ............................................................................................... 92
Section 9.10   ERISA Compliance.............................................................................................. 92
Section 9.11   Sale or Discount of Receivables ......................................................................... 92
Section 9.12   Merger, Etc.......................................................................................................... 93
Section 9.13   Sale of Properties; Unwinds of Swap Agreements ............................................. 93
Section 9.14   Environmental Matters......................................................................................... 94
Section 9.15   Transactions with Affiliates ................................................................................ 94
Section 9.16   Subsidiaries ......................................................................................................... 94
Section 9.17   Negative Pledge Agreements; Dividend Restrictions ......................................... 94
Section 9.18   Gas Imbalances, Take-or-Pay or Other Prepayments ......................................... 95
Section 9.19   Swap Agreements ................................................................................................ 95

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.01  Events of Default ................................................................................................. 96
Section 10.02  Remedies.............................................................................................................. 98

ARTICLE XI
THE ADMINISTRATIVE AGENT

Section 11.01  Appointment; Powers........................................................................................... 99
Section 11.02  Duties and Obligations of Administrative Agent................................................. 100
Section 11.03  Action by Administrative Agent .......................................................................... 101
Section 11.04  Reliance by Administrative Agent ....................................................................... 101
Section 11.05  Subagents ............................................................................................................ 102
Section 11.06  Resignation of Administrative Agent.................................................................... 102
Section 11.07  Administrative Agent as a Lender........................................................................ 103
Section 11.08  No Reliance.......................................................................................................... 103
Section 11.09  Administrative Agent May File Proofs of Claim .................................................. 103
Section 11.10  Authority of Administrative Agent to Release Collateral and Liens ...................... 104
Section 11.11  Certain ERISA Matters ........................................................................................ 104
Section 11.12  The Arranger ........................................................................................................ 105
Section 11.13  Credit Bidding...................................................................................................... 105
Section 11.14  Posting of Communications. ................................................................................. 106
Section 11.15  No Third Party Beneficiaries ................................................................................ 108

ARTICLE XII
MISCELLANEOUS

Section 12.01  Notices ................................................................................................................. 108

Section 12.02    Waivers; Amendments ............................................................................ 109
Section 12.03    Expenses, Indemnity; Damage Waiver .................................................... 111
Section 12.04    Successors and Assigns ............................................................................ 113
Section 12.05    Survival; Revival; Reinstatement ............................................................ 116
Section 12.06    Counterparts; Integration; Effectiveness ................................................ 117
Section 12.07    Severability ............................................................................................. 117
Section 12.08    Right of Setoff ......................................................................................... 117
Section 12.09    GOVERNING  LAW;  JURISDICTION;  CONSENT  TO  SERVICE  OF
                 PROCESS; WAIVER OF JURY TRIAL .................................................. 118
Section 12.10    Headings .................................................................................................. 119
Section 12.11    Confidentiality ........................................................................................ 119
Section 12.12    Interest Rate Limitation .......................................................................... 120
Section 12.13    EXCULPATION PROVISIONS .............................................................. 121
Section 12.14    Collateral Matters; Swap Agreements .................................................... 121
Section 12.15    No Third Party Beneficiaries ................................................................... 121
Section 12.16    USA Patriot Act Notice ........................................................................... 122
Section 12.17    Flood Insurance Provisions ..................................................................... 122
Section 12.18    No Fiduciary Duty ................................................................................... 122
Section 12.19    Releases .................................................................................................... 122
Section 12.20    Material Non-Public Information ............................................................. 123
Section 12.21    Acknowledgement and Consent to Bail-In of EEA Financial Institutions .............. 123
Section 12.22    Acknowledgement Regarding Any Supported QFCs ............................... 124

iv

## ANNEXES, EXHIBITS AND SCHEDULES

Annex I                    List of Maximum Credit Amounts and Closing Date Commitments

Exhibit A            Form of Note
Exhibit B            Form of Borrowing Request
Exhibit C            Form of Interest Election Request
Exhibit D            Form of Compliance Certificate
Exhibit E            Security Instruments
Exhibit F            Form of Assignment and Assumption
Exhibit G-1          Form of U.S. Tax Compliance Certificate
                     (Foreign Lenders; not partnerships)
Exhibit G-2          Form of U.S. Tax Compliance Certificate
                     (Foreign Participants; not partnerships)
Exhibit G-3          Form of U.S. Tax Compliance Certificate
                     (Foreign Participants; partnerships)
Exhibit G-4          Form of U.S. Tax Compliance Certificate
                     (Foreign Lenders; partnerships)
Exhibit H            Form of Solvency Certificate
Exhibit I            Form of Perfection Certificate
Exhibit J            Form of Reserve Report Certificate
Exhibit K            Form of Guaranty and Collateral Agreement
Exhibit L            Form of Maximum Credit Amount Increase Certificate
Exhibit M            Form of Additional Lender Certificate


Schedule 1.02        Existing Secured Swap Agreements
Schedule 7.05        Litigation
Schedule 7.14        Subsidiaries and Partnerships; Unrestricted Subsidiaries
Schedule 7.18        Gas Imbalances
Schedule 7.19        Marketing Contracts
Schedule 7.20        Swap Agreements
Schedule 9.02        Existing Indebtedness
Schedule 9.03        Existing Liens
Schedule 9.05        Investments

**THIS SENIOR SECURED REVOLVING CREDIT AGREEMENT** (this "Agreement") dated as of [_____], 2019 is among Halcón Resources Corporation, a corporation duly formed and existing under the laws of the State of Delaware (the "Borrower"); each of the Lenders from time to time party hereto; and BMO Harris Bank N.A. (in its individual capacity, "BMO"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent").

### R E C I T A L S

A.        Reference is made to that certain (a) Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 7, 2017 (as amended, amended and restated, supplemented, restated or otherwise modified prior to the date hereof, the "Pre-Petition Credit Agreement"), among the Borrower, the lenders and other parties from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and (b) Restructuring Support Agreement, dated as of August 2, 2019, among the Borrower, certain subsidiaries of the Borrower and the Consenting Creditors (as defined in the Restructuring Support Agreement) (as amended, amended and restated, supplemented, restated or otherwise modified, the "Restructuring Support Agreement").  Pursuant to the Restructuring Support Agreement, the Borrower and the other parties thereto agreed to a restructuring of the Borrower and its Subsidiaries.

B.        In furtherance of the Restructuring Support Agreement, (a) on August 7, 2019, the Borrower and certain of its Subsidiaries (collectively, the "Debtors") filed voluntary petitions to commence cases (the "Chapter 11 Cases") under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code and (b) on August 9, 2019, the Borrower entered into a debtor in possession credit agreement (as amended, amended and restated, supplemented, restated or otherwise modified prior to the date hereof, the "Junior DIP Credit Agreement") with Wilmington Trust, N.A., as administrative agent, and the lenders and other parties party thereto, pursuant to which the lenders party thereto (the "Junior DIP Lenders") agreed to make available a $35,000,000 million debtor-in-possession revolving credit facility (the "Junior DIP Facility"), subject to the terms and conditions therein.

C.        In furtherance of the Restructuring Support Agreement, the Debtors filed the Plan of Reorganization with the Bankruptcy Court on August 7, 2019, and the Disclosure Statement with the Bankruptcy Court on August 7, 2019.

D.        On [_____], the Bankruptcy Court entered the Confirmation Order confirming the Plan of Reorganization, which Confirmation Order *inter alia* authorized and approved the Debtors' entry into and performance under this Agreement.

E.        The Borrower has requested that the Lenders provide certain loans to and extensions of credit on behalf of the Borrower.

F.        The Lenders and the Issuing Bank have agreed to make loans and extensions of credit subject to the terms and conditions of this Agreement.

G.        In consideration of the foregoing and the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

1

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    <u>Terms Defined Above</u>.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"<u>ABR</u>" means, when used in reference to any Loan or Borrowing, whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"<u>Accounting Change</u>" has the meaning assigned to such term in <u>Section 1.05</u>.

"<u>Additional Lender</u>" has the meaning assigned to such term in <u>Section 2.06(c)(i)</u>.

"<u>Additional Lender Certificate</u>" has the meaning assigned to such term in Section <u>2.06(c)(ii)(F)</u>.

"<u>Adjusted LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate *per annum* (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period <u>multiplied</u> by (b) the Statutory Reserve Rate.

"<u>Administrative Agent</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Aggregate Maximum Credit Amounts</u>" at any time shall equal the sum of the Maximum Credit Amounts of all Lenders, as the same may be modified pursuant to <u>Section 2.06</u>. The Aggregate Maximum Credit Amounts on the Closing Date is $750,000,000.

"<u>Agreement</u>" means this Senior Secured Revolving Credit Agreement, including the Annexes, Schedules and Exhibits hereto, as the same may be further amended, restated, amended and restated, supplemented or modified from time to time.

"<u>Alternate Base Rate</u>" means, for any day, a rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1.0% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or, if such day is not a Business Day, the immediately preceding Business Day) plus 1.0%; <u>provided</u> that for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the LIBO Screen Rate (or if the LIBO Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or such Adjusted LIBO Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the NYFRB Rate or such Adjusted LIBO Rate, respectively.  If the Alternate Base Rate is being used as an alternate rate of

interest pursuant to Section 3.03, then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Margin" means, for any day, with respect to any ABR Loan or Eurodollar Loan or the Commitment Fee Rate, as the case may be, the rate per annum set forth in the Borrowing Base Utilization Percentage grid below based upon the Borrowing Base Utilization Percentage then in effect:

| Level | Borrowing Base Utilization Percentage | Eurodollar Loans | ABR Loans | Commitment Fee Rate |
|-------|---------------------------------------|------------------|-----------|---------------------|
| 1 | > 90% | 3.00 % | 2.00% | 0.50% |
| 2 | > 75% ≤ 90% | 2.75% | 1.75% | 0.50% |
| 3 | > 50% ≤ 75% | 2.50% | 1.50% | 0.50% |
| 4 | > 25% ≤ 50% | 2.25% | 1.25% | 0.375% |
| 5 | ≤ 25% | 2.00% | 1.00% | 0.375% |

Each change in the Applicable Margin or Commitment Fee Rate shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change; provided, however, that if at any time the Borrower fails to deliver a Reserve Report pursuant to Section 8.12(a), then the "Applicable Margin" and "Commitment Fee Rate" mean the rate per annum set forth on the grid when the Borrowing Base Utilization Percentage is at its highest level.

"Applicable Percentage" means, with respect to any Lender, the percentage of the Aggregate Maximum Credit Amounts represented by such Lender's Maximum Credit Amount as such percentage as of the Closing Date is set forth on Annex I; provided that, in the case of Section 4.04 when a Defaulting Lender shall exist, "Applicable Percentage" shall be adjusted to reflect the percentage of the Aggregate Maximum Credit Amounts disregarding any Defaulting Lender's Maximum Credit Amount. If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments and to any Lender's status as a Defaulting Lender at the time of determination.

"Approved Counterparty" means any Person who, at the time a Swap Agreement is entered into, is (a) the Administrative Agent or any Affiliate of the Administrative Agent, (b) any Lender or any Affiliate of a Lender or (c) any other Person whose long term senior unsecured debt rating is A-/A3 by S&P or Moody's (or their equivalent) or higher.

"Approved Electronic Platform" has the meaning assigned such term in Section 11.14.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary

3

course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means Netherland, Sewell & Associates, Inc. and any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"Arranger" means BMO Capital Markets Corp. in its capacity as sole lead arranger and sole bookrunner.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Availability Period" means the period from and including the Closing Date to but excluding the Termination Date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Products" means treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Bank Products Provider" means any Lender or Affiliate of a Lender that provides Bank Products to the Borrower or any Restricted Subsidiary.

"Bankruptcy Code" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"BHC Act Affiliate" of a party means an "affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"BMO" has the meaning assigned to such term in the preamble hereto.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning assigned to such term in the preamble hereto.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Base" means at any time an amount equal to the amount determined in accordance with Section 2.07, as the same may be redetermined or adjusted from time to time pursuant to the Borrowing Base Adjustment Provisions. The initial Borrowing Base in effect on the Closing Date shall be $275,000,000.

"Borrowing Base Adjustment Provisions" means Section 2.08(a), Section 2.08(b), Section 2.08(c), Section 2.08(d) and any other provision hereunder which adjusts (as opposed to redetermines) the amount of the Borrowing Base.

"Borrowing Base Deficiency" occurs if, at any time, the total Revolving Credit Exposures exceeds the total Commitments then in effect; provided, that, for purposes of determining the existence and amount of any Borrowing Base Deficiency, obligations under any Letter of Credit will not be deemed to be outstanding to the extent such obligations are cash collateralized in the manner set forth in Section 2.09(j).

"Borrowing Base Properties" means the Oil and Gas Properties that (a) are included in the Initial Reserve Report and thereafter in the most recently delivered Reserve Report delivered pursuant to Section 8.12 and (b) are given Borrowing Base credit.

"Borrowing Base Utilization Percentage" means, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the Revolving Credit Exposures of the Lenders on such day, and the denominator of which is the Borrowing Base in effect on such day.

"Borrowing Base Value" means, with respect to any Oil and Gas Property or any Swap Agreement, the value attributed to such asset in connection with the most recent determination of the Borrowing Base as reasonably determined by the Administrative Agent.

"Borrowing Request" means a request by the Borrower, substantially in the form of Exhibit B or any other form approved by the Administrative Agent, for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed; and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which dealings in dollar deposits are carried out in the London interbank market.

"Cash Equivalent" means cash held in US dollars and all Investments of the type identified in Section 9.05(c) through Section 9.05(f).

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of its Restricted Subsidiaries.

"Change in Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person (other than a Permitted Holder) or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC) (other than a group of Permitted Holders) of Equity Interests representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower, (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were not (i) directors of the Borrower on the Closing Date, (ii) nominated or appointed by the board of directors of the Borrower or (iii) approved by the board of directors of the Borrower as director candidates prior to their election or (c) a Specified Change of Control shall have occurred.

"Change in Law" means (a) the adoption of or taking effect of any law, rule or regulation or treaty after the date of this Agreement, (b) any change in any law, rule or regulation or treaty or in the administration, in the interpretation, implementation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 5.01(b)), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III (but not Basel II), shall in each case be deemed to be a "Change in Law", regardless of the date enacted, issued, adopted, promulgated or implemented.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Closing Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Closing Date Exceptions" has the meaning assigned to such term in Section 6.01(h).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" means all Property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Instrument.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make or continue Loans and to acquire participations in Letters of Credit hereunder, as such commitment may be (a) modified from time to time pursuant to Section 2.06, (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b) or (c) otherwise modified pursuant to the terms of this Agreement.  The amount representing each Lender's Commitment shall, at any time, be the lesser of such Lender's Maximum Credit Amount and such Lender's Applicable Percentage of the then effective Borrowing Base.

"Commitment Fee Rate" means, for any day, the rate set forth in the definition of "Applicable Margin".

"Commitment Letter" means that certain means that certain Commitment Letter, dated as of August 2, 2019, by and among the Borrower, BMO, and BMO Capital Markets Corp.

"Commodities Account" has the meaning assigned to such term in the UCC.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"Compliance Certificate" means the Compliance Certificate, signed by a Financial Officer, substantially in the form of Exhibit D.

"Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Borrower or any Guarantor pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent, any Lender or any Issuing Bank by means of electronic communications pursuant to this Agreement, including through an Approved Electronic Platform.

"Confirmation Order" means the order of the Bankruptcy Court dated [_____] [Docket No. 513] confirming the Plan of Reorganization, which order *inter alia* authorized and approved the Debtors' entry into and performance under this Agreement.

"Consolidated Net Income" means, with respect to the Borrower and its Consolidated Restricted Subsidiaries for any period, the aggregate of the net income (or loss) of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; provided that there shall be excluded therefrom:

    (a)    the net income (or loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting, except to the extent of the amount of dividends or distributions actually paid in cash during such period by such other Person to the Borrower or to a Consolidated Restricted Subsidiary;

    (b)    the net income of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that net income is not at the date of determination permitted without any prior governmental approval (that has not been

obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument or Governmental Requirement applicable to that Restricted Subsidiary or its stockholders;

(c)     any gains or losses attributable to any write-ups or write-downs of assets, including ceiling test write-downs;

(d)     any gain (or loss), together with any related provision for Taxes on such gain (or loss), realized in connection with: (i) any Disposition which is not made in the ordinary course of business or (ii) the disposition of any securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries.

For the avoidance of doubt, if the Borrower or any Consolidated Restricted Subsidiary shall acquire or dispose of any Property during such period or a Subsidiary shall be redesignated as either an Unrestricted Subsidiary or a Restricted Subsidiary, then Consolidated Net Income shall be calculated after giving pro forma effect to such acquisition, merger, disposition or redesignation, as if such acquisition, disposition or redesignation had occurred on the first day of such period.

"Consolidated Restricted Subsidiaries" means any Restricted Subsidiaries that are Consolidated Subsidiaries.

"Consolidated Subsidiaries" means, as to any Person, each Subsidiary of such Person (whether now existing or hereafter created or acquired) the financial statements of which shall be (or should have been) consolidated with the financial statements of such Person in accordance with GAAP.

"Consolidated Total Net Indebtedness" means as of any date of determination, the aggregate principal amount of all Indebtedness of the Borrower and its Consolidated Restricted Subsidiaries, without duplication, outstanding on such date, in an amount that would be reflected on a consolidated balance sheet (excluding the notes thereto) prepared as of such date on a consolidated basis in accordance with GAAP but only to the extent such Indebtedness comprises Indebtedness for borrowed money, obligations in respect of Finance Leases and debt obligations evidenced by bonds, notes, debentures, promissory notes or similar instruments (including, for the avoidance of doubt, deferred purchase price obligations that would be reflected as debt on a consolidated balance sheet prepared as of such date on a consolidated basis in accordance with GAAP, to the extent such deferred purchase price obligations are then due and payable), and any obligations in respect of unreimbursed drawn letters of credit minus (a) on any date on which there are no Loans outstanding, the aggregate amount of all Unrestricted Cash that would be listed on the consolidated balance sheet of the Borrower and its Consolidated Restricted Subsidiaries at such date or (b) on any date on which there are Loans outstanding, up to $50,000,000 of Unrestricted Cash that would be listed on the consolidated balance sheet of the Borrower and its Consolidated Restricted Subsidiaries at such date; provided that Consolidated Total Net Indebtedness shall not include Indebtedness in respect of obligations under Swap Agreements, other than to the extent such obligations are due and payable and not paid on such date, or, undrawn (or if drawn, to the extent cash collateralized in the manner set forth in Section 2.09(j)) letters of credit, bank guarantees and performance or similar bonds.

"Consolidated Unrestricted Subsidiaries" means any Unrestricted Subsidiaries that are Consolidated Subsidiaries.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  For the purposes of this definition, and without limiting the generality of the

foregoing, any Person that owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person.  "Controlled" has the meaning correlative thereto.

"Control Agreement" means a control agreement or similar agreement, as applicable, in form and substance reasonably satisfactory to the Administrative Agent, executed by the applicable Loan Party, the Administrative Agent and the relevant financial institution party thereto, which (a) provides a first priority perfected Lien in favor of the Administrative Agent for the benefit of the Secured Parties (provided such Control Agreement may permit certain Excepted Liens according to its terms) and (b) establishes the Administrative Agent's control, in each case, with respect to any Deposit Account, Securities Account or Commodities Account of such Loan Party.

"Controlled Account" means (a) a Deposit Account, Securities Account or Commodities Account that is subject to a Control Agreement or (b) in the sole discretion of the Administrative Agent, a Deposit Account, Securities Account or Commodities Account maintained with the Administrative Agent or on which the Administrative Agent has a perfected first priority Lien (provided such Control Agreement may permit certain Excepted Liens according to its terms).

"Covered Entity" means any of the following:

(a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to such term in Section 12.22.

"Current Assets" means, as of any date of determination, without duplication, the sum of all amounts that would, in accordance with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Consolidated Restricted Subsidiaries at such date, plus the unused Commitments then available to be borrowed, but excluding (a) all non-cash assets under FASB ASC Topic 815, (b) the aggregate amount of any deposits (whether in cash or otherwise) posted by the Borrower or any of its Consolidated Restricted Subsidiaries to secure Swap Obligations owing by such Persons or to cover market exposures (c) and any deferred tax assets.

"Current Liabilities" means, as of any date of determination, without duplication, the sum of all amounts that would, in accordance with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Consolidated Restricted Subsidiaries on such date, but excluding (a) all non-cash obligations under FASB ASC Topic 815, (b) the current portion of the then outstanding aggregate principal amount of the Loans under this Agreement, (c) any deferred tax liabilities and (d) any current maturities of long-term Indebtedness.

"Current Ratio" means, for any date of determination, the ratio of (a) Current Assets as of the last day of the most recently ended fiscal quarter (which may be such date of determination) to (b) Current Liabilities on such day.

9

"Debtors" has the meaning assigned to such term in the recitals hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Letters of Credit or (iii) pay over to any Loan Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Loan Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by a Loan Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Loans and participations in then outstanding Letters of Credit under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Loan Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) has become the subject of (A) a Bankruptcy Event or (B) a Bail-In Action.

"Deficiency Date" has the meaning assigned to such term in Section 3.04(c)(ii).

"Deposit Account" has the meaning assigned to such term in the UCC.

"Disclosure Statement" means the disclosure statement in respect of the Plan of Reorganization filed with the Bankruptcy Court.

"Disposition" means, with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer, condemnation or other disposition thereof (in one transaction or in a series of transactions and whether effected pursuant to a division or otherwise). The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, (a) matures (excluding any maturity as a result of the optional redemption by the issuer thereof) or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, (b) is convertible or exchangeable (unless at the sole option of the issuer thereof) for Indebtedness or (c) is redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in each case, in whole or in part, on or prior to the date that is one year after the Maturity Date.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

10

"EBITDAX" means, for any period, an amount determined for the Borrower and its Consolidated Restricted Subsidiaries equal to the sum of Consolidated Net Income for such period plus the following expenses or charges to the extent deducted from Consolidated Net Income in such period: (a) interest expense, (b) income taxes, (c) depreciation, (d) depletion, (e) amortization, (f) all other non-cash charges, (g) exploration expenses or costs (to the extent the Borrower adopts the successful efforts method of accounting), (h) any fees, expenses and other transaction costs which are incurred through [        ], in connection with the Transactions, the Chapter 11 Cases and the other transactions contemplated hereby or thereby[2] and (i) the amount of non-recurring expenses and charges in an amount not to exceed ten percent (10%) of EBITDAX (prior to giving effect to such addbacks) for such period in the aggregate during such time, minus all non-cash income (including cancellation of indebtedness income and non-cash income resulting from the requirements of Accounting Standards Codifications 410 and 815) to the extent included in Consolidated Net Income; provided that for purposes of calculating EBITDAX for any period of four consecutive Fiscal Quarters (or less in the case of any period during which the calculation of EBITDAX is being annualized for purposes of the financial covenant calculations in Section 9.01) (each, a "Reference Period"), (i) if during such Reference Period (or, in the case of pro forma calculations, during the period from the last day of such Reference Period to and including the date as of which such calculation is made) the Borrower or any Consolidated Restricted Subsidiary shall have made a Material Disposition or Material Acquisition, EBITDAX (including Consolidated Net Income) for such Reference Period shall be calculated after giving pro forma effect thereto as if such Material Disposition or Material Acquisition by the Borrower or its Consolidated Restricted Subsidiaries occurred on the first day of such Reference Period and (ii) if any calculations in the foregoing clause (i) are made on a pro forma basis, such pro forma adjustments are factually supportable and are determined in good faith by a Responsible Officer and subject to supporting documentation reasonably acceptable to the Administrative Agent. As used in this definition, "Material Acquisition" means any acquisition by the Borrower or its Consolidated Restricted Subsidiaries of property or series of related acquisitions of property that involves consideration in excess of $5,000,000, and "Material Disposition" means any Disposition of property or series of related sales, transfers or other dispositions of property that yields gross proceeds to the Borrower or any Consolidated Restricted Subsidiary in excess of $5,000,000.

For purposes of determining EBITDAX for the fiscal quarters of the Borrower ending [First Test Date], [Second Test Date] and [Third Test Date],

(a) in the case of the fiscal quarter ending [First Test Date], EBITDAX shall be equal to EBITDAX for the three month period then ending multiplied by 4,

(b) in the case of the fiscal quarter ending [Second Test Date], EBITDAX shall be equal to EBITDAX for the six month period then ending multiplied by 2,

(c) in the case of the fiscal quarter ending [Third Test Date], EBITDAX shall be equal to EBITDAX for the nine month period then ending multiplied by 4/3, and

(d) for each fiscal quarter thereafter, EBITDA shall be equal to EBITDA for the twelve month period then ending.

"ECP" means any Person who qualifies as an "eligible contract participant" under Section 2(e) of the Commodity Exchange Act.

---

[2] NTD: Date place holder to be filled when closer to emergence and to include a 90 day post-emergence time period until the Chapter 11 Cases are closed.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Engineering Reports" has the meaning assigned to such term in Section 2.07(c)(i).

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health, safety the environment or the preservation or reclamation of natural resources, in effect in any and all jurisdictions in which the Borrower or any Restricted Subsidiary is conducting or at any time has conducted business, or where any Property of the Borrower or any Restricted Subsidiary is located, including without limitation, the Oil Pollution Act of 1990 ("OPA"), as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements.  For the purpose of this definition, (i) the term "oil" shall have the meaning specified in OPA, (ii) the terms "hazardous substance" and "release" (or "threatened release") have the meanings specified in CERCLA, (iii) the terms "solid waste" and "disposal" (or "disposed") have the meanings specified in RCRA and (iv) the term "oil and gas waste" shall have the meaning specified in Section 91.1011 of the Texas Natural Resources Code ("Section 91.1011"); provided, however, that (a) in the event either OPA, CERCLA, RCRA or Section 91.1011 is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and (b) to the extent the laws of the state or other jurisdiction in which any Property of the Borrower or any Restricted Subsidiary is located establish a meaning for "oil," "hazardous substance," "release," "solid waste," "disposal" or "oil and gas waste" which is broader than that specified in either OPA, CERCLA, RCRA or Section 91.1011, such broader meaning shall apply.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, and the rules and regulations thereunder, each as amended or modified from time to time.

12

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of section 414 of the Code.

"ERISA Event" means (a) a "reportable event" described in section 4043 of ERISA with respect to a Plan or a controlled group member, as applicable, for which the reporting requirements have not been waived, (b) the withdrawal of the Borrower, a Subsidiary or any ERISA Affiliate from a Plan during a plan year in which it was a "substantial employer" as defined in section 4001(a)(2) of ERISA, except as provided in section 4062(e) of ERISA, (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under section 4041 of ERISA, (d) the institution of proceedings to terminate a Plan by the PBGC, (e) receipt of a notice of withdrawal liability pursuant to section 4202 of ERISA, (f) the failure of a Plan to meet the minimum funding standards under section 430 of the Code or section 303 of ERISA (determined without regard to any waiver of funding provisions therein), (g) the Borrower, a Subsidiary or any ERISA Affiliate incurs a withdrawal liability under Subtitle E of Title IV of ERISA with respect to a Multiemployer Plan or (h) any other event or condition which constitutes grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 10.01.

"Excepted Liens" means:  (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained to the extent required in accordance with GAAP; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c) landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties each of which is in respect of obligations that are not more than sixty (60) days  delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (d) contractual Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not more than sixty (60) days delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (e) Liens arising solely by virtue

13

of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower or any of its Restricted Subsidiaries to provide collateral to the depository institution; (f) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower or any Restricted Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any Indebtedness for borrowed money and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (g) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business; (h) judgment and attachment Liens not giving rise to an Event of Default, provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; (i) Liens arising from UCC financing statement filings regarding operating leases entered into in the ordinary course of business covering only the Property under any such operating lease; (j) Liens listed on the exhibits to the Security Instruments with respect to the Oil and Gas Properties of Borrower and each of its Restricted Subsidiaries, so long as such Liens (1) do not reduce the Net Revenues Interest (or "NRI" or terms of similar effect) attributable to any well, unit or lease included in the Oil and Gas Properties of Borrower and its Restricted Subsidiaries, materially below that shown on such exhibits to the Security Instruments or (2) increase the Working Interest (or "WI" or terms of similar effect) attributable to any well, unit or lease included in the Oil and Gas Properties of Borrower and its Restricted Subsidiaries, materially above that shown on such exhibits to the Security Instruments; and (k) Liens pursuant to merger agreements, stock purchase agreements, asset sale agreements and similar agreements (1) limiting the transfer of properties and assets pending the consummation of the subject transaction, or (2) in respect of earnest money deposits, good faith deposits, purchase price adjustment and indemnity escrows and similar deposit or escrow arrangements made or established thereunder; provided, further that Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced and no intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of such Excepted Liens.

"Excluded Accounts" means (a) Deposit Accounts the balance of which consists exclusively of (i) withheld income Taxes and federal, state or local employment Taxes required to be paid to the Internal Revenue Service or state or local Governmental Authorities with respect to employees of the Borrower or any Restricted Subsidiary, (ii) amounts required to be paid over to an employee benefit plan on behalf of or for the benefit of employees of the Borrower or any Restricted Subsidiary, (iii) amounts set aside for payroll and the payment of accrued employee benefits, medical, dental and employee benefits claims to employees of the Borrower or any Restricted Subsidiary, (iv) amounts constituting purchase price deposits held in escrow pursuant to a purchase and sale agreement with a third party containing customary provisions regarding the payment and refunding of such deposits, (v) amounts held in escrow or in trust pending litigation or other settlement claims, and (vi) amounts held in trust or as fiduciaries for third parties in respect of such third party's ratable share of the revenues of Oil and Gas Properties and (b) other Deposit Accounts so long as (i) the average daily maximum balance in such Deposit Account over a thirty (30) day period does not at any time exceed $1,000,000 and (ii) the aggregate balance for all such Deposit Accounts excluded pursuant to this clause (b) on any day does not exceed $3,000,000.

14

"Excluded Swap Obligation" means (as such definition may be modified from time to time as agreed by the Borrower and the Administrative Agent), with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order thereunder (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one Swap Agreement, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Agreements for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) Taxes on income (however denominated), branch profits Taxes or franchise Taxes, in each case, (i) imposed by any jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (ii) that are Other Connection Taxes, (b) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 5.04(b)), any withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such federal withholding Tax pursuant to Section 5.03, (c) Taxes attributable to such Lender's failure to comply with Section 5.03(e) and (d) any withholding Tax that is imposed under FATCA.

"Existing Credit Agreements" means, collectively, (a) the Pre-Petition Credit Agreement and (b) the Junior DIP Credit Agreement.

"Existing Secured Swap Agreements" means the Swap Agreements described on Schedule 1.02, which shall be secured with the Secured Obligations pursuant to this Agreement and the other Loan Documents.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement between the United States and any other such jurisdiction that facilitates the implementation of the foregoing.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Fee Letters" means that certain Upfront Fee Letter, dated as of August 2, 2019, by and among the Borrower, BMO, and BMO Capital Markets Corp. and that certain Arranger Fee Letter, dated as of August 2, 2019, by and among the Borrower, BMO, and BMO Capital Markets Corp.

15

"Finance Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as finance leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder; provided that any lease that would not have been recorded as a finance lease if it had been entered into prior to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" shall not be a Finance Lease whether or not so designated in accordance with GAAP as in effect at the time of the execution of such lease.

"Financial Officer" means, for any Person, the chief executive officer, the chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Statements" means the financial statement or statements of the Borrower and its Consolidated Subsidiaries referred to in Section 7.04(a).

"Flood Insurance Regulations" means(a) the National Flood Insurance Act of 1968, (b) the Flood Disaster Protection Act of 1973, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, et seq.), (d) the Flood Insurance Reform Act of 2004 and (e) the Biggert-Waters Flood Insurance Reform Act of 2012, in each case as now or hereafter in effect or any successor statute thereto and including any regulations promulgated thereunder.

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.05.

"Gas Balancing Obligations" means those obligations set forth on Schedule 7.18 (as may be updated pursuant to the terms of Section 7.18).

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, rules of common law, authorization or other directive or requirement, whether now or hereinafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"Guarantors" means, collectively:

(a)      as of the Closing Date, each of the Restricted Subsidiaries set forth on Schedule 7.14 hereto; and

(b)      following the Closing Date, each other Material Domestic Subsidiary or other Domestic Subsidiary that guarantees the Secured Obligations pursuant to Section 8.14(b) or any other Subsidiary that guarantees the Secured Obligations at the election of the Borrower.

16

"Guaranty Agreement" means a Guaranty and Collateral Agreement substantially in the form of Exhibit K and executed by the Guarantors.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans or on other Secured Obligations under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Impacted Interest Period" has the meaning assigned to such term in the definition of "LIBO Rate".

"Indebtedness" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services; (d) all obligations under Finance Leases; (e) all obligations under Synthetic Leases; (f) all Indebtedness (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Indebtedness is assumed by such Person; (g) all Indebtedness (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Indebtedness (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to purchase the Indebtedness or Property of others; (i) obligations to deliver commodities, goods or services, including, without limitation, Hydrocarbons, in consideration of one or more advance payments for periods in excess of 120 days prior to the day of delivery, other than gas balancing arrangements in the ordinary course of business; (j) obligations to pay for goods or services whether or not such goods or services are actually received or utilized by such Person; (k) any Indebtedness of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment. The Indebtedness of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP; provided, however, the contingent obligations of Borrower or any Subsidiary of Borrower pursuant to any purchase and sale agreement, stock purchase agreement, merger agreement or similar agreement shall not constitute "Indebtedness" within this definition so long as none of the same contains an obligation to pay money over time.

17

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document.

"Indemnitee" has the meaning assigned to such term in Section 12.03(b).

"Information" has the meaning assigned to such term in Section 12.11.

"Initial Reserve Report" means the report with respect to certain Oil and Gas Properties of the Borrower and its Restricted Subsidiaries prepared under the supervision of the chief engineer of the Borrower dated as of July 1, 2019.

"Interest Election Request" means a request by the Borrower substantially in the form of Exhibit C or any other form approved by the Administrative Agent to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender, twelve months) thereafter, as the Borrower may elect in its Borrowing Request or Interest Election Request, as applicable, given with respect thereto; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the immediately preceding Business Day, (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) no Interest Period may have a term which would extend beyond the Maturity Date.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Redetermination" has the meaning assigned to such term in Section 2.07(b).

"Interim Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to an Interim Redetermination becomes effective as provided in Section 2.07(d).

"Interpolated Rate" means, at any time, for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Indebtedness of, purchase or other acquisition of any other Indebtedness of, or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory, goods, supplies or services sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property of another Person that constitutes a business unit or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Issuing Bank" means each of BMO, [___][3] and any other Lender that agrees to act as an Issuing Bank, each, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.09(i). The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Junior DIP Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"Junior DIP Facility" has the meaning assigned to such term in the recitals hereto.

"Junior DIP Lenders" has the meaning assigned to such term in the recitals hereto.

"LC Availability Requirements" has the meaning assigned to such term in Section 2.09(a).

"LC Commitment" means, at any time, (a) as to BMO $[___], (b) as to [___], $[___] and (c) as to [___], $[___].[4] The aggregate LC Commitment is an amount equal to $50,000,000. For the avoidance of doubt, the LC Commitment is part of, and not in addition to, the aggregate Commitments.

"LC Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lender Parent" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

"Lenders" means the Persons listed on Annex I and any Person that shall have become a party hereto pursuant to an Assignment and Assumption and any Person that shall have become a party

---

[3] NTD: To include any additional named agents under the Credit Agreement.

[4] NTD: LC Commitments to be split ratably among all Issuing Banks.

hereto as an Additional Lender pursuant to Section 2.06(c) other than, in each case, any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement.

"Letter of Credit Agreements" means all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with the Issuing Bank relating to any Letter of Credit.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the LIBO Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") then the LIBO Rate shall be the Interpolated Rate.

"LIBO Screen Rate" means, for any day and time, with respect to any Eurodollar Borrowing for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for dollars for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its sole discretion); provided that if the LIBO Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a deed of trust, mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties.  The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Borrower and its Restricted Subsidiaries shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Loan Documents" means this Agreement, the Notes, if any, the Letter of Credit Agreements, the Letters of Credit and the Security Instruments.

"Loan Party" means, collectively, the Borrower and each Guarantor.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority Lenders" means, at any date, (a) Non-Defaulting Lenders having or holding more than fifty percent (50%) of all unused Commitments and the total Revolving Credit Exposure (excluding Revolving Credit Exposure of Defaulting Lenders) in the aggregate at such date or (b) if the Commitments have been terminated, Non-Defaulting Lenders having or holding more than fifty percent (50%) of the outstanding principal amount of all Loans and the total LC Exposure (excluding Revolving Credit Exposure of Defaulting Lenders) in the aggregate at such date.

"Material Adverse Effect" means a material adverse effect on (a) the business, financial condition, operations, performance, properties of the Borrower, the Guarantors and their respective Restricted Subsidiaries, taken as a whole, (b) the ability of the Loan Parties to perform their respective material obligations under the Loan Documents, or (c) the ability of the Administrative Agent, the Issuing Bank and the Lenders to enforce the Loan Documents.

"Material Domestic Subsidiary" means, as of any date, any Domestic Subsidiary that (a) is a Wholly-Owned Subsidiary and (b) together with its Restricted Subsidiaries, owns Property having a fair market value of $1,000,000 or more; provided that, notwithstanding the foregoing, each Restricted Subsidiary that owns Oil and Gas Properties for which Borrowing Base credit is given, or is to be given in an upcoming redetermination shall be a Material Domestic Subsidiary.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate outstanding principal amount exceeding $10,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means [_____], 2024.

"Maximum Credit Amount" means, as to each Lender, the amount set forth opposite such Lender's name on Annex I under the caption "Maximum Credit Amounts", as the same may be (a) modified from time to time in connection with a reduction, termination or increase of the Aggregate Maximum Credit Amounts pursuant to Section 2.06, (b) modified from time to time pursuant to any assignment permitted by Section 12.04(b) or (c) otherwise modified pursuant to this Agreement.

"Maximum Credit Amount Increase Certificate" has the meaning assigned to such term in Section 2.06(c)(ii)(E).

"Money Laundering Laws" has the meaning assigned to such term in Section 7.23.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgage" means each of the mortgages or deeds of trust executed by any one or more Loan Parties for the benefit of the Secured Parties as security for the Secured Obligations, together with any supplements, modifications or amendments thereto and assumptions or assignments of the obligations thereunder by any Loan Party.  "Mortgages" means all of such Mortgages collectively.

"Mortgaged Property" means any Property owned by any Loan Party which is subject to the Liens existing and to exist under the terms of the Security Instruments.

"Multiemployer Plan" means a Plan which is a multiemployer plan as defined in sections 3(37) or 4001 (a)(3) of ERISA.

"Net Cash Proceeds" means in connection with any issuance or sale of Equity Interests, debt securities or instruments, the incurrence or issuance of Indebtedness, any Disposition of Property, any Unwind of Swap Agreements, or Casualty Event, the aggregate cash proceeds received from such issuance, sale, incurrence, Disposition, Unwind or Casualty Event, as applicable, net of attorneys' fees, investment

banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"New Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(d).

"New Indebtedness" has the meaning assigned to such term in the definition of Permitted Refinancing Indebtedness.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Recourse Indebtedness" means any Indebtedness of any Unrestricted Subsidiary, in each case in respect of which: (a) the holder or holders thereof (i) shall have recourse only to, and shall have the right to require the obligations of such Unrestricted Subsidiary to be performed, satisfied, and paid only out of, the Property of such Unrestricted Subsidiary and/or one or more of its Subsidiaries (but only to the extent that such Subsidiaries are Unrestricted Subsidiaries) and/or any other Person (other than Borrower and/or any Restricted Subsidiary (other than Equity Interests of such Unrestricted Subsidiary)) and (ii) shall have no direct or indirect recourse (including by way of guaranty, support or indemnity) to the Borrower or any Restricted Subsidiary or to any of the Property of Borrower or any Restricted Subsidiary (other than Equity Interests of such Unrestricted Subsidiary), whether for principal, interest, fees, expenses or otherwise; and (b) the terms and conditions relating to the non-recourse nature of such Indebtedness are in form and substance reasonably acceptable to the Administrative Agent.

"Notes" means the promissory notes of the Borrower as requested by a Lender and described in Section 2.02(d) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such

22

Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise solely from any payment made under or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and any other Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 5.04(b)).

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Participant" has the meaning set forth in Section 12.04(c)(i).

"Participant Register" has the meaning set forth in Section 12.04(c)(i).

"Patriot Act" has the meaning assigned to such term in Section 7.23.

"Payment Conditions" means (a) at the time of, and given effect to the occurrence of the proposed event, no Default or Event of Default has occurred and is continuing and (b) after giving *pro forma* effect to the proposed event, (i) the unused Commitments then available to be borrowed are at least 20% of the then effective Borrowing Base and (ii) the Total Net Indebtedness Leverage Ratio does not exceed 2.75 to 1.00.

"Payment in Full" means (a) the Commitments have expired or been terminated, (b) the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been indefeasibly paid in full in cash (other than contingent indemnification obligations), (c) all Letters of Credit shall have expired or terminated (or are cash collateralized or otherwise secured to the satisfaction of the Issuing Bank) and all LC Disbursements shall have been reimbursed and (d) all amounts due under Secured Swap Agreements shall have been indefeasibly paid in full in cash (or such Secured Swap Agreements are cash collateralized or otherwise secured to the satisfaction of the Secured Swap Provider).

"Perfection Certificate" means a perfection certificate substantially in the form of Exhibit I.

23

"Permitted Holders" means Luminus Management, LLC, Oaktree Capital Management L.P., Lion Point Capital L.P. and Gen IV Investment Opportunities, LLC, and each of their respective Affiliates and funds managed or advised by any of them or any of their respective Affiliates (but excluding any operating portfolio companies of the foregoing persons).

"Permitted Refinancing Indebtedness" means Indebtedness (for purposes of this definition, "New Indebtedness") incurred in exchange for, or proceeds of which are used to refinance, all of any other Indebtedness (the "Refinanced Indebtedness"); provided that:

(a)      such New Indebtedness is in an aggregate principal amount not in excess of the sum of (i) the aggregate principal of, plus accrued interest on, the amount then outstanding of the Refinanced Indebtedness (or, if the Refinanced Indebtedness is exchanged or acquired for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration thereof, such lesser amount) and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such exchange or refinancing,

(b)      such New Indebtedness has a stated maturity no earlier than the stated maturity of the Refinanced Indebtedness and a weighted average life no shorter than the weighted average life of the Refinanced Indebtedness and does not, by its terms, restrict the prepayment or repayment of the Secured Obligations,

(c)      such New Indebtedness contains covenants, events of default and guarantees which (other than "market" interest rate, fees, funding discounts and redemption or prepayment premiums as determined at the time of issuance or incurrence of any such Indebtedness) are not more restrictive on the Borrower and each of its Restricted Subsidiaries than the terms of this Agreement (as in effect at the time of such issuance or incurrence),

(d)      no Subsidiary of the Borrower (other than a Guarantor or a Person who becomes a Guarantor in connection therewith) is an obligor under such New Indebtedness, and

(e)      such New Indebtedness (and any guarantees thereof) is subordinated in right of payment to the Secured Obligations (or, if applicable, the Guaranty Agreement) to at least the same extent as the Refinanced Indebtedness and otherwise on terms satisfactory to the Administrative Agent.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate.

"Plan of Reorganization" means the Joint Prepackaged Chapter 11 Plan of Reorganization of the Debtors (as amended, or supplemented in accordance with its terms, the "Plan of Reorganization") with the Bankruptcy Court on August 7, 2019 [Docket No. ___].

"Post-Closing Required Swap Agreements Covenant" has the meaning assigned to such term in Section 8.20(a).

24

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proposed Acquisition" has the meaning assigned to such term in Section 9.19(a)(iii).

"Proposed Borrowing Base" has the meaning assigned to such term in Section 2.07(c)(i).

"Proposed Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(c)(ii).

"Proved Reserves" means oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves."

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public-Sider" means a Lender whose representatives may trade in securities of the Borrower or any of their respective Subsidiaries while in possession of the financial statements provided by the Borrower under the terms of this Agreement, and has notified the Administrative Agent in writing that such Lender wishes to receive only information consisting exclusively of information with respect to the Borrower and its Affiliates that is either publicly available or not material with respect to the Borrower and its Affiliates, any of their respective securities for purposes of United States federal and state securities laws.

"PV-9" means, on any date of determination, with respect to any Proved Reserves expected to be produced from any Borrowing Base Properties, the net present value, discounted at 9% per annum, of the future net revenues expected to accrue to the Borrower's and the other Restricted Subsidiaries' collective interests in such Proved Reserves during the remaining expected economic lives of such reserves, calculated in accordance with the most recent bank price deck provided to the Borrower by the Administrative Agent.

"QFC Credit Support" has the meaning assigned to such term in Section 12.22.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each of the Borrower, any Restricted Subsidiary and any Guarantor that has total assets exceeding $10,000,000 at the time such Swap Obligation is incurred or such other person as constitutes an ECP under the Commodity Exchange Act or any regulations promulgated thereunder.

25

"Redemption" means with respect to any Indebtedness, the repurchase, redemption, prepayment, repayment, defeasance, purchase or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Indebtedness. "Redeem" has the correlative meaning thereto.

"Redetermination Date" means, with respect to any Scheduled Redetermination or any Interim Redetermination, the date that the redetermined Borrowing Base related thereto becomes effective pursuant to Section 2.07(d).

"Reference Period" has the meaning assigned to such term in the definition of "EBITDAX".

"Register" has the meaning assigned to such term in Section 12.04(b)(iv).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Remedial Work" has the meaning assigned to such term in Section 8.10(a).

"Required Lenders" means, at any date, (a) Non-Defaulting Lenders having or holding at least sixty-six and two thirds percent (66-2/3%) of all unused Commitments and the total Revolving Credit Exposure (excluding Revolving Credit Exposure of Defaulting Lenders) in the aggregate at such date or (b) if the Commitments have been terminated, Non-Defaulting Lenders having or holding at least sixty-six and two thirds percent (66-2/3%) of the outstanding principal amount of all Loans and the total LC Exposure (excluding Revolving Credit Exposure of Defaulting Lenders) in the aggregate at such date.

"Required Swap Agreements" means Swap Agreements entered into by the Borrower at prices reasonably acceptable to the Administrative Agent in respect of crude oil and natural gas, calculated separately (on a barrel of oil equivalent basis for natural gas), on not less than (a) 75% of the reasonably anticipated projected production from the Proved Reserves classified as "Developed Producing Reserves" of the Loan Parties (as forecast based upon the most recently delivered Reserve Report) for a period through at least the first twelve (12) months following the Closing Date and (b) 50% of the reasonably anticipated projected production from the Proved Reserves classified as "Developed Producing Reserves" of the Loan Parties (as forecast based upon the most recently delivered Reserve Report) for a period through at least months thirteen (13) through twenty-four (24) following the Closing Date.

"Required Swap Date" has the meaning assigned to such term in Section 8.20(a).

"Reserve Report" means the Initial Reserve Report and any other subsequent report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th (or such other date in the event of an Interim Redetermination) the oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and the Restricted Subsidiaries, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon the pricing assumptions consistent with SEC reporting requirements at the time.

"Reserve Report Certificate" has the meaning assigned to such term in Section 8.12(c).

26

"Responsible Officer" means, as to any Person, the Chief Executive Officer, the President, the Chief Operating Officer, any Financial Officer, Chief Legal Officer or Executive Vice President of such Person.  Unless otherwise specified, all references to a Responsible Officer herein means a Responsible Officer of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in any Person, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of (a) any such Equity Interests or (b) any option, warrant or other right to acquire any such Equity Interests.

"Restricted Subsidiary" means any Subsidiary of the Borrower that is not an Unrestricted Subsidiary.

"Restructuring Support Agreement" has the meaning assigned to such term in the recitals hereto.

"Restructuring Term Sheet" has the meaning assigned to such term in the Restructuring Support Agreement.

"Revolving Credit Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans and LC Exposure at such time.

"S&P" means Standard & Poor's Rating Services, a Standard & Poor's Financial Services LLC business and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (as of the Closing Date, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any government that is itself the subject or target of Sanctions or (d) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a), (b) or (c).

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom.

"Scheduled Redetermination" has the meaning assigned to such term in Section 2.07(b).

"Scheduled Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to a Scheduled Redetermination becomes effective as provided in Section 2.07(d).

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

27

"Secured Obligations" means any and all amounts owing or to be owing by the Borrower or any Guarantor to (a) the Administrative Agent, the Issuing Bank or any Lender under any Loan Document, (b) any Secured Swap Provider with respect to any Secured Swap Agreement, (c) any Bank Products Provider with respect to any Bank Products and (d) all renewals, extensions and/or rearrangements of any of the foregoing, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising (including interest and fees accruing after the maturity of the Loans and LC Disbursements or the termination of the Secured Swap Agreements and interest accruing after the filing of any petition for bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding); provided that solely with respect to any Loan Party that is not an "eligible contract participant" under the Commodity Exchange Act, Excluded Swap Obligations of such Loan Party shall in any event be excluded from "Secured Obligations" owing by such Loan Party.

"Secured Parties" means, collectively, the Administrative Agent, the Issuing Bank, the Lenders, each Bank Products Provider, each Secured Swap Provider and any other Person owed Secured Obligations. "Secured Party" means any of the foregoing individually.

"Secured Swap Agreement" means a Swap Agreement between (a) any Loan Party and (b) a Secured Swap Provider, which shall include, for the avoidance of doubt, the Existing Secured Swap Agreements.

"Secured Swap Provider" means, with respect to any Swap Agreement, (a) a Lender or an Affiliate of a Lender who is the counterparty to such Swap Agreement with a Loan Party and (b) any Person who was a Lender or an Affiliate of a Lender at the time when such Person entered into such Swap Agreement who is a counterparty to any such Swap Agreement with a Loan Party; provided that any such Secured Swap Provider that ceases to be a Lender or an Affiliate of a Lender shall continue to be a "Secured Swap Provider" for purposes of the Loan Documents to the extent that such Secured Swap Provider entered into a Secured Swap Agreement with the Borrower or any of its Subsidiaries prior to the date hereof or at the time such Secured Swap Provider was a Lender (or Affiliate of a Lender) hereunder and such Secured Swap Agreement remains in effect and there are remaining obligations under such Secured Swap Agreement (but excluding any transactions, confirms, or trades entered into after such Person ceases to be a Lender or an Affiliate of a Lender) (it being understood that if such Swap Agreement is novated or otherwise transferred by such Person to a third party that is not a Lender or an Affiliate of a Lender, such third party shall not constitute a Secured Swap Provider).

"Securities Account" has the meaning assigned to such term in the UCC.

"Security Instruments" means (a) the Guaranty Agreement, (b) the Mortgages, (c) any Perfection Certificate, (d) any Control Agreement, (e) the other agreements, instruments or certificates described or referred to in Exhibit E and (f) any and all other agreements, instruments or certificates now or hereafter executed and delivered by the Borrower or any other Person (other than Swap Agreements with the Lenders or any Affiliate of a Lender or participation or similar agreements between any Lender and any other lender or creditor with respect to any Secured Obligations pursuant to this Agreement), in each case in connection with, or as security for the payment or performance of the Secured Obligations, the Loans, the Notes, if any, this Agreement, or reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"Senior Note Backstop Agreement" has the meaning assigned to such term in the Restructuring Support Agreement.

"Solvency Certificate" means a solvency certificate signed by a Financial Officer in substantially the form of Exhibit H hereto.

"Specified Additional Indebtedness" means unsecured senior or senior subordinated Indebtedness issued or incurred by the Borrower and any guarantees thereof by the Guarantors (including any Persons becoming Guarantors simultaneously with the incurrence of such Indebtedness):

(a)     that does not restrict, by its terms, the prepayment or repayment of the Secured Obligations,

(b)     that has terms which do not provide for the maturity of such Indebtedness to be or any scheduled repayment, mandatory redemption or sinking fund obligation to occur prior to one hundred and eight (180) days after the Maturity Date (other than customary offers to purchase upon a change of control and customary acceleration rights after an event of default),

(c)     where the covenants, events of default and guarantees which (other than "market" interest rate, fees, funding discounts and redemption or prepayment premiums as determined at the time of issuance or incurrence of any such Indebtedness) are not more restrictive on the Borrower and each of its Restricted Subsidiaries than the terms of this Agreement (as in effect at the time of such issuance or incurrence),

(d)     where, if such Indebtedness is subordinated Indebtedness in right of payment, the terms of such Indebtedness provide for customary subordination of such Indebtedness to the Secured Obligations,

(e)     where no Subsidiary of the Borrower (other than a Guarantor or a Person who becomes a Guarantor in connection therewith) is an obligor under such Indebtedness.

"Specified Change of Control" means a "Change of Control" (or any other defined term having a similar purpose or meaning) as defined in any Specified Additional Indebtedness or any Permitted Refinancing Indebtedness in respect thereof.

"Specified Indebtedness" has the meaning assigned to such term in Section 9.04(b).

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). Such reserve percentage shall include those imposed pursuant to Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" means: (a) any Person of which at least a majority of the outstanding Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors, manager or other governing body of such Person (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the Borrower or

29

one or more of its Subsidiaries or by the Borrower and one or more of its Subsidiaries and (b) any partnership of which the Borrower or any of its Restricted Subsidiaries is a general partner.  Unless otherwise indicated herein, each reference to the term "Subsidiary" means a Subsidiary of the Borrower.

"Supported QFC" has the  meaning assigned to such term in Section 12.22.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction, collar or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more interest rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Termination Date" means the earlier of the Maturity Date and the date of termination of the Commitments.

"Total Net Indebtedness Leverage Ratio" means the financial covenant of the Borrower set forth in Section 9.01(a).

"Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of its obligations under this Agreement, each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and the grant of Liens by the Borrower on Mortgaged Properties and other Properties pursuant to the Security Instruments and (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Secured Obligations and the other obligations under the Guaranty Agreement by such Guarantor and such Guarantor's grant of the security interests and provision of collateral thereunder, and the grant of Liens by such Guarantor on Mortgaged Properties and other Properties pursuant to the Security Instruments.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"UCC" means the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any collateral.

"Unrestricted Cash" means cash and Cash Equivalents of the Borrower or any of its Restricted Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Borrower or any of its Restricted Subsidiaries; provided that (a) cash and Cash Equivalents that would appear as "restricted" on a consolidated balance sheet of Borrower or any of its Restricted Subsidiaries solely because such cash or Cash Equivalents are subject to a Control Agreement in favor of the Administrative Agent shall constitute Unrestricted Cash hereunder, (b) cash and Cash Equivalents shall be included in the determination of Unrestricted Cash only to the extent that such cash and Cash Equivalents are maintained in accounts subject to a Control Agreement or are Excluded Accounts of the type specified in clause (b) of the definition thereof, in each case, in compliance with the terms of this Agreement and (c) cash and Cash Equivalents that are maintained in accounts to the extent required under this Agreement to cash collateralize LC Exposure shall not be included in Unrestricted Cash.

"Unrestricted Subsidiary" means any Subsidiary of the Borrower designated as such on Schedule 7.14 or which the Borrower has designated in writing to the Administrative Agent to be an Unrestricted Subsidiary pursuant to Section 9.06.

"Unwind" means, with respect to any transaction under a Swap Agreement, the early termination, unwind, or cancelation of any transaction under such Swap Agreement. "Unwound" shall have a meaning correlative to the foregoing.

"U.S. Person" has the meaning given in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regimes" has the meaning given to such term in Section 12.22.

"Wholly-Owned Subsidiary" means any Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by the Borrower or one or more of the Wholly-Owned Subsidiaries or by the Borrower and one or more of the Wholly-Owned Subsidiaries.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.03    Types of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan" or a "Eurodollar Borrowing").

Section 1.04    Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated, amended and restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b) any reference

31

herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement. The use of the phrase "subject to" as used in connection with Excepted Liens or otherwise and the permitted existence of any Excepted Liens or any other Liens shall not be interpreted to expressly or impliedly subordinate any Liens granted in favor of the Administrative Agent and the other Secured Parties as there is no intention to subordinate the Liens granted in favor of the Administrative Agent and the other Secured Parties. No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.05    Accounting Terms and Determinations; GAAP. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP (including the impact of "fresh start" accounting under Accounting Standards Codification 852), applied on a basis consistent with the Financial Statements, except for Accounting Changes (as defined below) with which the Borrower's independent certified public accountants concur and which are disclosed to the Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a). Notwithstanding anything to the contrary contained in the preceding sentence or in the definitions of "Finance Leases," in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on the date hereof) that would constitute Finance Leases in conformity with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" shall be considered Finance Leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith. In the event that any "Accounting Change" shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in good faith in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Majority Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board or, if applicable, the SEC.

Section 1.06    Interest Rates; LIBOR Notification. The interest rate on Eurodollar Loans is determined by reference to the LIBO Rate, which is derived from the London interbank offered rate. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "IBA") for purposes of the IBA setting the London interbank offered rate. As a result, it is possible that commencing in 2022, the London interbank offered

32

rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Eurodollar Loans. In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate. In the event that the London interbank offered rate is no longer available or in certain other circumstances as set forth in Section 3.03 of this Agreement, such Section 3.03 provides a mechanism for determining an alternative rate of interest.  The Administrative Agent will notify the Borrower, pursuant to Section 3.03, in advance of any change to the reference rate upon which the interest rate on Eurodollar Loans is based. However, the Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration (except as expressly set forth in Section 3.03), submission or any other matter related to the London interbank offered rate or other rates in the definition of "LIBO Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate, as it may or may not be adjusted pursuant to Section 3.03, will be similar to, or produce the same value or economic equivalence of, the LIBO Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

Section 1.07   Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## THE CREDITS

Section 2.01   Commitments.  Subject to the terms and conditions set forth herein, on and after the Closing Date, each Lender agrees to make Loans to the Borrower from time to time on any Business Day during the Availability Period in an aggregate principal amount that will not result in (a) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment or (b) the total Revolving Credit Exposures exceeding the total Commitments.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

Section 2.02   Loans and Borrowings.

(a)   Borrowings; Several Obligations.  Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)   Types of Loans.  Subject to the terms of this Agreement, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)   Minimum Amounts; Limitation on Number of Borrowings.  At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that

is an integral multiple of $1,000,000 and not less than $1,000,000.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000; provided that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.09(e).  Borrowings of more than one Type may be outstanding at the same time, provided that there shall not at any time be more than a total of eight (8) Eurodollar Borrowings outstanding.  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d)     Notes.  Any Lender may request that Loans made by it be evidenced by a Note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender and substantially in the form of Exhibit A dated, in the case of (i) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement, (ii) any Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption, or (iii) any Additional Lender that becomes a Lender party hereto in connection with an increase in the Aggregate Maximum Credit Amounts pursuant to Section 2.06(c), payable to such Lender in a principal amount equal to its Maximum Credit Amount as in effect on such date, and otherwise duly completed.  In the event that any Lender's Maximum Credit Amount increases or decreases for any reason (whether pursuant to Section 2.06, Section 12.04(b) or otherwise), upon the request of such Lender, the Borrower shall deliver or cause to be delivered as of the effective date of such increase or decrease, a new Note payable to such Lender in a principal amount equal to its Maximum Credit Amount after giving effect to such increase or decrease, and otherwise duly completed.  The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be endorsed by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.03     Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by submitting a Borrowing Request (a) in the case of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, on the date of the proposed Borrowing; provided that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.09(e).  Each such Borrowing Request shall be irrevocable and shall be signed by a Responsible Officer of the Borrower.  Each such Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)     the aggregate amount of the requested Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day;

(iii)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

34

(v)      the amount of the then effective Borrowing Base, the current total Revolving Credit Exposures (without regard to the requested Borrowing) and the pro forma total Revolving Credit Exposures (giving effect to the requested Borrowing); and

(vi)      the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Each Borrowing Request shall constitute a representation that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposures to exceed the total Commitments.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04      Interest Elections.

(a)      Conversion and Continuance.  Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.04.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)      Interest Election Requests.  To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable and shall be signed by a Responsible Officer of the Borrower.

(c)      Information in Interest Election Requests.  Each Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)      the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(iii) and Section 2.04(c)(iv) shall be specified for each resulting Borrowing);

(ii)      the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)      whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)      if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

35

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)      Notice to Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)      Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing: (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05      Funding of Borrowings.

(a)      Funding by Lenders.  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to a Controlled Account designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.09(e) shall be remitted by the Administrative Agent to the Issuing Bank.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)      Presumption of Funding by the Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to 10:00 A.M. New York City time on the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to the requested Borrowing.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.06      Termination and Reduction of Aggregate Maximum Credit Amounts.

(a)      Scheduled Termination of Commitments.  Unless previously terminated, the Commitments shall terminate on the Maturity Date.  If at any time the Aggregate Maximum Credit Amounts

36

are terminated or reduced to zero, then the Commitments shall terminate on the effective date of such termination or reduction.

(b)        Optional Termination and Reduction of Aggregate Credit Amounts.

(i)        The Borrower may at any time terminate, or from time to time reduce, the Aggregate Maximum Credit Amounts; provided that (A) each reduction of the Aggregate Maximum Credit Amounts shall be in an amount that is an integral multiple of $5,000,000 and not less than $10,000,000 and (B) the Borrower shall not terminate or reduce the Aggregate Maximum Credit Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c)(i), the total Revolving Credit Exposures would exceed the total Commitments.

(ii)        The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Maximum Credit Amounts under Section 2.06(b)(i) at least three (3) Business Days prior to the effective date of such termination or reduction or such shorter time as the Administrative Agent may agree in writing, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) shall be irrevocable; provided that a notice of termination of the Aggregate Maximum Credit Amounts delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit or debt facilities or any other transaction, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Aggregate Maximum Credit Amounts shall be permanent and may not be reinstated except pursuant to Section 2.06(c). Each reduction of the Aggregate Maximum Credit Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

(c)        Optional Increase in Aggregate Maximum Credit Amounts.

(i)        Subject to the conditions set forth in Section 2.06(c)(ii), the Borrower may increase the Aggregate Maximum Credit Amounts then in effect by increasing the Maximum Credit Amount of a Lender or, with the written consent of the Administrative Agent and each Issuing Bank (such consent not to be unreasonably withheld or delayed), by causing a Person that at such time is not a Lender to become a Lender (an "Additional Lender"). Notwithstanding anything to the contrary contained in this Agreement, in no case shall an Additional Lender be the Borrower or an Affiliate of the Borrower.

(ii)        Any increase in the Aggregate Maximum Credit Amounts shall be subject to the following additional conditions:

(A)        such increase shall not be less than $25,000,000 and all such increases pursuant to this Section 2.06 shall not exceed $1,000,000,000 in the aggregate;

(B)        no Default shall have occurred and be continuing on the effective date of such increase;

(C)        [reserved];

(D)        no Lender's Maximum Credit Amount may be increased without the consent of such Lender;

(E)        if the Borrower elects to increase the Aggregate Maximum Credit Amounts by increasing the Maximum Credit Amount of an existing Lender, the Borrower and such

Lender shall execute and deliver to the Administrative Agent a certificate substantially in the form of Exhibit L (a "Maximum Credit Amount Increase Certificate"), and the Borrower shall, (1) if requested by such Lender, deliver a new Note payable to such Lender in a principal amount equal to its Maximum Credit Amount after giving effect to such increase and otherwise duly completed and (2) pay any applicable fees as may have been agreed to between the Borrower, the Additional Lender and/or the Administrative Agent;

(F)     if the Borrower elects to increase the Aggregate Maximum Credit Amounts by causing an Additional Lender to become a party to this Agreement, then the Borrower and such Additional Lender shall execute and deliver to the Administrative Agent a certificate substantially in the form of Exhibit M (an "Additional Lender Certificate"), together with an Administrative Questionnaire and a processing and recordation fee of $3,500, and the Borrower shall (1) if requested by the Additional Lender, deliver a Note payable to such Additional Lender in a principal amount equal to its Maximum Credit Amount, and otherwise duly completed and (2) pay any applicable fees as may have been agreed to between the Borrower, the Additional Lender and/or the Administrative Agent; and

(G)     the Borrower shall deliver or cause to be delivered any customary legal opinions or other documents (including, without limitation, a resolution duly adopted by the board of directors (or equivalent body) of each Loan Party authorizing such increase in the Aggregate Maximum Credit Amounts) in connection with such increase in the Aggregate Maximum Credit Amounts, in each case, to the extent reasonably requested by the Administrative Agent.

(iii)     Subject to acceptance and recording thereof pursuant to Section 2.06(c)(iv), from and after the effective date specified in the Maximum Credit Amount Increase Certificate or the Additional Lender Certificate (or, if any Eurodollar Borrowings are outstanding, then the last day of the Interest Period in respect of such Eurodollar Borrowings, unless the Borrower has paid any compensation required by Section 5.02):

(A)     the amount of the Aggregate Maximum Credit Amounts shall be increased as set forth therein, and

(B)     in the case of an Additional Lender Certificate, any Additional Lender party thereto shall be a party to this Agreement and have the rights and obligations of a Lender under this Agreement and the other Loan Documents.

In addition, the Lender or the Additional Lender, as applicable, shall purchase a pro rata portion of the outstanding Loans (and participation interests in Letters of Credit) of each of the other Lenders (and such Lenders hereby agree to sell and to take all such further action to effectuate such sale) such that each Lender (including any Additional Lender, if applicable) shall hold its Applicable Percentage of the outstanding Loans (and participation interests) after giving effect to the increase in the Aggregate Maximum Credit Amounts.

(iv)     Upon its receipt of a duly completed Maximum Credit Amount Increase Certificate or an Additional Lender Certificate, executed by the Borrower and the Lender or by the Borrower and the Additional Lender party thereto, as applicable, the written consent of the Administrative Agent and each Issuing Bank referred to in Section 2.06(c)(i), the processing and recording fee referred to in Section 2.06(c)(ii)(F), and the Administrative Questionnaire referred to in Section 2.06(c)(ii)(F), if applicable, the Administrative Agent shall accept such Maximum Credit Amount Increase Certificate or Additional Lender Certificate and record the information contained therein in the Register required to be

38

maintained by the Administrative Agent pursuant to Section 12.04(b)(iv).  No increase in the Aggregate Maximum Credit Amounts shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 2.06(c)(iv).

(v)     Upon any increase in the Aggregate Maximum Credit Amounts pursuant to this Section 2.06(c), Annex I to this Agreement shall be automatically amended to reflect any changes in the Lenders' Maximum Credit Amounts and any resulting changes in the Lenders' Applicable Percentages.

Section 2.07     Borrowing Base.

(a)     Initial Borrowing Base.  For the period from and including the Closing Date to but excluding the first Redetermination Date, the amount of the Borrowing Base shall be $275,000,000. Notwithstanding the foregoing, the Borrowing Base may be subject to further adjustments from time to time pursuant to the Borrowing Base Adjustment Provisions.

(b)     Scheduled and Interim Redeterminations.   The Borrowing Base shall be redetermined semi-annually in accordance with this Section 2.07(b) (each such redetermination, a "Scheduled Redetermination").   Subject to Section 2.07(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders on May 1st and November 1st of each year (or such date promptly thereafter as reasonably practical), commencing on or about May 1, 2020.  In addition, (i) the Borrower may, by notifying the Administrative Agent thereof, and (ii) the Administrative Agent may, following the first Scheduled Redetermination hereunder, at the direction of the Required Lenders, by notifying the Borrower thereof, in each case, one time during each period between any two consecutive Scheduled Redeterminations, each elect to cause the Borrowing Base to be redetermined (an "Interim Redetermination") in accordance with this Section 2.07.

(c)     Scheduled and Interim Redetermination Procedure.

(i)     Each Scheduled Redetermination and each Interim Redetermination shall be effectuated as follows: upon receipt by the Administrative Agent of (A) the Reserve Report for such redetermination and the related Reserve Report Certificate (unless waived by the Administrative Agent in the case of an Interim Redetermination) and (B) such other reports, data and supplemental information, including, the information provided pursuant to Section 8.12(c), as may, from time to time, be reasonably requested by the Required Lenders (the Reserve Report, such Reserve Report Certificate and such other reports, data and supplemental information being the "Engineering Reports"), the Administrative Agent shall evaluate the information contained in the Engineering Reports and shall, in good faith and based upon its sole credit discretion, propose a new Borrowing Base (the "Proposed Borrowing Base") based upon such information and such other information (including, without limitation, the status of title information with respect to the Oil and Gas Properties as described in the Engineering Reports and the existence of any other Indebtedness) as the Administrative Agent deems appropriate and consistent with its normal oil and gas lending criteria as it exists at the particular time. In no event shall the Proposed Borrowing Base at such time exceed the Aggregate Maximum Credit Amounts.

(ii)     The Administrative Agent shall thereafter notify the Borrower and the Lenders of the Proposed Borrowing Base (the "Proposed Borrowing Base Notice"):

(A)     in the case of a Scheduled Redetermination (I) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Sections 8.12(a) and Section 8.12(c), in a timely and complete manner, then

39

on or before April 15th or October 15th, as the case may be, of such year following the date of delivery or (II) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Sections 8.12(a) and Section 8.12(c), in a timely and complete manner, then promptly after the Administrative Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.07(c)(i); and

(B)     in the case of an Interim Redetermination, promptly, and in any event, within fifteen (15) days after the Administrative Agent has received the required Engineering Reports (or such later date to which the Borrower and the Administrative Agent may agree in their respective sole discretion).

(iii)     Any Proposed Borrowing Base that would (A) increase the Borrowing Base then in effect must be approved by all Lenders as provided in this Section 2.07(c)(iii) and (B) decrease or maintain the Borrowing Base then in effect must be approved by the Required Lenders as provided in this Section 2.07(c)(iii).  Such decisions will be made by each Lender based upon the Engineering Reports and such other information (including the status of title information with respect to the Oil and Gas Properties as described in the Engineering Reports and the existence of any other Indebtedness) as such Lender deems appropriate in its sole credit discretion and consistent with each Lender's normal and customary standards and practices for determining the value of oil and gas properties based upon its usual and customary criteria for reserve based oil and gas lending criteria as it exists at the particular time.  Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have fifteen (15) days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base.  If, at the end of such 15-day period, all of the Lenders, in the case of a Proposed Borrowing Base that would increase the Borrowing Base then in effect, or the Required Lenders, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, have approved, as aforesaid, then the Proposed Borrowing Base shall become the new Borrowing Base, effective on the date specified in Section 2.07(d).  If, however, at the end of such 15-day period, all of the Lenders or Required Lenders, as applicable, have not approved, as aforesaid, then the Administrative Agent shall poll the Lenders to ascertain the highest Borrowing Base then acceptable to the Required Lenders for purposes of this Section 2.07(c) and, so long as such amount does not increase the Borrowing Base then in effect, such amount shall become the new Borrowing Base, effective on the date specified in Section 2.07(d) (provided that, if the Administrative Agent shall have polled the Lenders and ascertained that the highest Borrowing Base then acceptable to all of the Lenders increases the Borrowing Base then in effect, such amount shall become the new Borrowing Base, effective on the date specified in Section 2.07(d)).

(d)     Effectiveness of a Redetermined Borrowing Base.     After a redetermined Borrowing Base is approved by all of the Lenders or the Required Lenders, as applicable, pursuant to Section 2.07(c)(iii), the Administrative Agent shall notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "New Borrowing Base Notice"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders:

(i)     in the case of a Scheduled Redetermination, (A) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and Section 8.12(c), in a timely and complete manner, then on May 1st or November 1st of each year, as applicable, following such notice (or as soon as possible thereafter, pursuant to the procedures set forth in Section 2.07(c)(iii)), or (B) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and Section 8.12(c), in a timely and complete manner, then on the Business Day next succeeding delivery of such New Borrowing Base Notice; and

40

(ii)     in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such New Borrowing Base Notice.

Such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination Date or the next adjustment to the Borrowing Base pursuant to the Borrowing Base Adjustment Provisions, whichever occurs first.   Notwithstanding the foregoing, no Scheduled Redetermination or Interim Redetermination shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower.

Section 2.08     Borrowing Base Adjustment Provisions.

(a)     Reduction of Borrowing Base Upon Asset Dispositions and Termination of Swap Positions.  If the Borrower or a Restricted Subsidiary Disposes of (or any Casualty Event occurs in respect of) Oil and Gas Properties (but excluding any Disposition to a Loan Party or from a non-Loan Party to a non-Loan Party, in each case, subject to prior written notice to the extent required by Section 8.01(k)) or any Equity Interests in any Person owning Oil and Gas Properties (but excluding any Disposition to a Loan Party or from a non-Loan Party to a non-Loan Party, in each case, subject to prior written notice to the extent required by Section 8.01(k)), or Unwinds Swap Agreements and (i) the Borrowing Base Value attributable to such Oil and Gas Property Disposed of or subject to such Casualty Event (or the Oil and Gas Properties owned by the Borrower or a Restricted Subsidiary whose Equity Interests were sold) plus (ii) the Borrowing Base Value attributable to such Unwound Swap Agreements, since the later of (A) the last Redetermination Date and (B) the last adjustment of the Borrowing Base pursuant to this Section 2.08(a) is in excess of ten percent (10%) of the Borrowing Base as then in effect, individually or in the aggregate, then the Required Lenders shall have the right to adjust the Borrowing Base by an amount equal to the Borrowing Base Value attributable to such Oil and Gas Properties (or such Oil and Gas Properties owned by any Subsidiary whose Equity Interests were sold) or such Unwound Swap Agreement in the current Borrowing Base and (if the Required Lenders in fact elect to make such adjustment) the Administrative Agent shall promptly inform the Borrower of the amount of the adjusted Borrowing Base. For the purposes of this Section 2.08(a), a Disposition of Oil and Gas Properties shall be deemed to include the designation of a Restricted Subsidiary owning Oil and Gas Properties as an Unrestricted Subsidiary and the Disposition of Oil and Gas Properties, or Equity Interests in any Person owning Oil and Gas Properties, to an Unrestricted Subsidiary.

(b)     Reduction of Borrowing Base Related to Title.  If the Administrative Agent or Required Lenders have adjusted the Borrowing Base in accordance with Section 8.13(c), so that, after giving effect to such reduction, the Borrower will satisfy the requirements of Section 8.13(c), the Administrative Agent shall promptly notify the Borrower in writing and, upon receipt of such notice, the new Borrowing Base will simultaneously become effective.

(c)     Reduction of Borrowing Base Upon Incurrence of Specified Additional Indebtedness.  Upon the issuance or incurrence of any Specified Additional Indebtedness (other than Permitted Refinancing Indebtedness in respect thereof), the Borrowing Base then in effect shall be automatically reduced by an amount equal to the product of 0.25 multiplied by the stated principal amount of such Specified Additional Indebtedness, without regard to any original issue discount, and the Borrowing Base as so reduced shall become the new Borrowing Base on the Business Day of such issuance or incurrence.

(d)     Reduction of Borrowing Base Upon Failure to Satisfy the Post-Closing Required Swap Agreements Covenant.  If the Administrative Agent has adjusted the Borrowing Base in accordance with Section 8.20(b), the Administrative Agent shall promptly notify the Borrower in writing and, upon receipt of such notice, the new Borrowing Base will simultaneously become effective.

Section 2.09    Letters of Credit.

(a)    General.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of dollar denominated Letters of Credit for its own account or for the account of any of its Restricted Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the period from the Closing Date until the day which is five (5) Business Days prior to the end of the Availability Period; provided that, in addition to the conditions set forth in Section 6.02, the Borrower may not request the issuance, amendment, renewal or extension of Letters of Credit hereunder if (x) the LC Exposure would exceed the LC Commitment or (y) the Revolving Credit Exposure of any Lender would exceed the Commitment of such Lender (collectively, the "LC Availability Requirements").  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.  Notwithstanding anything herein to the contrary, the Issuing Bank shall have no obligation hereunder to issue, and shall not issue, any Letter of Credit the proceeds of which would be made available to any Person in violation of Section 9.09.

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (not less than three (3) Business Days in advance of the requested date of issuance, amendment, renewal or extension unless otherwise consented to by the Issuing Bank) a notice:

(i)    requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)    specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)    specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.09(c));

(iv)    specifying the amount of such Letter of Credit;

(v)    specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)    specifying the amount of the then effective Borrowing Base and whether a Borrowing Base Deficiency exists at such time, the current total Revolving Credit Exposures (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and the pro forma total Revolving Credit Exposures (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit).

Each notice shall constitute a representation that, after giving effect to the requested issuance, amendment, renewal or extension, as applicable, the LC Availability Requirements will be satisfied on the date of such issuance, amendment, renewal or extension.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.

42

(c)      Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five (5) Business Days prior to the Maturity Date.

(d)      Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.09(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.09(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the existence of a Borrowing Base Deficiency or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)      Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, (i) on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or (ii) if such notice has not been received by the Borrower prior to such time on such date, then not later than 12:00 noon, New York City time, on the Business Day immediately following the day that the Borrower receives such notice; provided that if such LC Disbursement is equal to or greater than $1,000,000, the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such LC Disbursement be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof. Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, mutatis mutandis, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.09(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this Section 2.09(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Lender pursuant to this Section 2.09(e) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)      Obligations Absolute.  The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.09(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit

43

Agreement or any other Loan Document, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply substantially with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.09(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its reasonable discretion, either accept and make payment upon such documents without responsibility for further investigation, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Disbursement Procedures.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy or electronic mail) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)     Interim Interest.  If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.09(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans and such interest shall be due and payable on the date when such reimbursement is payable; provided that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to Section 2.09(e), then Section 3.02(c) shall apply. Interest accrued pursuant to this Section 2.09(h) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to Section 2.09(e) to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i)     Replacement and Resignation of the Issuing Bank.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the

44

Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b).  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall also be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of the Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.  Subject to the appointment and acceptance of a successor Issuing Bank which is reasonably acceptable to the Borrower, any Issuing Bank may resign as an Issuing Bank at any time upon thirty (30) days' prior written notice to the Administrative Agent, the Borrower and the Lenders, in which case, such Issuing Bank shall be replaced in accordance with this Section 2.09(i).

(j)        Cash Collateralization.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this Section 2.09(j), (ii) the LC Exposure exceeds the LC Commitment at any time, (iii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c) or (iv) the Borrower is required to cash collateralize a Defaulting Lender's LC Exposure pursuant to Section 4.04, then the Borrower shall deposit, in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to 105% of (A) in the case of an Event of Default, the LC Exposure (net of any cash collateral already held at the applicable time by the Administrative Agent with respect to such LC Exposure), (B) in the case of the LC Exposure exceeding the LC Commitment, the amount of such excess, (C) in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon and (D) in the case that the Borrower is required to cash collateralize a Defaulting Lender's LC Exposure, the amount required by Section 4.04; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any Restricted Subsidiary described in Section 10.01(h) or Section 10.01(i).  The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, an exclusive first priority and continuing perfected security interest in and Lien on such account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor.  The Borrower's obligation to deposit amounts pursuant to this Section 2.09(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of its Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever.  Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantor's obligations under this Agreement and the other Loan Documents.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such deposit shall accumulate in such account.  Moneys in such account shall be applied by the Administrative Agent to

45

reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived.

(k)     Letters of Credit Issued for Account of Restricted Subsidiaries.  Notwithstanding that a Letter of Credit issued or outstanding hereunder supports any obligations of, or is for the account of, a Restricted Subsidiary, or states that a Restricted Subsidiary is the "account party," "applicant," "customer," "instructing party," or the like of or for such Letter of Credit, and without derogating from any rights of the applicable Issuing Bank (whether arising by contract, at law, in equity or otherwise) against such Restricted Subsidiary in respect of such Letter of Credit, the Borrower shall reimburse, indemnify and compensate the applicable Issuing Bank hereunder for such Letter of Credit (including to reimburse any and all drawings thereunder) in accordance with the terms of this Agreement as if such Letter of Credit had been issued solely for the account of the Borrower.  The Borrower hereby acknowledges that the issuance of such Letters of Credit for its Restricted Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Restricted Subsidiaries.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

Section 3.02    Interest.

(a)     ABR Loans.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)     Eurodollar Loans.  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)     Post-Default Rate.  If (i) an Event of Default pursuant to Section 10.01(a), Section 10.01(b), Section 10.01(h) or Section 10.01(i) has occurred and is continuing, then all Loans and other amounts outstanding shall bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) plus the applicable interest rate (or, in the event there is no applicable rate, two percent (2%) plus the rate applicable to ABR Loans as provided in Section 3.02(a)), but in no event to exceed the Highest Lawful Rate and (ii) any other Event of Default has occurred and is continuing, then the Majority Lenders by written notice (which may be given on their behalf by the Administrative Agent) may elect to have all Loans and other amounts outstanding bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) plus the applicable interest rate (or, in the event there is no applicable rate, two percent (2%) plus the rate applicable to ABR Loans as provided in Section 3.02(a)), but in no event to exceed the Highest Lawful Rate.

46

(d)      Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; provided that (i) interest accrued pursuant to Section 3.02(c) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)      Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03      Alternate Rate of Interest.

(a)      If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(i)      the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means (including, without limitation, by means of an Interpolated Rate) do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including because the LIBO Screen Rate is not available or published on a current basis), for such Interest Period; or

(ii)      the Administrative Agent shall have received notice from the Majority Lenders that the Adjusted LIBO Rate or LIBO Rate, as applicable, determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, or telecopy or electronic mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective (and such Borrowing shall be automatically converted into ABR Loans on the last day of the applicable Interest Period), and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made either (x) as an ABR Borrowing or (y) subject to the prior written consent of the Borrower, at an alternate rate of interest determined by the Majority Lenders as their cost of funds.

(b)      If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Section 3.03(a) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 3.03(a) have not arisen but (A) the supervisor for the administrator of the LIBO Screen Rate has made a public statement that the administrator of the LIBO Screen Rate is insolvent (and there is no successor administrator that will continue publication of the LIBO Screen Rate), (B) the administrator of the LIBO Screen Rate has

47

made a public statement identifying a specific date after which the LIBO Screen Rate will permanently or indefinitely cease to be published by it (and there is no successor administrator that will continue publication of the LIBO Screen Rate), (C) the supervisor for the administrator of the LIBO Screen Rate has made a public statement identifying a specific date after which the LIBO Screen Rate will permanently or indefinitely cease to be published or (D) the supervisor for the administrator of the LIBO Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBO Screen Rate may no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then-prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin); provided that, if such alternate rate of interest as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.  Notwithstanding anything to the contrary in Section 12.02, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest and such amendment are provided to the Lenders, a written notice from the Majority Lenders stating that such Majority Lenders reasonably object to such amendment and providing the reasons therefor.  Until an alternate rate of interest shall be determined in accordance with this paragraph (but, in the case of the circumstances described in clause (ii)(A), clause (ii)(B) or clause (ii)(C) of the first sentence of this paragraph, only to the extent the LIBO Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (y) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

Section 3.04    Prepayments.

(a)    Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay, without premium or penalty (except with respect to any amounts due under Section 5.02) any Borrowing in whole or in part, subject to prior notice in accordance with Section 3.04(b).

(b)    Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone and/or fax (confirmed by telecopy or electronic mail) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three (3) Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 12:00 noon, New York City time, one (1) Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that a notice of prepayment delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit or debt facilities or any other transaction, in which case, such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02 and any amounts due under Section 5.02.

48

(c)    Mandatory Prepayments.

(i)    Upon Optional Termination and Reduction.  If, after giving effect to any termination or reduction of the Aggregate Maximum Credit Amounts pursuant to Section 2.06(b), there is a Borrowing Base Deficiency, then the Borrower shall (A) prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such Borrowing Base Deficiency, and (B) if any Borrowing Base Deficiency remains after prepaying all such Borrowings, solely as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.09(j).

(ii)    Upon Redeterminations and Title Related Borrowing Base Adjustment. If there is a Borrowing Base Deficiency (A) on any Redetermination Date as a result of any redetermination of the Borrowing Base in accordance with Section 2.07 or (B) as a result of a Borrowing Base adjustment pursuant to Section 2.08(b), then upon such Redetermination Date or the occurrence of such Borrowing Base adjustment (such date, the "Deficiency Date"), the Borrower shall, within ten (10) days of the Deficiency Date, inform the Administrative Agent that it intends to do one or more of the following (provided that, if the Borrower fails to elect any of the following actions within such ten (10) day period, it shall be deemed to have elected option (A) hereof):

(A)    within thirty (30) days following such Deficiency Date (1) prepay the Borrowings in an aggregate principal amount equal to such Borrowing Base Deficiency and (2) if any Borrowing Base Deficiency remains after prepaying all of the Borrowings, solely as a result of any LC Exposure, cash collateralize as provided in Section 2.09(j),

(B)    commencing on the 30th day after such Deficiency Date and continuing on the same day of each month for the next five months thereafter (or if any such day is not a Business Day, the immediately preceding Business Day), prepay the Borrowings in an amount equal to one-sixth (1/6th) of such Borrowing Base Deficiency so that the Borrowing Base Deficiency is reduced to zero within 180 days of the Deficiency Date,

(C)    within thirty (30) days following such Deficiency Date, submit and pledge as Collateral additional Oil and Gas Properties or other collateral reasonably acceptable to the Administrative Agent, owned by the Borrower or any of the other Loan Parties in connection with the determination of the Borrowing Base, which the Administrative Agent and the Required Lenders deem reasonably satisfactory, in their sole discretion, to eliminate such Borrowing Base Deficiency; or

(D)    eliminate the Borrowing Base Deficiency by any combination of prepayments and/or the pledging of additional Collateral as provided in clauses (A), (B) and (C) above;

provided that, notwithstanding the options set forth above, in all cases, the Borrowing Base Deficiency must be eliminated on or prior to the Termination Date.  If, because of LC Exposure, a Borrowing Base Deficiency remains after prepaying all of the Loans, the Borrower shall cash collateralize Letters of Credit in an amount equal to such remaining Borrowing Base Deficiency as provided in Section 2.09(j).

(iii)    Upon Certain Adjustments. If there is a Borrowing Base Deficiency, as a result of Borrowing Base adjustment pursuant to the Borrowing Base Adjustment Provisions (other than Section 2.08(b)), then on the next Business Day after the occurrence of such Borrowing Base adjustment the Borrower shall (A) prepay the Borrowings in an aggregate principal amount equal to such Borrowing

49

Base Deficiency and (B) if any Borrowing Base Deficiency remains after prepaying all of the Borrowings, solely, as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.09(j).

(iv)     Upon The Occurrence and Continuation of a Borrowing Base Deficiency. In addition to the foregoing mandatory prepayments set forth in this Section 3.04(c), at any time that Specified Additional Indebtedness (other than Permitted Refinancing Indebtedness in respect thereof) shall be incurred or issued while a Borrowing Base Deficiency exists, the Borrower shall to the extent necessary to cure such Borrowing Base Deficiency (calculated after giving effect to the Borrowing Base adjustment required pursuant to Section 2.08(c) in connection with such Specified Additional Indebtedness), upon the incurrence or issuance of such Specified Additional Indebtedness, prepay the Loans in an aggregate amount equal to the lesser of (A) one hundred percent (100%) of the Net Cash Proceeds received in respect of such Specified Additional Indebtedness and (B) the aggregate principal amount equal to such Borrowing Base Deficiency and, if any Borrowing Base Deficiency remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.09(j).

(v)     Application of Prepayments to Types of Borrowings. Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied, first, ratably to any ABR Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.

(vi)     Interest to be Paid with Prepayments. Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to the Loans included in the prepaid Borrowings. Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest to the extent required by Section 3.02 and any break funding payments required by Section 5.02.

(d)     No Premium or Penalty.  Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

Section 3.05     Fees.

(a)     Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily unused amount of the Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date.  Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     Letter of Credit Fees.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the average daily amount of such Lender's LC Exposure (excluding any portion

50

thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.25% *per annum* on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, provided that in no event shall such fee be less than $500 during any quarter, and (iii) to the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the date of this Agreement; provided that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand.  Any other fees payable to the Issuing Bank pursuant to this Section 3.05(b) shall be payable within ten (10) days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     Administrative Agent Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and the Administrative Agent.

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01     Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     Payments by the Borrower.  The Borrower shall make each payment or prepayment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 5.01, Section 5.02, Section 5.03 or otherwise) prior to 12:00 noon, New York City time, on the date when due or the date fixed for any prepayment hereunder, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon, but shall be considered received on the date paid for purposes of Section 10.01.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Section 5.01, Section 5.02, Section 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)     Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the

51

amounts of interest and fees then due to such parties, and (ii) <u>second</u>, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)     <u>Sharing of Payments by Lenders</u>.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this <u>Section 4.01(c)</u> shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or Participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this <u>Section 4.01(c)</u> shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02     <u>Presumption of Payment by the Borrower</u>.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment or prepayment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment or prepayment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03     <u>Disposition of Proceeds</u>.  The Security Instruments contain an assignment by the Borrower and/or the Guarantors to and in favor of the Administrative Agent for the benefit of the Secured Parties of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property. The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Secured Obligations and other obligations described therein and secured thereby. Notwithstanding the assignment contained in such Security Instruments, unless and until an Event of Default has occurred and is continuing, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Borrower and its Restricted Subsidiaries and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary or advisable to cause such proceeds to be paid to the Borrower and/or such Restricted Subsidiaries.

Section 4.04     Payments and Deductions to a Defaulting Lender.

(a)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(a), Section 2.05(b), Section 2.09(d), Section 2.09(e) or Section 4.02 then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid in cash.

(b)     If a Defaulting Lender as a result of the exercise of a set-off shall have received a payment in respect of its Revolving Credit Exposure which results in its Revolving Credit Exposure being less than its Applicable Percentage of the aggregate Revolving Credit Exposures, then no payments will be made to such Defaulting Lender until such time as all amounts due and owing to the Lenders have been equalized in accordance with each Lender's respective *pro rata* share of the aggregate Revolving Credit Exposures.  Further, if at any time prior to the acceleration or maturity of the Loans, the Administrative Agent shall receive any payment in respect of principal of a Loan or a reimbursement of an LC Disbursement while one or more Defaulting Lenders shall be party to this Agreement, the Administrative Agent shall apply such payment first to the Borrowing(s) for which such Defaulting Lender(s) shall have failed to fund its *pro rata* share until such time as such Borrowing(s) are paid in full or each Lender (including each Defaulting Lender) is owed its Applicable Percentage of all Loans then outstanding.  After acceleration or maturity of the Loans, subject to the first sentence of this Section 4.04(b), all principal will be paid ratably as provided in Section 10.02(c).

(c)     Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(i)     Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 3.05.

(ii)     The Commitment, the Maximum Credit Amount, the outstanding principal balance of the Loans and participation interests in Letters of Credit of such Defaulting Lender shall not be included in determining whether all Lenders, the Required Lenders or the Majority Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 12.02), provided that (except as expressly set forth in Section 12.02 and in the next proviso) any waiver, amendment or modification requiring the consent of each affected Lender and which affects such Defaulting Lender, shall require the consent of such Defaulting Lender; and provided further that any redetermination or affirmation of the Borrowing Base shall occur without participation of a Defaulting Lender, but the Commitments (*i.e.*, the Applicable Percentage of the Borrowing Base of a Defaulting Lender) may not be increased without the consent of such Defaulting Lender.

(iii)     If any LC Exposure exists at the time a Lender becomes a Defaulting Lender then:

(A)     all or any part of such LC Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent (1) the sum of all Non-Defaulting Lenders' Revolving Credit Exposures plus such Defaulting Lender's LC Exposure does not exceed the total of all Non-Defaulting Lenders' Commitments, (2) the sum of each Non-Defaulting Lender's Revolving Credit Exposure plus its reallocated share of such Defaulting Lender's LC Exposure does not exceed such Non-Defaulting Lender's Commitment, and (3) the conditions set forth in Section 6.02 are satisfied at such time;

53

(B)      if the reallocation described in <u>clause (A)</u> above cannot, or can only partially, be effected, then the Borrower shall, within one (1) Business Day following notice by the Administrative Agent, cash collateralize such Defaulting Lender's LC Exposure (after giving effect to any partial reallocation pursuant to <u>clause (A)</u> above) in accordance with the procedures set forth in <u>Section 2.09(e)</u> for so long as such LC Exposure is outstanding;

(C)      if the Borrower cash collateralizes any portion of such Defaulting Lender's LC Exposure pursuant to this <u>Section 4.04</u> then the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to <u>Section 3.05(b)</u> with respect to such Defaulting Lender's LC Exposure during the period such Defaulting Lender's LC Exposure is cash collateralized;

(D)      if the LC Exposure of the Non-Defaulting Lenders is reallocated pursuant to this <u>Section 4.04</u>, then the fees payable to the Lenders pursuant to <u>Section 3.05(a)</u> and <u>Section 3.05(b)</u> shall be adjusted in accordance with such Non-Defaulting Lenders' Applicable Percentages; or

(E)      if any Defaulting Lender's LC Exposure is neither cash collateralized nor reallocated pursuant to this <u>Section 4.04(c)(iii)</u>, then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all commitment fees that otherwise would have been payable to such Defaulting Lender (solely with respect to the portion of such Defaulting Lender's Commitment that was utilized by such LC Exposure) and letter of credit fees payable under <u>Section 3.05(b)</u> with respect to such Defaulting Lender's LC Exposure shall be payable to the Issuing Bank until such LC Exposure is cash collateralized and/or reallocated.

(iv)      any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Section 10.02(c)</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 12.08</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows:  *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a *pro rata* basis of any amounts owing by such Defaulting Lender to any Issuing Bank hereunder; *third*, to cash collateralize the Issuing Banks' LC Exposure with respect to such Defaulting Lender in accordance with this Section; *fourth*, as the Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to (i) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (ii) cash collateralize the Issuing Banks' future LC Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with this <u>Section 4.04</u>; *sixth*, to the payment of any amounts owing to the Lenders or the Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender or the Issuing Banks against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document; *seventh*, so long as no Event of Default is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (i) such payment is a payment of the principal amount of any Loans or LC Disbursements in respect of which such Defaulting Lender has not fully funded its appropriate share, and (ii) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in <u>Section 6.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Disbursements owed to, all non-Defaulting Lenders on a *pro rata* basis prior

54

to being applied to the payment of any Loans of, or LC Disbursements owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in the Borrower's obligations corresponding to such Defaulting Lender's LC Exposure are held by the Lenders *pro rata* in accordance with the Commitments without giving effect to Section 4.04(c)(iii).  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 4.04 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(d)      So long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 4.04, and participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.09(d) (and Defaulting Lenders shall not participate therein).

(e)      If (i) a Bankruptcy Event or a Bail-In Action with respect to a Lender Parent of any Lender shall occur following the date hereof and for so long as such event shall continue or (ii) the Issuing Bank has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, the Issuing Bank shall not be required to issue, extend, renew or increase any Letter of Credit, unless the Issuing Bank shall have entered into arrangements with the Borrower or such Lender, satisfactory to the Issuing Bank to defease any risk to it in respect of such Lender hereunder.

(f)      In the event that the Administrative Agent, the Borrower and the Issuing Bank each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the LC Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment and on such date such Lender shall purchase at par such of the Loans or participations in Letters of Credit of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage. No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a non-Defaulting Lender as a result of such non-Defaulting Lender's increased exposure following such reallocation.

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01      Increased Costs.

(a)      Eurodollar Changes in Law.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender (except  any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)      shall subject any Lender or Issuing Bank to any Taxes (other than (A) Indemnified Taxes or Other Taxes indemnified under Section 5.03 and (B) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or any Issuing Bank or the London interbank market any other condition affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or Issuing Bank of making, converting into, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender, such Issuing Bank or such other Loan Party of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or Issuing Bank (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or Issuing Bank such additional amount or amounts as will compensate such Lender or Issuing Bank for such additional costs incurred or reduction suffered.

(b)     Capital and Liquidity Requirements.  If any Lender or the Issuing Bank determines that any Change in Law regarding capital requirements or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or liquidity on the capital or liquidity of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)     Certificates.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or Section 5.01(b) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

(d)     Effect of Failure or Delay in Requesting Compensation.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02     Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, (d) an increase in the Aggregate Maximum Credit Amounts pursuant to Section 2.06(c) on a day other than the last day of the Interest Period in respect of outstanding Eurodollar Borrowings, or (e) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 5.04(b), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense

attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

Section 5.03    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable law. If a withholding agent shall be required under applicable law (as determined in the good faith discretion by the applicable withholding agent) to deduct any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions, (ii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax or Other Tax, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 5.03), the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made.

(b)    Payment of Other Taxes by the Borrower.  The Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for such Other Taxes.

(c)    Indemnification by the Borrower.  The Borrower and Guarantors shall jointly and severally indemnify the Administrative Agent and each Lender, within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent and such Lender, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent or a Lender as to the amount of such payment or liability under this Section 5.03 shall be delivered to the Borrower and shall be conclusive absent manifest error.  Failure or delay on the part of any Lender or the Administrative Agent to demand compensation pursuant to this Section 5.03 shall not constitute a waiver of such Lender's or the Administrative Agent's right to demand such compensation.

(d)    Evidence of Payments.  As soon as reasonably practicable after any payment of Taxes by the Borrower or a Guarantor to a Governmental Authority pursuant to this Section 5.03, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

57

(e)      Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments under this Agreement or any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by a Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by such Borrower or the Administrative Agent as will enable such Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.03(e)(i)(A), (i)(B) and (i)(D) below) shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)      Without limiting the generality of the foregoing:

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of  IRS Form W-8BEN or W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership), executed copies of IRS Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, Form W-9, and/or other certification

58

documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such beneficial owner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that the Borrower or Guarantors have not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower and Guarantors to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 5.03(f).

(g)     Tax Refunds.  If the Administrative Agent or a Lender determines, in its sole discretion (exercised in good faith), that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts

pursuant to this Section 5.03, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 5.03 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section 5.03 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(h)     For purposes of this Section 5.03, the term Lender shall include the Issuing Bank and the Administrative Agent.

Section 5.04     Mitigation Obligations; Replacement of Lenders.

(a)     Designation of Different Lending Office.  If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or Section 5.03, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If (i) any Lender requests compensation under Section 5.01, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, (iii) any Lender becomes a Defaulting Lender or (iv) any Lender has failed to consent to a proposed amendment, waiver, modification, consent, discharge or termination that requires the consent of all the Lenders (or the affected Lenders and such Lender is an affected Lender) pursuant to Section 12.02 and with respect to which the Required Lenders have consented, then the Borrower may, at its sole expense, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 12.04(b)), all its interests, rights (other than its existing rights to payments pursuant to Sections 5.01 or 5.03) and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (1) the Borrower shall have received the prior written consent of the Administrative Agent (and if a Commitment is being assigned, the Issuing Banks), which consent shall not unreasonably be withheld, (2) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (3) in the case of any such assignment resulting from a claim for compensation under Section 5.01 or payments required to be made pursuant to Section 5.03, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that (1) an assignment required pursuant to this paragraph (b) may be effected pursuant to an Assignment and Assumption

60

executed by the Borrower, the Administrative Agent and the assignee (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and such parties are participants), and (2) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to and be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender; provided that any such documents shall be without recourse to or warranty by the parties thereto.

(c)      Replacement for Borrowing Base Increase.  If a Lender does not approve a proposed Borrowing Base increase which has been approved by at least the Required Lenders, then the Borrower may, at its sole expense, within three (3) Business Days after the Borrower receives the New Borrowing Base Notice with respect to such increase, at the discretion of such existing Lender either:

(i)      cause such existing Lender to assign and delegate, without recourse, all its interests, rights (other than its existing rights to payments pursuant to Sections 5.01 and 5.03) and obligations under this Agreement and the other Loan Documents to one or more assignees proposed by the Borrower that shall assume such obligations (which assignees may be another Lender, if a Lender accepts such assignment), provided that such existing Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee(s) (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), or

(ii)      cause such existing Lender to reduce its Maximum Credit Amount based upon a new Applicable Percentage for such existing Lender that is calculated by dividing such existing Lender's then outstanding Revolving Credit Exposure by the Borrowing Base determined after the increase of the Borrowing Base and assigning the balance of such Lender's Maximum Credit Amount to an assignee or assignees proposed by the Borrower that shall assume such amount of the assigning Lender's Maximum Credit Amount (which assignee may be another Lender, if a Lender accepts such assignment).

Each party hereto agrees that (1) an assignment required pursuant to this paragraph (c) may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and such parties are participants), and (2) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender; provided that any such documents shall be without recourse to or warranty by the parties thereto.

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01      Closing Date.  The obligation of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit on the Closing Date shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 12.02):

(a)      Credit Agreement. The Loan Documents shall be in form and substance reasonably satisfactory to the Borrower and the Administrative Agent and in connection therewith the Administrative

Agent shall have received from each party hereto counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(b)    Loan Documents.

(i)    Execution of Security Instruments.  The Administrative Agent shall have received from each party thereto counterparts (in such number as may be requested by the Administrative Agent) of the Security Instruments described on Exhibit E, including the Guaranty Agreement and Perfection Certificate, that have been executed and delivered by a Responsible Officer of each party thereto. (A) The Administrative Agent shall be reasonably satisfied that, upon recording the Mortgages, the reaffirmation agreements, the assignments or other documents reasonably satisfactory to the Administrative Agent, if any, in each case, in the appropriate filing offices, it shall have a first priority Lien on at least 85% of the PV-9 of the Borrowing Base Properties and (B) the Borrower shall have executed and delivered Control Agreements in connection with its Deposit Accounts, Securities Accounts and Commodities Accounts (other than any Excluded Accounts), as applicable.

(ii)    Filings, Registrations and Recordings.  Each Security Instrument and any other document (including any UCC financing statement) required by any Security Instrument or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral, prior and superior in right to any other Person (other than Liens permitted by Section 9.03) shall be in proper form for filing, registration or recordation.

(iii)    Pledged Stock; Stock Powers; Pledged Notes. The Administrative Agent shall have received (A) the certificates (if any) representing the shares of Equity Interests required to be pledged pursuant to the Guaranty Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (B) each promissory note (if any) required to be pledged to the Administrative Agent pursuant to the Guaranty Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(c)    Fees.  All fees required to be paid to the Administrative Agent, the Arranger and the Lenders on or before the Closing Date shall have been paid. All reasonable and documented out-of-pocket fees and expenses (including reasonable and documented out-of-pocket fees and expenses of outside counsel) required to be paid to the Administrative Agent and the Lenders on or before the Closing Date shall have been paid.

(d)    Solvency Certificate.  The Administrative Agent shall have received the Solvency Certificate (after giving effect to the Plan of Reorganization) from a Financial Officer.

(e)    Secretary's Certificates.  The Administrative Agent shall have received a certificate of a Responsible Officer of each Loan Party setting forth (i) resolutions of its board of directors or other appropriate governing body with respect to the authorization of such Loan Party to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of such Loan Party (A) who are authorized to sign the Loan Documents to which such Loan Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers and (iv) the articles or certificate of incorporation and by-laws or other applicable organizational documents of such Loan Party, certified by such Responsible Officer as being true and complete.  The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from such Loan Party to the contrary.

(f)     Legal Opinions.  The Administrative Agent shall have received an opinion of (i) Weil, Gotshal & Manges LLP, counsel for the Loan Parties and (ii) local counsel in any jurisdictions where Security Instruments will be recorded to perfect first priority Liens on any Borrowing Base Properties, in each case in form and of substance reasonably acceptable to the Administrative Agent.

(g)     Financial Statements; No Other Debt; Closing Date Availability.    The Administrative Agent shall have received (i) a certificate of a Financial Officer in form and substance reasonably satisfactory to the Administrative Agent certifying that (A) attached to such certificate is a *pro forma* unaudited consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as of the Closing Date giving effect to the Transactions and the other transactions contemplated to occur on the Closing Date, which will reflect that the Borrower and the other Loan Parties will have no Indebtedness on the Closing Date other than the Secured Obligations or other Indebtedness permitted by Section 9.02 (excluding any Specified Additional Indebtedness), (B) that such *pro forma* unaudited consolidated balance sheet presents fairly, in all material respects, the *pro forma* balance sheet of the Borrower and its Consolidated Subsidiaries as of the Closing Date in accordance with GAAP and (C) after giving effect to the Transactions and the other transactions contemplated to occur on the Closing Date, the Borrower has unused Commitments of not less than $125,000,000 and (ii) the Financial Statements.

(h)     Approvals and Consents; No Material Adverse Effect. The Administrative Agent shall have received a certificate of a Responsible Officer in form and substance reasonably satisfactory to the Administrative Agent certifying that (i) after giving effect to the Confirmation Order and the Plan of Reorganization, all necessary governmental and third party consents and approvals necessary in connection with the Transactions and the other transactions contemplated hereby shall have been obtained (without the imposition of any materially adverse conditions that are not reasonably acceptable to the Administrative Agent) and shall remain in effect; and (ii) since December 31, 2018, there has been no event, occurrence, development or change that has had or could reasonably be expected to have a Material Adverse Effect; provided, that solely for the purposes of such certificate and, on the Closing Date, Section 7.04(b), a Material Adverse Effect shall not include any event, occurrence, development or change in the circumstances or facts arising out of or resulting from: (A) conditions or effects that generally affect persons or entities engaged in the industries, business, markets, financial conditions or the geographic area in which the Loan Parties operate taking into consideration any event that is related to the operations of the Loan Parties in the specific geographical and geological areas in which it operates, (B) general economic conditions in regions and markets in which the Loan Parties operate, (C) regional, national or international political or social conditions, including acts of war, terrorism or natural disasters, escalation or material worsening of hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or its territories, possessions, diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (D) financial, banking, securities, credit, or commodities markets, prevailing interest rates or general capital markets conditions, (E) changes in GAAP, (F) changes in laws, orders, or other binding directives issued by any governmental entity, (G) the taking of any action or any inaction required by the Restructuring Support Agreement, the Senior Note Backstop Agreement, the Restructuring Term Sheet, the Plan of Reorganization, or any action or inaction in connection with the Chapter 11 Cases, including the commencement, announcement and pendency of the Chapter 11 Cases, or (H) any action or inaction consented to or requested by the Consenting Noteholders (as defined in the RSA); provided, further, that exceptions set forth in clauses (A), (B), (C) and (D) of this proviso shall not apply to the extent that such event is disproportionately adverse to the Loan Parties, taken as a whole, as compared to other companies comparable in size and scale to the Loan Parties operating in the industries and same geographical area in which the Loan Parties operate (such exceptions set forth in clauses (A) through (H), the "Closing Date Exceptions").

63

(i)      Insurance. The Administrative Agent shall have received a certificate of insurance coverage of the Borrower evidencing that the Borrower is carrying insurance in accordance with Section 8.07.

(j)      Good Standing Certificates.   The Administrative Agent shall have received certificates of the appropriate State agencies with respect to the existence, qualification and good standing of the Borrower and each Guarantor, in each case, in their respective jurisdiction of organization and in any other jurisdiction in which such Person owns Borrowing Base Properties.

(k)      Patriot Act; Beneficial Ownership Regulation.  Each Lender who has requested in writing the same at least ten (10) Business Days prior to the Closing Date shall have received, at least three (3) Business Days prior to the Closing Date, (i) all documentation and other information in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and (ii) to the extent applicable, in connection with the Beneficial Ownership Regulation, a Beneficial Ownership Certification in a form reasonably satisfactory to the Administrative Agent and each requesting Lender.

(l)      Title Information.  The Administrative Agent shall have received title information as the Administrative Agent may reasonably require, reasonably satisfactory to the Administrative Agent, setting forth the status of title to at least eighty-five (85%) of the PV-9 of the Borrowing Base Properties.

(m)      Initial Reserve Report.   The Administrative Agent shall have received (i) a satisfactory report with respect to certain Oil and Gas Properties of the Borrower and its Restricted Subsidiaries prepared by Netherland, Sewell & Associates, Inc. with an as of date of January 1, 2019 and (ii) a satisfactory Initial Reserve Report accompanied by a Reserve Report Certificate with respect to the Oil and Gas Properties covered by the Initial Reserve Report and covering only the matters described in Section 8.12(c)(i), Section 8.12(c)(ii), Section 8.12(c)(iii), Section 8.12(c)(v) and Section 8.12(c)(vi) with respect thereto.

(n)      Production Reports and Lease Operating Statements.  The Administrative Agent shall have received production reports and accounting lease operating statements in form and substance satisfactory to the Administrative Agent, setting forth, for the fiscal year ended December 31, 2018, the fiscal quarter ended March 31, 2019 and the fiscal quarter ended June 30, 2019[5], on a production date basis, the volume of production and sales attributable to production for which cash activity has been recorded (and the prices at which such sales were made and the revenues derived from such sales) for each such period from the Oil and Gas Properties evaluated in the Initial Reserve Report, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such period; provided that the Administrative Agent acknowledges that it has received production reports and accounting lease operating statements for the fiscal year ended December 31, 2018 and the fiscal quarter ended March 31, 2019 in form and substance satisfactory to it.

(o)      Refinancing of Existing Credit Agreements; No Other Liens.

(i)      On the Closing Date, or substantially contemporaneously with the Loans advanced hereunder on the Closing Date, the Administrative Agent shall have received evidence satisfactory to it that the Existing Credit Agreements shall have been paid in full and the Liens securing the

---

[5] NTD: To include 9/30/19 to the extent the Closing Date is on or after 11/15/19.

64

Existing Credit Agreements shall have been released and the Existing Credit Agreement has been terminated.

(ii)      The Administrative Agent shall have received evidence satisfactory to it that all Liens on the assets of the Borrower and its Subsidiaries (other than Liens permitted by Section 9.03) shall have been (or will be or substantially contemporaneously with the Loans advanced hereunder on the Closing Date) released or terminated and that duly executed recordable releases and terminations in forms reasonably acceptable to the Administrative Agent with respect thereto have been obtained by the Borrower or its subsidiaries.

(p)      Plan of Reorganization.  (i) The Plan of Reorganization and all other related documentation shall be satisfactory to the Administrative Agent with respect to any portions of such Plan of Reorganization that directly relate to this Agreement and the Loan Documents, and reasonably satisfactory to the Administrative Agent in all other respects, (ii) the Bankruptcy Court shall have entered the Confirmation Order, which order shall be satisfactory to the Administrative Agent with respect to any portions of such order that directly relate to this Agreement and the Loan Documents, and reasonably satisfactory to the Administrative Agent in all other respects, which order shall be in full force and effect, unstayed and final, and shall not have been modified or amended without the written consent of Administrative Agent, reversed or vacated, (iii) all conditions precedent to the effectiveness of the Plan of Reorganization as set forth therein shall have been satisfied or waived (the waiver thereof having been approved by the Administrative Agent), and the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan of Reorganization in accordance with its terms shall have occurred contemporaneously with the Closing Date and (iv) the transactions contemplated by the Plan of Reorganization to occur on the effective date of the Plan of Reorganization shall have been substantially consummated (as defined in Section 1101 of the Bankruptcy Code) on the Closing Date and substantially contemporaneously with the Loans advanced hereunder on the Closing Date in accordance with the terms of the Plan of Reorganization and in compliance with applicable law and Bankruptcy Court and regulatory approvals.

(q)      Required Swap Agreements.  The Loan Parties shall have entered into the Required Swap Agreements as of the Closing Date; provided that, subject to the Loan Parties using commercially reasonable efforts to enter into the Required Swap Agreements, if such Required Swap Agreements have not been entered into as of the Closing Date, the entering into of such Required Swap Agreements shall not be a condition to the occurrence of the Closing Date and shall instead be required pursuant to Section 8.20.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.  Notwithstanding the foregoing, the obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 12.02) at or prior to 5:00 p.m., New York City time, on November 15, 2019 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

Section 6.02    Each Credit Event.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the initial funding on the Closing Date), and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)      At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

65

(b)     All representations and warranties of the Loan Parties in each applicable Loan Document shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, with the same effect as though made on and as of such date, except in the case of any representation and warranty which (A) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (B) is qualified by a materiality or Material Adverse Effect standard in which case such representation and warranty shall be true and correct in all respects.

(c)     The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit (or an amendment, extension or renewal of a Letter of Credit) in accordance with Section 2.09(b), as applicable.

Each request for such Borrowing or for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in Section 6.02(a) and Section 6.02(b).

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

Section 7.01     Organization; Powers.  Each of the Borrower and the Restricted Subsidiaries is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02     Authority; Enforceability. After giving effect to the Confirmation Order and the Plan of Reorganization, the Transactions are within the Borrower's and each Guarantor's constituent powers and have been duly authorized by all necessary corporate, limited liability company or partnership, and, if required, stockholder action (including, without limitation, any action required to be taken by any class of directors of the Borrower or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions).  Each Loan Document to which a Loan Party is a party has been duly executed and delivered by the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03     Approvals; No Conflicts; Confirmation Order.   After giving effect to the Confirmation Order and the Plan of Reorganization, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person, nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the Transactions, except such as have been obtained or made and are in full force and effect other than (i) the recording and filing of the Security Instruments as required by this Agreement and (ii) those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the

Borrower or any Restricted Subsidiary or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any Restricted Subsidiary or its Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or such Restricted Subsidiary and (d) will not result in the creation or imposition of any Lien on any Property of the Borrower or any Restricted Subsidiary (other than the Liens created by the Loan Documents).  The Confirmation Order is in full force and effect, not subject to any stay, nor has the Confirmation Order been amended or modified in any manner adverse to the Administrative Agent or the Lenders without the consent of the Administrative Agent.

Section 7.04    Financial Condition; No Material Adverse Effect.

(a)    The Borrower has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2018, reported on by Deloitte & Touche LLP, independent public accountants, (ii) as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2019 and (iii) as of and for the fiscal quarter and the portion of the fiscal year ended June 30, 2019.[6]  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its Consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.

(b)    Since December 31, 2018, (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect, excluding, on the Closing Date, the Closing Date Exceptions and (ii) the business of the Borrower and its Restricted Subsidiaries has been conducted only in the ordinary course consistent with past business practices.

(c)    Neither the Borrower nor any Restricted Subsidiary has on the date hereof any material Indebtedness (including Disqualified Capital Stock) or any contingent liabilities, off-balance sheet liabilities or partnerships, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments (other than the Gas Balancing Obligations and the Swap Agreements listed on Schedule 7.20) which are not referred to or reflected or provided for in the Financial Statements.

Section 7.05    Litigation.

(a)    After giving effect to the Confirmation Order and the Plan of Reorganization, except as set forth on Schedule 7.05, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any Restricted Subsidiary (i) not fully covered by insurance (except for normal deductibles) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any Loan Document or the Transactions.

(b)    Since the date of this Agreement, there has been no change in the status of the matters disclosed in Schedule 7.05 that, individually or in the aggregate, has resulted in a Material Adverse Effect.

---

[6] NTD: To also include 9/30/19 financials if Closing occurs on or after 11/15/19.

67

Section 7.06    Environmental Matters.   Except as could not be reasonably expected to have a Material Adverse Effect (or with respect to (b), (c), (d) and (e) below, where the failure to take such actions could not be reasonably expected to have a Material Adverse Effect):

(a)    neither any Property of the Borrower or any Restricted Subsidiary nor the operations conducted thereon violate any order or requirement of any court or Governmental Authority or any Environmental Laws.

(b)    no Property of the Borrower or any Restricted Subsidiary nor the operations currently conducted thereon or, to the knowledge of the Borrower, by any prior owner or operator of such Property or operation, are in violation of or subject to any existing, pending or threatened action, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority or to any remedial obligations under Environmental Laws.

(c)    all notices, permits, licenses, exemptions, approvals or similar authorizations, if any, required to be obtained or filed in connection with the operation or use of any and all Property of the Borrower and each Restricted Subsidiary, including, without limitation, past or present treatment, storage, disposal or release of a hazardous substance, oil and gas waste or solid waste into the environment, have been duly obtained or filed, and the Borrower and each Restricted Subsidiary are in compliance with the terms and conditions of all such notices, permits, licenses and similar authorizations.

(d)    all hazardous substances, solid waste and oil and gas waste, if any, generated at any and all Property of the Borrower or any Restricted Subsidiary have in the past been transported, treated and disposed of in accordance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and, to the knowledge of the Borrower, all such transport carriers and treatment and disposal facilities have been and are operating in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and are not the subject of any existing, pending or threatened action, investigation or inquiry by any Governmental Authority in connection with any Environmental Laws.

(e)    the Borrower has taken all steps reasonably necessary to determine and has determined that no oil, hazardous substances, solid waste or oil and gas waste, have been disposed of or otherwise released and there has been no threatened release of any oil, hazardous substances, solid waste or oil and gas waste on or to any Property of the Borrower or any Restricted Subsidiary except in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment.

(f)    to the extent applicable, all Property of the Borrower and each Restricted Subsidiary currently satisfies all design, operation, and equipment requirements imposed by the OPA, and the Borrower does not have any reason to believe that such Property, to the extent subject to the OPA, will not be able to maintain compliance with the OPA requirements during the term of this Agreement.

(g)    neither the Borrower nor any Restricted Subsidiary has any known contingent liability or Remedial Work in connection with any release or threatened release of any oil, hazardous substance, solid waste or oil and gas waste into the environment.

Section 7.07    Compliance with Laws and Agreements; No Defaults.

(a)    After giving effect to the Confirmation Order and the Plan of Reorganization, each of the Borrower and each Restricted Subsidiary is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and

68

possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     No Default has occurred and is continuing.

Section 7.08     Investment Company Act.   Neither the Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09     Taxes.   Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves to the extent required in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

Section 7.10     ERISA.

(a)     Except as could not reasonably be expected to result in a Material Adverse Effect, the Borrower, the Subsidiaries and each ERISA Affiliate have complied in all respects with the applicable provisions of ERISA, the Code and other applicable federal and state laws with respect to each Plan.

(b)     Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan is, and has been, established and maintained in substantial compliance with its terms and applicable provisions of ERISA, the Code and other applicable federal and state laws.

(c)     Except as could not reasonably be expected to result in a Material Adverse Effect, no act, omission or transaction has occurred which could result in imposition on the Borrower, any Subsidiary or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under section 409 of ERISA.

(d)     Except as could not reasonably be expected to result in a Material Adverse Effect, full payment when due has been made of all amounts which the Borrower, the Subsidiaries or any ERISA Affiliate is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof.

(e)     Neither the Borrower, nor any of the Subsidiaries sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by the Borrower, or a Subsidiary in its sole discretion at any time without any material liability other than the payment of accrued benefits under such plan.

(f)     Neither the Borrower, the Subsidiaries nor any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 7.11     Disclosure; No Material Misstatements.

69

(a)        None of the reports, financial statements, certificates or other information (other than projections and other forward-looking information and information of a general economic or industry specific nature) furnished by or on behalf of the Borrower or any Restricted Subsidiary to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to any projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that actual results may vary from the projected financial information).  There is no fact peculiar to the Borrower or any Restricted Subsidiary which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Agreement or the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of the Borrower or any Restricted Subsidiary on the date hereof in connection with the transactions contemplated hereby.  No statements or conclusions exist in any Reserve Report which are based upon or include misleading information or which fail to take into account material information regarding the matters reported therein to the extent such misstatement, misleading information or failure could reasonably be expected to have a Material Adverse Effect.

(b)        As of the Closing Date, to the knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

Section 7.12      Insurance.  The Borrower has, and has caused all its Restricted Subsidiaries to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and its Restricted Subsidiaries.  The Administrative Agent is named as an additional insured in respect of such liability insurance policies and as lender loss payee and mortgagee with respect to Property loss insurance.

Section 7.13      Restriction on Liens.  After giving effect to the Confirmation Order and the Plan of Reorganization, neither the Borrower nor any of the Restricted Subsidiaries is a party to any material agreement or arrangement (other than Finance Leases creating Liens permitted by Section 9.03(c), but then only on the Property subject of such Finance Lease), or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent and the Lenders on or in respect of their Properties to secure the Secured Obligations and the Loan Documents.

Section 7.14      Subsidiaries.  Except as set forth on Schedule 7.14 or as disclosed in writing to the Administrative Agent (which shall promptly furnish a copy to the Lenders), which shall be a supplement to Schedule 7.14, the Borrower has no Subsidiaries and the Borrower has no Foreign Subsidiaries.  Schedule 7.14, as may be supplemented from time to time, identifies each Subsidiary as either Restricted or Unrestricted, and each Restricted Subsidiary on such schedule is a Wholly-Owned Subsidiary.

Section 7.15      Location of Business and Offices.  After giving effect to the Confirmation Order and the Plan of Reorganization, the Borrower's jurisdiction of organization is Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Halcón Resources Corporation;

70

and the organizational identification number of the Borrower in its jurisdiction of organization is [3761452][7] (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(m) in accordance with Section 12.01). The Borrower's principal place of business and chief executive offices are located at the address specified in Section 12.01 (or as set forth in a notice delivered pursuant to Section 8.01(m) and Section 12.01(c)). Each Restricted Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.14 (or as set forth in a notice delivered pursuant to Section 8.01(m)).

Section 7.16    Properties; Titles, Etc.  After giving effect to the Confirmation Order and the Plan of Reorganization:

(a)    Each of the Borrower and the Restricted Subsidiaries has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report and good title to all its other personal Properties, in each case, free and clear of all Liens except Liens permitted by Section 9.03. After giving full effect to the Excepted Liens, the Borrower or the Restricted Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such Property.

(b)    All leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have a Material Adverse Effect.

(c)    The rights and Properties presently owned, leased or licensed by the Borrower and the Restricted Subsidiaries including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Borrower and the Restricted Subsidiaries to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof, except to the extent that the failure to include any such rights could not reasonably be expected to result in a Material Adverse Effect.

(d)    All of the Properties of the Borrower and the Restricted Subsidiaries which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, except for any such failure to maintain such Properties, individually or in the aggregate, that could not reasonably be expected to result in a Material Adverse Effect.

(e)    The Borrower and each Restricted Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such Restricted Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower and its Restricted Subsidiaries either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering

_____

[7] NTD: Company to confirm.

71

data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17    Maintenance of Properties.  After giving effect to the Chapter 11 Cases, except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Borrower and its Restricted Subsidiaries have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries.  Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of the Borrower or any Restricted Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of the Borrower or any Restricted Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of the Borrower or such Restricted Subsidiary.  All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of its Restricted Subsidiaries that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Borrower or any of its Restricted Subsidiaries, in a manner consistent with the Borrower's or its Restricted Subsidiaries' past practices (other than those the failure of which to maintain in accordance with this Section 7.17 could not reasonably be expected to have a Material Adverse Effect).

Section 7.18    Gas Imbalances, Prepayments.  Except as set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(c), on a net basis there are no gas imbalances, take or pay or other prepayments which would require the Borrower or any of its Restricted Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding $1,000,000 of net aggregate liability.

Section 7.19    Marketing of Production.  Except for contracts listed on Schedule 7.19 and in effect on the date hereof, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or its Restricted Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on sixty (60) days' notice or less without penalty or detriment for the sale of production from the Borrower's or its Restricted Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.20    Swap Agreements.  Schedule 7.20 sets forth, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(e) or as may otherwise be disclosed in writing to the Administrative Agent, sets forth, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including

72

the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 7.21    Use of Loans and Letters of Credit.  The proceeds of the Loans and the Letters of Credit shall be used (a) to provide for working capital and other general corporate purposes, including to fund lease acquisitions, exploration and production operations, development (including the drilling and completion of producing wells) and acquisitions of Oil and Gas Properties permitted hereunder, (b) to refinance the [Existing Credit Agreements], (c) for fees and expenses related to the Transactions and (d) for fees and expenses related to the Borrower's emergence from the Chapter 11 Cases.  The Borrower and its Subsidiaries are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board).  No part of the proceeds of any Loan or Letter of Credit will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 7.22    Solvency.    After giving effect to the Confirmation Order, the Plan of Reorganization, the Transactions and the other transactions contemplated hereby and thereby (including at the time of and immediately after giving effect to any Borrowing or the issuance, amendment, renewal or extension of any Letter of Credit, as applicable), (a) the aggregate assets (after giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement), at a fair valuation, of the Borrower and its Subsidiaries, taken as a whole, will exceed the aggregate debt and liabilities (including subordinated liabilities) of the Borrower and its Subsidiaries on a consolidated basis, as the debt and liabilities (including subordinated liabilities) become absolute and mature, (b) the Borrower and its Subsidiaries, taken as a whole, will not have incurred or intended to incur, and will not believe that they will incur, debt and liabilities (including subordinated liabilities) beyond their ability to pay such debt and liabilities (including subordinated liabilities) (after taking into account the timing and amounts of cash to be received by the Borrower and its Subsidiaries and the amounts to be payable on or in respect of their liabilities, and giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement) as such debt and liabilities (including subordinated liabilities) become absolute and mature and (c) the Borrower and its Subsidiaries, taken as a whole, will not have (and will have no reason to believe that they will have thereafter) unreasonably small capital for the conduct of their business.

Section 7.23    Money Laundering.  The operations of the Borrower and its Subsidiaries are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements including those of the Bank Secrecy Act, as amended by the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), and the applicable anti-money laundering statutes of jurisdictions where the Borrower and its Subsidiaries conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Money Laundering Laws"), and no material action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the best knowledge of the Borrower, threatened.

Section 7.24    Anti-Corruption Laws. Neither the Borrower nor any of its Subsidiaries, nor any director or officer, or to the knowledge of any Loan Party, any agent or employee of the Borrower or any of its Subsidiaries is aware of or has taken any action, directly or indirectly, that would result in a material violation by such Persons of any Anti-Corruption Laws, including without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or

73

authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of any Anti-Corruption Laws; and, the Borrower and its Subsidiaries have conducted their business in material compliance with the Anti-Corruption Laws and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

Section 7.25    Anti-Corruption Laws; Sanctions; OFAC.

(a)    The Borrower has implemented and maintains in effect policies and procedures designed to promote compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

(b)    The Borrower, its Subsidiaries, their respective officers and employees and, to the knowledge of the Borrower, its directors and agents are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.

(c)    None of (i) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (ii) to the knowledge of the Borrower, any agent of the Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. The Borrower will not directly or, to its knowledge, indirectly use the proceeds from the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person currently subject to any applicable Sanctions.

Section 7.26    EEA Financial Institutions.    Neither the Borrower nor any of its Restricted Subsidiaries is an EEA Financial Institution.

Section 7.27    Senior Debt Status.    The Secured Obligations constitute "Senior Indebtedness", "Designated Senior Indebtedness" or any similar designation under and as defined in any agreement governing any unsecured, senior subordinated or subordinated Indebtedness and the subordination provisions set forth in each such agreement, if any, are legally valid and enforceable against the parties thereto subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**ARTICLE VIII**
**AFFIRMATIVE COVENANTS**

Until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 8.01    Financial Statements; Other Information.    The Borrower will furnish to the Administrative Agent and each Lender:

(a)    Annual Financial Statements.    As soon as available, but in any event in accordance with then applicable law and not later than ninety (90) days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2019, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year (except for the fiscal year ending December 31, 2019 for which no comparison shall be required to be delivered other than as

74

required by Accounting Standards Codification 852), all reported on by independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit, except for any such qualification or exception resulting solely from the impending maturity date of the Loans or any breach or anticipated breach of a financial covenant) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

(b)     Quarterly Financial Statements.  As soon as available, but in any event in accordance with then applicable law and not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year (except for any fiscal quarters ending on or prior to [•], for which no comparisons will be delivered [other than as required by Accounting Standards Codification 852][8]), all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

The Borrower represents and warrants that the Borrower and each of its Subsidiaries file the financial statements provided under Section 8.01(a) and Section 8.01(b) with the SEC and/or make such financial statements available to potential holders of their 144A securities, and, accordingly, unless the Borrower has marked such financial statements as "PRIVATE", the Borrower hereby (1) authorizes the Administrative Agent to make the financial statements to be provided under Section 8.01(a) and Section 8.01(b), along with the Loan Documents, available to Public-Siders and (2) agrees that at the time such financial statements are provided hereunder, they shall already have been made available to holders of its securities.  The Borrower will not request that any other material be posted to Public-Siders without expressly representing and warranting to the Administrative Agent in writing that (1) such materials do not constitute material non-public information within the meaning of the federal securities laws or (2) make such materials that do constitute material non-public information within the meaning of the federal securities laws publicly available by press release or public filing with the SEC.

(c)     Certificate of Financial Officer – Compliance.  Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a Compliance Certificate (i) certifying as to whether a Default exists and, if a Default so exists, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) certifying that the Borrower has been in compliance with Section 9.01 at such times during the period covered by such financial statements as required therein and in connection therewith, setting forth reasonably detailed calculations demonstrating compliance with Section 8.13(b) and Section 9.01 and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 7.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d)     Certificate of Financial Officer – Consolidating Information.  If, at any time, all of the Consolidated Subsidiaries of the Borrower are not Consolidated Restricted Subsidiaries, then concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer setting forth consolidating spreadsheets that show all Consolidated Unrestricted

---

[8] NTD: To be confirmed.

Subsidiaries and the eliminating entries, in such form as would be presentable to the auditors of the Borrower.

(e)     Certificate of Financial Officer – Swap Agreements.  Concurrently with any delivery of any Reserve Report or at such other times as may be reasonably requested by the Administrative Agent, a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as of the last Business Day of the calendar month preceding the delivery of such Reserve Report, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value therefore as of the end of the preceding fiscal quarter, any new credit support agreements relating thereto not listed on Schedule 7.20, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(f)     Certificate of Insurer – Insurance Coverage.  Concurrently with any delivery of financial statements under Section 8.01(a), a certificate of insurance coverage from each insurer with respect to the insurance required by Section 8.07, in form and substance reasonably satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

(g)     Other Accounting Reports.  Promptly upon receipt thereof, a copy of each other material report or opinion submitted to the Borrower or any of its Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Borrower or any such Subsidiary, and a copy of any response by the Borrower or any such Subsidiary, or the Board of Directors of the Borrower or any such Subsidiary, to such material report or opinion.

(h)     SEC and Other Filings; Reports to Shareholders.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the SEC, or with any national securities exchange and distributed by the Borrower to its shareholders.

(i)     Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this Section 8.01.

(j)     Lists of Purchasers.  Concurrently with the delivery of the annual financial statements in accordance with Section 8.01(a), a list of all Persons who collectively purchased at least 70% of the aggregate production of Hydrocarbons from the Borrower and its Restricted Subsidiaries during the year presented in such annual financial statements.

(k)     Notice of Sales of Oil and Gas Properties and Unwinds of Swap Agreements.  In the event the Borrower or any Restricted Subsidiary intends to sell, transfer, assign, Unwind or otherwise Dispose of at least the greater of $5,000,000 or 2% of the then effective Borrowing Base worth of any Oil and Gas Properties, Swap Agreements or any Equity Interests in any Restricted Subsidiary in accordance with Section 9.13 which are included in the then-current Borrowing Base, prior written notice (of at least five (5) Business Days or such shorter time as the Administrative Agent may agree in its sole discretion) of such Disposition or Unwind, the price thereof, in the case of Oil and Gas Properties (or any Equity Interests of any Restricted Subsidiary), and the anticipated decline in the mark-to-market value thereof or net cash proceeds therefrom, in the case of Swap Agreements, and, in each case, the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent.

(l)      Notice of Casualty Events.  Prompt written notice, and in any event within three (3) Business Days after the Borrower obtains knowledge of the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event having a fair market value in excess of $5,000,000.

(m)      Information Regarding Borrower and Guarantors.  Prompt written notice (and in any event, within ten (10) days after the occurrence) of any change (i) in a Loan Party's corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) in the location of the Loan Party's chief executive office or principal place of business, (iii) in the Loan Party's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed, (iv) in the Loan Party's jurisdiction of organization, and (v) in the Loan Party's federal taxpayer identification number.

(n)      Production Report and Lease Operating Statements.  Within sixty (60) days after the end of each fiscal quarter, a report setting forth, for each calendar month during the then current fiscal year to the end of such fiscal quarter on a production date basis, the volume of production and sales attributable to production for which cash activity has been recorded (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

(o)      Notices of Certain Changes.  (i) Five (5) Business Days prior written notice of any amendment, modification or supplement to the certificate or articles of incorporation, by-laws, any preferred stock designation or, to the extent such amendment, modification or supplement would have an adverse effect on the Administrative Agent or the Lenders, any other organic document of the Borrower or any Restricted Subsidiary and (ii) within five (5) days after the execution thereof, copies of any such any amendment, modification or supplement.

(p)      Issuance and Incurrences of Indebtedness.  Five (5) Business Days prior written notice of the incurrence by the Borrower or any Restricted Subsidiary of any Specified Additional Indebtedness, any Permitted Refinancing Indebtedness or, if in excess of $5,000,000, any other Indebtedness for borrowed money as well as the amount thereof, the anticipated closing date and definitive documentation for the foregoing and any other related information reasonably requested.

(q)      Budget.  Concurrently with the delivery of financial statements under Section 8.01(a), a certificate of a Financial Officer, setting forth a report, in form and substance reasonably satisfactory to the Administrative Agent, of the projected production of Hydrocarbons by the Borrower and its Subsidiaries and the assumptions used in calculating such projections, the Borrower's annual operating and capital expenditure budgets and financial forecasts, including cash flow projections covering proposed fundings, repayments, additional advances, investments and other cash receipts and disbursements, each on a quarterly basis for the remaining fiscal year and the first fiscal quarter of the succeeding fiscal year.

(r)      Other Requested Information.  Promptly following any request therefor, (i) such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary (including, without limitation, any Plan and any reports or other information required to be filed by the Borrower or any of the Subsidiaries under ERISA in respect of any Plan), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may reasonably request and (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation.

77

Documents required to be delivered pursuant to Section 8.01(a), Section 8.01(b), Section 8.01(g), Section 8.01(h) or Section 8.01(i) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which such materials are publicly available as posted on the SEC's Electronic Data Gathering, Analysis and Retrieval system (EDGAR) (or any successor system); or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether made available by the Administrative Agent); provided that:  (A) upon written request by the Administrative Agent (or any Lender through the Administrative Agent) to the Borrower, the Borrower shall deliver paper copies of such documents to the Administrative Agent or such Lender until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (B) the Borrower shall notify the Administrative Agent (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such document to it and maintaining its copies of such documents.

Section 8.02     Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)     Defaults. The occurrence of any Default or Event of Default;

(b)     Governmental Matters. The filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration previously disclosed to the Lenders that could reasonably be expected to be adversely determined and result in liability in excess of the greater of $5,000,000 or 2% of the then effective Borrowing Base not fully covered by insurance, subject to normal deductibles; and

(c)     Material Adverse Effect. Any other development that results in, or could reasonably be expected to result in a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03     Existence; Conduct of Business.   The Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties is located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.12.  The Borrower shall at all times remain organized under the laws of the United States of America, any State thereof or the District of Columbia.

Section 8.04     Payment of Obligations.  After giving effect to the Confirmation Order and the Plan of Reorganization, the Borrower will, and will cause each Restricted Subsidiary to, pay its obligations,

78

including Tax liabilities of the Borrower and all of its Subsidiaries before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Restricted Subsidiary has set aside on its books adequate reserves with respect thereto to the extent required in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in (i) a Material Adverse Effect or (ii) the seizure or levy of any Property of the Borrower or any Subsidiary thereof.

Section 8.05    Performance of Obligations under Loan Documents.  The Borrower will pay the Loans according to the reading, tenor and effect thereof, and the Borrower will, and will cause each Restricted Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

Section 8.06    Operation and Maintenance of Properties.  Except for matters that could not reasonably be expected to result in a Material Adverse Effect, the Borrower, at its own expense, will, and will cause each Restricted Subsidiary to:

(a)    operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom;

(b)    keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its Oil and Gas Properties and other Properties, including, without limitation, all equipment, machinery and facilities;

(c)    promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and will do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder;

(d)    promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties; and

(e)    to the extent the Borrower or such Restricted Subsidiary is not the operator of any Property, use reasonable efforts to cause the operator to comply with this Section 8.06.

Section 8.07    Insurance.  The Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall (i) name the Administrative Agent as an "additional insured" in respect of liability insurance, (ii) name the Administrative Agent as lender loss payee and mortgagee with respect to Property insurance and (iii) provide that the insurer will use

79

commercially reasonable efforts to give at least thirty (30) days prior notice of any cancellation to the Administrative Agent, but in any event not less than ten (10) days prior notice of such cancellation.

Section 8.08   Books and Records; Inspection Rights.  The Borrower will, and will cause each Restricted Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each Restricted Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested; provided, that, so long as no Event of Default shall have occurred and be continuing, (a) the Administrative Agent and the Lenders shall not exercise their rights under this Section 8.08 more than twice in any fiscal year and (b) the Borrower and its Restricted Subsidiaries shall not be required to reimburse the Administrative Agent and the Lenders for more than one inspection during any fiscal year.

Section 8.09   Compliance with Laws.

(a)   The Borrower will, and will cause each Restricted Subsidiary to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)   The Borrower will maintain in effect and enforce policies and procedures regarding compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 8.10   Environmental Matters.

(a)   The Borrower shall at its sole expense: (i) comply, and shall cause its Properties and operations and each Subsidiary and each Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect; (ii) not dispose of or otherwise release, and shall cause each Subsidiary not to dispose of or otherwise release, any oil, oil and gas waste, hazardous substance, or solid waste on, under, about or from any of the Borrower's or its Subsidiaries' Properties or any other Property to the extent caused by the Borrower's or any of its Subsidiaries' operations except in compliance with applicable Environmental Laws, the disposal or release of which could reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all notices, permits, licenses, exemptions, approvals, registrations or other authorizations, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's or its Subsidiaries' Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future disposal or other release of any oil, oil and gas waste, hazardous substance or solid waste on, under, about or from any of the Borrower's or its Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; and (v) establish and implement, and shall cause each Subsidiary to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's and its

80

Subsidiaries' obligations under this Section 8.10(a) are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b)     The Borrower will promptly, but in no event later than five (5) days after the occurrence of a triggering event, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any landowner or other third party against the Borrower or its Subsidiaries or their Properties of which the Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if the Borrower reasonably anticipates that such action will result in liability (whether individually or in the aggregate) in excess of $25,000,000 million, not fully covered by insurance, subject to normal deductibles.

(c)     The Borrower will, and will cause each Subsidiary to, provide environmental audits and tests in accordance with ASTM International standards upon request by the Administrative Agent and the Lenders and no more than once per year in the absence of any Event of Default (or as otherwise required to be obtained by the Administrative Agent or the Lenders by any Governmental Authority), in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11     Further Assurances.

(a)     The Borrower at its expense will, and will cause each Restricted Subsidiary to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower or any Restricted Subsidiary, as the case may be, in the Loan Documents, including the Notes, if requested, or to further evidence and more fully describe the Collateral intended as security for the Secured Obligations, or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Administrative Agent, to ensure that the Administrative Agent, on behalf of the Secured Parties, has a perfected security interest in all assets of the Loan Parties.  In addition, at the Administrative Agent's reasonable written request, the Borrower, at its sole expense, shall enter into any Security Instruments to evidence the Liens on the Collateral and provide any information requested to identify any Collateral, including an updated Perfection Certificate, exhibits to Mortgages in form and substance reasonably satisfactory to the Administrative Agent (which such exhibits shall be in recordable form for the applicable jurisdiction) or any other information reasonably requested in connection with the identification of any Collateral.

(b)     The Borrower hereby authorizes the Administrative Agent or its designee to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral (including the Mortgaged Property) without the signature of the Borrower or any other Guarantor where permitted by law.  A carbon, photographic or other reproduction of the Security Instruments or any financing statement covering the Collateral (including the Mortgaged Property) or any part thereof shall be sufficient as a financing statement where permitted by law.  The Borrower acknowledges and agrees that any such financing statement may describe the collateral as "all assets" of the applicable Loan Party or words of similar effect as may be required by the Administrative Agent.

Section 8.12     Reserve Reports.

(a)      On or before April 1st and October 1st of each year, commencing April 1, 2020, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of the Borrower and its Subsidiaries as of the immediately preceding December 31st and June 30th, as applicable.  The Reserve Report as of December 31st of each year shall be prepared by one or more Approved Petroleum Engineers, and the June 30th Reserve Report of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared in accordance with the procedures used in the immediately preceding December 31st Reserve Report.

(b)      In the event of an Interim Redetermination, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared in accordance with the procedures used in the immediately preceding December 31st Reserve Report with an "as of" date as required by the Administrative Agent as soon as possible, but in any event no later than thirty (30) days following the receipt of such request.

(c)      With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a certificate substantially in the form of Exhibit J (a "Reserve Report Certificate") from a Responsible Officer certifying that in all material respects: (i) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects, (ii) the Borrower or its Restricted Subsidiaries owns good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report and such Properties are free of all Liens except for Liens permitted by Section 9.03, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 7.18 with respect to its Oil and Gas Properties evaluated in such Reserve Report which would require the Borrower or any Restricted Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Oil and Gas Properties have been sold since the date of the last Borrowing Base determination except as set forth on an exhibit to the certificate, which exhibit shall list all of its Oil and Gas Properties sold other than Hydrocarbons sold in the ordinary course of business and in such detail as reasonably required by the Administrative Agent, (v) attached thereto is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on Schedule 7.19 had such agreement been in effect on the date hereof and (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties and demonstrating that the Borrower is in compliance with Section 8.14(a).

Section 8.13      Title Information.

(a)      On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12(a), to the extent requested by the Administrative Agent, the Borrower shall deliver title information in form and substance acceptable to the Administrative Agent covering enough of the Borrowing Base Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on at least eighty-five percent (85%) of the PV-9 of the Borrowing Base Properties.

(b)      If the Borrower has provided title information for additional Properties under Section 8.13(a), the Borrower shall, within sixty (60) days (or such longer period of time as may be acceptable to the Administrative Agent in its sole discretion) of written notice from the Administrative Agent that title defects or exceptions exist with respect to such additional Properties, either (i) cure any

82

such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 9.03 raised by such information, (ii) substitute acceptable Mortgaged Properties with no title defects or exceptions except for Excepted Liens (other than Excepted Liens described in clauses (e), (g) and (h) of such definition) having an equivalent value or (iii) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on at least eighty-five percent (85%) of the PV-9 of the Borrowing Base Properties.

(c)       If the Borrower is unable to cure any title defect requested by the Administrative Agent or the Lenders to be cured within the period of time required by clause (b) above or the Borrower does not comply with the requirements to provide acceptable title information covering at least eighty-five percent (85%) of the PV-9 of the Borrowing Base Properties, such default shall not be a Default, but instead the Administrative Agent and/or the Required Lenders shall have the right to exercise the following remedy in their sole discretion from time to time, and any failure to so exercise this remedy at any time shall not be a waiver as to future exercise of the remedy by the Administrative Agent or the Required Lenders.  To the extent that the Administrative Agent or the Required Lenders are not satisfied with title to any Mortgaged Property after such period of time has elapsed, such unacceptable Mortgaged Property shall not count towards the eighty-five percent (85%) requirement, and the Administrative Agent may send a written notice to the Borrower and the Lenders that the then outstanding Borrowing Base shall be reduced by an amount as determined by the Required Lenders to cause the Borrower to be in compliance with the requirement to provide acceptable title information covering at least eighty-five percent (85%) of the PV-9 of the Borrowing Base Properties evaluated by such Reserve Report.  This new Borrowing Base shall become effective in accordance with Section 2.08(b).

Section 8.14       Additional Collateral; Additional Guarantors.

(a)       In connection with each redetermination of the Borrowing Base (including, for the avoidance of doubt, any Interim Redetermination), the Borrower shall review the Reserve Report and the list of current Mortgaged Properties (as described in Section 8.12(c)(vi)) to ascertain whether the Mortgaged Properties represent at least eight-five percent (85%) of the PV-9 of the Borrowing Base Properties after giving effect to exploration and production activities, acquisitions, dispositions and production.  In the event that the Mortgaged Properties do not represent at least eighty-five percent (85%) of the PV-9 of the Borrowing Base Properties, then the Borrower shall, and shall cause its Restricted Subsidiaries to, grant, within thirty (30) days of delivery of the Reserve Report Certificate required under Section 8.12(c), to the Administrative Agent as security for the Secured Obligations a first-priority Lien interest (provided that Excepted Liens of the type described in clauses (a) to (d) and (f) of the definition thereof shall be permitted to exist thereupon, but subject to the provisos at the end of such definition) on additional Oil and Gas Properties not already subject to a Lien of the Security Instruments such that after giving effect thereto, the Mortgaged Properties will represent at least eighty-five percent (85%) of the PV-9 of the Borrowing Base Properties.  All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, mortgages, security agreements and financing statements or other Security Instruments, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes.  In order to comply with the foregoing, if any Restricted Subsidiary places a Lien on its Oil and Gas Properties and such Restricted Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with Section 8.14(b).

(b)       In the event that (i) any Restricted Subsidiary is a Material Domestic Subsidiary or (ii) any Domestic Subsidiary incurs or guarantees any Material Indebtedness, the Borrower shall promptly cause such Restricted Subsidiary to guarantee and secure the Secured Obligations pursuant to the Guaranty Agreement.  In connection with any such guaranty and security interest grant, the Borrower shall, or shall cause (A) such Subsidiary to, execute and deliver a supplement to the Guaranty Agreement

executed by such Subsidiary, (B) the owners of the Equity Interests of such Subsidiary who are Loan Parties to pledge all of the Equity Interests of such new Subsidiary (including, without limitation, delivery of original stock certificates evidencing the Equity Interests of such Subsidiary, together with an appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof) and (C) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(c)     In the event that the Borrower or any Domestic Subsidiary becomes the owner of a Foreign Subsidiary which has total assets in excess of $1,000,000, then the Borrower shall promptly, or shall cause such Domestic Subsidiary to promptly, guarantee the Secured Obligations pursuant to the Guaranty Agreement.  In connection with any such guaranty, the Borrower shall, or shall cause such Domestic Subsidiary to, (i) execute and deliver a supplement to the Guaranty Agreement, (ii) pledge sixty six and two thirds percent (66-2/3%) of all the voting Equity Interests of such Foreign Subsidiary and one hundred percent (100%) of the nonvoting Equity Interests of such Foreign Subsidiary (including, without limitation, delivery of original stock certificates evidencing such Equity Interests of such Foreign Subsidiary, together with appropriate stock powers for each certificate duly executed in blank by the registered owner thereof) and (iii) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(d)     The Borrower will at all times cause the other material tangible and intangible assets of the Borrower and each Guarantor to be subject to a Lien pursuant to the Security Instruments.  All Borrowing Base Properties shall, at all times, be owned by a Guarantor.

Section 8.15     ERISA Compliance.  The Borrower will promptly furnish and will cause the Subsidiaries to promptly furnish to the Administrative Agent (i) promptly after the filing thereof with the United States Secretary of Labor or the Internal Revenue Service, copies of each annual and other report with respect to each Plan, other than a Multiemployer Plan, or any trust created thereunder, and (ii) promptly upon becoming aware of the occurrence of any "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the Code, in connection with any Plan, other than a Multiemployer Plan, or any trust created thereunder, a written notice signed by the President or the principal Financial Officer or the Subsidiary, as the case may be, specifying the nature thereof, what action the Borrower or the Subsidiary is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service or the Department of Labor with respect thereto if such action could reasonably be expected to result in liability to the Borrower, the Guarantors or their respective Subsidiaries (whether individually of in the aggregate) in excess of the greater of $10,000,000 or 5% of the then effective Borrowing Base.

Section 8.16     Account Control Agreements; Location of Proceeds of Loans.

(a)     The Borrower will, and will cause each other Loan Party to, in connection with any Deposit Account, any Securities Account and/or any Commodities Account (other than Excluded Accounts for so long as it is an Excluded Account) established, held or maintained on or after the Closing Date promptly, but in any event within twenty (20) Business Days (or such later date as the Administrative Agent may agree in its sole discretion) of the establishment of such account, cause such account to be a Controlled Account.

(b)     The Borrower will, and will cause each Loan Party to, until the proceeds of any Loans are transferred to a third party in accordance with the Loan Documents, hold the proceeds of any Loans made under this Agreement in a Deposit Account that is a Controlled Account.

Section 8.17     Unrestricted Subsidiaries.  The Borrower:

84

(a)  will cause the management, business and affairs of each of the Borrower and its Restricted Subsidiaries to be conducted in such a manner (including, without limitation, by keeping separate books of account, furnishing separate financial statements of Unrestricted Subsidiaries to creditors and potential creditors thereof and by not permitting Properties of the Borrower and its respective Restricted Subsidiaries to be commingled) so that each Unrestricted Subsidiary that is a corporation will be treated as a corporate entity separate and distinct from the Borrower and the Restricted Subsidiaries.

(b)  will not, and will not permit any of the Restricted Subsidiaries to, incur, assume, guarantee or be or become liable for any Indebtedness of any of the Unrestricted Subsidiaries.

(c)  will not permit any Unrestricted Subsidiary to hold any Equity Interest in, or any Indebtedness of, the Borrower or any Restricted Subsidiary.

Section 8.18    Marketing Activities.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their Proved Reserves during the period of such contract, (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from Proved Reserves of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries that the Borrower or one of its Restricted Subsidiaries has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business and (iii) other contracts for the purchase and/or sale of Hydrocarbons of third parties (A) which have generally offsetting provisions (*i.e.*, corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken and (B) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

Section 8.19    Keepwell.  The Borrower will, and will cause each Guarantor to, provide such funds or other support as may be needed from time to time by the Borrower or any Guarantor, as applicable, to honor all of its obligations under this Agreement and any other Loan Document in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 8.19 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.19, or otherwise under this Agreement or any other Loan Document, as it relates to the Borrower, any Restricted Subsidiary or any Guarantor, as applicable, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Loan Party under this Section 8.19 shall remain in full force and effect until Payment in Full.  The Borrower intends that this Section 8.19 constitute, and this Section 8.19 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit the Borrower and any Guarantor, as applicable, for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 8.20    Post-Closing Required Swap Agreements Covenant.

(a)  To the extent that the Loan Parties have not entered into the Required Swap Agreements as of the Closing Date, the Borrower shall, within thirty (30) days of the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion) (such requirement, the "Post-Closing Required Swap Agreements Covenant"), enter into the Required Swap Agreements (the date on which the Required Swap Agreements are entered into, the "Required Swap Date"). The Borrower will, after the Required Swap Date, have and maintain the Required Swap Agreements.

(b)  To the extent that the Loan Parties have failed to satisfy the Post-Closing Required Swap Agreements Covenant, the Administrative Agent shall have the right to adjust the Borrowing Base by an amount equal to the Borrowing Base Value attributable to the Required Swap Agreements in the

current Borrowing Base which are not entered into in connection with the Post-Closing Required Swap Agreements Covenant and (if the Administrative Agent in fact elects to make such adjustment) the Administrative Agent shall promptly inform the Borrower of the amount of the adjusted Borrowing Base.

## ARTICLE IX
## NEGATIVE COVENANTS

Until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 9.01    Financial Covenants.

(a)    Total Net Indebtedness Leverage Ratio.  The Borrower will not permit its ratio of Consolidated Total Net Indebtedness as of the last day each fiscal quarter, commencing with the fiscal quarter ending [_____][9], to EBITDAX for the period ending on such day to be greater than 4.00 to 1.00.

(b)    Current Ratio.  The Borrower will not permit as of the last day of any fiscal quarter, commencing with the fiscal quarter ending [_____][10], its Current Ratio as of such last day to be less than 1.00 to 1.00.

(c)    Equity Cure.  In the event that the Borrower fails to comply with Section 9.01(a) for any four fiscal quarter period, then until the expiration of the fifteenth (15th) Business Day following delivery of financial statements with respect to the applicable fiscal quarter or fiscal year ending on the last day of such period, the Borrower shall be permitted to cure such failure to comply by requesting that such financial covenant be recalculated by increasing EBITDAX of the fiscal quarter most recently ended by an amount equal to cash equity contributions (which shall be in the form of common equity or, if on terms and conditions reasonably acceptable to the Administrative Agent, preferred equity) received by Borrower from its equity holders needed to bring the Borrower in compliance with Section 9.01(a). If, after giving effect to the foregoing recalculations, the Borrower shall then be in compliance with the requirements of the financial covenant set forth in Section 9.01(a), the Borrower shall be deemed to have satisfied the requirements of such applicable financial covenant as of the relevant earlier required date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of any such covenant that had occurred shall be deemed cured for purposes of this Agreement and the other Loan Documents. The Borrower may not exercise the equity cure right described in this Section 9.01(c) more than (i) twice in any period of four (4) consecutive fiscal quarters or (ii) more than four (4) times in the aggregate during the term of this Agreement. The proceeds of such equity issuance or capital contributions shall be counted as EBITDAX solely for the purpose of compliance with the financial covenant set forth in Section 9.01(a) and shall not be included for any other purpose hereunder.

Section 9.02    Indebtedness.   The Borrower will not, and will not permit any Restricted Subsidiary to, incur, create, assume or suffer to exist any Indebtedness, except:

(a)    the Loans, any Notes or other Secured Obligations arising under the Loan Documents or any Secured Swap Agreement any guaranty of or suretyship arrangement for the Loans, any Notes or other Secured Obligations arising under the Loan Documents, and any deferred put premiums associated with Swap Agreements entered into with an Approved Counterparty;

---

[9] NTD: To be the first full fiscal quarter ending after the Closing Date.

[10] NTD: To be the first full fiscal quarter ending after the Closing Date.

(b)      any Indebtedness of the Borrower and its Restricted Subsidiaries existing on the date hereof  and that is set forth on Schedule 9.02;

(c)      accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than sixty (60) days past the date of invoice or delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(d)      Indebtedness (including guarantees) under Finance Leases, provided that the aggregate amount of such Indebtedness and Indebtedness incurred pursuant to Section 9.02(i) and Section 9.02(k) does not exceed the greater of $10,000,000 or 5% of the then effective Borrowing Base at any one time outstanding;

(e)      Indebtedness associated with worker's compensation claims, performance, bid, surety or similar bonds or surety obligations required by Governmental Requirements or third parties in connection with the operation of the Oil and Gas Properties;

(f)      intercompany Indebtedness between the Borrower and any Restricted Subsidiary or between Restricted Subsidiaries to the extent permitted by Section 9.05(g); provided that such Indebtedness is not held, assigned, transferred, negotiated or pledged to any Person other than a Loan Party, and, provided further, that any such Indebtedness owed by either the Borrower or a Guarantor shall be subordinated to the Secured Obligations on terms set forth in the Guaranty Agreement;

(g)      endorsements of negotiable instruments for collection in the ordinary course of business;

(h)      Indebtedness incurred to finance insurance premiums;

(i)      Indebtedness incurred solely for the purpose of financing the acquisition, construction or improvement of any fixed or capital assets, including Indebtedness assumed in connection with the acquisition of such assets; provided that (i) the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (ii) the aggregate amount of such Indebtedness and Indebtedness incurred pursuant to Section 9.02(d) and Section 9.02(k) does not exceed the greater of $10,000,000 or 5% of the then effective Borrowing Base at any one time outstanding;

(j)      (i) Indebtedness in respect of Specified Additional Indebtedness; provided that: (A) at the time of, and after giving effect to, the incurrence of such Indebtedness no Default or Event of Default has occurred and is continuing,  (B) after giving pro forma effect to such issuance or incurrence and any concurrent repayment of Indebtedness, (I) the Total Net Indebtedness Leverage Ratio shall not exceed 4.00 to 1.00 and (II) the Current Ratio shall not exceed 1.00 to 1.00 (it being understood that for purposes of calculating the Total Net Indebtedness Leverage Ratio and the Current Ratio, (x) Consolidated Total Net Indebtedness and Current Liabilities shall give pro forma effect to the issuance or incurrence of such Indebtedness and any other Indebtedness incurred through such date of determination and any concurrent repayment of Indebtedness and (y) Unrestricted Cash and Current Assets shall exclude the amount of any cash to be received by the Borrower or any Subsidiary in connection with the incurrence of such Specified Additional Indebtedness for the purposes of determining the pro forma Total Net Indebtedness Leverage Ratio and Current Ratio), (C) at the time of the issuance or incurrence of such Indebtedness, the Borrowing Base is adjusted as contemplated by Section 2.08(c) and the Borrower makes

any prepayment required under Section 3.04(c)(iii) and (D) the Borrower shall have complied with Section 8.01(p) and (ii) any Permitted Refinancing Indebtedness of such Specified Additional Indebtedness; and

(k)     other Indebtedness, provided that the aggregate amount of such Indebtedness and other Indebtedness incurred pursuant to Section 9.02(d) and Section 9.02(i) does not exceed the greater of $10,000,000 or 5% of the then effective Borrowing Base at any one time outstanding.

Section 9.03     Liens.  The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)     Liens securing the payment of any Secured Obligations;

(b)     (i) Liens existing on the Closing Date and set forth on Schedule 9.03 and (ii) Excepted Liens;

(c)     Liens securing (i) Finance Leases permitted by Section 9.02(d) but only on the Property under lease and (ii) Indebtedness for any fixed or capital assets pursuant to Section 9.02(i) but only on the fixed or capital assets financed by such Indebtedness;

(d)     Liens securing Indebtedness permitted by Section 9.02(h) or other obligations related to the payment of insurance premiums; provided that such Liens do not extend to any Property of the Borrower or its Restricted Subsidiaries other than Property of the type customarily subject to such Liens (including rights under the insurance policies purchased by such premiums); and

(e)     Liens on (i) cash and securities and (ii) other Property not constituting Collateral for the Secured Obligations or Properties used in determining the Borrowing Base and not otherwise permitted by the foregoing clauses of this Section 9.03; provided that the aggregate principal or face amount of all Indebtedness or other obligations secured under this Section 9.03(e) shall not exceed the greater of $10,000,000 or 5% of the then effective Borrowing Base at any time.

Section 9.04     Restricted Payments; Repayment of Specified Indebtedness; Restrictions on Amendments of Specified Indebtedness.

(a)     Restricted Payments.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, except (i) the Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock), (ii) Subsidiaries may declare and pay dividends or any other distributions to the Borrower or any Guarantor with respect to their Equity Interests, (iii) the Borrower may make Restricted Payments in connection with stock option plans or other benefit plans for management or employees of the Borrower and its Subsidiaries, (iv) the Borrower may make Restricted Payments in connection with the termination of its directors' or employees' option agreements or restricted stock agreements under any of Borrower's incentive stock plans provided, however, that the aggregate amounts paid in respect thereof do not exceed $[2,500,000], (v) the Borrower may (A) declare and pay in respect of preferred Equity Interests (which are not Disqualified Capital Stock) regularly scheduled dividends in additional Equity Interests (which are not Disqualified Capital Stock) as and when the same accrue and are payable at the stated dividend rate, (B) issue Equity Interests (which are not Disqualified Capital Stock) in connection with a conversion of such preferred Equity Interests into other Equity Interests, and (C) make cash payments in lieu of fractional shares in connection with any such

conversion of preferred Equity Interests and (vi) the Borrower may make Restricted Payments if the Payment Conditions are satisfied at the time such Restricted Payment is made.

(b)     Redemptions.   The Borrower will not, and will not permit any Restricted Subsidiary to, prior to the date that is ninety-one (91) days after the Maturity Date, call, make or offer to make any optional or voluntary Redemption of or otherwise optionally or voluntarily Redeem (whether in whole or in part), (i) any Specified Additional Indebtedness or (ii) any Permitted Refinancing Indebtedness in respect of the foregoing (such Indebtedness, collectively, the "Specified Indebtedness"); provided that the Borrower may Redeem such Specified Indebtedness (A) with the proceeds of any Permitted Refinancing Indebtedness in respect thereof or with the Net Cash Proceeds of any sale of Equity Interests (other than Disqualified Capital Stock) of the Borrower so long as (I) no Default, Event of Default or Borrowing Base Deficiency has occurred and is continuing or would occur as a result of such Redemption and (II) such Redemption occurs substantially concurrently with the receipt of such proceeds from Permitted Refinancing Indebtedness or Net Cash Proceeds or (B) if the Payment Conditions are satisfied at the time of such Redemption.

(c)     Amendments. The Borrower will not, and will not permit any of its Restricted Subsidiaries to amend, modify, waive or otherwise change, consent or agree to any amendment, modification, waiver or other change to any Specified Indebtedness if doing so would (i) increase the rate of interest thereon or (ii) (A) cause such Specified Indebtedness to not meet the requirements set forth in the definition of Specified Additional Indebtedness or Permitted Refinancing Indebtedness, as applicable (tested as if such Specified Indebtedness were being issued or incurred at such time) and (B) (I) shorten the weighted average maturity or weighted average life of such Specified Indebtedness or (II) be otherwise materially adverse to the Lenders; provided that the foregoing shall not prohibit the execution of supplemental indentures to add guarantors if required; provided that such Person complies with Section 8.14(d).

Section 9.05     Investments, Loans and Advances.  The Borrower will not, and will not permit any Restricted Subsidiary to, make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)     Investments made on or prior to the Closing Date in the entities described in Schedule 7.14 or as set forth on Schedule 9.05;

(b)     accounts receivable arising in the ordinary course of business;

(c)     direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one year from the date of creation thereof;

(d)     commercial paper maturing within one year from the date of creation thereof rated in one of the two highest grades by S&P or Moody's;

(e)     deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $100,000,000 (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively or, in the case of any Foreign Subsidiary, a bank organized in a jurisdiction in which the Foreign Subsidiary conducts operations having in excess of $500,000,000 (or its equivalent in another currency);

(f)        deposits in money market funds investing primarily in Investments described in Section 9.05(c), Section 9.05(d) or Section 9.05(e);

(g)        Investments (i) made by the Borrower in or to the Guarantors, (ii) made by any Restricted Subsidiary in or to the Borrower or any Guarantor and (iii) made by the Borrower or any Restricted Subsidiary in or to all other Subsidiaries which are not Guarantors in an aggregate amount at any one time outstanding not to exceed the greater of $5,000,000 or 2% of the then effective Borrowing Base;

(h)        subject to the limits in Section 9.07, Investments (including, without limitation, capital contributions) in general or limited partnerships or other types of entities (each a "venture") entered into by the Borrower or a Restricted Subsidiary with others in the ordinary course of business; provided that (i) any such venture is engaged exclusively in oil and gas exploration, development, production, processing and related activities, including transportation, (ii) the interest in such venture is acquired in the ordinary course of business and on fair and reasonable terms and (iii) such venture interests acquired and capital contributions made (valued as of the date such interest was acquired or the contribution made) do not exceed, in the aggregate at any time outstanding an amount equal to the greater of $10,000,000 or 5% of the then effective Borrowing Base;

(i)        subject to the limits in Section 9.07, Investments in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America;

(j)        loans or advances to employees, officers or directors in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries, in each case only as permitted by applicable law, including Section 402 of the Sarbanes Oxley Act of 2002, but in any event not to exceed $1,000,000 in the aggregate at any time;

(k)        Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 owing to the Borrower or any Restricted Subsidiary as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of the Borrower or any of its Restricted Subsidiaries; provided that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 9.05(k) exceeds $5,000,000;

(l)        Investments in the form of loans to third parties for the sole purpose of purchasing Oil and Gas Properties pursuant to a like-kind or reverse like-kind exchange in accordance with Section 1031 of the Code provided that (i) such loans shall not exceed [$100,000,000] of principal outstanding at any one time; (ii) at all times during which such loans are outstanding the amount of unused total Commitments shall not be less than 25% of the then effective Borrowing Base; and (iii) the Oil and Gas Properties acquired with such loans shall not be included in the determination of the Borrowing Base until the Borrower or a Restricted Subsidiary takes title to such Oil and Gas Property upon consummation of the exchange; and

(m)        other Investments (including investments in Unrestricted Subsidiaries) if the Payment Conditions are satisfied at the time such Investment is made.

Section 9.06    Designation and Conversion of Restricted and Unrestricted Subsidiaries; Indebtedness of Unrestricted Subsidiaries.

(a)     Unless designated as an Unrestricted Subsidiary on Schedule 7.14 as of the Closing Date or thereafter, assuming compliance with Section 9.06(b), any Person that becomes a Subsidiary of the Borrower or any of its Restricted Subsidiaries shall be classified as a Restricted Subsidiary.

(b)     The Borrower may designate, by written notification thereof to the Administrative Agent, any Restricted Subsidiary, including a newly formed or newly acquired Subsidiary, as an Unrestricted Subsidiary if (i) prior, and after giving effect, to such designation, neither a Default, Event of Default nor a Borrowing Base Deficiency would exist, (ii) the representations and warranties of the Borrower and its Restricted Subsidiaries contained in each of the Loan Documents are true and correct in all material respects on and as of such date as if made on and as of the date of such designation (or, in the case of any representation and warranty which (A) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (B) is qualified by a materiality or Material Adverse Effect standard in which case such representation and warranty shall be true and correct in all respects, (iii) the designation of any Restricted Subsidiary as an Unrestricted Subsidiary and any Disposition of Property to an Unrestricted Subsidiary is (A) deemed to be an Investment in an Unrestricted Subsidiary in an amount equal to the fair market value as of the date of such designation or Disposition of the Borrower's direct and indirect ownership interest in such Subsidiary and such Investment would be permitted to be made at the time of such designation under Section 9.05(g) and Section 9.05(l) and (B) deemed to be a Disposition as of the date of designation or Disposition and (iv) prior, and after giving effect, to such designation, the Borrower is in pro forma compliance with Section 9.01(a) and Section 9.01(b).  Except as provided in this Section 9.06(b), no Restricted Subsidiary may be redesignated as an Unrestricted Subsidiary.

(c)     The Borrower may designate any Unrestricted Subsidiary to be a Restricted Subsidiary if after giving effect to such designation, (i) the representations and warranties of the Borrower and its Restricted Subsidiaries contained in each of the Loan Documents are true and correct on and as of such date as if made on and as of the date of such redesignation (or, in the case of any representation and warranty which (A) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (B) is qualified by a materiality or Material Adverse Effect standard in which case such representation and warranty shall be true and correct in all respects), (ii) no Default would exist and (iii) the Borrower complies with the requirements of Section 8.14, Section 8.17 and Section 9.16.  Any such designation shall be treated as a cash dividend in an amount equal to the fair market value of the Borrower's direct and indirect ownership interest in such Subsidiary.

(d)     The Borrower shall not permit the aggregate principal amount of all Non-Recourse Indebtedness outstanding at any one time to exceed the greater of $6,500,000 or 5.0% of the then effective Borrowing Base.

Section 9.07     Nature of Business; International Operations.  Neither the Borrower nor any Restricted Subsidiary will allow any material change to be made in the character of its business (a) as an independent oil and gas exploration, development and production company, and (b) activities incidental to the foregoing.  From and after the date hereof, the Borrower and its Domestic Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States.

Section 9.08     Amendments to Organizational Documents; Fiscal Year End.  The Borrower shall not, and shall not permit any Restricted Subsidiary to, (a) amend, supplement or otherwise modify (or permit to be amended, supplemented or modified) its certificate or articles of incorporation, by-laws, any preferred stock designation or any other organic document in a manner that is material and adverse to the interests of the Administrative Agent or the Lenders without the consent of the Majority Lenders and the

Administrative Agent or (b) have its fiscal year end on a date other than December 31 or change the its method of determining fiscal quarters.

Section 9.09    Proceeds of Loans.

(a)    The Borrower will not permit the proceeds of the Loans to be used for any purpose other than those permitted by Section 7.21.  Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

(b)    The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States of America, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 9.10    ERISA Compliance. The Borrower will not, and will not permit any Subsidiary to, at any time:

(a)    engage, or permit any ERISA Affiliate to engage, in any transaction in connection with which the Borrower, a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code, if either of which would have a Material Adverse Effect.

(b)    fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any such Plan, agreement relating thereto or applicable law, the Borrower, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto, if such failure could reasonably be expected to have a Material Adverse Effect.

(c)    contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to (i) any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability other than the payment of accrued benefits under such plan, or (ii) any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 9.11    Sale or Discount of Receivables.  Except for (a) receivables obtained by the Borrower or any Restricted Subsidiary out of the ordinary course of business or (b) the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, neither the

Borrower nor any Restricted Subsidiary will discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.12     Merger, Etc.  The Borrower will not, and will not permit any Restricted Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property (except as permitted by Section 9.13) to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve; provided that:

(a)     any Restricted Subsidiary may participate in a consolidation with the Borrower or any Guarantor (provided that the Borrower shall be the continuing or surviving entity in any such transaction involving the Borrower, and a Guarantor shall be the continuing or surviving entity of any such transaction not involving the Borrower);

(b)     any Guarantor may participate in a consolidation with another Guarantor;

(c)     any Restricted Subsidiary that is not a Guarantor may consolidate into any other Restricted Subsidiary that is not a Guarantor; or

(d)     any Restricted Subsidiary may liquidate or dissolve so long as its assets (if any) are distributed to the Borrower or a Guarantor prior to such liquidation or dissolution.

Section 9.13     Sale of Properties; Unwinds of Swap Agreements.  The Borrower will not, and will not permit any Restricted Subsidiary to, sell, assign, farm-out, convey or otherwise transfer any Property or to Unwind any Swap Agreement in respect commodities except for:

(a)     the sale of Hydrocarbons and geological and seismic data in the ordinary course of business;

(b)     farmouts of undeveloped acreage and assignments in connection with such farmouts;

(c)     the sale or transfer of Property that is no longer necessary for the business of the Borrower or such Restricted Subsidiary or is replaced by Property of at least comparable value and use;

(d)     the sale, transfer or other disposition of Equity Interests in Unrestricted Subsidiaries;

(e)     the sale or other Disposition (including Casualty Events) of any Oil and Gas Property or any interest therein or any Restricted Subsidiary owning Oil and Gas Properties or the Unwind of Swap Agreements; provided that

(i)     at least 75% of the consideration received in respect of any such sale or other Disposition with a purchase price exceeding $5,000,000 or Unwind shall be cash or other Oil and Gas Properties (provided that if a Borrowing Base Deficiency exists at such time then 100% of the cash consideration received in respect of any such sale or other Disposition or Unwind shall be applied as a prepayment to reduce the Borrowing Base Deficiency),

(ii)     the consideration received in respect of any such sale or other Disposition or Unwind shall be equal to or greater than the fair market value of the asset subject of such sale or other

93

Disposition or Unwind, and if such fair market value is greater than $10,000,000, the Borrower shall deliver a certificate of a Responsible Officer certifying to the fair market value and that the board of directors of the Borrower has reasonably determined such,

(iii)    if any such sale or other Disposition is of a Restricted Subsidiary owning Oil and Gas Properties, such sale or other Disposition shall include all the Equity Interests owned by the Borrower and its Restricted Subsidiaries of such Restricted Subsidiary and

(iv)    no Default, Event of Default or Borrowing Base Deficiency exists or results (after giving effect to Section 2.08(a) and any prepayment of the Loans made with the proceeds of such sale or other Disposition or Unwind (including any prepayment required to be made pursuant to Section 2.08(a))) from such Disposition or Unwind

(f)    sales and other Dispositions of Properties (i) from a Restricted Subsidiary to the Borrower or any Guarantor, (ii) between the Borrower and any Guarantor or between any Guarantor and any other Guarantor and (iii) between any Restricted Subsidiary that is not a Guarantor and any other Restricted Subsidiary that is not a Guarantor, in the case of clauses (i) and (ii), including Dispositions to a Restricted Subsidiary or another Person created as a result of a division so long as such Subsidiary or other Person created as a result of a division becomes a Guarantor hereunder or otherwise assumes the obligations of the Borrower); and

(g)    if no Default, Event of Default or Borrowing Base Deficiency then exists, sales and other dispositions of Properties not otherwise permitted above having a fair market value not to exceed the greater of $7,500,000 or 3.5% of the then effective Borrowing Base during any 12-month period.

Section 9.14    Environmental Matters.  The Borrower will not, and will not permit any Restricted Subsidiary to, cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations or remedial obligations could reasonably be expected to have a Material Adverse Effect.

Section 9.15    Transactions with Affiliates.  The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Guarantors) unless such transactions are otherwise permitted under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.

Section 9.16    Subsidiaries.  The Borrower will not, and will not permit any Restricted Subsidiary to, create or acquire any additional Restricted Subsidiary or redesignate an Unrestricted Subsidiary as a Restricted Subsidiary unless the Borrower gives written notice to the Administrative Agent of such creation or acquisition and complies with Section 8.14(b) and Section 8.14(c).  All Restricted Subsidiaries will be Wholly-Owned Subsidiaries, except as the result of (a) transactions permitted under Section 9.05, Section 9.12 or Section 9.13.  The Borrower shall not, and shall not permit any other Restricted Subsidiary to, have any Foreign Subsidiaries.

Section 9.17    Negative Pledge Agreements; Dividend Restrictions.  The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any contract, agreement or understanding which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Administrative Agent and the Secured Parties or restricts any

94

Restricted Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, or which requires the consent of or notice to other Persons in connection therewith; provided, however, the preceding restrictions will not apply to encumbrances or restrictions arising under or by reason of (a) this Agreement or the Security Instruments, (b) any leases, licenses or similar contracts as they affect any Property or Lien subject to a lease or license, (c) any contract, agreement or understanding creating Liens on Finance Leases permitted by Section 9.03(c) (but only to the extent related to the Property on which such Liens were created), (d) any restriction with respect to a Subsidiary imposed pursuant to an agreement entered into for the direct or indirect sale or Disposition of all or substantially all of the Equity Interests or Property of such Subsidiary (or the Property that is subject to such restriction) pending the closing of such sale or Disposition to the extent such sale is permitted under this Agreement, (e) customary provisions with respect to the distribution of Property of a joint venture contained in joint venture agreements entered into in the ordinary course of business with respect to such joint venture, (f) prohibitions, encumbrances or other restrictions imposed by Governmental Requirements and (g) prohibitions, encumbrances or other restrictions imposed by any agreement relating to secured Indebtedness permitted by Section 9.02(d) or (i), provided that such prohibitions, encumbrances or other restrictions apply only to the assets securing such Indebtedness.

Section 9.18     Gas Imbalances, Take-or-Pay or Other Prepayments.  The Borrower will not, and will not permit any Restricted Subsidiary to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Restricted Subsidiary that would require the Borrower or such Restricted Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed one half bcf of gas (on an mcf equivalent basis).

Section 9.19     Swap Agreements.

(a)     The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Swap Agreements with any Person other than:

(i)     Swap Agreements in respect of commodities entered into not for speculative purposes with an Approved Counterparty and the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect, other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not exceed, as of the date such Swap Agreement is executed, 85% of the reasonably anticipated Hydrocarbon production from the total Proved Reserves of the Loan Parties (as forecast based upon the most recently delivered Reserve Report) of crude oil, natural gas liquids and natural gas, calculated separately (on a barrel of oil equivalent basis for natural gas), for each calendar month during the period of sixty (60) months following the date such Swap Agreement is executed;

(ii)     Swap Agreements in respect of interest rates with an Approved Counterparty, as follows: (i) Swap Agreements effectively converting interest rates from fixed to floating, the notional amounts of which (when aggregated and netted with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from fixed to floating) do not exceed 50% of the then outstanding principal amount of the Borrower's Indebtedness for borrowed money which bears interest at a fixed rate and (ii) Swap Agreements effectively converting interest rates from floating to fixed, the notional amounts of which (when aggregated and netted with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from floating to fixed) do not exceed 75% of the then outstanding principal amount of the Borrower's Indebtedness for borrowed money which bears interest at a floating rate; and

(iii)     In addition to Swap Agreements under Section 9.19(a)(i), in connection with a proposed acquisition of Oil and Gas Properties or Equity Interests of a Person owning Oil and Gas

95

Properties (a "Proposed Acquisition"), the Borrower or any Restricted Subsidiary may also enter into incremental Swap Agreements with respect to the reasonably anticipated projected production from the Oil and Gas Properties subject of the Proposed Acquisition so long as (A) the Borrower or a Restricted Subsidiary has signed a definitive acquisition agreement in connection with a Proposed Acquisition and (B) the aggregate notional volumes associated with such incremental Swap Agreements do not exceed 85% of the reasonably anticipated Hydrocarbon production from the total Proved Reserves subject of such Proposed Acquisition (as forecast based upon the reserve report for the Oil and Gas Properties subject of such Proposed Acquisition which has been delivered to the Lenders) of crude oil, natural gas liquids and natural gas, calculated separately (on a barrel of oil equivalent basis for natural gas), for each calendar month during the period of twenty-four (24) months following the date such incremental Swap Agreement is executed.  The Borrower may permit such incremental Swap Agreements to remain in place so long as none of the following has occurred: (1) the unused Commitments then available to be borrowed are less than or equal to 10% of the then effective Borrowing Base, (2) the fifteenth (15th) day (or such longer period as the Administrative Agent may reasonably agree) after the date of the termination of the definitive acquisition agreement in connection with such Proposed Acquisition has passed or (3) the ninetieth (90th) day (or such longer period as the Administrative Agent may reasonably agree) after such definitive acquisition agreement in connection with such Proposed Acquisition was executed has passed and the Proposed Acquisition has not been consummated.  If such incremental Swap Agreements are not permitted to remain in place pursuant to the preceding sentence, the Borrower shall promptly terminate or Unwind such Swap Agreements.

(b)     In no event shall any Swap Agreement entered into by the Loan Parties (i) contain any requirement, agreement or covenant for the Borrower or any Restricted Subsidiary to post collateral or margin to secure their obligations under such Swap Agreement or to cover market exposures except to the extent permitted by Section 9.03(e) or (ii) have a tenor longer than sixty (60) months.

(c)     No Swap Agreement in respect of commodities shall be terminated, Unwound, cancelled or otherwise Disposed of by the Borrower or any Restricted Subsidiary except (i) to the extent permitted by Section 9.13 and (ii) subject to Section 2.08(a).

(d)     If, after the end of any fiscal quarter of the Borrower, the aggregate volume of all Swap Agreements in respect of commodities for which settlement payments were calculated in such fiscal quarter (other than basis differential swaps on volumes hedged by other Swap Agreements) exceeded, or will exceed, 100% of actual production of crude oil, natural gas and natural gas liquids, calculated separately (on a barrel of oil equivalent basis in the case of natural gas), in such fiscal quarter, then the Borrower shall within twenty (20) Business Days following the last day of such fiscal quarter (or such later time to which the Administrative Agent may agree in its sole discretion) terminate, create off-setting positions, allocate volumes to other production the Borrower or any Subsidiary is marketing, or otherwise Unwind existing Swap Agreements such that, at such time, future hedging volumes will not exceed 100% of reasonably anticipated projected production from Proved Reserves classified as "Developed Producing Reserves" for each of crude oil, natural gas and natural gas liquids, calculated separately (on a barrel of oil equivalent basis in the case of natural gas), for the then-current and any succeeding fiscal quarter.

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01   Events of Default.  One or more of the following events shall constitute an "Event of Default":

96

(a)	The Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise.

(b)	The Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days.

(c)	Any representation or warranty made or deemed made by or on behalf of the Borrower or any Restricted Subsidiary in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, that (i) was subject to a materiality qualifier (by reference to Material Adverse Effect or otherwise) shall prove to have been incorrect when made or deemed made or (ii) was not subject to a materiality qualifier shall prove to have been incorrect in any material respect when made or deemed made.

(d)	The Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.02(a), Section 8.03 (with respect to Borrower's or any Restricted Subsidiary's existence only), Section 8.16 or in Article IX.

(e)	The Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b), or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after the earlier to occur of (i) notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of the Majority Lenders) or (ii) a Responsible Officer of the Borrower or such Restricted Subsidiary otherwise becoming aware of such default.

(f)	The Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness prior to the longer of (i) three (3) Business Days after the same shall become due and payable or (ii) the expiration of any applicable grace or notice period, if any, specified in the relevant document for such Material Indebtedness.

(g)	Any other event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (after giving effect to any applicable notice periods, if any, and any applicable grace periods) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower or any Restricted Subsidiary to make an offer in respect thereof.

(h)	An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Restricted Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for thirty (30) days or an order or decree approving or ordering any of the foregoing shall be entered.

97

(i)  The Borrower or any Restricted Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 10.01(h), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing.

(j)  The Borrower or any Restricted Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due.

(k)  One or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by independent third party insurance provided by reputable insurers as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) shall be rendered against the Borrower, any Restricted Subsidiary or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Restricted Subsidiary to enforce any such judgment.

(l)  The Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or the Borrower or any Restricted Subsidiary or any of their Affiliates shall so state in writing.

(m)  Other than as contemplated by the Plan of Reorganization on the effective date thereof, a Change in Control shall occur.

(n)  an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect.

Section 10.02    Remedies.

(a)  In the case of an Event of Default other than one described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), at any time thereafter during the continuance of such Event of Default, the Administrative Agent may, and at the request of the Majority Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate the Commitments and/or the LC Commitments, and thereupon the Commitments and/or the LC Commitments shall terminate immediately, and (ii) declare the Notes, if any, and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Loans, the Notes, if any, and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.09(j)), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each Loan Party; and in case of an Event of Default described in Section 10.01(h), Section 10.01(i) or Section 10.01(j),

98

the Commitments shall automatically terminate and the Notes, if any, and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and the other obligations of the Borrower and the Guarantors accrued hereunder and under the Loans, the Notes, if any, and the other Loan Documents (including, without limitation, any break funding payment the payment of cash collateral to secure the LC Exposure as provided in Section 2.09(j)), shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Loan Party.

(b)     In the case of the occurrence and continuation of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(c)     All proceeds realized from the liquidation or other Disposition of collateral or otherwise received after maturity of the Loans, whether from the Borrower, another Loan Party, by acceleration or otherwise, shall be applied:

(i)     first, to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)     second, *pro rata* to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Lenders;

(iii)     third, *pro rata* to payment of accrued interest on the Loans;

(iv)     fourth, *pro rata* to principal outstanding on the Loans and Secured Obligations referred to in clauses (b) and (c) of the definition of "Secured Obligations";

(v)     fifth, to any other Secured Obligations;

(vi)     sixth, to serve as cash collateral to be held by the Administrative Agent to secure the LC Exposure; and any excess shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

(d)     In the case of the occurrence of an Event of Default which results in the Commitments terminating then the Borrowing Base shall automatically and concurrently be reduced to $0.

Notwithstanding the foregoing, amounts received from the Borrower or any Guarantor that is not an "eligible contract participant" under the Commodity Exchange Act shall not be applied to any Excluded Swap Obligations (it being understood, that in the event that any amount is applied to Secured Obligations other than Excluded Swap Obligations as a result of this clause, the Administrative Agent shall make such adjustments as it determines are appropriate to distributions pursuant to clause fourth above from amounts received from "eligible contract participants" under the Commodity Exchange Act to ensure, as nearly as possible, that the proportional aggregate recoveries with respect to Secured Obligations described in clause fourth above by the holders of any Excluded Swap Obligations are the same as the proportional aggregate recoveries with respect to other Secured Obligations pursuant to clause fourth above).

## ARTICLE XI
## THE ADMINISTRATIVE AGENT

Section 11.01   Appointment; Powers.   Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the

terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Each Lender (and each Person that becomes a Lender hereunder pursuant to Section 12.04) hereby authorizes and directs the Administrative Agent to enter into the Loan Documents, including without limitation, the Security Instruments, on behalf of such Lender, in each case, as needed to effectuate the transactions permitted by this Agreement and agrees that the Administrative Agent may take such actions on its behalf as is contemplated by the terms of such applicable Security Instrument. Without limiting the provisions of Section 11.02 and Section 12.03, each Lender hereby consents to the Administrative Agent and any successor serving in such capacity and agrees not to assert any claim (including as a result of any conflict of interest) against the Administrative Agent, or any such successor, arising from the role of the Administrative Agent or such successor under the Loan Documents so long as it is either acting in accordance with the terms of such documents and otherwise has not engaged in gross negligence or willful misconduct.

Section 11.02   Duties and Obligations of Administrative Agent.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  In performing its functions and duties hereunder and under the other Loan Documents, the Administrative Agent is acting solely on behalf of the Lenders and the Issuing Banks (except in limited circumstances expressly provided for herein), and its duties are entirely mechanical and administrative in nature.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 11.03, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  Additionally, each Lender agrees that it will not assert any claim against the Administrative Agent based on an alleged breach of fiduciary duty by the Administrative Agent in connection with this Agreement and/or the transactions contemplated hereby. Nothing in this Agreement or any Loan Document shall require the Administrative Agent to account to any Lender for any sum or the profit element of any sum received by the Administrative Agent for its own account.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrower, a Lender or an Issuing Bank, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VI or elsewhere in any Loan Document, other than to confirm receipt of items (which on their face purport to be items) expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Borrower and its Subsidiaries or any other obligor or guarantor, or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein.  For purposes of determining compliance with the conditions specified in Article VI, each Lender shall be deemed to have consented to, approved or

100

accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender or an Issuing Bank unless the Administrative Agent shall have received written notice from such Lender or such Issuing Bank prior to the proposed closing date specifying its objection thereto.

Section 11.03    Action by Administrative Agent.  The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 2.07(b), Section 5.04(b), Section 8.13(c) or Section 12.02) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 2.07(b), Section 5.04(b), Section 8.13(c) or Section 12.02) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action.  The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders.  If a Default or Event of Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default or Event of Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03, provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.  In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Loan Documents or applicable law.  The Administrative Agent shall not (i) be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders, the Required Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in Section 2.07(b), Section 5.04(b), Section 8.13(c) or Section 12.02), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct (the absence of which is to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment) or (ii) be responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Borrower or any Guarantor or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of the Borrower or any Restricted Subsidiary to perform its obligations hereunder or thereunder.

Section 11.04    Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (which writing may be a fax, electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower, the Lenders and the Issuing Bank hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or

101

willful misconduct by the Administrative Agent.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent may deem and treat the payee of the Notes, if any, as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.  The Administrative Agent may rely on the Register to the extent set forth in Section 12.04(b).  The Administrative Agent makes no warranty or representation to any Lender or Issuing Bank and shall not be responsible to any Lender or Issuing Bank for any statements, warranties or representations made by or on behalf of the Borrower or any Guarantor in connection with this Agreement or any other Loan Document.

Section 11.05    Subagents.  The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of this Article XI shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  Agent and any such sub-agent, and shall apply to their respective activities pursuant to this Agreement.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

Section 11.06    Resignation of Administrative Agent.

(a)    Subject to the appointment and acceptance of a successor Administrative Agent as provided in this Section 11.06, the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower.  Upon any such resignation, the Majority Lenders shall have the right, with the consent of the Borrower, which consent shall not be unreasonably withheld or delayed (provided that no such consent of the Borrower shall be required upon the occurrence and during the continuance of an Event of Default under Section 10.01(a), Section 10.01(b), Section 10.01(h) or Section 10.01(i)), to appoint a successor from among the Lenders.  If no successor shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent from among the Lenders, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article XI and Section 12.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

(b)    Notwithstanding Section 11.06(a), in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders, the Issuing Banks and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring Administrative Agent shall

102

be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) the Majority Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided that (A) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall directly be given or made to each Lender and each Issuing Bank.

Section 11.07    Administrative Agent as a Lender.  The Administrative Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or the Issuing Banks.  The terms "Issuing Banks", "Lenders", "Majority Lenders", "Required Lenders" and any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity as a Lender, Issuing Bank or as one of the Majority Lenders or Required Lenders, as applicable.

Section 11.08    No Reliance.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any Arranger or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Arranger or any other Lender, or any Related Parties of any of the foregoing and based on such documents and information (which may contain material non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Administrative Agent shall not be required to keep itself informed as to the performance or observance by the Borrower or any of its Subsidiaries of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or its Subsidiaries.  Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Arranger shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of the Administrative Agent or any of its Affiliates.  In this regard, each Lender acknowledges that Simpson, Thacher & Bartlett LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.  Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.  Each Lender, by delivering its signature page to this Agreement on the Closing Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Closing Date.

Section 11.09    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any of its Subsidiaries, the Administrative Agent irrespective of whether the principal of any Loan or LC Disbursement shall then be due and payable as

herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Disbursements and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Bank and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 12.03) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each Issuing Bank to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 12.03.

Except as specifically contemplated herein, nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or other Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or other Secured Party or to authorize the Administrative Agent to vote in respect of the claim of any Lender or other Secured Party in any such proceeding.

Section 11.10 Authority of Administrative Agent to Release Collateral and Liens. Each Lender, the Issuing Bank and each other Secured Party hereby authorizes the Administrative Agent to release any collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents (including irrevocably authorizing the Administrative Agent to comply with the provisions of Section 12.19 (without requirement of notice to or consent of any Person except as expressly required by Section 12.02(b)). Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all (a) releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other disposition of Property to the extent such sale or other disposition is permitted by the terms of Section 9.13 or is otherwise authorized by the terms of the Loan Documents, (b) releases from the Guaranty Agreement of any Subsidiary that is sold or otherwise disposed of as permitted by the terms of Section 9.13 or as otherwise specifically authorized by the terms of the Loan Documents and (c) other releases of collateral that may be specifically authorized by the terms of the Loan Documents.

Upon request by the Administrative Agent at any time, the Majority Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty Agreement pursuant to this Section 11.10 or Section 12.19.

Section 11.11 Certain ERISA Matters

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the

104

date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments, or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

Section 11.12   The Arranger.  The Arranger shall have no duties, responsibilities or liabilities under this Agreement and the other Loan Documents other than its duties, responsibilities and liabilities in its capacity as a Lender hereunder (if it is a Lender).

Section 11.13   Credit Bidding.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Majority Lenders, to credit bid all or any portion of the Secured Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either

directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Secured Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured Parties shall be entitled to be credit bid by the Administrative Agent at the direction of the Majority Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any Disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Majority Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Majority Lenders contained in Section 12.02 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.  For the avoidance of doubt, Secured Obligations under a Secured Swap Agreement shall not be subject to a credit bid without the prior written consent of the relevant Secured Swap Provider. For the avoidance of doubt, Secured Obligations under a Secured Swap Agreement shall not be subject to a credit bid without the prior written consent of the relevant Secured Swap Provider.

Section 11.14    Posting of Communications.

(a)    The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make any Communications available to the Lenders and the Issuing Banks by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform

106

chosen by the Administrative Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b)     Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders, each of the Issuing Banks and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution.  Each of the Lenders, each of the Issuing Banks and the Borrower hereby approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)     THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE".  THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT, ANY ARRANGER, ANY AGENT OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "APPLICABLE PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY GUARANTOR, ANY LENDER, ANY ISSUING BANK OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S, ANY GUARANTOR'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND BY A FINAL AND NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     Each Lender and each Issuing Bank agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender and Issuing Bank agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's or Issuing Bank's (as applicable) email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)     Each of the Lenders, each of the Issuing Banks and the Borrower agrees that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally applicable document retention procedures and policies.

(f)        Nothing herein shall prejudice the right of the Administrative Agent, any Lender or any Issuing Bank to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 11.15    No Third Party Beneficiaries.  The provisions of this Article XI are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Banks, and, except solely to the extent of the Borrower's rights to consent and the release of collateral, in each case, pursuant to and subject to the conditions set forth in this Article, none of the Borrower or any Subsidiary, or any of their respective Affiliates, shall have any rights as a third party beneficiary under any such provisions.

**ARTICLE XII**
**MISCELLANEOUS**

Section 12.01    Notices.

(a)        Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing (i) delivered by hand or overnight courier service, mailed by certified or registered mail, (ii) sent by telecopy or (iii) sent by email, as follows:

(A)        if to the Borrower, to it at 1000 Louisiana St., Suite 1500, Houston, TX 77002, Attention: Richard Little, Phone No. [____] and email address rlittle@halconresources.com, and Ragan Altizer, Phone No. 832-538-0303 and email address raltizer@halconresources.com;

(B)        if to the Administrative Agent, to it at 700 Louisiana St., Suite 2100, Houston, TX 77002, Attention: Jim Ducote, Phone No. (713)546-9760 and email address jim.ducote@bmo.com; and

(C)        if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through Approved Electronic Platforms, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)        Notices and other communications to the Lenders and the Issuing Banks hereunder may be delivered or furnished by Approved Electronics Platforms pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)        Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 12.02    Waivers; Amendments.

(a)        No failure on the part of the Administrative Agent, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)        Subject to Section 3.03(b), Section 4.04 and Section 12.02(c), neither this Agreement nor any provision hereof nor any Loan Document nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; provided that no such agreement shall

(i)        increase the Maximum Credit Amount or Commitment of any Lender without the written consent of such Lender affected thereby,

(ii)        increase the Borrowing Base without the written consent of each of the Lenders, decrease or maintain the Borrowing Base without the consent of the Required Lenders; provided that a Scheduled Redetermination and the delivery of a Reserve Report may be postponed by the Required Lenders; provided further that it is understood that any waiver (or amendment or modification that would have the effect of a waiver) of the right of the Required Lenders to adjust (through a reduction of) the Borrowing Base or the amount of such adjustment in the form of a reduction to the Borrowing Base pursuant to the Borrowing Base Adjustment Provisions in connection with the occurrence of a relevant event giving rise to such right shall require the consent of the Required Lenders,

(iii)        reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Secured Obligations hereunder or under any other Loan Document, without the written consent of each Lender or Secured Swap Provider directly and adversely affected thereby (except in connection with any amendment or waiver of the applicability of any post-default increase in interest rates, which shall be effective with the written consent of the Majority Lenders),

(iv)        subject to the provisos in Section 12.02(b)(ii), postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Secured Obligations hereunder or under any other Loan Document, reduce the amount of, waive or excuse any such payment, or postpone or extend the Termination Date, or extend the expiry date of any Letter of Credit beyond the then current Maturity Date without the written consent of each Lender directly and adversely affected thereby,

109

(v)      change <u>Section 4.01(b)</u> or <u>Section 4.01(c)</u> in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender directly and adversely affected thereby,

(vi)      waive or amend <u>Section 3.04(c)</u> or <u>Section 6.01</u> or change the definition of "Applicable Percentage", without the written consent of each Lender directly and adversely affected thereby,

(vii)      release any Guarantor (except as set forth in the Guaranty Agreement or pursuant to a transaction permitted hereby) or release a substantial portion of the collateral (other than as provided in <u>Section 11.10</u>), in each case, without the written consent of each directly and adversely affected Lender (other than any Defaulting Lender) or Secured Swap Provider,

(viii)      modify the terms of <u>Section 10.02(c),</u> <u>Section 12.14</u> or <u>Section 12.19</u> without the written consent of (A) each Lender directly and adversely affected thereby and (B) each party to a Secured Swap Agreement directly and adversely affected thereby that is not a Lender (or an Affiliate of a Lender) at the time of, or after giving effect to, such agreement; <u>provided</u> that any waiver, amendment or modification to any Security Instrument that results in the obligations and amounts owing to any Secured Swap Provider secured by such Security Instrument no longer being secured thereby on an equal and ratable basis with the principal of the Loans, or any amendment, modification or change to the definition of the terms "Existing Secured Swap Agreement," "Payment in Full," "Secured Swap Agreement" or "Secured Swap Provider," shall also require the written consent of each Secured Swap Provider directly and adversely affected thereby, or

(ix)      change (A) any of the provisions of this <u>Section 12.02(b)</u> without the written consent of each Lender or other Secured Swap Provider directly and adversely affected thereby, (B) the definitions of "Majority Lenders," "Required Lenders" or reduce the voting rights of any Lender, without the written consent of each directly and adversely affected Lender (other than any Defaulting Lender), (C) any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender directly and adversely affected thereby; <u>provided</u> that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Issuing Bank, as the case may be.

Notwithstanding the foregoing, any supplement to <u>Schedule 7.14</u> (Subsidiaries), Schedule 7.18 (Gas Imbalances), Schedule 7.19 (Marketing Contracts), or Schedule 7.20 (Swap Agreements)  shall be effective simply by delivering to the Administrative Agent a supplemental schedule clearly marked as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders.

(c)      Notwithstanding anything to the contrary contained in the Loan Documents, the Administrative Agent and the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender in order to (i) correct, amend, cure or resolve any minor ambiguity, omission, defect, typographical error, inconsistency or other manifest error therein, (ii) add a guarantor or collateral or otherwise enhance the rights and benefits of the Lenders, (iii) make minor administrative or operational changes not adverse to any Lender or (iv) adhere to any local Governmental Requirement on advice of local counsel.

(d)      Notwithstanding anything to the contrary contained in any Loan Documents, the Commitment of any Defaulting Lender may not be increased without its consent (it being understood, for

avoidance of doubt, that no Defaulting Lender shall have any right to approve or disapprove any increase, decrease or reaffirmation of the Borrowing Base) and the Administrative Agent may with the consent of the Borrower amend, modify or supplement the Loan Documents to effectuate an increase to the Borrowing Base where such Defaulting Lender does not consent to an increase to its Commitment, including not increasing the Borrowing Base by the portion thereof applicable to the Defaulting Lender.

Section 12.03    Expenses, Indemnity; Damage Waiver.

(a)    The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Arranger and their respective Affiliates, including the reasonable fees, charges and disbursements of counsel and other outside consultants for the Administrative Agent (provided that counsel shall be limited to (x) one (1) counsel to such Persons, taken as a whole, one (1) local counsel in each relevant jurisdiction and one (1) regulatory counsel to all such Persons with respect to a relevant regulatory matter, taken as a whole and (y), solely in the event of a conflict of interest, one (1) additional counsel (and, if necessary, one (1) regulatory counsel and one (1) local counsel in each relevant jurisdiction or for each matter) to each group of similarly situated affected indemnified persons), the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, including all IntraLinks expenses, and the cost of environmental assessments and audits and surveys and appraisals, in connection with the syndication of this Agreement, preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the Transactions or the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, taxes, assessments and other charges incurred by the Administrative Agent or any Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein or conducting of title reviews, mortgage matches and collateral reviews, (iii) all reasonable and documented out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iv) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Issuing Bank or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Issuing Bank or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit; provided, this Section 12.03(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)    THE BORROWER SHALL INDEMNIFY EACH AGENT, THE ISSUING BANK, THE ARRANGER AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES, LITIGATIONS, INVESTIGATIONS, PROCEEDINGS AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE (PROVIDED THAT COUNSEL SHALL BE LIMITED TO (X) ONE (1) COUNSEL TO SUCH INDEMNITEES, TAKEN AS A WHOLE, ONE (1) LOCAL COUNSEL IN EACH RELEVANT JURISDICTION AND ONE (1) REGULATORY COUNSEL TO ALL SUCH INDEMNITEES WITH RESPECT TO A RELEVANT REGULATORY MATTER, TAKEN AS A WHOLE AND (Y), SOLELY IN THE EVENT OF A CONFLICT OF INTEREST, ONE (1) ADDITIONAL COUNSEL (AND, IF NECESSARY, ONE (1) REGULATORY COUNSEL AND ONE (1) LOCAL COUNSEL IN EACH RELEVANT JURISDICTION OR FOR EACH MATTER) TO EACH

111

GROUP OF SIMILARLY SITUATED AFFECTED INDEMNITEES), INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT (INCLUDING THE ARRANGEMENT AND SYNDICATION OF THE COMMITMENTS), (ii) THE FAILURE OF THE BORROWER OR ANY RESTRICTED SUBSIDIARY TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iii) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (iv) ANY LOAN OR LETTER OF CREDIT OR THE USE OF THE PROCEEDS THEREFROM, INCLUDING, WITHOUT LIMITATION, (A) ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT, OR (B) THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH, (v) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (vi) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND ITS SUBSIDIARIES BY THE BORROWER AND ITS SUBSIDIARIES, (vii) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS, (viii) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY OR ANY OF THEIR PROPERTIES, INCLUDING WITHOUT LIMITATION, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON ANY OF THEIR PROPERTIES, (ix) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY, (x) THE PAST OWNERSHIP BY THE BORROWER OR ANY SUBSIDIARY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (xi) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF ITS SUBSIDIARIES, (xii) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF ITS SUBSIDIARIES, OR (xiii) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR (xiv) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING THAT MAY BE BROUGHT BY THE BORROWER, ANY GUARANTOR, ANY OF THEIR RESPECTIVE AFFILIATES OR ANY OTHER PERSON OR ENTITY, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY

112

KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or the Issuing Bank under Section 12.03(a) or Section 12.03(b), each Lender severally agrees to pay to the Administrative Agent or the Issuing Bank, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Issuing Bank in its capacity as such.

(d)     All amounts due under this Section 12.03 shall be payable not later than five (5) days after written demand therefor.

Section 12.04   Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in Section 12.04(c)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i)     Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)     the Borrower, provided that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default of the type described in Sections 10.01(a), 10.01(b), 10.01(h) or 10.01(i) has occurred and is continuing, any other assignee, and provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof and

113

(B)      the Administrative Agent and each Issuing Bank, provided that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender or an Affiliate of a Lender immediately prior to giving effect to such assignment.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consent; provided that no such consent of the Borrower shall be required if an Event of Default of the type described in Sections 10.01(a), 10.01(b), 10.01(h) or 10.01(i) has occurred and is continuing;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent (1) an Assignment and Assumption or (2) to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and the parties to the Assignment and Assumption are participants, together with a processing and recordation fee of $3,500;

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Subsidiaries and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws;

(E)      the assignee must not be a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person), a Defaulting Lender or an Affiliate or a Subsidiary of the Borrower or any other Loan Party.

(iii)      Subject to Section 12.04(b)(iv), and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02, Section 5.03 and Section 12.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

(iv)      The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Maximum Credit Amount of, and principal amount of (and stated interest on) the Loans and LC

114

Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Issuing Bank(s) and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and, at its election, forward a copy of such revised Annex I to the Borrower, the Issuing Bank and each Lender.

(v)     Upon its receipt of (A) a duly completed Assignment and Assumption executed by an assigning Lender and an assignee or (B) to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and the parties to the Assignment and Assumption are participants, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Sections 2.05(b), 2.09(d) or (e), 4.02 or 12.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).

(c)     (i) Any Lender may, without the consent of, or notice to, the Borrower, the Administrative Agent or the Issuing Bank, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clauses (i), (iii), (iv), (v), (vi), and (vii) of the proviso to Section 12.02(b) that affects such Participant and for which such Lender would have consent rights.  In addition such agreement must provide that the Participant be bound by the provisions of Section 12.03.  Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 (subject to the requirements and limitations therein, including the requirements under Section 5.03(e) (it being understood that the documentation required under Section 5.03(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b); provided that such Participant agrees to be subject to the provisions of Section 5.04 as if it were an assignee under paragraph (b) of this Section.  Each Lender that sells a participation to a Participant agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 5.04 with respect to such Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, provided such Participant agrees to be subject to Section 4.01(c) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which

115

it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 5.01 or Section 5.03 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(iii)    A Participant must not be a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person), a Defaulting Lender or an Affiliate or a Subsidiary of the Borrower or any other Loan Party.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank having jurisdiction over such Lender, and this Section 12.04 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding any other provisions of this Section 12.04, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the Guarantors to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 12.05   Survival; Revival; Reinstatement.

(a)     All covenants, agreements, representations and warranties made by the Borrower herein, in the other Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until Payment in Full.  The provisions of Section 5.01, Section 5.02, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)     To the extent that any payments on the Secured Obligations or proceeds of any collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Secured Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Secured Parties' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Administrative Agent and the Lenders and other Secured Parties to effect such reinstatement.

Section 12.06     Counterparts; Integration; Effectiveness.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     **This Agreement and the other Loan Documents represent the final agreement among the parties hereto and thereto and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.**

(c)     Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(d)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent.

Section 12.07     Severability.  Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08     Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender, each Issuing Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including, without limitations obligations under Swap Agreements) at any time owing by such Lender or

such Issuing Bank or any such Affiliate to or for the credit or the account of the Borrower or any Restricted Subsidiary against any of and all the obligations of the Borrower or any Restricted Subsidiary owed to such Lender, or such Issuing Bank or their respective Affiliates now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender, Issuing Bank or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate holding such deposit or obligated on such indebtedness ; provided that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.  The rights of each Lender under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 10.02(c) and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, Issuing Bank(s) and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, Issuing Bank(s) and their respective Affiliates under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender, Issuing Bank(s) or their respective Affiliates may have. Each Lender and Issuing Bank agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09   GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)   THIS AGREEMENT, THE NOTES (IF ANY) AND ANY LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)   ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY, AND CITY OF NEW YORK, BOROUGH OF MANHATTAN, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS; PROVIDED, THAT NOTHING CONTAINED HEREIN OR IN ANY OTHER LOAN DOCUMENT WILL PREVENT ANY PARTY FROM BRINGING ANY ACTION TO ENFORCE ANY AWARD OR JUDGMENT OR EXERCISE ANY RIGHT UNDER THE LOAN DOCUMENTS IN ANY OTHER FORUM IN WHICH JURISDICTION CAN BE ESTABLISHED. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.   EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM *NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(c)   EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR

PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN SECTION 12.01 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO SECTION 12.01 (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR THE ADMINISTRATIVE AGENT, THE ISSUING BANK, ANY LENDER OR THE HOLDER OF ANY NOTE TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d)     EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES (PROVIDED, THAT THIS WAIVER SHALL NOT LIMIT RECOVERY BY AN INDEMNITEE PURSUANT TO SECTION 12.03 FOR INDEMNIFICATION OF EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES PAID TO, OR ASSERTED BY, A THIRD PARTY); (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 12.09.

Section 12.10    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11    Confidentiality.  Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 12.11, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any pledge or assignment permitted under Section 12.04(d) or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement or any credit insurance provider, in each case relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 12.11 or (ii) becomes available to the Administrative Agent, the

119

Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower or (j) on a confidential basis to (i) any rating agency in connection with rating the Borrower or its Subsidiaries or the credit facilities provided for herein or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of identification numbers with respect to the credit facilities provided for herein.  For the purposes of this Section 12.11, "Information" means all information received from the Borrower or any Restricted Subsidiary relating to the Borrower or any Restricted Subsidiary and their businesses, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a non-confidential basis prior to disclosure by the Borrower or any Restricted Subsidiary and other than information pertaining to this Agreement routinely provided by the Arranger to data service providers, including league table providers, that serve the lending industry; provided that, in the case of information received from the Borrower or any Restricted Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 12.12   Interest Rate Limitation.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America, the State of New York and the State of Texas or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Loans, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (ii) in the event that the maturity of the Loans is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such

120

Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans, until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.

Section 12.13   EXCULPATION PROVISIONS.   EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.  EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14   Collateral Matters; Swap Agreements.  The benefit of the Security Instruments and of the provisions of this Agreement relating to any collateral securing the Secured Obligations shall also extend to and be available on a *pro rata* basis to any Person under any Swap Agreement between the Borrower or any Restricted Subsidiary and such Person if either (a) at the time such Swap Agreement was entered into, such Person was a Lender or Affiliate of a Lender hereunder or (b) such Swap Agreement was in effect on the Closing Date and such Person or its Affiliate was a Lender on the Closing Date, in each case, after giving effect to all netting arrangements relating to such Swap Agreements.  Except as expressly set forth in this Agreement, no Person shall have any voting rights under any Loan Document as a result of the existence of obligations owed to it under any such Swap Agreements.

Section 12.15   No Third Party Beneficiaries.  This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan

Document against the Administrative Agent, the Issuing Bank or any Lender for any reason whatsoever. Other than the Indemnitees, there are no third party beneficiaries.

Section 12.16   USA Patriot Act Notice.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and other Loan Parties, which information includes the name and address of the Borrower and other Loan Parties and other information that will allow such Lender to identify the Borrower and other Loan Parties in accordance with the Patriot Act.

Section 12.17   Flood Insurance Provisions.  Notwithstanding any provision in any of the Loan Documents to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulations) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulations) owned by any Loan Party included in the Mortgaged Property and no Building or Manufactured (Mobile) Home shall be encumbered by any Security Instrument; provided, that (i) the applicable Loan Party's interests in all lands and Hydrocarbons situated under any such Building or Manufactured (Mobile) Home shall be included in the Mortgaged Property and shall be encumbered by the Security Instruments and (ii) the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, permit to exist any Lien on any Building or Manufactured (Mobile) Home except Liens permitted by Section 9.03.

Section 12.18   No Fiduciary Duty.  Each Lender and their Affiliates (collectively, solely for purposes of this Section 12.18, the "Lenders"), may have economic interests that conflict with those of the Borrower and its Subsidiaries and their stockholders and/or their affiliates.  The Borrower, for itself and on behalf of its Subsidiaries, agrees that nothing in this Agreement or the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and the Borrower or its Subsidiaries, their stockholders or their affiliates, on the other.  The Borrower, for itself and on behalf of its Subsidiaries, acknowledges and agrees that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Borrower and its Subsidiaries, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of the Borrower or its Subsidiaries, their stockholders or their affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise Borrower or its Subsidiaries, their stockholders or their affiliates on other matters) or any other obligation to the Borrower or any of its Subsidiaries except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of the Borrower or any of its Subsidiaries, their management, stockholders, creditors or any other Person.  The Borrower, for itself and its Subsidiaries, acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  The Borrower, for itself and its Subsidiaries, agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Borrower or Subsidiary, in connection with such transaction or the process leading thereto.

Section 12.19   Releases.

(a)      Release Upon Payment in Full.  Upon Payment in Full, the Administrative Agent, at the written request and expense of the Borrower, will promptly release, reassign and transfer the Collateral to the Loan Parties.

(b)      Further Assurances.  If any of the Collateral shall be sold, transferred or otherwise Disposed of by the Borrower or any Restricted Subsidiary in a transaction permitted by the Loan Documents and such Collateral shall no longer constitute or be required to be Collateral under the Loan Documents, then the Administrative Agent, at the request and sole expense of the Borrower and the applicable Restricted Subsidiary, shall promptly execute and deliver all releases or other documents reasonably necessary or desirable for the release of the Liens created by the applicable Security Instrument on such Collateral.  At the request and sole expense of the Borrower, a Loan Party shall be released from its obligations under the Loan Documents in the event that all the capital stock or other Equity Interests of such Loan Party shall be sold, transferred or otherwise disposed of in a transaction permitted by the Loan Documents and such Equity Interests shall no longer constitute or be required to be Collateral under the Loan Documents.

Section 12.20    Material Non-Public Information.

(a)      **EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 12.11 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

(b)      **ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE GUARANTORS AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.**

Section 12.21    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will

123

be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 12.22      Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for hedging agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, default rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such default rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

[SIGNATURES BEGIN NEXT PAGE]

124

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**HALCÓN RESOURCES CORPORATION,**
as Borrower

By: _____
    Name:
    Title:

Signature Page to Senior Secured Revolving Credit Agreement
Halcón Resources Corporation

**BMO HARRIS BANK N.A.,**
as Administrative Agent, Issuing Bank and Lender

By: _____
      Name:
      Title:

**[LENDER],**
as Lender

By:  _____
         Name:
         Title:

**Exhibit B**

**Warrant Agreement**

**WARRANT AGREEMENT**

**dated as of [●], 2019 between**

**HALCÓN RESOURCES CORPORATION**

**and**

**[●]**

**as Warrant Agent**

## TABLE OF CONTENTS

**Page**

**Article 1 Definitions** ............................................................................................. **2**
    Section 1.1    Certain Definitions................................................................... 2

**Article 2 Issuance, Execution and Transfer of Warrants** ........................................... **6**
    Section 2.1    Issuance of Warrants................................................................ 6
    Section 2.2    Registration, Transfer, Exchange and Substitution.................... 7
    Section 2.3    Cancellation of the Warrants .................................................. 8
    Section 2.4    Reservation of Common Shares................................................ 8

**Article 3 Exercise and Settlement of Warrants** ......................................................... **8**
    Section 3.1    Exercise of Warrants................................................................ 8
    Section 3.2    Procedure for Exercise ............................................................ 8
    Section 3.3    Settlement of Warrants .......................................................... 10
    Section 3.4    Delivery of Common Shares................................................... 10
    Section 3.5    No Fractional Common Shares to Be Issued ........................... 12
    Section 3.6    Acquisition of Warrants by Company ..................................... 12
    Section 3.7    Validity of Exercise .............................................................. 12
    Section 3.8    Certain Calculations.............................................................. 12
    Section 3.9    Reservation and Listing of Shares ......................................... 13
    Section 3.10   Charges, Taxes and Expenses................................................. 13

**Article 4 Adjustments** .......................................................................................... **13**
    Section 4.1    Adjustments and Other Rights................................................ 13
    Section 4.2    Dividends, Distributions, Stock Splits, Subdivisions,
                     Reclassifications or Combinations.......................................... 14
    Section 4.3    Sale of the Company.............................................................. 14
    Section 4.4    Rounding of Calculations; Minimum Adjustments .................. 15
    Section 4.5    Timing of Issuance of Additional Common Shares Upon Certain
                     Adjustments .......................................................................... 15
    Section 4.6    Statement Regarding Adjustments.......................................... 15
    Section 4.7    Notice of Adjustment Event.................................................... 15
    Section 4.8    Proceedings Prior to Any Action Requiring Adjustment .......... 16
    Section 4.9    Adjustment Rules.................................................................. 16
    Section 4.10   Changes in Common Stock..................................................... 16

**Article 5 Other Provisions Relating to Rights of Warrantholders** .......................... **17**
    Section 5.1    No Rights as Stockholders...................................................... 17
    Section 5.2    Modification/Amendment....................................................... 17
    Section 5.3    Rights of Action.................................................................... 17
    Section 5.4    Issuance Obligation Remedies................................................ 18

**Article 6 Concerning the Warrant Agent and Other Matters** .................................. **18**
    Section 6.1    Change of Warrant Agent ...................................................... 18
    Section 6.2    Compensation; Further Assurances ........................................ 19
    Section 6.3    Reliance on Counsel .............................................................. 20

## TABLE OF CONTENTS

**Page**

Section 6.4    Proof of Actions Taken..........................................................................20
Section 6.5    Correctness of Statements......................................................................20
Section 6.6    Validity of Agreement ...........................................................................20
Section 6.7    Use of Agents.........................................................................................20
Section 6.8    Liability of Warrant Agent.....................................................................21
Section 6.9    Legal Proceedings ..................................................................................21
Section 6.10   Actions as Agent.....................................................................................21
Section 6.11   Appointment and Acceptance of Agency ...............................................21
Section 6.12   Successors and Assigns...........................................................................21
Section 6.13   Notices ...................................................................................................22
Section 6.14   Applicable Law; Jurisdiction .................................................................23
Section 6.15   Waiver of Jury Trial...............................................................................23
Section 6.16   Specific Performance .............................................................................23
Section 6.17   Benefit of this Warrant Agreement.........................................................24
Section 6.18   Registered Warrantholder ......................................................................24
Section 6.19   Headings ................................................................................................24
Section 6.20   Counterparts............................................................................................24
Section 6.21   Entire Agreement ...................................................................................24
Section 6.22   Severability ............................................................................................24
Section 6.23   Termination.............................................................................................25
Section 6.24   Confidentiality .......................................................................................25
Section 6.25   Rule 144 Information..............................................................................25
Section 6.26   Representations and Warranties of the Company....................................25
Section 6.27   Representations and Warranties of Warrant Agent .................................26
Section 6.28   Withholding and Reporting Requirements ..............................................26

Exhibit A    Form of Assignment
Exhibit B    Form of Book-Entry Warrant Exercise Notice
Exhibit C    Form of Direct Registration Warrant Exercise Notice
Exhibit D    Schedule of Fees

**WARRANT AGREEMENT**

Warrant Agreement (as it may be amended from time to time, this "**Warrant Agreement**"), dated as of [●], 2019, between Halcón Resources Corporation, a Delaware corporation (the "**Company**"), and [●], a [●] (the "**Warrant Agent**").

WHEREAS, on August 2, 2019, the Company entered into that certain Restructuring Support Agreement ("**RSA**"), by and among the Company, Halcón Resources Operating, Inc., Halcón Holdings, Inc., Halcón Energy Properties, Inc., Halcón Permian, LLC, Halcón Field Services, LLC, and Halcón Operating Co. (collectively, the "**Debtors**") and certain beneficial holders, or investment advisors or managers for the account of beneficial holders, of the Company's 6.75% Senior Notes due 2025, pursuant to which certain warrants (the "**Warrants**") to purchase Common Shares (as defined herein) of the Company on the terms set forth in the restructuring term sheet attached as Exhibit A thereto shall be issued;

WHEREAS, on August 7, 2019, each of the Debtors commenced prepackaged cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, jointly administered under Case No. 19-34446 (DRJ) (the "**Chapter 11 Cases**");

WHEREAS, on August 7, 2019, the Debtors filed in the Chapter 11 Cases the *Joint Prepackaged Chapter 11 Plan of Halcón Corporation and its Affiliated Debtors* [Docket No. 20] (the "**Plan**") to, among other things, effectuate the transactions contemplated in the RSA;

WHEREAS, pursuant to the RSA, the Warrants shall be divided into three tranches (each, a "Tranche"), with (i) the Series A Warrants (as defined herein) representing (A) the number of shares equal to 10% of the Common Shares outstanding (other than any Common Shares issued pursuant to the MIP) after giving effect to the exercise of the Series A Warrants less (B) the number of Common Shares that would have been issued upon the exercise of Series A Warrants but for the Existing Equity Cash Out (as defined herein), (ii) the Series B Warrants (as defined herein) representing (a) the number of shares that equals 20% of the Common Shares outstanding (other than any Common Shares issued pursuant to the MIP) after giving effect to the exercise of the Series A Warrants and the Series B Warrants less (B) the number of the Series A Warrants less (C) the number of Common Shares that would have been issued upon the exercise of Series A Warrants and Series B Warrants but for the Existing Equity Cash Out, and (iii) the Series C Warrants (as defined herein) representing a number of shares that, equals 30% of the Common Shares outstanding (other than any Common Shares issued pursuant to the MIP) after giving effect to the exercise of the Series A Warrants, the Series B Warrants and the Series C Warrants less (B) the number of the Series A Warrants and Series B Warrants less (C) the number of Common Shares that would have been issued upon the exercise of Series A Warrants, Series B Warrants, and Series C Warrants but for the Existing Equity Cash Out; and

WHEREAS, the Warrants and the Common Shares underlying the Warrants have been offered and sold in reliance on one or more exemptions from the registration requirements of the Securities Act.

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows.

## ARTICLE 1

## DEFINITIONS

**Section 1.1**    **Certain Definitions**.

"**Affiliate**" shall mean, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first specified Person.  For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time.

"**Board**" means the board of directors of the Company from and after the Effective Date.

"**Book-Entry Warrants**" has the meaning set forth in in Section 2.2.

"**Business Day**" means any day other than a Saturday, a Sunday, a day which is a legal holiday in the State of New York, or a day on which banking institutions and trust companies in the State of New York are authorized or obligated by Law, regulation or executive order to close.

"**Close of Business**" means 5:00 p.m., New York City time.

"**Common Shares**" means shares of the common stock, par value $0.0001 per share, of the Company.

"**Company**" has the meaning set forth in the Preamble.

"**Daily Compounding Factor**" means, as of any date of determination, an amount equal to:  $(1 + 0.0675/365)^t$, where "t" is the number of days between such date of determination and the Effective Date.[1]

"**Debtors**" has the meaning set forth in the Recitals.

"**Depositary**" has the meaning set forth in Section 2.2.

"**Direct Registration Warrants**" has the meaning set forth in Section 2.2.

---

[1] NTD: Frequency of compounding to be adjusted in the event that Warrants are issued through DTC.

2

"**Dividends**" means, as of any time, the aggregate amount (including the fair market value of any non-cash dividends or distributions) of dividends or distributions (other than dividends or distributions in the form of Common Shares) made in respect of [●] Common Shares (as such number may be equitably adjusted to reflect any changes to such Common Shares described in clauses (i)-(iii) of Section 4.2) between the Effective Date and such time.

"**Effective Date**" means the effective date of the Plan.

"**Effective Date Stockholder**" means a Person to whom Common Shares are issued by the Company on the Effective Date.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and the related rules and regulations promulgated thereunder.

"**Exercise Date**" has the meaning set forth in Section 3.2(b).

"**Exercise Notice**" means, (i) for any Book-Entry Warrant, an exercise notice substantially in the form set forth in Exhibit B hereto and (ii) for any Direct Registration Warrant, an exercise notice substantially in the form set forth in Exhibit C hereto.

"**Exercise Price**" means, as of any time:

(i)     in the case of the Series A Warrants, an amount equal to the quotient of (A) the Series A Allocation as of such time divided by (B) the number of Common Shares held by Senior Noteholders on the Effective Date[2] (the "Series A Exercise Price");

(ii)    in the case of the Series B Warrants, an amount equal to the quotient of (I)(A) the Series B Allocation minus the Series A Allocation as of such time divided by (B) the number of Common Shares held by Senior Noteholders on the Effective Date[3] plus (II) the Series A Exercise Price (the "Series B Exercise Price"); and

(iii)   in the case of the Series C Warrants, an amount equal to the quotient of (I)(A) the Series C Allocation minus the Series B Allocation as of such time divided by (B) the number of Common Shares held by Senior Noteholders on the Effective Date[4] plus (II) the Series B Exercise Price,

in each case, subject to adjustment as provided in Article 4, including, for the avoidance of doubt, adjustments to the number of Common Shares issuable under Warrants included in the various components of the above calculation.

---

[2]   NTD: Common Shares held by Senior Noteholders in respect of the Senior Notes Claims, the Rights Offering, and the Backstop Commitment Premium on the Effective Date.

[3]   NTD: Common Shares held by Senior Noteholders in respect of the Senior Notes Claims, the Rights Offering, and the Backstop Commitment Premium on the Effective Date.

[4]   NTD: Common Shares held by Senior Noteholders in respect of the Senior Notes Claims, the Rights Offering, and the Backstop Commitment Premium on the Effective Date.

"**Existing Equity Cash Out**" means the payment of cash to registered holders of Existing Equity Interests who hold fewer than or equal to 2,000 shares of such Existing Equity Interests, pursuant to the terms of the Plan.

"**Existing Equity Interests**" means shares of the class of common stock of the Company that existed immediately prior to the Effective Date, including any restricted stock of the Company that vests prior to the Effective Date.

"**Exercising Owner**" means any Warrantholder that exercises Warrants pursuant to the terms hereof.

"**Expiration Time**" means the Close of Business on the date that is the third-year anniversary of the Effective Date.

"**Funds**" has the meaning set forth in Section 3.2(d) hereof.

"**Funds Account**" has the meaning set forth in Section 3.2(d) hereof.

"**Investment Affiliate**" means any Affiliate of an Effective Date Stockholder or fund (or portion thereof) managed by, or under common management with, an Effective Date Stockholder that (i) is organized for the purpose of making equity or debt investments in one or more Persons, (ii) is an "accredited investor" within the meaning of subparagraph (a)(1), (3) or (7) of Rule 501 of Regulation D under the Securities Act (or is an "accredited investor" within the meaning of subparagraph (a)(8) of Rule 501 of Regulation D under the Securities Act and all of its equity owners are "accredited investors" within the meaning of subparagraph (a)(1), (3) or (7) of Rule 501 of Regulation D under the Securities Act) and (iii) is not a disqualified person under the "bad actor" provisions of SEC Release No. 33-9414.

"**Law**" means any federal, state, local, foreign or provincial law, statute, ordinance, rule, regulation, judgment, order, injunction, decree or agency requirement having the force of law or any undertaking to or agreement with any governmental authority, including common law.

"**MIP**" means the Management Incentive Plan of the Company.

"**Permitted Holder**" means (a) the Company or any of its Subsidiaries, (b) any Warrantholder, (c) any Person to whom Common Shares are issued by the Company on the Effective Date or (d) any Investment Affiliates of any of the foregoing Persons.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Sale of the Company**" means any bona fide consolidation, merger, sale or other transfer of all or substantially all of the equity interests or assets, in each case, of the Company, or any successor, and its Subsidiaries (taken as a whole) or any similar transaction or series of transactions, in each case, in which the holders of Common Shares are entitled to receive (either directly or upon subsequent liquidation) cash, Securities or other property with respect to or in exchange for Common Shares.

4

"**Securities**" means (i) any capital stock (whether common or preferred, voting or nonvoting), partnership, membership or limited liability company interest or other equity or voting interest (including the Common Shares), (ii) any right, option, warrant (including the Warrants) or other security or evidence of indebtedness convertible into, or exercisable or exchangeable for, directly or indirectly, any interest described in clause (i), (iii) any notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, and (iv) any other "securities," as such term is defined or determined under the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the related rules and regulations promulgated thereunder.

"**Series A Allocation**" means, as of any date of determination:

(i)       the product of 75% and

(1) $625,005,000 multiplied by (a) the Daily Compounding Factor <u>minus</u> (b) Dividends paid prior to such date of determination,

(ii)      <u>plus</u> $150,150,000.

"**Series B Allocation**" means, as of any date of determination:

(i)       the product of 95% and

(1) $625,005,000 multiplied by (a) the Daily Compounding Factor <u>minus</u> (b) Dividends paid prior to such date of determination,

(ii)      <u>plus</u> $150,150,000.

"**Series C Allocation**" means, as of any date of determination:

(i)       the product of 125% and

(1) $625,005,000 multiplied by (a) the Daily Compounding Factor <u>minus</u> (b) Dividends paid prior to such date of determination,

(ii)      <u>plus</u> $150,150,000.

"**Series A Warrants**" means the [●] Warrants.

"**Series B Warrants**" means the [●] Warrants.

"**Series C Warrants**" means the [●] Warrants.

"**Settlement Date**" means, in respect of a Warrant that is validly and timely exercised hereunder, the third Business Day immediately following the later of (i) the Exercise Date for such Warrant and (ii) the making of all governmental filings, receipt of all governmental approval and expiration of all waiting periods with respect thereto that are required pursuant to applicable Law with respect to the issuance of Common Shares upon exercise of a Warrant.

5

"**Settlement Share Amount**" means, for each Warrant exercised, one fully paid and nonassessable Common Share, subject to adjustment in accordance with Article 4.

"**Subsidiary**" means, as to any Person, any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, of which at least a majority of the Securities or other interests having by their terms voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly beneficially owned or controlled by such party or by any one or more of its subsidiaries.

"**Trading Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday, other than any day on which Securities are not traded on the applicable securities exchange.

"**Tranche**" has the meaning set forth in the Recitals.

"**Warrant**" or "**Warrants**" means the warrants of the Company which expire at the Expiration Time and are issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth herein, including the Series A Warrants, Series B Warrants and Series C Warrants.  Each Warrant shall entitle the holder thereof upon exercise to one Common Share, subject to adjustment as provided herein.

"**Warrant Agent**" has the meaning set forth in the Preamble.

"**Warrant Agreement**" has the meaning set forth in the Preamble.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

"**Warrant Register**" has the meaning set forth in Section 2.2(a).

"**Warrant Shares**" means each Common Share issuable upon the exercise of the Warrants.

## ARTICLE 2

## ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

**Section 2.1**    **Issuance of Warrants**.

(a)     The Company shall issue on the Effective Date, in accordance with the Plan, the Series A Warrants, the Series B Warrants and the Series C Warrants (each such Warrant to be subject to adjustment from time to time as described herein) in accordance with the terms of this Warrant Agreement and the Plan.

(b)     Each Warrant shall be exercisable for one fully paid and nonassessable Common Share (subject to adjustment under Article 4) upon payment of the applicable Exercise Price for each such Common Share (subject to adjustment under Article 4) so receivable upon exercise of such Warrant and compliance with the procedures set forth in

this Warrant Agreement.  Upon issuance of any Warrants, the Warrant Agent shall register all such Warrants in the Warrant Register and shall notify each Warrantholder of such issuance.  Each Warrant shall be dated as of the date of issuance of such Warrant.

(c)     All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to their respective benefits under this Warrant Agreement, without preference, priority, or distinction on account of the actual time of the issuance and authentication or (except as to the respective Exercise Price of each Tranche of Warrants) any other terms thereof.  Each Warrant shall be, and shall remain, subject to the provisions of this Warrant Agreement until such time as such Warrant shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.  Each Warrantholder shall be bound by all of the terms and provisions of this Warrant Agreement as fully and effectively as if such Warrantholder had signed the same.

**Section 2.2     Registration, Transfer, Exchange and Substitution**.

(a)     Unless otherwise provided in this Agreement, the Warrants ("Book-Entry Warrants") shall be issued through the book-entry facilities of The Depository Trust Company, as depositary (the "Depositary").  Notwithstanding the foregoing, if the Warrants are not issuable through the Depositary, the Warrants shall be issued by book entry registration on the books of the Warrant Agent (the "Direct Registration Warrants").  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which the Company shall provide for the registration of any Warrants and any transfers, exchanges or substitutions of any Warrant as provided herein.  Any Warrant issued upon any registration of transfer or exchange of or substitution for any Warrant shall be a valid obligation of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as the respective Warrant surrendered for such registration of transfer, exchange or substitution.  Upon the Company's request, the Warrant Agent shall provide to the Company as soon as reasonably practicable a copy of the Warrant Register as of the date of such request. Upon a Warrantholder's request, the Warrant Agent shall provide to such Warrantholder as soon as reasonably practicable the details of such Warrantholder's Warrants as of the date of such request.

(b)     (i)     In the case of Book-Entry Warrants, the transfer, from time to time, of any outstanding Book-Entry Warrants shall be effected through the Depositary and its direct and indirect participants, in accordance with the practices and procedures therefor of the Depositary and such participants.

(ii)     In the case of Direction Registration Warrants, the Warrant Agent shall register the transfer, from time to time, of any outstanding Direct Registration Warrant upon the Warrant Register, upon delivery of a duly executed assignment, in the form attached hereto as Exhibit A, and accompanied by appropriate instructions for transfer.  No such transfer shall be effected until, and the transferee shall succeed to the rights of the holder thereof only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to

7

the registration of any transfer of a Warrant as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name such Warrant is registered as the owner thereof for all purposes, notwithstanding any notice to the contrary.  Subject to Section 3.10 with respect to taxes, [no service charge shall be required of any transferor or transferee in connection with any such transfer or registration of transfer.[5]] A party requesting transfer of a Warrant must provide reasonable and customary evidence of authority if requested by the Warrant Agent.

**Section 2.3     Cancellation of the Warrants**.  Any Warrants that have not been timely and validly exercised in accordance with the terms of this Warrant Agreement prior to the Expiration Time shall be automatically cancelled without any further action on the part of the Warrant Agent or any other person.

**Section 2.4     Reservation of Common Shares**.  The Company shall at all times reserve and keep available a number of its authorized but unissued Common Shares sufficient to permit the exercise in full of all outstanding Warrants.

## ARTICLE 3

## EXERCISE AND SETTLEMENT OF WARRANTS

**Section 3.1     Exercise of Warrants**.  A Warrant may be exercised at any time prior to the Expiration Time, either in full or from time to time in part.

**Section 3.2     Procedure for Exercise**.

(a)     To exercise a Warrant, a Warrantholder must (i) deliver a duly completed and executed Exercise Notice to the principal office of the Warrant Agent (A) in the form of Exhibit B in the case of Direct Registration Warrants and (B) in the form of Exhibit C in the case of Book-Entry Warrants (or otherwise comply with the practices and procedures of the Depositary and its direct and indirect participants, as applicable) and (ii) pay to the Warrant Agent an amount equal to the Exercise Price for each Warrant to be exercised, together with those applicable taxes and charges provided for in the proviso to Section 3.10 (not including taxes and charges which are the responsibility of the Company pursuant to the first clause of Section 3.10).

(b)     The date on which all of the requirements for exercise set forth in Section 3.2(a) in respect of a Warrant have been satisfied is the "**Exercise Date**" with respect to such Warrant (subject to Section 3.2(f)).  The Exercise Price for the exercise of any Warrant shall be determined on the Exercise Date.

---

[5] NTD: To be confirmed by Company.

(c)     Subject to Section 3.2(e) and Section 3.2(f), any exercise of a Warrant pursuant to the terms of this Warrant Agreement shall be irrevocable and enforceable in accordance with its terms.

(d)     All funds received by the Warrant Agent under this Warrant Agreement that are to be distributed or applied by the Warrant Agent in the performance of services in accordance with this Warrant Agreement (the "**Funds**") shall be held by the Warrant Agent as agent for the Company and deposited in one or more bank accounts to be maintained by the Warrant Agent in its name as agent for the Company (the "**Funds Account**").  Until paid pursuant to the terms of this Warrant Agreement, the Warrant Agent will hold the Funds through the Funds Account in deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating), each as reported by Bloomberg Finance L.P. The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.

(e)     Prior to the delivery of any Common Shares upon exercise of a Warrant, the Company shall be obligated to use reasonable best efforts to comply in all material respects with all applicable Laws which require action to be taken by the Company in connection with such delivery, subject to the assistance and cooperation by any Exercising Owner with respect thereto.  The Company shall reasonably assist and cooperate with (at the Exercising Owner's sole cost and expense), upon the reasonable advance request of, any Exercising Owner that is required to make any governmental filings or obtain any governmental approvals prior to or in connection with receipt of Common Shares upon any exercise of a Warrant, to the extent such requirement is specified in the Exercise Notice, and any exercise of a Warrant by a holder may be made contingent by it upon the making of any such filing and the receipt of any such approval; provided that in no event shall any such filing, approval or contingency extend the Expiration Time.  In the case of Book-Entry Warrants, the Company and the Warrant Agent shall cooperate with the Depositary and its direct and indirect participants in order to effectuate the exercise of such Warrants, in accordance with the applicable practices and procedures of the Depositary and such participants.  Notwithstanding anything to the contrary contained in this Warrant Agreement, the Company shall not be required: (i) to offer, agree or consent to, sell, divest, lease, license, transfer, dispose of or otherwise encumber or hold separate any assets, licenses, operations, rights, product lines, businesses or interest therein of the Company or any of its Subsidiaries, (ii) to offer, agree or consent to any changes (including through a licensing arrangement) to or restriction on (including any access or other requirements), or other impairment of the Company's or its Subsidiaries' ability to own or operate, any such assets, licenses, operations, rights, product lines, businesses or interests or the Investor's ability to vote, transfer, receive dividends or otherwise exercise full ownership rights with respect to the equity securities or other ownership interests of the Company or any of its Subsidiaries, (iii) to contest, defend or appeal any action, suit or proceeding brought by a governmental

9

authority against any Person which seeks to prohibit, prevent or restrict any of the transactions contemplated by this Warrant Agreement, (iv) commence, institute or maintain any action, suit or proceeding against any Person or (v) comply with a so-called "Second Request."  Any filing or similar fees incurred in connection with any antitrust or other competition, merger, trade control or similar Laws shall be borne solely by the Exercising Owner.

(f)        Notwithstanding any other provision of this Warrant Agreement, if the exercise of any Warrant is to be made in connection with a registered public offering, a Sale of the Company or any other event (which event shall be described in the applicable Exercise Notice), such exercise may, upon proper election in the Exercise Notice, be conditioned upon consummation of such offering or occurrence of such event, in which case such exercise shall not be deemed effective unless and until, and the Exercise Date with respect to such Warrant shall be, the first date on which both (i) all requirements for exercise set forth in the other provisions of Section 3.2(a) in respect of a Warrant have been satisfied and (ii) such offering, Sale of the Company has been consummated or other event has occurred; provided, that if such offering or Sale of the Company has not been consummated or such other event has not occurred prior to the Expiration Time, such conditional exercise shall be deemed not to be effective and unless such Warrant has otherwise been validly and timely exercised, such Warrant shall be cancelled in accordance with Section 2.3.

(g)        The Warrant Agent shall forward funds deposited in the Funds Account in a given week by the fifth Business Day of the following week by wire transfer to an account designated by the Company.

(h)        Payment of the applicable aggregate Exercise Price upon exercise of Warrants shall be by federal wire or other immediately available funds payable to the account maintained by the Warrant Agent in its name as agent for the Company.  The Warrant Agent shall reasonably promptly provide an exercising Warrantholder, upon request, with the appropriate payment instructions.

**Section 3.3    Settlement of Warrants**.

Upon the proper, timely and valid exercise thereof by an Exercising Owner, the Company shall cause to be delivered to the Exercising Owner, the Settlement Share Amount on the Settlement Date.

**Section 3.4    Delivery of Common Shares**.

(a)        In connection with the exercise of Warrants, the Warrant Agent shall:

(i)        examine all Exercise Notices and all other documents delivered to it to ascertain whether, on their face, such Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)       where an Exercise Notice or other document appears on its face to have been improperly completed or executed or some other irregularity in

10

connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the Person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)     inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Notices received and delivery of Warrants to the Warrant Agent's account;

(iv)     advise the Company with respect to an exercise, no later than three Business Days following the satisfaction of each of the applicable procedures for exercise set forth in Section 3.2(a) of (A) the receipt of such Exercise Notice and the number of Warrants exercised in accordance with the terms and conditions of this Warrant Agreement, (B) the number of Common Shares to be delivered by the Company, (C) the instructions with respect to issuance of the Common Shares, (D) the number of Persons who will become holders of record of the Company (who were not previously holders of record) as a result of receiving Common Shares upon exercise of the Warrants and (E) such other information as the Company shall reasonably require;

(v)     promptly deposit in the Funds Account all Funds received in payment of the applicable Exercise Price in connection with any exercise of Warrants;

(vi)     provide to the Company, upon the Company's request, the number of Warrants previously exercised, the number of Common Shares issued in connection with such exercises and the number of remaining outstanding Warrants; and

(vii)     provide to the Company, upon the Company's request, any Exercise Notices delivered pursuant to Section 3.2(a) and any documents delivered pursuant to Section 3.4(b)(i)(B).

(b)     With respect to each properly exercised Warrant in accordance with this Warrant Agreement, (i) in the case of Direct Registration Warrants (A) the Company shall register and issue, in book-entry form, the Common Shares due in connection with such exercise for the benefit and in the name of the Warrantholder; and (B) the Warrant Agent shall deliver such Common Shares to such Person and (ii) in the case of Book-Entry Warrants, the Company shall issue, or otherwise deliver,  in authorized denominations to or upon the order of the Warrantholder, by same-day or next-day credit to the Depositary for the account of such Warrantholder or for the account of a participant in the Depositary the Settlement Share Amount to which such Warrantholder is entitled, in each case registered in such name and delivered to such account as directed in the Exercise Notice by such Warrantholder or by the direct participant in the Depositary through which such Exercising Holder is acting.  The Person on whose behalf and in whose name any Common Shares are registered shall for all purposes be deemed to have become the holder of record of such Common Shares as of the Close of Business

11

on the applicable Exercise Date.  The Company covenants that all Common Shares which may be issued upon exercise of Warrants will be, upon payment of the Exercise Price and issuance thereof, fully paid and nonassessable, free of preemptive rights and (except as specified in the proviso to Section 3.10) free from all taxes, liens, charges and security interests with respect to the issuance thereof.

(c)     Promptly after the Warrant Agent has taken the action required by this Section 3.4 (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to the consummation of any exercise of any Warrants.

**Section 3.5     No Fractional Common Shares to Be Issued**.

(a)     Notwithstanding anything to the contrary in this Warrant Agreement but subject to the aggregation provisions below in paragraph (b), the Company shall not be required to issue any fraction of a Common Share upon exercise of any Warrants.

(b)     If any fraction of a Common Share would, except for the provisions of this Section 3.5, be issuable on the exercise of any Warrants, the Company shall round down to the nearest whole share and no cash shall be paid in lieu of any such fraction of a Common Share.  All Warrants exercised by a Warrantholder on the same Exercise Date and all Common Shares (or fractions thereof) issuable upon such exercise shall be aggregated for purposes of determining the number of Common Shares to be delivered pursuant to Section 3.4(b).

(c)     Each Warrantholder, by its acceptance of an interest in a Warrant, expressly waives its right to any fraction of a Common Share upon its exercise of such Warrant.

**Section 3.6     Acquisition of Warrants by Company**.  The Company shall have the right, except as limited by Law, to purchase or otherwise to acquire one or more Warrants at such times, in such manner and for such consideration as agreed by the Company and the applicable Warrantholder.

**Section 3.7     Validity of Exercise**.  All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company reasonably and in good faith in accordance with the terms of this Warrant Agreement and the Warrants, which determination, absent manifest error, shall be final and binding with respect to the Warrant Agent.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's gross negligence, willful misconduct, bad faith or breach of this Warrant Agreement (as determined by a court of competent jurisdiction in a final non-appealable judgment) and shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of, such determination by the Company.  The Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Exercise Notices with regard to any particular exercise of Warrants.

**Section 3.8     Certain Calculations**.

12

(a)      The Warrant Agent shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants as described in this Article 3. In connection therewith, the Warrant Agent shall provide prompt written notice to the Company, in accordance with Section 3.4(a)(iv), of the number of Common Shares deliverable upon exercise and settlement of Warrants.  The Warrant Agent shall not be responsible for performing the calculations set forth in Article 4.

(b)      The Warrant Agent shall not be accountable with respect to the validity or value of any Common Shares that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible, to the extent not arising from the Warrant Agent's gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), for any failure of the Company to issue, transfer or deliver any Common Shares, or to comply with any of the covenants of the Company contained in this Article 3 of this Warrant Agreement.

**Section 3.9      Reservation and Listing of Shares**.  The Company will at all times reserve and keep available, out of its authorized but unissued Common Shares, solely for the purpose of providing for the exercise of the Warrants, the aggregate number of Common Shares then issuable upon exercise of the Warrants at any time.  The Company will procure, at its sole expense, the listing of the Common Shares issuable upon exercise of the Warrants at any time, subject to issuance or notice of issuance, on all principal stock exchanges on which the Common Shares are then listed or traded.  The Company shall take all action reasonably necessary to ensure that the Common Shares will be issued without violation of any applicable law or regulation or of any requirement of any securities exchange on which the Common Shares are listed or traded.

**Section 3.10   Charges, Taxes and Expenses**.  Issuance of Common Shares upon the exercise of the Warrants shall be made without charge for any documentary, stamp or similar issue or transfer tax or other similar incidental expense (a "**Transfer Tax**") in respect of the issuance thereof, all of such Transfer Taxes shall be paid by the Company; provided, however, that the Company shall not be required to pay any Transfer Tax that may be payable in respect of any transfer (i) involved in the issuance or delivery of such Warrants or Common Shares beneficially held by or for a Person other than the Warrantholder of the Warrant surrendered upon exercise or transfer of the Warrant or Common Shares, and (ii) following the issuance of such Warrants or Common Shares by the Company, and the Company shall not be required to register a transfer or issue or deliver such Warrants or Common Shares, as applicable, unless and until the Persons requesting the transfer or issuance thereof shall have paid to the Company the amount of such Transfer Tax or shall have reasonably demonstrated to the Company's satisfaction that such Transfer Tax has been paid.

**ARTICLE 4**

**ADJUSTMENTS**

**Section 4.1      Adjustments and Other Rights**.  The Exercise Price and the number of Common Shares into which each Warrant is to be convertible pursuant to Article 3 of this Warrant

13

Agreement shall be subject to adjustment from time to time in accordance with this Article 4; provided that no single event shall be subject to adjustment under more than one subsection of this Article 4 so as to result in duplication; provided, further that, notwithstanding any provision of this Warrant Agreement to the contrary, any adjustment shall be made to the extent (and only to the extent) that such adjustment would not cause or result in a Warrantholder and its Affiliates, collectively, being in violation of any applicable law, regulation or rule of any governmental authority or self-regulatory organization. Any adjustment (or portion thereof) prohibited pursuant to the immediately foregoing proviso shall be postponed and implemented on the first date on which such implementation would not result in the condition described in such proviso.

**Section 4.2     Dividends, Distributions, Stock Splits, Subdivisions, Reclassifications or Combinations**.  If the Company shall (i) declare a dividend or make a distribution on its Common Shares in Common Shares, (ii) split, subdivide, recapitalize, restructure or reclassify the outstanding Common Shares into a greater number of Common Shares or effect a similar transaction or (iii) combine, recapitalize, restructure or reclassify the outstanding Common Shares into a smaller number of Common Shares or effect a similar transaction, the number of Common Shares issuable upon exercise of a Warrant at the Record Date for such dividend or distribution or effective date of such split, subdivision, combination, recapitalization, restructuring, reclassification or similar transaction shall be proportionately adjusted so that the Warrantholder, after such date, shall be entitled to purchase the number of Common Shares which such Warrantholder would have owned or been entitled to receive on such date had such Warrant been exercised immediately prior to such date. In such event, the Exercise Price per Common Share in effect at the Record Date for such dividend or distribution or effective date of such split, subdivision, combination, recapitalization, restructuring, reclassification or similar transaction shall be adjusted to the number obtained by dividing (x) the product of (i) the number of Common Shares issuable upon the exercise of a Warrant before such adjustment and (ii) the Exercise Price in effect immediately prior to the Record Date or effective date, as the case may be, for such dividend, distribution, split, subdivision, combination, recapitalization, restructuring, reclassification or similar transaction giving rise to this adjustment by (y) the new number of Common Shares issuable upon exercise of a Warrant determined pursuant to the immediately preceding sentence.

**Section 4.3     Sale of the Company**.

(a)     In the event of any Sale of the Company, and in each such case, the Company will mail or cause to be mailed to each Warrantholder as promptly as practicable following entry into definitive agreements effecting such Sale of the Company and, in any event, no later than ten Business Days prior to the consummation of such Sale of the Company, a notice specifying the effective date on which such Sale of the Company is or is expected to take place, the material terms of such Sale of the Company, and the time, if any is to be fixed, as of which the holders of record of Common Shares (or such other stock or Securities at the time deliverable upon the exercise of a Warrant) as of such effective date (and time, if applicable) shall be entitled to exchange their Common Shares (or such other stock or Securities) for Securities or other property deliverable upon such Sale of the Company.

14

(b)      If a Sale of the Company is consummated prior to the Expiration Time, then any Warrants that are unexercised at the time of such consummation shall be deemed to have expired worthless and will be cancelled for no further consideration. Warrants that have been exercised at or prior to the consummation of any Sale of the Company for which the Settlement Date occurs upon or after the consummation of such Sale of the Company shall be settled, in lieu of Common Shares, for the consideration that the Common Shares that would have been required to be issued in connection with such exercise would have received in such Sale of the Company.  For the avoidance of doubt, Warrantholders shall not be entitled to receive the fair market value of the Warrants in connection with a Sale of the Company, but shall have the right to exercise the Warrants at any time prior to the consummation of any Sale of the Company.

**Section 4.4      Rounding of Calculations; Minimum Adjustments**.  All calculations under this Article 4 shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one-hundredth (1/100th) of a share, as the case may be. Any provision of this Article 4 to the contrary notwithstanding, no adjustment in the Exercise Price or the number of Common Shares issuable upon the exercise of a Warrant shall be made if the amount of such adjustment would be less than $0.01 or one-tenth (1/10th) of a Common Share, respectively, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment which, together with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or 1/10th of a Common Share, respectively, or more, subject in all cases to Section 3.5.

**Section 4.5      Timing of Issuance of Additional Common Shares Upon Certain Adjustments**.  In any case in which the provisions of this Article 4 shall require that an adjustment shall become effective immediately after a Record Date for an event, the Company may defer until the occurrence of such event, issuing to each Warrantholder of a Warrant exercised after such Record Date and before the occurrence of such event, issuance or sale the additional Common Shares issuable upon such exercise by reason of the adjustment required by such agreement over and above the Common Shares issuable upon such exercise before giving effect to such adjustment.

**Section 4.6      Statement Regarding Adjustments**.  Whenever the Exercise Price or the number of Common Shares issuable upon exercise of a Warrant shall be adjusted as provided in this Article 4, the Company shall promptly, and in any event within three Business Days, file, at the principal office of the Company, a statement showing in reasonable detail the facts requiring such adjustment and the Exercise Price that shall be in effect and the number of Common Shares issuable upon exercise of a Warrant after such adjustment. The Company shall also cause a copy of such statement to be reasonably promptly delivered to each Warrantholder at the address appearing in the Company's records.

**Section 4.7      Notice of Adjustment Event**.  In the event that the Company shall propose to take any action of the type described in this Article 4 or fix a Record Date for any such action, the Company shall give notice to each Warrantholder, in the manner set forth in Section 4.6, which notice shall specify the date, if any, with respect to any such action and the approximate date on which such action is to take place. Such notice shall also set forth the facts with respect thereto as shall be reasonably necessary to indicate the effect on the Exercise Price

15

and the number, kind or class of shares or other Securities or property which shall be deliverable upon exercise of a Warrant, if any.  Such notice shall be given at least ten Business Days prior to the taking of such proposed action. Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.

Section 4.8    **Proceedings Prior to Any Action Requiring Adjustment**.  As a condition precedent to the taking of any action which would require an adjustment pursuant to this Article 4, the Company shall take any action which may be necessary, including obtaining regulatory, stock exchange (if applicable) or stockholder approvals or exemptions under the Securities Act, in order that the Company may thereafter validly and legally issue, as fully paid and nonassessable, all Common Shares that each Warrantholder is entitled to receive upon exercise of a Warrant.

Section 4.9    **Adjustment Rules**.  Any adjustments pursuant to this Article 4 shall be made successively whenever an event referred to herein shall occur. If an adjustment in the Exercise Price made hereunder would reduce the Exercise Price to an amount below the par value of the Common Shares, then such adjustment in the Exercise Price made hereunder shall reduce the Exercise Price to the par value of the Common Shares and then, so long as the Company shall have taken any corporate action which would, in the opinion of its counsel, be necessary in order that the Company may validly issue Common Shares at the Exercise Price as so adjusted in accordance with its obligations under Section 3.9, to such lower par value as may then be established.

Section 4.10   **Changes in Common Stock**.  In case at any time or from time to time while the Warrants remain outstanding and unexpired in whole or in part, the Company shall be a party to or shall otherwise engage in any transaction or series of related transactions constituting any reclassification of the Common Shares into securities or other property (other than solely into Common Shares of the Company (in which event Section 4.2 shall apply), or any merger of another Person into the Company in which the previously outstanding Common Shares shall be cancelled, reclassified or converted or changed into or exchanged for securities of the Company or other property (including cash) or any combination of the foregoing (other than solely into or for Common Shares of the Company (in which event Section 4.2 shall apply)) (a "**Surviving Transaction**") then, as a condition to the consummation of such Surviving Transaction, the Company shall execute and deliver to the Warrant Agent a written instrument providing that:

(x)    so long as any Warrant remains outstanding, on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement and not adverse (except to the extent replacement of Common Shares with Substituted Property as specified below may be deemed adverse) to any Warrantholder, each Warrant, upon the exercise thereof at any time after the consummation of such Surviving Transaction, shall be exercisable:

(I)    into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities or other property ("**Substituted Property**") that would have been receivable upon such Surviving Transaction by

16

a holder of the number of Common Shares into which such Warrant was exercisable immediately prior to such Surviving Transaction; and

(II)   at an Exercise Price for such Substituted Property equal to the aggregate Exercise Price payable by such holder for all such Common Shares into which such Warrant was exercisable immediately prior to such Surviving Transaction; and

(y)   the rights and obligations of the Company and the Warrantholders in respect of Substituted Property shall be as nearly equivalent as may be practicable to the rights and obligations of the Company and Warrantholders in respect of Common Shares hereunder as set forth herein.

Such written instrument shall provide for adjustments which, for events subsequent to the effective date of such written instrument, shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 4.  The above provisions of this Section 4.10 shall similarly apply to successive Surviving Transactions.

For avoidance of doubt, this Section 4.10 shall not apply to any transaction or series of transactions constituting a Sale of the Company, as to which Section 4.3(b) shall apply.

## ARTICLE 5

## OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

**Section 5.1   No Rights as Stockholders**.  Nothing contained in this Warrant Agreement shall be construed as conferring upon any Person, solely as a result such Person holding or having a beneficial interest in a Warrant, the right to vote, receive any dividend or other distribution, receive notice of, or attend, any meeting of stockholders, to share in the assets of the Company in the event of its liquidation, dissolution or winding up or otherwise exercise any rights whatsoever, in each case, as a stockholder of the Company to the extent such vote, dividend, giving of notice, meeting or other exercise of rights precedes the Close of Business on the Exercise Date with respect to the exercise of such Warrant.

**Section 5.2   Modification/Amendment**.  This Warrant Agreement may be modified or amended with respect to any Tranche only upon the written consent of the Warrantholders holding at least 75% of such Tranche of the Warrants and the Company; provided, however, that any modification or amendment that (i) materially and adversely affects the rights or interests of any Warrantholder disproportionately relative to any other Warrantholder, (ii) amends the Exercise Price for any Tranche of Warrants or (iii) amends the number of Common Shares a Warrantholder would have owned or been entitled to receive had such Warrant been exercised prior to such modification or amendment shall require the written consent of each such Warrantholder so affected. Any consent delivered by electronic means shall be deemed to constitute written consent.

**Section 5.3   Rights of Action**.  All rights of action against the Company in respect of this Warrant Agreement are vested in the Warrantholders, and any Warrantholder individually,

17

without the consent of the Warrant Agent or any other Warrantholder, may, on such Warrantholder's own behalf and for such Warrantholder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Warrantholder's right to exercise such Warrantholder's Warrants subject to the terms and conditions set forth in this Warrant Agreement.

**Section 5.4** **Issuance Obligation Remedies**.  Nothing in this Warrant Agreement shall limit the right of any Warrantholder to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance or injunctive relief with respect to the Company's violation of its obligations under this Warrant Agreement, including, without limitation, any failure by the Company to timely issue Warrant Shares upon exercise of such Warrant as required pursuant to the terms hereof.

## ARTICLE 6

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

**Section 6.1** **Change of Warrant Agent**.

(a)     The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder (except for liability arising as a result of the Warrant Agent's own gross negligence, willful misconduct bad faith or breach of this Warrant Agreement) after giving sixty (60) days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of thirty (30) days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by the Warrantholders representing a majority of the Warrants at the time outstanding, then the Warrantholders representing a majority of the Warrants at the time outstanding may appoint a successor warrant agent.

(b)     The Warrant Agent may be removed by the Company at any time upon thirty (30) days' written notice to the Warrant Agent; provided, however, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed; provided, further, that, until such successor warrant agent has been appointed, the Company shall compensate the Warrant Agent in accordance with Section 6.2.

(c)     Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the Laws of the United States of America or any state thereof or the District of Columbia, and authorized under such Laws to exercise corporate trust powers and subject to supervision or examination by federal or state authority and having a combined capital and surplus of not less than $50,000,000.  The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital

18

and surplus as set forth in the most recent report of its condition published prior to its appointment; provided that such reports are published at least annually pursuant to Law or to the requirements of a federal or state supervising or examining authority.

(d)      After acceptance in writing of such appointment by the successor warrant agent, such successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations.  Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder, including the Warrant Register.  As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent and each transfer agent for its Common Shares.  Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(e)      Any entity into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the corporate trust or agency business of the Warrant Agent, shall be the successor warrant agent under this Warrant Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto; provided, however, that such entity would be eligible for appointment as a successor warrant agent under Section 6.1(c).

**Section 6.2**      **Compensation; Further Assurances**.  The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent as set forth on Exhibit C and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon written demand for all reasonable and documented expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable and documented compensation, expenses and disbursements of its counsel incurred in connection with the execution and administration of this Warrant Agreement), except any such expense, disbursement or advance as may arise from its or any of their gross negligence, willful misconduct or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement. The Warrant Agent agrees to provide the Company with prior written notice of the retention of counsel whose compensation, expenses and disbursements are to be paid or reimbursed by the Company under this Section 6.2.

19

**Section 6.3**   **Reliance on Counsel**.  The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

**Section 6.4**   **Proof of Actions Taken**.  Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by a certificate executed by a duly authorized officer of the Company delivered to the Warrant Agent, and such certificate shall, in the absence of bad faith on the part of the Warrant Agent, be relied upon by the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement; provided that in its discretion, the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable. The Company shall, or procure that a duly authorized officer of the Company shall, promptly provide any such certificate or additional evidence reasonably requested by the Warrant Agent.

**Section 6.5**   **Correctness of Statements**.  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

**Section 6.6**   **Validity of Agreement**.  From time to time, the Warrant Agent may apply to any duly authorized officer of the Company for instruction, and the Company shall provide the Warrant Agent with such instructions concerning the services to be provided hereunder.  The Warrant Agent shall not be held to have notice of any change of authority of any Person, until receipt of notice thereof from the Company.  The Warrant Agent shall not be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement, nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Shares to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any Common Shares will, when issued, be validly issued, fully paid and nonassessable. The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Company for any action taken or omitted by Warrant Agent in reliance in good faith upon any Company instructions except to the extent that the Warrant Agent had actual knowledge of facts and circumstances that would render such reliance unreasonable.

**Section 6.7**   **Use of Agents**.  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents provided that the Warrant Agent shall remain responsible for the activities or omissions of any such agent or attorney and reasonable care has been exercised in the selection and in the continued employment of such attorney or agent.

20

**Section 6.8    Liability of Warrant Agent**.  The Warrant Agent shall incur no liability or responsibility to the Company or to any Warrantholder for any action taken or not taken (i) in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument reasonably believed by it to be genuine and to have been signed, sent and presented by the proper party or parties or (ii) in relation to its services under this Warrant Agreement, unless such liability arises out of or is attributable to the Warrant Agent's gross negligence, breach of this Warrant Agreement, willful misconduct or bad faith.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's gross negligence, breach of this Warrant Agreement, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment).  The Warrant Agent shall be liable hereunder only for its gross negligence, breach of this Warrant Agreement, fraud, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), for which the Warrant Agent is not entitled to indemnification under this Warrant Agreement.

**Section 6.9    Legal Proceedings**.  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or any Warrantholder shall furnish the Warrant Agent with reasonable indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.  The Warrant Agent shall promptly notify the Company and each Warrantholder in writing of any claim made or action, suit or proceeding instituted against it arising out of or in connection with this Warrant Agreement.

**Section 6.10    Actions as Agent**.  The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.  The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.  No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own gross negligence, willful misconduct or bad faith.

**Section 6.11    Appointment and Acceptance of Agency**.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth or as the Company and the Warrant Agent may hereafter agree.

**Section 6.12    Successors and Assigns**.  All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.  The Warrant Agent may assign this Warrant Agreement or any rights and obligations hereunder, in whole or in part,

21

to an Affiliate thereof with the prior consent of the Company, <u>provided</u> that the Warrant Agent may make such an assignment without consent of the Company to any successor to the Warrant Agent by consolidation, merger or transfer of its assets subject to the terms and conditions of this Warrant Agreement.

      **Section 6.13** <u>Notices</u>.  Any notice or demand authorized by this Warrant Agreement to be given or made to the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent) or electronic mail, as follows:

> Halcón Resources Corporation
> 1000 Louisiana St., Suite 1500
> Houston, Texas 77002
> Attention:  David S. Elkouri
> Executive Vice President and Chief Legal Officer
> (delkouri@halconresources.com)

> With copies (which shall not constitute notice to the Company) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153

> Attn.:  Gary Holtzer, Esq.
>       (Gary.Holtzer@weil.com)
>       Alfredo R. Pérez, Esq.
>       (Alfredo.Perez@weil.com)
>       Gavin Westerman, Esq.
>       (Gavin.Westerman@weil.com)
>       Lauren Tauro, Esq.
>       (Lauren.Tauro@weil.com)

> Any notice or demand authorized by this Warrant Agreement to be given or made to the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company) or electronic mail, as follows:

> [●]
> Attention:  [●]
> Email:  [●]

      Any notice or demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid or electronic mail to the last address of the Warrantholder as it shall appear on the Warrant Register, with a copy (which shall not constitute notice) to its counsel listed on such Warrant Register.

22

**Section 6.14    Applicable Law; Jurisdiction**.  The validity, interpretation and performance of this Warrant Agreement shall be governed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of Laws thereof.  The parties hereto irrevocably consent to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware in connection with any action, suit or proceeding arising out of or relating to this Warrant Agreement. Each party agrees to commence any such suit, action or proceeding in such court. Each party hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any suit, action or proceeding with respect to this Warrant Agreement, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve process in accordance with this Section 6.14, that its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the fullest extent permitted by applicable law, that the suit, action or proceeding in any such court is brought in an inconvenient forum, or that this Warrant Agreement, or the subject matter hereof, may not be enforced in or by such courts and further irrevocably waives, to the fullest extent permitted by applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is entitled pursuant to the final judgment of any court having jurisdiction.  Each party irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered mail, postage prepaid, to such party at its mailing address determined in accordance with this Warrant Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail.  Nothing herein shall affect the right of any party to serve process in any other manner permitted by law.

**Section 6.15    Waiver of Jury Trial**.  **Each of the Company and the Warrant Agent acknowledges and agrees that any controversy which may arise under this Warrant Agreement or a Warrant is likely to involve complicated and difficult issues, and therefore each such person hereby irrevocably and unconditionally waives any right such person may have to a trial by jury with respect to any litigation directly or indirectly arising out of or relating to this Warrant Agreement or a Warrant.  Each of the Company and the Warrant Agent certifies and acknowledges that (a) no representative, agent or attorney of the other person has represented, expressly or otherwise, that such other person would not, in the event of litigation, seek to enforce the foregoing waiver, (b) such person understands and has considered the implications of this waiver, (c) such person makes this waiver voluntarily, and (d) such person has been induced to enter into this Warrant Agreement by, among other things, the mutual waivers and certifications in this section.**

**Section 6.16    Specific Performance**.  Each of the Company and the Warrant Agent acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant Agreement would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

23

**Section 6.17    Benefit of this Warrant Agreement**.  Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their respective successors and permitted assigns and the Warrantholders.  Each Warrantholder is an express third party beneficiary of this Agreement.

**Section 6.18    Registered Warrantholder**.  Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

**Section 6.19    Headings**.  The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

**Section 6.20    Counterparts**.  This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.  A signed copy of this Warrant Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant Agreement.

**Section 6.21    Entire Agreement**.  This Warrant Agreement constitutes the entire agreement of the Company, the Warrant Agent and the Warrantholders with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Company, the Warrant Agent and the Warrantholders with respect to the subject matter hereof, including the RSA and any term sheets attached thereto or any prior drafts or versions of any of the foregoing or of this Warrant Agreement.

**Section 6.22    Severability**.  Wherever possible, each provision of this Warrant Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Warrant Agreement shall be prohibited by or invalid under applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Warrant Agreement.

24

**Section 6.23   Termination**.  This Warrant Agreement shall terminate at the earlier to occur of (i) the Expiration Time (or, if later, Close of Business on the Settlement Date with respect to all exercises of Warrants as to which the respective Exercise Date is prior to the Expiration Time, but in any event no later than 180 days following the Expiration Time) and (ii) the date on which all outstanding Warrants have been exercised.  All provisions regarding indemnification, warranty, liability and limits thereon shall survive the termination or expiration of this Warrant Agreement.

**Section 6.24   Confidentiality**.  The Warrant Agent and the Company agree that personal, non-public Warrantholder information which is exchanged or received pursuant to the negotiation or the carrying out of this Warrant Agreement shall remain confidential, and shall not be voluntarily disclosed to any other person, except disclosures pursuant to applicable securities Laws or otherwise as may be required by Law, including, without limitation, pursuant to subpoenas from state or federal government authorities.

**Section 6.25   Rule 144 Information**.  If and for as long as the Company is subject to the reporting obligations of the Exchange Act, the Company covenants that it will use its reasonable best efforts to timely file all reports and other documents required to be filed by it under the Exchange Act and the rules and regulations promulgated by the U.S. Securities and Exchange Commission thereunder. In addition, whether or not the Company becomes subject to the reporting obligations of the Securities Act or the Exchange Act, the Company will use reasonable best efforts to take such further action as the Warrantholders may reasonably request, all to the extent required from time to time to enable such Warrantholders to sell the Warrants without registration under the Securities Act within the limitation of the exemptions provided by (i) Rule 144 or Regulation S under the Securities Act, as such rules may be amended from time to time or (ii) any successor rule or regulation hereafter adopted by the U.S. Securities and Exchange Commission; provided that the Company shall not be required to publicly disclose or make public any information with respect to the Company other than as required under applicable law.

**Section 6.26   Representations and Warranties of the Company**.  The Company hereby represents and warrants to the Warrantholders that (i) it has the corporate power and authority to execute this Warrant Agreement and consummate the transactions contemplated by this Warrant Agreement, (ii) there are no statutory or contractual stockholders' preemptive rights or rights of refusal with respect to the issuance of any Warrants and (iii) the execution and delivery by the Company of this Warrant Agreement and the issuance of the Common Shares upon exercise of any Warrant do not and shall not (A) conflict with or result in a breach of the terms, conditions or provisions of, (B) constitute a default under, (C) result in the creation of any lien, security interest, charge or encumbrance upon the Company's capital stock or assets pursuant to, (D) result in a violation of, or (E) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or governmental body or agency pursuant to, the Company's certificate of incorporation or bylaws or any Law in effect as of the date hereof to which the Company is subject, or any agreement, instrument, order, judgment or decree to which the Company is subject as of the date hereof, except for any such authorization, consent, approval, notice or exemption required under applicable securities laws.

25

**Section 6.27   Representations and Warranties of Warrant Agent**.  The Warrant Agent hereby represents and warrants to the Company that (i) it has the corporate or similar power and authority to execute this Warrant Agreement and consummate the transactions contemplated by this Warrant Agreement, (ii) the execution, delivery and performance by the Warrant Agent of this Warrant Agreement do not and shall not (A) conflict with or result in a breach of the terms, conditions or provisions of, (B) constitute a default under, (C) result in a violation of, or (D) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or governmental body or agency pursuant to, the Warrant Agent governing documents or any Law in effect as of the date hereof to which the Warrant Agent is subject, or any agreement, instrument, order, judgment or decree to which the Warrant Agent is subject as of the date hereof, except for any such authorization, consent, approval, notice or exemption required under applicable securities laws.

**Section 6.28   Withholding and Reporting Requirements**.  Notwithstanding any provision to the contrary, the Company will be authorized to (i) take any actions that may be necessary or appropriate to comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, including in connection with all distributions, deemed distributions or other situations requiring withholding under applicable law, (ii) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, (iii) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes, (iv) require reimbursement from any holder of Warrants to the extent any withholding is required in the absence of any distribution, or (v) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) that are necessary to enable compliance with this Section 6.28.

*[signature pages follow]*

26

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**HALCÓN RESOURCES CORPORATION**

By: _____
Name: _____
Title:

[●]

By: _____
Name:
Title:

[*Signature Page to Warrant Agreement*]

**EXHIBIT A**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers _____ Warrants to:

_____

Name, Address and Zip Code of Assignee

_____

and irrevocably          Name of Agent
appoints

as its agent to transfer such Warrants on the books of the Warrant Agent.

*[Signature page follows]*

A-1

Date:  [●]

_____
Name of Assignor

By:      _____
         Name:
         Title:

A-2

**EXHIBIT B**

**FORM OF EXERCISE NOTICE FOR BOOK-ENTRY WARRANTS**

[Address]

Attention:  Transfer Department

Re:   Warrant Agreement dated as of [●], 2019 between Halcón Resources Corporation (the "**Company**") and [●], as Warrant Agent (as it may be supplemented or amended, the "**Warrant Agreement**")

The undersigned, being the beneficial holder of the Warrants, hereby irrevocably elects to exercise the right to exercise _____ Warrants held for its benefit through the book-entry facilities of the Depository Trust Company and receive the consideration deliverable in exchange therefor to the account at the Depositary as specified below.

The undersigned shall tender payment of the Exercise Price therefor in accordance with instructions received from the Warrant Agent.

Please check below if this exercise is contingent upon a registered public offering, a Sale of the Company or any other event in accordance with Section 3.2(f) of the Warrant Agreement.

☐   This exercise is being made in connection with a registered public offering, a Sale of the Company or the following event:_____; provided, that in the event that such transaction shall not be consummated or such event shall not occur prior to the Expiration Time, then this exercise shall be deemed revoked.

☐   Receipt of the following governmental filings or approvals will be required prior to the issuance of Common Shares upon the exercise contemplated hereby:

_____

THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO THE EXPIRATION TIME.  THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITARY TO WHICH YOU MUST DELIVER YOUR WARRANTS, AND PAYMENT, IF ANY, ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT.

| | |
|---|---|
| AUTHORIZED SIGNATURE: | _____ |
| NAME: | _____ |
| CAPACITY IN WHICH SIGNING: | _____ |
| DATED: | _____ |

B-1

| | |
|---|---|
| NAME OF PARTICIPANT: | _____ |
| ADDRESS: | _____ |
| CONTACT NAME (if different than above): | _____ |
| TELEPHONE (INCLUDING INTERNATIONAL CODE): | _____ |
| FAX (INCLUDING INTERNATIONAL CODE): | _____ |
| E-MAIL ADDRESS: | _____ |
| DEPOSITARY ACCOUNT NO.: | _____ |

.

**EXHIBIT C**

**FORM OF EXERCISE NOTICE FOR DIRECT REGISTRATION WARRANTS**

[Address]

Attention:  Transfer Department

Re:    Warrant Agreement dated as of [●], 2019 between Halcón Resources Corporation (the "**Company**") and [●], as Warrant Agent (as it may be supplemented or amended, the "**Warrant Agreement**")

The undersigned hereby irrevocably elects to exercise the right to exercise _____ Warrants and receive the consideration deliverable in exchange therefor.

The undersigned shall tender payment of the Exercise Price therefor in accordance with instructions received from the Warrant Agent.

Please check below if this exercise is contingent upon a registered public offering, a Sale of the Company or any other event in accordance with Section 3.2(f) of the Warrant Agreement.

☐    This exercise is being made in connection with a registered public offering, a Sale of the Company or the following event:_____; provided, that in the event that such transaction shall not be consummated or such event shall not occur prior to the Expiration Time, then this exercise shall be deemed revoked.

☐    Receipt of the following governmental filings or approvals will be required prior to the issuance of Common Shares upon the exercise contemplated hereby:

_____

THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO THE EXPIRATION TIME.  THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS AND PHONE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

C-1

C-2

All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

By: _____

     Authorized Signature
     Address:
     Telephone:

**EXHIBIT D**

**SCHEDULE OF FEES**

[●]

**Exhibit C**

**Registration Rights Agreement**

**REGISTRATION RIGHTS AGREEMENT**

**BY AND AMONG**

**HALCÓN RESOURCES CORPORATION**

**AND**

**THE INVESTORS PARTY HERETO**

**DATED AS OF [___], 2019**

**TABLE OF CONTENTS**

**Page**

1.   DEFINITIONS.................................................................................................. 1

2.   REGISTRATION ............................................................................................. 4

3.   RELATED OBLIGATIONS .............................................................................. 9

4.   OBLIGATIONS OF THE INVESTORS........................................................... 16

5.   EXPENSES OF REGISTRATION.................................................................... 16

6.   INDEMNIFICATION....................................................................................... 17

7.   CONTRIBUTION............................................................................................. 19

8.   REPORTS UNDER THE EXCHANGE ACT ................................................... 19

9.   ASSIGNMENT OF REGISTRATION RIGHTS ............................................... 20

10.   AMENDMENT OF REGISTRATION RIGHTS.............................................. 20

11.   MISCELLANEOUS ........................................................................................ 21

**REGISTRATION RIGHTS AGREEMENT**

**REGISTRATION RIGHTS AGREEMENT** (this "**Agreement**"), dated as of [__], 2019, by and among Halcón Resources Corporation, a Delaware corporation (the "**Company**"), and each of the parties identified on the signature pages hereto (collectively, the "**Investors**", and each an "**Investor**").

**RECITALS**

A.      The Company and certain affiliated debtors (collectively, the "**Debtors**") commenced, on August 7, 2019, cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, jointly administered under Case No. 19-34446 (DRJ).

B.      The Debtors filed the *Joint Prepackaged Chapter 11 Plan of Halcón Corporation and its Affiliated Debtors* [Docket No. 20] on August 7, 2019 which, as hereto amended or modified, was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [___], 2019 [Docket No. ##] (including all exhibits, schedules and supplements thereto and as amended from time to time, the "**Plan**").

C.      The Company proposes to issue the Common Stock (as defined below) pursuant to, and upon the terms set forth in, the Plan.

D.      The Company and the Investors have agreed to enter into this Agreement pursuant to which the Company shall grant the Investors registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "**Securities Act**") with respect to the Registrable Securities (as defined below) in furtherance of the foregoing.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Investors hereby agree as follows:

**AGREEMENT**

1.      DEFINITIONS.

As used in this Agreement, the following terms shall have the following meanings:

"**Alternative Transaction**" has the meaning ascribed to such term in Section 2(e).

"**Blue Sky Filing**" has the meaning ascribed to such term in Section 6(a).

"**Business Day**" means any day other than Saturday, Sunday or any other day on which either commercial banks in the City of New York are authorized or required by Law to remain closed or the New York Stock Exchange LLC is not open for a full business day.

"**Claims**" has the meaning ascribed to such term in Section 6(a).

"**Common Stock**" means the common stock of the Company, par value [$0.0001] per share, as it exists on the date of this Agreement following the effectiveness of the Plan and any shares of any class or series of capital stock of the Company resulting from any reclassification or reclassifications thereof, or, in the event of a merger, consolidation or other similar transaction involving the Company that is otherwise permitted hereunder in which the Company is not the surviving corporation, the common stock, common equity interests, ordinary shares or depositary shares or other certificates representing common equity interests of such surviving corporation or its direct or indirect parent corporation, and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding-up of the Company and which are not subject to redemption by the Company.

"**Company**" has the meaning ascribed to such term in the preamble.

"**Effective Date**" means the date that a Registration Statement is declared effective by the SEC.

"**Eligible Market**" means The New York Stock Exchange, The NYSE MKT LLC, The NASDAQ Global Select, or The NASDAQ Global Market.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"**Filing Deadline**" means the date which is the later of (i) 90 days after the effective date of the Plan and (ii) the date specified in a written notice to the Company by the Required Holders.

"**Filing Determination Date**" has the meaning ascribed to such term in Section 2(a).

"**Governmental Authority**" means the government of any nation, state, city, locality or other political subdivision thereof, any entity or self-regulatory organization exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"**Indemnified Damages**" has the meaning ascribed to such term in Section 6(a).

"**Indemnified Party**" has the meaning ascribed to such term in Section 6(b).

"**Indemnified Person**" has the meaning ascribed to such term in Section 6(a).

"**Inspectors**" has the meaning ascribed to such term in Section 3(h).

"**Law**" means any United States federal, state or local or foreign law, rule, regulation, statute, Order or other legally enforceable requirement (including common law)

2

issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"**Legal Counsel**" has the meaning ascribed to such term in Section 2(b).

"**Maximum Offering Size**" has the meaning ascribed to such term in Section 2(e).

"**New Registration Rights Agreement**" means a new registration rights agreement, providing the Investors with registration rights that are customary for investors in a company that is not subject to the reporting requirements of Section 12(b), 12(g) or 15(d) of the Exchange Act (including initial public offering demand registration rights at the request of the Investors holding a customary percentage of the outstanding Common Stock and seeking to register a customary minimum threshold amount of Common Stock and, after completion of an initial public offering of Common Stock, demand registration rights, shelf registration rights and piggyback registration rights customary for investors in a company that is not subject to the reporting requirements of Section 12(b), 12(g) or 15(d) of the Exchange Act), as shall be reasonably agreed among the Company and the Investors holding Registrable Securities at the time such registration rights agreement is entered into.

"**Order**" means any judgment, decision, writ, order, injunction, award, decree or other determination of or by any Governmental Authority.

"**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an estate, an unincorporated organization or other entity and a government or any department or agency thereof.

"**Plan**" means the Debtors' *Joint Prepackaged Chapter 11 Plan of Halcón Corporation and its Affiliated Debtors* [Docket No. 20], filed in the Debtors' chapter 11 cases in the United States Bankruptcy Court for the Southern District of Texas, Case No. 19-34446 (DRJ) (as it may be amended, modified or supplemented from time to time).

"**Records**" has the meaning ascribed to such term in Section 3(h).

"**register**," "**registered**," and "**registration**" refer to a registration effected by preparing and filing one or more Registration Statements in compliance with the Securities Act and pursuant to Rule 415, and the declaration or ordering of effectiveness of such Registration Statement(s) by the SEC.

"**Registrable Securities**" means (i) any shares of Common Stock, whether now owned or hereafter acquired by the Investors (including shares of Common Stock issued pursuant to the Plan) and (ii) any shares of capital stock of the Company issued or issuable with respect to the Common Stock described in clause (i), as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise; *provided*, that any Registrable Securities beneficially owned by an Investor shall cease to be Registrable Securities to the extent such securities may be sold pursuant to Rule 144 (or any similar provisions in force) without regard to volume or manner of sale limitations.

3

"**Registration Actions**" has the meaning ascribed to such term in Section 2(f).

"**Registration Period**" has the meaning ascribed to such term in Section 3(a).

"**Registration Statement**" means a registration statement or registration statements of the Company filed under the Securities Act covering the resale of the Registrable Securities.

"**Requested Shelf Registered Securities**" has the meaning ascribed to such term in Section 2(e).

"**Required Holders**" means the holders of at least a majority of the Registrable Securities.

"**Rule 144**" has the meaning ascribed to such term in Section 8.

"**Rule 415**" means Rule 415 promulgated under the Securities Act or any successor rule providing for offering securities on a delayed or continuous basis.

"**SEC**" means the United States Securities and Exchange Commission.

"**SEC Guidance**" means (i) any publicly available written or oral interpretations, questions and answers, guidance and forms of the SEC, (ii) any oral or written comments, requirements or requests of the SEC or its staff, (iii) the Securities Act and the Exchange Act and (iv) any other rules, bulletins, releases, manuals and regulations of the SEC.

"**Securities Act**" has the meaning ascribed to such term in the recitals.

"**Shelf Registered Securities**" means any Registrable Securities whose resale is covered by an effective Registration Statement filed pursuant to this Agreement.

"**Suspension Notice**" has the meaning ascribed to such term in Section 2(f).

"**Suspension Period**" has the meaning ascribed to such term in Section 2(f).

"**Underwritten Offering**" has the meaning ascribed to such term in Section 2(e).

"**Underwritten Offering Notice**" has the meaning ascribed to such term in Section 2(e).

"**Underwritten Offering Request**" has the meaning ascribed to such term in Section 2(e).

"**Underwritten Offering Requesting Holder**" has the meaning ascribed to such term in Section 2(e).

"**Violations**" has the meaning ascribed to such term in Section 6(a).

2.      REGISTRATION.

4

(a)     Mandatory Registration.  The Company shall prepare, and, as soon as reasonably practicable but in no event later than the Filing Deadline, file with the SEC a Registration Statement on Form S-3 covering the resale of all of the Registrable Securities. In the event that Form S-3 is unavailable for such a registration in accordance with SEC Guidance, the Company shall use such other appropriate form as is available for such a registration in accordance with SEC Guidance, subject to the provisions of Section 2(c). The Registration Statement prepared pursuant hereto shall register for resale the number of Registrable Securities determined as of the Business Day prior to the date the Registration Statement is initially filed with the SEC (the "**Filing Determination Date**"), subject to adjustment as provided in Section 2(d). Not later than five Business Days prior to the anticipated Filing Determination Date, the Company shall provide written notice to the Investors of such anticipated Filing Determination Date.  Each Investor shall provide such information as is required by Section 4(a) not later than the third Business Day after receipt of such notice from the Company.  The Company shall use its commercially reasonable best efforts to have the Registration Statement declared effective by the SEC as soon as reasonably practicable[, provided however, for the avoidance of doubt, if a Registration Statement shall include financial statements for the year ending December 31, 2019 and "fresh start" financial statements are required to be prepared in accordance with U.S. generally accepted accounting principles following the Effective Date, the Company shall not be required to cause such Registration Statement to become effective until March 15, 2020]. By the end of the Business Day following the Effective Date, the Company shall file with the SEC, in accordance with SEC Guidance, a final prospectus to be used in connection with sales pursuant to such Registration Statement.  From time to time, the Investors may, by written notice to the Company, request that an amount of additional Registrable Securities be registered on a Registration Statement.  Upon receipt of such notice, the Company shall prepare, and, as soon as reasonably practicable, file with the SEC a post-effective amendment to the Registration Statement on Form S-3 covering the resale of all of such additional Registrable Securities.

(b)     Legal Counsel.  Subject to Section 5 hereof, the Required Holders shall have the right to select one legal counsel to review and oversee any registration pursuant to this Section 2 ("**Legal Counsel**"), which shall be Paul, Weiss, Rifkind, Wharton & Garrison LLP or such other counsel as thereafter designated by the Required Holders.  The Company and Legal Counsel shall reasonably cooperate with each other in performing the Company's obligations under this Agreement. For the avoidance of doubt, the Company shall be entitled to select separate legal counsel to represent the Company in connection with fulfilling its obligations under this Agreement.

(c)     Ineligibility for Form S-3.  In the event that Form S-3 is not available for the registration of the resale of Registrable Securities hereunder in accordance with SEC Guidance, the Company shall (i) register the resale of the Registrable Securities on Form S-1 or another appropriate form in accordance with SEC Guidance and (ii) undertake to register the Registrable Securities on Form S-3 as soon as such form is available for secondary sales in accordance with SEC Guidance, *provided* that the Company shall use its commercially reasonable efforts to maintain the effectiveness of the Registration Statement then in effect until such time as a Registration Statement on Form S-3 covering the Registrable Securities has been declared effective by the SEC.

(d)     Termination of Exchange Act Registration.  Notwithstanding anything to the contrary in this Section 2, if the Company expects that it will no longer be subject to the reporting requirements of Section 12(b), 12(g) or 15(d) of the Exchange Act after completion of its reporting obligations under the Exchange Act for its fiscal year ending December 31, 2019, subject to the condition precedent that the Company shall have used its commercially reasonable best efforts to enter into a New Registration Rights Agreement with the Investors holding Registrable Securities at such time, the Company and the Investors shall not be required to comply with their respective obligations under this Agreement and, for the avoidance of doubt, the Company shall not be required to file or maintain the effectiveness of any Registration Statements filed under this Agreement or perform any Registration Actions (as defined below) and may withdraw any such Registration Statements in accordance with SEC Guidance.  The New Registration Rights Agreement shall provide that it supersedes this Agreement in its entirety.

(e)     Conduct of Underwritten Offerings and Alternative Transactions.

(i)     Upon written request by an Investor holding Shelf Registered Securities (the "**Underwritten Offering Requesting Holder**"), which request (the "**Underwritten Offering Request**") shall specify the class or series and amount of such Underwritten Offering Requesting Holder's Shelf Registered Securities to be sold (the "**Requested Shelf Registered Securities**"), the Company shall perform its obligations hereunder with respect to the sale of such Requested Shelf Registered Securities in the form of a firm commitment underwritten public offering (unless otherwise consented to by the Underwritten Offering Requesting Holder) (an "**Underwritten Offering**") if the aggregate proceeds reasonably anticipated to be generated, net of underwriting discounts and commissions, from the sale of the Requested Shelf Registered Securities equals or exceeds $25.0 million (as determined by the Company in good faith, as of the date the Company receives the Underwritten Offering Request), unless such Underwritten Offering shall include all of the Registrable Securities then owned by the Underwritten Offering Requesting Holder(s).  Promptly upon receipt of an Underwritten Offering Request, the Company shall provide notice (the "**Underwritten Offering Notice**") of such proposed Underwritten Offering (which notice shall state the material terms of such proposed Underwritten Offering, to the extent known, as well as the identity of the Underwritten Offering Requesting Holder) to the other Investors holding Shelf Registered Securities.  Such other Investors may, by written request to the Company and the Underwritten Offering Requesting Holders, within three Business Days after receipt of such Underwritten Offering Notice, offer and sell up to all of their Shelf Registered Securities of the same class or series as the Requested Shelf Registered Securities in such proposed Underwritten Offering.  No Investor shall be entitled to include any of its Registrable Securities in an Underwritten Offering unless such Investor has complied with clause (iv), below.  The lead managing underwriter or underwriters selected for such Underwritten Offering shall be an investment bank of national reputation selected by the Underwritten Offering Requesting Holder(s) and shall be reasonably acceptable to the Company.  The terms and conditions of any customary underwriting or purchase arrangements pursuant to which Registrable Securities shall be sold in an Underwritten Offering shall be approved by the Underwritten Offering Requesting Holder(s) and shall be reasonably acceptable to the Company.

6

(ii)      In an Underwritten Offering, if the lead managing underwriter advises the Company and the Underwritten Offering Requesting Holder that, in its view, the number of Registrable Securities requested to be included in such Underwritten Offering (including any securities that the Company proposes to be included that are not Registrable Securities) exceeds the number of Registrable Securities that may be sold without having a material and adverse effect on such Underwritten Offering (the "**Maximum Offering Size**"), the Company shall include in such Underwritten Offering the following securities, in the priority listed below, up to the Maximum Offering Size:

(A)      first, Shelf Registered Securities that are requested to be included in such Underwritten Offering by the Underwritten Offering Requesting Holder(s);

(B)      second, Shelf Registered Securities that are requested to be included in such Underwritten Offering by Investors other than the Underwritten Offering Requesting Holder(s); and

(C)      third, all securities that are registered on the applicable Registration Statement and are requested to be included in such Underwritten Offering by the Company (including securities to be included pursuant to other applicable registration rights agreements or provisions).

(iii)     The Company shall use its commercially reasonable efforts to cooperate in a timely manner with any request of the Investors holding Shelf Registered Securities in respect of any block trade, hedging transaction, derivatives transaction, short sale, stock loan or pledge or other transaction that is registered under a Registration Statement that is not a firm commitment Underwritten Offering (each, an "**Alternative Transaction**"), including entering into customary agreements with respect to such Alternative Transactions (and providing customary representations, warranties, covenants and indemnities in such agreements) as well as providing other reasonable assistance in respect of such Alternative Transactions of the type applicable to a transaction registered on a Registration Statement, subject to Section 3 hereof, to the extent customary for such transactions.

(iv)     Notwithstanding anything herein to the contrary, no Investor may participate in any Underwritten Offering hereunder unless such Investor accurately completes and executes in a timely manner all questionnaires, powers of attorney, indemnities, custody agreements, underwriting agreements (as approved in accordance with the terms of this Agreement), and other documents reasonably requested under the terms of such underwriting arrangements; *provided*, that all Persons participating in such Underwritten Offering shall be required to complete and execute, on the same terms and conditions, such questionnaires, powers of attorney, indemnities, custody agreements, underwriting agreements, and other documents (if applicable).  The right of an Investor to register and sell Registrable Securities in an Underwritten Offering shall also be subject to any restrictions, limitations or prohibitions on the sale of Registrable Securities as may be required by the underwriters in the interests of the offering (and, without limiting the foregoing, each Registration Rights Holder shall in connection therewith agree to be bound by (and if requested, execute and deliver) a lock-up agreement with the underwriter(s) of any such Underwritten Offering as provided in clause (v), below).

(v)     In connection with an Underwritten Offering:

(A)     Each Investor hereby agrees that, except for sales in such Underwritten Offering:  (1) it will not effect any public sale or distribution (including sales pursuant to Rule 144 and through derivative transactions) of Common Stock during (x) the period from the date of the Underwritten Offering Notice until the end of the 60-day period beginning on the date of commencement of such Underwritten Offering (which period may be extended to the extent required by applicable Law or SEC Guidance) or (y) such shorter period as the underwriters participating in such Underwritten Offering may require; *provided*, that the duration of the restrictions described in this subclause (1) shall be no longer than the duration of the shortest restriction generally imposed by the underwriters on the chief executive officer and the chief financial officer of the Company (or persons in substantially equivalent positions) in connection with such Underwritten Offering; and (2) it will execute a lock-up agreement in favor of the underwriters in form and substance reasonably acceptable to the Company and the underwriters to such effect.

(B)     The Company agrees that (1) it shall not effect any public sale or distribution (including through derivative transactions) of Common Stock (except pursuant to registrations on Form S-8 or Form S-4 or any similar or successor form under the Securities Act) during (x) the period from the date of the Underwritten Offering Notice until the end of the 60-day period beginning on the date of commencement of such Underwritten Offering (which period may be extended to the extent required by applicable Law or SEC Guidance) or (y) such shorter period as the underwriters participating in such Underwritten Offering may require; and (2) to the extent requested by the underwriters participating in such Underwritten Offering, it shall agree to include provisions in the relevant underwriting or other similar agreement giving effect to the restrictions described in the preceding subclause (1), in form and substance reasonably acceptable to such underwriters.

(f)     <u>Suspension</u>.  Notwithstanding anything to the contrary contained in this Agreement, but subject to the limitations set forth in this Section 2(f), the Company shall be entitled to suspend its obligation to (i) file or submit (but not to prepare) any Registration Statement, (ii) file or submit any amendment to such a Registration Statement, (iii) file, submit or furnish any supplement or amendment to a prospectus included in such a Registration Statement, (iv) make any other filing with the SEC, (v) cause such a Registration Statement or other filing with the SEC to become or remain effective or (vi) take any similar actions or actions related thereto (including entering into agreements and actions related to the marketing of securities) (collectively, "**Registration Actions**") upon (1) the issuance by the SEC of a stop order suspending the effectiveness of any such Registration Statement or the initiation of proceedings with respect to such a Registration Statement under Section 8(d) or 8(e) of the Securities Act, (2) the determination of the Company's board of directors that any such Registration Action should not be taken because it would reasonably be expected to materially

8

interfere with or require the public disclosure of any material corporate development or plan, including any material financing, securities offering, acquisition, disposition, corporate reorganization or merger or other transaction involving the Company or any of its subsidiaries or (3) the Company possessing material non-public information the disclosure of which its board of directors determines would reasonably be expected to not be in the best interests of the Company.  Upon the occurrence of any of the conditions described in clause (1), (2) or (3) above in connection with undertaking a Registration Action, the Company shall give prompt notice of such suspension (and whether such action is being taken pursuant to clause (1), (2) or (3) above) (a "**Suspension Notice**") to the Investors.  Upon the termination of such condition, the Company shall give prompt notice thereof to the Investors and shall promptly proceed with all Registration Actions that were suspended pursuant to this Section 2(f).  The Company may only suspend Registration Actions pursuant to clause (2) or (3) above on three occasions during any period of 12 consecutive months for a reasonable time specified in the Suspension Notice but not exceeding an aggregate of 90 days (which period may not be extended or renewed) during such 12 consecutive month period (each such occasion, a "**Suspension Period**").  Each Suspension Period shall be deemed to begin on the date the relevant Suspension Notice is given to the Investors and shall be deemed to end on the earlier to occur of (x) the date on which the Company gives the Investors a notice that the Suspension Period has terminated and (y) the date on which the number of days during which a Suspension Period has been in effect exceeds the 90-day limit.  Notwithstanding anything to the contrary in this Agreement, the Company shall not be in breach of, or have failed to comply with, any obligation under this Agreement where the Company acts or omits to take any action in order to comply with applicable Law, any SEC Guidance or any Order.  Each Investor shall keep confidential the fact that a Suspension Period is in effect unless otherwise notified by the Company, except (a) for disclosure to the Investors and any underwriters or counterparties in Alternative Transactions, and their employees, agents and professional advisers who reasonably need to know such information, (b) for disclosures to the extent required in order to comply with reporting obligations to its limited partners or other direct or indirect investors who are subject to confidentiality arrangements with such Investor, (c) if and to the extent such matters are publicly disclosed by the Company or any of its subsidiaries or any other Person that, to the actual knowledge of such Investor, was not subject to an obligation or duty of confidentiality to the Company or any of its subsidiaries, (d) as required by applicable Law (*provided*, that the Investor gives prior written notice to the Company of such requirement and the contents of the proposed disclosure to the extent it is permitted to do so under applicable Law), and (e) for disclosure to any other Investor who is subject to the foregoing confidentiality requirement.

3.      <u>RELATED OBLIGATIONS</u>.

        At such time as the Company is obligated to file a Registration Statement with the SEC pursuant to Section 2, the Company will use its commercially reasonable efforts to effect the registration of the Registrable Securities in accordance with the intended method of disposition thereof and, pursuant thereto, the Company shall have the following obligations:

        (a)     The Company shall promptly prepare and file with the SEC a Registration Statement with respect to the Registrable Securities and use its commercially reasonable efforts to cause such Registration Statement relating to the Registrable Securities to become effective as soon as reasonably practicable after such filing. The Company shall keep each Registration

Statement effective pursuant to Rule 415 at all times until the earlier of (i) the date on which there are no longer any Registrable Securities and (ii) the date on which the Investors shall have sold all of the Registrable Securities covered by such Registration Statement (the "**Registration Period**").  Each Registration Statement (including any amendments or supplements thereto and prospectuses contained therein) shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein (in the case of prospectuses, in the light of the circumstances in which they were made) not misleading.  The term "commercially reasonable efforts" shall mean, among other things, that the Company shall submit to the SEC, within five Business Days after the later of the date that (i) the Company is advised by the SEC that no review of a particular Registration Statement will be made by the staff of the SEC or that the staff has no further comments on a particular Registration Statement, as the case may be, and (ii) the approval of Legal Counsel pursuant to Section 3(c) (which approval is immediately sought), a request for acceleration of effectiveness of such Registration Statement to a time and date not later than two Business Days after the submission of such request.  The Company shall respond in writing to comments made by the SEC in respect of a Registration Statement as soon as reasonably practicable.

(b)      In accordance with SEC Guidance, the Company shall prepare and file with the SEC such amendments (including post-effective amendments) and supplements to a Registration Statement and the prospectus used in connection with such Registration Statement, which prospectus is to be filed pursuant to Rule 424 promulgated under the Securities Act, as may be necessary to keep such Registration Statement effective at all times during the Registration Period, and, during such period, comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities of the Company covered by such Registration Statement until such time as all of such Registrable Securities shall have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof as set forth in such Registration Statement.  The "Plan of Distribution" section of each Registration Statement shall permit all customary means of disposition of Registrable Securities, including firm-commitment underwritten public offerings, block trades, agented transactions, sales directly into the market, purchases or sales by brokers, derivative transactions, short sales, stock loan or stock pledge transactions and sales not involving a public offering.  In the case of amendments and supplements to a Registration Statement which are required to be filed pursuant to this Agreement (including pursuant to this Section 3(b)) by reason of the Company filing a report on Form 10-K, Form 10-Q, Form 8-K or any analogous report under the Exchange Act, the Company shall have incorporated such report by reference into such Registration Statement, if applicable, or shall file such amendments or supplements with the SEC on the same day on which the Exchange Act report is filed which created the requirement for the Company to amend or supplement such Registration Statement.

(c)      The Company shall (A) permit Legal Counsel to review and comment upon (i) a Registration Statement at least two Business Days prior to its filing with the SEC and (ii) all amendments and supplements to all Registration Statements (except for Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any similar or successor reports) within a reasonable number of days prior to their filing with the SEC, and (B) not file any Registration Statement or any such amendment or supplement thereto in a form to which Legal Counsel reasonably objects.  The Company shall not submit a request for acceleration of the effectiveness of a Registration Statement or any amendment or supplement

10

thereto without the prior approval of Legal Counsel, which approval shall not be unreasonably withheld.  The Company shall furnish to Legal Counsel, without charge, (i) copies of any correspondence from the SEC or the staff of the SEC to the Company or its representatives relating to any Registration Statement, (ii) promptly after the same is prepared and filed with the SEC, one copy of any Registration Statement and any amendment(s) thereto, including financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor, and all exhibits and (iii) upon the effectiveness of any Registration Statement, one copy of the prospectus included in such Registration Statement and all amendments and supplements thereto.  The Company shall reasonably cooperate with Legal Counsel in performing the Company's obligations pursuant to this Section 3.

(d)     The Company shall upon request furnish to each Investor whose Registrable Securities are included in any Registration Statement, without charge, (i) promptly after the same is prepared and filed with the SEC, at least one copy of such Registration Statement and any amendment(s) thereto, including financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor, all exhibits and each preliminary prospectus, (ii) upon the effectiveness of any Registration Statement, 10 copies of the prospectus included in such Registration Statement and all amendments and supplements thereto (or such other number of copies as such Investor may reasonably request) and (iii) such other documents, including copies of any preliminary or final prospectus, as such Investor may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities owned by such Investor; *provided*, that any such item which is available on the SEC's EDGAR System (or successor thereto) need not be furnished in physical form.

(e)     The Company shall use its commercially reasonable efforts to (i) register and qualify, unless an exemption from registration and qualification applies, the resale by Investors of the Registrable Securities covered by a Registration Statement under such other securities or "blue sky" Laws of such jurisdictions in the United States as the Required Holders may reasonably request, (ii) prepare and file in those jurisdictions such amendments (including post-effective amendments) and supplements to such registrations and qualifications as may be necessary to maintain the effectiveness thereof during the Registration Period, (iii) take such other actions as may be necessary to maintain such registrations and qualifications in effect at all times during the Registration Period, and (iv) take all other actions reasonably necessary or advisable to qualify the Registrable Securities for sale in such jurisdictions; provided, however, that the Company shall not be required in connection therewith or as a condition thereto to (x) qualify to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(e), (y) subject itself to general taxation in any such jurisdiction, or (z) file a general consent to service of process in any such jurisdiction. The Company shall promptly notify Legal Counsel and each Investor who holds Registrable Securities of the receipt by the Company of any notification with respect to the suspension of the registration or qualification of any of the Registrable Securities for sale under the securities or "blue sky" Laws of any jurisdiction in the United States or its receipt of actual notice of the initiation or threatening of any proceeding for such purpose.

(f)     The Company shall notify Legal Counsel and each Investor in writing (which may be by email) of the happening of any event, as promptly as reasonably practicable after becoming aware of such event, as a result of which the prospectus included in a Registration Statement, as

11

then in effect, includes an untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (*provided* that in no event shall such notice contain any material, nonpublic information), and, subject to Section 3(q) hereof, promptly prepare a supplement or amendment to such Registration Statement to correct such untrue statement or omission, and upon request deliver 10 copies of such supplement or amendment to Legal Counsel and each Investor (or such other number of copies as Legal Counsel or such Investor may reasonably request) provided, that any such item which is available on the SEC's EDGAR System (or successor thereto) need not be furnished in physical form.  The Company shall also promptly notify Legal Counsel in writing (which may be by email) (i) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and when a Registration Statement or any post-effective amendment has become effective (notification of such effectiveness shall be delivered to Legal Counsel by facsimile or email on the same day of such effectiveness), (ii) of any request by the SEC for amendments or supplements to a Registration Statement or related prospectus or related information, and (iii) of the Company's reasonable determination that a post-effective amendment to a Registration Statement would be appropriate.  By the end of the Business Day following the date any post-effective amendment has become effective, the Company shall file with the SEC in accordance with Rule 424 under the Securities Act the final prospectus to be used in connection with sales pursuant to such Registration Statement.

(g)     The Company shall use its commercially reasonable efforts to prevent the issuance of any stop order or other suspension of effectiveness of a Registration Statement, or the suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension as early as is reasonably practicable and to notify Legal Counsel and each Investor who holds Registrable Securities being sold of the issuance of such order and the resolution thereof or its receipt of actual notice of the initiation or threat of any proceeding for such purpose.

(h)     Subject to customary confidentiality arrangements in form and substance reasonably satisfactory to the Company, the Company shall make available for inspection (upon reasonable notice and during normal business hours) by any Investor and any underwriter or counterparty in an Alternative Transaction participating in any disposition pursuant to a Registration Statement and any attorney (including Legal Counsel), any accountant or any other professional retained by any such Registration Rights Holder, underwriter or counterparty (collectively, the "**Inspectors**"), all financial and other records, pertinent corporate documents and properties of the Company (collectively, the "**Records**") as shall be reasonably necessary or desirable to enable them to exercise their due diligence responsibility and comply with SEC Guidance, and cause the officers and the employees of the Company to supply all information reasonably requested by any Inspectors in connection with such Registration Statement.  Records that the Company determines, in good faith, to be confidential and that it notifies the Inspectors are confidential shall not be disclosed by the Inspectors unless (i) the disclosure of such Records is necessary to avoid or correct a misstatement or omission in such Registration Statement or related prospectus, (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, (iii) disclosure of such Records is necessary to comply with SEC Guidance, federal or state securities Laws or the rules of any securities

exchange or trading market on which any Common Stock is listed or traded or is otherwise required by applicable Law, SEC Guidance or administrative or legal process, (iv) the information in such Records was known to the Inspectors on a non-confidential basis prior to its disclosure by the Company or has been made generally available to the public other than as a result of a violation of this paragraph (h) or any other agreement or duty of confidentiality, (v) the information in such Records is or becomes available to the public other than as a result of disclosure by any Inspector in violation of the confidentiality agreements or (vi) is or was independently developed by any Inspector without the benefit of the information in such Records. Each Inspector agrees that, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, it shall, to the extent permitted by applicable Law, give notice to the Company and allow the Company, at its expense, to undertake appropriate action to prevent disclosure of the Records deemed confidential.  Nothing in this paragraph (h) (or in any other confidentiality agreement between the Company and any Inspector) shall be deemed to limit the Investors' ability to sell Registrable Securities in a manner which is otherwise consistent with applicable Law.

(i)       The Company shall hold in confidence and not make any disclosure of information concerning an Investor provided to the Company unless (i) the disclosure of such information is necessary to avoid or correct a misstatement or omission in such Registration Statement or related prospectus, (ii) the release of such information is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, (iii) disclosure of such information is necessary to comply with SEC Guidance, federal or state securities Laws or the rules of any securities exchange or trading market on which any Common Stock is listed or traded or is otherwise required by applicable Law, SEC Guidance or administrative or legal process, (iv) the information in such information was known to the Company on a non-confidential basis prior to its disclosure by the Investors or has been made generally available to the public other than as a result of a violation of this paragraph (i) or any other agreement or duty of confidentiality, (v) such information is or becomes available to the public other than as a result of disclosure by the Company in violation of the confidentiality agreements or (vi) is or was independently developed by the Company. The Company agrees that it shall, upon learning that disclosure of such information concerning an Investor is sought in or by a court or other Governmental Authority of competent jurisdiction or through other means, give prompt written notice to such Investor and allow such Investor, at the Investor's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

(j)       The Company shall use its commercially reasonable efforts to cause all of the Registrable Securities covered by a Registration Statement to be listed on each securities exchange on which securities of the same class or series issued by the Company are then listed, if any, if the listing of such Registrable Securities is then permitted under the rules of such exchange.  The Company shall pay all fees and expenses in connection with satisfying its obligation under this Section 3(j).

(k)       The Company shall cooperate with the Investors who hold Registrable Securities being offered and, to the extent applicable, facilitate the timely preparation and delivery of certificates (not bearing any restrictive legend if such shares are sold pursuant to a Registration Statement to a person who is not an affiliate of the Company) representing the Registrable Securities to be offered pursuant to a Registration Statement and enable such certificates to be in

13

such denominations or amounts, as the case may be, as the Investors may reasonably request and registered in such names as the Investors may request.

(l)     If requested by an Investor, the Company shall as soon as reasonably practicable (i) incorporate in a prospectus supplement or post-effective amendment such information as an Investor reasonably requests to be included therein relating to the sale and distribution of Registrable Securities, including, without limitation, information with respect to the number of Registrable Securities being offered or sold, the manner of such sale and distribution, the purchase price being paid therefor and any other terms of the offering of the Registrable Securities to be sold in such offering; (ii) make all required filings of such prospectus supplement or post-effective amendment after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment; and (iii) supplement or make amendments to any Registration Statement if reasonably requested by an Investor holding any Registrable Securities.

(m)     The Company shall use its commercially reasonable efforts to cause the Registrable Securities covered by a Registration Statement to be registered with or approved by such other Governmental Authorities as may be necessary to consummate the disposition of such Registrable Securities as contemplated by the Registration Statement.

(n)     The Company shall make generally available to its security holders as soon as practical, but not later than 90 days after the close of the period covered thereby, an earnings statement (in form complying with, and in the manner provided by, the provisions of Rule 158 under the Securities Act) covering a twelve-month period beginning not later than the first day of the Company's fiscal quarter next following the applicable Effective Date of a Registration Statement.

(o)     The Company shall otherwise use its commercially reasonable efforts to comply with all SEC Guidance in connection with any Registration Statement.

(p)     Within two Business Days after a Registration Statement which covers Registrable Securities is ordered effective by the SEC, the Company shall deliver, and shall cause legal counsel for the Company to deliver, to the transfer agent for such Registrable Securities (with copies to the Investors whose Registrable Securities are included in such Registration Statement) confirmation that such Registration Statement has been declared effective by the SEC.  The Company shall provide such confirmation to any underwriters or counterparties in Alternative Transactions covered by such Registration Statement.

(q)     In connection with any Underwritten Offering or Alternative Transaction:

(i)     The Company shall enter into any underwriting or other agreements that are reasonably necessary to complete transactions of such type, which agreements shall provide for representations, warranties, covenants and indemnities that are customary for transactions of such type;

(ii)     The Company shall furnish to each Investor and to each underwriter in an Underwritten Offering or counterparty in an Alternative Transaction, if any, a signed counterpart, addressed to such underwriter or counterparty, of (A) an opinion or opinions of

14

counsel to the Company and (B) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the kind customarily covered by opinions or comfort letters, as the case may be, any Investor or the lead managing underwriter (or lead counterparty, as the case may be) therefor reasonably requests;

(iii)    Prior to filing or submitting to the SEC or any other Governmental Authority or distributing publicly any materials (including free writing prospectuses, prospectus supplements, materials to be incorporated by reference in the relevant Registration Statement and amendments or supplements to the relevant Registration Statement) related to such Underwritten Offering or Alternative Transaction, the Company shall afford counsel to any underwriter or counterparty in such Alternative Transaction a reasonable opportunity to review and comment on any such materials, and the Company shall use commercially reasonable efforts to address any such comments; and

(iv)    The Company shall take all other actions as are reasonably required in order to expedite or facilitate the disposition of such Registrable Securities in any such Underwritten Offering or Alternative Transaction, including, if required, (A) engaging a "qualified independent underwriter" in connection with the qualification of the underwriting arrangements with FINRA, (B) providing reasonable cooperation to any underwriters or counterparties in Alternative Transactions in their filings with FINRA, (C) causing its senior management, upon reasonable request and at reasonable times to prepare and make presentations at any "road shows" in connection with Underwritten Offerings and Alternative Transactions and otherwise cooperate as requested by the underwriters or counterparties in an Alternative Transaction in the offering, marketing or selling of the Registrable Securities, (D) including in such Registration Statement such additional information for marketing purposes as the managing underwriter or counterparty in an Alternative Transaction reasonably requests (which information may be provided by means of a prospectus supplement if permitted by SEC Guidance), (E) furnishing the underwriters or counterparties in Alternative Transactions such number of copies of such Registration Statement, each amendment and supplement thereto filed with the SEC (in each case including all exhibits thereto and documents incorporated by reference therein), the prospectus included in such Registration Statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424, Rule 430A, Rule 430B or Rule 430C under the Securities Act and such other documents as such underwriters or counterparties may reasonably request in order to facilitate the disposition of the Registrable Securities.

(r)    Neither the Company nor any subsidiary or affiliate thereof shall identify any Investor as an "underwriter" in any public disclosure or filing with the SEC or any Eligible Market without the prior written consent of such Investor (it being understood, that if the Company is required to name such Investor as an "underwriter" in such Registration Statement by the SEC (after a good faith discussion with the SEC to lift such requirement, including, without limitation, any reduction in the number of Registrable Securities of such Investor to be registered on such Registration Statement (to the extent necessary to lift such requirement)), such Investor shall have the option of electing to exclude all such Registrable Securities from such Registration Statement or to be named as an "underwriter" in such Registration Statement").

15

(s)      Neither the Company nor any of its subsidiaries has entered, as of the date hereof, nor shall the Company or any of its subsidiaries, on or after the date of this Agreement, except with respect to the New Registration Rights Agreement, enter into any agreement with respect to its securities, that would have the effect of impairing the rights granted to the Investor in this Agreement or otherwise conflicts with the provisions hereof.

4.      OBLIGATIONS OF THE INVESTORS.

(a)      At least five Business Days prior to the first anticipated filing date of a Registration Statement, the Company shall notify each Investor in writing (which may be by email) of the information the Company requires from each such Investor if such Investor elects to have any of such Investor's Registrable Securities included in such Registration Statement.  It shall be a condition precedent to the obligations of the Company to complete any registration pursuant to this Agreement with respect to the Registrable Securities of a particular Investor that such Investor shall furnish to the Company such information regarding itself, the Registrable Securities held by it and the intended method of disposition of the Registrable Securities held by it as shall be reasonably required to effect and maintain the effectiveness of the registration of such Registrable Securities and shall execute such documents in connection with such registration as the Company may reasonably request.

(b)      Each Investor, by such Investor's acceptance of the Registrable Securities, agrees to cooperate with the Company as reasonably requested by the Company in connection with the preparation and filing of any Registration Statement hereunder, unless such Investor has notified the Company in writing (which may be by email) of such Investor's election to exclude all of such Investor's Registrable Securities from such Registration Statement.

(c)      Each Investor agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(g) or the first sentence of Section 3(f), such Investor will immediately discontinue disposition of Registrable Securities pursuant to any Registration Statement(s) covering such Registrable Securities until such Investor's receipt of copies of the supplemented or amended prospectus as contemplated by Section 3(g) or the first sentence of Section 3(f) or receipt of notice that no supplement or amendment is required. Notwithstanding anything to the contrary, the Company shall cause its transfer agent to deliver unlegended shares of Common Stock to a transferee of an Investor in connection with any sale of Registrable Securities with respect to which an Investor has entered into a contract for sale prior to the Investor's receipt of a notice from the Company of the happening of any event of the kind described in Section 3(g) or the first sentence of Section 3(f) and for which the Investor has not yet settled.

(d)      Each Investor covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it or an exemption therefrom in connection with sales of Registrable Securities pursuant to the Registration Statement.

5.      EXPENSES OF REGISTRATION.  All reasonable expenses, other than underwriting discounts and commissions, incurred in connection with registrations, filings or qualifications pursuant to Sections 2 and 3, including, without limitation, all registration, listing and qualifications fees, printers and accounting fees, and fees and disbursements of counsel for the

Company shall be paid by the Company.  In connection with each registration pursuant to Section 2, the Company shall reimburse the Required Holders for the reasonable fees and disbursements of the Legal Counsel, which reimbursement amount shall not exceed $100,000 per registration without the prior approval of the Company

6.      INDEMNIFICATION.

In the event any Registrable Securities are included in a Registration Statement under this Agreement:

(a)      To the fullest extent permitted by Law, the Company will, and hereby does, indemnify, hold harmless and defend each Investor, the directors, officers, partners, members, employees, agents, representatives of, and each Person, if any, who controls any Investor within the meaning of the Securities Act or the Exchange Act (each, an "**Indemnified Person**"), against any losses, claims, damages, liabilities, judgments, fines, penalties, charges, costs, reasonable attorneys' fees, amounts paid in settlement or expenses, joint or several (collectively, "**Claims**"), incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or other Governmental Authority, whether pending or threatened, whether or not an indemnified party is or may be a party thereto ("**Indemnified Damages**"), to which any of them may become subject insofar as such Claims (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon: (i) any untrue statement or alleged untrue statement of a material fact in a Registration Statement or any post-effective amendment thereto or in any filing made in connection with the qualification of the offering under the securities or other "blue sky" Laws of any jurisdiction in which Registrable Securities are offered ("**Blue Sky Filing**"), or the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading or (ii) any untrue statement or alleged untrue statement of a material fact contained in any preliminary prospectus if used prior to the effective date of such Registration Statement, or contained in the final prospectus (as amended or supplemented, if the Company files any amendment thereof or supplement thereto with the SEC) or the omission or alleged omission to state therein any material fact necessary to make the statements made therein, in light of the circumstances under which the statements therein were made, not misleading (the matters in the foregoing clauses (i) and (ii) being, collectively, "**Violations**"). Subject to Section 6(c) hereof, the Company shall reimburse the Indemnified Persons, promptly as such expenses are incurred and are due and payable, for any reasonable legal fees or other reasonable expenses incurred by them in connection with investigating or defending any such Claim.  Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6(a): (i) shall not apply to a Claim by an Indemnified Person arising out of or based upon a Violation which occurs in reliance upon and in conformity with information furnished in writing to the Company by such Indemnified Person for such Indemnified Person expressly for use in connection with the preparation of the Registration Statement or any such amendment thereof or supplement thereto, if such prospectus was timely made available by the Company pursuant to Section 3(d); (ii) shall not apply to expenses or damages which arise out of an Indemnified Person's failure to send or give a copy of the final prospectus, as the same may be then supplemented or amended, within the time required by the Securities Act to the Person asserting the existence of an untrue statement or alleged untrue statement or omission or alleged omission at or prior to the written confirmation of the sale of

17

Registrable Securities to such Person if such statement or omission was corrected in such final prospectus or an amendment or supplement thereto; and (iii) shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Indemnified Person and shall survive the transfer of any of the Registrable Securities by any of the Investors pursuant to Section 9.

(b)     In connection with any Registration Statement in which an Investor is participating, each such Investor agrees to severally and not jointly indemnify, hold harmless and defend, to the same extent and in the same manner as is set forth in Section 6(a), the Company, each of its directors, each of its officers who signs the Registration Statement and each Person, if any, who controls the Company within the meaning of the Securities Act or the Exchange Act (each, an "**Indemnified Party**"), against any Claim or Indemnified Damages to which any of them may become subject, under the Securities Act, the Exchange Act or otherwise, insofar as such Claim or Indemnified Damages arise out of or are based upon any Violation, in each case to the extent, and only to the extent, that such Violation occurs in reliance upon and in conformity with written information furnished to the Company by such Investor expressly for use in connection with such Registration Statement; and, subject to Section 6(c), such Investor shall reimburse the Indemnified Party for any legal or other expenses reasonably incurred by an Indemnified Party in connection with investigating or defending any such Claim; provided, however, that the Investor shall be liable under this Section 6(b) for only that amount of a Claim or Indemnified Damages as does not exceed the net proceeds to such Investor as a result of the sale of Registrable Securities pursuant to such Registration Statement. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Indemnified Party and shall survive the transfer of the Registrable Securities by the Investors pursuant to Section 9.

(c)     Promptly after receipt by an Indemnified Person or Indemnified Party under this Section 6 of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving a Claim, such Indemnified Person or Indemnified Party shall, if a Claim in respect thereof is to be made against any indemnifying party under this Section 6, deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person or the Indemnified Party, as the case may be; *provided*, *however*, that an Indemnified Person or Indemnified Party shall have the right to retain its own counsel with the fees and expenses of not more than one counsel for all such Indemnified Person or Indemnified Party to be paid by the indemnifying party, if, in the reasonable opinion of counsel retained by the Indemnified Person or Indemnified Party, as applicable, the representation by such counsel of the Indemnified Person or Indemnified Party and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person or Indemnified Party and any other party represented by such counsel in such proceeding.  In the case of an Indemnified Person, legal counsel referred to in the immediately preceding sentence shall be selected by the Investors holding at least a majority in interest of the Registrable Securities included in the Registration Statement to which the Claim relates.  The Indemnified Party or

18

Indemnified Person shall reasonably cooperate with the indemnifying party in connection with any negotiation or defense of any such action or Claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party or Indemnified Person which relates to such action or Claim.  The indemnifying party shall keep the Indemnified Party or Indemnified Person fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto.  No indemnifying party shall be liable for any settlement of any action, claim or proceeding effected without its prior written consent, provided, however, that the indemnifying party shall not unreasonably withhold, delay or condition its consent.  No indemnifying party shall, without the prior written consent of the Indemnified Party or Indemnified Person, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party or Indemnified Person of a release from all liability in respect to such Claim or litigation and such settlement shall not include any admission as to fault on the part of the Indemnified Party.  Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnified Party or Indemnified Person with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made.  The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability to the Indemnified Person or Indemnified Party under this Section 6, except to the extent that the indemnifying party is prejudiced in its ability to defend such action.

(d)      The indemnification required by this Section 6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Damages are incurred.

(e)      The indemnity agreements contained herein shall be in addition to (i) any cause of action or similar right of the Indemnified Party or Indemnified Person against the indemnifying party or others and (ii) any liabilities the indemnifying party may be subject to pursuant to the Law.

7.      CONTRIBUTION.

To the extent any indemnification by an indemnifying party is prohibited or limited by Law, the indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under Section 6 to the fullest extent permitted by Law; *provided*, *however*, that: (i) no Person involved in the sale of Registrable Securities which Person is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) in connection with such sale shall be entitled to contribution from any Person involved in such sale of Registrable Securities who was not guilty of fraudulent misrepresentation; and (ii) contribution by any seller of Registrable Securities shall be limited in amount to the amount of net proceeds received by such seller from the sale of such Registrable Securities pursuant to such Registration Statement.

8.      REPORTS UNDER THE EXCHANGE ACT.

19

With a view to making available to the Investors the benefits of Rule 144 promulgated under the Securities Act or any other similar rule or regulation of the SEC that may at any time permit the Investors to sell securities of the Company to the public without registration ("**Rule 144**"), the Company agrees to:

(a)    make and keep public information available, as those terms are understood and defined in Rule 144;

(b)    file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act so long as the Company remains subject to such requirements and the filing of such reports and other documents is required for the applicable provisions of Rule 144; and

(c)    furnish to each Investor so long as such Investor owns Registrable Securities, promptly upon request, (i) a written statement by the Company, if true, that it has complied with the reporting requirements of Rule 144, the Securities Act and the Exchange Act, (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested to permit the Investors to sell such securities pursuant to Rule 144 without registration; *provided*, that any such item which is available on the SEC's EDGAR System (or successor thereto) need not be furnished in physical form.

9.    ASSIGNMENT OF REGISTRATION RIGHTS.

The rights and obligations under this Agreement shall be automatically assignable by the Investors to any transferee of all or any portion of such Investor's Registrable Securities if: (i) the Investor agrees in writing with the transferee or assignee to assign such rights and obligations and a copy of such agreement is furnished to the Company within a reasonable time after such assignment; (ii) the Company is, within a reasonable time after such transfer or assignment, furnished with written notice of (a) the name and address of such transferee or assignee, (b) the securities with respect to which such registration rights and obligations hereunder are being transferred or assigned and (c) any other information which the Company requests in order to reflect such transferee as a selling stockholder in the Registration Statement; (iii) immediately following such transfer or assignment the further disposition of such securities by the transferee or assignee is restricted under the Securities Act or applicable state securities Laws; and (iv) at or before the time the Company receives the written notice contemplated by clause (ii) of this sentence the transferee or assignee agrees in writing with the Company to be bound by all of the provisions contained herein.

10.    AMENDMENT OF REGISTRATION RIGHTS.

Provisions of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Required Holders; *provided* that any such amendment or waiver that complies with the foregoing but that disproportionately, materially and adversely affects the rights and obligations of any Investor relative to the comparable rights and obligations of the other Investors shall require the prior written consent of such adversely

affected Investor.  Any amendment or waiver effected in accordance with this Section 10 shall be binding upon each Investor and the Company.  No such amendment shall be effective to the extent that it applies to less than all of the holders of the Registrable Securities. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of this Agreement unless the same consideration (other than the reimbursement of legal fees) also is offered to all of the parties to this Agreement.

11.     MISCELLANEOUS.

(a)     Entire Agreement.  This Agreement supersedes all other prior oral or written agreements between the Investors, the Company, their affiliates and persons acting on their behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and, except as specifically set forth herein, neither the Company nor any Investor makes any representation, warranty, covenant or undertaking with respect to such matters.

(b)     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns, including any transferees of Registrable Securities permitted under Section 9.  The Company shall not assign this Agreement or any rights or obligations hereunder, including by way of a fundamental change, without the prior written consent of the Required Holders.  No purchaser of any of the Common Stock from an Investor shall be deemed a successor or assign by reason merely of such purchase; provided, however, that an Investor may assign some or all of its rights hereunder without the consent of the Company to any permitted assignee, in which event such assignee shall be deemed to be an Investor hereunder with respect to such assigned rights. For the avoidance of doubt, and without limiting the rights of a permitted assignee hereunder, the assignment of this Agreement to a permitted assignee shall not relieve the Company of any obligations to an Investor for any fees, reimbursement of expenses, indemnification or any other payments hereunder.

(c)     No Third Party Beneficiaries.  This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person, except that each Indemnified Person shall have the right to enforce the obligations of the Company with respect to Section 6.

(d)     Notices.  Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon transmission, when delivered by email or facsimile; or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same.  The addresses, facsimile numbers and e-mail addresses for such communications shall be:

If to the Company:

Halcón Resources Corporation
1801 California Street, Suite 3500

21

Denver, Colorado 80202
Attention:  David S. Elkouri
Executive Vice President and Chief Legal Officer
(delkouri@halconresources.com)

With copies (which shall not constitute notice to the Company) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Attn.:  Gary Holtzer, Esq.
(Gary.Holtzer@weil.com)
Alfredo R. Pérez, Esq.
(Alfredo.Perez@weil.com)
Frank R. Adams, Esq.
(Frank.Adams@weil.com)
Lauren Tauro, Esq.
(Lauren.Tauro@weil.com)

If to an Investor:

To the individual named on the Investor's signature page
With a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas New York, NY 10019-6064
Attention: Andrew N. Rosenberg, David S. Huntington, and Robert A. Britton
E-mail addresses: arosenberg@paulweiss.com; dhuntington@paulweiss.com; and rbritton@paulweiss.com

Any party to this Agreement may change such address for notices by sending to the parties to this Agreement written notice of a new address for such purpose.

(e)     Specific Performance.  The parties acknowledge that money damages are not an adequate remedy for violations of this Agreement and that any party may, in its sole discretion, apply to a court of competent jurisdiction for specific performance or injunctive or such other relief as such court may deem just and proper in order to enforce this Agreement or prevent any violation hereof and, to the extent permitted by applicable Law, each party waives any objection to the imposition of such relief, this being in addition to any other remedy to which such party is entitled at law or in equity.

(f)     Governing Law; Jurisdiction; Jury Trial.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal Laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the Laws of any jurisdictions other than the State of New York.  Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts

22

sitting in the City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by Law. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(g)     Headings.  The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(h)     Extensions; Waivers.  Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  Any such extension or waiver will be valid only if set forth in a writing signed by the party to be bound thereby.  No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.  Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

(i)     Severability.  If any provision of this Agreement is prohibited by Law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Agreement so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.  The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

23

(j)      <u>Counterparts</u>.  This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically in Portable Document Format shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment.

(k)      <u>No Strict Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(l)      <u>Further Assurances</u>.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(m)      <u>Several and not Joint</u>.  Notwithstanding any other provision of this Agreement, the rights, duties, and obligations of each Investor hereunder are several and not joint, and no Investor shall be liable hereunder for the duties or obligations of any other Investor.  No Investor makes any representation or warranty hereunder to or for the benefit of any other Investor.

[<em>Signature Page Follows</em>]

24

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**COMPANY:**

**HALCÓN RESOURCES CORPORATION**

By:_____
      Name:
      Title:

[*Signature Page to Registration Rights Agreement*]

**INVESTORS:**

[_____]

[*Signature Page to Registration Rights Agreement*]

**Exhibit D**

**Schedule of Retained Causes of Action**

## SCHEDULE OF RETAINED CAUSES OF ACTION

Section 10.11 of the *Joint Prepackaged Chapter 11 Plan of Halcón Resources Corporation and Its Affiliated Debtors* (the "**Plan**")[1] provides that except as otherwise provided in the Plan, including sections 10.6, 10.7, 10.8, and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action against parties with a relationship with the Debtors.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses, including any actions specifically enumerated in the Plan Supplement (as amended and supplemented), as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, including Causes of Action that are not expressly identified in this Schedule of Retained Causes of Action.**  Unless any Causes of Action against an Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person will vest in the Reorganized Debtors.  The applicable Reorganized Debtor, through its authorized agents or representatives, will retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

Below are specific Causes of Actions expressly identified and preserved by the Debtors and the Reorganized Debtors, subject to the terms of the Plan and the information provided in this Exhibit D.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

| Debtor Person | Counterparty(ies) | Nature of Dispute |
|---|---|---|
| Halcón Energy Properties, Inc. | Morascyzk & Polochak, Attorneys at Law, and Co-Exprise, Inc., d/b/a C-Energy | Appeal of Pennsylvania state court judgment entered against Halcón Energy Properties, Inc. for breach of contract claims. |

In addition to the foregoing, unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve their rights with respect to all Causes of Action that are not expressly released under the Plan, including the following:

1. Contract or Tort Causes of Action

The Debtors and Reorganized Debtors, as applicable, expressly reserve all Causes of Action based in whole or in part upon contracts or tort.  The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics', artisans', warehousemen's, materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; and (h) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

2. Causes of Action Related to Insurance Policies

The Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies and occurrence contracts to which any Debtor or Reorganized Debtor is or was a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, including Causes of Action against current or former insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, overpayment of premiums and fees, breach of contract or any other matters.

3. Causes of Action Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings

The Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit or

collateral owed by any creditor, lessor, utility, supplier, vendor, landlord, sub-lessee, assignee or other Person.

4.   Causes of Action Related to Liens

Unless otherwise released by the DIP Orders, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.

5.   Causes of Action Related to Defenses, Cross-Claims and Counter-Claims Related to Litigation and Potential Litigation

The Debtors expressly reserve all Causes of Action against or related to all Persons that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, including all actual or potential (a) contract and tort actions that may exist or may subsequently arise, (b) actions relating to environmental and product liability matters, and (c) actions arising out of, or relating to, the Debtors' intellectual property rights.  For the avoidance of doubt, nothing herein shall be read as an admission as to the validity or allowance of any claim against any Debtor, and any and all prepetition claims against the Debtors that may be identified herein shall be treated in accordance with the Plan and the Bankruptcy Code.

6.   Causes of Action Related to Accounts Receivable and Accounts Payable

The Debtors expressly reserve all Causes of Action against or related to all Persons that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Person is expressly identified in the Plan or the Plan Supplement.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Persons who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them.

7.   Causes of Action Related to Taxes, Fees, and Tax or Fee Refunds or Credits

The Debtors expressly reserve all Causes of Action against or related to all Persons that owe or that may in the future owe money related to tax or fee refunds, credits, overpayments, recoupments or offsets that may be due and owing to the Debtors or Reorganized Debtors. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Persons that assert or may assert that the Debtors or Reorganized Debtors owe taxes to them.

**The Debtors reserve all rights to amend, revise, or supplement this Exhibit D to the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.**

3

## Exhibit E

### New Board Disclosure

The initial board of directors of Halcón Resources Corporation, as reorganized (the "**New Board**"), will be chosen in accordance with section 5.6 of the Plan. The New Board shall be set at five to seven directors and shall consist of the Debtors' chief executive officer and members selected by the Requisite Creditors. The composition of the boards of directors of each Reorganized Debtor, as applicable, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

## Exhibit F

**Amended Certificate of Incorporation of Reorganized Halcón Resources Corporation**

**FORM OF AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
HALCÓN RESOURCES CORPORATION**[1]

Halcón Resources Corporation, a Delaware corporation (the "***Corporation***"), organized and existing under the provisions of the Delaware General Corporation Law (the "***DGCL***"), hereby certifies as follows:

1.        The present name of the Corporation is Halcón Resources Corporation. The Corporation was originally incorporated under the name Tremisis Energy Acquisition Corporation.

2.        This Amended and Restated Certificate of Incorporation (the "***Certificate of Incorporation***") restates and integrates and further amends the Certificate of Incorporation, and has been duly adopted pursuant to the Joint Prepackaged Chapter 11 Plan of Halcón Corporation and its Affiliated Debtors [Docket No. 20], filed in the chapter 11 cases of Halcón Resources Corporation et al. in the United States Bankruptcy Court for the Southern District of Texas, Case No. 19-34446 (DRJ) (as it may be amended, modified or supplemented from time to time), and thereby has been approved pursuant to Section 303 of the DGCL.

3.        This Amended and Restated Certificate of Incorporation shall become effective as of [•], 2019 (the "***Certificate Effective Time***").

4.        The text of the Certificate of Incorporation is hereby restated and integrated and further amended to read in its entirety as follows:

**FIRST:** The name of the corporation is Halcón Resources Corporation (the "***Corporation***").

**SECOND:** The Corporation's registered office in the State of Delaware is located at 1675 S. State Street, Suite B, Dover, Kent County, Delaware 19901. The name of its registered agent at such address is Capitol Services, Inc.

**THIRD:** The purpose of the Corporation shall be to engage in any lawful act or activity for which corporations may be organized under the DGCL.

**FOURTH:** The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is 1,001,000,000, of which 1,000,000,000 shares shall be common stock, par value $0.0001 per share ("***Common Stock***") and 1,000,000 shares shall be preferred stock, par value $0.0001 per share ("***Preferred Stock***").

   A.        <u>Preferred Stock</u>. The Board of Directors is expressly granted authority to

---

[1]   **Note to Draft**:  This Form of Amended and Restated Certificate of Incorporation is for discussion purposes only and shall not bind the Corporation or any other person until duly adopted in accordance with the Corporation's existing governing documents and applicable law.  To be revised to reflect the terms of any Stockholders Agreement (as defined in the draft Form of Sixth Amended and Restated Bylaws of the Company).

issue shares of the Preferred Stock, in one or more series, and to fix for each such series such voting powers, full or limited, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issue of such series (a "***Preferred Stock Designation***") and as may be permitted by the DGCL. The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting power of all of the then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors (the "***Voting Stock***"), voting together as a single class, without a separate vote of the holders of the Preferred Stock, or any series thereof, unless a vote of any such holders is required pursuant to any Preferred Stock Designation.

B.      Common Stock. Except as otherwise required by law or as otherwise provided in any Preferred Stock Designation, the holders of the Common Stock shall exclusively possess all voting power and each share of Common Stock shall have one vote.

C.      No Non-Voting Equity. To the extent provided by Section 1123(a)(6) of chapter 11 of title 11 of the United States Code, the Corporation shall not be permitted to issue any non-voting equity securities; provided, however, that this provision (i) shall have no further force or effect beyond that requirement under Section 1123 of the United States Code, (ii) shall have no force and effect, if any, only for so long as Section 1123 of the United States Code is in effect and applicable to the Corporation and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

D.      HSR Restriction. Notwithstanding any provision herein to the contrary, in connection with any acquisition of common stock (and/or any other voting securities of the Corporation) as to which the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "***HSR Act***"), would, but for this paragraph, be applicable, any person or entity (as defined under the HSR Act) acquiring such common stock (and/or other voting securities of the Corporation) shall have no right to vote such common stock or voting securities until such person or entity has complied with the filing and waiting period requirements of the HSR Act.

[E.      Dividends. Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock, dividends may be declared and paid on the Common Stock out of funds legally available therefor at such times and in such amounts as the Board in its discretion shall determine.][2]

F.      Dissolution, Liquidation or Winding Up. Upon the dissolution, liquidation or winding up of the Corporation, subject to the rights, if any, of the holders of any outstanding series of Preferred Stock, the holders of the Common Stock shall be entitled to receive the assets of the Corporation available for distribution to its stockholders ratably in proportion to the number of shares of Common Stock held by them.

---

[2]     **Note to Draft:** Keep if public company.

2

**FIFTH:** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the authority and powers conferred upon the Board of Directors by the DGCL or other provisions of this Certificate of Incorporation, the Board of Directors is hereby authorized and empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject to the provisions of the DGCL, this Certificate of Incorporation and the bylaws of the Corporation; provided, however, that no bylaws hereafter adopted by the stockholders of the Corporation, or any amendments thereto, shall invalidate any prior act of the Board of Directors that would have been valid if such bylaws or amendment had not been adopted.

A.      Term of Office. The term of office of the members of the Board of Directors shall be classified with respect to the time for which each such member severally holds office into three classes: Class A, Class B and Class C. [Class A shall initially consist of two (2) directors] to be elected for a term expiring at the first annual meeting of the stockholders. Class B shall initially consist of three (3) directors to be elected for a term expiring at the second annual meeting of the stockholders. Class C shall initially consist of two (2) directors to be elected for a term expiring at the third annual meeting of the stockholders.] Each director shall hold office until such director's successor shall be duly elected and shall qualify or until such director's earlier resignation, removal from office, death or incapacity. At each annual meeting of the stockholders commencing upon the first annual meeting of stockholders after the Certificate Effective Time, the successors of the class of directors whose term expires at that meeting shall be elected to hold office for a term expiring at the annual meeting of the stockholders held in the third year following the year of their election. The Board of Directors shall have the right to reassign directors already in their respective classes at the Certificate Effective Time.[3]

B.      Vacancies. Except as the DGCL may otherwise require, in the interim between annual meetings of the stockholders, any vacancies in the Board of Directors, including vacancies resulting from the removal of directors for cause, or resulting from death, resignation, retirement, disqualification, or other cause may be filled by the vote of the remaining directors then in office, although less than a quorum, and each director so chosen shall hold office for the unexpired portion of the full term of the director whose vacancy has been filled, or as otherwise provided by the Board of Directors.

C.      Removal of Directors by Stockholders. Subject to any rights, contractual or otherwise, of any group or groups of shareholders to designate (and to remove such designee) a director to the Board of Directors, pursuant to Section 141(k) of the DGCL, any director or the entire Board of Directors may be removed, with or without cause, by a majority of the shares then entitled to vote at an election of directors. In case any one or more directors be so removed, new directors may be elected at the same time for the unexpired portion of the full term of the director or directors so removed.

---

[3]   **Note to Draft:** Staggered voting to be removed if private.

3

**SIXTH:** The following provisions are inserted for the management of the business and for the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

      A.     Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

      B.     The Board of Directors shall have the power to make, alter, amend, change, add to or repeal the bylaws of the Corporation as provided in the bylaws of the Corporation and without any action on the part of the stockholders, except as may be otherwise provided by applicable law.

      C.     The directors in their discretion may submit any contract or act for approval or ratification at any annual meeting of the stockholders or at any meeting of the stockholders called for the purpose of considering any such act or contract, and any contract or act that shall be approved or be ratified by the vote of the holders of a majority of the stock of the Corporation which is represented in person or by proxy at such meeting and entitled to vote thereat (provided that a lawful quorum of stockholders be there represented in person or by proxy) shall be as valid and binding upon the Corporation and upon all the stockholders as though it had been approved or ratified by every stockholder of the Corporation, whether or not the contract or act would otherwise be open to legal attack because of directors' interests, or for any other reason.

**SEVENTH:** A. A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit. If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of this paragraph A by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation with respect to events occurring prior to the time of such repeal or modification.

      B.     The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he or she is or was a director or officer of the Corporation, or while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order,

4

settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

C.      The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he or she is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection with the defense or settlement of such action or suit if he or she acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

D.      To the extent that a director or officer of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 7.B or 7.C, or in defense of any claim, issue or matter therein, he or she shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection therewith.

E.      Indemnification under Section 7.B or 7.C (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director or officer is proper in the circumstances because he or she has met the applicable standard of conduct set forth in such Section 7.A or 7.B. Such determination shall be made:

(i)      By the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or

(ii)      If such a quorum is not obtainable, or, even if obtainable a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or

(iii)      By the stockholders.

F.      Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding for which such officer or director may be entitled to indemnification hereunder shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as

5

authorized in this ARTICLE SEVENTH.

G.     The indemnification and advancement of expenses provided by, or granted pursuant to, the other sections of this ARTICLE SEVENTH shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

H.     The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of this ARTICLE VII.[4]

**EIGHTH:** Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, or (iv) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.

**NINTH:** [The Corporation shall not be governed by Section 203 of the DGCL.][5]

**TENTH:** The Corporation reserves the right at any time, and from time to time, to amend or repeal any provision contained in this Amended and Restated Certificate of Incorporation, and add other provisions authorized by the laws of the State of Delaware at the time in force, in the manner now or hereafter prescribed by applicable law; and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Amended and Restated Certificate of Incorporation (as amended) are granted subject to the rights reserved in this ARTICLE TENTH.

**[Remainder of Page Intentionally Left Blank]**

---

[4]     **Note to Draft:** Article 7, Sections B-H were taken directly from the company bylaws.
[5]     **Note to Draft:** Keep if public company.

6

IN WITNESS WHEREOF, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of the Corporation on this [•] day of [•], 2019.

HALCÓN RESOURCES CORPORATION

By: _____
Name:
Title:

[Signature Page to Amended and Restated Certificate of Incorporation — Halcón Resources Corporation]

**Exhibit G**

**Amended By-Laws of Reorganized Halcón Resources Corporation**

**FORM OF SIXTH
AMENDED AND RESTATED
BYLAWS
OF
HALCÓN RESOURCES CORPORATION[1]**

ARTICLE I
OFFICES

1.1     Registered Office. The registered office of Halcón Resources Corporation (the "Corporation") in the State of Delaware shall be established and maintained at 1675 South State Street, Suite B, Dover, Kent County, Delaware 19901 and Capitol Services, Inc. shall be the registered agent of the Corporation in charge thereof.

1.2     Other Offices. The Corporation may also have offices at such other places both within and without the State of Delaware as the board of directors of the Corporation (the "Board of Directors") may from time to time determine or the business of the Corporation may require.

ARTICLE II
MEETINGS OF STOCKHOLDERS

2.1     Place of Meetings. All meetings of the stockholders shall be held at such time and place, either within or without the State of Delaware, as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.

2.2     Annual Meetings. The annual meeting of stockholders shall be held on such date and at such time as may be fixed by the Board of Directors and stated in the notice of the meeting, for the purpose of electing directors and for the transaction of only such other business as is properly brought before the meeting in accordance with these Sixth Amended and Restated Bylaws (the "Bylaws"). Written notice of an annual meeting stating the place, date and hour of the meeting, shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the annual meeting. [To be properly brought before the annual meeting, business must be either (i) specified in the notice of annual meeting (or any supplement or amendment thereto) given by or at the direction of the Board of Directors, (ii) otherwise brought before the annual meeting by or at the direction of the Board of Directors, or (iii) otherwise properly brought before the annual meeting by a stockholder. In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation sixty (60) to ninety (90) days before the anniversary of the prior year's meeting; provided, however, that in the event that less than seventy (70) days' notice, or prior public disclosure of the date of

---

[1] **Note to Draft**:  These Form of Sixth Amended and Restated Bylaws are for discussion purposes only and shall not bind the Corporation or any other person until duly adopted in accordance with the Corporation's existing governing documents and/or applicable law.

the annual meeting is given or made to stockholders, notice by a stockholder, to be timely, must be received no later than the close of business on the tenth (10th) day following the day on which such notice of the date of the annual meeting was mailed or such public disclosure was made, whichever first occurs. A stockholder's notice to the Secretary shall set forth (a) as to each matter the stockholder proposes to bring before the annual meeting (i) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, and (ii) any material interest of the stockholder in such business, and (b) as to the stockholder giving the notice (i) the name and record address of the stockholder and (ii) the class, series and number of shares of capital stock of the Corporation which are beneficially owned by the stockholder. Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at the annual meeting except in accordance with the procedures set forth in this Section 2.2. The officer of the Corporation presiding at an annual meeting shall, if the facts warrant, determine and declare to the annual meeting that business was not properly brought before the annual meeting in accordance with the provisions of this Section 2.2, and if such officer should so determine, such officer shall so declare to the annual meeting and any such business not properly brought before the meeting shall not be transacted.][2]

2.3     Special Meetings. Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the Certificate of Incorporation of the Corporation (as amended, the "Certificate of Incorporation"), may only be called by a majority of the entire Board of Directors, or the Chief Executive Officer, and shall be called by the Secretary at the request in writing of stockholders owning a majority in amount of the entire capital stock of the Corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed special meeting. Unless otherwise provided by law, written notice of a special meeting of stockholders, stating the time, place and purpose or purposes thereof, shall be given to each stockholder entitled to vote at such meeting, not less than ten (10) or more than sixty (60) days before the date fixed for the special meeting. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

2.4     Quorum. The holders of a majority of the capital stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business, except as otherwise provided by law or by the Certificate of Incorporation. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the holders of a majority of the votes entitled to be cast by the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder entitled to vote at the meeting.

---

[2] **Note to Draft:** Keep if public company.

2.5      [Voting Procedures and Inspectors at Meetings of Stockholders  The Board, in advance of any meeting of Stockholders, [may/shall][3]appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting and make a written report thereof.  The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting, the person presiding at the meeting [may/shall] appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall (a) ascertain the number of shares outstanding and the voting power of each, (b) determine the shares represented at the meeting and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors and (e) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties.  Unless otherwise provided by the Board, the date and time of the opening and the closing of the polls for each matter upon which the Stockholders will vote at a meeting shall be determined by the person presiding at the meeting and shall be announced at the meeting.  No ballot, proxies, votes or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by a Stockholder shall determine otherwise.  In determining the validity and counting of proxies and ballots cast at any meeting of Stockholders, the inspectors may consider such information as is permitted by applicable law.  No person who is a candidate for office at an election may serve as an inspector at such election.][4]

2.6      Organization. The Chairman of the Board of Directors shall act as chairman of meetings of the stockholders. The Board of Directors may designate any other officer or director of the Corporation to act as chairman of any meeting in the absence of the Chairman of the Board of Directors, and the Board of Directors may further provide for determining who shall act as chairman of any stockholders meeting in the absence of the Chairman of the Board of Directors and such designee. The Secretary of the Corporation shall act as secretary of all meetings of the stockholders, but in the absence of the Secretary the presiding officer may appoint any other person to act as secretary of any meeting.

2.7      Voting. Unless otherwise required by law, the Certificate of Incorporation or these Bylaws, any question brought before any meeting of stockholders shall be decided by the vote of the holders of a majority of the stock represented at any such meeting and entitled to vote thereat; provided that if as of a date that is 14 days in advance of the date the Corporation files its definitive proxy statement (regardless of whether or not thereafter revised or supplemented) with the Securities and Exchange Commission the number of nominees exceeds the number of directors to be elected, the directors shall be elected by the vote of the holders of a plurality of the stock represented at any such meeting and entitled to vote on the election of

---

[3] **Note to Draft:** Delaware corporations with listed stock or more than 2,000 record stockholders are required to have an inspector (See DGCL § 231). If Company has more than 2,000 record stockholders, language should be "shall".

[4] **Note to Draft:** Keep if public company.

directors. Each stockholder represented at a meeting of stockholders shall be entitled to cast one vote for each share of the capital stock entitled to vote thereat held by such stockholder, unless otherwise provided by the Certificate of Incorporation. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize any person or persons to act for him by proxy. All proxies shall be executed in writing and shall be filed with the Secretary of the Corporation not later than the day on which exercised. No proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. The Board of Directors, in its discretion, or the officer of the Corporation presiding at a meeting of stockholders, in his or her discretion, may require that any votes cast at such meeting shall be cast by written ballot.

2.8     Action of Shareholders Without Meeting. Unless otherwise provided by law or the Certificate of Incorporation, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal executive offices, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

2.9     Voting List. The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the election, either at a place within the city, town or village where the election is to be held, which place shall be specified in the notice of the meeting, or, if not specified, at the place where said meeting is to be held. The list shall be produced and kept at the time and place of election during the whole time thereof, and may be inspected by any stockholder of the Corporation who is present.

2.10     Stock Ledger. The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by Section 2.8 of these Bylaws or the books of the Corporation, or to vote in person or by proxy at any meeting of stockholders.

2.11     Adjournment. Any meeting of the stockholders, including one at which directors are to be elected, may be adjourned for such periods as the presiding officer of the meeting or the stockholders present in person or by proxy and entitled to vote shall direct.

4

## ARTICLE III
## DIRECTORS

3.1     <u>Powers; Number; Qualifications</u>. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, except as may be otherwise provided by law or in the Certificate of Incorporation. The number of directors which shall constitute the Board of Directors shall be not less than one (1) nor more than fifteen (15). The exact number of directors shall be fixed from time to time, within the limits specified in this <u>Section 3.1</u> or in the Certificate of Incorporation, by the Board of Directors. Directors need not be stockholders of the Corporation.

3.2     <u>Election; Term of Office; Resignation; Removal; Vacancies</u>. Each director shall hold office until the next annual meeting of stockholders at which his or her class stands for election and until such director's successor shall be duly elected and shall qualify or until such director's earlier resignation, removal from office, death or incapacity. Unless otherwise provided in the Certificate of Incorporation, vacancies and newly created directorships resulting from any increase in the authorized number of directors or from any other cause may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director, and each director so chosen shall hold office [until the next annual meeting at which such appointed director's class stands for election][5] and until such director's successor shall be duly elected and shall qualify, or until such director's earlier resignation, removal from office, death or incapacity.

3.3     [<u>Nominations</u>. To be qualified for election to the Board of Directors of the Corporation at a meeting of stockholders of the Corporation, a person must be nominated by or at the direction of the Board of Directors, by any committee or persons appointed by the Board of Directors or by any stockholder of the Corporation entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in this <u>Section 3.3</u>. Such nominations by any stockholder shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation sixty (60)  to ninety (90) days before the anniversary of the prior year's meeting; provided, however, that in the event that less than seventy (70) days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder, to be timely, must be received no later than the close of business on the tenth (10th) day following the day on which such notice of the date of the meeting was mailed or such public disclosure was made, whichever first occurs. Such stockholder's notice to the Secretary shall set forth (i) as to each person whom the stockholder proposes to nominate for election or reelection as a director, (a) the name, age, business address and residence address of the person, (b) the principal occupation or employment of the person, (c) the class and number of shares of capital stock of the Corporation which are beneficially owned by the person, and (d) any other information relating to the person that is required to be disclosed in solicitations for proxies for election of directors pursuant to the Rules and Regulations of the Securities and Exchange Commission under Section 14 of the Securities Exchange Act of 1934, as amended, and (ii) as to the stockholder giving the notice (a) the name and record address of the stockholder and (b) the class and number of shares of capital stock of

---

[5] **Note to Draft:** Keep if public company.

the Corporation which are beneficially owned by the stockholder. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as a director of the Corporation. The officer of the Corporation presiding at an annual meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the foregoing procedure, and if he should so determine, he shall so declare to the meeting and the defective nomination shall be disregarded.][6]

3.4     Meetings. The Board of Directors of the Corporation may hold meetings, both regular and special, either within or without the State of Delaware. Regular meetings of the Board of Directors may be held without notice at such time and place as shall from time to time be determined by the Board of Directors. Special meetings of the Board of Directors may be called by the Chief Executive Officer or a majority of the entire Board of Directors. Notice thereof stating the place, date and hour of the meeting shall be given to each director either by mail not less than forty-eight (48) hours before the date of the meeting, by telephone, facsimile, electronic mail (including portable document format (.pdf)), or telegram on twenty-four (24) hours notice, or on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances.

3.5     Quorum and Voting. The presence of a majority of the total number of Directors then in office shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board; provided, however, that in no case shall a quorum consist of less than one-third of the total number of Directors that the Corporation would have if there were no vacancies on the Board.  The act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors.

3.6     Organization of Meetings. The Board of Directors shall elect one of its members to be Chairman of the Board of Directors. The Chairman of the Board of Directors shall lead the Board of Directors in fulfilling its responsibilities as set forth in these Bylaws, including its responsibility to oversee the performance of the Corporation, and shall determine the agenda and perform all other duties and exercise all other powers which are, or from time to time may be, delegated to him or her by the Board of Directors. Meetings of the Board of Directors shall be presided over by the Chairman of the Board of Directors, or in his or her absence, by any other officer or director of the Corporation designated by the Board of Directors to act as chairman of any meeting.

3.7     Actions of Board of Directors Without Meeting. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or of such committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

3.8     Resignations. Any director may resign at any time by submitting his or her written or electronic transmission of such resignation to the Board of Directors or Secretary of

---

[6] **Note to Draft:** Keep if public company.

6

the Corporation. Such resignation shall take effect at the time of its receipt by the Corporation unless another time shall be fixed in the resignation, in which case it shall become effective at the time so fixed. The acceptance of a resignation shall not be required to make it effective.

3.9     Committees. The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided by law and in the resolution of the Board of Directors establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but, no such committee shall have the power or authority in reference to (i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval or (ii) adopting, amending or repealing any bylaw of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

3.10    Compensation. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed amount (in cash or other form of consideration) for attendance at each meeting of the Board of Directors or a stated salary as a director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

3.11    Meetings by Means of Conference Telephone. Members of the Board of Directors or any committee designed by the Board of Directors may participate in a meeting of the Board of Directors or of a committee of the Board of Directors by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this subsection shall constitute presence in person at such meeting.

ARTICLE IV
OFFICERS

4.1     General. The officers of the Corporation shall be elected by the Board of Directors and may consist of: a Chairman of the Board, Vice Chairman of the Board, Chief Executive Officer, President, Chief Financial Officer, Secretary and Treasurer. The Board of Directors, in its discretion, may also elect one or more Vice Presidents (including Executive Vice Presidents and Senior Vice Presidents), Assistant Secretaries, Assistant Treasurers, a Controller and such other officers as in the judgment of the Board of Directors may be necessary or desirable. Any number of offices may be held by the same person and more than one person may hold the same office, unless otherwise prohibited by law, the Certificate of Incorporation or these Bylaws. The officers of the Corporation need not be stockholders of the Corporation, nor need such officers be directors of the Corporation.

7

4.2     Election. The Board of Directors shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors; and all officers of the Corporation shall hold office until their successors are chosen and qualified, or until their earlier resignation or removal. Except as otherwise provided in this Article IV, any officer elected by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors. The salaries of all officers who are directors of the Corporation shall be fixed by the Board of Directors.

4.3     Voting Securities Owned by the Corporation. Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chief Executive Officer, President or any Executive Vice President, and any such officer may, in the name and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and powers incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present. The Board of Directors may, by resolution, from time to time confer like powers upon any other person or persons.

4.4     Chief Executive Officer. Subject to the provisions of these Bylaws and to the direction of the Board of Directors, the Chief Executive Officer shall have ultimate authority for decisions relating to the general management and control of the affairs and business of the Corporation and shall perform such other duties and exercise such other powers which are or from time to time may be delegated to him or her by the Board of Directors or these Bylaws, all in accordance with basic policies as established by, and subject to the oversight of, the Board of Directors.

4.5     President. In the absence or disability of the Chief Executive Officer, the President shall perform all the duties of the Chief Executive Officer and when so acting shall have the powers of, and be subject to all the restrictions upon, the Chief Executive Officer. To the extent the President is not also the Chief Executive Officer, the duties of the President shall include, but not be limited to, assisting the Chief Executive Officer in directing the overall business, affairs, operations and officers of the Corporation. Notwithstanding the foregoing, the President shall have the general powers and duties of management usually vested in the office of president of a corporation (as limited by the powers of the Chief Executive Officer), and shall have such other powers and duties as may be prescribed by the Chief Executive Officer, the Board of Directors or these Bylaws.

4.6     Chief Financial Officer. The Chief Financial Officer shall have general supervision, direction and control of the financial affairs of the Corporation and shall perform such other duties and exercise such other powers which are or from time to time may be delegated to him or her by the Board of Directors or these Bylaws, all in accordance with basic policies as established by and subject to the oversight of the Board of Directors. In the absence of a named Treasurer, the Chief Financial Officer shall also have the powers and duties of the

Treasurer as hereinafter set forth and shall be authorized and empowered to sign as Treasurer in any case where such officer's signature is required.

4.7     Vice Presidents. At the request of the Chief Executive Officer or the President or in the absence of the Chief Executive Officer and the President, or in the event of their inability or refusal to act, the Vice President or the Vice Presidents if there is more than one (in the order designated by the Board of Directors) shall perform the duties of the Chief Executive Officer or the President (as applicable), and when so acting, shall have all the powers of and be subject to all the restrictions upon such office. Each Vice President shall perform such other duties and have such other powers as the Board of Directors from time to time may prescribe. If there be no Vice President, the Board of Directors shall designate the officer of the Corporation who, in the absence of the Chief Executive Officer and the President or in the event of the inability or refusal of such officers to act, shall perform the duties of such office, and when so acting, shall have all the powers of and be subject to all the restrictions upon such office.

4.8     Secretary. The Secretary shall attend all meetings of the stockholders and record all the proceedings thereat in a book or books to be kept for that purpose. The Secretary shall also maintain all minutes and records of the proceedings of the Board of Directors and committees of the Board of Directors in a book or books for such purpose. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the Chief Executive Officer, under whose supervision the Secretary shall be. If the Secretary shall be unable or shall refuse to cause to be given notice of all meetings of the stockholders and special meetings of the Board of Directors, then the Chief Executive Officer or any Assistant Secretary shall perform such actions. If there be no Assistant Secretary, then the Board of Directors or the Chief Executive Officer may choose another officer to cause such notice to be given. The Secretary shall have custody of the seal of the Corporation and the Secretary or any Assistant Secretary, if there be one, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the signature of the Secretary or by the signature of any such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature. The Secretary shall see that all books, reports, statements, certificates and other documents and records required by law to be kept or filed are properly kept or filed, as the case may be.

4.9     Treasurer. The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Chief Executive Officer and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his or her transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, the Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his or her office and for the restoration to the Corporation, in case of his or her death, resignation, retirement or removal from

9

office, of all books, papers, vouchers, money and other property of whatever kind in his or her possession or under his or her control belonging to the Corporation.

4.10    Assistant Secretaries. Except as may be otherwise provided in these Bylaws, Assistant Secretaries, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the Chief Executive Officer, the President, any Vice President, or the Secretary, and in the absence of the Secretary or in the event of his or her disability or refusal to act, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary.

4.11    Assistant Treasurers. Assistant Treasurers, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the Chief Executive Officer, the President, any Vice President, or the Treasurer, and in the absence of the Treasurer or in the event of his or her disability or refusal to act, shall perform the duties of the Treasurer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Treasurer. If required by the Board of Directors, an Assistant Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his or her office and for the restoration to the Corporation, in case of his or her death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his or her possession or under his or her control belonging to the Corporation.

4.12    Controller. The Controller shall establish and maintain the accounting records of the Corporation in accordance with generally accepted accounting principles applied on a consistent basis, maintain proper internal control of the assets of the Corporation and shall perform such other duties as the Board of Directors, the Chief Executive Officer, the President or any Vice President of the Corporation may prescribe.

4.13    Other Officers. Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors. The Board of Directors may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

4.14    Vacancies. The Board of Directors shall have the power to fill any vacancies in any office occurring from whatever reason.

4.15    Resignations. Any officer may resign at any time by submitting his or her written or electronic transmission of such resignation to the Corporation. Such resignation shall take effect at the time of its receipt by the Corporation, unless another time shall be fixed in the resignation, in which case it shall become effective at the time so fixed. The acceptance of a resignation shall not be required to make it effective

4.16    Removal. Any officer of the Corporation may be removed at any time, with or without cause, by the Board of Directors.

10

ARTICLE V
CAPITAL STOCK

5.1     Stock Certificates; Uncertificated Shares. Every holder of stock in the Corporation shall be entitled to have a certificate signed, in the name of the Corporation by any two authorized officers of the Corporation representing the number of shares registered in certificate form. Any or all the signatures on the certificate may be a facsimile, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares.

5.2     Signatures. Any or all of the signatures on the certificate may be a facsimile (including portable document format (.pdf)), including, but not limited to, signatures of officers of the Corporation and countersignatures of a transfer agent or registrar. In case an officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

5.3     Lost Certificates. The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate, or his or her legal representative, to advertise the same in such manner as the Board of Directors shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

5.4     Fixing Record Date. In order that the Corporation may determine the stockholders entitled to notice or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than ten (10) days after the date upon which the resolution fixing the record date of action without a meeting is adopted by the Board of Directors, nor more than sixty (60) days prior to any other action. If no record date is fixed:

(a)     The record date for determining stockholders entitled to notice of, or to vote at, a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

11

(b)      The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the first date on which a signed written consent is delivered to the Corporation.

(c)      The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

A determination of stockholders of record entitled to notice of, or to vote at, a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

5.5      Registered Stockholders. Prior to due presentment for transfer of any share or shares, the Corporation shall treat the registered owner thereof as the person exclusively entitled to vote, to receive notifications and to all other benefits of ownership with respect to such share or shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

ARTICLE VI
NOTICES

6.1      Form of Notice. Notices to directors and stockholders, other than notices to directors of special meetings of the Board of Directors which may be given by any means stated in Section 3.4, shall be given in accordance with Section 232 of the DGCL.

6.2      Waiver of Notice. Whenever any notice is required to be given under the provisions of law or the Certificate of Incorporation or by these Bylaws, a written waiver, signed by the person or persons entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular, or special meeting of the stockholders, directors, or members of a committee of directors need be specified in any written waiver of notice unless so required by the Certificate of Incorporation.[7]

ARTICLE VII
GENERAL PROVISIONS

7.1      Reliance on Books and Records. Each director, each member of any committee designated by the Board of Directors, and each officer of the Corporation, shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation, including reports made to the Corporation by any of

---

[7] **Note to Draft:** Indemnification language moved to Articles of Incorporation.

12

its officers, by an independent certified public accountant, or by an appraiser selected with reasonable care.

7.2     Dividends. Subject to the provisions of the Certificate of Incorporation, if any, dividends upon the capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, believe to be proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the directors shall believe conducive to the interest of the Corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

7.3     Checks. All checks or demands for money and notes of the Corporation shall be signed by the Chief Financial Officer or such other persons such officer may from time to time designate.

7.4     Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless the Board of Directors shall choose a different fiscal year from time to time.

7.5     Seal. The Corporation may have a corporate seal in such form as the Board of Directors may from time to time determine. The seal may be used by causing it or a facsimile (including portable document format (.pdf)) thereof to be impressed or affixed or in any manner reproduced.

7.6     Amendments. These Bylaws may be adopted, amended or repealed by the stockholders entitled to vote thereon at any regular or special meeting or, if the Certificate of Incorporation so provides, by the Board of Directors. The fact that such power has been so conferred upon the Board of Directors shall not divest the stockholders of the power nor limit their power to adopt, amend or repeal these Bylaws.

7.7     Interpretation of Bylaws. All words, terms and provisions of these Bylaws shall be interpreted and defined by and in accordance with the Delaware General Corporation Law, as amended from time to time hereafter.

7.8     Stockholders Agreement.  Should the Corporation at any time, or from time to time, be party to a stockholders agreement (a "Stockholders Agreement"), then notwithstanding anything to the contrary contained in these Bylaws, in the event of any conflict between any provision of such Stockholders Agreement and any provision of these Bylaws, such conflicting provision of the Stockholders Agreement shall be incorporated herein as a Bylaw and shall control.

13

## Exhibit H

**Governance Term Sheet**

**Draft 8/30/2019**

Halcón Resources Corporation

<u>Non-Binding Corporate Governance Term Sheet</u>[1]

If the Company deregisters its securities and goes private, the following terms, which will be set forth in a Stockholders' Agreement, to be entered into between the Company and its stockholders, which agreement will not be effective prior to the date immediately following such deregistration.

**A.  Board Representation**:  Upon emergence, the board of directors (the "<u>Board</u>") of Halcón Resources Corporation (the "<u>Company</u>"), will consist of [five - seven] directors:  (a) the CEO, (b) [__] directors appointed by Luminus Management, LLC ("<u>Luminus</u>"), (c) [__] directors appointed by affiliates of Oaktree Capital Management L.P. ("<u>Oaktree</u>") and (d) [__] director appointed by Lion Point Capital L.P. ("<u>Lion Point</u>") and LSP Investment Advisors, LLC ("<u>LSP</u>").  Each director shall have one vote.

Luminus will have the right to appoint [__] directors for so long as it owns at least [__]% of the shares of common equity of the Company held by it as of immediately following emergence (with respect to any holder, as of the time of determination, such holder's "<u>Emergence Shares</u>"), [__] directors for so long as it owns less than [__]% but at least [__]% of its Emergence Shares and [__] director[s] for so long as it owns less than [__]% but at least [__]% of its Emergence Shares.  Oaktree will have the right to appoint [__] directors for so long as it owns at least [__]% of its Emergence Shares and [__] director[s] for so long as it owns less than [__]% but at least [__]% of its Emergence Shares.  Lion Point and LSP will have the collective right to appoint [__] director[s] for so long as they hold, in the aggregate, at least [__]% of their Emergence Shares.  Any appointment right so forfeited may be exercised by the other holders, voting on a pro rata basis in accordance with their holdings of the outstanding common equity.  The shareholder agreement will include a mechanism to reallocate Board seats to reflect significant increases in individual holdings of the outstanding common equity that may occur in the future.

**B.  Specified Approval Matters**:  The following matters require approval of [[__]% of the shares of common equity of the Company [or] [__]% of the directors]:

(1) Entry into a "<u>Sale Transaction</u>" which includes a transaction providing for the direct or indirect sale of a majority or greater of the equity securities of the Company or all or substantially all of the Company's assets (including by means of merger, consolidation, other business combination, share exchange or other reorganization);

(2) Undertake an initial public offering of equity or equity linked securities of the Company;

(3) Restructure, liquidate, or commence bankruptcy proceedings;

---

[1] This term sheet is in draft form, is a preliminary draft, and remains subject to negotiation by the Company and the Ad Hoc Noteholder Group, and each party reserves all of its rights in all respects.

(4) Acquisition or disposition of assets having a value in excess of $[__ million];

(5) Incur additional indebtedness above $[__ million];

(6) Issue preferred equity with a value above $[__ million] or common equity greater than [5]% of outstanding common shares as of immediately following emergence; and

(7) Related party transactions above $[__ million].

C. **Transfer Restrictions**:

(1) Customary tag-along rights in connection with any transfer, series of related transfers or series of transfers occurring over [__] months, in each case to the extent that such transfer(s) represent more than [__]% of the equity interests of the Company;

(2) Customary drag-along rights to require other holders to sell if a holder or group of holders sells more than [__]% of the equity interests of the Company in one or a series of transaction; and

(3) No right of first refusal or first offer.

D. **Other**:

(1) *Pre-emptive Rights*:  If the Company issues any common or convertible equity of or securities convertible into or exchangeable for equity of the Company or its subsidiaries, existing holders shall have customary pre-emptive rights to acquire a portion of such equity, subject to certain customary exceptions and appropriate caps where necessary, including rescue situations.

(2) *Information Rights*:  Customary with notes offered and sold pursuant to Rule 144 under the Securities Act of 1933.  The Company's management will hold calls with holders quarterly, which shall include a Q&A.

(3) *Trading Windows*:  The Company will work with holders to create a trading window each quarter during which affiliates of Board members may acquire or dispose of debt or equity instruments in the Company.

(4) *Amendments*:  Any amendments to the shareholder agreement will require consent of at least [__]% of the holders; provided that any amendment that would materially and adversely affect any holder in a manner that is disproportionate to any other holder, solely in its capacity as such, shall require the prior written consent of the adversely affected holder; provided, further, that the shareholder agreement may be amended by the Board without the consent of any holder for certain customary ministerial matters to be set forth therein.

2

(5) *Confidentiality Agreement*:  Holders shall have the right to enter into confidentiality agreements with proposed purchasers of their common equity in order to facilitate the potential purchase, subject to customary restrictions (*e.g.*, no sales to competitors).

The terms set forth herein are for discussion purposes only and shall not constitute a binding commitment unless and until a definitive agreement setting forth the terms as the parties in their discretion may agree has been executed and delivered by each party.  The parties shall not have any obligation to negotiate definitive terms.

## Exhibit I

**Schedule of Rejected Executory Contracts and Unexpired Leases**

N/A

## Exhibit J

### Reporting Company Election

Pursuant to section 5.8 of the Plan, the Debtors, with the consent of the Requisite Creditors, are required to make a determination as to whether Halcón Resources Corporation, as reorganized, will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp) following December 31, 2019.  While the Debtors have not yet made such determination, they are filing the Governance Term Sheet, attached to this Plan Supplement as Exhibit H, out of an abundance of caution.  The Debtors reserve all rights to amend, revise or supplement the Governance Term Sheet attached to this Plan Supplement as Exhibit H. The Debtors will provide notice of such determination in advance of the Confirmation Hearing to the extent known.