IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

SEP 03 2019

David J. Bradley, Clerk of Court

In re:

HALCON RESOURCES, *et al.*,
Debtors.

Chapter 11
Case No. 19-34446(DRJ)

**EMERGENCY MOTION for Appointment
Of an Unsecured Creditors Committee**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON SEPTEMBER \_\_\_\_\_, 2019 AT \_\_\_\_AM/PM (CDT) IN COURTROOM 400, 4th FLOOR, 515 RUSK STREET, HOUSTON, TX 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN SEPTEMBER 6, 2019.**

---

Unsecured Creditor Michael Sammons[1], *pro se*, hereby files this **EMERGENCY MOTION** seeking an Order directing the Office of the U.S. Trustee to appoint an Unsecured Creditors Committee ("UCC") pursuant to 11 USC §1102(a)(1) in this "complex" designated Chapter 11 case.

---

[1] Mr. Sammons has long been retired, but as the owner of $865,000 in Halcon Resources unsecured notes has a strong interest in this case.

1

In support thereof, Mr. Sammons would show as follows:

**FACTS**

(1) The Office of the U.S. Trustee has been working diligently and tirelessly to establish an Unsecured Creditors Committee; however, its efforts appear to have been unsuccessful because (a) it believes that the law requires a minimum of *three* willing vetted creditors (it only has *two*)[2], and (b) because of a concern that adult members of the same family should not serve together on the same UCC, potentially disqualifying the wife and adult son of Mr. Sammons, who are also major creditors, from serving.[3]

(2) Even a cursory review of the Liquidation Statement in the Disclosure Statement, Dkt. 19, pg. 399, reveals several glaring red flags, materially *understated* asset values and materially *overstated* costs and claims, warranting investigation by professionals to be selected by the UCC.

(3) The discovery responses by the Debtors to date to Mr. Sammons have revealed the following surprising (if not shocking) facts:

---

[2] All large institutional unsecured creditors, who are typically found on most UCCs, have signed an RSA which obligates them to "refrain from taking any action that would delay or impede ... the Prepackaged Plan." Investigating the accuracy of the Liquidation Analysis in the Disclosure Statement, as requested by several unsecured creditors who have already voted against the Plan, would undoubtedly "delay ... the Prepackaged Plan" and likely RSA signees would "tend to steer the committee's focus away from" any such investigation, warranted or not. See e.g. In re Venturelink, 2003 WL 22229419 (ND Tx 2003).

[3] Michael Sammons is owed $864,000 by the Debtors, his wife Dr. Elena Sammons is owed $165,000, and their adult son Mr. Stephen Sammons is owed $60,000. Each has formally applied for appointment to a UCC. (Another institutional creditor was/is under consideration for the third seat although that creditor might have a conflict due the Exit RBL Facility.)

(a) Although the Debtors' Plan values the Debtors' assets at only $450 million, Dkt. 19, pg. 104, a competitor and interested M&A party indicated that it viewed the Debtors assets to be worth **$750 million to $1 billion;** Discovery HAL.0003

(b) A second competitor suggested an M&A transaction which would return over 50% to unsecured creditors indicating a total Halcon asset value of approximately **$900 million;** Discovery HAL.0003

(c) A third competitor offered a substantial sum of *cash* for Halcon's *least* valuable acreage, Discovery HAL.0146, indicating a total market value of the Debtors' assets in the area of **$630 million**, not counting its remaining midstream assets, which private equity firm Fir Tree, now with representation on the Halcon board, estimated in its Feb 4, 2019 Halcon Board Presentation to be worth "**$250 million**" (https://www.firtree.com/Halcon/ boardpresentation.aspx).

> *** *So, in summary, we have **THREE competitors** seriously discussing M&A transactions implicitly valuing Halcon's assets at **$750 mil - $1 billion, $900 mil, and $880 mil** ... a tight valuation range, and all double the Plan's $450 million exit valuation.* **Even a Chapter 7 liquidation limited to just these three competitors would almost certainly exceed the $450 million Plan value.**

(d) And while the Liquidation Analysis in the Disclosure Statement appears to materially *understate* the liquidation value of Debtor

assets in a hypothetical Chapter 7 liquidation, that same analysis appears to also materially *overstate* Chapter 7 costs and total claims by ***radically*** deviating from principles applied in seven comparable E&P Chapter 11 bankruptcy case filed since 2018, several from this very Court (specifically as to "Purchase Price Adjustment Cost" and "General Unsecured Claims").

## ARGUMENT
### The Law Does Not *Require* a Minimum Of *Three* Willing Members to Establish a Chapter 11 UCC

Pursuant to §1102 of the Bankruptcy Code, the United States trustee is **required** to appoint a committee of creditors to serve as an official UCC. 11 U.S.C. § 1102(a)(1). See 7 COLLIER ON BANKRUPTCY ¶1102.02[1], p. 1102-6 (Alan N. Resnick & Henry J. Somme reds., 16th ed.) ("Appointment of an unsecured creditors' committee is mandatory and **the United States trustee must appoint one in all chapter 11 cases**, assuming that there are creditors willing to serve.")(emphasis added).

The crucial function of a UCC is to represent and protect the interests of the unsecured creditors throughout the entire bankruptcy case. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 235, 401 (1978) (creditors' committees will provide "supervision of the debtor in possession and of the trustee, and will protect their constituents' interests.").

As a matter of policy, and more likely as an interpretation of the law, the Office of the U.S. Trustee for Region 7 requires "at least three" willing

unsecured creditors before a UCC will be formed. *Cf.* In re ScripsAmerica, Inc., Case No. 16-11991 (US Bankr. Court Del.)(U.S. trustee appointed UCC with only *two* members).

But, unlike a Chapter 7 case, which *explicitly* requires *exactly* three to eleven UCC members, see 11 USC §705(a), Section 1102(a)(1) for Chapter 11 cases does not specify any required minimum or maximum number of members, but rather simply mandates that "the United State trustee shall appoint a committee."[4]  In the view of Congress, a UCC of only two members would certainly be preferable to no UCC at all (particularly in a complex case).

## Adult Unsecured Creditors Who Are Related by Blood or Marriage Should Not be Disqualified From Serving on a UCC

Mr. Sammons, owed $865,000 by the Debtors, has, along with one other unrelated creditor, been preliminarily vetted for appointment to a UCC. But no qualifying third "willing creditor" in this pre-packaged Chapter 11 bankruptcy has been found so the U.S. trustee might not appoint a UCC *at all*.

But this is not entirely correct, for you see, Dr. Elena Sammons, a Texas licensed cardiac anesthesiologist, is also owed $165,000 by the Debtors and she is willing to serve on a UCC with her husband, as is their adult son, Mr. Stephen Sammons, who is owed $60,000 by the Debtors.

Adult family members are presumed to possess free will and do vote independently of each other in all state and national elections, may serve on

---

[4] There are obvious reasons a UCC might not be required if only one or two creditors were willing to serve in a Chapter 7 liquidation case. A Chapter 7 case, unlike a Chapter 11 case, is handled, virtually from start to finish, by a U.S. trustee. So while §705(a) might prefer a UCC be appointed to watchdog the trustee, in practice this is rarely, if ever, a real concern.

the same jury (even in a murder trial[5]), have been known to disagree on any number of serious matters throughout history, and are presumed in our enlightened age to have *independent adult judgment*. There should be no per se disqualifying presumption of a conflict of interest applied against related adult unsecured creditors willing to serve together on a UCC.

### Complex Chapter 11 Cases Require a UCC

In the vast majority of complex Chapter 11 cases, Congress clearly intended that small creditors, like Mr. and Dr. Sammons, would not need to battle huge companies and their estate financed legions of attorneys and experts alone, and so Congress mandated UCCs to balance the scales with *explicit* authority to retain professionals if necessary to adequately test and verify material Debtor assertions and serve as watchdog over the case.[6]

The simple fact is that small unsecured creditors do not have the specialized knowledge, experience, or means to handle a complex

---

[5] See <u>People v. James Soper</u> (husband & wife served together in State of California 2005 murder case/guilty verdict).

[6] And receiving evidence from both the Debtors and a UCC is essential if the Court is to fulfill its obligations in this case under 1129(a)(7). Because some creditors have already voted to reject the Plan, the Court has an *independent* duty to determine that the requirements of 1129(a)(7) are met. Yet without a UCC, the Court will be forced to accept as gospel the uncontroverted testimony of the Debtors' expert hired guns, even if the Court through its own experience suspects the reliability of such uncontested testimony. The entire carefully constructed Chapter 11 framework envisioned by Congress simply falls apart when one entire side of a complex Chapter 11 case, a UCC, is wholly absent.

Chapter 11 case alone. Mr. Sammons has a very limited knowledge of the Debtors and the E&P industry, while Dr. Sammons has even less such knowledge. But UCCs are structured to allow unsecured creditors, whose common bond is that they are all owed money by the Debtors even if they lack specific financial or legal expertise, to appoint professionals through a UCC who *do* have the necessary specialized knowledge of complex Chapter 11 cases and the involved industry to protect the interests of all creditors. That is exactly how Congress envisioned a Chapter 11 case would be handled – by professionals on *both* sides.

### There is a GLARING Need for a UCC and its Professionals

The management of the Debtors in this case has filed two Chapter 11 cases in three years, essentially wiping out stockholders, causing massive losses to creditors, all while reaping exorbitant MIP benefits[7] and compensation, including a lavish (only recently relinquished) private jet. See https://www.firtree.com/ Halcon/boardpresentation.aspx.

But the Debtors will no doubt argue that, "Your Honor, no UCC is even needed in this case. You can trust us. We have only the best interests of our creditors at heart – the up to $35 million in MIP benefits we might reap, as tempting as they might be to lesser mortals, means nothing to us." Maybe so ... but Congress, in *mandating* a UCC, seems to have been somewhat more circumspect.

---

[7] In this latest Chapter 11 filing, *another* 10% MIP is deemed necessary to retain that rare breed of management which, having steered an asset rich company into Chapter 11 bankruptcy twice in a short three years, *might* now has the experience to avoid a third Chapter 11 filing (at least within the next few years).

7

An unsecured creditor need not show a smoking gun before a bankruptcy court will order a UCC in a complex Chapter 11 case. But even if it were required, *several* smoking guns certainly appear to exist in this case:

(a) Although the Debtors assert that the Plan value of the Debtors is only $450 million[8], *three* separate and independent competitors have indicated that they were interested in exploring M&A transactions implicitly valuing Halcon assets at $750 million to $1 billion, $900 million, and $880 million, respectively; *infra* pg. 3;

(b) The Debtors failed to disclose or reveal that while creditors who participate in a rights equity raise will recovery 22.1%, creditors who elect not participate for some reason will recovery *much* less, perhaps only 18.9%[9] (an estimate because the Debtors refuse to

---

[8] Almost incomprehensibly, based upon the current trading price of Halcon's notes, the recovery value of noteholders under the Plan with this management team will only be 12% (the notes are now trading for 12% of par), see Dkt. 191, pg. 5, equating to a Plan value of even less than the $450 million stated - in fact only about $350 million. No matter the quality of the Debtors' Permian assets, even if worth $880 mil to $1 billion in the hands of other (more successful) Permian operators, *supra* pg. 3 (a)-(c), the market is convinced that new-Halcon under this management will, for a third time, simply waste its valuable assets and newfound cash and eventually file for a *third* Chapter 11. Nothing else possibly explains the vast difference between *three* competitors' estimates of the value of Halcon assets ($880 mil to $1 billion) and the current price of Halcon debt indicating only a 12% creditor recovery and a new-Halcon total asset value of only $350 million.

[9] The obvious question is whether §1129(a)(7), which deals with individual creditor rights, includes those individual creditors who elect not to participate in an equity raise (as the note indenture included no such equity raise requirement to full repayment) as well as those who do elect to participate. Should the §1129(a)(7) bar be the 22.1% recovery rate for creditors electing to participate in the optional equity raise, or the 18.9% recovery rate for those individual creditors electing not to participate in the optional equity raise?

reveal the actual percent unsecured creditors recovery without equity rights participation [10];

(c) While it is certainly appears that the total liquidation value of Halcon's assets could have been drastically understated in the Liquidation Analysis in the Disclosure Statement, the Chapter 7 liquidation "costs" and total "unsecured creditor claims" stated therein are even *more* suspect:

(1) Below is a comparison of the Chapter 7 estimated liquidation expense termed "**Purchase Price Adjustment Costs**" for Halcon and in seven other comparable recent Chapter 11 cases also presenting a Chapter 7 "Liquidation Analysis":

**Chapter 7 E&P "PURCHASE PRICE ADJUSTMENT COST" ($000)**

|  | Case | Total ASSETS | Purch.price adj. | % |
|---|---|---|---|---|
| Ascent Resources | D. Del. 18-10265 | 481,960 | 0 | 0.0% |
| Enduro Resources | D. Del. 18-11174 | 115,301 | 0 | 0.0% |
| EV Energy | D. Del. 18-10814 | 467,100 | 0 | 0.0% |
| Fieldwood Energy | SD Tex 18-30648 | 1,320,762 | 0 | 0.0% |
| **Halcon Resources** | **SD Tex 19-34446** | **558,066** | **41,217** | **7.4%** |
| Jones Energy | SD Tex 18-32112 | 291,845 | 0 | 0.0% |
| Petroquest Energy | SD Tex 18-36322 | 171,209 | 0 | 0.0% |
| R&E Gas Devlopment | WD PA 18-22032 | 148,500 | 0 | 0.0% |

---

[10] Cf. Disclosure Statement in In re Phi, Inc, ND Tex No. 19.30923 (Dkt. 659, pg. 15: "50-55%" depending on rights participation).

"Purchase Price Adjustment Costs" are (a) adjustments to the purchase price to reflect properly matching expenses and revenues incurred prior the actual closing date, (b) adjustments for changes in expected working capital, cash, EBITDA, etc., and (c) they usually net out close to $0 in well-structured transactions:

> For Ascent Resources the "Purchase Price Adjust. Cost" netted to $0.
> For Enduro Resources the "Purchase Price Adjust. Cost" netted to $0.
> For EV Energy the "Purchase Price Adjust. Cost" netted to $0.
> For Fieldwood Energy the "Purchase Price Adjust. Cost" netted to $0.
> For Jones Energy the "Purchase Price Adjustment Cost" netted to $0.
> For Petroquest the "Purchase Price Adjustment Cost" netted to $0.
> For R&E Gas Devel. the "Purchase Price Adjustment Cost" netted to $0.
>
> **For Halcon Resources the "Purchase Price Adjustment Cost" netted to $41,217,000.**

What?!? A smoking gun? – definitely. Explainable – maybe, but certainly calls for at least a cursory investigation by professionals retained by a UCC.

Next we have a comparison of the Chapter 7 estimated liquidation **"General Unsecured Claims,"** which, in our and most cases involve contract rejection claims, particularly rejection of midstream transportation contracts

in E&P cases, for Halcon and seven other recent comparable Chapter 11 cases also presenting a "Liquidation Analysis":

### Chapter 7 E&P "GENERAL UNSECURED CLAIMS" ($000) EXCLUDING DEBT DEFICIENCY CLAIMS

|  | Case | Total ASSETS | Gen. Unsecured Claims | % |
|---|---|---|---|---|
| Ascent Resources | D. Del. 18-10265 | 481,960 | 7,487 | 1.6% |
| Enduro Resources | D. Del. 18-11174 | 115,301 | 6,045 | 5.2% |
| EV Energy | D. Del. 18-10814 | 467,100 | 6 | 0.0% |
| Fieldwood Energy | SD Tex 18-30648 | 1,320,762 | 2,550 | 0.2% |
| **Halcon Resources** | **SD Tex 19-34446** | **558,066** | **284,445** | **51.0%** |
| Jones Energy | SD Tex 18-32112 | 291,845 | 0 | 0.0% |
| Petroquest Energy | SD Tex 18-36322 | 171,209 | 4,361 | 2.5% |
| R&E Gas Devlopment | WD PA 18-22032 | 148,500 | 0 | 0.0% |

E&P "General Unsecured Claims" (excluding debt deficiency claims) are usually comprised of midstream oil and gas transportation contract rejection claims (such is the case for Halcon, per Discovery HAL.00154, showing $269 million in midstream rejection claims), and, at least in the midstream constrained Permian Basin, such midstream rejection claims are usually fully mitigated by the substitution of any number of other Permian operators needing midstream services.

So, as a percent of E&P distributable Chapter 7 assets, rejected midstream claims and other unsecured claims are usually estimated by E&P legal experts at a small fraction of the gross rejection claim. Expressed as a

11

percent of total distributable Chapter 7 assets in the seven comparable E&P Chapter 11 cases listed above we have:

> For Ascent Resources the "General Unsecured Claims" were 1.6%.
> For Enduro Resources the "General Unsecured Claims" were 5.2%.
> For EV Energy the "General Unsecured Claims" were 0.0%.
> For Fieldwood Energy the "General Unsecured Claims" were 0.2%.
> For Jones Energy the "General Unsecured Claims" were 0.0%.
> For Petroquest the "General Unsecured Claims" were 2.5%.
> For R&E Gas Devel. the "General Unsecured Claims" were 0.0%.

**For Halcon Resources the "General Unsecured Claims" are 51.0%.**

What?!? Another smoking gun? – definitely. Explainable – maybe, but certainly calls for at least a cursory investigation by professionals retained by a UCC.

## SUMMARY AND CONCLUSION

Halcon unsecured notes are trading at around 12 indicating that the professional bond market believes the Plan will result in a **12%** recovery to unsecured noteholders (since notes are actively trading at 12% of par), see Dkt. 191, pg. 5, which equates to a total Halcon exit value of $350 million.

The Debtors argue that the bond market is completely and wildly wrong[11] and unsecured notes should be trading at 22.1 because noteholders

---

[11] But see In re VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007)("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.")

will recovery 22.1% under the Plan (or perhaps **18.9%** without participating in an optional equity raise), Dkt. 19, pg. 15.

The Debtors also state that a Chapter 7 liquidation would result in a **17.9%** recovery for unsecured creditors. Dkt. 19, pg. 399.

So in this case we have the Debtors presenting a razor thin difference between Plan value (unsecured creditor recovery rate of perhaps **18.9%** or so for non-equity rights participating creditors, such as Mr. Sammons) vs. the presented Chapter 7 liquidation value (recovery rate of **17.9%**). Unless the Plan recovery rate (18.9%) is equal to or greater than the Chapter 7 liquidation recovery rate (17.9%) the Plan fails under §1129(a)(7) and management loses up to $35 million in management incentive rewards.

To make things even more confusing, *three* competitors have indicated interest in M&A transactions implicitly valuing Halcon assets between $750 mil and $1 billion, $900 million, and $880 million, respectively.[12] ***If even remotely true, Halcon in liquidation is worth far far more than its going concern Plan value.***

As crazy as those different asset values sound there is a logic to the madness. The Debtors have taken over $1 billion in prime assets plus huge cash surpluses and in only three years, **twice** driven Halcon into bankruptcy. Yes, *three* competitors believe the Halcon assets *in their hands* would be worth $880 mil to $1 billion. But logic, and apparently the professional bond market, is *emphatically* saying that those same assets in the hands of this management

---

[12] A logical inference from all this interest is that Halcon's assets, if divided up among these three interested competitors with each paying slightly more specific assets it values the most, might even result in a total "Chapter 7 liquidation value" of over the $880 million to $1 billion range they indicated if there were only a single buyer.

team are only worth $350 million (with a future Chapter 33 bankruptcy more likely than any possible future financial success).[13]

The point is that it appears, based upon the professional bond market as well as three competitors, that the Chapter 7 liquidation value of the Debtors of as much as $1 billion far exceeds the Plan exit value of $450 million the Debtors see, and far far exceeds the Plan exit value of $350 million the professional bond market sees.

But if glaring red flags exist as to the accuracy of the Chapter 7 asset liquidation values stated in the Liquidation Analysis, even more glaring red flags exist concerning the estimated Chapter 7 liquidation expenses and claims, with Halcon's "Purchase Price Adjustment Costs" and "Unsecured Creditors Claims" appearing to be over **10 times** the average or median found in seven recent comparable E&P Chapter 11 cases with similar Chapter 7 Liquidation Analyses.

If the Debtors prevail 100% on every single glaring red flag they survive a 1129(a)(7) challenge by 1% (**18.9%** Plan recovery vs. a Chapter 7 **17.9%** recovery). If the UCC challenges and prevails on *any* of the red flags the Plan fails spectacularly under 1129(a)(7).

Does Mr. Sammons, or any other individual creditor, know *for sure* whether the Debtors fudged the Liquidation Analysis just a few percent to secure their $35 million dollar MIP? Of course not – and *only* the professionals and experts available to a UCC could ever possibly answer that question to the satisfaction of the Court.

---

[13] Which is why private equity firm Fir Tree, with representation now on the Halcon board, stated publically in February, 2019 that the only possible path forward to realize Halcon's true asset value was to sell all its assets to a competitor. https://www.firtree.com/Halcon/boardpresentation.aspx).

Congress never intended a single unsecured creditor in a complex Chapter 11 case to investigate such glaring red flags without a UCC and its estate-funded necessary professionals and experts, and that is why a UCC is mandatory in all but the rarest Chapter 11 cases.

**WHEREFORE**, the Court should ensure compliance in this complex Chapter 11 case with 11 USC 1102(a)(1) by directing the U.S. trustee to appoint an Unsecured Creditors Committee, even if that means only appointing a two member committee and/or using Dr. Elena Sammons and/or Mr. Stephen Sammons, if deemed qualified without regard to family ties.

Respectfully submitted,

*Michael Sammons*
Michael Sammons
1013 10th St # B
Galveston, TX  77550
210-858-6199
michaelsammons@yahoo.com

## Certificate of Service

A true copy of this Objection was served by email on all parties; in addition, the Court Clerk is also requested to file this document in the ECF System for all parties; both this 3nd day of September, 2019.

*Michael Sammons*
Michael Sammons